**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARILYN J. MOSBY,**<br><br>        **Defendant** | **Criminal No. LKG-22-7** |

     The United States of America, by and through its undersigned attorneys, hereby submits this omnibus response to the following pretrial motions filed by the Defendant:

     (1) Defendant Marilyn J. Mosby's Moton to Dismiss Indictment, ECF 17;

     (2) Defendant Marilyn J. Mosby's Motion to Disqualify Counsel, ECF 18; and

     (3) Defendant Marilyn J. Mosby's Motion for a Bill of Particulars, ECF 16.

     For the reasons outlined below, the Defendant's motions are meritless and should be denied.

**<u>REQUEST TO EXCEED PAGE LIMITATIONS</u>**

     The Government chose to respond to three filings in a single response, which required the Government to exceed the 35-page limit in Local Rule 105.3. The Government requests permission to exceed the page limit rather than separate this single filing into three separate filings.

[this space intentionally left blank]

## <u>TABLE OF CONTENTS</u>

I.      BACKROUND ..................................................................................................................... 4

II.     THE DEFENDANT'S MOTION TO DISMISS FOR VINDICTIVE AND SELECTIVE
PROSECUTION IS MERITLESS AND SHOULD BE DENIED ........................................... 11

   A.   No Legal Authority Supports the Defendant's Motion to Dismiss .................................... 14

      *1.   Vindictive Prosecution Occurs When a Defendant is Punished for Exercising a Clearly
Established Right: Defendant Makes No Such Claim Here* .............................................................. 15

      *2.   The Defendant Does Not Cite Any Relevant Authority on Selective Prosecution in Her Motion
Let Alone Meet Her Burden to Establish It* ....................................................................................... 19

      *3.   The Decision to Charge in this Case is Presumptively Lawful and the Defendant Has Not
Proffered Any Evidence to Overcome this Presumption* .................................................................. 20

      *4.   The Defendant's Citations to the Justice Manual are Inapposite* ............................................... 21

      *5.   The Defendant Does Not Cite a Single Case Where a Court Has Dismissed a Superseding
Indictment Based on Factual Assertions Similar to those Made by the Defendant* ........................... 22

   B.   The Defendant Offers No Factual Basis for Her Claims of Animus Because There is None ........ 22

      *1.   An Assistant State's Attorney Tipped Off Wayne Jenkins that He Was Under Investigation; the
Government's Proffer of that Information to the Court is Not a "Smear Campaign" Against the
Defendant* .......................................................................................................................................... 22

      *2.   AUSA Wise Did Not Endeavor to Upend the 2018 State's Attorney's Election by Donating
$200; He Made Three Solicited $100 Contributions in the 2018 Election Cycle to Individuals With
Whom He Had Professional Relationships* ......................................................................................... 29

      *3.   The Defendant Offers No Facts that Support Her Claims of Selective Prosecution* .................. 31

      *4.   The Defendant's Claim About U.S. Attorney Erek Barron Are Irrelevant and the Source of them
is Unreliable* ....................................................................................................................................... 35

      *5.   The Defendant's Claim that the Federal Grand Jury Investigation Began with a Referral from
Bar Counsel is False; It Began Before Bar Counsel's Independent Inquiry* ..................................... 37

      *6.   The Defendant's Claim that the FBI and IRS Interrupted a Meeting at City Hall to Interview the
Defendant's Husband is False; the Agents Waited for 65 Minutes Until a  Board of Estimates
Meeting Ended and Then Interviewed the Defendant's Husband in Private* ...................................... 40

      *7.   The Defendant's Claim that the Government Refused to Meet with Them Are False; the
Government Met with Counsel for the Defendant on September 10, 2021* ......................................... 41

      *8.   The Defendant's Claim that the She Asked to Testify Before the Grand Jury and was
"Precluded" from Doing So is False* .................................................................................................. 43

      *9.   The Defendant's Claim that "the Tax Investigation" was a "Nonstarter" is False* ................. 46

      *10.   The Defendant's Claim that the Government Excluded Exculpatory Evidence from the Grand
Jury are False* ..................................................................................................................................... 47

*11.   The Defendant Has Presented No Evidence that the Timing of the Indictment Was Designed to Affect Her Election* .................................................................................................... 48

III.   THE DEFENDANT'S MOTON TO DISQUALIFY AUSA WISE REPEATS THE SAME PERSONAL ATTACKS AS THE MOTION TO DISMISS AND MAKES THE SAME INACCURATE FACTUAL REPRESENTATIONS; IT IS THEREFORE MERITLESS AND SHOULD BE DENIED .. 49

IV.   THE DEFENDANT IS NOT ENTITLED TO A BILL OF PARTICULARS ............................ 54

   A.   *The Legal Standard Governing Motions for a Bill of Particulars* .................................... 55

   B.   *The Indictment Clearly Advises the Defendant of the Specific Allegations Against Her.* ............... 57

V.   CONCLUSION ..................................................................................................................... 61

[this space intentionally left blank]

## I.      BACKGROUND

A federal grand jury sitting in Baltimore returned a four (4) count Indictment against the Defendant on January 13, 2022, and a Superseding Indictment on March 10, 2022.  The defendant is charged with two counts of perjury, in violation of 18 U.S.C. § 1621 (Counts One and Three) and two counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014 (Counts Two and Four).

Counts One and Three allege that the Defendant committed perjury on two separate occasions.  Count One alleges that on May 26, 2020, the Defendant submitted a request to withdraw $40,000 from her City of Baltimore Deferred Compensation Plan falsely claiming, under penalties of perjury, that she had suffered specific enumerated financial hardships resulting from the COVID-19 pandemic.  Superseding Indictment ¶ 3.  Count Three alleges that on December 29, 2020, the Defendant submitted an additional request to withdraw $50,000 from the same City of Baltimore Deferred Compensation Plan again falsely claiming, under penalties of perjury, that she had suffered specific enumerated financial hardships resulting from the COVID-19 pandemic.

The Defendant used the first COVID-19 financial hardship withdrawal as a down payment to purchase an eight (8) bedroom single family home for $545,000 in September 2020.  The Defendant used the second COVID-19 financial hardship withdrawal as a down payment to purchase a two (2) bedroom condominium for $476,000 in Long Boat Key, Florida, in February 2021.

The City of Baltimore Deferred Compensation Plan in which the Defendant participated was established under 26 U.S.C. § 457(b), and is therefore commonly referred to as a "457(b) plan."  In her withdrawal requests, the Defendant claimed to have suffered from financial hardship related to the COVID-19 pandemic, specifically, a financial hardship resulting from, "[b]eing

quarantined, furloughed or laid off[,] Having reduced work hours[,] Being unable to work due to lack of childcare[, or] The closing or reduction of house of a business I own or operate." *Id.* at ¶ 5. None of those conditions applied to the Defendant. *Id.* at ¶ 7. In fact, the Defendant's gross salary in 2020 was $247,955.58, and it was never reduced. She received bi-weekly gross pay direct deposits in the amount of $9,183.54 in all the months leading up to her alleged hardship withdrawal in May 2020. Rather than experiencing a reduction in income in 2020, the Defendant's gross salary in 2020 increased $9,183.54 over her 2019 salary. *Id.* at ¶ 8.

Only state and local governments and some non-profit organizations can offer 457(b) plans to employees. *Id.* at ¶ 2. While there are some similarities between 457(b) plans and other types of retirement accounts, there are also notable differences. For example, an employee in the private sector who participates in a 401(k) plan can make withdrawals prior to retiring but has to pay taxes on the withdrawal and a ten percent penalty. By contrast, a 457(b) plan participant can only withdraw funds prior to retirement if they leave government service or experience "unforeseen emergencies," that meet certain legal criteria. According to the Internal Revenue Service (IRS), 457(b) plans may only offer distributions to a participant based on an unforeseeable emergency for:

- an illness or accident of the participant, the participant's beneficiary, or the participant's or beneficiary's spouse or dependents;
- property loss caused by casualty (for example, damage from a natural disaster not covered by homeowner's insurance) of the participant or beneficiary;
- funeral expenses of the participant's spouse or dependent; and
- other similar extraordinary and unforeseeable circumstances resulting from events beyond the control of the participant or his or her beneficiary (for example, imminent foreclosure or eviction from a primary residence, or to pay for medical expenses or prescription drug medication).

*See* Employee Plans News December 17, 2010, Unforeseeable Emergency Distributions from 457b Plans (Exhibit 1).  Importantly, before making an "unforeseeable emergency" withdrawal, a state or local employee must exhaust their other financial resources.  *Id.*

So, while a 401(k) plan participant can always withdraw funds from their account and pay taxes and penalty, 457(b) plan participant cannot withdraw funds from their account before they retire unless they leave government service or experience an "unforeseeable emergency" and exhaust their other financial resources.[1]

The Coronavirus Aid, Relief, and Economic Security (CARES) Act created a new withdrawal option in calendar year 2020 only for 457(b) plan participants who were affected by COVID-19.  Superseding Indictment ¶ 2.  Specifically, as it relates to this case, in calendar year 2020, 457(b) plan participants were authorized to make withdrawals if they experienced "financial hardship" resulting from: "[b]eing quarantined, furloughed or laid off[,] Having reduced work hours[,] Being unable to work due to lack of childcare[, or] The closing or reduction of house of a business I own or operate."  The CARES Act also provided that plan participants self-certify that they met these criteria.  *Id.* at ¶ 4.

The Defendant exploited those CARES Act provisions in order to obtain $40,000 in May 2020, as charged in Count One, and an additional $50,000 in December 2020, as charged in Count Three.[2]  But for her false statements, the Defendant would not have been able to make the two withdrawals charged in Counts One and Three.  And without those two withdrawals, she would

---

[1] If a 457(b) plan participant takes a withdrawal before they retire, either because they leave government service or because they experience an "unforeseeable emergency," they owe taxes on the withdrawal but, unlike 401(k) plan participants, they do not have to pay a 10 percent penalty.

[2] Taxes were withheld by the City of Baltimore's 457(b) plan administrator so the amount of funds wired to the Defendant's checking account was less than the total amount of the withdrawal.

not have been able to make the down payment on either of the two Florida vacation homes she purchased in September 2020 and February 2021.   Simply put, the Defendant's perjury allowed her to leverage $90,000 in funds she should not have had access to in order to get two vacation homes.  And as the Superseding Indictment makes clear, the Defendant's false statements extended beyond the COVID-19 financial hardship withdrawals to the mortgage applications for the vacation properties themselves.

The Defendant used the two COVID-19 financial hardship withdrawals as down payments on two vacation homes in Florida she purchased in late 2020 and early 2021.  At the time she made both purchases she owed significant debt to the IRS for unpaid taxes.  That debt dated to tax years 2014 and 2015.  *Id.* at ¶ 5.  Specifically, when the Defendant and her husband filed their joint return for 2014, they owed the IRS $46,556, which they did not pay, *id.* at ¶5(a), and when they filed their joint return for 2015, they owed the IRS $17,812, which they did not pay, *id.* at ¶5(b).  In tax years 2016, 2017 and 2018, the Defendant and her husband filed joint returns that claimed they were entitled to refunds.  *Id.* at ¶¶ 8, 9 and 10.  However, they never received any of those refunds because the IRS applied them against the Defendant and her husband's outstanding tax debts.  *Id.*  In all of those years, the IRS also sent multiple notices to the Defendant and her husband at their home telling them that they owed unpaid taxes and that their refunds were being applied against those debts.  *Id.* at ¶¶ 6, 7, 8, 9 and 10.

Because the Defendant and her husband did not satisfy their outstanding tax debts, on or about March 3, 2020, the IRS placed a lien on "all property and rights to property belonging to" the Defendant in the amount of the unpaid taxes the Defendant owed the IRS as of that date which was in the amount of $45,022."  *Id.* at ¶ 11.  The lien was not against the home in which the

Defendant.  *Id.*  The IRS sent the Defendant and her husband, individually, a notice that a lien had been filed against them by certified mail to their home address.  *Id.*

After the IRS filed this lien, on or about June 17, 2020, the Defendant filed her individual income tax return for 2019.  *Id.* at ¶ 13.  For that tax year, 2019, the Defendant and her husband filed separate returns.  *Id.*  On her return, the Defendant claimed a refund of $549.  The Defendant did not receive that refund, however, because it was applied against taxes the Defendant and her husband owed the IRS.  *Id.*

A little more than a month later, on July 28, 2020, the Defendant signed a contract to purchase an eight (8) bedroom single family home in Kissimmee, Florida for $545,000 and applied for a mortgage from Cardinal Financial in the amount of $490,500.  *Id.* at ¶ 14.  The Defendant closed on that property on September 2, 2020.  *Id.*  On that date she signed a second mortgage application with Cardinal.  The Defendant used the COVID-19 financial hardship withdrawal she had made in May 2020 towards the down payment for this property.

