```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
                        NORTHERN DIVISION

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,      :
                              :
     v.                       :    Criminal No. 17-00106-JKB
                              :
MARCUS ROOSEVELT TAYLOR,       :
                              :
          Defendant.          :
                              :
- - - - - - - - - - - - - - - x    April 20, 2017

                                   Baltimore, Maryland


                      DETENTION HEARING


     BEFORE THE MAGISTRATE JUDGE STEPHANIE A. GALLAGHER


APPEARANCES:              DEREK HINES, Esq.
                          Office of the U.S. Attorney
                          36 S. Charles Street, 4th Floor
                          Baltimore, MD   21201
                              On Behalf of the Government

                          JUSTIN EISEL, Esq.
                          MIRRIAM Z. SEDDIQ, Esq.
                          Seddiq Law Firm
                          14452 Old Mill Roade, Suite 201
                          Upper Marlboro, Maryland 20772
                              On Behalf of the Defendant

Audio Operator:           Jill Waryu

Transcription Company:    Compuscribe
                          5100 Forbes Boulevard
                          Suite 101
                          Lanham, MD  20706
                          (301) 577-5882



Proceeding recorded by electronic sound recording, transcript
produced by transcription service.
```

nm                                                                                    2

I N D E X

                                                                              Page

Comments by Mr. Hines, Esq.
    Attorney for the United States                                              5


WITNESS                    DIRECT      CROSS     REDIRECT      RECROSS
For the Defendant:

Theodore Taylor              13          --          --           --

                                                                              Page

Comments by Mr. Eisele, Esq.
    Attorney for the Defendant                                                20

Comments by Mr. Hines, Esq.
    Attorney for the United States                                            28

Rebuttal by Mr. Eisele, Esq.                                                  30

Ruling by Judge Gallagher                                                     31

Keynote:  "*" indicates phonetically spelled in transcript.

nm                                                                          3

P R O C E E D I N G S

1

2          (Whereupon, at 10:35 a.m., the proceeding began.)

3          THE COURT:  Good morning.  Please be seated.

4          Mr. Hines?

5          MR. HINES:  Good morning, Your Honor.  We are here

6   for a detention hearing in the matter of United States versus

7   Marcus Taylor, criminal docket number 17-106-JKB.  Assistant

8   U.S. Attorney Derek Hines appearing on behalf of the United

9   States.  Good morning.

10          THE COURT:  Thank you.  Good morning.

11          MR. EISELE:  Good morning, Your Honor.  Justin

12   Eisele and Mirriam Seddiq on behalf of Mr. Taylor.  He is also

13   at counsel table.

14          THE DEFENDANT:  Good morning.

15          THE COURT:  Good morning to all of you.

16          THE DEFENDANT:  Good morning.

17          THE COURT:  All right.  Are we ready to proceed with

18   the hearing?

19          MR. HINES:  Yes, Your Honor.

20          THE COURT:  Mr. Hines?

21          MR. HINES:  Your Honor, the Government respectfully

22   submits that pretrial detention is warranted in this case

23   pursuant to the factors outlined in 18 United States Code

24   3142.  We are seeing detention on three grounds today.

25          First, pursuant to 18 United States Code

nm                                                                    4

1    3142(f)(2)(b), we move to detain Mr. Taylor because there is a

2    serious risk that he will obstruct or attempt to obstruct

3    justice, or threaten, injure, intimidate, or attempt to

4    threaten, injure, or intimate a perspective witness or juror.

5            Second, under 3142(f)(1)(a), we move to detain

6    Mr. Taylor on the basis of his commission of a crime of

7    violence for which a maximum term of imprisonment of ten years

8    or more is prescribed.

9            And third, under 18 United States Code

10   3142(f)(2)(b), we move to detain Mr. Taylor on the basis of

11   there is a serious risk of flight if he is not detained.

12           At the outset, Your Honor, we agree with the

13   recommendation of the United States Pretrial Services Office

14   that no set of conditions or combination of conditions can

15   reasonably assure safety to the community.

16           Turning to the factors that this Court should

17   consider when making its determination.  Starting with the

18   nature of the office, if this were a case, Your Honor, in

19   which the defendants' series of robberies were charged against

20   the defendants, the Government would be seeking detention to

21   protect the community.  What makes this case and these facts

22   far worse, Your Honor, is that in each example of a robbery in

23   this case, the Defendant and his co-defendants -- and/or his

24   co-defendants engaged in obstruction of justice in order to

25   conceal evidence of the robberies and extortions in which they

1   participated.

2          In each case, the defendants filed false incident

3   reports with the Baltimore City Police Department.  These

4   Baltimore City incident reports were relied on by the City's

5   criminal justice system, including judges and state

6   prosecutors in making charging determinations.  These reports,

7   in some cases, became statements of probable cause.  And in

8   several instances, citizens were charged with crimes based on

9   these false and fabricated documents.

10         These document were prepared in which the Defendant

11  -- in robberies in which the Defendant took an oath to

12  accurately describe what had occurred.  But instead, he lied

13  to conceal and protect his criminal conduct.

