# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARILYN J. MOSBY,**<br><br>**Defendant** | **Case No. 22-cr-00007-LKG-1** |

**DEFENDANT MARILYN J. MOSBY'S MOTION TO DISMISS
COUNTS 1 AND 3 OF THE INDICTMENT, OR ALTERNATIVELY
TO COMPEL PRODUCTION OF THE INSTRUCTIONS OF LAW
<u>PROVIDED TO THE GRAND JURY FOR COUNTS 1 AND 3</u>**

Pursuant to Federal Rules of Criminal Procedure 6(e)(3)(E)(ii), 7(d), and 12(b)(3)(B)(v), Baltimore State's Attorney Marilyn J. Mosby ("State's Attorney Mosby") respectfully moves the Court to dismiss Counts 1 and 3 of the Superseding Indictment charging perjury, in violation of 18 U.S.C. § 1621, for failing to state an offense. Alternatively, State's Attorney Mosby requests that the Court order the production of the grand jury transcripts containing the instructions of law for Counts 1 and 3 that were provided to the grand jury in this case (or permit their review in camera), as detailed below.

The Superseding Indictment is defective as a matter of law because it does not (and cannot) sufficiently allege that the "matter" or statements State's Attorney Mosby certified as true were material—a required element for a perjury offense.[1] Dismissal of Counts 1 and 3 is also warranted because the phrase "adverse financial consequences" is fundamentally ambiguous and as such, insufficient to support the perjury charges under § 1621.

---

[1] Recent events demonstrate just how critical—and potentially dispositive—materiality can be with respect to allegedly false statements. On March 31, 2022, a jury acquitted former Hillary Clinton campaign lawyer Michael Sussman of lying to the FBI after his lawyers "repeatedly harped on the 'materiality' element" of the charges against him. *See* https://www.cnn.com/2022/05/31/politics/sussmann-verdict/index.html.

Should the Court not dismiss Counts 1 and 3, State's Attorney Mosby alternatively seeks an order compelling the government to produce the instructions of law for Counts 1 and 3 that were provided to the grand jury that returned the original and superseding Indictments. Barring dismissal, such an alternative remedy would be warranted because the Superseding Indictment alleges an incorrect legal standard not found in Section 2202 of the CARES Act (which the government alleges State's Attorney Mosby failed to meet) as the basis for charging perjury in Counts 1 and 3. In this first of its kind case where the government has criminally prosecuted perjury based on an individual's Section 2202 coronavirus-related withdrawal, due process requires that the Court ensure the grand jury was not improperly instructed with misleading and prejudicial instructions, as the Superseding Indictment strongly suggests occurred.

## BACKGROUND

### A.    Distributions of Retirement Funds under Section 2202 of The CARES Act

Congress enacted the CARES Act of 2020 to provide economic relief to taxpayers impacted by the coronavirus pandemic. *See* IRS Guidance, attached hereto as Ex. 1, at. 1-3. Section 2202 of the CARES Act ("Section 2202") provides such relief by allowing taxpayers to make early withdrawals of their own retirement funds and providing favorable tax treatment with respect to those distributions. *Id.* at 1. In particular, under Section 2202, a coronavirus-related distribution ("CRD") is not subject to the 10% early withdrawal penalty typical of retirement plans, and the plan participant is allowed to spread the payments of the taxes due on the withdrawn amount over a 3-year period, instead of being required to pay all the taxes in the year of the withdrawal. *Id.* A *self-certified* qualified taxpayer was allowed, under Section 2202, to designate a distribution out of their retirement account as coronavirus-related and enjoy that distribution subject to lesser tax consequences than would otherwise be associated with such an early distribution. *Id.* at 6.

### B.      State's Attorney Mosby's Section 2202 Coronavirus-Related Withdrawals

At all times relevant to this case, State's Attorney Mosby participated in the City of Baltimore Deferred Compensation 457(b) Plan, which was administered by Nationwide Insurance. Super. Indictment, ¶ 3. At issue in this case are two Section 2202 CRDs that State's Attorney Mosby made in May and December of 2020. *Id.* at ¶¶ 4, 13.

Notably, State's Attorney Mosby did not enjoy any tax-related benefits by designating these withdrawals as CRDs. Participants in 457(b) plans (such as State's Attorney Mosby) are never subject to the 10% early withdrawal penalty, unlike 401(k) and 403(b) plan participants; so the savings offered by the Section 2202 10% penalty waiver did not apply to her.[2] Further, State's Attorney Mosby *paid all* the taxes due on *both* of her withdrawals when she filed her 2020 taxes, even though Section 2202 allowed her to defer those tax payments over three years.[3] Simply put, the only benefit State's Attorney Mosby enjoyed from her two CRDs was her own money, and nothing more – no waived 10% penalty, and no deferred tax liability.

### C.      The Government Alleges That State's Attorney Mosby Committed Perjury By Falsely Certifying That She Experienced Adverse Financial Consequences Pursuant to Section 2202

Almost 20 months after State's Attorney Mosby made the first withdrawal, a federal grand jury returned a four-count Indictment on January 13, 2022, and a Superseding Indictment on March 10, 2022, charging her with two counts of Perjury, in violation of 18 U.S.C. § 1621 (Counts 1 and 3) and two counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014 (Counts Two and Four). Both Counts 1 and 3 concern State's Attorney Mosby's 457(b) CRDs, *see* Super. Indictment, at ¶¶ 4, 13, and accuse State's Attorney Mosby of falsely certifying

---

[2] *Retirement Topics - Exceptions to Tax on Early Distributions: Exception to 10% Additional Tax*. IRS.gov. (last updated 07-Apr-2022), https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-topics-tax-on-early-distributions.

[3] In lieu of attaching the tax documents (which contain confidential information) under seal, State's Attorney Mosby can make those documents available to the Court as necessary.

under oath that she experienced "adverse financial consequences" pursuant to Section 2202. The government claims that this certification was false because:

> MOSBY received her full salary of $247,955.58 from January 1, 2020, through the date on which she signed this form, December 29, 2020, in bi-weekly gross pay direct deposits in the amount of $9,183.54 and had not experienced any of the enumerated financial hardships she claimed to have experienced.

*See* Super. Indictment, at ¶¶ 5, 14.

Throughout Counts 1 and 3 of the Superseding Indictment, the government uses inconsistent terminology when referring to the nature of the certification, variously using the phrase "financial hardship," *see, e.g.*, Super. Indictment at ¶¶ 1, 5, interchangeably with "adverse financial consequences." *See, e.g., id.* at ¶ 3. Despite using these phrases interchangeably, only "adverse financial consequences" appears in Section 2202.

## ARGUMENT

Counts 1 and 3 fail to state a viable offense and should be dismissed for two reasons. *First*, the Superseding Indictment fails to allege (and cannot allege) that the "matter" or statements State's Attorney certified as true were material. *Second*, the phrase "adverse financial consequences" which is the basis for qualification for a CRD is fundamentally ambiguous and thus insufficient to support a charge of perjury under § 1621. For either or both of these reasons, dismissal of Counts 1 and 3 is appropriate.

## I.     COUNTS 1 AND 3 FAIL TO STATE AN OFFENSE AND SHOULD BE DISMISSED

### A.     Governing Law

Federal Rule of Criminal Procedure 12(b)(3)(A) provides that a defendant may move to dismiss an indictment or allegations in an indictment based on a defect in the charging instrument, including failure to state an offense. *Id.* "When a defendant challenges the sufficiency of an

indictment, courts apply a 'heightened scrutiny to ensure that every essential element of an offense has been charged.'" *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014). To be legally sufficient, an indictment "must contain the elements of the offense charged." *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009) (citations omitted). That an indictment must include all elements of an offense derives from "the Fifth Amendment requirement that all elements of the offense have been considered and found by the grand jury." *United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir. 1988).

To be sufficient, an indictment must "fully, directly, and expressly, *without any uncertainty or ambiguity*, set forth all the elements necessary to constitute the offense." *United States v. Remarque*, No. SAG-19-0039, 2021 U.S. Dist. LEXIS 28016, at *6 (D. Md. Feb. 12, 2021) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974) (emphasis added)). "If the indictment does not contain every essential element of the offense, it is invalid." *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997). But "simply parroting the language of the statute in the indictment is insufficient." *United States v. Fitzgerald*, 514 F. Supp. 3d 721, 737-38 (D. Md. 2021). "[I]n testing the sufficiency of an indictment, 'it is the statement of facts in the pleading, rather than the statutory citation that is controlling …'" *Hooker*, 841 F.2d at 1227. As the Court of Appeals for the Fourth Circuit has instructed:

> When the words of a statute are used to describe the offense generally, they must be accompanied with such *a statement of the facts and circumstances* as will inform the accused of the *specific offense*, coming under the general description, with which he is charged. Thus, the indictment must also contain *a statement of the essential facts constituting the offense charged*.

*United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002) (emphasis added).

**B.      Counts 1 and 3 Fail to Sufficiently Allege Materiality**

Counts 1 and 3 fail to state the offense of perjury under 18 U.S.C. § 1621 because they do not allege an essential element of the offense, *i.e.*, that the "matter" or statements State's Attorney Mosby certified as true, were material.

Section 1621 provides, in relevant part:

> Whoever … in any declaration … under penalty of Perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any *material matter* which [s]he does not believe to be true … is guilty of Perjury.

18 U.S.C. § 1621(2) (emphasis added). Thus, to properly bring a charge under § 1621, an indictment must "fully, directly, and expressly, *without any uncertainty or ambiguity*" set forth "a statement of the facts and circumstances" showing: "(1) a declaration, (2) made under penalty of Perjury, (3) in which the accused willfully subscribes as true (4) *any material matter*, (5) which [s]he does not believe to be true." *United States v. Savoy*, 38 F. Supp. 2d 406, 413 (D. Md. 1998) (internal quotation marks omitted) (emphasis added). Important for the purposes here, "[a]n allegedly perjured statement is material 'if it has a natural tendency to influence, or is capable of influencing, *the decision-making body to which it was addressed*." *United States v. Savoy*, 38 F. Supp. 2d 406, 413 (D. Md. 1998) (emphasis added). The Superseding Indictment falls woefully short of this standard.

The Superseding Indictment alleges that State's Attorney Mosby falsely certified as true, the following "matter" or statement:

> I have experienced adverse financial consequences stemming from [the Coronavirus] as a result of:
> Being quarantined, furloughed or laid off
> Having reduced work hours
> Being unable to work due to lack of child care
> The closing or reduction of hours of a business I own or operate.

*See* Super. Indictment at ¶ 12. But missing from the Superseding Indictment is "a statement of the essential facts" showing that the "matter" or statement that State's Attorney Mosby certified as true, that is*, the specific reasons she qualified for the distribution, themselves,* were material. And, as this Court held in *Savoy*, the Superseding Indictment also had to contain specific facts demonstrating that those specific reasons were addressed to and capable of influencing a "decision-making body." *Savoy*, 38 F. Supp. 2d at 413 (holding that a "*material matter*" that is, one that is "capable of influencing, the decision-making body to which it was addressed," is a necessary element for a charge of perjury under § 1621); *Brandon*, 298 F.3d at 307 ("[T]he indictment must also contain *a statement of the essential facts* constituting the offense charged") (emphasis added).

Rather than meeting these legal requirements, the Superseding Indictment, in alleging materiality, merely "parrots" the statutory language then confusingly claims something else was material. Specifically:

> MARILYN J. MOSBY did submit a "*457(b) Coronavirus-Related Distribution Request*" to Nationwide … *It was material to such distribution requests that the applicants certify* that s/he meet at least one of the qualifications for a distribution as defined under the CARES Act Section 2202(a)(4)(A) as summarized on the distribution request.

*See* Super. Indictment at ¶¶ 4, 13. This falls short of the "without any uncertainty or ambiguity" standard and is insufficient under Fourth Circuit law because simply alleging generally and in conclusory fashion, as the Superseding Indictment does, that "it was material to *such distribution requests that the applicants certify*" they were qualified is simply not enough under this Court's precedent and the law of this Circuit. *Savoy*, 38 F. Supp. 2d at 413; *see also Hooker*, 841 F.2d at 1233 (dismissing RICO charge because the indictment failed to set forth facts showing that the defendant was engaged in interstate commerce, a required element).[4]

---

[4] The government's allegations here are akin to saying that a witness' *taking of the oath* to testify truthfully is material instead of the *actual testimony itself.*

As such, the allegations in Counts 1 and 3 fail as a matter of law and should be dismissed.

**C.      Counts 1 & 3 Can Never Properly Allege Materiality Under the Facts of This Case.**

As discussed above, a statement is only material "if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *Savoy*, 38 F. Supp. 2d at 413; *United States v. Kimble*, No. WDQ-13-035, 2015 U.S. Dist. LEXIS 90107, at *98 (D. Md. July 8, 2015) citing *Neder v. United States*, 527 U.S. 1, 16 (1999) ("In general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed."); *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007) (a statement is material only if it is capable of influencing a decision that the decision-maker is "entitled to" or "able to make").

It is not a surprise that the Superseding Indictment fails to set forth facts showing that the alleged false statements were directed to or capable of influencing a "decision-making body" because there is no "decision of [a] decision-making body" as contemplated by § 1621, involved in the process for making a CRD. Under Section 2202, a CRD is defined as "any distribution from an eligible retirement plan made on or after January 1, 2020, and before December 31, 2020, to a qualified individual." *See* IRS Guidance, at 5. Whether a plan participant is a "qualified individual" is not determined by the insurance plan or any "decision-making body." Instead, a plan participant *self-certifies* that they meet the definition of a "qualified individual" under Section 2202 and instructs the plan to treat the distribution as a "coronavirus-related distribution." *See* IRS Guidance, at 5-6, 9.  And, the IRS has instructed that the plan administrator "may rely on an individual's certification" that they are qualified. *See* IRS Guidance, at 9.

