**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**MARILYN J. MOSBY,**<br><br>**Defendant** | **Case No. 22-cr-00007-LKG-1** |

**DEFENDANT MARILYN J. MOSBY'S MOTION TO DISMISS
COUNTS 1 AND 3 OF THE INDICTMENT, OR ALTERNATIVELY
TO COMPEL PRODUCTION OF THE INSTRUCTIONS OF LAW
<u>PROVIDED TO THE GRAND JURY FOR COUNTS 1 AND 3</u>**

Pursuant to Federal Rules of Criminal Procedure 6(e)(3)(E)(ii), 7(d), and 12(b)(3)(B)(v), Baltimore State's Attorney Marilyn J. Mosby ("State's Attorney Mosby") respectfully moves the Court to dismiss Counts 1 and 3 of the Superseding Indictment charging perjury, in violation of 18 U.S.C. § 1621, for failing to state an offense. Alternatively, State's Attorney Mosby requests that the Court order the production of the grand jury transcripts containing the instructions of law for Counts 1 and 3 that were provided to the grand jury in this case (or permit their review in camera), as detailed below.

The Superseding Indictment is defective as a matter of law because it does not (and cannot) sufficiently allege that the "matter" or statements State's Attorney Mosby certified as true were material—a required element for a perjury offense.[1] Dismissal of Counts 1 and 3 is also warranted because the phrase "adverse financial consequences" is fundamentally ambiguous and as such, insufficient to support the perjury charges under § 1621.

---

[1] Recent events demonstrate just how critical—and potentially dispositive—materiality can be with respect to allegedly false statements. On March 31, 2022, a jury acquitted former Hillary Clinton campaign lawyer Michael Sussman of lying to the FBI after his lawyers "repeatedly harped on the 'materiality' element" of the charges against him. *See* https://www.cnn.com/2022/05/31/politics/sussmann-verdict/index.html.

Should the Court not dismiss Counts 1 and 3, State's Attorney Mosby alternatively seeks an order compelling the government to produce the instructions of law for Counts 1 and 3 that were provided to the grand jury that returned the original and superseding Indictments. Barring dismissal, such an alternative remedy would be warranted because the Superseding Indictment alleges an incorrect legal standard not found in Section 2202 of the CARES Act (which the government alleges State's Attorney Mosby failed to meet) as the basis for charging perjury in Counts 1 and 3. In this first of its kind case where the government has criminally prosecuted perjury based on an individual's Section 2202 coronavirus-related withdrawal, due process requires that the Court ensure the grand jury was not improperly instructed with misleading and prejudicial instructions, as the Superseding Indictment strongly suggests occurred.

## BACKGROUND

### A.    Distributions of Retirement Funds under Section 2202 of The CARES Act

Congress enacted the CARES Act of 2020 to provide economic relief to taxpayers impacted by the coronavirus pandemic. *See* IRS Guidance, attached hereto as Ex. 1, at. 1-3. Section 2202 of the CARES Act ("Section 2202") provides such relief by allowing taxpayers to make early withdrawals of their own retirement funds and providing favorable tax treatment with respect to those distributions. *Id.* at 1. In particular, under Section 2202, a coronavirus-related distribution ("CRD") is not subject to the 10% early withdrawal penalty typical of retirement plans, and the plan participant is allowed to spread the payments of the taxes due on the withdrawn amount over a 3-year period, instead of being required to pay all the taxes in the year of the withdrawal. *Id.* A *self-certified* qualified taxpayer was allowed, under Section 2202, to designate a distribution out of their retirement account as coronavirus-related and enjoy that distribution subject to lesser tax consequences than would otherwise be associated with such an early distribution. *Id.* at 6.

**B.      State's Attorney Mosby's Section 2202 Coronavirus-Related Withdrawals**

At all times relevant to this case, State's Attorney Mosby participated in the City of Baltimore Deferred Compensation 457(b) Plan, which was administered by Nationwide Insurance. Super. Indictment, ¶ 3. At issue in this case are two Section 2202 CRDs that State's Attorney Mosby made in May and December of 2020. *Id.* at ¶¶ 4, 13.

Notably, State's Attorney Mosby did not enjoy any tax-related benefits by designating these withdrawals as CRDs. Participants in 457(b) plans (such as State's Attorney Mosby) are never subject to the 10% early withdrawal penalty, unlike 401(k) and 403(b) plan participants; so the savings offered by the Section 2202 10% penalty waiver did not apply to her.[2] Further, State's Attorney Mosby *paid all* the taxes due on *both* of her withdrawals when she filed her 2020 taxes, even though Section 2202 allowed her to defer those tax payments over three years.[3] Simply put, the only benefit State's Attorney Mosby enjoyed from her two CRDs was her own money, and nothing more – no waived 10% penalty, and no deferred tax liability.