The Defendant made a series of false statements, as charged in Count Two of the Superseding Indictment, in both of those mortgage applications with Cardinal.  First, the application required the Defendant to disclose her liabilities.  The Defendant did not disclose that she owed significant amounts of federal taxes.  Superseding Indictment Count Two ¶ 15.  Second, in response to a different question, "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee," the Defendant indicated "no" despite the fact that she was delinquent in the payment of federal taxes resulting in the IRS filing a $45,022 lien against her on March 3, 2020.  *Id.* at ¶ 16.  Third, at closing on September 2, 2020, the Defendant signed a "Second Home Rider," which provided that she would maintain "exclusive control" over the ownership property and would not "subject the Property to

any…agreement that requires the Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property." *Id.* at 18. The Defendant signed and dated the Second Home Rider below a line that stated, "BY SIGNING BELOW, Borrower accepted and agrees to the terms and covenants contained in this Second Home Rider." *Id.* That statement was false because on August 25, 2020, approximately one week before she signed the Second Home Rider, the Defendant had executed an agreement with a vacation home management company giving the management company control over the rental of the property she ultimately purchased in Kissimmee. *Id.* at ¶ 17. The agreement stated, in relevant part, "The Manager will always be obligated to and have the right to offer the Vacation Home for rent during the time of this contract, UNLESS PRE-BOOKED ON THE COMPANIES [sic] COMPUTERISED BOOKING SYSTEM BY OWNER." *Id.*

By falsely executing the Second Home Rider, the Defendant could obtain a lower interest rate on the mortgage for the property than the one she would have received if she had not executed the Second Home Rider, and reduced the amount of cash the Defendant had to put down in order to buy the home. *Id.* at ¶ 19.

The Defendant used the second COVID-19 financial hardship withdrawal she made in December 2020, to purchase a second vacation property, a two bedroom condominium in Long Boat Key, Florida, for $476,000 in February 2021. The Defendant applied for a $428,400 mortgage with Universal Wholesale Mortgage to pay for this property. Superseding Indictment Count Four ¶ 24. The Defendant made a number of false statements in the applications for this mortgage, which she signed on January 14, 2021, and then later, at closing, on February 19, 2021. *Id.*

First, the application required the Defendant to disclose her liabilities.  The Defendant did not disclose that she owed significant amounts of federal taxes.  *Id.* at ¶25.

Second, in response to the question, "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee," the Defendant indicated "no" despite the fact that she was delinquent in the payment of federal taxes resulting in the IRS filing a $45,022 tax lien against her on March 3, 2020.  *Id.* at ¶26.

Third, included in the closing documents was a document titled, "ATTENTION SETTLEMENT AGENT," which provided that "The borrower(s) *must* attest to the following statements as a part of closing their loan.  If any of the information below is not true and the borrower cannot attest to ANY part of it, DO NOT PROCEED WITH THE CLOSING AND CONTACT THE LENDER for further guidance." Below this statement the Defendant identified her "Current Financial Obligations," as the mortgage on the Kissimmee, Florida, home she had purchased earlier in 2020, three installment loans, the car loan for her BMW, and a revolving credit card liability.  the Defendant did not disclose her federal tax debt or the fact that the IRS had filed a $45,022 lien against her on March 3, 2020.  Below these entries and above her signature was the following attestation: "the above debts/liabilities are all to which I am currently obligated, per my credit report dated JANUARY 9, 2021, and/or any other debts that were presented on my loan application.  There are no additional installment debts, home equity lines or mortgages."

Fourth, in order to close on the Long Boat vacation home, the Defendant needed $35,699.15 in cash. As of January 25, 2021, she had only $31,043.24 in liquid assets in her checking account.  *Id.* at ¶ 30.  Rather than wait for her next paycheck, the Defendant submitted a false gift letter to Universal Wholesale Mortgage on February 9, 2021.  *Id.*  In it, she falsely claimed that her husband had made her a gift of $5,000 "to be transferred AT CLOSING" to be applied

toward the purchase of the Long Boat Key vacation home. *Id.* The letter further stated that the source of the funds was her husband's Municipal Employee Credit Union (MECU) account ending in 0882. *Id.* On February 17, 2021, two days before closing, the Defendant's husband wired $5,000 to the escrow agent. *Id.* However, the $5,000 was not, in fact, a gift the Defendant's husband made to her, as the Gift Letter represented. *Id.* Rather, the Defendant had wired the $5,000 to her husband's MECU account ending in 0882 on February 12, 2021. *Id.* Her husband then transferred the money from that account to his MECU savings account ending in 4022 and then transferred it back to his MECU checking account ending in 0882 before wiring it to the escrow agent. The Defendant submitted the false gift letter on February 9, 2021, in order to lock in a lower interest rate than she would have received if she waited until she her next paycheck. *Id.*

Fifth, she drafted a letter, which her loan broker submitted to Universal Wholesale Mortgage in which she claimed to have lived in Florida for 70 days before she submitted her mortgage application on January 14, 2021. In that January 14, 2021, application the Defendant indicated that the mortgage would be for a primary residence. Universal Wholesale Mortgage reviewed the letter in which the Defendant indicated she had lived in Florida for 70 days when it reclassified the home from a primary residence to a secondary one.

## II.   THE DEFENDANT'S MOTION TO DISMISS FOR VINDICTIVE AND SELECTIVE PROSECUTION IS MERITLESS AND SHOULD BE DENIED

The Defendant asks this Court to dismiss the Superseding Indictment returned by the federal grand jury pursuant to Federal Rule of Criminal Procedure 12(b)(3)(iv), asserting that it is a product of "selective or vindictive prosecution." Mot. to Dismiss at 2. The Defendant's motion finds no support in the facts, the law, or even logic and should be denied as meritless. The personal attacks on AUSAs Wise and Schenning that the Defendant makes in her motion—falsely claiming they harbor "personal and political animus" towards her and even calling them racists—do not

establish vindictive or selective prosecution.  Name calling is not facts and that is all the Defendant offers.

The Defendant's meritless motion to dismiss is part of a pattern. The Defendant publicly attacks any law enforcement professional who questions her behavior: Isabel Mercedes Cumming, the Baltimore City Inspector General, Lydia Lawless, the Bar Counsel, Assistant United States Attorney Leo Wise, former Acting U.S. Attorney Stephen M. Schenning and now even United States Attorney Erek L. Barron.

The Defendant has invented a tale of victimhood in an attempt to deflect attention from her own behavior. As the evidence at trial will show, the only thing the Defendant is a victim of is her own lies and choices.

The sole basis that the Defendant offers for her claim of "personal animus" is the fact that Assistant United States Attorney (AUSA) Wise provided information to the court in 2017, three years before the investigation in this case began, that a member of the Baltimore Police Department's Gun Trace Task Force (GTTF) had been tipped off by an Assistant State's Attorney (ASA) that members of the GTTF were under investigation.  This information was offered in support of the Government's motion, which was granted, to detain the GTTF defendants pending trial.  The Defendant bizarrely claims this was a "smear campaign" targeting her.  In so doing, she misrepresents what actually occurred during the GTTF case, which is addressed below.  The Defendant's argument is particularly nonsensical because the Defendant was never alleged to have been involved in the tip-off, and second, as summarized below, it is an incontrovertible fact that such a tip off occurred and the Defendant has known it occurred since 2018.  In fact, the Defendant fired the individual responsible for the tip-off because of it, something the Defendant fails to disclose to the Court.

12

The sole basis that the Defendant cites in support of her claim of "political animus" is the fact that AUSA Wise made two **solicited** $100 campaign contributions to individuals with whom he had pre-existing professional relationships in the 2018 democratic primary for Baltimore City State's Attorney.  AUSA Wise also made a $100 solicited donation to another former colleague in the 2018 election cycle who was running for Congress in Virginia.  The Defendant's theory appears to be that AUSA Wise made these contributions because he thought $200 could change the outcome of a city-wide and then, when he was unsuccessful, he lay in wait for three years in order to launch a "witch hunt" targeting the Defendant.  Somehow, although the Defendant never addresses how, AUSA Wise then convinced the FBI, the IRS, the Tax Division of the U.S. Department of Justice, his two colleagues on the prosecution team, and not one but three U.S. Attorneys from two different Administrations to go along with it.  This claim of "political animus" is preposterous.

As for the Defendant's claim that AUSAs Wise and Schenning are racist, she offers no evidence because there is none.  Instead, the Defendant misquotes and mischaracterize two 12-year-old news articles that criticized the House Ethics Committee, not AUSA Wise as she falsely claims.  News articles, whether accurately quoted or not, are not facts.  The Defendant's citation to the fact that AUSA Wise has successfully prosecuted a number of Baltimore-area politicians also does not give rise to any inference of racial animus.  AUSA Wise has successfully prosecuted hundreds of defendants in his 17-year career with the U.S. Department of Justice.

At times, the Defendant's meritless allegations get ahead of her own ability to make up facts to support them.  For example, the Defendant writes, "Lead Prosecutor Assistant United States Attorney Leo Wise ("AUSA Wise") in particular has been involved in **several** attempts to sabotage State's Attorney Mosby's career **from the beginning** of her time in office."  Mot. to

Dismiss at 1 (emphasis added).  The Defendant was first elected State's Attorney for Baltimore City in 2014. The first event that the Defendant describes in her motion, when the Government provided information to this court that an ASA tipped off former GTTF Sergeant Wayne Jenkins, occurred in 2017, years after the Defendant's election.  So what is it that AUSA Wise did "from the beginning of her time in office?"  The Defendant never says.  Similarly, the Defendant doesn't bother to describe what the "several" attempts to sabotage State's Attorney Mosby's career were. It clearly was not the accurate and appropriate disclosure of the tip-off to this court, because the Defendant herself showed she agreed it was true when she fired the ASA who did it.  And it clearly wasn't making two $100 solicited donations to individuals with whom AUSA Wise had a pre-existing professional relationship. The Defendant's inability to even articulate what these "sabotage attempts," were shows how just how baseless the entire motion is.  Similarly, the Defendant asserts, "the United States Attorney for the District of Maryland, Erek Barron—who is overseeing the prosecution and signed the Indictment against State's Attorney Mosby—also has had a fair share of conflicts with State's Attorney Mosby," and then fails to articulate a single one. Mot. to Dismiss at 23.

The Defendant's theory of selective and vindictive prosecution also just doesn't make any sense.  The Defendant writes that "These facts make clear exactly what AUSA Wise's goal was here: settle a score with State's Attorney Mosby and derail her career in elected office."  Mot. to Dismiss at 14.  But she never explains what this supposed "score" was that needed to be settled, because no such "score" exists.

### A.  No Legal Authority Supports the Defendant's Motion to Dismiss

The Defendant has no legal support for her arguments.  First, the Defendant misapplies the vindictive prosecution doctrine to this case.  Second, while the Defendant asks this Court to dismiss

the Superseding Indictment based on *both* vindictive *and* selective prosecution grounds, the Defendant only cites the standards for vindictive prosecution.  She fails to apply or even cite the different standard for selective prosecution.  In any event, as explained further below, the Defendant fails to meet either standard.  Finally, the Defendant does not cite a single case where an indictment was dismissed based on factual assertions, false as they may be, similar to that which she offers in her in the Motion to Dismiss.

> 1. *Vindictive Prosecution Occurs When a Defendant is Punished for Exercising a Clearly Established Right: Defendant Makes No Such Claim Here*

In *United States v. Goodwin*, 457 U.S. 368 (1982), a case where the defendant moved to set-aside his conviction on the grounds of vindictive prosecution, the Supreme Court described the vindictive prosecution doctrine in this way:

> To punish a person because he has done what the law plainly allows him to do is a due process violation "of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604. In a series of cases beginning with *North Carolina v. Pearce* and culminating in *Bordenkircher v. Hayes*, the Court has recognized this basic—and itself uncontroversial—principle. For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right.

*Id.* at 372.

> More recently, another district court in this circuit described the doctrine in this way:

> … the vindictive prosecution doctrine bars a prosecutor from punishing a criminal defendant for exercising a clearly-established right.  The doctrine is intended to prevent the government from exacting a price from such a defendant by, *inter alia,* adding new charges against him that would result in an increased prison sentence. The law therefore intercedes to prevent the government from punishing a defendant for doing what the law plainly allows him to do.

*United States v. Santana*, 509 F. Supp. 2d 563, 565 (E.D. Va. 2007), *aff'd in part*, 352 F. App'x 867 (4th Cir. 2009).

All of the cases cited in the Defendant's Motion to Dismiss involving claims of vindictive prosecution are cases where a defendant asserted the exercise of a statutory or constitutional right. None of them were ones asserting, as the Defendant does here, claims of "animus" divorced from any assertion of a legal right.  Even still, in none of the cases cited by the Defendant in her motion was a finding of vindictiveness successful:

- In *United States v. Stokes*, Mot. to Dismiss at 1-2, the defendant claimed vindictive prosecution when he was acquitted in state court of a murder charge and then indicted, federally, on a handgun charge related to that murder.  124 F.3d 39, 41-42 (1st Cir. 1997).   The First Circuit reversed the district court's finding of vindictiveness and dismissal of the indictment.  *Id.*

- In *United States v. Wilson*, Mot. to Dismiss at 3, the defendant claimed vindictive prosecution asserting that "the U.S. Attorney for the Eastern District of North Carolina prosecuted Wilson on the request of the U.S. Attorney for the District of South Carolina solely in furtherance of personal animus against Wilson *based on Wilson's successful appeal of an unrelated conviction* obtained by the South Carolina U.S. Attorney." 262 F.3d 305, 314 (4th Cir. 2001) (emphasis added).  The Fourth Circuit reversed the district court's dismissal of the indictment on a finding of vindictive prosecution.