14         The defendants who are charged in this indictment

15  participated in a creation of false property receipts to

16  conceal the theft of money, property, and narcotics that the

17  defendants had taken from victims.

18         The defendants coached one another to lie and make

19  false statements to internal affairs investigators.  And these

20  facts, Your Honor, raise a central issue in this case, and

21  that is, whether this Defendant can be trusted.  This is a

22  central issue towards the assessment of whether the Pretrial

23  Services Office can adequately supervise the Defendant and can

24  assure the safety of the community.  If the Pretrial Services

25  officers cannot trust the Defendant, trust the responses they

nm                                                                          6

1   receive to their questions, trust that he will abide by

2   conditions set on him, then Pretrial Services cannot protect

3   the community by supervising the Defendant.

4          What we have seen in this case and unique to this

5   Defendant, and this Defendant in particular, is multiple

6   interactions with the criminal just system, not from the

7   perspective of having been charged as a Defendant, but from

8   the perspective of having taken an oath to uphold the

9   integrity and enforce -- of the criminal justice system and

10  enforce the law and having disregarded of that oath in the

11  process of submitting false and fraudulent presentations to

12  various actors in the criminal justice system.

13         In addition to fabricating incident reports, this

14  Defendant has submitted false time and attendance and overtime

15  requests for times that he was not even in the State of

16  Maryland and could not have been working.  This Defendant

17  engaged in an unsanctioned vehicle pursuit.  And when the

18  driver of the chased vehicle was involved in a significant

19  crash, Defendant Taylor and his co-defendants drove a short

20  distance from the scene and essentially hid and watched from

21  afar while innocent witness bystanders called paramedics who

22  responded to aid the person they had chased in that vehicle

23  chase.

24         The Defendants then after that agreed to

25  inaccurately report their timecards to make them look as if

1    they were not working during this incident and could not have

2    caused the horrific accident, which they did nothing about.

3          Despite this conduct, the Defendant is here today

4    now asking this Court to trust him going forward.  And we

5    simply do not believe that this Court can trust him based on

6    the record of his own actions and his own conduct.

7          Turning to the second prong, the weight of the

8    evidence prong, 3142(g)(2), in terms of the weight of the

9    evidence in this case, the FBI intercepted telephone

10   communications on various phones, installed a listening device

11   in a BPD -- Baltimore Police Department vehicle used by these

12   officers, obtained City Watch camera footage from these

13   episodes, obtained closed-circuit surveillance camera footage

14   from private businesses, interviewed and obtained sworn

15   testimony from victims and witnesses, including law

16   enforcement witnesses, obtained similar statements and

17   testimony from law enforcement officers that were not involved

18   in these episodes, but corroborated the victims, and obtained

19   contemporaneous jail call reportings in which the victims

20   discussed the robberies during what the victims thought were

21   conversations which would never be listened to and were

22   otherwise private, they disclosed specific amounts of money

23   that were taken by these officers.  And this was then

24   corroborated later when these victims were interviewed by law

25   enforcement.

nm                                                                        8

1          We also have Defendant Taylor's own statements that

2   he made on the date of his arrest.  Defendant Taylor made

3   incriminating statements about his co-defendants stealing

4   money from victims.  He even called them -- and, Your Honor,

5   this is his quote, "Dirty mother fuckers."

6          With respect to Defendant Taylor, he is charged in

7   three acts of robbery and extortions, in addition to numerous

8   acts of wire fraud.  Since the case was indicted, the

9   Government has learned of additional information about more

10  robberies committed by Defendant Taylor, which are not charged

11  in this indictment.

12         All of the defendants are charged in Count 1 with

13  participating in a conspiracy once they joined the Gun Trace

14  Task Force.  Defendant Taylor joined this unit in the summer

15  of 2016.  To the surprise of investigators, when Defendant

16  Taylor joined the unit we expected the criminal conduct that

17  was occurring within that unit to stop or diminish.  Instead,

18  it ramped up and precipitated throughout the latter half of

19  2016.

20         And when investigators looked back in time at

21  Defendant Taylor's record prior to his joining the GTTF, the

22  Gun Trace Task Force, investigators found that Defendant

23  Taylor had participated in robberies in his prior unit as

24  well.  These robberies are charged in Count 2, which are the

25  substantive RICO charges.

nm                                                                                              9

1                When you compare this defendant to his co-defendants

2      in the case, Your Honor, from our perspective, he had a

3      greater role than at least two defendants -- two co-

4      defendants, Defendant Hendrix and Defendant Ward, who this

5      Court has already ordered detained along with the rest of

6      Defendant Taylor's co-defendants.

7                For example, in the episode involving OS -- this

8      racketeering act 4 in the indictment -- Defendant Taylor is

9      the one who made multiple, repeated trips to the basement

10     where the safe was located that the officers broke into and

11     stole approximately $200,000.  Defendant Taylor then invited

12     the officers to come back to his house where they divided up

13     the cash that they robbed from OS.