Put differently, when State's Attorney Mosby submitted the 457(b) distribution form to Nationwide, she was not submitting it for Nationwide to decide whether she was qualified based

on the veracity of the statements that corresponded to the box she checked, that is, the specific reasons she self-certified qualified her for a distribution. Instead, she was designating the distribution as a CRD and instructing Nationwide to treat it as such.

Significantly, the procedure State's Attorney Mosby followed for her CRD differs markedly from a plan participant who requests "hardship" or "emergency" distributions from their retirement plans, including the 457(b) plan for which State's Attorney Mosby is a participant. Unlike a CRD, "hardship" or "emergency" distributions require the plan to engage in a "decision-making" process to determine not only whether a participant qualifies for the distribution but also the amount of the distribution.

Section 2202 CRDs are separate and distinct from "hardship" and "emergency" distributions from retirement plans which were, and continue to be, available to plan participants, before and after the enactment of Section 2202. In particular, 457(b), 401(k) and 403(b) retirement plans all offer "hardship" or "emergency" distributions to plan participants based on *immediate and specific* need.[5] The IRS defines the "hardship" distributions offered under 401(k) and 403(b) plans as distributions made because of an "immediate and heavy financial need."[6] Similarly, "emergency" distributions offered under 457(b) plans are defined "as distributions to a participant based on an unforeseeable emergency."[7] And the process for requesting and receiving a "hardship" or "emergency" distribution differs significantly from Section 2202 CRDs.

Unlike a CRD, qualification for a "hardship" or "emergency" distribution is determined by the plan and is based on the specific need identified by the plan participant. For example, to

---

[5] *See, e.g., Retirement Topics - Hardship Distributions*. IRS.gov. (last updated 27-Apr-2022), https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-topics-hardship-distributions.
[6] *Id.*
[7] *Unforeseeable Emergency Distributions from 457(b) Plans*. IRS.gov. (last updated 17-Mar-2022), https://www.irs.gov/retirement-plans/employee-plans-news-december-17-2010-unforeseeable-emergency-distributions-from-457b-plans

determine the eligibility of a plan participant for a 457(b) "emergency" distribution, the administrator for State's Attorney Mosby's plan, Nationwide, requires participants "to provide a detailed explanation of the unforeseeable emergency … including names and dates." *See* Nationwide 457(b) Emergency Distribution Request Form, attached as Ex. 2. And for "hardship" withdrawals, as expressly provided in the withdrawal application: "The Plan *permits* hardship withdrawals only to the extent a participant *demonstrates to the satisfaction of the Plan Committee* that the reason for the hardship withdrawal complies with the applicable requirements under the Internal Revenue Code *and* that such hardship imposes an immediate and heavy financial burden upon such participant." *See* Nationwide Hardship Withdrawal Application form, attached as Ex. 3. Unlike CRDs, there is no self-certification of qualification for these distributions.

Moreover, both 'hardship" and "emergency" distributions are directly tied to and limited by the identified "hardship" or "emergency" and the amount a plan participant is allowed to withdraw is determined by the plan. *See id*. ("Hardship withdrawals are limited to bona fide financial emergencies *as determined by the Plan Committee*) (emphasis added); IRS.GOV[8] ("Hardship withdrawals are "[l]imited to the **amount necessary** to satisfy that financial need.") (emphasis in original); *See* Ex. 2 ("Distributions due to unforeseeable emergencies are only permitted in the *amount necessary* to satisfy the financial need.") (emphasis added). By contrast, there is no such limitation for a Section 2202 CRD; a plan participant may withdraw any amount up to the maximum preset and expressly provided for in the statute. Further, "CRDs are permitted *without regard to the qualified individual's need for funds*, and the amount of the distribution is *not required to correspond* to the extent of the adverse financial consequences experienced by the qualified individual." *See* IRS Guidance, at 6 (emphasis added).

---

[8] Note 5, *supra*.

So while the specific indicated reason for a *"*hardship" or "emergency" withdrawal may be material because it is used by the plan to determine whether a plan participant is qualified and the amount of funds they are eligible to receive, the indicated reason for a CRD under Section 2202—the statement that corresponds to the box a participant checks—*is not*. As clearly outlined in the IRS guidelines, a plan is not obliged to inquire into the veracity of the statements that correspond to the box a participant checks on a CRD form to determine whether they qualify for the distribution. Once a participant checks a box, indeed any box on the CRD form, the plan may rely on that certification. IRS Guidance, 9. While checking a box may be *relevant* to a plan (in that checking the box is required to completely fill out the form), the underlying statements associated with that box have no probative weight and are not "capable of influencing" a plan into making the CRD. *Weinstock v. United States*, 231 F.2d 699, 701 (1956) ("To be 'relevant' means to relate to the issue. To be 'material' means to have probative weight … A statement may be relevant but not material."); *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007) (finding no materiality and holding: "While the leverage ratio here is certainly relevant, Defendants' misrepresentations were material only if they tended to affect interest rates.").

In sum, per the IRS guidelines, unlike "hardship" or "emergency" withdrawals, the statements that correspond to the box a participant checks in a Section 2202 CRD form have no probative weight such that a plan administrator need inquire into the veracity of those statements to qualify an applicant for a distribution or the amount they receive. As such, under the alleged facts here, the Superseding Indictment does not, and in any event, could never properly allege materiality pursuant to § 1621 and thus Counts 1 and 3 should be dismissed.

## II. DISMISSAL OF COUNTS 1 & 3 IS REQUIRED BECAUSE THE TERM "ADVERSE FINANCIAL CONSEQUENCES" IS FUNDAMENTALLY AMBIGUOUS

Counts 1 and 3 should also be dismissed on the equally-dispositive ground that the term "adverse financial consequences"—which Section 2202 provides as the basis for qualification for a CRD—is fundamentally ambiguous and thus insufficient to support a perjury charge.

"[P]recise questioning is imperative as a predicate for the offense of Perjury." *Bronston v. United States*, 409 U.S. 352, 362 (1973) (internal quotation marks omitted). "Perjury requires that a witness believe that the testimony he gives is false. Thus, whether the witness believes that an answer is true or false generally turns on the declarant's understanding of the question" or statements contained therein. *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986); *United States v. Manapat,* 928 F.2d 1097 (11th Cir. 1991*)*. As such, "answers to fundamentally ambiguous questions cannot support a Perjury conviction." *United States v. Chujoy*, 207 F. Supp. 3d 626, 651 (W.D. Va. 2016); *Manapat*, 928 F.2d at 1102 ("[T]he government may not provide someone with a confusing and ambiguous form and then prosecute when the answers are inaccurate."). Courts routinely dismiss charges where questions or phrases are fundamentally ambiguous and thus insufficient as a matter of law to support a charge of perjury. *See, e.g., Chujoy*, 207 F. Supp. 3d at 652 (dismissing perjury charge where question was fundamentally ambiguous); *accord Lighte,* 782 F.2d at 375 (holding that fundamentally ambiguous question insufficient as a matter of law to support indictment of conviction*); Manapat,* 928 F.2d at 1097 (affirming pre-trial dismissal because the application form containing the phrases "Record of Traffic Convictions" and a "Record of Other Convictions" was fundamentally ambiguous*); United States v. Ryan*, 828 F.2d 1010, 1015-16 (3d Cir. 1987) (reversing a defendant's conviction because the phrase "previous address" in credit card application form was fundamentally ambiguous because "previous" was capable of different interpretations).

"[A] question or phrase is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *Manapat*, 928 F.2d at 1100. In conducting this inquiry, a court will examine the question itself and "the context of the question and answers, as well as other extrinsic evidence, to determine whether the respondent provided false answers to the questions 'as he understood [them].'" *United States v. Bussell*, 414 F.3d 1048, 1057 (9th Cir. 2005).

### A.     The Term "Adverse Financial Consequences" Is Undefined and Thus Fundamentally Ambiguous

The fundamental ambiguity of the subject phrase here surpasses any of the examples cited above. Specifically, the "457(b) CRD Request" form requires the following self-certification:

> I have experienced *adverse financial consequences* stemming from such virus or disease as a result of:
> - Being quarantined, furloughed or laid off
> - Having reduced work hours
> - Being unable to work due to lack of child care
> - The closing or reduction of hours of a business I own or operate

Nationwide's 457(b) Coronavirus-related distribution form, attached as Ex. 4. Whether a retirement plan participant suffered an "adverse financial consequence" is fundamentally ambiguous because the term is 'is not a phrase with a meaning about which men of ordinary intellect could agree." *Manapat*, 928 F.2d at 1100.

The statute from where the phrase is derived, Section 2202 of the CARES, does not define the term "adverse financial consequences." Moreover, the term is not defined on the distribution form or in any guidance promulgated by the IRS. *See* Ex. 4. And as noted, Counts 1 and 3 are the first of their kind and there *are no regulations or cases precedent* defining the phrase and providing a standard to be applied in a criminal prosecution for perjury or any other offense. *Manapat*, 928

F.2d at 1100 (a phrase is fundamentally ambiguous and insufficient to support a perjury charge particularly when it was not defined for the questioner and answerer at the time the answer was sought); *see also United States v. Engle,* 676 F.3d 405, 415 (4th Cir 2012) ("A district court may dismiss an indictment under Rule 12 where there is an infirmity of law in the prosecution. . . ."). The phrase is a definitional mystery and this mystery has, as illustrated below, left many seasoned tax and legal professionals wondering and speculating as to its meaning:

- "The IRS has not defined "adverse financial consequences," but presumably this means financial difficulties, and as discussed below, the individual can self-certify to this." *IRS Clarifies Retirement Account Changes from the CARES Act*, Jana M. Luttenegger Weile. JDSupra, available at https://www.jdsupra.com/post/contentViewerEmbed.aspx?fid=956655ba-e32a-4189-924a-8bfe9c66c98b. Accessed 5/3/2021.

- "Adverse financial consequences are not defined. Clearly someone losing an entire income as a result of a virus-triggered business closing has suffered substantial adverse financial consequences. But the statute does not require "substantial" consequences--any adverse financial consequences will do. Natalie Choate. *Who Qualifies for Coronavirus-Related Distributions?* Morning Star. May 14, 2020, available at https://www.morningstar.com/articles/984600/who-qualifies-for-coronavirus-related-distributions

- "The IRS has not yet issued guidance defining 'adverse financial consequences.' This determination is highly dependent upon a *subjective interpretation of the facts and circumstances of each situation*." *CARES Act: Penalty-Free Withdrawals*. 09.09.2020. Goldman Sachs, available at https://www.ayco.com/insights/articles/cares-act-penalty-free-withdrawals.html#insightsdisclosure

- "Adverse financial consequences is not a term of precision and will need additional clarification." David Cechanowicz. *Special Coronavirus Relief for Retirement Plans and IRAs: Facts You Need to Know*. REDW Wealth LLC. Attached as Ex. 5.

There was even uncertainty on whether the enumerated factors were all-inclusive:

- "The listing of 'adverse financial consequences,' meanwhile, *includes but is not limited to* being quarantined, furloughed, laid off or a reduction of work hours, having a lack of childcare or a reduction in pay or self-employment income." Angela Evans. *Learn If You Qualify For A Coronavirus-Related Distribution.* McClintock and Associates. November 11, 2020, available at https://www.mcclintockcpa.com/learn-if-you-qualify-for-a-coronavirus-related-distribution/

- "Basically, these factors include lost wage or business income due to the effect of the virus on the individual's employer, business, or day care provider. *The net is cast pretty wide*

*considering it would include the shut-down and longer-term changes in shopping, dining, travel, entertainment and commuting habits*." James Solheim J.D., *Expert Insights: Coronavirus Distributions: Adverse Financial Consequences and Recontributions*. Wolters Kluwer Tax & Accounting North America United States. July 02, 2020. https://www.wolterskluwer.com/en/expert-insights/coronavirus-distributions-adverse-financial-consequences-and-recontributions

The fundamental ambiguity of the term "adverse financial consequences" makes it insufficient as a matter of law to support a charge of perjury. As such, Counts 1 and 3 should be dismissed.

**B.      The Government's Invented Standards for "Adverse Financial Consequences" Should be Rejected**

Confronted by this fundamental ambiguity, the government has created multiple standards for "adverse financial consequences" out of whole cloth. This alone illustrates the phrase's fundamental ambiguity. In particular and most concerning, the government invents both a higher standard for qualification, and a limiting standard for what can be considered "adverse financial consequences." Neither is supported by the text of Section 2202 or any case law, and the Court cannot accept or allow a jury to consider the government's construction of Section 2202 because doing so would violate well-established Due Process principles.

*First*, the government claims that State's Attorney Mosby's certification that she experienced "adverse financial consequences" "was false *in that* MOSBY *received her full salary* … through the date on which she signed this form*." See* Super. Indictment at ¶¶ 5, 14. But this is pure fiction by the government, because nothing about Section 2202 supports a finding that "adverse financial consequences" is dictated by a person's salary. Such a reading is unsupported by any statute, regulation, or formally promulgated guidance related to the Section 2202, or any case law. The government's reading is also contrary to common sense because there may be countless reasons why a particular person may perceive they have experienced adverse financial consequences pursuant to Section 2202 whether or not they experienced a reduction in pay.