**C.      The Government Alleges That State's Attorney Mosby Committed Perjury By Falsely Certifying That She Experienced Adverse Financial Consequences Pursuant to Section 2202**

Almost 20 months after State's Attorney Mosby made the first withdrawal, a federal grand jury returned a four-count Indictment on January 13, 2022, and a Superseding Indictment on March 10, 2022, charging her with two counts of Perjury, in violation of 18 U.S.C. § 1621 (Counts 1 and 3) and two counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014 (Counts Two and Four). Both Counts 1 and 3 concern State's Attorney Mosby's 457(b) CRDs, *see* Super. Indictment, at ¶¶ 4, 13, and accuse State's Attorney Mosby of falsely certifying

---

[2] *Retirement Topics - Exceptions to Tax on Early Distributions: Exception to 10% Additional Tax.* IRS.gov. (last updated 07-Apr-2022), https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-topics-tax-on-early-distributions.
[3] In lieu of attaching the tax documents (which contain confidential information) under seal, State's Attorney Mosby can make those documents available to the Court as necessary.

under oath that she experienced "adverse financial consequences" pursuant to Section 2202. The government claims that this certification was false because:

> MOSBY received her full salary of $247,955.58 from January 1, 2020, through the date on which she signed this form, December 29, 2020, in bi-weekly gross pay direct deposits in the amount of $9,183.54 and had not experienced any of the enumerated financial hardships she claimed to have experienced.

*See* Super. Indictment, at ¶¶ 5, 14.

Throughout Counts 1 and 3 of the Superseding Indictment, the government uses inconsistent terminology when referring to the nature of the certification, variously using the phrase "financial hardship," *see, e.g.*, Super. Indictment at ¶¶ 1, 5, interchangeably with "adverse financial consequences." *See, e.g., id.* at ¶ 3. Despite using these phrases interchangeably, only "adverse financial consequences" appears in Section 2202.

## ARGUMENT

Counts 1 and 3 fail to state a viable offense and should be dismissed for two reasons. *First*, the Superseding Indictment fails to allege (and cannot allege) that the "matter" or statements State's Attorney certified as true were material. *Second*, the phrase "adverse financial consequences" which is the basis for qualification for a CRD is fundamentally ambiguous and thus insufficient to support a charge of perjury under § 1621. For either or both of these reasons, dismissal of Counts 1 and 3 is appropriate.

## I.    COUNTS 1 AND 3 FAIL TO STATE AN OFFENSE AND SHOULD BE DISMISSED

### A.    Governing Law

Federal Rule of Criminal Procedure 12(b)(3)(A) provides that a defendant may move to dismiss an indictment or allegations in an indictment based on a defect in the charging instrument, including failure to state an offense. *Id.* "When a defendant challenges the sufficiency of an

indictment, courts apply a 'heightened scrutiny to ensure that every essential element of an offense has been charged.'" *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014). To be legally sufficient, an indictment "must contain the elements of the offense charged." *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009) (citations omitted). That an indictment must include all elements of an offense derives from "the Fifth Amendment requirement that all elements of the offense have been considered and found by the grand jury." *United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir. 1988).

To be sufficient, an indictment must "fully, directly, and expressly, *without any uncertainty or ambiguity*, set forth all the elements necessary to constitute the offense." *United States v. Remarque*, No. SAG-19-0039, 2021 U.S. Dist. LEXIS 28016, at *6 (D. Md. Feb. 12, 2021) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974) (emphasis added)). "If the indictment does not contain every essential element of the offense, it is invalid." *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997). But "simply parroting the language of the statute in the indictment is insufficient." *United States v. Fitzgerald*, 514 F. Supp. 3d 721, 737-38 (D. Md. 2021). "[I]n testing the sufficiency of an indictment, 'it is the statement of facts in the pleading, rather than the statutory citation that is controlling …'" *Hooker*, 841 F.2d at 1227. As the Court of Appeals for the Fourth Circuit has instructed:

> When the words of a statute are used to describe the offense generally, they must be accompanied with such *a statement of the facts and circumstances* as will inform the accused of the *specific offense*, coming under the general description, with which he is charged. Thus, the indictment must also contain *a statement of the essential facts constituting the offense charged*.

*United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002) (emphasis added).

**B.      Counts 1 and 3 Fail to Sufficiently Allege Materiality**

Counts 1 and 3 fail to state the offense of perjury under 18 U.S.C. § 1621 because they do not allege an essential element of the offense, *i.e.*, that the "matter" or statements State's Attorney Mosby certified as true, were material.

Section 1621 provides, in relevant part:

> Whoever … in any declaration … under penalty of Perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any *material matter* which [s]he does not believe to be true … is guilty of Perjury.

18 U.S.C. § 1621(2) (emphasis added). Thus, to properly bring a charge under § 1621, an indictment must "fully, directly, and expressly, *without any uncertainty or ambiguity*" set forth "a statement of the facts and circumstances" showing: "(1) a declaration, (2) made under penalty of Perjury, (3) in which the accused willfully subscribes as true (4) *any material matter*, (5) which [s]he does not believe to be true." *United States v. Savoy*, 38 F. Supp. 2d 406, 413 (D. Md. 1998) (internal quotation marks omitted) (emphasis added). Important for the purposes here, "[a]n allegedly perjured statement is material 'if it has a natural tendency to influence, or is capable of influencing, *the decision-making body to which it was addressed*." *United States v. Savoy*, 38 F. Supp. 2d 406, 413 (D. Md. 1998) (emphasis added). The Superseding Indictment falls woefully short of this standard.

The Superseding Indictment alleges that State's Attorney Mosby falsely certified as true, the following "matter" or statement:

> I have experienced adverse financial consequences stemming from [the Coronavirus] as a result of:
> Being quarantined, furloughed or laid off
> Having reduced work hours
> Being unable to work due to lack of child care
> The closing or reduction of hours of a business I own or operate.