- In *Bordenkircher v. Hayes*, Mot to Dismiss at 17, in a habeas petition, the defendant claimed vindictive prosecution because in plea negotiations, the Government indicated that if the defendant did not plead guilty, it would seek a superseding indictment that included more serious charges.  434 U.S. 357, 358-359 (1978).  The defendant rejected the Government's plea offer, was indicted on more serious charges and went to trial and was convicted.  *Id.*  The Supreme Court rejected the defendant's claim of vindictive prosecution.  *Id.*

- In *United States v. Goodwin*, Mot. to Dismiss at 3, the defendant claimed vindictive prosecution when, after he requested a jury trial on a pending misdemeanor charge, the Government indicted him on felony charges arising out of the same incident. 457 U.S. 368, 371 (1982).  Like in *Bordenkircher,* the Supreme Court reversed the Court of Appeals decisions to dismiss the indictment on finding a presumption of vindictiveness.

"A criminal defendant faces a substantial burden in bringing a vindictive prosecution claim." *United States v. Johnson*, 325 F.3d 205, 210 (4th Cir. 2003). "To establish prosecutorial vindictiveness, a defendant must show, through objective evidence, that (1) the

prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001) *citing United States v. Goodwin,* 457 U.S. 368, 372 at 380 n. 12 (1982) (noting that the charges must be brought "solely to 'penalize' the defendant and could not be justified as a proper exercise of prosecutorial discretion"); *United States v. Sanders,* 211 F.3d 711, 717 (2d Cir. 2000).

Importantly, "actual vindictiveness" as opposed to a presumption of vindictiveness, can only be established if there is direct evidence that the government connected the decision to charge to the exercise of some legal right by a defendant.  *United States v. Goodwin*, 457 U.S. 368, 380–81 (1982) ("This case, like *Bordenkircher*, arises from a pretrial decision to modify the charges against the defendant. Unlike *Bordenkircher*, however, there is no evidence in this case that could give rise to a claim of *actual* vindictiveness; the prosecutor never suggested that the charge was brought to influence the respondent's conduct.").

"If the defendant is unable to prove an improper motive with direct evidence, he may still present evidence of circumstances from which an improper vindictive motive may be presumed." To invoke such a presumption, a defendant must show that the circumstances "pose a realistic likelihood of 'vindictiveness.'" *Wilson* 262 F.3d at 314 *quoting Blackledge v. Perry,* 417 U.S. 21, 28–29, 94 (1974).

In this case, the Defendant does not argue actual vindictiveness.  She offers no evidence that the decision to charge was connected, in any way, to her exercise of a right protected by the law.  Moreover, the Defendant has not even argued that the charging decision was connected to her exercise of a protected right.  Therefore, she is unable to show a "reasonable likelihood of vindictiveness," as the law requires.

And critically for this case, as the Fourth Circuit further explained in *Wilson*, "Because the presumption of vindictiveness must be applicable to all cases presenting the same circumstances, it will rarely, if ever, be applied to prosecutors' pretrial decisions.  *See id.* at 315 *citing Godwin*, 457 U.S. at 381.  That is precisely what the Defendant is doing here—attacking charging decisions made prior to any trial on this matter.  The Fourth Circuit in *Wilson* explained the reason for the distinction between pre and post-trial decisions in this way:

> Because of the broad discretion given prosecutors and the wide range of factors that may properly be considered in making pretrial prosecutorial decisions, "a prosecutor should remain free before trial to exercise [that] broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct." *Id.* at 382, 102 S.Ct. 2485. "Thus, a change in the charging decision made *after* an initial trial is completed is much more likely to be improperly motivated than a pretrial decision." *Id.* at 381.

*Wilson*, 262 F.3d at 315 *quoting Goodwin*, 457 U.S. at 381-382.  As the Fourth Circuit noted  more recently in *United States v. Lucas*:

> This court has stated that a presumption of vindictiveness typically arises where a defendant's successful appeal necessitates a retrial on the same charge. *Wilson*, 262 F.3d at 319. In such a case, a presumption of vindictiveness is recognized because of the " '*institutional bias against the retrial of a decided question.*' " *Id.* at 318

62 F. App'x 53, 57 (4th Cir. 2003) (emphasis in original).  This case obviously does not present a situation where a decision was made to retry a defendant.  So, the Defendant is asking the Court to presume vindictiveness at the pretrial phase, something the Fourth Circuit has cautioned that "rarely, if ever" should occur.  And it should not occur here.

"When a presumption of vindictiveness is warranted, the burden shifts to the government to present objective evidence justifying its conduct." *Id. citing Godwin*, 457 U.S. at 381.  The Defendant has not and cannot establish that such a presumption is warranted and therefore the burden has not shifted to the government to present "objective evidence justifying his conduct."

However, as described below, there is, in any case, objective evidence justifying the Government's conduct at every stage.

Finally, the Defendant fails to even address the second prong of *Wilson* in her motion. She offers no evidence that "the defendant would not have been prosecuted but for that animus." The detailed Superseding Indictment describes how the Defendant committed perjury on two occasions—claiming she had suffered from COVID-19 related financial hardships—and made multiple false statements in mortgage applications for two different properties. Since the onset of the COVID-19 pandemic and the changes in federal law and federal spending that it triggered, the United States Department of Justice has pursued prosecutes COVID-19 related fraud in every district in the United States. And the Department of Justice has long prosecuted mortgage fraud. The Defendant offers no evidence, because there is none, that we should not have been prosecuted for these serious offenses "but for [] animus."

### 2. The Defendant Does Not Cite Any Relevant Authority on Selective Prosecution in Her Motion Let Alone Meet Her Burden to Establish It

While the Defendant uses the phrase "selective prosecution" in her motion, she fails to even cite the legal standard a defendant must meet to prove it. Like with claims of vindictive prosecution, "The burden on a party seeking to dismiss an indictment on the basis of selective prosecution is high." *United States v. Venable*, 666 F.3d 893, 900 (4th Cir. 2012), *as amended* (Feb. 15, 2012). "'In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary,' demonstrating that the government was motivated by a discriminatory purpose to adopt a prosecutorial policy with a discriminatory effect." *Id.* at 465, *quoting Armstrong*, 517 U.S. at 465. "To make this showing, a defendant must 'establish both (1) that similarly situated individuals of a different race were not prosecuted, and (2) that the decision to prosecute was invidious or in bad

19

faith.'" *Venable*, 666 F.3d at 465 *quoting United States v. Olvis,* 97 F.3d 739, 743 (4th Cir.1996).[3]

Beyond a lack of legal analysis on this standard, the Defendant offers no evidence that "similarly

situated individuals of a different race were not prosecuted."   Therefore, her selective prosecution

claim fails.

> 3.   *The Decision to Charge in this Case is Presumptively Lawful and the Defendant
>       Has Not Proffered Any Evidence to Overcome this Presumption*

"[A] prosecutor's charging decision is presumptively lawful," regardless of whether the

defendant claims vindictive or selective prosecution."   *Wilson*, 262 F.3d  at 315 (4th Cir. 2001)

---

[3] As the Fourth Circuit explained in *Venable*:

> Defendants are similarly situated when their circumstances present no
> distinguishable legitimate prosecutorial factors that might justify making different
> prosecutorial decisions with respect to them. *Olvis,* 97 F.3d at 744. "Generally, in
> determining whether persons are similarly situated for equal protection purposes,
> a court must examine all relevant factors." *Id.* Of particular significance here, the
> district court cannot only consider the other persons' "relative culpability," but
> must "take into account several factors that play important and legitimate roles in
> prosecutorial decisions." *Id.* Examples of such factors include: (1) a prosecutor's
> decision to offer immunity to an equally culpable defendant because that
> defendant may choose to cooperate and expose more criminal activity; (2) the
> strength of the evidence against a particular defendant; (3) the defendant's role in
> the crime; (4) whether the defendant is being prosecuted by state authorities; (5)
> the defendant's candor and willingness to plead guilty; (6) the amount of
> resources required to convict a defendant; (7) the extent of prosecutorial
> resources; (8) the potential impact of a prosecution on related investigations
> and prosecutions; and (9) prosecutorial priorities for addressing specific types of
> illegal conduct. *Id.* Our analysis of these factors is not to be conducted in a
> mechanistic fashion, however, because "[m]aking decisions based on the myriad
> of potentially relevant factors and their permutations require the very professional
> judgment that is conferred upon and expected from prosecutors in discharging
> their responsibilities." *Id.* As such, we have rejected a "narrow approach to
> relevant factors to be considered when deciding whether persons are similarly
> situated for prosecutorial decisions." *Id.*

666 F.3d 893, 900–01 (4th Cir. 2012), *as amended* (Feb. 15, 2012).

*citing United States v. Armstrong,* 517 U.S. 456, 464, (1996). In this case, the Defendant's imagined animus does not overcome that presumption. As the Supreme Court explained in *Armstrong*:

> A selective-prosecution claim asks a court to exercise judicial power over a "special province" of the Executive. The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal law.... As a result, [t]he presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.

In *Wilson*, the Fourth Circuit held that "the same may be said of vindictive prosecution claims." *Wilson*, 262 F.3d at 315. "Judicial authority is . . . at its most limited" when reviewing the Executive's charging determinations, because the judiciary is generally "not competent to undertake" such an assessment. *See United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016).

As summarized below, there is no "clear evidence to the contrary," in the Defendant's Motion to Dismiss that can overcome the presumption of regularity afforded the decision to prosecute in this case.

### 4. *The Defendant's Citations to the Justice Manual are Inapposite*

The Defendant repeatedly cites provisions of the Justice Manual as if it could offer legal support for their meritless claims. *See* Mot. to Dismiss at 13, 15, 16 and 17. It does not and cannot. The very first title of the Justice Manual, which describes its organization and function, expressly states,

> The Justice Manual provides internal DOJ guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigation prerogatives of DOJ.

Justice Manual § 1-1.200 Authority. Despite this clear and unambiguous language, the Defendant repeatedly, erroneously, urges the Court to rely on it to dismiss the Superseding Indictment. *See, e.g.*, Mot. to Dismiss at 13.

> 5. *The Defendant Does Not Cite a Single Case Where a Court Has Dismissed a Superseding Indictment Based on Factual Assertions Similar to those Made by the Defendant*

Finally, the Defendant's Motion to Dismiss is devoid of citations to any case, reported or unreported, in any federal court, in any district in the United States where an indictment was dismissed based on factual representations like the ones made here, inaccurate as they are.  She has not cited any authority for the relief she seeks here because there is none.

**B.  The Defendant Offers No Factual Basis for Her Claims of Animus Because There is None**

The Defendant offers no *accurate* factual basis for her claims.  That is because the Defendant's motion is riddled with inaccuracies and misstatements.  Some of these are false accounts of things that actually happened, while others are facts that the Defendant has simply made up. The Government will attempt to correct these errors so that the Court has an accurate record before it.