14               With respect to the robbery of SS, racketeering act

15     10, Defendant Taylor is the one that falsely told the victim

16     of the robbery that he -- or the officers had obtained a

17     searched warrant for the storage unit.  That was a lie.  And

18     as a result of it, it enabled the officers to get into SS's

19     storage unit and rob him of money, which Defendant Taylor

20     personally took.

21               And in the episode involving M.MC -- this is

22     racketeering act 3, Defendant Taylor is the one that took the

23     money from the victim.  And he falsely told the victim that he

24     would bring the money to the victim's girlfriend, but

25     Defendant Taylor never did.

1           Turning to the fourth factor this Court should

2   consider, the nature and seriousness of the danger to any

3   person or the community that would be posed by the Defendant's

4   release:  Your Honor, the witnesses in this case are

5   absolutely terrified of these defendants, including

6   Mr. Taylor.  They have testified about their fears.  They are

7   in fear of retaliation by people like Mr. Taylor as well as

8   his co-defendants.  And they are fearful of not just these

9   defendants, but of other police officers within the Baltimore

10  Police Department as well, who they believe, might be working

11  with these defendants.

12          This fear is not unfounded.  Members of the

13  conspiracy have threatened to kill witnesses, including

14  threatening to have a witness killed if the witness said

15  anything to police.  This was a confidential informant that in

16  an intercepted communication members of the conspiracy said

17  they would let it be known that this person was a snitch on

18  the street and that the informant would then wind up dead if

19  he said anything.  These are Baltimore police officers who

20  were making these statements, the Defendant's co-defendants.

21          Members of this conspiracy have also received

22  information from other BPD officers, and even an Assistant

23  State's attorney during the course of the investigation.  This

24  kind of information and access exists if the Defendant is

25  released on any set of conditions.  If the Defendant remains

nm                                                                          11

1    detained, his communications over the jail phone system can be

2    monitored.

3            Since the defendants have been detained, we have

4    learned that the defendants have attempted to reach out to

5    witnesses in this case.

6            And, Your Honor, this is task force officer John

7    Seraki* who is joining me at counsel table.  He is with the

8    FBI.

9            The evidence obtained in this case has involved the

10   use of telephones to facilitate the commission of these

11   crimes.  If Defendant Taylor is released the Government cannot

12   monitor his phone calls even if he were to be placed on the

13   strictest of location home monitoring, any set of conditions

14   the Court can come up with.

15           THE COURT:  Just so I am clear as to that last point

16   you made when you said defendants have attempted to reach out

17   to witnesses, Defendant Taylor or some of his co-defendants?

18           MR. HINES:  Some of Defendant Taylor's co-

19   defendants, Your Honor.  Just to be clear.

20           THE COURT:  Thank you.

21           MR. HINES:  To the extent he now faces greater

22   stakes -- this was Judge Bredar's point at Defendant Hersl's

23   bail review hearing -- to the extent he now faces greater

24   stakes, he is going to be more incentivized at this juncture

25   to tamper with witnesses, or intimidate witnesses, or have

nm                                                                    12

1    them killed.  And on that point, Your Honor, with respect to

2    risk of flight, as Judge Bredar found, the defendants in this

3    case face dire consequences, and on that ground alone, we

4    believe there is a serious risk of flight.

5            Defendant Taylor is uniquely challenging for

6    Pretrial Services to supervise because he is a law enforcement

7    officer.  Throughout this investigation Defendant Taylor has

8    evidence and knowledge of counter law enforcement techniques,

9    including evading surveillance, taking other steps to prevent

10   being monitored or supervised, and to prevent his conduct from

11   coming to the light of, not only the Baltimore Police

12   Department, but his internal affairs division, United States

13   Department of Justice Civil Rights Division, which was

14   overseeing a consent decree.  And while all this was going on,

15   Defendant Taylor was tipped off that there was a federal

16   investigation.  Despite that tip and that threat, Defendant

17   Taylor continued his conduct of robbing people.

18           The question is now whether Pretrial Services with

19   far less resources available to it, can affectively monitor

20   Defendant Taylor now that the stakes are that much higher.

21           Your Honor, the Defendant has been detained since

22   March 1st and that detention has worked.  It has protected the

23   community.  We would ask that Your Honor continue to protect

24   the public by detaining Defendant Taylor.  And we agree with

25   Pretrial Services' recommendation that Defendant Taylor should

1   be detained because no set of conditions can reasonably assure

2   safety to the community.

3           THE COURT:  Thank you.

4           Mr. Eisele?

5           MR. EISELE:  Yes.  Before arguing, Your Honor, I

6   would like to call my client's father for brief testimony.

7           THE COURT:  Okay.

8           MR. EISELE:  I call Mr. Taylor.

9           THE CLERK:  Please raise your right hand.

10  Whereupon,

11              THEODORE ROOSEVELT TAYLOR

12  was called as a witness by the Defendant, having been first

13  duly sworn, was examined and testified as follows:

14          THE CLERK:  Please sit down.  If I can ask you to

15  speak into the microphone.  State your full name for the

16  record, and if you can please spell your first and last name.