For example, even if a person receives their full salary, do they experience adverse financial consequences pursuant to Section 2202 if a planned business venture and the income expected therefrom are essentially deemed "dead in the water" because of the pandemic? Even if receiving their full salary, does that person experience adverse financial consequences if inflation rises, if the costs for meals are increased because their kids are at home and not receiving meals at school, if they have more food delivered because it's risky to go shopping for groceries, if utility costs increase because everyone is working or schooling from home, or if the costs related to starting and implementing a now shuttered business venture cannot be recovered because they will no longer receive the anticipated income the business venture would have generated? *See, e.g.*, Wolters Kluwer, *supra* ("The net is cast pretty wide considering it would include the shut-down and longer-term changes in shopping, dining, travel, entertainment and commuting habits.") Because of the lack of a definition and the fundamental ambiguity of the term "adverse financial consequences" there may be no way to accurately answer such questions. This is likely why the drafters of Section 2202 wisely provided that a plan participant may *self-certify* they have suffered "adverse financial consequences" as such a determination is necessarily based on an individual's subjective perception of their own personal financial circumstances.

The government's tethering of "adverse financial consequence" solely to a person's salary has no foundation in law or reality and cannot be the used as the basis for prosecuting State's Attorney Mosby under Counts 1 and 3.

*Second*, the government changes the standard for qualification for a Section 2202 CRD by improperly equating "adverse financial consequences" (the language in the statute) with "financial hardship." The government makes this insidious change by claiming that State's Attorney Mosby's certification that she experienced "adverse *financial consequences*" was false because she "had

not experienced any of the *enumerated financial hardships* she claimed to have experienced." Super. Indictment at ¶¶ 5, 14. The government's false equivalence here does not comport with the ordinary meaning of the words "consequence" and "hardship." A "consequence" is "[a] *result* that follows as an effect of something that came before." Black's Law Dictionary (10th ed. 2014) (emphasis added)). On the other hand, "hardship" means "privation" or "suffering." *Id.* By falsely equating these two different terms, the government seeks to create a new and never before seen standard for qualification under Section 2202.

Here again, the government's imputing of a hardship requirement into Section 2202 is unsupported by any statute, regulation, formally promulgated guidance, or case law. It is solely the creation of the government for prosecuting this case. The allegation that State's Attorney Mosby committed perjury because she "had not experienced any of the *enumerated financial hardships* she claimed to have experienced" is a farce because Nationwide's 457(b) distribution form contains no "enumerated financial hardships." *See* Ex. 4. Indeed, the word "hardship" appears nowhere on the 457(b) CRD form. *Id.* More significantly, the word "hardship" cannot be found *anywhere* in Section 2202. And as discussed above, 401(k), 403(b), and 457(b) plans already provide a means for participants who suffer "financial hardship" to receive a distribution that is separate and apart from a Section 2202 CRD. Equating a Section 2202 distribution to a "hardship" distribution is yet another invention by the government because experiencing "financial hardship" is not a requirement to qualify for a distribution under Section 2202. *See* Ex. 4. State's Attorney Mosby checked the box on a 457(b) coronavirus distribution form, *not* a box on a 457(b) "emergency" or "hardship" withdrawal form, and thus never claimed, as the government improperly charges, to have experienced "financial hardship".[9] *Compare* Ex. 4 *with* Ex. 2. The

---

[9] In terms of statutory interpretation, the drafters of Section 2202 appeared to have recognized the significance (and difference) of the two terms because while qualification under Section 2202 only requires "financial consequences"

government's assertion of this never before seen, false, problematic, and misleading standard of "financial hardship" is due to the fundamental ambiguity of the phrase "adverse financial consequences." Due process requires that such ambiguity not exist nor serve as the basis of a criminal perjury prosecution. *Manapat*, 928 F.2d at 1102 ("[T]he government may not provide someone with a confusing and ambiguous form and then prosecute when the answers are inaccurate.").

This Court should therefore reject the government's attempt to superimpose on Congress' choice of words different constructions to facilitate a prosecution of State's Attorney Mosby. Were the Court to allow the jury to consider the government's erroneous interpretation of Section 2202, State's Attorney Mosby's due process right to fair notice would be violated because prior to making the withdrawal, there was no way for her to know of these never before existing standards and thus what was prohibited under Section 2202.

For these reasons, the Court should reject the standards invented by the government for Section 2202, and dismiss Counts 1 and 3 because the phrase "adverse financial consequences" is fundamentally ambiguous and insufficient to be the basis for a perjury charge under § 1621.

## III.    ALTERNATIVELY, THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE THE INSTRUCTIONS OF LAW PRESENTED TO THE GRAND JURY REGARDING COUNTS 1 AND 3.

As an alternative to dismissal, the Court should order the government to produce to the defense the instructions of law concerning Counts 1 and 3 provided to the grand jury(ies) that returned the original and superseding indictments. There is "a particularized need" for the

---

other sections of the Cares Act explicitly require a showing of "financial hardship"; for example, "financial hardship" is required to qualify for relief under section 4022 – consistent with the definition "suffering" or "privation" – which places a moratorium on foreclosures and gives consumers the right to have a forbearance on mortgage payments.

instructions to ensure that the grand jury was properly instructed about the law in this unprecedented and first of its kind prosecution.

Although grand jury proceedings are generally secret in nature, "in some situations justice may demand that discrete portions of transcripts be made available for use in subsequent proceedings." *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 219-20 (1979); *In re Grand Jury Proceedings*, 800 F.2d 1293, 1299-300 (4th Cir. 1986) ("Grand jury secrecy is, of course, not an end in itself … when the advantages gained by secrecy are outweighed by a counter vailing interest in disclosure, secrecy may and should be lifted, for to do so in such a circumstance would further the fair administration of criminal justice.") (citation omitted). Such situations are what "led to the provision in [Fed. R. Crim. P. 6(e)(3)(E)(ii)]" which provides that the Court is authorized to order disclosure of grand jury matter at the request of a defendant if "irregularities may have occurred in the grand jury proceedings and may justify the dismissal of one or more counts of the indictment." *Id.* (citing Fed. Rule Crim. Proc. 6 (e)(2)(C)(i)) (now, Fed. R. Crim. P. 6(e)(3)(E)(ii)); *United States v. Naegele*, 474 F. Supp. 2d 9, 10 (D.D.C. 2007).

The Court may exercise its discretion and require the disclosure of grand jury materials where a defendant demonstrates that a "particularized need" exists that outweighs the policy of grand jury secrecy. *In re Grand Jury Proceedings*, 800 F.2d at 1297. This Court has recognized that such a need for disclosure exists where, as here, it is likely that the grand jury was given "erroneous and prejudicial legal advice" by the prosecutor. *United States v. Stevens*, 771 F. Supp. 2d 556, 564 (D. Md. 2011) (first ordering disclosure of relevant portions of grand jury transcript, then dismissing indictment after transcript showed that the "prosecutor's legal instruction to the grand jury seriously misstate[d] the applicable law"); *see also Naegele*, 474 F. Supp. 2d at 12.

As in *Stevens*, a "particularized need" for disclosure of grand jury materials exists here. It bears repeating that Counts 1 and 3 are based on a theory of perjury that has never been prosecuted before now. This case will establish *the* precedent for the standard required to bring prosecutions for perjury against the millions of plan participants who made CRDs and checked a box on a Section 2202 distribution form. Indeed the complete lack of law concerning this theory of perjury warrants the Court ensuring that the grand jury was properly instructed on the law.

This is especially important here because the Superseding Indictment on its face provides sufficient reasons for the Court to be concerned that the grand jury was improperly instructed in regards to Counts 1 and 3. For instance, Counts 1 and 3 of the Superseding Indictment have the following respective headings: "Perjury - May 2020 COVID 19 *HARDSHIP WITHDRAWAL*" and "Perjury - December 2020 COVID 19 *HARDSHIP WITHDRAWAL.*" As discussed above, State's Attorney Mosby did not make a "hardship withdrawal" as the word "hardship" appears nowhere on the form she submitted or in Section 2202, because experiencing "financial hardship" is not the legal standard to qualify for a Section 2202 distribution. A COVID-19 withdrawal is NOT a "hardship withdrawal." Indeed the Congressional Research Service, which provides the legislature with expert "research and analytical services" when drafting and enacting laws, including the CARES Act, *see* 2 U.S.C.S. § 166, expressly makes this distinction:

> *Unlike hardship distributions*, CRDs could be included in taxable income in 2020 alone or included equally over 2020, 2021, and 2022, and the amount of the CRD may be recontributed to an individual's account within three years.

Library of Cong. Elizabeth A. Myers, Cong. Research Serv., R46837, *The CARES Act: Selected Data on Coronavirus-Related Distribution and Loan Usage in 2020* (July 13, 2021).

Claiming that State's Attorney Mosby made a "COVID-19 Hardship Withdrawal" and labeling Counts 1 and 3 as such, is erroneous, specious and prejudicial in every respect. The government's "hardship withdrawal" allegations are wrong factually and legally and cannot be

used to prosecute State's Attorney Mosby. The government's labelling of Counts 1 and 3 as "COVID 19 HARDSHIP WITHDRAWAL" and predicating its charges on the false claim that State's Attorney Mosby represented that she suffered "enumerated *financial hardships*" is highly indicative that the government presented this invented and erroneous legal standard to the grand jury, which the grand jury likely considered in finding probable cause to return the Superseding Indictment. *See* Super. Indictment at ¶¶ 5, 14.

If the Government presented to the grand jury, as the defense suspects, this invented and demonstrably false legal standard based on its erroneous interpretation of Section 2202, just as in *Stevens*, dismissal of the subject counts would be "appropriate and required in the interests of justice."[10] *Stevens*, 771 F. Supp. 2d at 568; *accord United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (dismissing indictment because the "defendants were seriously prejudiced by the cumulative effect of the government's misleading statements of law" to the grand jury).[11]

As such, a "particularized need" exists here and the Court should order the production of the sections of the Grand Jury transcripts in this case related to the prosecutors' presentation of

---

[10] Further, the government's "materiality" allegations, or lack thereof, also indicate that the grand jury may have been improperly instructed on what needs to be material for the government to bring a perjury charge under § 1621. If the government improperly instructed the grand jury, as the defense suspects, that the certification was material, and not that the "matters" or specific statements State's Attorney Mosby certified as true, themselves, were material, then dismissal of the subject charges would also be warranted.

[11] In addition, the other factors courts look to in determining whether production of grand jury transcripts is appropriate further counsel in favor of disclosure here. Specifically: (1) the Grand Jury's work is completed (and thus, the need for secrecy is reduced); (2) there is no concern associated with preventing escape from individuals under governmental scrutiny (Defendant is the State's Attorney for Baltimore City); (3) disclosure of the transcripts in this limited context would not interfere with the Grand Jury's freedom of deliberation – on the contrary, it will establish whether the Grand Jury was given "erroneous and prejudicial legal advice" by the prosecutor in violation of State's Attorney Mosby's constitutionally protected rights, as it appears from the face of the Indictment; and (4) the other factors – i.e., concerns about subordinating perjury or tampering, encouraging free disclosure of information from persons with knowledge, and to prevent the innocent – are inapplicable because the Grand Jury's work is completed. *See In re Grand Jury Proceedings*, 800 F.2d at 1300-03 (listing factors relevant to determination of whether to release grand jury transcripts).

Counts 1 and 3 to the grand jury.[12] To be sure, if the government prosecutors did in fact mislead and wrongfully instruct the Grand Jury as to Counts 1 and 3, those charges should be dismissed for the reasons outlined above.

## IV.    CONCLUSION

For all these reasons, State's Attorney Mosby requests that this Court (a) dismiss Counts 1 and 3 of the Superseding Indictment, or alternatively (b) order the production of the grand jury transcripts containing the instructions of law concerning Counts 1 and 3 that were provided to the grand jury(ies) who returned the indictment and superseding indictment

A Proposed Order is attached.


Dated: June 1, 2022                              Respectfully Submitted,


                                    _____

                                    A. Scott Bolden (*admitted pro hac vice*)
                                    Rizwan A. Qureshi (*admitted pro hac vice*)
                                    Reed Smith LLP
                                    1301 K Street, N.W.
                                    Suite 1000 - East Tower
                                    Washington, D.C. 20005-3373
                                    Telephone: +1 202 414 9200
                                    Facsimile: +1 202 414 9299
                                    RQureshi@ReedSmith.com
                                    ABolden@ReedSmith.com

                                    Kelley Miller (*admitted pro hac vice*)
                                    Reed Smith LLP
                                    7900 Tysons One Place, Suite 500
                                    McLean, Virginia 22102
                                    Telephone: + 1 703 641 4200
                                    Facsimile: +1 703 641 4340
                                    KMiller@ReedSmith.com

                                    Anthony R. Todd (*admitted pro hac vice*)
                                    Reed Smith LLP

---

[12] Alternatively, the Court should order the in-camera production of the grand jury transcripts to determine the extent to which the material should be disclosed to the defense. *Stevens*, 771 F. Supp. 2d at 564 (first ordering in-camera review of grand jury minutes, then disclosing excerpts necessary to allow for further briefing on whether the grand jury was properly instructed on the law.)

10 South Wacker Drive
40th Floor
Chicago, IL 60606-7507
Telephone: + 312.207.1000
Facsimile: + 312.207.6400
ATodd@ReedSmith.com

Gary E. Proctor (Bar No. 27936)
Law Offices of Gary E. Proctor, LLC
8 E. Mulberry Street
Baltimore, Maryland 21202
Telephone: (410) 444-1500
garyeproctor@gmail.com

Lucius T. Outlaw III (Bar No. 20677)
Outlaw PLLC
1351 Juniper St. NW
Washington, DC 20012
Telephone: (202) 997-3452
loutlaw3@outlawpllc.com

*Counsel for Defendant Marilyn J. Mosby*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARILYN J. MOSBY,**<br><br>**Defendant** | **Case No. 22-cr-00007-LKG-1** |

**PROPOSED ORDER**

**AND NOW**, this _____ day of ____, 2022, upon consideration of Defendant Marilyn Mosby's Motion to Dismiss Counts 1 and 3 of the Indictment, or Alternatively, to Compel Production of the Instructions of Law Provided to the Grand Jury for Counts 1 and 3, it is **HEREBY ORDERED** that said motion is **GRANTED**, and that Counts 1 and 3 of the Superseding Indictment are **DISMISSED**.