*See* Super. Indictment at ¶ 12. But missing from the Superseding Indictment is "a statement of the essential facts" showing that the "matter" or statement that State's Attorney Mosby certified as true, that is*, the specific reasons she qualified for the distribution, themselves,* were material. And, as this Court held in *Savoy*, the Superseding Indictment also had to contain specific facts demonstrating that those specific reasons were addressed to and capable of influencing a "decision-making body." *Savoy*, 38 F. Supp. 2d at 413 (holding that a "*material matter*" that is, one that is "capable of influencing, the decision-making body to which it was addressed," is a necessary element for a charge of perjury under § 1621); *Brandon*, 298 F.3d at 307 ("[T]he indictment must also contain *a statement of the essential facts* constituting the offense charged") (emphasis added).

Rather than meeting these legal requirements, the Superseding Indictment, in alleging materiality, merely "parrots" the statutory language then confusingly claims something else was material. Specifically:

> MARILYN J. MOSBY did submit a "*457(b) Coronavirus-Related Distribution Request*" to Nationwide … *It was material to such distribution requests that the applicants certify* that s/he meet at least one of the qualifications for a distribution as defined under the CARES Act Section 2202(a)(4)(A) as summarized on the distribution request.

*See* Super. Indictment at ¶¶ 4, 13. This falls short of the "without any uncertainty or ambiguity" standard and is insufficient under Fourth Circuit law because simply alleging generally and in conclusory fashion, as the Superseding Indictment does, that "it was material to *such distribution requests that the applicants certify*" they were qualified is simply not enough under this Court's precedent and the law of this Circuit. *Savoy*, 38 F. Supp. 2d at 413; *see also Hooker*, 841 F.2d at 1233 (dismissing RICO charge because the indictment failed to set forth facts showing that the defendant was engaged in interstate commerce, a required element).[4]

---

[4] The government's allegations here are akin to saying that a witness' *taking of the oath* to testify truthfully is material instead of the *actual testimony itself.*

As such, the allegations in Counts 1 and 3 fail as a matter of law and should be dismissed.

**C.    Counts 1 & 3 Can Never Properly Allege Materiality Under the Facts of This Case.**

As discussed above, a statement is only material "if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *Savoy*, 38 F. Supp. 2d at 413; *United States v. Kimble*, No. WDQ-13-035, 2015 U.S. Dist. LEXIS 90107, at *98 (D. Md. July 8, 2015) citing *Neder v. United States*, 527 U.S. 1, 16 (1999) ("In general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed."); *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007) (a statement is material only if it is capable of influencing a decision that the decision-maker is "entitled to" or "able to make").

It is not a surprise that the Superseding Indictment fails to set forth facts showing that the alleged false statements were directed to or capable of influencing a "decision-making body" because there is no "decision of [a] decision-making body" as contemplated by § 1621, involved in the process for making a CRD. Under Section 2202, a CRD is defined as "any distribution from an eligible retirement plan made on or after January 1, 2020, and before December 31, 2020, to a qualified individual." *See* IRS Guidance, at 5. Whether a plan participant is a "qualified individual" is not determined by the insurance plan or any "decision-making body." Instead, a plan participant *self-certifies* that they meet the definition of a "qualified individual" under Section 2202 and instructs the plan to treat the distribution as a "coronavirus-related distribution." *See* IRS Guidance, at 5-6, 9.  And, the IRS has instructed that the plan administrator "may rely on an individual's certification" that they are qualified. *See* IRS Guidance, at 9.

Put differently, when State's Attorney Mosby submitted the 457(b) distribution form to Nationwide, she was not submitting it for Nationwide to decide whether she was qualified based

on the veracity of the statements that corresponded to the box she checked, that is, the specific reasons she self-certified qualified her for a distribution. Instead, she was designating the distribution as a CRD and instructing Nationwide to treat it as such.

Significantly, the procedure State's Attorney Mosby followed for her CRD differs markedly from a plan participant who requests "hardship" or "emergency" distributions from their retirement plans, including the 457(b) plan for which State's Attorney Mosby is a participant. Unlike a CRD, "hardship" or "emergency" distributions require the plan to engage in a "decision-making" process to determine not only whether a participant qualifies for the distribution but also the amount of the distribution.

Section 2202 CRDs are separate and distinct from "hardship" and "emergency" distributions from retirement plans which were, and continue to be, available to plan participants, before and after the enactment of Section 2202. In particular, 457(b), 401(k) and 403(b) retirement plans all offer "hardship" or "emergency" distributions to plan participants based on *immediate and specific* need.[5] The IRS defines the "hardship" distributions offered under 401(k) and 403(b) plans as distributions made because of an "immediate and heavy financial need."[6] Similarly, "emergency" distributions offered under 457(b) plans are defined "as distributions to a participant based on an unforeseeable emergency."[7] And the process for requesting and receiving a "hardship" or "emergency" distribution differs significantly from Section 2202 CRDs.