> 1. *An Assistant State's Attorney Tipped Off Wayne Jenkins that He Was Under Investigation; the Government's Proffer of that Information to the Court is Not a "Smear Campaign" Against the Defendant*

Under the heading, "Mr. Wise Baselessly Smears State's Attorney Mosby Over the Baltimore Gun Trace Task Force Prosecution," the Defendant asserts that, "In 2017, Mr. Wise and then-Acting U.S. Attorney Stephen Schenning ("Mr. Schenning") began a smear campaign to falsely accuse State's Attorney Mosby and her staff of improperly leaking the federal GTTF investigation to lead the lead suspect in the police corruption scandal." Mot. to Dismiss at 4. The

Defendant goes on to claim that, "[t]his campaign came to a head in January 2018 when, during a plea hearing for Mr. Wayne Jenkins, Mr. Wise made an on-the-record assertion that State's Attorney's Mosby's office was leaking information about the federal investigation to the lead suspect in the case." *Id.* The Defendant then claims that she "demanded a meeting with AUSA Wise and the documentation and notes that supported Mr. Wise's assertion." During this meeting, the Defendant claims that "Mr. Wise was unable to produce any further proof to support the USAO's public statements that State's Attorney Mosby's Office leaked information about the GTTF prosecution beyond his own say-so." *Id.* Finally, the Defendant asserts that, "Specifically, despite identifying the alleged source of the information at the prior proffer session with Mr. Jenkins, Mr. Wise was unable to identify or corroborate anything in his notes that supported his public assertion." In support of these factual assertions, the Defendant cites only her own lawyer's factually inaccurate letters to the Department of Justice from March 2021. *See* Exhibits A and B to Motion to Dismiss. Far from being evidence of anything, these two letters were a publicity stunt by the Defendant's counsel. He wrote them to the U.S. Department of Justice's Office of Professional Responsibility (hereafter "OPR") on not one but two occasions, marked these letters as "Confidential," and then promptly leaked them to the press. *See* McKenna Oxenden, *Attorneys for Baltimore officials Nick and Marilyn Mosby accuses federal prosecutors of misconduct, seeks suspension of investigation*, THE BALTIMORE SUN, March 23, 2021 (Exhibit 2).[4]

The Defendant's claim that she was the victim of a smear-campaign during the GTTF investigation is breathtakingly disingenuous. The Defendant never disclosed to the Court in her Motion to Dismiss that she fired the ASA who tipped off Jenkins when the U.S. Attorney's Office

---

[4] The first letter to OPR that the Defendant leaked to the press was incorrectly post-dated May 19, 2021 – months after it was sent and leaked.

informed her that the ASA had done so.  On April 20, 2018, an attorney retained by the Defendant wrote a letter threatening to sue the ASA who had tipped off Jenkins.  *See* Letter from James W. Webster, April 20, 2018 (Exhibit 3).  The letter begins, "I write this letter on behalf of Marilyn Mosby, whom I represent in her personal capacity."  The letter continues, "You were terminated because an FBI investigation revealed you had leaked the existence of an investigation of certain members of the Baltimore Police Department's Gun Trace Task Force ("G.T.T.F.") to another member of the G.T.T.F."  *Id.* at 2.  The Defendant's lawyer's letter then summarizes a letter from then Acting U.S. Attorney Schenning to the Defendant at length which contained the evidence of the tip-off the FBI had gathered.  *See* Letter from Acting U.S. Attorney Schenning to Marilyn Mosby, February 15, 2018 (Exhibit 4).  If this was a smear-campaign, why the Defendant fire the ASA who was involved in it and then hire lawyers to threaten to sue the ASA if she claimed otherwise?

Further, every one of the factual assertions the Defendant makes about the conduct of the GTTF prosecution is wrong.

First, Wayne Jenkins admitted, under oath in front of United States District Court Judge Catherine C. Blake, who by that point was presiding over the case against Jenkins and the other GTTF defendants, that he had learned that members of the GTTF were under investigation from a member of the State's Attorney's Office.  The tipoff is not something that AUSA Wise said at Jenkins guilty plea hearing as the Defendant incorrectly asserts – it is something Jenkins said. Furthermore, the Government learned of the tip off not from a proffer with Jenkins, as the Defendant also incorrectly asserts, but from a recorded conversation between two of Jenkins' co-conspirators corroborated by telephone toll records that showed Jenkins spoke to an individual identified as an ASA for 17 minutes immediately before the recorded conversation between his

co-conspirators. Below is the relevant paragraph from Attachment A, the statement of facts from

Jenkins' guilty plea, where he made that admission:

---

**Alerting Members of the Conspiracy to Investigations into their Criminal Conduct**

56. JENKINS learned that Gondo, Rayam, or both of them, were under investigation from other BPD officers and from an Assistant State's Attorney in the Baltimore City State's Attorney's Office. In approximately June 2016, JENKINS learned from a BPD officer that there was a federal wiretap on Gondo's phone. JENKINS shared this information with Hersl. Later on October 5, 2016, JENKINS spoke with an Assistant State's Attorney who told him that Rayam was under investigation for lying and stealing. JENKINS then shared that information with Rayam.

---

Attachment A to Jenkins Plea Agreement, Cr. No. 17-106, ECF 254, filed January 5, 2018 (Exhibit

5).

At Jenkins' guilty plea hearing on January 5, 2018, Judge Blake reviewed this factual

statement with him.

THE COURT: . . . Paragraph 8 says that you agree to the statement of facts. There is a lengthy Attachment A which I will try to summarize briefly with you. That is a statement of facts.

Let me just be clear: Did you read that statement of facts as well –

THE DEFENDANT: Yes, ma'am.

THE COURT: -- Mr. Jenkins?

All right.  It says that you agree that if the Government did go to trial in this case, it could prove beyond a reasonable doubt all the charges against you.

You agree to certain facts that at least the Government could have proved going to trial …

Jenkins Guilty Plea Trans. at 15:25-16:11 (Exhibit 6).

Judge Blake then proceeded to summarize the facts in Jenkins' plea agreement.  When

Judge Blake came to paragraph 56 of the Statement of Facts, she summarized it this way: "It relates

that you learned at some time in 2016 about the existence of this federal investigation and shared that information with others." *Id.* at 17:19-21.  After summarizing the entire lengthy statement of facts that was incorporated in Jenkins' plea agreement, Judge Blake asked Jenkins, "Do you agree that the statement of facts, with the further acknowledgement by your counsel, but do you agree that is correct and you did what it says in there you did?" to which Jenkins responded, "Yes, ma'am." *Id.* at 22:14-19.

Thus, it is incontrovertible that Jenkins was tipped off that members of the GTTF were under investigation by an ASA.  Further,  it was Judge Blake, not AUSA Wise, that confirmed with Jenkins during his guilty plea hearing that he had "learned about the existence of this federal investigation and shared this information with others."  In fact, at no point during Jenkins' guilty plea hearing did AUSA Wise say anything about whether Jenkins had been tipped off by a member of the State's Attorney's Office, as the Defendant inaccurately claims in her Motion to Dismiss. This factual misstatement to the Court is particularly striking because the transcript of Jenkins' plea agreement is available on the public docket and could have been reviewed by Defense Counsel which would have revealed that their assertions are erroneous.

What Jenkins admitted to at his guilty plea hearing confirmed what federal investigators already knew.  In late summer 2016, the FBI installed a recording device in a BPD vehicle driven by Momodu Gondo, another member of the GTTF who was a co-conspirator of Jenkins and who was ultimately charged and pled guilty.  On October 5, 2016, the FBI recorded a conversation between Gondo and a third member of the GTTF who was also charged and pled guilty, Jemell Rayam.  In that conversation, Gondo and Rayam discussed how Jenkins had told them that an ASA had told him they were under investigation.  After hearing that recording, a 17 minute phone call

was identified on toll records for Jenkins' phone between Jenkins and an ASA, which corroborated the discussion that Gondo and Rayam had about Jenkins being tipped off by an ASA.

After Jenkins and the other GTTF defendants were arrested on March 1, 2017, the Government proffered the fact that they had been tipped off by an ASA that members of the GTTF were under investigation in detention hearings for each defendant, including Jenkins.  For example, in the detention hearing for Marcus Taylor, AUSA Derek Hines, AUSA Wise's co-counsel in the GTTF case told the Court that, "Members of the conspiracy have also received information from other BPD officers, and even an Assistant State's attorney during the course of the investigation." *United States v. Jenkins, et al*., Cr. No. 17-106, transcript of April 20, 2017, detention hearing at 12:21-23 (Exhibit 7).  Based on this information, and additional information, then-Magistrate Judge Gallagher ordered Taylor, and all the other GTTF defendants, detained.  Taylor sought review of the order of detention before Chief United States District Court Judge James K. Bredar, who was presiding over the case at the time, and Chief Judge Bredar ordered Taylor detained.  Ultimately Taylor even appealed his detention to the United States Court of Appeals for the Fourth Circuit which affirmed the orders of detention.

All of these facts had been provided to the Defendant in a letter signed by then-Acting United States Attorney Stephen Schenning in February 2018.  A copy of that letter, which has been redacted to remove the names of individuals who have not been publicly identified in the GTTF case, is attached.  *See* Letter from Acting U.S. Attorney Schenning to Marilyn Mosby, February 15, 2018 (Exhibit 4).

The Defendant's account of a meeting with AUSA Wise concerning these facts is also inaccurate.  At some point after the detention hearings in this case, AUSA Wise was asked to join a meeting, in progress, between the Defendant and Mr. Schenning without any advance notice.  As

a result, AUSA did not have documents related to the tip-off with him.  Instead, the evidence of

the tip-off was provided in detail in the February 15, 2018, letter from then Acting U.S. Attorney

Schenning, as reflected in the letter the Defendant's own lawyer wrote to the ASA, after she was

fired.  *See* Letter from Acting U.S. Attorney Schenning to Marilyn Mosby, February 15, 2018

(Exhibit 4) and Letter from James W. Webster, April 20, 2018 (Exhibit 3).

In sum, AUSAs Wise and Schenning never engaged in a "smear campaign to falsely accuse

State's Attorney Mosby and her staff of improperly leaking the federal GTTF investigation" to

Wayne Jenkins, the "lead suspect in the police corruption scandal."    Mot. to Dismiss at 4.

(emphasis added).    AUSA Wise and his co-counsel AUSA Derek Hines, not Mr. Schenning,

proffered facts to the court that the GTTF defendants had been tipped off by an ASA, because they

had been tipped off and the fact that they had been tipped off was relevant to the detention

determination before this court.  The recording from the bug in Gondo's BPD vehicle proved they

had been tipped off, as did the toll records of a 17 minute call between Jenkins and an ASA

immediately preceding that recording.  Finally, Jenkins ultimately admitted, under oath before

Judge Blake, that he had been tipped off by an ASA.

In light of all the facts summarized above, it unclear why the Defendant appears to argue

now that an ASA did not tip off Jenkins that members of the GTTF were under investigation.  It

also strains logic to equate providing this information about an ASA to this court in a detention

hearing to harboring "animus" towards the Defendant, particularly when the Government never

proffered that the Defendant was involved in the leak to Jenkins or even that she knew about it.

    2.  *AUSA Wise Did Not Endeavor to Upend the 2018 State's Attorney's Election by Donating $200; He Made Three Solicited $100 Contributions in the 2018 Election Cycle to Individuals With Whom He Had Professional Relationships*

The Defendant's next baseless accusation is that "Mr. Wise was evidently embarrassed by that encounter," referring to the unscheduled meeting that the Defendant inaccurately described related to the ASA who tipped off Jenkins, and that it "appears to have directly led to his own personal efforts to undermine State's Attorney Mosby's re-election." Mot. to Dismiss at 5. The "personal efforts to undermine State's Attorney Mosby's re-election," consist of two $100 donations to other candidates in the Democratic primary for Baltimore City State's Attorney, one in January 2018 to Thiru Vignarajah and one in June 2018 to Ivan Bates. This sequence of events and what prompted these donations is an invention of the Defendant.

The two donations AUSA Wise made were **solicited** by individuals with whom AUSA Wise had prior professional relationships and as they describe, they made decisions on the timing of those solicitations. *See* Declaration of Thiru Vignarajah (Exhibit 8) and Declaration of Ivan J. Bates (Exhibit 9). Contrary to the Defendant's claims, the timing of both donations had nothing to do with the brief, impromptu meeting that the Defendant inaccurately describes in her motion.

[this space intentionally left blank]

In his declaration, Mr. Vignarajah describes the circumstances and timing of his solicitation this way:

1. As a candidate in the Democratic primary for State's Attorney for Baltimore City in 2018, I solicited campaign contributions from former colleagues with whom I had served at the U.S. Attorney's Office for the District of Maryland, the State's Attorney's Office for Baltimore City, the Maryland Attorney General's Office, the United States Supreme Court, and the law firms where I had practiced in Washington, DC and Baltimore, MD.

2. During the reporting period ending January 10, 2018, over 50 former colleagues made individual contributions to our campaign, ranging from $50 to $6,000.

3. A number of these contributions were from active federal prosecutors with whom I had worked, including Assistant U.S. Attorney Leo Wise, who donated $100.

4. I solicited this contribution from Mr. Wise shortly before the January 2018 reporting deadline, and he made his $100 contribution on January 10, 2018.

*See* Declaration of Thiru Vignarajah (Exhibit 8).   In his declaration, Mr. Bates describes the circumstances and timing of his solicitation in this way:

7. On June 14, 2018, I received a campaign contribution from Mr. Wise, in the amount of one hundred dollars ("$100").[5]

   a. The circumstances leading to Mr. Wise's contribution to my campaign began with my review of fundraising reports filed by my political opponents, Mrs. Mosby and Mr. Vignarajah (collectively, "my political opponents").

   b. In so doing, I noted that on January 10, 2018, Mr. Wise[6] donated one hundred dollars ("$100") to Mr. Vignarajah's campaign.[7]

   c. Mr. Wise had not donated to my campaign, so I solicited a contribution from him.

   d. In response to my solicitation, Mr. Wise, made a one-time donation to my campaign, as noted above, contributing the same amount of money he contributed to Mr. Vignarajah's campaign.

Declaration of Ivan J. Bates (Exhibit 9).   Mr. Bates also states in his declaration that, "My professional association with Mr. Wise stems from the numerous cases I have handled in the

federal system wherein Mr. Wise served as the prosecuting attorney, and I served as defense counsel, including matters leading to Mr. Wise's prosecution of the Gun Trace Task Force ("GTTF").  *Id*. at n. 6.