17          THE WITNESS:  Theodore Roosevelt Taylor.  My first

18  name, I will spell it, T-h-e-o-d-o-r-e.  Last name Taylor,

19  T-a-y-l-o-r.

20          THE CLERK:  Thank you.

21          MR. EISELE:  Thank you.

22                  DIRECT EXAMINATION

23          BY MR. EISELE:

24  Q    Good morning.

25  A    Good morning.

1   Q     How do you know Marcus?

2   A     Oh, he's my son.  He's my son when he first came into

3   this world.

4   Q     Been there since the beginning?

5   A     Oh, yes.

6   Q     Okay.  And what have you done for the vast majority of

7   your career?

8   A     Well, I'm a retired military person.  I did 22 years in

9   the United States Army.  So most of that I did in the United

10  States military.  And now I work for the ports.

11  Q     And where do you live?

12  A     I live in Maryland.  I live in 1322 Treasure Drive,

13  Odenton, Maryland.

14  Q     Okay.  And your home -- we are going to get to some other

15  questions -- would it have a bedroom for Marcus if he were to

16  live with you?

17  A     Yes.

18  Q     And are you married?

19  A     Yes, I am.

20  Q     And what is your wife's name?

21  A     Saddia* Taylor?

22  Q     And what was her career for most of her life?

23  A     Most of her life, she's a registered nurse.  Retired in

24  the United States Army, officer.

25  Q     And she is retired now, is that right?

1    A    Yes, she is.

2    Q    And she lives at that residence with you?

3    A    Yes, she does.

4    Q    And his mother -- what is Marcus' mother's name?

5    A    Theresa.  Theresa Taylor.

6    Q    And is she here today?

7    A    Yes, she is.

8    Q    And even though you two are no longer married, you have

9    maintained a good relationship --

10   A    Yes.

11   Q    -- as the parents of Marcus?

12   A    Yes.

13   Q    And, in fact, you are all still a very close-knit family,

14   is that right?

15   A    Yes, we are.  Yes, we are.

16   Q    Now, your son lived in a different -- lived on his own,

17   is that right?

18   A    Yes.

19   Q    And at that time, did he have a mortgage and a car

20   payment?

21   A    Yes, he did.  Yes, he does.

22   Q    Now, since he has been incarcerated, have you and other

23   family -- have you helped him keep up with that month --

24   A    Yes.  Yes.  His mortgage, his car payment.  Yes.  Yes.

25   As well as his child support.

1  Q    And he -- so he does pay child support?

2  A    Yes, he does.

3  Q    And to your knowledge, up until he was arrested, was he

4  up to date on that and keeping up with it?

5  A    Yes.  Yes.

6  Q    I want to go into that in a minute, but if the Judge

7  decides to release Mr. Taylor -- that is one of the decisions

8  today -- he may be on complete home detention, which means he

9  wouldn't be able to work possibly.  That is going to involve

10 the continued financial support -- not just for the

11 obligations that you have, but to -- him to eat and things

12 like that.

13 A    Yes.

14 Q    Is that something that you are financially and personally

15 willing to do?

16 A    Oh, yes.  Oh, yes.

17 Q    Okay.

18 A    Oh, yes.  In a heartbeat.

19 Q    Okay.  Now, you mentioned the child support.  He has a

20 son, is that right?

21 A    Yes.

22 Q    And how old -- and what is his son's name?

23 A    Jayden*.  Jayden T.  Jayden C. T.

24 Q    Now, Marcus was previously married to his son's mother,

25 is that right?

 1    A    Yes.

 2    Q    And at some point a couple years ago, they got divorced,

 3    is that right?

 4    A    Yes.  It has been a little bit -- yeah, a little bit more

 5    than two years.  Yes.  Yes.  Yes.

 6    Q    And so there were some court proceedings related to that

 7    divorce, is that right?

 8    A    Yes.

 9    Q    And did Marcus attend those proceedings?

10    A    Yes, he did.

11    Q    And did the court order certain things about support, and

12    property, and things like that?

13    A    Yes.  Yes.

14    Q    And to your knowledge, has your son followed those orders

15    and done what he is supposed to do?

16    A    Yes, sir.

17    Q    And does he maintain a relationship with his son?

18    A    Yes, he does.  He does.

19    Q    And what type of activities is he involved in with his

20    son?

21    A    Well, he -- when he's not working, he's involved in the

22    schools, going to school, talk to his teacher.  He -- on the

23    weekends, too, he has him.  Jayden is also in soccer and he's

24    involved with that as well.  So all his activities, my son is

25    -- he's good.  Things that I did for him, okay, he's doing for

 1  his son.

 2  Q    He is following in those --

 3  A    Yes.

 4  Q    -- directions?  Okay.

 5        Since you have known him, have you known him to have

 6  any addiction issues that you are aware of?