**BY THE COURT:**

_____,   J.

*Judge Lydia K. Griggsby*

# EXHIBIT 1

**Guidance for Coronavirus-Related Distributions and Loans from Retirement Plans Under the CARES Act**

Notice 2020-50

## PURPOSE

This notice provides guidance relating to the application of section 2202 of the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (2020) (CARES Act) for qualified individuals and eligible retirement plans.  The CARES Act was enacted on March 27, 2020.  Under section 2202 of the CARES Act, qualified individuals receive favorable tax treatment with respect to distributions from eligible retirement plans that are coronavirus-related distributions.  A coronavirus-related distribution is not subject to the 10% additional tax under § 72(t) of the Internal Revenue Code (Code) (including the 25% additional tax under § 72(t)(6) for certain distributions from SIMPLE IRAs), generally is includible in income over a 3-year period, and, to the extent the distribution is eligible for tax-free rollover treatment and is contributed to an eligible retirement plan within a 3-year period, will not be includible in income.  Section 2202 of the CARES Act also increases the allowable plan loan amount under § 72(p) of the Code and permits a suspension of payments for plan loans outstanding on or after March 27, 2020, that are made to qualified individuals.  The guidance in this notice is intended to assist employers and plan administrators, trustees and custodians, and qualified individuals in applying section 2202 of the CARES Act, including by providing guidance on how plans may report coronavirus-related distributions and how individuals may report these distributions on their individual federal income tax returns.

## BACKGROUND

A. Distributions

Under § 402(c)(8), an eligible retirement plan includes an individual retirement arrangement (IRA) under § 408(a) or (b), a qualified plan under § 401(a), an annuity plan under § 403(a), a § 403(b) plan, and a governmental deferred compensation plan under § 457(b).  Distributions from these plans generally are includible in the distributee's gross income in the year of the distribution.  For example, for qualified plans, § 402(a) provides that any amount actually distributed to a distributee is taxable to the distributee in the taxable year of the distribution under § 72.  Similar rules apply to § 403(b) plans under § 403(b)(1), governmental § 457(b) plans under § 457(a), and IRAs under § 408(d)(1).

Section 402(c)(4) provides that any distribution of all or a portion of the balance to the credit of an employee under a qualified plan is an eligible rollover

distribution with certain exceptions.  These exceptions include substantially equal periodic payments over a specified period of at least 10 years, or for the life or the life expectancy of the employee (or the employee and the employee's designated beneficiary); minimum distributions required under § 401(a)(9); and any distribution that is made upon the hardship of an employee.  This same definition of eligible rollover distribution applies to distributions from § 403(b) plans under § 403(b)(8) and governmental § 457(b) plans under § 457(e)(16).  Generally, any distribution from an IRA is eligible for rollover except a required minimum distribution or certain distributions from inherited IRAs.  Section 2203 of the CARES Act provides that, for eligible retirement plans other than defined benefit plans, no minimum distributions under § 401(a)(9) are required for 2020.

Under § 401(a)(31)(A), if a distributee elects to have an eligible rollover distribution paid directly to an eligible retirement plan and specifies the eligible retirement plan to receive the distribution, a qualified plan must pay the distribution to that eligible retirement plan in a direct rollover.  Similar rules apply to § 403(b) plans under § 403(b)(10) and governmental § 457(b) plans under § 457(d)(1).

Q&A-14 of § 1.401(a)(31)-1 provides that if a plan accepts an invalid rollover contribution, for purposes of applying the qualification requirements to the receiving plan, the contribution will be treated as if it were a valid rollover contribution if two conditions are satisfied.  First, when accepting the amount from the employee as a rollover contribution, the plan administrator of the receiving plan reasonably concludes that the contribution is a valid rollover contribution.  Second, if the plan administrator later determines that the rollover contribution was an invalid rollover contribution, any amount attributable to the invalid rollover contribution (including earnings) must be distributed to the employee within a reasonable amount of time after the determination.

Under § 402(c), if an eligible rollover distribution is contributed to an eligible retirement plan in a direct rollover or within 60 days from the date of distribution as a rollover contribution, the amount rolled over is not includible in the distributee's gross income.  In certain situations, the 60-day rollover period is extended; for example, under § 402(c)(3), the rollover period for qualified plan loan offsets is extended to the federal income tax return deadline for the year of the distribution.

Section 401(k)(2)(B)(i) generally provides that amounts attributable to elective contributions under a qualified cash or deferred arrangement may not be distributable to participants or beneficiaries earlier than severance from employment, death or disability, plan termination, attainment of age 59½, hardship of the employee, entitlement to a qualified reservist distribution, or, for amounts held in lifetime income investments, 90 days prior to the date that the lifetime income investment is no longer held by the arrangement.  Similar rules

apply to custodial accounts under § 403(b)(7)(A)(i), to annuity contracts under § 403(b)(11), and to governmental § 457(b) plans under § 457(d)(1)(A).

Section 72(t)(1) imposes an additional tax on early distributions from eligible retirement plans (other than governmental § 457(b) plans, unless a distribution is attributable to an amount that was transferred to the § 457(b) plan from a plan that was subject to § 72(t)).  In general, this additional tax is equal to 10% of the portion of the distribution that is includible in income.  For any amount distributed from a SIMPLE IRA during the 2-year period described in § 72(t)(6), the rate of the additional tax is increased from 10% to 25%.  Section 72(t)(2) provides a number of exceptions to this additional tax, including, for example, exceptions for distributions made on or after the employee attains age 59½, distributions made to a beneficiary on or after the employee's death, distributions made because of the employee's disability, and distributions that are part of substantially equal periodic payments made over the employee's life or life expectancy.

Section 402(f) provides that a plan is required to provide a distributee, within a reasonable period of time before an eligible rollover distribution is made, a written explanation of the distributee's rollover rights and the tax and other potential consequences of the distribution or rollover.

B.  Plan loans

Section 72(p) imposes certain requirements relating to plan loans.  Unless these requirements are satisfied, an amount received by a participant as a loan is treated as having been received as a distribution from the plan (deemed distribution).  Deemed distributions are includible in income and are subject to the 10% additional tax under § 72(t), unless an exception applies.

Under § 72(p)(2)(A), a plan loan (when added to the outstanding balance of all other loans outstanding) must not exceed the lesser of (1) $50,000 reduced by the excess of the highest outstanding balance of loans from the plan during the 1-year period ending on the day before the date on which the loan is made over the outstanding balance of loans from the plan on the date that the loan is made, or (2) the greater of $10,000 or one-half of the present value of the participant's nonforfeitable accrued benefit under the plan.  Section 72(p)(2)(B) provides that a loan must be repaid within 5 years.  However, an exception to the 5-year repayment rule applies for loans used to acquire any dwelling unit that will be used (determined at the time the loan is made) as the participant's principal residence.  Section 72(p)(2)(C) requires substantially level amortization of a plan loan (with payments not less frequently than quarterly) over the term of the loan.

Q&A-10(a) of § 1.72(p)-1 provides that the failure to make any installment payment when due, in accordance with the terms of a loan, violates § 72(p)(2)(C) and, accordingly, results in a deemed distribution at the time of the failure.

However, the plan administrator may allow a cure period, and § 72(p)(2)(C) will not be considered to have been violated if the installment payment is made not later than the end of the cure period, which cannot continue beyond the last day of the calendar quarter following the calendar quarter in which the required installment payment was due.  If there is a failure to pay the installment payments required under the terms of the loan (taking into account any cure period allowed under Q&A-10(a)), then the amount of the deemed distribution equals the entire outstanding balance of the loan (including accrued interest) at the time of the failure.  Under Q&A-13(b) of § 1.72(p)-1 and Q&A-9(b) of § 1.402(c)-2, a distribution of a plan loan offset amount occurs when, under the terms governing a plan loan, the accrued benefit of a participant or beneficiary is reduced (or offset) in order to repay the loan (including the enforcement of the plan's security interest in the accrued benefit).  In the event of a plan loan offset, including a qualified plan loan offset described in § 402(c)(3)(C), the amount of the account balance that is offset against the loan is an actual distribution, not a deemed distribution.

## SECTION 1.  CORONAVIRUS-RELATED DISTRIBUTIONS

A. <u>Special tax treatment for coronavirus-related distributions</u>

Section 2202(a) of the CARES Act provides for special tax treatment for a coronavirus-related distribution.  The section provides an exception to the 10% additional tax under § 72(t) of the Code (including the 25% additional tax under § 72(t)(6) for certain distributions from SIMPLE IRAs), allows the distribution to be included in income ratably over 3 years, and provides that the distribution will be treated as though it were paid in a direct rollover to an eligible retirement plan if the distribution is eligible for tax-free rollover treatment and is recontributed to an eligible retirement plan within the 3-year period beginning on the day after the date on which the distribution was received.  The section also permits special treatment for coronavirus-related distributions under employer retirement plans (eligible retirement plans other than IRAs), as described in section 2 of this notice.

B. <u>Definition of qualified individual</u>

Pursuant to section 2202(a)(4)(A)(ii) of the CARES Act, a qualified individual for purposes of this notice is an individual:

- who is diagnosed with the virus SARS-CoV-2 or with coronavirus disease 2019 (referred to collectively in this notice as COVID-19) by a test approved by the Centers for Disease Control and Prevention (including a test authorized under the Federal Food, Drug, and Cosmetic Act);

- whose spouse or dependent (as defined in section 152 of the

Code) is diagnosed with COVID-19 by a test approved by the Centers for Disease Control and Prevention (including a test authorized under the Federal Food, Drug, and Cosmetic Act; or

- who experiences adverse financial consequences as a result of:

    o the individual being quarantined, being furloughed or laid off, or having work hours reduced due to COVID-19;

    o the individual being unable to work due to lack of childcare due to COVID-19; or

    o closing or reducing hours of a business owned or operated by the individual due to COVID-19.

In addition, pursuant to the authority of the Secretary to issue guidance to provide for other factors under section 2202(a)(4)(A)(ii)(III) of the CARES Act, a qualified individual for purposes of this notice is an individual who experiences adverse financial consequences as a result of:

- the individual having a reduction in pay (or self-employment income) due to COVID-19 or having a job offer rescinded or start date for a job delayed due to COVID-19;

- the individual's spouse or a member of the individual's household (as defined below) being quarantined, being furloughed or laid off, or having work hours reduced due to COVID-19, being unable to work due to lack of childcare due to COVID-19, having a reduction in pay (or self-employment income) due to COVID-19, or having a job offer rescinded or start date for a job delayed due to COVID-19; or

- closing or reducing hours of a business owned or operated by the individual's spouse or a member of the individual's household due to COVID-19.

For purposes of applying these additional factors, a member of the individual's household is someone who shares the individual's principal residence.

C.  Definition of coronavirus-related distribution

Section 2202(a)(4)(A) of the CARES Act defines a coronavirus-related distribution as any distribution from an eligible retirement plan made on or after January 1, 2020, and before December 31, 2020, to a qualified individual. Section 2202(a)(2) of the CARES Act limits the amount of aggregate distributions

from all eligible retirement plans that can be treated as coronavirus-related distributions to no more than $100,000.

In general, a qualified individual is permitted to designate a distribution described in the preceding paragraph as a coronavirus-related distribution. This designation is permitted to be made with respect to any distribution to a qualified individual that would meet the requirements of a coronavirus-related distribution without regard to whether the plan treated the distribution as a coronavirus-related distribution. Thus, periodic payments and distributions that would have been required minimum distributions but for section 2203 of the CARES Act, received by a qualified individual from an eligible retirement plan on or after January 1, 2020, and before December 31, 2020, are permitted to be treated as coronavirus-related distributions and, therefore, permitted to be included in income ratably over 3 years. Similarly, any distribution received by a qualified individual as a beneficiary can be treated as a coronavirus-related distribution. In addition, a reduction or offset of a qualified individual's account balance in order to repay a plan loan, as described in Q&A-9(b) of § 1.402(c)-2, including a qualified plan loan offset, is permitted to be treated as a coronavirus-related distribution. See section 1.D of this notice for rules relating to which coronavirus-related distributions are permitted to be recontributed to an eligible retirement plan.

However, any amount described in Q&A-4 of §1.402(c)-2 is not permitted to be treated as a coronavirus-related distribution. Thus, the following amounts are not coronavirus-related distributions: corrective distributions of elective deferrals and employee contributions that are returned to the employee (together with the income allocable thereto) in order to comply with the § 415 limitations, excess elective deferrals under § 402(g), excess contributions under § 401(k), and excess aggregate contributions under § 401(m); loans that are treated as deemed distributions pursuant to § 72(p); dividends paid on applicable employer securities under § 404(k); the costs of current life insurance protection; prohibited allocations that are treated as deemed distributions pursuant to § 409(p); distributions that are permissible withdrawals from an eligible automatic contribution arrangement within the meaning of § 414(w); and distributions of premiums for accident or health insurance under § 1.402(a)-1(e)(1)(i).

The definition of a coronavirus-related distribution under section 2202(a)(4) of the CARES Act does not limit these distributions to amounts withdrawn solely to meet a need arising from COVID-19. Thus, for example, for an individual who is a qualified individual as a result of experiencing adverse financial consequences as described above, coronavirus-related distributions are permitted without regard to the qualified individual's need for funds, and the amount of the distribution is not required to correspond to the extent of the adverse financial consequences experienced by the qualified individual.