Unlike a CRD, qualification for a "hardship" or "emergency" distribution is determined by the plan and is based on the specific need identified by the plan participant. For example, to

---

[5] *See, e.g., Retirement Topics - Hardship Distributions*. IRS.gov. (last updated 27-Apr-2022), https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-topics-hardship-distributions.
[6] *Id.*
[7] *Unforeseeable Emergency Distributions from 457(b) Plans*. IRS.gov. (last updated 17-Mar-2022), https://www.irs.gov/retirement-plans/employee-plans-news-december-17-2010-unforeseeable-emergency-distributions-from-457b-plans

determine the eligibility of a plan participant for a 457(b) "emergency" distribution, the administrator for State's Attorney Mosby's plan, Nationwide, requires participants "to provide a detailed explanation of the unforeseeable emergency … including names and dates." *See* Nationwide 457(b) Emergency Distribution Request Form, attached as Ex. 2. And for "hardship" withdrawals, as expressly provided in the withdrawal application: "The Plan *permits* hardship withdrawals only to the extent a participant *demonstrates to the satisfaction of the Plan Committee* that the reason for the hardship withdrawal complies with the applicable requirements under the Internal Revenue Code *and* that such hardship imposes an immediate and heavy financial burden upon such participant." *See* Nationwide Hardship Withdrawal Application form, attached as Ex. 3. Unlike CRDs, there is no self-certification of qualification for these distributions.

Moreover, both 'hardship" and "emergency" distributions are directly tied to and limited by the identified "hardship" or "emergency" and the amount a plan participant is allowed to withdraw is determined by the plan. *See id*. ("Hardship withdrawals are limited to bona fide financial emergencies *as determined by the Plan Committee*) (emphasis added); IRS.GOV[8] ("Hardship withdrawals are "[l]imited to the **amount necessary** to satisfy that financial need.") (emphasis in original); *See* Ex. 2 ("Distributions due to unforeseeable emergencies are only permitted in the *amount necessary* to satisfy the financial need.") (emphasis added). By contrast, there is no such limitation for a Section 2202 CRD; a plan participant may withdraw any amount up to the maximum preset and expressly provided for in the statute. Further, "CRDs are permitted *without regard to the qualified individual's need for funds*, and the amount of the distribution is *not required to correspond* to the extent of the adverse financial consequences experienced by the qualified individual." *See* IRS Guidance, at 6 (emphasis added).

---

[8] Note 5, *supra*.

So while the specific indicated reason for a *"hardship"* or "emergency" withdrawal may be material because it is used by the plan to determine whether a plan participant is qualified and the amount of funds they are eligible to receive, the indicated reason for a CRD under Section 2202—the statement that corresponds to the box a participant checks—*is not*. As clearly outlined in the IRS guidelines, a plan is not obliged to inquire into the veracity of the statements that correspond to the box a participant checks on a CRD form to determine whether they qualify for the distribution. Once a participant checks a box, indeed any box on the CRD form, the plan may rely on that certification. IRS Guidance, 9. While checking a box may be *relevant* to a plan (in that checking the box is required to completely fill out the form), the underlying statements associated with that box have no probative weight and are not "capable of influencing" a plan into making the CRD. *Weinstock v. United States*, 231 F.2d 699, 701 (1956) ("To be 'relevant' means to relate to the issue. To be 'material' means to have probative weight … A statement may be relevant but not material."); *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007) (finding no materiality and holding: "While the leverage ratio here is certainly relevant, Defendants' misrepresentations were material only if they tended to affect interest rates.").

In sum, per the IRS guidelines, unlike "hardship" or "emergency" withdrawals, the statements that correspond to the box a participant checks in a Section 2202 CRD form have no probative weight such that a plan administrator need inquire into the veracity of those statements to qualify an applicant for a distribution or the amount they receive. As such, under the alleged facts here, the Superseding Indictment does not, and in any event, could never properly allege materiality pursuant to § 1621 and thus Counts 1 and 3 should be dismissed.

## II.   DISMISSAL OF COUNTS 1 & 3 IS REQUIRED BECAUSE THE TERM "ADVERSE FINANCIAL CONSEQUENCES" IS FUNDAMENTALLY AMBIGUOUS

Counts 1 and 3 should also be dismissed on the equally-dispositive ground that the term "adverse financial consequences"—which Section 2202 provides as the basis for qualification for a CRD—is fundamentally ambiguous and thus insufficient to support a perjury charge.

"[P]recise questioning is imperative as a predicate for the offense of Perjury." *Bronston v. United States*, 409 U.S. 352, 362 (1973) (internal quotation marks omitted). "Perjury requires that a witness believe that the testimony he gives is false. Thus, whether the witness believes that an answer is true or false generally turns on the declarant's understanding of the question" or statements contained therein. *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986); *United States v. Manapat,* 928 F.2d 1097 (11th Cir. 1991)*.* As such, "answers to fundamentally ambiguous questions cannot support a Perjury conviction." *United States v. Chujoy*, 207 F. Supp. 3d 626, 651 (W.D. Va. 2016); *Manapat*, 928 F.2d at 1102 ("[T]he government may not provide someone with a confusing and ambiguous form and then prosecute when the answers are inaccurate."). Courts routinely dismiss charges where questions or phrases are fundamentally ambiguous and thus insufficient as a matter of law to support a charge of perjury. *See, e.g., Chujoy*, 207 F. Supp. 3d at 652 (dismissing perjury charge where question was fundamentally ambiguous); *accord Lighte,* 782 F.2d at 375 (holding that fundamentally ambiguous question insufficient as a matter of law to support indictment of conviction)*; Manapat,* 928 F.2d at 1097 (affirming pre-trial dismissal because the application form containing the phrases "Record of Traffic Convictions" and a "Record of Other Convictions" was fundamentally ambiguous)*; United States v. Ryan*, 828 F.2d 1010, 1015-16 (3d Cir. 1987) (reversing a defendant's conviction because the phrase "previous address" in credit card application form was fundamentally ambiguous because "previous" was capable of different interpretations).