The Defendant's theory of how AUSA Wise set out to "undermine State's Attorney Mosby's re-election," by making two $100 donations is laughable.  It gets even more fantastical when she claims, "His contributions were unsuccessful, as State's Attorney Mosby was victorious in her election, and he now seeks to do through the DOJ what he could not do through the ballot box—remove State's Attorney Mosby from Office."  Mot. to Dismiss at 14.  Lacking either facts or even a plausible theory, the claim of "political animus" on the part of AUSA Wise fails.

It is also worth noting that on January 2, 2018, eight days before AUSA Wise made a solicited donation to Mr. Vignarajah, Mr. Wise made a solicitated donation to another former colleague of his, Paul Pelletier.  Mr. Pelletier had worked with AUSA Wise in the Fraud Section of the United States Department of Justice and was running for Congress in the Democratic primary for Virginia's 10th Congressional district.  Mr. Pelletier asked AUSA Wise for a donation and AUSA Wise donated $100 via his credit card.  *See* Credit Card Statement (Exhibit 10).

In sum, in the 2018 election cycle, AUSA Wise made three solicited donations of $100 each to candidates with whom he had prior professional relationships.  These donations are in no way evidence of "political animus" against the Defendant.

### 3. The Defendant Offers No Facts that Support Her Claims of Selective Prosecution

The Defendant offers no facts whatsoever in support of her meritless claim that this is a selective prosecution based on her race.  As summarized above, the law requires a defendant making a selective prosecution claim to "'establish both (1) that similarly situated individuals of a different race were not prosecuted, and (2) that the decision to prosecute was invidious or in bad

faith.'" *Venable*, 666 F.3d at 465 *quoting United States v. Olvis,* 97 F.3d 739, 743 (4th Cir.1996). The Defendant does not even address the first requirement of *Venable* that she establish that "similarly situated individuals of a different race were not prosecuted." The Motion to Dismiss never mentions another individual who was not prosecuted under circumstances similar to the Defendant. Nor can she because such evidence does not exist.

In place of facts, the Defendant misquotes two news articles to support her baseless claims of racial animus. These articles date from 2008-2010 when AUSA Wise wasn't even a federal prosecutor. At that time he worked for Office of Congressional Ethics (OCE) in the U.S. House of Representatives. First, the Defendant claims, "as far back as 2008, when AUSA Wise was the head of the Office of Congressional Ethics, the Congressional Black Caucus complained about the office's behavior under his leadership." Mot. to Dismiss at 5. In support of this claim, the Defendant cites an article that appeared in *Politico* on August 1, 2010, concerning the House Ethics Committee's decision to file ethics charges against former Representative Charles Rangel and Representative Maxine Waters. *See* Jonathan Allen and John Bresnahan, *Ethics Cases Raise Racial Questions*, POLITICO, August 1, 2010 (Exhibit 11. The Defendant asserts in her motion that "At one point during AUSA Wise's tenure, all eight lawmakers under formal investigation by the House Ethics Committee were Black Democrats, including Representatives Maxine Waters and Charles Rangel." Mot. to Dismiss at 5. This statement misquotes the *Politico* story. What the *Politico* story actually says is that "At one point earlier this year, all eight lawmakers under formal investigation *by the House Ethics Committee*, including Rangel and Waters, were black Democrats." (emphasis added). *Id.* In her motion, the Defendant has grafted a reference to AUSA Wise onto that sentence, which is otherwise a verbatim quote from the *Politico* story. This is either a deliberate misrepresentation or the Defendant fails to understand that the OCE and the House

Ethics Committee are distinct entities, independent of one another.  The *Politico* story doesn't mention AUSA Wise because AUSA Wise never worked for the House Ethics Committee.  The House Ethics Committee made the decision to pursue those eight cases, not AUSA Wise and not the OCE and the criticism described in the article was leveled at the House Ethics Committee, not AUSA Wise or the OCE.  While the next line in the *Politico* story says that the eight investigations being pursued by the House Ethics Committee originated with the OCE, the OCE pursued dozens of investigations in the two years that AUSA Wise worked they were not investigations solely of Black Democrats.

Furthermore, the Defendant is wrong when she asserts that AUSA Wise was the "head" of the OCE.  AUSA Wise was the Staff Director and Chief Counsel to the OCE's Board.  The OCE is governed by a Board appointed by the Speaker of the House and the Minority Leader.  The Chair of the Board is the "head" of the OCE.  Furthermore, only the OCE's Board, and not its staff can initiate investigations.  *See* H. R. 495 of the 110th Congress (Exhibit 12).  In 2008, former Colorado Congressman David Skaggs, a member of the Democratic Party, was the OCE's Chair.  The Board itself was a diverse and distinguished group of former lawmakers and public servants from both parties, including Yvonne Burke, the first African American woman elected to Congress from California, Porter Goss, the former Director of the Central Intelligence Agency, Abner Mikva, the former Chief Judge of the United States Court of Appeals for the D.C. Circuit, and others.  *See* Report and Findings in Review No. 09-2121 (listing OCE Board) (Exhibit 13).  During the time that AUSA Wise worked for the OCE, every single decision to initiate an investigation into a member of Congress was made unanimously by the OCE Board.

The Defendant next falsely asserts that "After AUSA Wise's resignation, questions were raised about his alleged targeting of Black elected officials," and, in support of that false claim,

33

the Defendant cites an article that appeared in *Time* magazine when AUSA Wise left the OCE to return to the U.S. Department of Justice.  Mot. to Dismiss at 5.  Just as with the *Politico* article, the Defendant confuses the OCE with the House Ethics Committee in making this claim.  *See* Jay Newton Small, *Leo Wise Resigns*, Time, October 15, 2020 (Exhibit 14).  In a footnote she included the following quote from the *Time* magazine article: "*The Standards Committee* has had an uneven record in deciding what cases it'll pursue and those it drops.  The stilted approach had led to accusations of racism – most of the cases they've pursued have been against Congressional Black Caucus members."  Mot. to Dismiss at 5, n. 2 (emphasis added).  As the text the Defendant quoted makes clear, the criticism in the *Time* magazine article was of the *Standards Committee*, which was the formal name of the House Ethics Committee at that time, and *not the OCE*.  Again, AUSA Wise worked for the OCE and not the Standards Committee.

In any event, neither of these decade-old articles are evidence of racial animus.  And the Defendant provides no such evidence because there is none.  The only relevance these articles have to the present baseless accusations the Defendant has leveled against AUSAs Wise and Schenning is that they demonstrate that when politicians are under investigation, they sometimes attack the individuals and agencies who are conducting the investigations.  This is done to de-legitimize any inquiry into their behavior.

Furthermore, the partial and incomplete list of defendants that AUSA Wise has prosecuted during his 17 years with the Department of Justice that the Defendant included in their motion is not evidence of racial animus.  State Delegate Cheryl Glenn, Former Baltimore Mayor Catherine Pugh, Former Baltimore Police Commissioner Darryl DeSousa and State Senator Nathaniel Oaks all pled guilty and "Prominent Attorney Ken Ravenell" was convicted by a jury after trial.  In none

of these cases was there any evidence that the defendants were prosecuted because of their race, because they weren't.

> ### 4.   The Defendant's Claim About U.S. Attorney Erek Barron Are Irrelevant and the Source of them is Unreliable

The Defendant and her lawyer, A. Scott Bolden, have been personally attacking AUSAs Wise and Schenning in various public fora since March 2021, making many of the same meritless claims they include in the Motion to Dismiss.  The appointment and confirmation of United States Attorney Erek Barron obviously scrambled the Defendant's false assertion that she is being prosecuted because she is a progressive Black Democrat.  The Defendant now attempts to discredit the U.S. Attorney with private comments she claims he made about her to a third party several years ago, which the person he supposedly said them to cannot even really remember.  Mot. to Dismiss at 17.  Specifically, the Defendant claims that the U.S. Attorney has a "negative history" with her, whatever that means, and the Defendant claims that U.S. Attorney Barron "commented negatively on Ms. Mosby's style and approach to work," and "repeated disparaging rumors alleging marital infidelity," before he became U.S. Attorney.  The Defendant claims the source of these comments is Sheaniqua A. Thompson, a former lobbyist in Annapolis.   Exhibit E to Defendant's Motion to Dismiss (ECF 17-5).

At the outset, the Government notes that, consistent with their approach to the facts in the rest of their Motion, the Defendant's description of the Thompson declaration is not accurate. While the Defendant claims that the U.S. Attorney "repeated disparaging rumors alleging marital infidelity," to Ms. Thompson, that is not what the Thompson Declaration says.  All the Declaration says is that the U.S. Attorney "discuss[ed] rumors about State's Attorney Mosby's sex life."  The Declaration does not say that the U.S. Attorney discussed "rumors alleging marital infidelity" or that he disparaged the Defendant in any way.

35

Assuming for the sake of argument that the representations of Ms. Thompson's comments are even accurate, they are wholly irrelevant.  A negative opinion of a defendant's "style and approach to work" or even their marital fidelity in no logical way relates to claims that someone was prosecuted because they exercised some legal right, which is the standard for claims of vindictive prosecution.  *Goodwin*, 457 U.S. at 372.  Similarly, someone's "style and approach to work" and their marital fidelity in no way relates to whether similarly-situated individuals of a different race were not prosecuted, which is the standard for claims of selective prosecution. *Venable*, 666 F.3d at 465 *quoting United States v. Olvis,* 97 F.3d 739, 743 (4th Cir.1996).  Thus, they have no bearing on the issues before the Court.

Further, Ms. Thompson's declaration is unreliable and should be disregarded.  According to public reports, corroborated by data provided by the City of Baltimore on municipal employees, Ms. Thompson is the "$115,000-a-year director of legislative affairs for City Council President Nick Mosby," the Defendant's husband, the Baltimore City Council President.  *See* Fern Shen and Mark Reutter, "Marilyn Mosby says her husband's tax decisions and lies placed her in legal jeopardy," THE BALTIMORE BREW, February 21, 2022 (Exhibit 20) and https://www.google.com/search?q=baltimorie+city+salaries.  That fact was not disclosed in the Declaration and, given that it goes to Ms. Thompson's bias, it certainly should have been.  Further, statements in the Declaration itself conflict with one another.  Specifically, the Declaration purports to quote the U.S. Attorney, putting statements in quotation marks, but then states that the Declarant's "recollection of this comment is not precisely verbatim," and is only an "approximation."  *Id.* at ¶ 5.  The Declaration also refers to the U.S. Attorney as "then-assemblyman Erek Barron."  In Maryland, members of the House of Delegates are referred to as Delegates, not "assemblymen," or assemblywomen."  This suggests the declaration was written

by the Defendant's Washington, D.C., based lawyers, and not even closely reviewed by Ms. Thompson, who, as a former lobbyist, would have known that.

> 5. *The Defendant's Claim that the Federal Grand Jury Investigation Began with a Referral from Bar Counsel is False; It Began Before Bar Counsel's Independent Inquiry*

The Defendant in her Motion to Dismiss next makes a series of personal attacks on the Maryland Bar Counsel, Lydia Lawless, as part of a larger and wholly inaccurate account of the investigation in this matter.   Mot. to Dismiss at 7.  The Defendant claims, again without any factual support, that she has been the victim of "incessant harassment," by Ms. Lawless.  *Id.*  The Defendant then wrongly represents to the Court that "on April 30, 2021, AUSA Wise indicated in an email to counsel in the instant matter that Ms. Lawless had referred the State Bar inquiry to AUSA Wise's office after State's Attorney Mosby declined to comply with Ms. Lawless' overboard request that she turn over substantiation of her deductions dating back seven years." *Id.* In support of this inaccurate claim, the Defendant cites an email from AUSA Wise to the Defendant dated April 30, 2021.  *Id. citing* Exhibit H to Def. Mot. to Dismiss.  Nowhere in the April 30, 2021, email does AUSA Wise say that the federal investigation arose from a referral from Bar Counsel because it did not.[5]

---

[5] Below is the full text of the email:

Mr. Bolden,

Your summary and characterizations of our conversations with Mr. Qureshi are not accurate. We say that not to begin a debate with you about those two phone calls, but to make it clear that we do not agree with what you have written about them.

Our response to your question is the same as the one we gave Mr. Qureshi: we cannot disclose the information you request related to the Grand Jury because of the restrictions placed on us by Federal Rule of Criminal Procedure 6(e). Your specific request that we "provide us further information about the *focus* of the investigation – without revealing secret grand jury *materials* –" (emphasis added) inverts the law on what is and isn't covered by Rule 6(e). As the D.C. Circuit explained in *Senate of the Commonwealth of Puerto Rico on Behalf of Judiciary Committee. v. United States Department of Justice*:

As the April 30, 2021, email clearly articulates, Federal Rule of Criminal Procedure 6(e) prohibited the Government from identifying the "focus" of the Grand Jury investigation, something the Defendant repeatedly asked the Government to do.  In response to these questions, the Government pointed the Defendant to the Bar Counsel's inquiry because it raised numerous questions about items on the Defendant's tax returns and Bar Counsel's investigation, unlike a federal grand jury investigation, is not covered by Rule 6(e).  Defense Counsel then weaponized this attempt to constructively engage with them by the Government and spun it into a false narrative that the federal grand jury investigation arose from a referral from Bar Counsel, which is not true.