 7  A    No.  No addiction.

 8  Q    Okay.  In your presence, or when he was married, or

 9  around anybody else, have you ever seen him be violent towards

10  anybody?

11  A    No.  No.  That doesn't sound like my son.

12  Q    Now, we are not -- this is a bail hearing, we have a lot

13  of people -- there are a lot of people in the audience, isn't

14  there?

15  A    Yes, it is.  It's family, uncles, grandparents, okay?

16  Mother, okay?  Friends.  People he grew up with.  We're all

17  here.

18  Q    About twenty-some-odd people.  Is that fair to say?

19  A    Yes.

20  Q    And these uncles, and cousins, and everybody, are they --

21  most of them from the Maryland area?

22  A    Most of them are from the Maryland area.

23  Q    And Marcus has been living in this area for twenty-some-

24  odd years, is that correct?

25  A    Yes, that's correct.

1   Q    Is it fair to say that the people that he cares about in

2   this world are right in this area around the state?

3   A    Oh, yes.  Oh, yes.  Oh, yes.

4   Q    Now, to be a third party custodian -- if the judge,

5   again, were to allow him to be released, would you be willing

6   to pay for monitoring -- electronic monitoring at the home?

7   A    Yes.  Yes.

8   Q    Okay.

9   A    Yes.

10  Q    And if the Court were to say you can't have any firearms,

11  no communication devices for Marcus, would you be willing to

12  make sure that happens?

13  A    Oh, yes.  Oh, yes.

14  Q    Now, even as a parent, you want him to be okay.  You

15  would like him to be out, is that right?

16  A    Yes.

17  Q    But you understand that if you are in a position of a

18  third party custodian, you are essentially an agent of the

19  Court.  Do you understand that?  Has some responsibilities --

20  A    Oh, yes.  Well, yes.  I understand that.  And, again,

21  being in the military -- okay? -- I understand that.  I'm not

22  going to, you know, cover up if he goes -- he steps out of

23  line, I'm going to do what I have to do.

24  Q    You would report that directly to probation?

25  A    Oh, yes.  Oh, yes.  I'm that type of father.  I am that

1  type of father.  He knows me.

2  Q    He's nodding.

3          MR. EISELE:  That is all I have, Your Honor.

4          THE WITNESS:  Yes.

5          THE COURT:  All right.  Thank you.

6          Mr. Hines, any cross examination?

7          MR. HINES:  No questions, Your Honor.

8          THE COURT:  All right.  Thank you, Mr. Taylor.  You

9  may return to your seat.

10          (Witness excused.)

11          MR. EISELE:  That is all I have for testimony.  I

12 will just proceed to argument, Your Honor.

13          As it is clear, Mr. Taylor is the last of the

14 persons in this case to have a bond hearing.  The previous

15 persons were detained.  And it seems that the argument of the

16 Government and some of the rationale in the detention orders

17 is that, well, he is a police officer who did things he wasn't

18 supposed to do, as a result, I can't trust him.  Which, even

19 though this is not a presumption case that we would argue, and

20 we would object to any classification that this is a

21 presumption case, it creates a de facto presumption because he

22 is a police officer, so anything that he did to abuse trust

23 would mean that he can't be trust, which means, he doesn't get

24 a chance to show that he can be out on conditions.

25          And that flies in the face of the whole Bail Reform

1   Act that was created in the 80's that the default position is

2   first, even personal recognizance.

3          Now, we are not asking the Court for personal

4   recognizance in any way, but the issue is not detention with

5   conditions or detention release with conditions, it is are

6   there any conditions that are reasonable that if we put them

7   in place that, would it be reasonable -- not guaranteed --

8   would it be reasonable to think that if those conditions were

9   in place, such as having two military parents, on complete

10  home detention with no access to communication devices, not

11  allowed to leave to work, can that reasonably guarantee the

12  safety of the community and provide that he will not flee?

13  And we would argue that that is definitely the case with

14  regard to Mr. Taylor.

15         Now, respectfully, the Government goes through and

16  lists some individual accusations against Mr. Taylor, but as

17  the Court pointed out when asking a question, if the answer

18  was, well, these people or these defendants are doing

19  something, it is not Mr. Taylor.  Mr. Taylor has not

20  threatened witnesses.  He is not that type of person.

21         And it is very difficult in a case like this not to

22  bunch people together because the courts -- everyone in the

23  city is dealing with problems in the Baltimore Police

24  Department.  And I am bringing that up with all due respect.

25  I am not trying to make excuses for my client, but we have a

nm                                                                    22

1    consent decree for a reason.  We have reports of -- I mean,

2    the statistics for the Baltimore Police Department -- and,

3    again, it is up to the Prosecutors to bring these cases, but

4    122 of the 155 top paid employees in Baltimore are police

5    officers.  And the vast majority of that income is from

6    overtime.  I mean, this is all public record, Your Honor.

7    And, again, that is not to say that -- minimize the issue, but

8    it is a police department that is rampant.