As explained in section 2.C of this notice, an employer retirement plan also is permitted, but not required, to treat a plan distribution meeting the conditions described in this section 1.C as a coronavirus-related distribution. It is possible that a qualified individual's designation of a coronavirus-related distribution may be different from the employer retirement plan's treatment of the distribution. This different treatment could occur, for example, if a qualified individual has more than one plan distribution that meets the requirements of a coronavirus-related distribution, but one of those distributions occurs before the effective date of the plan amendment providing for coronavirus-related distributions. The different treatment could also occur, for example, if a qualified individual has distributions from more than one eligible retirement plan, and the aggregate amount of those distributions exceeds $100,000.

D. Certain coronavirus-related distributions are permitted to be recontributed

Coronavirus-related distributions may be included in income ratably over 3 years and are not subject to the 10% additional tax under § 72(t). However, only a coronavirus-related distribution that is eligible for tax-free rollover treatment under § 402(c), 403(a)(4), 403(b)(8), 408(d)(3), or 457(e)(16) is permitted to be recontributed to an eligible retirement plan, and that recontribution will be treated as having been made in a trustee-to-trustee transfer to that eligible retirement plan. Any coronavirus-related distribution (whether from an employer retirement plan or an IRA) paid to a qualified individual as a beneficiary of an employee or IRA owner (other than the surviving spouse of the employee or IRA owner) cannot be recontributed.

In general, a distribution from an employer retirement plan made on account of hardship is not an eligible rollover distribution. However, if the distribution satisfies the requirements under section 1.C of this notice, then, except as otherwise provided in section 6 of this notice (relating to nonqualified deferred compensation plans), the distribution is not treated as made on account of hardship for purposes of this notice and, thus, any portion of the distribution is permitted to be recontributed to an eligible retirement plan.

See section 4.C of this notice for rules relating to recontributions of coronavirus-related distributions.

**SECTION 2.  GUIDANCE FOR EMPLOYER RETIREMENT PLANS MAKING CORONAVIRUS-RELATED DISTRIBUTIONS**

A. Coronavirus-related distributions generally are treated as satisfying certain plan distribution restrictions

Under section 2202(a)(6) of the CARES Act, a distribution designated as a coronavirus-related distribution by an employer retirement plan is treated as meeting the distribution restrictions for qualified cash or deferred arrangements

under § 401(k)(2)(B)(i), custodial accounts under § 403(b)(7)(A)(i), annuity contracts under § 403(b)(11), governmental deferred compensation plans under § 457(d)(1)(A), and the Thrift Savings Plan under 5 U.S.C. 8433(h)(1). Thus, for example, an employer may expand the distribution options under its plan to allow an amount attributable to an elective, qualified nonelective, qualified matching, or safe harbor contribution under a qualified cash or deferred arrangement to be distributed as a coronavirus-related distribution even though it is distributed before an otherwise permitted distributable event, such as severance from employment, disability, or attainment of age 59½.

Except as described above, section 2202 of the CARES Act does not change the rules for when plan distributions are permitted to be made from employer retirement plans. Thus, for example, a qualified plan that is a pension plan (such as a money purchase pension plan) is not permitted to make a distribution before an otherwise permitted distributable event merely because the distribution, if made, would qualify as a coronavirus-related distribution. Further, a pension plan is not permitted to make a distribution under a distribution form that is not a qualified joint and survivor annuity without spousal consent merely because the distribution, if made, could be treated as a coronavirus-related distribution.

B. Direct rollover, § 402(f) notice, and 20% withholding requirements are not applicable to coronavirus-related distributions

If a distribution is treated as a coronavirus-related distribution by an employer retirement plan, the rules for eligible rollover distributions under §§ 401(a)(31), 402(f), and 3405 are not applicable to the distribution. Thus, the plan is not required to offer the qualified individual a direct rollover with respect to the distribution. In addition, the plan administrator is not required to provide a § 402(f) notice. Finally, the plan administrator or payor of the coronavirus-related distribution is not required to withhold an amount equal to 20% of the distribution, as is usually required under § 3405(c)(1). However, a coronavirus-related distribution is subject to the voluntary withholding requirements of § 3405(b) and § 35.3405-1T.

C. Treatment of distributions as coronavirus-related distributions

An employer is permitted to choose whether, and to what extent, to treat distributions under its plans as coronavirus-related distributions (as well as whether, and to what extent, to apply coronavirus-related plan loan rules described in section 5 of this notice). Thus, for example, an employer may choose to provide for coronavirus-related distributions but choose not to change its plan loan provisions or loan repayment schedules. Further, the employer (or plan administrator) is permitted to develop any reasonable procedures for identifying which distributions are treated as coronavirus-related distributions under its retirement plans. However, if, under an employer retirement plan, any

distribution of an amount subject to § 401(k)(2)(B)(i), 403(b)(7)(A)(i), 403(b)(11) or 457(d)(1)(A) is treated as a coronavirus-related distribution, the plan must be consistent in its treatment of similar distributions. Accordingly, the amount of the distribution must be taken into account in determining the $100,000 limit on coronavirus-related distributions made under all the retirement plans maintained by the employer. Even if, under a plan, a distribution is not treated as coronavirus-related, a qualified individual may treat a distribution that meets the requirements of section 1.C of this notice as a coronavirus-related distribution on the individual's federal income tax return.

D.  Distribution limits on coronavirus-related distributions

        The total amount of distributions treated by an employer as coronavirus-related distributions under all its retirement plans with respect to a qualified individual is not permitted to exceed $100,000. For purposes of this rule, the term "employer" means the employer maintaining the plan and those employers required to be aggregated with the employer under § 414(b), (c), (m), or (o). However, a plan will not fail to satisfy any requirement under the Code merely because a qualified individual's total coronavirus-related distributions exceed $100,000 taking into account distributions from IRAs or other eligible retirement plans maintained by unrelated employers.

E.  Reliance on certifications

        The administrator of an eligible retirement plan may rely on an individual's certification that the individual satisfies the conditions to be a qualified individual in determining whether a distribution is a coronavirus-related distribution, unless the administrator has actual knowledge to the contrary. The requirement that an administrator not have "actual knowledge" that is contrary to an individual's certification does not mean that the administrator has an obligation to inquire into whether an individual has satisfied the conditions described in section 1.B of this notice to be a qualified individual. Rather, this requirement is limited to situations in which the administrator already possesses sufficiently accurate information to determine the veracity of a certification.

        The following is an example of an acceptable certification:

        Name: _____ (and other identifying
        information requested by the employer for administrative purposes).

        I certify that I meet at least one of the following conditions: (1) I was
        diagnosed with the virus SARS-CoV-2 or with coronavirus disease
        2019 (referred to collectively as COVID-19) by a test approved by
        the Centers for Disease Control and Prevention (including a test
        authorized under the Federal Food, Drug, and Cosmetic Act);
        (2) my spouse or my dependent was diagnosed with COVID-19 by

9

a test approved by the Centers for Disease Control and Prevention (including a test authorized under the Federal Food, Drug, and Cosmetic Act); or (3) I have experienced adverse financial consequences because: (i) I, my spouse, or a member of my household was quarantined, furloughed or laid off, or had work hours reduced due to COVID-19; (ii) I, my spouse, or a member of my household was unable to work due to lack of childcare due to COVID-19; (iii) a business owned or operated by me, my spouse, or a member of my household closed or reduced hours due to COVID-19; or (iv) I, my spouse, or a member of my household had a reduction in pay (or self-employment income) due to COVID-19 or had a job offer rescinded or start date for a job delayed due to COVID-19.

Signature: _____

Although an administrator may rely on an individual's certification in making and reporting a distribution, the individual is entitled to treat the distribution as a coronavirus-related distribution for purposes of the individual's federal income tax return only if the individual actually meets the eligibility requirements for that treatment under section 1 of this notice.

F.  <u>An employer retirement plan will be treated as operating in accordance with its terms if certain requirements are satisfied</u>

An employer retirement plan will not be treated as failing to operate in accordance with its terms merely because the plan implements the provisions of section 2202 of the CARES Act if the employer amends its plan by the dates described in this paragraph.  For employer retirement plans other than governmental plans under § 414(d) of the Code, the date by which any plan amendment to reflect the CARES Act is required to be made is the last day of the first plan year beginning on or after January 1, 2022.  For governmental plans under § 414(d) of the Code, the date by which any plan amendment to reflect the CARES Act is required to be made is the last day of the first plan year beginning on or after January 1, 2024.  Pursuant to the authority of the Secretary under section 2202(c)(2) of the CARES Act, these dates may be extended in future guidance.

**SECTION 3.  GUIDANCE FOR ELIGIBLE RETIREMENT PLANS MAKING OR ACCEPTING RECONTRIBUTION OF CORONAVIRUS-RELATED DISTRIBUTIONS**

This section provides guidance for eligible retirement plans (that is, employer retirement plans and IRAs) making, or accepting recontribution of, coronavirus-related distributions.

A. Tax reporting on coronavirus-related distributions

An eligible retirement plan must report the payment of a coronavirus-related distribution to a qualified individual on Form 1099-R, Distributions from Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc. This reporting is required even if the qualified individual recontributes the coronavirus-related distribution to the same eligible retirement plan in the same year. If a payor is treating the payment as a coronavirus-related distribution and no other appropriate code applies, the payor is permitted to use distribution code 2 (early distribution, exception applies) in box 7 of Form 1099-R. However, a payor also is permitted to use distribution code 1 (early distribution, no known exception) in box 7 of Form 1099-R.

B. Accepting recontributions of coronavirus-related distributions

In general, a qualified individual who receives a coronavirus-related distribution that is eligible for tax-free rollover treatment is permitted to recontribute, at any time in a 3-year period, any portion of the distribution to an eligible retirement plan that is permitted to accept eligible rollover contributions. The relief in Q&A-14 of § 1.401(a)(31)-1 applies to an employer retirement plan accepting recontributions of coronavirus-related distributions. In order to obtain the relief described in Q&A-14 of § 1.401(a)(31)-1, a plan administrator accepting the recontribution of a coronavirus-related distribution must reasonably conclude that the recontribution is eligible for direct rollover treatment under section 2202(a)(3) of the CARES Act and that the recontribution is made in accordance with the rules under section 4.C of this notice. In making this determination, the rule in section 2.E of this notice applies. Thus, the administrator of an eligible retirement plan may rely on an individual's certification that the individual satisfies the conditions to be a qualified individual in determining whether a distribution is a coronavirus-related distribution, unless the administrator has actual knowledge to the contrary.

In general, it is anticipated that eligible retirement plans will accept recontributions of coronavirus-related distributions, which are to be treated as rollover contributions. However, eligible retirement plans generally are not required to accept rollover contributions. For example, if a plan does not accept any rollover contributions, the plan is not required to change its terms or procedures to accept recontributions of coronavirus-related distributions.

**SECTION 4. GUIDANCE FOR INDIVIDUALS RECEIVING CORONAVIRUS-RELATED DISTRIBUTIONS UNDER SECTION 2202 OF THE CARES ACT**

This section provides guidance for qualified individuals requesting and receiving coronavirus-related distributions. A qualified individual receiving a coronavirus-related distribution is entitled to the following favorable tax treatment with respect to the distribution by reporting the distribution on the individual's

federal income tax return for 2020 and on Form 8915-E, Qualified 2020 Disaster Retirement Plan Distributions and Repayments (or if there is no federal income tax return for 2020, by filing just Form 8915-E).[1]  First, the 10% additional tax under § 72(t) (including the 25% additional tax under § 72(t)(6) for certain distributions from SIMPLE IRAs) does not apply to any coronavirus-related distribution.  Second, a coronavirus-related distribution is permitted to be included in income ratably over 3 years.  Third, a qualified individual is permitted to recontribute any portion of a coronavirus-related distribution that is eligible for tax-free rollover treatment to an eligible retirement plan within the 3-year period beginning on the day after the date on which the distribution was received, and the recontribution will be treated as if it were paid in a trustee-to-trustee transfer to an eligible retirement plan.  See section 1.D of this notice for rules relating to which coronavirus-related distributions are permitted to be recontributed.  Qualified individuals will use Form 8915-E to report any recontribution made during the taxable year and to determine the amount of the coronavirus-related distribution includible in income for the taxable year.

A.  Election to designate a distribution as a coronavirus-related distribution

A qualified individual is permitted to designate any distribution described in section 1.C of this notice as a coronavirus-related distribution provided the total amount treated by the individual as coronavirus-related distributions from all eligible retirement plans does not exceed $100,000.

Example 1.  If a qualified individual receives a distribution of $50,000 in August of 2020 and a distribution of $75,000 in September of 2020 and both distributions satisfy the definition of a coronavirus-related distribution, only $100,000 of the $125,000 received by the qualified individual can be treated as a coronavirus-related distribution.  Thus, the individual can only treat $100,000 of the August and September distributions as coronavirus-related distributions on the individual's 2020 federal income tax return.  Assuming no § 72(t)(2) exception applies, the remaining $25,000 of the distribution is an early distribution that is subject to the 10% additional tax.  This amount must be included on the individual's 2020 federal income tax return and will not be eligible for 3-year recontribution to an eligible retirement plan.

Example 2.  A section 401(k) plan distributes $35,000 to a qualified individual on December 1, 2020.  The qualified individual also receives a distribution from the individual's IRA on December 1, 2020, of $15,000.  The individual is permitted to treat both the $35,000 from the plan and the $15,000 from the IRA as coronavirus-related distributions on the individual's 2020 federal income tax return.

B.  Income inclusion for coronavirus-related distributions

---

[1] Form 8915-E is expected to be available before the end of 2020.