"[A] question or phrase is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *Manapat*, 928 F.2d at 1100. In conducting this inquiry, a court will examine the question itself and "the context of the question and answers, as well as other extrinsic evidence, to determine whether the respondent provided false answers to the questions 'as he understood [them].'" *United States v. Bussell*, 414 F.3d 1048, 1057 (9th Cir. 2005).

## A. The Term "Adverse Financial Consequences" Is Undefined and Thus Fundamentally Ambiguous

The fundamental ambiguity of the subject phrase here surpasses any of the examples cited above. Specifically, the "457(b) CRD Request" form requires the following self-certification:

> I have experienced *adverse financial consequences* stemming from such virus or disease as a result of:
> - Being quarantined, furloughed or laid off
> - Having reduced work hours
> - Being unable to work due to lack of child care
> - The closing or reduction of hours of a business I own or operate

Nationwide's 457(b) Coronavirus-related distribution form, attached as Ex. 4. Whether a retirement plan participant suffered an "adverse financial consequence" is fundamentally ambiguous because the term is 'is not a phrase with a meaning about which men of ordinary intellect could agree." *Manapat*, 928 F.2d at 1100.

The statute from where the phrase is derived, Section 2202 of the CARES, does not define the term "adverse financial consequences." Moreover, the term is not defined on the distribution form or in any guidance promulgated by the IRS. *See* Ex. 4. And as noted, Counts 1 and 3 are the first of their kind and there *are no regulations or cases precedent* defining the phrase and providing a standard to be applied in a criminal prosecution for perjury or any other offense. *Manapat*, 928

F.2d at 1100 (a phrase is fundamentally ambiguous and insufficient to support a perjury charge particularly when it was not defined for the questioner and answerer at the time the answer was sought); *see also United States v. Engle,* 676 F.3d 405, 415 (4th Cir 2012) ("A district court may dismiss an indictment under Rule 12 where there is an infirmity of law in the prosecution. . . ."). The phrase is a definitional mystery and this mystery has, as illustrated below, left many seasoned tax and legal professionals wondering and speculating as to its meaning:

- "The IRS has not defined "adverse financial consequences," but presumably this means financial difficulties, and as discussed below, the individual can self-certify to this." *IRS Clarifies Retirement Account Changes from the CARES Act*, Jana M. Luttenegger Weile. JDSupra, available at https://www.jdsupra.com/post/contentViewerEmbed.aspx ?fid=956655ba-e32a-4189-924a-8bfe9c66c98b. Accessed 5/3/2021.

- "Adverse financial consequences are not defined. Clearly someone losing an entire income as a result of a virus-triggered business closing has suffered substantial adverse financial consequences. But the statute does not require "substantial" consequences--any adverse financial consequences will do. Natalie Choate. *Who Qualifies for Coronavirus-Related Distributions?* Morning Star. May 14, 2020, available at https://www.morningstar.com/ articles/984600/who-qualifies-for-coronavirus-related-distributions

- "The IRS has not yet issued guidance defining 'adverse financial consequences.' This determination is highly dependent upon a *subjective interpretation of the facts and circumstances of each situation*." *CARES Act: Penalty-Free Withdrawals*. 09.09.2020. Goldman Sachs, available at https://www.ayco.com/insights/articles/cares-act-penalty-free-withdrawals.html#insightsdisclosure

- "Adverse financial consequences is not a term of precision and will need additional clarification." David Cechanowicz. *Special Coronavirus Relief for Retirement Plans and IRAs: Facts You Need to Know*. REDW Wealth LLC. Attached as Ex. 5.

There was even uncertainty on whether the enumerated factors were all-inclusive:

- "The listing of 'adverse financial consequences,' meanwhile, *includes but is not limited to* being quarantined, furloughed, laid off or a reduction of work hours, having a lack of childcare or a reduction in pay or self-employment income." Angela Evans. *Learn If You Qualify For A Coronavirus-Related Distribution*. McClintock and Associates. November 11, 2020, available at https://www.mcclintockcpa.com/learn-if-you-qualify-for-a-coronavirus-related-distribution/

- "Basically, these factors include lost wage or business income due to the effect of the virus on the individual's employer, business, or day care provider. *The net is cast pretty wide*

*considering it would include the shut-down and longer-term changes in shopping, dining, travel, entertainment and commuting habits.*" James Solheim J.D., *Expert Insights: Coronavirus Distributions: Adverse Financial Consequences and Recontributions*. Wolters Kluwer Tax & Accounting North America United States. July 02, 2020. https://www.wolterskluwer.com/en/expert-insights/coronavirus-distributions-adverse-financial-consequences-and-recontributions

The fundamental ambiguity of the term "adverse financial consequences" makes it insufficient as a matter of law to support a charge of perjury. As such, Counts 1 and 3 should be dismissed.