---

There is no *per se* rule against disclosure of any and all information which has reached the grand jury chambers; as the district court correctly observed, the touchstone is whether disclosure would "tend to reveal some secret aspect of the grand jury's investigation" such matters as " 'the identities of witnesses or jurors, the substance of testimony, *the strategy or direction of the investigation*, the deliberations or questions of jurors, and the like.' " The disclosure of information "coincidentally before the grand jury [which can] be revealed in such a manner that its revelation *would not elucidate the inner workings of the grand jury*" is not prohibited.

823 F.2d 574, 582 (D.C. Cir. 1987) (emphasis added).

As a professional courtesy, we reiterate that the Bar Counsel's investigation raised numerous questions related to your client's taxes. *See e.g.,* Letter to William Brennan dated November 30, 2020. We are able to reference the Bar Counsel's investigation because it is not covered by Rule 6(e). We also observe that in federal criminal tax investigations, subjects of the investigation, like your client, often retain counsel with expertise in criminal tax law to review their returns and identify likely issues for criminal enforcement.

You are under no obligation to provide any information beyond what was called for in the grand jury subpoena. However, as we told Mr. Qureshi, we will review any information you choose to voluntarily provide us.

Sincerely,
Leo J. Wise
Assistant United States Attorney
Chief, Fraud and Public Corruption Section
United States Attorney's Office for the District of Maryland
36 South Charles Street
Baltimore, MD 21201

To be clear, by the Defendant's own account, the Bar Counsel's investigation began no earlier than October 13, 2020.  *See* Mot. to Dismiss at 7.[6]  By contrast, the Grand Jury began investigating the Defendant prior to that date.  The Defendant has been provided in discovery with certifications pursuant to Federal Rules of Evidence 803(6) and 902(1), also referred to as business records certifications, that are dated prior to October 13, 2020.  *See, e.g.,* Exhibit 15 (certification from Municipal Employee's Credit Union dated September 2, 2020).  Therefore, the Defendant's claim that "Instead of referring this matter to the IRS for a civil audit which would have been the normal course of action in this scenario, Ms. Lawless' referral resulted in the opening of a criminal tax grand jury investigation, where there had been no evidence of wrongdoing on the part of State's Attorney Mosby," is false.  Mot. to Dismiss at 8.  Similarly, the fact that the federal grand jury investigation began *before* Bar Counsel's investigation means that the Defendant's claim that "The irregular manner in which this referral was made instead of initiating a civil audit demonstrates how Ms. Lawless and AUSA Wise conspired together to effectuate their mutual goal of damaging State's Attorney Mosby's reputation," is also false.  The claim that AUSA Wise and Ms. Lawless "conspired together to effectuate their mutual goal of damaging State's Attorney Mosby's

---

[6] The Defendant writes in her motion that:

In [sic.] October 13, 2020, Ms. Lawless became aware of a tax lien placed against State's Attorney Mosby and her husband after an article discussing the tax lien was published by the Baltimore Sun. Ms. Lawless, who at the time was investigating a six year old unfounded complaint against States's Attorney Mosby, dismissed this initial investigation and immediately opened another investigation into State's Attorney Mosby's taxes. Pursuant to that investigation, Ms. Lawless made requests for State's Attorney Mosby to turn over her tax returns for 2014 to 2019.

Def. Mot. to Dismiss at 7.

reputation," is patently absurd. The alleged "conspiracy" to do so is a fiction invented by the Defendant.

Relatedly, the Defendant's claim that "While AUSA Wise initially elected to use the Grand Jury process to conduct inquiries into otherwise routine civil IRS audit matters, State's Attorney [sic.] was ultimately not charged with *any* criminal tax violations," is factually inaccurate in multiple ways. Mot. to Dismiss at 9-10.  First, the federal grand jury investigation was not limited to tax matters, as the charges in the Superseding Indictment demonstrate.  Second, the Defendant's unsupported assertion that this investigation should have been a civil tax audit is contradicted by the fact that Tax Division of the U.S. Department of Justice authorized the U.S. Attorney's Office to conduct a *criminal* grand jury investigation, as the Defendant knows.  *See* Email from Melissa S. Siskind to A. Scott Bolden, August 18, 2021 (Exhibit 16).  The email states, "The Tax Division is in receipt of your letter dated April 2, 2021, requesting a conference in this matter in the event the IRS referred your client for **criminal** prosecution.  The Tax Division has received a referral from the IRS, and therefore I am writing to schedule the taxpayer conference."  *Id.* (emphasis added).  Therefore, the Defendant's repeated assertions that there should have been a civil audit of their client rather than a criminal investigation is wrong.  If that were the case, then the Tax Division would not have authorized a criminal investigation.

> 6.  *The Defendant's Claim that the FBI and IRS Interrupted a Meeting at City Hall to Interview the Defendant's Husband is False; the Agents Waited for 65 Minutes Until a Board of Estimates Meeting Ended and Then Interviewed the Defendant's Husband in Private*

In their fictional account of the progress off this investigation, the Defendant make another demonstrably false factual assertion.  In a footnote they claim:

> On that same day, March 10, 2021, the FBI went to Baltimore's City Hall in the middle of a public City Council meeting that State's Attorney Mosby's husband, Nick Mosby, was participating in to interview Mr. Mosby. Rather than conduct this

> interview in a private setting, the FBI intentionally disrupted a public meeting pointing towards the Government's intention to publicly shame State's Attorney Mosby.

Mot. to Dismiss, n. 3.  The FBI and IRS agents that interviewed the Defendant's husband did not "disrupt[] a public meeting."  To avoid any future misrepresentations about what occurred during this interview, the FBI recorded the entire encounter.  The recording has been produced to the Defendant in discovery and can be provided to the Court if the Court wishes to view it.  The recording device was turned on before the agents entered City Hall and remained on until after the interview ended.  The recording shows that the FBI and IRS agent who interviewed Nick Mosby waited for 65 minutes in his office until a meeting of the Board of Estimates ended.  They then interviewed him in private, in his office.  The agents were dressed in business suits and nothing about their appearance or conduct indicated they were law enforcement.  Thus the claim that their interview was designed to "shame State's Attorney Mosby," is wholly unfounded.  Furthermore, there was no public reporting of the FBI and IRS's presence at City Hall on March 10, 2021, when the interview occurred, so the agent's presence was not detected.

> 7.  *The Defendant's Claim that the Government Refused to Meet with Them Are False; the Government Met with Counsel for the Defendant on September 10, 2021*

The Defendant repeatedly and falsely claims that the Government refused to meet with her counsel.  *See* Mot. to Dismiss at 9 ("Counsel asked for the opportunity to meet to present exculpatory evidence, which the Government never granted … The USAO would go on to repeatedly refuse to have a formal meeting with counsel for State's Attorney Mosby to discuss the potential criminal tax charges against her.").

The Government met with counsel for the Defendant on September 10, 2021, along with lawyers from the Tax Division of the U.S. Department of Justice.  *See* Email from Melissa Siskind

to A. Scott Bolden, August 18, 2021 (Exhibit 16).  Counsel for the Defendant was told when they requested a taxpayer conference that the United States Attorney's Office would also participate in the conference.  *Id.*  ("The conference will occur via WebEx and will be attended by myself, another attorney from the Tax Division, **and one or more of the AUSAs assigned to this investigation**") (emphasis added).  Not only did all undersigned counsel attend, but they were joined by AUSA Stephen Schenning, who was the Acting U.S. Attorney on this case, and Michael Hanlon, the Criminal Chief of the U.S. Attorney's Office for the District of Maryland.  *See* WebEx invite from Melissa Siskind for September 10, 2021, taxpayer conference (Exhibit 17).  Further, attached is an email from Defense Counsel dated September 15, 2021, acknowledging that the Government, including the USAO and the Tax Division, had met with the Defendant on September 15, 2021.  *See* Email from A. Scott Bolden dated September 15, 2021 (Exhibit 18).

[this space intentionally left blank]

**From:** Siskind, Melissa S. (TAX)
**Sent:** Monday, August 23, 2021 8:53 AM
**To:** Miller, Kelley C. <KMiller@ReedSmith.com>; Bolden, A. Scott <ABolden@ReedSmith.com>
**Cc:** Qureshi, Rizwan A. <RQureshi@reedsmith.com>
**Subject:** RE: Marilyn Mosby - Taxpayer Conference

EXTERNAL E-MAIL - From Melissa.S.Siskind

Good morning Kelley,

The Tax Division is considering the following charges with respect to your client:

- 26 USC 7201 (evasion of assessment; 2 counts; 2019 and 2020)
- 26 USC 7206(1) (1 count; 2019)
- 18 USC 1014 (1 count)
- 18 USC 1621 / 28 USC 1746 (2 counts)

The IRS calculated the tax loss as follows:

- 2019: $4,841
- 2020: $13,355

The IRS's calculations are not binding on the Tax Division, and the Tax Division may authorize charges that are different than those presently under consideration.

*See* Email from Melissa Siskind to A. Scott Bolden, August 23, 2021 (Exhibit 16).  Thus the Defendant's claims that "The USAO would go on to repeatedly refuse to have a formal meeting with counsel for State's Attorney Mosby to discuss the potential criminal tax charges against her," are demonstrably false.

>    8.  *The Defendant's Claim that the She Asked to Testify Before the Grand Jury and was "Precluded" from Doing So is False*

The Defendant falsely claims that she was "precluded" from testifying before the Grand Jury.  In making this claim, she contorts the meaning of words to hide the fact that she never actually requested to testify in the grand jury.  The first time the topic was ever raised was during the taxpayer conference that included the Defendant's counsel and prosecutors from the Tax

Division of the U.S. Department of Justice and the U.S. Attorney's Office on September 10, 2021. At the end of that meeting, Defense Counsel asked whether the Government would give the Defendant a "Queen for a Day" letter if she wished to proffer with the FBI. A "Queen for a Day" letter grants limited use immunity and provides that incriminating statements made by a witness will not be used directly against them. Defense Counsel also said at the end of the taxpayer conference that the Defendant was considering requesting the opportunity to testify before the grand jury or words to that effect. To be clear, at no point during or after the taxpayer conference did the Defendant or her counsel actually request that the Defendant be given the opportunity to testify before the grand jury.

In his emails and now in the Motion to Dismiss, Defense Counsel played word games. In the Motion to Dismiss, the Defendant claims, "there is no dispute that counsel for State's Attorney Mosby **made the offer** to have her testify on more than once occasions, and at least once in writing." Mot. to Dismiss at 9. Defense Counsel never made such an offer. The one time when issue came up in writing, according to the Defendant, was an email from Defense Counsel where he said the opposite—that it was *his* decision whether the Defendant wanted to testify and not the Government's. *See* Exhibit L to Mot. to Dismiss. Specifically, Defense Counsel wrote, "Also, whether to seek [Marilyn Mosby] going into the grand jury is the defense call—not the prosecutions call re our defense strategy. Doubt as you will, but her appearance should be considered a real **possibility**." *Id.* The second sentence is as far as Defense Counsel ever went, dancing around the topic of the Defendant testifying without ever actually asking that the Defendant be given the opportunity to testify. And a "possibility" that the Defendant would ask to testify is decidedly not the same thing as a request to testify.

Defense Counsel played similar word games in an email dated January 12, 2022. *See* Exhibit 19. In that email he wrote, "To date, and after several requests with no response, your office and the prosecutors assigned to this matter have not confirmed that Ms. Mosby **would** be permitted to appear before the grand jury." *Id.* (emphasis added). That was also not a request to have her testify and the letter has it backwards. If the target of a grand jury asks to testify before the grand jury, federal prosecutors consider the request and ultimately decide whether to grant it or not. Here that never occurred. The Government does not need to confirm to a defendant that they *would* be "permitted to appear," if they decided to do so. If the Defendant had wanted to testify before the grand jury, there would be a letter or an email where her counsel plainly and unambiguously made that request. The Defendant has not submitted such a document because none exists.

"Further, an accused has no right to be called as a witness before the grand jury that is considering his or her indictment and he or she has "no right of cross-examination, or of introducing evidence to rebut the prosecutor's presentation." *United States v. Leverage Funding Sys., Inc.*, 637 F.2d 645, 648 (9th Cir. 1980) (internal citations omitted); *United States v. Gardner*, 516 F.2d 334, 339 (7th Cir. 1975) *cert. denied*, 423 U.S. 861 (1976) ("the defendant has no absolute right to appear before the grand jury"); *United States ex rel. McCann v. Thompson*, 144 F.2d 604, 605-606 (2d Cir.), *cert. denied* 323 U.S. 790 (1944); *United States v. Kernodle*, 367 F.Supp. 844, 854 (M.D.N.C.1973). Thus, even if the Defendant had made such a request, the Government could decline to call her to testify and doing so does not rise to any inference of animus.