9           And you know how you can tell that one of the issues

10   -- the main issues in this police department and the problems

11   within?  Not only has the Federal Government got involved, but

12   Mr. Taylor -- his family would be shocked if you ever

13   mentioned that he did anything like this, and this happened at

14   the Baltimore Police Department.

15          He has had a family full of -- a courtroom full of

16   family here to support him to say -- if we let them, for days,

17   to say all the things that he has done to help them, be there

18   for them.  He is involved in his son's life.  And whatever

19   allegations there are, the Baltimore Police Department is

20   rampant with issues and that is why they have to be supervised

21   by the Federal Government.

22          Again, Your Honor, the specific issues with regard

23   to Mr. Taylor, he has not threatened anybody.  And, in fact,

24   he has gone to court and lost motions hearings because he is

25   too honest and the defense attorneys win.  He is someone who

nm                                                                    23

1   has not threatened people.  He has not tried to reach out to

2   victims.  I would put the Government to stand up and say one

3   specific incident where my client has reached out and, after

4   the fact, tried to intimidate any witness.  I don't believe it

5   exists.

6          We have received some of the discovery.  Some of the

7   things mentioned by the Government, we don't have yet.  We are

8   in that process of discovery so we are a little at a

9   disadvantage that way, but I don't see any indication that he

10  has reached out to intimidate witnesses.

11         And as much as it would be easy to do to lump these

12  people together, Mr. Taylor has a right under the Bail Reform

13  Act to say, I am Marcus Taylor, here are the reasons why I can

14  be safe in the community under these conditions.  And we have

15  put forward conditions that could reasonably ensure the safety

16  of the community and he is not a flight risk.

17         I would like to point out and refer to the Pretrial

18  Services report -- if I can get my hands on it.  If you go

19  back to the last page, and I know Your Honor has read it, but

20  on the assessment of danger it talks about the nature and

21  circumstances of the offense.  There is not one enumerated

22  instance of Mr. Taylor's specific conduct that is listed in

23  here.

24         And, Your Honor, that goes to our argument that the

25  Bail Reform Act is to consider each defendant, the nature and

nm                                                                    24

1    characteristics of the Defendant and what he did and who he

2    is.  And there is nothing in here, respectfully.  It just

3    says, well, what he did, because he is a police officer, means

4    he can't trusted or released.  And that is not the standard of

5    the Bail Reform Act.

6            The default is release and the Government has to

7    prove that he should be detained by clear and convincing

8    evidence if he is a danger or by preponderance if he is a

9    flight risk.

10           The assessment of non-appearance, if you look at the

11   recommendation, it talks about the safety of the community.

12   It doesn't mention flight.  And I know Your Honor did the

13   other bond hearings and did not find a flight risk.  And I

14   submit that Mr. Taylor is also not a flight risk.  I mean,

15   possession of a US passport -- when we talk about conditions

16   that can reasonably assure appearance, he turns in his

17   passport, he can't travel.  There is no indication that he has

18   any ties to fraudulent document creation or anything like

19   that.  So in foreign travel for vacation, that is not a reason

20   to detain someone.  He doesn't have connections overseas.

21   Everybody he loves and cares about is right here.

22           And my co-counsel reminds me, I think they have

23   already taken his passport, so that is not an issue at this

24   point.

25           Your Honor, if we -- just a brief review of the

1    facts -- I have already covered a lot of it, but when you talk

2    about the history and characteristics of Mr. Taylor, he had no

3    prior criminal history, no drug addiction, all of his family

4    is here, he has financial resources that -- with his family

5    that allows him to be released, but also allow the community

6    to be protected because he doesn't have to make a living right

7    now and be out and about, and that would alleviate concerns of

8    the Court.  He doesn't have an alcohol abuse criminal history.

9            And the reason I asked Mr. -- his father about

10   attending court, he is not someone who has abandoned his son

11   after a divorce.  Family is very important.  I mean, if you go

12   outside you will see mom, step-mom, and dad circling around

13   making sure everything gets taken of.  And he has taken that

14   culture and passed it on to his son.  And a divorce doesn't

15   mean, I am not going to take care of my kid.  He is paying

16   child support.  His family is making sure.  And frankly, they

17   haven't had to.  He has taken care of his son until now.  And

18   they are willing to band together to help him.

19           And, he has gone to court for that.  He has had

20   respect for the court.  I don't know of any record that he has

21   skipped court and failed to follow the orders of that divorce

22   proceeding.  He did everything he was supposed to do.

23           A brief review, when we talk about this not being

24   okay, in this case there is extremely nefarious behavior.  We

25   have Mr. Gondo, who I am sure you have heard information, who

nm                                                                          26

1   was essentially, drug dealing, but there is no evidence of my

2   client who, on his own, was doing something that would

3   intimidate witnesses after the fact.  And if you review the

4   line sheets, the conversations mentioned in the indictment are

5   not Mr. Taylor.  They are of Gondo and Rayam with alleged

6   references to Mr. Taylor, but not Mr. Taylor who was calling

7   in to these tap lines and not saying anything.