12

There are two methods for a qualified individual to include the taxable portion of a coronavirus-related distribution in income.  A qualified individual who receives a coronavirus-related distribution is permitted to include the taxable portion of the distribution in income ratably over a 3-year period that begins in the year of the distribution.  Alternatively, a qualified individual is permitted to elect out of the 3-year ratable income inclusion and include the entire amount of the taxable portion of the distribution in income in the year of the distribution.  This election cannot be made or changed after the timely filing of the individual's federal income tax return (including extensions) for the year of the distribution. All coronavirus-related distributions received in a taxable year must be treated consistently (either all distributions must be included in income over a 3-year period or all distributions must be included in income in the current year).

Example.  Taxpayer A receives a $30,000 distribution from his or her IRA on October 1, 2020.  Taxpayer A is a qualified individual and elects to treat the distribution as a coronavirus-related distribution.  Taxpayer A uses the 3-year ratable income inclusion for the $30,000 distribution.  Taxpayer A should include $10,000 in income with respect to the coronavirus-related distribution on each of the individual's 2020, 2021, and 2022 federal income tax returns.

C. Tax treatment of recontributions of coronavirus-related distributions

If a coronavirus-related distribution is eligible for tax-free rollover treatment (taking into account section 1.D of this notice), a qualified individual is permitted, at any time in the 3-year period beginning the day after the date of a coronavirus-related distribution, to recontribute any portion of the distribution, but not an amount in excess of the amount of the distribution, to an eligible retirement plan. A recontribution of a coronavirus-related distribution will not be treated as a rollover contribution for purposes of the one-rollover-per-year limitation under § 408(d)(3)(B).

D. Tax treatment of recontributions of a coronavirus-related distribution made to a taxpayer who uses the 1-year income inclusion method

If a qualified individual elects to include all coronavirus-related distributions received in a year in gross income for that year and recontributes any portion of the coronavirus-related distributions to an eligible retirement plan at any time during the 3-year recontribution period, then the amount of the recontribution will reduce the amount of the coronavirus-related distribution included in gross income for the year of the distribution.  The qualified individual will report the amount of the recontribution on Form 8915-E (which will be filed with the individual's federal income tax return, if applicable).

If a qualified individual includes a coronavirus-related distribution in gross income in the year of the distribution and recontributes the distribution to an eligible retirement plan after the timely filing of the individual's federal income tax

return for the year of the distribution (that is, after the due date, including extensions), the individual will need to file an amended federal income tax return for the year of the distribution.  The qualified individual will need to file a revised Form 8915-E (with his or her amended federal income tax return) to report the amount of the recontribution and should reduce his or her gross income by the amount of the recontribution, but not in an amount exceeding the amount of the coronavirus-related distribution.

Example 1.  Taxpayer B receives a $45,000 distribution from a § 403(b) plan on November 1, 2020.  Taxpayer B is a qualified individual and treats the distribution as a coronavirus-related distribution.  Taxpayer B receives no other coronavirus-related distribution from any eligible retirement plan.  Taxpayer B recontributes $45,000 to an IRA on March 31, 2021.  Taxpayer B reports the recontribution on Form 8915-E and files the 2020 federal income tax return on April 10, 2021.  For Taxpayer B, no portion of the coronavirus-related distribution is includible as income for the 2020 tax year.

Example 2.  The facts are the same as in Example 1 of this section 4.D, except that Taxpayer B timely requests an extension of time to file the 2020 federal income tax return and makes a recontribution on August 2, 2021, before filing the 2020 federal income tax return.  Taxpayer B files the 2020 federal income tax return on August 10, 2021.  As in Example 1, no portion of the coronavirus-related distribution is includible in income for the 2020 tax year because Taxpayer B made the recontribution before the timely filing of the 2020 federal income tax return.

Example 3.  Taxpayer C receives a $15,000 distribution from a governmental § 457(b) plan on March 30, 2020.  Taxpayer C is a qualified individual and treats the distribution as a coronavirus-related distribution. Taxpayer C elects out of the 3-year ratable income inclusion on Form 8915-E and includes the entire $15,000 in gross income for the 2020 taxable year.  On December 31, 2022, Taxpayer C recontributes $15,000 to the § 457(b) plan. Taxpayer C will need to file an amended federal income tax return for the 2020 tax year to report the amount of the recontribution and reduce the gross income by $15,000 with respect to the coronavirus-related distribution included on the 2020 original federal income tax return.

E.  Tax treatment for year of recontribution of a coronavirus-related distribution made to a taxpayer who uses the 3-year ratable income inclusion method

As explained above, a qualified individual is permitted to include a coronavirus-related distribution in income ratably over a 3-year period.  If a qualified individual includes a coronavirus-related distribution ratably over a 3-year period and the individual recontributes any portion of the coronavirus-related distribution to an eligible retirement plan at any date before the timely filing of the individual's federal income tax return (that is, by the due date, including

extensions) for a tax year in the 3-year period, the amount of the recontribution will reduce the ratable portion of the coronavirus-related distribution that is includible in gross income for that tax year.  See section 4.F of this notice for recontributions that affect income inclusion in other tax years.

Example 1.  Taxpayer D receives $75,000 from a section 401(k) plan on December 1, 2020.  Taxpayer D is a qualified individual and treats the $75,000 distribution as a coronavirus-related distribution.  Taxpayer D uses the 3-year ratable income inclusion method for the distribution.  Taxpayer D makes one recontribution of $25,000 to the section 401(k) plan on April 10, 2022.  Taxpayer D files the 2021 federal income tax return on April 15, 2022.  Without the recontribution, Taxpayer D should include $25,000 in income with respect to the coronavirus-related distribution on each of D's 2020, 2021, and 2022 federal income tax returns.  However, as a result of the recontribution to the section 401(k) plan, Taxpayer D should include $25,000 in income with respect to the coronavirus-related distribution on the 2020 federal income tax return, $0 in income with respect to the coronavirus-related distribution on the 2021 federal income tax return, and $25,000 in income with respect to the coronavirus-related distribution on the 2022 federal income tax return.

Example 2.  The facts are the same as in Example 1 of this section 4.E, except that Taxpayer D recontributes $25,000 to the section 401(k) plan on August 10, 2022.  Taxpayer D files the 2021 federal income tax return on April 15, 2022, and does not request an extension of time to file that federal income tax return.  As a result of the recontribution to the section 401(k) plan, Taxpayer D should include $25,000 in income with respect to the coronavirus-related distribution on the 2020 federal income tax return, $25,000 in income with respect to the coronavirus-related distribution on the 2021 federal income tax return, and $0 in income with respect to the coronavirus-related distribution on the 2022 federal income tax return.

F.  Recontributions of a coronavirus-related distribution may be carried back or forward when using the 3-year ratable income inclusion

If a qualified individual using the 3-year ratable income inclusion method recontributes an amount of a coronavirus-related distribution for a tax year in the 3-year period that exceeds the amount that is otherwise includible in gross income for that tax year, as described in section 4.E of this notice, the excess amount of the recontribution is permitted to be carried forward to reduce the amount of the coronavirus-related distribution that is includible in gross income in the next tax year in the 3-year period.  Alternatively, the qualified individual is permitted to carry back the excess amount of the recontribution to a prior taxable year or years in which the individual included income attributable to a coronavirus-related distribution.  The individual will need to file an amended federal income tax return for the prior taxable year or years to report the amount

of the recontribution on Form 8915-E and reduce his or her gross income by the excess amount of the recontribution.

Example.  Taxpayer E receives a distribution of $90,000 from his or her IRA on November 15, 2020.  Taxpayer E is a qualified individual and treats the distribution as a coronavirus-related distribution.  Taxpayer E ratably includes the $90,000 distribution in income over a 3-year period.  Without any recontribution, Taxpayer E will include $30,000 in income with respect to the coronavirus-related distribution on each of the 2020, 2021, and 2022 federal income tax returns.  Taxpayer E includes $30,000 in income with respect to the coronavirus-related distribution on the 2020 federal income tax return.  Taxpayer E then recontributes $40,000 to an IRA on November 10, 2021 (and makes no other recontribution in the 3-year period).  Taxpayer E is permitted to do either of the following:

Option 1.  Taxpayer E includes $0 in income with respect to the coronavirus-related distribution on the 2021 federal income tax return.  Taxpayer E carries forward the excess recontribution of $10,000 to 2022 and includes $20,000 in income with respect to the coronavirus-related distribution on E's 2022 federal income tax return.

Option 2.  Taxpayer E includes $0 in income with respect to the coronavirus-related distribution on the 2021 tax return and $30,000 in income on the 2022 federal income tax return.  Taxpayer E also files an amended federal income tax return for 2020 to reduce the amount included in income as a result of the coronavirus-related distribution to $20,000 (that is, the $30,000 original amount includible in income for 2020 minus the remaining $10,000 recontribution that is not offset on either the 2021 or 2022 federal tax return).

G.  Special rule for 3-year ratable income inclusion method for coronavirus-related distributions

If a qualified individual dies before the full taxable amount of the coronavirus-related distribution has been included in gross income, then the remainder must be included in gross income for the taxable year that includes the individual's death.

H.  Coronavirus-related distributions will not be treated as a change in substantially equal periodic payments

In the case of an individual receiving substantially equal periodic payments from an eligible retirement plan, the receipt of a coronavirus-related distribution from that plan will not be treated as a change in substantially equal payments as described in § 72(t)(4) merely because of the coronavirus-related distribution.

**SECTION 5. APPLICATION OF SECTION 2202 OF THE CARES ACT TO PLAN LOANS**

This section provides guidance regarding the application of section 2202(b) of the CARES Act to plan loans, including a safe harbor under which suspensions of payments and extensions of loan terms will be treated as satisfying section 2202(b)(2) of the CARES Act.  As described in section 2.C of this notice, an employer is permitted to choose whether, and to what extent, to apply coronavirus-related plan loan rules described in this section (regardless of how coronavirus-related distributions are treated).

A. <u>Increase in the allowable loan amount</u>

Special rules apply to a loan made from a qualified employer plan (as defined in § 1.72(p)-1, Q&A-2) to a qualified individual on or after March 27, 2020 (the date of enactment of the CARES Act) and before September 23, 2020.  For these loans, section 2202(b)(1) of the CARES Act changes the limits under § 72(p)(2)(A) of the Code.  In applying § 72(p) to a plan loan, the $50,000 aggregate limit in § 72(p)(2)(A)(i) is increased to $100,000 and the rule in § 72(p)(2)(A)(ii) limiting the aggregate amount of loans to 50 percent of the employee's vested accrued benefit is increased to 100 percent of the employee's vested accrued benefit.[2]

B. <u>Suspension of payments and extension of term of loan</u>

A special rule applies if a qualified individual has an outstanding loan from a qualified employer plan on or after March 27, 2020.  Section 2202(b)(2) of the CARES Act provides that, for purposes of § 72(p), in the case of a qualified individual with a loan from a qualified employer plan outstanding on or after March 27, 2020, if the due date pursuant to § 72(p)(2)(B) or (C) for any repayment with respect to the loan occurs during the period beginning on March 27, 2020, and ending on December 31, 2020, the due date shall be delayed for 1 year.  In addition, any subsequent repayments of the loan shall be adjusted appropriately to reflect the delay and any interest accruing during the delay, and the period of delay must be disregarded in determining the 5-year period and the term of the loan under § 72(p)(2)(B) and (C).  The effect of section 2202(b)(2) of the CARES Act is to permit a delay in certain plan loan repayments without causing the loans to violate § 72(p)(2)(B) and (C).  It does not, however, require a delay in plan loan repayments in order to satisfy § 72(p)(2)(B) and (C).  Thus, an employer is permitted to choose to allow this delay in loan repayments under

---

[2] The Department of Labor has advised the Department of the Treasury and the IRS that it will not treat any person as having violated the provisions of Title I of the Employee Retirement Income Security Act (ERISA), including the adequate security and reasonably equivalent basis requirements in ERISA section 408(b)(1) and 29 CFR 2550.408b-1, solely because the person made a plan loan to a qualified individual during the period beginning on March 27, 2020, and ending on September 22, 2020, in compliance with CARES Act section 2202(b)(1) and the provisions of this notice.  See EBSA Disaster Relief Notice 2020-01.

its plan with respect to qualified individuals, and, if it does, there will not be a deemed distribution to those individuals under § 72(p) due to the delay.  For example, each repayment that becomes due during the period from March 27, 2020, through December 31, 2020, may be delayed for up to 1 year and then reamortized (taking into account interest) over a period that is up to 1 year longer than the original term of the loan.  Each reamortized repayment may then be added to other reamortized repayments and to non-reamortized repayments to construct an overall loan reamortization schedule.

This notice provides a safe harbor for satisfying section 2202(b)(2) of the CARES Act.  Under this safe harbor, a qualified employer plan will be treated as satisfying the requirements of § 72(p) pursuant to section 2202(b)(2) of the CARES Act if a qualified individual's obligation to repay a plan loan is suspended under the plan for any period beginning not earlier than March 27, 2020, and ending not later than December 31, 2020 (suspension period).  The loan repayments must resume after the end of the suspension period, and the term of the loan may be extended by up to 1 year from the date the loan was originally due to be repaid.  If a qualified employer plan suspends loan repayments during the suspension period, the suspension will not cause the loan to be deemed distributed even if, due solely to the suspension, the term of the loan is extended beyond 5 years.  Interest accruing during the suspension period must be added to the remaining principal of the loan.  A plan satisfies these rules if the loan is reamortized and repaid in substantially level installments over the remaining period of the loan (that is, 5 years from the date of the loan, assuming that the loan is not a principal residence loan, plus up to 1 year from the date the loan was originally due to be repaid).  If an employer, under its plan, chooses to permit a suspension period that is less than the maximum suspension period described above, the employer is permitted to extend the suspension period subsequently, but not beyond December 31, 2020.