> **B.     The Government's Invented Standards for "Adverse Financial Consequences" Should be Rejected**

Confronted by this fundamental ambiguity, the government has created multiple standards for "adverse financial consequences" out of whole cloth. This alone illustrates the phrase's fundamental ambiguity. In particular and most concerning, the government invents both a higher standard for qualification, and a limiting standard for what can be considered "adverse financial consequences." Neither is supported by the text of Section 2202 or any case law, and the Court cannot accept or allow a jury to consider the government's construction of Section 2202 because doing so would violate well-established Due Process principles.

*First*, the government claims that State's Attorney Mosby's certification that she experienced "adverse financial consequences" "was false *in that* MOSBY *received her full salary* … through the date on which she signed this form.*" See* Super. Indictment at ¶¶ 5, 14. But this is pure fiction by the government, because nothing about Section 2202 supports a finding that "adverse financial consequences" is dictated by a person's salary. Such a reading is unsupported by any statute, regulation, or formally promulgated guidance related to the Section 2202, or any case law. The government's reading is also contrary to common sense because there may be countless reasons why a particular person may perceive they have experienced adverse financial consequences pursuant to Section 2202 whether or not they experienced a reduction in pay.

For example, even if a person receives their full salary, do they experience adverse financial consequences pursuant to Section 2202 if a planned business venture and the income expected therefrom are essentially deemed "dead in the water" because of the pandemic? Even if receiving their full salary, does that person experience adverse financial consequences if inflation rises, if the costs for meals are increased because their kids are at home and not receiving meals at school, if they have more food delivered because it's risky to go shopping for groceries, if utility costs increase because everyone is working or schooling from home, or if the costs related to starting and implementing a now shuttered business venture cannot be recovered because they will no longer receive the anticipated income the business venture would have generated? *See, e.g.*, Wolters Kluwer, *supra* ("The net is cast pretty wide considering it would include the shut-down and longer-term changes in shopping, dining, travel, entertainment and commuting habits.") Because of the lack of a definition and the fundamental ambiguity of the term "adverse financial consequences" there may be no way to accurately answer such questions. This is likely why the drafters of Section 2202 wisely provided that a plan participant may *self-certify* they have suffered "adverse financial consequences" as such a determination is necessarily based on an individual's subjective perception of their own personal financial circumstances.

The government's tethering of "adverse financial consequence" solely to a person's salary has no foundation in law or reality and cannot be the used as the basis for prosecuting State's Attorney Mosby under Counts 1 and 3.

*Second*, the government changes the standard for qualification for a Section 2202 CRD by improperly equating "adverse financial consequences" (the language in the statute) with "financial hardship." The government makes this insidious change by claiming that State's Attorney Mosby's certification that she experienced "adverse *financial consequences*" was false because she "had

not experienced any of the *enumerated financial hardships* she claimed to have experienced." Super. Indictment at ¶¶ 5, 14. The government's false equivalence here does not comport with the ordinary meaning of the words "consequence" and "hardship." A "consequence" is "[a] *result* that follows as an effect of something that came before." Black's Law Dictionary (10th ed. 2014) (emphasis added)). On the other hand, "hardship" means "privation" or "suffering." *Id.* By falsely equating these two different terms, the government seeks to create a new and never before seen standard for qualification under Section 2202.

Here again, the government's imputing of a hardship requirement into Section 2202 is unsupported by any statute, regulation, formally promulgated guidance, or case law. It is solely the creation of the government for prosecuting this case. The allegation that State's Attorney Mosby committed perjury because she "had not experienced any of the *enumerated financial hardships* she claimed to have experienced" is a farce because Nationwide's 457(b) distribution form contains no "enumerated financial hardships." *See* Ex. 4. Indeed, the word "hardship" appears nowhere on the 457(b) CRD form. *Id.* More significantly, the word "hardship" cannot be found *anywhere* in Section 2202. And as discussed above, 401(k), 403(b), and 457(b) plans already provide a means for participants who suffer "financial hardship" to receive a distribution that is separate and apart from a Section 2202 CRD. Equating a Section 2202 distribution to a "hardship" distribution is yet another invention by the government because experiencing "financial hardship" is not a requirement to qualify for a distribution under Section 2202. *See* Ex. 4. State's Attorney Mosby checked the box on a 457(b) coronavirus distribution form, *not* a box on a 457(b) "emergency" or "hardship" withdrawal form, and thus never claimed, as the government improperly charges, to have experienced "financial hardship".[9] *Compare* Ex. 4 *with* Ex. 2. The

---

[9] In terms of statutory interpretation, the drafters of Section 2202 appeared to have recognized the significance (and difference) of the two terms because while qualification under Section 2202 only requires "financial consequences"

government's assertion of this never before seen, false, problematic, and misleading standard of "financial hardship" is due to the fundamental ambiguity of the phrase "adverse financial consequences." Due process requires that such ambiguity not exist nor serve as the basis of a criminal perjury prosecution. *Manapat*, 928 F.2d at 1102 ("[T]he government may not provide someone with a confusing and ambiguous form and then prosecute when the answers are inaccurate.").

This Court should therefore reject the government's attempt to superimpose on Congress' choice of words different constructions to facilitate a prosecution of State's Attorney Mosby. Were the Court to allow the jury to consider the government's erroneous interpretation of Section 2202, State's Attorney Mosby's due process right to fair notice would be violated because prior to making the withdrawal, there was no way for her to know of these never before existing standards and thus what was prohibited under Section 2202.