9. *The Defendant's Claim that "the Tax Investigation" was a "Nonstarter" is False*

The Defendant next falsely claims that "the tax investigation was a nonstarter."  Def. Mot. at 16.  The Defendant fails to explain why that fact, even if true, supports their claims of vindictive prosecution.  In any event, the Supreme Court has foreclosed their argument that vindictiveness can be inferred from the selection of charges as a matter of law.  In *Armstrong*, the Supreme Court held,

> In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, **and what charge to file or bring before a grand jury,** generally rests entirely in his discretion.

666 F.3d 893, 900–01 (4th Cir. 2012), *as amended* (Feb. 15, 2012).  Thus, the Defendant's argument that the Court should divine some ill-motive from the fact that the Government did not bring tax charges in this case in addition to the charges it did bring should be disregarded.

As a factual matter, their assertion that the tax investigation was a "non-starter" also ignores the fact that the Baltimore City Deferred compensation retirement account that the Defendant improperly accessed exists because it is part of the Internal Revenue Code.  Furthermore, two of the false statements the Defendant made in each of the mortgage applications related to tax debt and a tax lien.

Oddly, the Defendant takes issue with the fact that the Defendant was notified that tax evasion charges were also being considered against her, in addition to perjury and false mortgage application charges, and the Defendant has not been charged with tax evasion. The fact that the Government considered tax evasion charges but elected not to bring them doesn't support the Defendant's meritless claims of vindictive prosecution, it undercuts them completely. If this was a vindictive prosecution, the Government would have charged the Defendant with evasion.

The Defendant also misunderstands the seriousness of the charges returned by the Grand Jury in comparison with potential tax evasion charges. The Defendant refers to the charges in the Superseding Indictment as "watered down," compared to tax evasion. Mot. to Dismiss at 16. It is just the opposite. The sentencing guidelines for the perjury charges are far greater than the sentencing guidelines would have been for tax evasion charges.

### 10. *The Defendant's Claim that the Government Excluded Exculpatory Evidence from the Grand Jury are False*

The Defendant next accuses the Government, without any factual support, of withholding exculpatory evidence from the Grand Jury. Mot. to Dismiss at 11. The Defendant obviously has no idea what occurred before the Grand Jury because it is a secret proceeding. Unconstrained by the facts, her counsel nonetheless make the claim that they know certain information was *not* presented. They cite a declaration from a single witness, Carlton Saunders in support of this assertion. *See* Exhibit M to Defense Motion to Dismiss (Declaration of Carlton Saunders). Mr. Saunders has no way of knowing what was presented to the grand jury which met for over a year before indicting the Defendant and his declaration does not establish that the documents he claims to have submitted to the Government were not presented to the grand jury.

Importantly, the Defendant never explains how whatever information Mr. Saunders claims he provided to the Government could be exculpatory to the charges she faces. And it could not be based on the subject matter it pertains to and its age. Saunders states in his declaration that he was her campaign treasurer "until approximately 2018." *Id*. Saunders further states that he produced documents "regarding certain alleged campaign finance irregularities," in response to a subpoena and that he was also subpoenaed to testify before the grand jury. *Id*. He further declares that "As I understood it, the basis of the subpoena was to inquire about an $11,000 check that the State's Attorney had written to herself from the campaign account." *Id*. The Defendant was charged with

committing perjury and submitting false mortgage applications in 2020 and 2021, in other words, for conduct that occurred more than 2 years after the time when Mr. Saunders ceased to be her campaign treasurer in 2018.   Further, the Defendant was not charged with campaign finance violations.  Therefore, nothing Mr. Saunders submitted or said could be exculpatory to the charges the Defendant actually faces.

> 11. *The Defendant Has Presented No Evidence that the Timing of the Indictment Was Designed to Affect Her Election*

The Defendant claims, "[p]erhaps the clearest determination of the animus at issue in this case is the timing of the Indictment filed against State's Attorney Mosby." Mot. to Dismiss at 17. To the contrary, this argument reveals how utterly baseless the Defendant's accusations are.  The Defendant offers no evidence that the timing of the Indictment has anything whatsoever to do with the Democratic primary in June 2022. The only facts the Defendant can point to are that the Defendant was indicted by the grand jury in January 2022 and she apparently intends to seek re-election later the same year. To be clear, there is no Department of Justice policy against bringing charges in the same year as an election. There is no blackout period when charges cannot or should not be brought. To the contrary, the policy that the Defendant cites, the Election Year Sensitivities Memorandum issued in 2016 by then Attorney General Lynch, makes clear that the timing of charging decisions should be made *without* reference to elections. *See* 2016 Election Year Sensitives Memorandum at 1 (Exhibit 21) ("Law enforcement officers or prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party).  The Defendant offers no evidence that, consistent with that policy, the timing of the charges in this case do not reflect the pace of the FBI and IRS investigation and internal deliberations within the United States Department of Justice. And there is no such evidence

**III.   THE DEFENDANT'S MOTON TO DISQUALIFY AUSA WISE REPEATS THE SAME PERSONAL ATTACKS AS THE MOTION TO DISMISS AND MAKES THE SAME INACCURATE FACTUAL REPRESENTATIONS; IT IS THEREFORE MERITLESS AND SHOULD BE DENIED**

The Defendant asks this Court to "disqualify Assistant United States Attorney Leo Wise ("Mr. Wise") from acting as counsel for the Government in this matter." *See* Mot. to Disqualify. This motion is a rehash of the Motion to Dismiss.  The only basis for disqualification that the Defendant cites are the same meritless claims of "personal and political and even racial animus," that she made in her Motion to Dismiss.  And the Defendant relies on the same factually inaccurate assertions she made in her Motion to Dismiss to try to justify her personal attacks on AUSA Wise in this motion.  The Defendant's motion is meritless and should be denied.

The Defendant fails to cite a single case where a court removed a federal prosecutor on the basis of the claims, untrue as they are, that the Defendant makes.  And there isn't one.  Nor does the Defendant cite any statutory authority for the court to do so because there is none.

The Defendant claims that AUSA Wise has violated the Maryland Rules of Professional Conduct.  He has not.

The Defendant claims AUSA Wise has "engaged in conduct that has prejudiced the administration of justice as it pertains to State's Attorney Mosby," in violation of Maryland Rule 8.4.  Mot. to Disqualify at 3.  The conduct that the Defendant claims violated the rule are the same false claims she made in her Motion to Dismiss.  First, she asserts that AUSA Wise "falsely accused her and her office, on the record, of leaking information regarding the GTTF investigation." *Id.*   As described in the Government's response to the Defendant's meritless Motion to Dismiss, AUSA Wise proffered accurate information to the court that an ASA had, in fact, tipped off the lead defendant in the GTTF case that members of the GTTF were under investigation.  *See* discussion *supra* Section II(B)(1).  His proffer was supported by a recorded

conversation between two GTTF defendants and toll records showing a 17 minute call between the ASA and Jenkins immediately preceding the recording. *Id.* Ultimately, Jenkins admitted he had been tipped off by the ASA as part of his guilty plea. *Id.* And the Defendant fired the ASA for this conduct. *Id.*

The Defendant also falsely claims that AUSA "instructed the FBI to publically serve a Grand Jury subpoena on State's Attorney Mosby's husband in the middle of a Baltimore City Council meeting, ensuring that the media would learn about the subpoena." Mot. to Disqualify at 3. As described in the Government's response to the Motion to Dismiss, the FBI did not serve Mr. Mosby with a subpoena "in the middle of a Baltimore City Council meeting." *See* discussion *supra* Section II(B)(6). As the recording from the interview makes clear, the FBI and IRS agents waited for 65 minutes in City Council President Mosby's office until a Board of Estimates Meeting finished before interviewing him in the privacy of his office. *Id.*

The Defendant also falsely claims that "After receiving State's Attorney Mosby's tax information from the Maryland Bar Counsel, instead of referring the information to the IRS for a civil audit, Mr. Wise used the information as the basis for false criminal tax charges against State's Attorney Mosby." Mot. to Disqualify at 3. As described in the Government's response to the Motion to Dismiss, the federal grand jury investigation began before the Bar Counsel's investigation and was never limited to investigating only tax-charges as the indictment makes clear. *See* discussion *supra* Section II(B)(5).

The Defendant claims AUSA Wise has a "conflict of interest," in contravention of Maryland Rule 1.7(a)(2). Mot. do Disqualify at 3. That rule provides that, "A conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by the attorney's responsibilities to another client, a former clientor a third person

**or by a personal interest of the attorney**." (emphasis added). The Defendant then claims that "Mr. Wise's personal and political interests in this matter clearly have 'materially limited' his representation of the Government," although the Defendant never explains how AUSA Wise's representation of the Government has been limited in any way. *Id*. at 4. The Defendant then offers the following:

> Mr. Wise has been personally interested in attacking State's Attorney Mosby since at least 2017. See Dkt. 17 at 3-4. Unable to make accusations of leaking details of the GTTF investigation stick, due to his lack of supporting evidence, Mr. Wise, within weeks of that failure, made political donations to State's Attorney Mosby's opponents in her last campaign – the only time he had given a campaign donation up to that point. *Id.*   at 5.

*Id*. at 4. For the reasons described in the Government's response to the Defendant's Motion, none of this is true. An ASA did, in fact, tip off Wayne Jenkins and the Defendant fired the ASA for doing it. *See* discussion *supra* Section II(B)(1). Further, the donations that AUSA Wise made were solicited, as both candidates attest to in the declarations they submitted. *Id.*

The Defendant asserts that AUSA Wise violated Rule 3.8 governing the "Special Responsibilities of a Prosecutor" which provides that a prosecutor refrain from making "extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused." Mot. to Disqualify at 4. In support of this assertion, the Defendant again falsely claims that AUSA Wise "falsely accused State's Attorney Mosby of leaking confidential information, *and* also publicly disclosed the existence of the Grand Jury subpoenas issued to State's Attorney Mosby and her husband by having them served on Mr. Mosby by the FBI during a public meeting of the Baltimore City Council." *Id*. Both claims are false for the reasons articulated above and in the Government's opposition to the Motion to Dismiss. *See* discussion *supra* Section II(B)(1) & (6).

The Defendant next claims that AUSA Wise has violated "numerous provisions of the DOJ Justice Manual." Mot. to Disqualify at 4. He has not.

The Defendant falsely claims that AUSA Wise "refused to allow State's Attorney Mosby" the opportunity to testify before the Grand Jury in contravention of Section 9-11.152 of the Justice Manual. Mot. to Disqualify at 4. As described in the Government's opposition to the Motion to Dismiss, the Defendant never asked to testify before the grand jury. *See* discussion *supra* Section II(B)(8).

The Defendant next falsely claims that "Mr. Wise failed to present exculpatory information provided by Carlton Saunders to the Grand Jury," in contravention of Section 9-11.233. Mot. to Disqualify at 5. As the Government described in its opposition to the Motion to Dismiss, the Defendant has failed to establish that the information provided by Mr. Saunders was not provided to the Grand Jury. *See* discussion *supra* Section II(B)(10). Further, information about campaign expenditures in 2018 cannot exculpate the Defendant from charges of COVID-19 fraud in 2020 and 2021 and filing false mortgage applications in 2020 and 2021. Id.

The Defendant next falsely claims that "Mr. Wise violated provisions of the Justice Manual related to the disclosure of conflicts," although she fails to identify what provisions she is referring to. Mot. to Disqualify at 5. The Defendant asserts that "Mr. Wise has provided no assurances, per the Justice Manual, he has properly reported the potential for a conflict of interest through the DOJ's internal systems." *Id*. The Government has no idea what the Defendant is referring to when she refers to "DOJ's internal systems," nor what provisions of the Justice Manual the Defendant believes obligate an Assistant United States Attorney to offer "assurances" to a criminal defendant about reporting "the potential for a conflict of interest." And there is no such provision in the Justice Manual.

The Defendant next make a series of false accusations against AUSA Wise that the Defendant claims show he is acting from a "personal interest," and is therefore not a "disinterested prosecutor," citing *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248-50 (1980).  But the Defendant misunderstands what "interested" and "disinterested" means in this context.  *Marshall* was a case involving administrative proceedings to enforce child labor laws.  In that case, an agency of the Department of Labor, the Employments Standards Administration (ESA), imposed a civil fine on the appellee, a chain of restaurants.  The appellee appealed the agency's imposition of fines to an administrative law judge who sided with the ESA.  The appellee then filed a suit in Federal District Court challenging the statute that required the fines imposed by the ESA to be returned to the ESA as reimbursement for its enforcement actions.  This provision, according to the appellee, made the ESA "interested" as opposed to "disinterested" because by taking enforcement actions it could generate revenue for itself.  The Supreme Court rejected the appellee's contention and held that, "[i]n this case, we need not say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function, for here the influence alleged to impose bias is exceptionally remote."  446 U.S.  at 250.  Thus, *Marshall* offers no support for the Defendant's assertion that AUSA Wise is an "interested" prosecutor, as opposed to a disinterested one.

The other Supreme Court case cited by the Defendant *Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 808 (1987) also does not define "interested" and "disinterested" in the way the Defendant uses those terms in her motion.  In *Young*, the district court judge appointed a private attorney as a prosecutor to pursue contempt charges against a party to a trademark dispute. That private attorney was counsel to the other party in the trademark dispute.  The Supreme Court found the appointment of counsel for one of the parties to act as prosecutor in a contempt hearing against the other party was improper because the prosecutor was "interested."  Thus, like *Marshall*,

*Young* offers the Defendant no support for her contention that AUSA is improperly "interested" in the outcome of this case.