8          I mean, I looked at the other day and he was asking

9   about a sandwich, whether he wanted union sauce on it.  I

10  mean, that is -- I could not find anything substantive where

11  Mr. Taylor is communicating with Rayam and Gondo saying, you

12  know, we have got take care of this witness, we have got to

13  take care of that.

14         And that, along with the other factors that make

15  Mr. Taylor's case specific to him -- he is in a unique

16  circumstance, and this goes to the large part of our argument,

17  the Bail Reform Act says that you have to look at conditions

18  that are available and say in those conditions, can the

19  community be safe?  In those conditions, can flight be

20  ameliorated?  And in this particular case, with Mr. Taylor's

21  particular background and particular family ties, it can

22  happen.

23         And we are asking for the most restrictive release,

24  home detention, no travel, except for perhaps for Pretrial

25  Services or attorney visits.  And that is what we are asking

1    to do in this case.

2            If I could just, one moment, check a couple things.

3            THE COURT:  Sure.

4            (Pause.)

5            And, Your Honor, late last night I submitted two

6    cases -- I will wrap up with this -- and I didn't have a

7    chance to describe why I brought them up.

8            THE COURT:  Right.

9            MR. EISELE:  But they do deal with bail hearing

10   issues on appeal.  And specifically, the Acaredo case deals

11   with information taken at separate bond hearings into

12   consideration for the person that is right in front of the

13   magistrate or the district judge.  And we would submit that

14   even though -- I couldn't find a Fourth Circuit case on point.

15   I sherardized this, they talked about other issues in the

16   case, but they didn't go against it in any way.  So I submit

17   that this --

18           THE COURT:  So the concern is whether I would use

19   evidence from the past hearings to consider this issue of

20   detention?

21           MR. EISELE:  Yes.  And I --

22           THE COURT:  Okay.  I assure you I am not going to do

23   that.  I am going to rest my decision today on what I have

24   heard today.

25           MR. EISELE:  Well, I appreciate that, Your Honor.  I

nm                                                                          28

1    didn't mean any disrespect.

2              THE COURT:  Sure.

3              MR. EISELE:  I just know that there has been a lot

4    of testimony evidence put forth, and I just wanted to not sure

5    -- start with that.

6              THE COURT:  Okay.

7              MR. EISELE:  So we would just ask to be heard on and

8    the case decided on the evidence before you.  And there is a

9    set of conditions that can reasonably assure the community's

10   safety and he is not a flight risk, Your Honor.

11             THE COURT:  Okay.  Was there a different point from

12   the Vortis* case or was --

13             MR. EISELE:  The Vortis just simply -- that was a

14   case where the court admonished the lower court for -- it is a

15   similar issue -- for previous hearings' testimony on a

16   subsequent -- not a different defendant, but since Your Honor

17   is going to just take this hearing testimony, that is not an

18   issue, I don't think.

19             THE COURT:  Okay.  All right.  Thank you.

20             Anything further, Mr. Hines?

21             MR. HINES:  Your Honor, this is not a case of over-

22   zealous policing.  We are not moving for detention in this

23   case because the Defendant was a police officer.  This was a

24   series of robberies and the defendants happen to be police

25   officers.

nm                                                                    29

1          With respect to risk of flight, we didn't move for

2    detention on that ground at the other detention proceedings,

3    but we are today in light of Judge Bredar's factual finding

4    that the defendants face dire consequences.

5          With respect to these cases, I understand -- that

6    was my point as well, Your Honor.  Your Honor will consider

7    the facts presented at this proffer today, as I am sure.  But

8    these cases are also distinguishable on factual grounds.  One

9    involved an illegal gambling business and the other, likewise,

10   did not involve a series of serious robberies, as is the case

11   in this case that the conduct that Defendant Taylor is alleged

12   to have committed.

13         I agree with Mr. Eisele that an individual

14   assessment is necessary.  The facts in this case, Your Honor,

15   distinguish Mr. Taylor from his co-defendants to show that he

16   is more culpable and more directly involved with respect to

17   the three robberies that are charged in the indictment.

18         There is -- Mr. Eisele made the point that there has

19   been no indication since Mr. Taylor has been detained that he

20   has reached out to intimidate witnesses.  We would agree with

21   that, Your Honor.  That is because the condition of detention

22   has worked and we can monitor his jail calls so he cannot

23   threaten or intimidate potential witnesses.

24         THE COURT:  Let me ask you this, Mr. Hines -- and

25   perhaps I misunderstood, I did not hear you to be saying

Appeal: 17-4336    Doc: 17-2        Filed: 06/12/2017    Pg: 86 of 224

nm                                                                          30

1  earlier that even prior to the arrest that there was

2  information that this Defendant had specifically intimated

3  witnesses.  I understand your argument that he specifically

4  was involved in several of the armed robberies, but do you

5  have specific obstruction or witness intimidation evidence as

6  to this defendant even prior to arrest?