Example applying the safe harbor.  On April 1, 2020, a participant with a nonforfeitable account balance of $40,000 borrowed $20,000 to be repaid in level monthly installments of $368.33 each over 5 years, with the repayments to be made by payroll withholding.  The participant makes payments for 3 months through June 30, 2020.  The participant is a qualified individual (as described in section 1.B of this notice).  The participant's employer takes action to suspend payroll withholding repayments, for the period from July 1, 2020, through December 31, 2020, for loans to qualified individuals that are outstanding on or after March 27, 2020.  Because the participant is a qualified individual, no further repayments are made on the participant's loan until January 1, 2021 (when the balance is $19,477).  At that time, repayments on the loan resume, with the amount of each monthly installment reamortized to be $343.27 in order for the loan to be repaid by March 31, 2026 (which is the date the loan originally would have been fully repaid, plus 1 year).

The Department of the Treasury and the IRS recognize that there may be additional reasonable, if more complex, ways to administer section 2202(b) of the CARES Act.  For example, in a plan with a suspension period beginning April 1, 2020, each repayment that becomes due during the suspension period may be delayed to April 1, 2021 (the 1-year anniversary of the beginning of the suspension period).  After originally scheduled repayments for January through March of 2021 are made, the outstanding balance of the loan on April 1, 2021, including the delayed repayments with interest, may be reamortized over a period that is up to 1 year longer than the original term of the loan.

C.  Reliance on certifications

The administrator of a qualified employer plan may rely on an individual's certification that the individual satisfies the conditions to be a qualified individual, and therefore qualifies for the special treatment for loans under section 2202(b) of the CARES Act, unless the administrator has actual knowledge to the contrary under the standard described in section 2.E of this notice.  See section 2.E of this notice for an example of an acceptable certification.

**SECTION 6. PERMITTED CANCELLATION OF DEFERRAL ELECTION UNDER NONQUALIFIED DEFERRED COMPENSATION PLAN**

Under § 1.409A-3(j)(4)(viii), a nonqualified deferred compensation plan subject to § 409A may provide for a cancellation of a service provider's deferral election, or such a cancellation may be made, due to an unforeseeable emergency or a hardship distribution pursuant to § 1.401(k)-1(d)(3).  If a service provider receives a distribution from an eligible retirement plan that constitutes a coronavirus-related distribution, that distribution will be considered a hardship distribution pursuant to § 1.401(k)-1(d)(3) for purposes of § 1.409A-3(j)(4)(viii).  As a result, a nonqualified deferred compensation plan may provide for a cancellation of the service provider's deferral election, or such a cancellation may be made, due to a coronavirus-related distribution described in section 1.C of this notice.  The deferral election must be cancelled, not merely postponed or otherwise delayed.

**DRAFTING INFORMATION**

The principal author of this notice is Jamie Dvoretzky of the Office of the Associate Chief Counsel (Employee Benefits, Exempt Organizations, and Employment Taxes).  For further information regarding this notice, contact Ms. Dvoretzky at (202) 317-4102 (not a toll-free number).

# EXHIBIT 2



**Nationwide Retirement Solutions**
457 Unforeseeable Emergency Distribution Form

## Personal Information

| | |
|---|---|
| Plan Name: | |

| | |
|---|---|
| Participant Name: | SSN #: |
| Mailing Address: | Date of Birth: |
| City, State, & Zip Code: | Phone Number: |
| Email Address: | |

How would you like to be contacted if additional information is required?   ☐ Telephone   ☐ Email

## Unforeseeable Emergency Details (Required)

Was the severe financial hardship a result of some unforeseeable circumstance arising as a result of events beyond the control of you, your spouse, dependent or primary beneficiary?

☐ **Yes**          ☐ **No**          If no, **STOP**, do not submit your request. it does not qualify as an unforeseeable emergency.

If yes, please provide a detailed explanation of the unforeseeable emergency that has caused you, your spouse, your dependent or your primary beneficiary a severe and unforeseeable financial hardship. Please be as detailed as you can, including names and dates.

Attach extra sheets if needed.

Date(s) unforeseeable emergency occurred _____

**NOTE:** Circumstances over 12 months from the date of application will not be considered for unforeseeable emergency distributions.

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |

## Financial Position Acknowledgement

THIS ACKNOWLEDGEMENT IS REQUIRED TO BEGIN THE REVIEW PROCESS

I attest that the unforeseeable emergency has caused a severe and unforeseeable financial hardship to me, my spouse, dependent, or primary beneficiary that cannot be met through any other means, including the following:

1. The reasonable liquidation of funds in checking and/or savings accounts, provided the liquidation would not itself cause an immediate and heavy financial need,

2. The reasonable liquidation of funds in investment accounts, IRA's, and/or insurance policy cash values, provided the liquidation would not itself cause an immediate and heavy financial need,

3. The reasonable liquidation of nonessential assets (i.e. rental/vacation properties, RV's, boats, or other), provided the liquidation would not itself cause an immediate and heavy financial need,

4. The cancellation of elective deferrals under the 457 Deferred Compensation Plan,

5. Other currently available distributions or nontaxable loans from other plans maintained by my employer or any other employer,

6. Borrowing from commercial sources on reasonable commercial terms in an amount sufficient to satisfy the need.

I certify that all of the information provided in this application is true, complete and accurate.

| Print Name: | |
|---|---|
| Signature: | Date: |

## Distribution Amount

Distributions due to unforeseeable emergencies are only permitted in the amount necessary to satisfy the financial need after reimbursement by insurance or other sources. Please attach required documentation to support the requested amount. This distribution may be taxable.

Amount Requested $_____     **OR**     ☐     Maximum Amount Allowed

Stopping your deferrals may help alleviate your financial need. If you would like to stop your deferrals please contact customer service at 1-877-677-3678.

Selecting to stop contributions will require the completion of a new participation agreement to restart your contributions to the deferred compensation plan.

## Payment Method

☐　　Send check by first class mail to my address of record. Allow 5 to 10 business days from process date for delivery. (Default option, if no other option is selected)

☐　　Send check overnight at my expense to my address of record. I understand there is an additional $25.00 fee that will be deducted from my account. P.O. Box addresses are not eligible for overnight delivery and Saturday delivery may not be available in your area. Allow 2 to 4 business days from process date for delivery.

☐　　ACH Instructions on File – Send funds to my bank account that NRS has on file.

☐　　Direct Deposit by ACH:  Check only one option: ☐ Checking Account ☐ Savings Account

_____

Bank/Credit Union Name

(_____)_____

Bank/Credit Union Phone Number

_____

ABA (Routing) Number* (first nine digits only)

_____

Account Number



**Note**: Direct Deposit is only offered through members of the Automatic Clearing House (ACH). We cannot accept a deposit slip for banking numbers. If ACH information is not completed correctly a check will be sent to your address on file.

Is this account associated with a brokerage firm or other investment firm?　☐ Yes ☐ No

If yes, have you confirmed that the ABA and account numbers are correct?　☐ Yes ☐ No

I hereby authorize NRS to initiate automatic deposits to my account at the financial institution named above. In the event an error is made, I authorize NRS to make a withdrawal from this account. Further, I agree not to hold NRS responsible for any delay or loss of funds due to incorrect or incomplete information supplied by me or by my financial institution or due to an error on the part of my financial institution in depositing funds to my account. This agreement will remain in effect until NRS receives a written notice of cancellation from me or my financial institution, or until I submit a new direct deposit authorization form to NRS. In the event this direct deposit authorization form is incomplete or contains incorrect information, I understand a check will be issued to my address of record.

## Tax Withholding

**Federal Tax:** Please select one option, if no option is selected, NRS will use a default rate of 10% federal tax withholding.

☐　　Increases the distribution amount to accommodate federal tax withholding on the taxable portion on my distribution. I will receive the approved amount of my request (by check or direct deposit), and the total distribution amount will be increased to include federal tax withholdings. NRS will use a default withholding rate of 10%. If account balance is insufficient to accommodate federal taxes, 100% of the account balance will be processed an 10% federal taxes will be withheld. The remaining balance will be sent (by check or direct deposit) to the member.

☐　　Do not withhold federal tax from my distribution. I will be liable for all federal taxes that may result from this distribution.

**State Tax:** State taxes will be automatically withheld if you are a resident in a state that mandates state income tax withholding. If you would like to adjust your state taxes, please complete and attach a state tax withholding form. These forms can be obtained from the State web site, NRS does not supply these forms.

## Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person.

4. The FATCA code entered on this form (if any) indicating that the payee is exempt from FATCA reporting is correct.

## Authorization

I consent to a distribution as elected above. I understand that the terms of the Plan document will control the amount and timing of any payment from the plan. I further acknowledge that this distribution is not eligible for rollover to another retirement plan or IRA.

As required by law, and under the penalty of perjury, I certify the Social Security Number (Taxpayer Identification Number) and information I have provided is correct. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and I am a U.S. citizen or other U.S. person.

| Print Name: | |
|---|---|
| Signature: | Date: |

## Form Return

By mail:        Nationwide Retirement Solutions          By fax:  877-677-4329
                PO Box 182797
                Columbus, OH 43218-2797

OR

Express mail address:
                Nationwide Retirement Solutions
                3400 Southpark Place, Suite A
                DSPF-F2
                Grove City, OH 43123-4856

# EXHIBIT 3

# Company Name:_____

## HARDSHIP WITHDRAWAL APPLICATION

| Employee Name | Social Security Number | Current Date |
|---|---|---|
| Mailing Address (City, State, Zip) | Date of Birth | Home Phone Number |
|  | Marital Status<br>☐ Single  ☐ Married | Business Phone Number |

### HARDSHIP WITHDRAWAL PROVISIONS

The Plan permits hardship withdrawals only to the extent a participant demonstrates to the satisfaction of the Plan Committee that the reason for the hardship withdrawal complies with the applicable requirements under the Internal Revenue Code and that such hardship imposes an immediate and heavy financial burden upon such participant. Hardship withdrawals are limited to bona fide financial emergencies as determined by the Plan Committee. A hardship withdrawal cannot be applied for until all other asset liquidation and credit options (including loan from 401(k) Plan) have been exhausted.

You will need to consult with your financial advisor to determine if there will be a 10% early withdrawal penalty when you file your taxes for the year in which Hardship Withdrawal is taken.

If you have any question about Hardship Withdrawals please contact your Human Resources Department.

### AMOUNTS AVAILABLE FOR WITHDRAWAL

If you have a qualified hardship, you may withdraw the amount necessary to meet the need created by the hardship, subject to reduction by any other assets you have available from any other source to meet the hardship. The total amount of the withdrawal cannot exceed the value of your deferral account.*

### NATURE AND DESCRIPTION OF HARDSHIP

In the space provided below, indicate the nature of the hardship for which you are requesting a withdrawal from the Plan. You may attach additional pages if more space is needed. You may also attach any documents which you feel would help prove that you have a financial hardship. As part of the review process, the Plan Committee may require additional proof of your financial hardship.

☐ Payment of medical care expenses previously incurred by the participant or the participant's spouse or dependents; expenses necessary to obtain medical care are also covered

_____

_____

☐ Costs related to the purchase of a participant's principal residence (not including mortgage payments)

_____

_____

☐ Payment of tuition, related educational fees, and room and board expenses for the next 12 months of post-secondary education

_____

_____

☐ Payments necessary to prevent eviction from or foreclosure on a mortgage on the participant's principal residence

_____

_____

* After 1/1/89, earnings on the deferral account are not available for withdrawal

NBS - 406a(10/02)

## Please forward this from to your company's Human Resource Department

**Company Name:**_____

## HARDSHIP WITHDRAWAL APPLICATION

PENALTIES

If you withdraw funds from the Plan, you cannot make any deferral contribution to the Plan for 6 months after the withdrawal.

CERTIFICATION OF HARDSHIP

I have read and I understand this application for hardship withdrawal.  I hereby request a withdrawal in the amount of $_____.  I hereby certify that I do not have any other source of assets which can be liquidated to meet the financial hardship outlined above.  I consent to the immediate distribution of the withdrawal to me in a single sum cash payment.  I declare under penalty of perjury under the laws of the state of _____ that the information I have supplied on this application for the hardship withdrawal is true and complete in all respects.  This application was signed at:

_____          _____
City                                                                                        State

_____          _____
Participant Signature                                                          Date

SPOUSAL CONSENT

Federal laws require that the Plan Committee obtain adequate signature verification when certain benefit payments are made under qualified plans; therefore, if you are legally married **and** the amount of the distribution is over **$5,000**, both you and your spouse must sign this hardship withdrawal application.  Your spouse's signature must be witnessed by a Plan representative or a notary public.

WITNESSED IN THE PRESENCE OF:

_____   _____          _____   _____
Spouse's Signature                              Date                       Notary Public or Plan Administrator                 Date

| **FOR TRUSTEE USE ONLY:** |
|---|

This Hardship Withdrawal Application has been approved by the Trustees of the Plan.

_____   _____
Trustee Signature (Required)                            Date

Additional Information or Comments:

NBS - 406b(11/2003)

Please forward this form to your company's Human Resource Department

# EXHIBIT 4



# City of Baltimore Retirement Savings and Deferred Compensation Plans
## 457(b) Coronavirus-Related Distribution Request

Page 1 of 3

This form is to be used for a distribution made available under the Coronavirus Aid, Relief, and Economic Security (CARES) Act. Available for participants only.