For these reasons, the Court should reject the standards invented by the government for Section 2202, and dismiss Counts 1 and 3 because the phrase "adverse financial consequences" is fundamentally ambiguous and insufficient to be the basis for a perjury charge under § 1621.

## III.   ALTERNATIVELY, THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE THE INSTRUCTIONS OF LAW PRESENTED TO THE GRAND JURY REGARDING COUNTS 1 AND 3.

As an alternative to dismissal, the Court should order the government to produce to the defense the instructions of law concerning Counts 1 and 3 provided to the grand jury(ies) that returned the original and superseding indictments. There is "a particularized need" for the

---

other sections of the Cares Act explicitly require a showing of "financial hardship"; for example, "financial hardship" is required to qualify for relief under section 4022 – consistent with the definition "suffering" or "privation" – which places a moratorium on foreclosures and gives consumers the right to have a forbearance on mortgage payments.

instructions to ensure that the grand jury was properly instructed about the law in this unprecedented and first of its kind prosecution.

Although grand jury proceedings are generally secret in nature, "in some situations justice may demand that discrete portions of transcripts be made available for use in subsequent proceedings." *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 219-20 (1979); *In re Grand Jury Proceedings*, 800 F.2d 1293, 1299-300 (4th Cir. 1986) ("Grand jury secrecy is, of course, not an end in itself … when the advantages gained by secrecy are outweighed by a counter vailing interest in disclosure, secrecy may and should be lifted, for to do so in such a circumstance would further the fair administration of criminal justice.") (citation omitted). Such situations are what "led to the provision in [Fed. R. Crim. P. 6(e)(3)(E)(ii)]" which provides that the Court is authorized to order disclosure of grand jury matter at the request of a defendant if "irregularities may have occurred in the grand jury proceedings and may justify the dismissal of one or more counts of the indictment." *Id.* (citing Fed. Rule Crim. Proc. 6 (e)(2)(C)(i)) (now, Fed. R. Crim. P. 6(e)(3)(E)(ii)); *United States v. Naegele*, 474 F. Supp. 2d 9, 10 (D.D.C. 2007).

The Court may exercise its discretion and require the disclosure of grand jury materials where a defendant demonstrates that a "particularized need" exists that outweighs the policy of grand jury secrecy. *In re Grand Jury Proceedings*, 800 F.2d at 1297. This Court has recognized that such a need for disclosure exists where, as here, it is likely that the grand jury was given "erroneous and prejudicial legal advice" by the prosecutor. *United States v. Stevens*, 771 F. Supp. 2d 556, 564 (D. Md. 2011) (first ordering disclosure of relevant portions of grand jury transcript, then dismissing indictment after transcript showed that the "prosecutor's legal instruction to the grand jury seriously misstate[d] the applicable law"); *see also Naegele*, 474 F. Supp. 2d at 12.

As in *Stevens*, a "particularized need" for disclosure of grand jury materials exists here. It bears repeating that Counts 1 and 3 are based on a theory of perjury that has never been prosecuted before now. This case will establish *the* precedent for the standard required to bring prosecutions for perjury against the millions of plan participants who made CRDs and checked a box on a Section 2202 distribution form. Indeed the complete lack of law concerning this theory of perjury warrants the Court ensuring that the grand jury was properly instructed on the law.

This is especially important here because the Superseding Indictment on its face provides sufficient reasons for the Court to be concerned that the grand jury was improperly instructed in regards to Counts 1 and 3. For instance, Counts 1 and 3 of the Superseding Indictment have the following respective headings: "Perjury - May 2020 COVID 19 *HARDSHIP WITHDRAWAL*" and "Perjury - December 2020 COVID 19 *HARDSHIP WITHDRAWAL.*" As discussed above, State's Attorney Mosby did not make a "hardship withdrawal" as the word "hardship" appears nowhere on the form she submitted or in Section 2202, because experiencing "financial hardship" is not the legal standard to qualify for a Section 2202 distribution. A COVID-19 withdrawal is NOT a "hardship withdrawal." Indeed the Congressional Research Service, which provides the legislature with expert "research and analytical services" when drafting and enacting laws, including the CARES Act, *see* 2 U.S.C.S. § 166, expressly makes this distinction:

> *Unlike hardship distributions*, CRDs could be included in taxable income in 2020 alone or included equally over 2020, 2021, and 2022, and the amount of the CRD may be recontributed to an individual's account within three years.

Library of Cong. Elizabeth A. Myers, Cong. Research Serv., R46837, *The CARES Act: Selected Data on Coronavirus-Related Distribution and Loan Usage in 2020* (July 13, 2021).

Claiming that State's Attorney Mosby made a "COVID-19 Hardship Withdrawal" and labeling Counts 1 and 3 as such, is erroneous, specious and prejudicial in every respect. The government's "hardship withdrawal" allegations are wrong factually and legally and cannot be

used to prosecute State's Attorney Mosby. The government's labelling of Counts 1 and 3 as "COVID 19 HARDSHIP WITHDRAWAL" and predicating its charges on the false claim that State's Attorney Mosby represented that she suffered "enumerated *financial hardships*" is highly indicative that the government presented this invented and erroneous legal standard to the grand jury, which the grand jury likely considered in finding probable cause to return the Superseding Indictment. *See* Super. Indictment at ¶¶ 5, 14.