The only other case the Defendant cites on the issue of an interested versus disinterested prosecuted, *Ganger v. Peyton*, 379 F.2d 709 (4th Cir. 1967). In that case, the petitioner was charged with assaulting his wife and convicted after trial. The district court set aside the defendant's conviction because the state prosecuting attorney represented the defendant's wife in a divorce proceeding which was pending at the same time as the criminal trial and was based on the same alleged assault. *Id.* at 712. The Fourth Circuit affirmed the district court finding that

> Because of the prosecuting attorney's own self-interest in the civil litigation (including the possibility that the size of his fee would be determined by what could be exacted from defendant), he was not in a position to exercise fairminded judgment with respect to (1) whether to decline to prosecute, (2) whether to reduce the charge to a lesser degree of assault, or (3) whether to recommend a suspended sentence of other clemency.

*Id.* at 713. Again, the way in which the Defendant use the terms "interested" and "disinterested" bears no resemblance to the way in which the Fourth Circuit did in this decision.

Aside from the lack of any legal support for her position, the Defendant's factual contentions on the question of whether AUSA Wise is "interested" or "disinterested," are all false for the reasons articulated in the Government's opposition to her Motion to Dismiss and summarized above. *See* discussion *supra* Section II.

## IV.    THE DEFENDANT IS NOT ENTITLED TO A BILL OF PARTICULARS

The Defendant argues that she is entitled to a bill of particulars in this case. ECF 16. But as described below, the Superseding Indictment meets all requirements of the Federal Rules of Criminal Procedure and properly apprises the Defendant of the allegations against her in advance of the May 2nd trial in this matter.

### A.   The Legal Standard Governing Motions for a Bill of Particulars

Pursuant to FED. R. CRIM. PROC. 7(c)(1), an indictment is required to "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  An indictment is sufficient if it "first, contains the elements of the offense charged and fairly informs a defendant of the charges against which he must defend, and, second, enables him to plead an acquittal or conviction in a bar of future prosecutions for the same offense."  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  Likewise, "[t]he purpose of a bill of particulars is to enable a defendant to obtain sufficient information on the nature of the charges against him so that he may prepare for trial, minimize the danger of surprise at trial, and enable him to plead his acquittal or conviction in bar of another prosecution for the same offense."  *United States v. Schembari*, 484 F.2d 931, 934-35 (4th Cir. 1973).  As long as the indictment is sufficient to fulfill these purposes, a bill of particulars is unnecessary and its denial does not constitute an abuse of discretion.  *United States v. Butler*, 885 F.2d 195, 199 (4th Cir. 1989); *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir. 1985).  A bill of particulars should therefore be required by the court only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he or she is accused.   *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999).

A defendant is not entitled to a bill of particulars as a matter of right.  *Wong Tai v. United States*, 273 U.S. 77, 82 (1927).  Generally, where the indictment contains sufficient detail and the government provides full discovery, a bill of particulars will not be required.  As one commentator has stated: "If the needed information is in the indictment, then no bill of particulars is required.  The same result is reached if the government has provided the information called for in some other satisfactory form."  1 C. Wright, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 5129 at 437 (1982). *See also United States v. Soc'y of Indep. Gasoline Marketers*, 624 F.2d 461, 466 (4th Cir.

1979); *United States v. Giese,* 597 F.2d 1170, 1180-81 (9th Cir. 1979) (full discovery obviates the need for a bill of particulars).

"Acquisition of evidentiary detail is not the function of the bill of particulars." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (quoting *Hemphill v. United States*, 392 F.2d 45,49 (8th Cir. 1968)).  Nor is it intended to allow defendants a preview of how the government intends to present its evidence at trial, or to permit the defense to explore the legal theories underlying the government's case.  *See United States v. Barnes*, 158 F.3d 662, 665-66 (2d Cir. 1998); *United States v. Gabriel*, 715 F.2d 1447, 1449 (10th Cir. 1983); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000); *United States v. Hsia*, 24 F. Supp. 2d 14, 30 (D.D.C. 1998) ("A bill of particulars properly includes clarification of the indictment, not the government's proof of its case."); *United States v. DeSalvo*, 797 F. Supp. 159, 174-75 (E.D.N.Y. 1992) (motion for bill of particulars would be denied where "Defendant clearly seeks to discover not just the contours of the case . . . defendant seeks in detail the sort of arguments that the government will make to bolster its arguments.").

But where, as here, the indictment fully complies with the requirements of the Fifth and Sixth Amendments and FED. R. CRIM. PROC. 7(c), "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Med. Lab., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985); *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996).  As another circuit has stated, "A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government investigation. . . .  Rather, it is intended to give the defendant only that minimum of information necessary to permit the defendant to conduct his *own* investigation." *United States v. Smith*, 776 F.2d 1104, 1111 (3rd Cir. 1985) (citations omitted; emphasis in original).  *See also United States v. Burgin*, 621 F.2d 1352, 1359

(5th Cir. 1980)   (a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial"); *United States v. Anderson*, 481 F.2d 685, 690 (4th Cir. 1973) (the function of a bill of particulars is not to provide detailed disclosure of the government's evidence in advance of trial, but to supply any essential detail that may have been omitted from the indictment), *affirmed*, 417 U.S. 211 (1974); *Hemphill*, 392 F.2d at 49.

      B.  *The Indictment Clearly Advises the Defendant of the Specific Allegations Against Her.*

The Defendant's motion for a bill of particulars is grounded in neither fact nor law.  While the Defendant feigns a lack of understanding of what is a detailed and straightforward indictment that zeroes in on the Defendant's lies and false statements, her motion seeks information far afield of what is required in an indictment.  Even the cases the Defendant cites in support of her motion do not support the Defendant's expansive definition of the information she claims she needs to understand the nature of the charges against her.  Rather, this motion is nothing more than a demand for the precise evidence that proves her lies as charged in the Superseding Indictment.  Such a motion is inappropriate.  Regardless, the evidence she seeks has been provided to the Defendant in discovery, and it will be put in front of a jury in due time.[7]

To be convicted of perjury as charged in Counts One and Three, the Government must prove: (1) that the Defendant under penalty of perjury, subscribed as true, written information; (2) that the Defendant made false statements as to matters about which the Defendant subscribed as

---

[7] The Defendant has been given approximately 17,000 pages of discovery.  While this may seem like a substantial number of pages, it is relatively light by comparison to other federal fraud cases.  Moreover, much of the discovery consists of the Defendant's own bank statements. Finally, the discovery was transmitted in electronic format for ease of analysis, contains a manifest, and is categorized under Federal Rule of Criminal Procedure 16.

true under oath as set forth in the indictment; (3) that the matters as to which it is charged that the Defendant made false statements were material to the issues under inquiry; (4) that such false statements were willfully made. Instruction 48–3 Elements of the Offense, 2 Modern Federal Jury Instructions-Criminal § 48.01 (2020).  The indictment lays out the relevant statutory language of 18 U.S.C. § 1621, including an allegation that the Defendant did "willfully and knowingly state material matter which she did not believe to be true."  The Superseding Indictment additionally provides the Defendant with notice of the specific documents she signed under penalties of perjury, the false information contained within, to whom the information was submitted, and the dates on which she the information was submitted.  The Superseding Indictment contains a screenshot of the actual boxes the Defendant checked that comprise her false statements.  The Court would be hard-pressed to find an indictment that provides more appropriate notice than these counts.

To be convicted of false statements on a loan application as charged in Counts Two and Four, the Government must prove: (1) that the Defendant made or caused to be made a false statement or report relating to an application to a bank (e.g., for a loan or credit card); (2) that the Defendant acted knowingly; (3) that the false statement or report was made for the purpose of influencing in any way the bank's action (e.g., on the loan application); and (4) that the bank was then insured by the Federal Deposit Insurance Corporation.  Instruction 37-17, 2 Modern Federal Jury Instructions – Criminal.  Similarly, the Superseding Indictment contains the relevant statutory language from 18 U.S.C. § 1014, including that the Defendant "knowingly made a false statement or report."  In each count, the Superseding Indictment additionally provides the Defendant with notice of the specific loan applications and dates at issue, as well as the specific information on those loan applications that were false.

Despite being presented with all of this information, the Defendant complains that the Indictment is somehow "not sufficiently detailed." Mot. for Bill of Particulars at 7. Specifically, the Defendant claims the Superseding Indictment does not contain sufficient information for the Defendant to know "how or why the Government believes the Defendant made perjurious statements she believed were not true," and "how or why the Government believes she made knowingly false statements on two mortgage applications." *Id.* at 5 and 7.

As an initial matter, the Defendant's request for the Government to provide evidence of "why the Government" believes anything betrays a fundamental lack of understanding of the law. This case has been brought because a federal grand jury in the District of Maryland has found probable cause that the Defendant committed four federal crimes. The subjective belief of "the Government," whomever the Defendant is referencing in this part of its motion, is irrelevant. The Defendant has cited no cases that stand for the proposition that the Government is required to present evidence in a bill of particulars as to *why* the Government believes the Defendant to be guilty, or even how the Government intends to prove it.

In truth, it appears this entire motion is just a vehicle for the Defendant to seek the evidence that proves the Defendant possessed the requisite intent to commit the crimes charged. The evidence of this assertion is found in Section II, "Particulars Requested," on page 4 of the Defendant's motion. This section of the Defendant's motion contains four separate numbered categories of information that the Defendant requests. Mot. for Bill of Particulars at 4. Each of these categories begins with the phrase "Particulars of how…" *Id.* at 4. Tellingly, the words that follow the phrase "Particulars of how" in each category include either recitations or summaries of the false representations made by the defendant in the four counts of the original indictment. The

Defendant's own request demonstrates that she needs no further information in order to understand the charges against her and prepare a defense.[8]

In *U.S. v. Cuong Gia Le*, 310 F.Supp. 2d 763 (E.D.Va. 2004), a case cited by the Defendant in her motion, the defense was denied a motion for bill of particulars where the court called the defendant's motion "in essence an improper request for evidentiary matters." *Id.* at 782. That is precisely what the Defendant's request represents here. *See id.* at 782. The court there responded unequivocally that "a court must not direct the government to reveal the details of its evidence or the precise manner in which it will make its proof in a bill of particulars." *Id.* at 781 (citing *U.S. v. Automated Medical Labs, Inc.* 770 F.2d at 405). Even *United States v. Sampson*, 448 F.Supp.2d. (E.D.VA 2006), a case cited by the Defendant that resulted in the issuance of a bill of particulars, shows the insufficiency of her argument here. In that case, the court ordered a bill of particulars in a mail fraud case where the indictment failed to state, "which specific documents were fraudulent, and what was allegedly fraudulent about the documents at issue." *Id.* at 696. By contrast, the Superseding Indictment in this case makes very clear which documents are at issue, and the very statements in those documents that are alleged to be false. *See id.* at 696. The Defendant has been made fully aware of precisely which of her statements a grand jury in this

---

[8] On page six of the Defendant's motion, the Defendant goes on at length about what she claims to have been her "subjective" view of her finances at the time of her lies on the 457(b) plan withdrawal forms. The Government is not required in a bill of particulars to disprove what the Defendant appears to preview as her defense in this case. Rather the Government will prove that the Defendant knew she had not experienced any of the four delineated events to trigger an "adverse financial consequence" as was required for the withdrawals.

The Defendant then states, "Indeed, the 457(b) administrators never questioned her application, nor does there seem to be even a mechanism to challenge the authenticity of her application for her own funds." This statement goes far afield of the alleged purpose of the motion. Rather, this appears more an attempt to litigate the facts of trial prior to the trial itself. Improper as such an attempt is in this motion, it just goes to demonstrate that the Defendant understands the charges against her and needs no bill of particulars to mount her defense, albeit a defense that appears more of an argument for jury nullification.

district has found probable cause to believe were false when she made them.  Evidence in support

of these charges has been provided to the Defendant in discovery.  The Defendant can expect to

see that evidence again as exhibits at trial.  No bill of particulars is warranted.


## V.      CONCLUSION

The Defendant's Motion to Dismiss (ECF 17) and to Disqualify Counsel (ECF 18) are a

mishmash of unsupported allegations, inaccuracies, misstatements, and baseless personal attacks.

These patent misrepresentations are as unmoored from any law as they are factually untrue.  For

these reasons, both motions should be denied.

As for the Defendant's Motion for a Bill of Particulars (ECF 16), because the Defendant

has been fairly apprised of the charges against her by both the Superseding Indictment and

discovery in this case, no bill of particulars is warranted, and that motion should also be denied.


Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

By:      _____/s/_____
Leo J. Wise
Sean R. Delaney
Aaron S.J. Zelinsky
Assistant United States Attorneys


## CERTIFICATE OF SERVICE

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

____/s/_____
Leo J. Wise
Assistant United States Attorney