7          MR. HINES:  Your Honor, the episode that I can think

8  of right now was the SS episode in the indictment in which

9  Defendant Taylor approached the victim and lied and said that

10 he had a search warrant to get into his storage unit.  So to

11 the extent that rises to sort of intimidation, that is some

12 evidence of that.  But there is a number of direct involvement

13 scenarios by this Defendant with respect to false and

14 untruthful --

15          THE COURT:  Reports.

16          MR. HINES:  -- incidents, which I have gone over.

17          THE COURT:  Right.

18          MR. HINES:  And that is the core issue that this

19 Court must consider, the Defendant's trustworthiness and

20 whether Pretrial Services is capable of supervising him.

21          THE COURT:  Okay.  All right.  Thank you.

22          Any response you wanted to make to that, Mr. Eisele?

23          MR. EISELE:  Just brief -- just one statement, is

24 that we are in Federal Court, Your Honor.  And everybody faces

25 dire consequences.  And I respectfully -- I have read the

1    order of Judge Bredar, but there is nothing specific as to

2    Mr. Taylor that gives him any more dire consequences than

3    anybody else who is facing prison time who has never been in

4    trouble in his life.  He will be a felon if he is convicted.

5            So we will submit that everybody is in that same

6    position.

7            THE COURT:  All right.  Thank you.

8            (Long pause.)

9            THE COURT:  All right.  Having considered all of the

10   information presented by the parties today, and again, I am

11   relying only on the information presented at this hearing, and

12   not on anything I may have heard in prior hearings, I am

13   issuing an order of detention, but let me explain my specific

14   reasons.

15           First of all, I agree with Mr. Eisele as to two of

16   the three grounds on which the Government is seeking

17   detention.  I do not believe that a serious risk of

18   obstruction has been proven as to this particular Defendant

19   based on the fact alleged.  And I also do not believe that

20   this Defendant poses a serious risk of flight.  And I base

21   that finding -- I understand what Judge Bredar said in the

22   prior hearing with the other defendant, but I believe that in

23   this Defendant with the strength of the proposed third party

24   custodians and the other particular conditions that were being

25   proposed, I think that the risk of flight could have been

1    sufficiently ameliorated to the extent that a risk of flight

2    as posed by the sentence that the Defendant is facing.

3            So even understanding Judge Bredar's ruling in the

4    prior hearing, I do think that conditions could have been set

5    in this case to ameliorate the risk of flight.  But my concern

6    here is the Defendant's commission of a crime of violence and

7    the risk of danger to the community that is posed by the

8    particular facts in this case.

9            So for that reason, I am issuing an order of

10   detention on the following grounds:  First, this is a case in

11   which the Government may properly seek detention.  The

12   Defendant is charged under 18 United States Code Section

13   1962(d).  Based upon the Government's proffer, there is

14   probable cause to believe that the Defendant committed the

15   charged offense.  I find by clear and convincing evidence from

16   the information produced at the hearing that the Defendant

17   poses a risk to the safety of other persons in the community.

18   And by clear and convincing evidence, that there is no

19   condition or accommodation of conditions to reasonably assure

20   community safety.

21           Specifically, I am relying upon the following -- and

22   what I am not doing is simply assuming detention because the

23   Defendant is a police officer.  That would be inappropriate

24   and that is not what is going on here.  But the Defendant --

25   the evidence proffered by the Government suggests that the

nm                                                                      33

1   Defendant participated in a series of armed robberies over a

2   relatively lengthy period of time.  And the Government cited

3   some relatively strong evidence suggesting that participation

4   in a series of armed robberies.  And as, I believe, Judge

5   Bredar said, and I certainly concur, you know, cases involving

6   armed robbers' detention is quite customary and it has nothing

7   to do with the Defendant being a police officer or not being a

8   police officer, armed robbery poses a serious risk to the

9   community safety.

10          Two, I do believe that there is an egregious breach

11  of public trust inherent in the facts here.  The Defendant was

12  a sworn law enforcement officer on a very serious task force

13  investigating gun crime in a city with a serious problem of

14  gun crime.  And the actions that were described related to

15  this Defendant, specifically the participation in a series of

16  armed robberies and the submission of false reports in

17  connection with his law enforcement duties, do show an

18  extremely egregious breach of public trust that I think

19  inhibits my ability to find that he could be trusted to comply

20  with conditions of release.

21          Finally, I am also relying on Pretrial Services'

22  recommendation of detention.

23          So for all of those reasons, I will issue an order

24  of detention in this case.

25          Is there anything further that needs to be addresses

nm                                                                              34

1    in this matter today?

2              MR. HINES:  Nothing form the Government, Your Honor.

3              MR. EISELE:  Not from the Defense.  Thank you, Your

4    Honor.

5              THE COURT:  Thank you.

6              MS. SEDDIQ:  No, Your Honor.  Thank you.

7              (Whereupon, at 11:18 a.m., the proceeding

8    concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the duplicated electronic sound recording of the

proceedings in the above-entitled matter.


_Noemy Martinez_    _5/30/2017_
Noemy Martinez          Date
Transcriber