## Participant Information

Name: Marilyn J. Mosby

Date of Birth: ▮▮▮▮▮▮▮                     SSN or Account Number: ▮▮▮▮▮▮▮

Street Address: ▮▮▮▮▮▮▮

City: Baltimore                               State[1]: MD          ZIP: 21217

Phone[2]: ▮▮▮▮▮▮▮              Email: ▮▮▮▮▮▮▮

How would you like to be contacted if additional information is required? ☐ Phone  ☑ Email

[1] NRS will use the State provided in your mailing address as your State of residency for tax purposes.

[2] Nationwide strives to provide excellent customer service to our Members. By providing your telephone number, you authorize the Nationwide Family of Companies to contact you via telephone using automated technology to assist you with your account.

## Payment Amount

☐ Total Account Balance   OR   ☑ Other Amount: $ 40,000

**NOTE:** An amount must be provided and cannot exceed the lesser of 100% of the vested balance or $100,000 total across all plans maintained by the Employer.

## Distribution Direction (select one)

If an option is not selected, your assets will be distributed from all money sources and investment funds (pro-rata). If you indicate a percentage, you must use whole percents only.

☐ **1. Proportionately** from all sources and funds (pro-rata)

☐ **2. From Specific Sources** (indicate all that apply)        ☐ **3. From Specific Funds** (please list funds)

| _____ | $_____ | or | ____% | | _____ | $_____ | or | ____% |
| _____ | $_____ | or | ____% | | _____ | $_____ | or | ____% |
| _____ | $_____ | or | ____% | | _____ | $_____ | or | ____% |
| _____ | $_____ | or | ____% | | _____ | $_____ | or | ____% |
| _____ | $_____ | or | ____% | | _____ | $_____ | or | ____% |

## Important Information

**Money Sources**
Funds will be withdrawn equally across all money sources and investment options for each requested distribution unless instructed otherwise.

**Self-Directed Brokerage Account**
If you have money in the Self-Directed Brokerage Account and the requested amount exceeds your core account balance, you will need to transfer funds back to the core account before your request can be processed.

## Payment Method (select one)

☐ **ACH Instructions on File** – Send funds to my bank account that Nationwide has on file.

☐ **Send check by first class mail to my address of record**. Allow 5 to 10 business days from process date for delivery. (Default option, if no other option is selected)

☑ **New Direct Deposit ACH** (complete information below)

**Financial Institution Information:**

_____
Financial Institution Name

Account Type: ☑ Checking ☐ Savings
If account type is not selected, checking will be used.

_____
Transit/ABA routing Number

_____
Account Number

John Doe                          1492
123 Main Street  Ph. (916) 555-1212
Hometown, CA 98765

Date _____

PAY TO THE
ORDER OF _____  $ _____

_____ DOLLARS

Money Bank, Inc.
321 Main Street
Hometown, CA 98765

MEMO _____

⑈ 123456789 ⑈    ⑆00001234 5678 ‖⑈    1492
9-digit ABA routing number    Checking Account Number    Check Number

**Account Verification:** The following documents are required to verify ownership of the account provided:

- **Checking Accounts:** Please include a pre-printed voided check with this authorization.
- **Savings Accounts:** Please include a letter from the bank, signed by a bank representative, which indicates the ABA routing number, the account number and the account holder's name for verification.

**NOTE:** Direct Deposit is only offered through members of the Automatic Clearing House (ACH). We cannot accept a deposit slip or starter check for banking numbers.

Is this account associated with a brokerage firm or other investment firm?      ☐ Yes  ☑ No

If yes, have you confirmed that the ABA and account numbers are correct?      ☐ Yes  ☐ No

I hereby authorize Nationwide to initiate automatic deposits to my account at the financial institution named above. In the event an error is made, I authorize Nationwide to make a corrective reversal from this account. Further, I agree not to hold Nationwide responsible for any delay or loss of funds due to incorrect or incomplete information supplied by me or by my financial institution or due to an error on the part of my financial institution in depositing funds to my account. This agreement will remain in effect until Nationwide receives a written notice of cancellation from me or my financial institution, or until I submit a new direct deposit authorization form to Nationwide. **In the event this direct deposit authorization form is incomplete or contains incorrect information, I understand a check will be issued to my address of record.**

## Income Tax Withholding

**Federal Income Tax Withholding:** A 10% income tax will be withheld unless you elect otherwise below.

☐ No Withholding      ☐ Other Withholding Amount: _____%

**State Income Tax Withholding:** State taxes will be automatically withheld if you are a resident in a State that mandates State income tax withholding. If you would like to adjust your State taxes, please complete and attach a State tax withholding form. These forms can be obtained from the State website; Nationwide does not supply these forms.

## Tax ID Certification

I certify that under penalties of perjury that:

1. The Taxpayer Identification Number or Social Security Number listed on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because:
   a. I am exempt from backup withholding, or
   b. I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or
   c. The Internal Revenue Service has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person, and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.
   (FATCA does not apply as this is a U.S. account)

You must cross out item (2) if you have been notified by the IRS that you are currently subject to backup withholding because of failure to report interest or dividends on your tax return.

## Participant Coronavirus Certification and Distribution Authorization

The Coronavirus Aid, Relief and Economic Security Act of 2020 ("CARES Act") was signed into law on March 27, 2020. The CARES Act permits qualifying members to receive a coronavirus-related distribution. I understand that I may receive a distribution of up to $100,000 if I am a qualified individual. By making this request, I acknowledge that the amount of coronavirus-related distribution(s) which I may obtain from The City of Baltimore Deferred Compensation Plan is limited to the amount of $100,000 and that I am not exceeding this limit. I further acknowledge that the City of Baltimore Deferred Compensation Plan is relying on my certifications in determining that I qualify for a coronavirus-related distribution and that I will not exceed the applicable limit.

By signing this form, I certify that I meet at least one of the qualifications for a distribution as defined under the CARES Act Section 2202(a)(4)(A) summarized below: (check one)

☐ I have been diagnosed with the virus SARS-CoV-2 or with coronavirus disease 2019 (COVID-19) by a test approved by the Centers for Disease Control and Prevention; or

☐ I have a spouse or dependents diagnosed with such virus or disease by such a test; or

☑ I have experienced adverse financial consequences stemming from such virus or disease as a result of:

- Being quarantined, furloughed or laid off
- Having reduced work hours
- Being unable to work due to lack of child care
- The closing or reduction of hours of a business I own or operate

### Additional Acknowledgments

I acknowledge that this distribution is subject to ordinary income taxes and any State or Federal income taxes withheld will be reported on a form 1099-R. As listed in the Income Tax Withholding section on page 2 of this form, I understand that 10% will be withheld for Federal Income Tax unless I elected otherwise. To the extent otherwise applicable, I understand that the CARES Act waives the 10% early withdrawal penalty for coronavirus-related distributions. The CARES Act also permits the Federal tax on the distribution to be apportioned over a three-year period. The City of Baltimore Deferred Compensation Plan has advised me to talk with my personal tax consultant about how this distribution will affect my individual taxes and what repayment rights I have under the CARES Act.

I consent to a distribution as elected above and affirm under the penalties for perjury the statements and acknowledgments made in this request. I understand that the terms of the plan document will control the amount and timing of any payment from the plan.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

Signature (required): _____   Date: 5/26/20 _____

NOTE: Adobe Signature is not permitted.

**NOTE:** The full text of the CARES Act can be found at https://www.congress.gov/bill/116th-congress/house-bill/748/text

## Form Return

**By mail:** Nationwide Retirement Solutions
PO Box 182797
Columbus, OH 43218-2797

**By email:** rpublic@nationwide.com

**By fax:** 877-677-4329

# EXHIBIT 5

## REDW *Wealth* **insights.**
### planning matters

# Special Coronavirus Relief for Retirement Plans and IRAs: Facts You Need to Know

SPRING 2020

*By David Cechanowicz, JD, MSFS, AIF®, AEP, EA – Senior Financial Planner*

**O**n the heels of the SECURE Act that was passed at the end of 2019, the CARES Act of 2020 has provided expanded distribution options and favorable tax treatment for up to $100,000 of coronavirus-related distributions from eligible retirement plans. In addition to special rollover rules that will apply to those distributions, the Act increases the limits on the amount a qualified individual may borrow from an eligible retirement plan (not an IRA) and changes the loan repayment terms. It also eliminates required minimum distributions from most retirement plans.

## KEY QUESTIONS & ANSWERS

**Q** **Who qualifies for the CARES Act provisions pertaining to retirement plans (as outlined in Section 2202)?**

**A** You are a qualified individual if:

- You are diagnosed with the virus SARS-CoV-2 or with coronavirus disease 2019 (COVID-19) by a test approved by the Centers for Disease Control and Prevention;

- Your spouse or dependent is diagnosed with SARS-CoV-2 or with COVID-19 by a test approved by the Centers for Disease Control and Prevention;

- You experience adverse financial consequences as a result of being quarantined, being furloughed or laid off, or having your work hours reduced due to SARS-CoV-2 or COVID-19;

- You experience adverse financial consequences as a result of being unable to work due to lack of child care due to SARS-CoV-2 or COVID-19; or

- You experience adverse financial consequences as a result of closing or reducing hours of a business that you own or operate due to SARS-CoV-2 or COVID-19.

The IRS has gone on record to say it may issue additional guidance that explains and expands the list of factors that will be taken into account to determine whether an individual is qualified as a result of experiencing adverse financial consequences. "Adverse financial consequences" is not a term of precision and will need additional clarification.

In the meantime, the IRS points to notice 2005–92, which was issued on November 30, 2005. That notice provided guidance on the tax favored treatment of distributions and plan loans that were linked to the Katrina Emergency Tax Relief Act of 2005. The IRS has stated that where current circumstances are similar to those in 2005, the 2005 notice can be used for guidance.

*continued*

Copyright 2020 REDW Wealth LLC.  All Rights Reserved.  This publication is intended for general informational purposes only and should not be construed as investment, financial, tax, or legal advice.

**Q**   **What is a coronavirus-related distribution?**

**A**   This is a distribution that is made from an eligible retirement plan to a qualified individual from January 1, 2020 to December 30, 2020. The amount of the distribution is capped at $100,000 for qualified retirement plans and IRAs.

**Q**   **Is there a 10% penalty for taking a coronavirus-related distribution from my retirement plan or IRA if I am younger than 59½?**

**A**   No, the 10% additional tax on early distributions does not apply to any coronavirus-related distributions. Additionally, the mandatory 20% withholding rules do not apply for such distributions.

**Q**   **When are the taxes due on a coronavirus-related distribution from a retirement plan?**

**A**   The distributions are generally included in your income over a three-year period, starting with the year in which you receive your distribution. For example, if you took a $30,000 coronavirus-related distribution in 2020, you would report $10,000 in income on your federal income tax return for each of the following years: 2020, 2021, and 2022. You will still have the option of including the entire distribution in your income in the year it was distributed.

**Q**   **Can a coronavirus-related distribution be repaid to the retirement plan?**

**A**   There are two relief provisions that deal with loans from retirement plans. However, understand that retirement plans are not required to have loan provisions. If a retirement plan does not have loan provisions, the CARES Act cannot force loans to be made.

   **1.**  If a loan is outstanding on or after March 27, 2020, and any repayment on the loan is due from March 27, 2020 to December 31, 2020, that due date may be delayed under the plan for up to one year. Any payments after the suspension will be adjusted to reflect the delay and any interest accruing during the delay.

   **2.**  The CARES Act also permits employers to increase the maximum loan amount available to qualified individuals. Loans used to be restricted to $50,000 or the  vested account balance, if less. That limit may now be increased up to $100,000 (minus any outstanding loans already held by the individual), or the vested benefit under the plan if it is less than $100,000.

**Q**   **Does the CARES Act eliminate required minimum distributions for individuals who would otherwise be required to take them?**

**A**   Required minimum distributions have been suspended for 2020. The suspension will apply for everyone with an IRA or a defined contribution type of account, but not for individuals who are participants in defined benefit plans that are required to take withdrawals.

**Q**   **Can I roll over the required minimum distribution that I took early in the year?**

**A**   Individuals who took their required distribution during the month of January 2020 are not able to roll those distributions into an IRA account. Additionally, individuals who took a series of distributions each month can only roll over one month's distribution in 2020. That is because the rollover rules only allow one rollover for every 12 calendar months. Individuals who took distributions in February, March or April have until July 15 of 2020 to roll those distributions over if they choose.

*continued*



Albuquerque   |   Phoenix   |   redwealth.com

**Q   Can I still make a qualified charitable distribution from my IRA in 2020?**

**A**   One of the requirements to make a qualified charitable distribution from an IRA is that the distribution can only be made by individuals who are subject to required minimum distributions. Even though required minimum distributions have been suspended, you may still give IRA money directly to a charity in 2020. Additionally, even though required minimum distributions do not begin until age 72, the previous law allowing those distributions to begin at age 70½ remains in place.

**Q   Are there other planning issues that I might think about during this year when required distributions are suspended?**

**A**   Depending on your personal income tax situation, 2020 may be a year where it makes sense for you to consider converting some IRA money to a Roth IRA. It is known that the Tax Cuts and Jobs Act of 2017, which reduced brackets, will expire in 2025. Without Congress having to do anything, income tax rates will rise. It may make sense for you to discuss with your tax advisors exactly where the sweet spot may be for you to consider a Roth conversion.

There are many additional issues surrounding the uncertainty that has been brought about by this pandemic. We at REDW Wealth stand ready to help you understand the changes in the tax law and planning strategies you might want to consider during this year.

REDW Wealth LLC, an SEC-registered subsidiary of REDW LLC, is an investment advisory firm with a primary focus on serving clients in the Southwest. As fee-only advisors, we do not receive commissions or sell investment products, so you can be confident that our recommendations and advice are based solely on your needs and with only your success in mind.