If the Government presented to the grand jury, as the defense suspects, this invented and demonstrably false legal standard based on its erroneous interpretation of Section 2202, just as in *Stevens*, dismissal of the subject counts would be "appropriate and required in the interests of justice."[10] *Stevens*, 771 F. Supp. 2d at 568; *accord United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (dismissing indictment because the "defendants were seriously prejudiced by the cumulative effect of the government's misleading statements of law" to the grand jury).[11]

As such, a "particularized need" exists here and the Court should order the production of the sections of the Grand Jury transcripts in this case related to the prosecutors' presentation of

---

[10] Further, the government's "materiality" allegations, or lack thereof, also indicate that the grand jury may have been improperly instructed on what needs to be material for the government to bring a perjury charge under § 1621. If the government improperly instructed the grand jury, as the defense suspects, that the certification was material, and not that the "matters" or specific statements State's Attorney Mosby certified as true, themselves, were material, then dismissal of the subject charges would also be warranted.

[11] In addition, the other factors courts look to in determining whether production of grand jury transcripts is appropriate further counsel in favor of disclosure here. Specifically: (1) the Grand Jury's work is completed (and thus, the need for secrecy is reduced); (2) there is no concern associated with preventing escape from individuals under governmental scrutiny (Defendant is the State's Attorney for Baltimore City); (3) disclosure of the transcripts in this limited context would not interfere with the Grand Jury's freedom of deliberation – on the contrary, it will establish whether the Grand Jury was given "erroneous and prejudicial legal advice" by the prosecutor in violation of State's Attorney Mosby's constitutionally protected rights, as it appears from the face of the Indictment; and (4) the other factors – i.e., concerns about subordinating perjury or tampering, encouraging free disclosure of information from persons with knowledge, and to prevent the innocent – are inapplicable because the Grand Jury's work is completed. *See In re Grand Jury Proceedings*, 800 F.2d at 1300-03 (listing factors relevant to determination of whether to release grand jury transcripts).

Counts 1 and 3 to the grand jury.[12] To be sure, if the government prosecutors did in fact mislead and wrongfully instruct the Grand Jury as to Counts 1 and 3, those charges should be dismissed for the reasons outlined above.

## IV.   CONCLUSION

For all these reasons, State's Attorney Mosby requests that this Court (a) dismiss Counts 1 and 3 of the Superseding Indictment, or alternatively (b) order the production of the grand jury transcripts containing the instructions of law concerning Counts 1 and 3 that were provided to the grand jury(ies) who returned the indictment and superseding indictment

A Proposed Order is attached.


Dated: June 16, 2022                  Respectfully Submitted,


                      */s/ A. Scott Bolden*

A. Scott Bolden (*admitted pro hac vice*)
Rizwan A. Qureshi (*admitted pro hac vice*)
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
Telephone: +1 202 414 9200
Facsimile: +1 202 414 9299
RQureshi@ReedSmith.com
ABolden@ReedSmith.com

Kelley Miller (*admitted pro hac vice*)
Reed Smith LLP
7900 Tysons One Place, Suite 500
McLean, Virginia 22102
Telephone: + 1 703 641 4200
Facsimile: +1 703 641 4340
KMiller@ReedSmith.com

Anthony R. Todd (*admitted pro hac vice*)
Reed Smith LLP

---

[12] Alternatively, the Court should order the in-camera production of the grand jury transcripts to determine the extent to which the material should be disclosed to the defense. *Stevens*, 771 F. Supp. 2d at 564 (first ordering in-camera review of grand jury minutes, then disclosing excerpts necessary to allow for further briefing on whether the grand jury was properly instructed on the law.)

10 South Wacker Drive
40th Floor
Chicago, IL 60606-7507
Telephone: + 312.207.1000
Facsimile: + 312.207.6400
ATodd@ReedSmith.com

Gary E. Proctor (Bar No. 27936)
Law Offices of Gary E. Proctor, LLC
8 E. Mulberry Street
Baltimore, Maryland 21202
Telephone: (410) 444-1500
garyeproctor@gmail.com

Lucius T. Outlaw III (Bar No. 20677)
Outlaw PLLC
1351 Juniper St. NW
Washington, DC 20012
Telephone: (202) 997-3452
loutlaw3@outlawpllc.com

*Counsel for Defendant Marilyn J. Mosby*

## **CERTIFICATE OF SERVICE**

I certify that, on June 16, 2022, this document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will then serve a notification of the filing to the registered parties of record.

/s/ *A. Scott Bolden*
A. Scott Bolden

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARILYN J. MOSBY,**<br><br>**Defendant** | **Case No. 22-cr-00007-LKG-1** |

## PROPOSED ORDER

**AND NOW**, this _____ day of ____, 2022, upon consideration of Defendant Marilyn Mosby's Motion to Dismiss Counts 1 and 3 of the Indictment, or Alternatively, to Compel Production of the Instructions of Law Provided to the Grand Jury for Counts 1 and 3, it is **HEREBY ORDERED** that said motion is **GRANTED**, and that Counts 1 and 3 of the Superseding Indictment are **DISMISSED**.

**BY THE COURT:**

_____, ____ J.

*Judge Lydia K. Griggsby*