```
1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND
2                            NORTHERN DIVISION

3      UNITED STATES OF AMERICA,)
             Plaintiff,        )
4                              )
             vs.               )   CRIMINAL CASE NO.
5                              )   LKG-22-0007
       MARILYN J. MOSBY,       )
6            Defendant.        )
       _____)
7

8                       TRANSCRIPT OF PROCEEDINGS.
                 BEFORE THE HONORABLE LYDIA K. GRIGGSBY
9                     UNITED STATES DISTRICT JUDGE
                       THURSDAY, APRIL 14, 2022
10                        BALTIMORE, MARYLAND

11          For the Plaintiff:

12              Leo Wise, Esq.
                Sean Delaney, Esq.
13              Aaron Zelinsky, Esq.

14          For the Defendant:

15              A. Scott Bolden, Esq.
                Rizwan A. Qureshi, Esq.
16              Kelley C. Miller, Esq.
                Anthony R. Todd, Esq.

17

18          Also Present:

19              Anthony Todd, Esq.
                Paola Nunez-Henry, Esq.
20              Raymond Vanderhyden, Esq.

21

22     _____
                              Reported by:
23                       Melissa L. Clark, RPR
                       Federal Official Court Reporter
24                    101 W. Lombard Street, 4th Floor
                         Baltimore, Maryland  21201
25                            410-962-4474
```

**P R O C E E D I N G S**

1

2          **THE COURT:**  Please be seated.  Good afternoon and

3     welcome.

4          Would the Government please call the case.

5          **MR. WISE:**  Thank you, Your Honor.

6          The case is the United States of America vs. Marilyn J.

7     Mosby, Criminal No. LKG-22-7.  Leo Wise, Sean Delaney, and

8     Aaron Zelinsky appearing for the United States, Your Honor.

9          Thank you.

10          **THE COURT:**  Good afternoon and welcome, Counsel.

11          Is there anyone else from your litigation team that you

12     would like to introduce to the Court at this time?

13          **MR. WISE:**  Your Honor, we have several of our case

14     agents with us, but they won't be participating today.

15          Thank you.

16          **THE COURT:**  Thank you so much.

17          Let's have introductions from the Defense, please.

18          **MR. BOLDEN:**  Good afternoon, Your Honor.

19          On behalf of the Baltimore State's Attorney Marilyn

20     Mosby, A. Scott Bolden.  With me is Rizwan Qureshi, as well as

21     Kelley Miller from the firm of Reed Smith.

22          I have several associates with me who are behind me,

23     Anthony Todd, Paola Nunez, and Mr. Vanderhyden.

24          **THE COURT:**  Welcome to all of you.

25          Thank you so much.

1    The Court has a few brief remarks and then we will move

2    to our oral argument.  As the parties know, before the Court

3    today are the Defendant's pretrial motions in this matter.

4    They are three-fold.  The Defense has moved for a Bill of

5    Particulars.  They have also moved for a -- to dismiss this

6    indictment.  And they've also moved to disqualify counsel.

7    The Government has responded in opposition to all three

8    of these motions.  The motions have also been fully briefed by

9    all parties.  The Court has carefully reviewed the written

10   submissions of both parties.  They include a number of

11   exhibits, approximately 20 on each side, which the Court has

12   also carefully considered in connection with today's oral

13   argument.

14   Our mission today is to hopefully resolve these motions

15   and so we can assess our next steps in the case.  To aid us in

16   that effort, as the parties know, on April 4th, the Court did

17   issue an order with time allocations for today's oral

18   argument.  The Court will remind counsel of those time

19   allocations at this time.  They are 20 minutes each for

20   opening rounds for both sides, 15 minutes each for responses

21   for both sides, and then ten minutes for any rebuttal.  The

22   Court invites counsel to present their arguments at the

23   podium, which is available to you and set up for your use.

24   As a reminder to everyone in the courtroom today, the

25   Court does have a masking policy, and that policy is that

 1    everyone should remain masked while in the courtroom.  There

 2    is one exception for an individual who is speaking and

 3    participating in these proceedings, and so the Court is now

 4    speaking and will remove her mask for that purpose.  The Court

 5    is fully vaccinated and doubly boosted.

 6         Counsel, when you present your arguments, if you are

 7    fully vaccinated and wish to do so, feel free to remove your

 8    mask.  The Court will obviously be engaging with you, so she

 9    will remove her mask as well so you can hear me and understand

10    me.  Those are all of the preliminary matters that the Court

11    wishes to discuss before we begin.

12         We'll ask whether either side has any preliminary

13    matters, starting with Mr. Wise.  Any preliminary issues,

14    Mr. Wise?

15              **MR. WISE:**  No, Your Honor.  Thank you.

16              **THE COURT:**  Thank you so much.

17         Mr. Bolden, anything for you?

18              **MR. BOLDEN:**  No, Your Honor.

19              **THE COURT:**  Very good.  I also failed to mention

20    that my law clerk will have a clock, which he is going to

21    display now to aid counsel in keeping track of time.

22         Hopefully you can see that, and, Justin, feel free to

23    turn it around so they can see it, and you can let me know.

24         Please try to adhere to the time allotments.  We have

25    much to do today.

1          With that, the Court will invite Mr. Bolden to please

2     approach the podium and we will begin whenever you are ready,

3     sir.

4          **MR. BOLDEN:**  Thank you, Your Honor.  I will be

5     removing my mask.  And I want to thank the Court for allowing

6     us to do the walk-through this morning with your team.  They

7     were very accommodating and very helpful.

8          Your Honor, on behalf of Marilyn Mosby, my name is

9     A. Scott Bolden, and I'm here to argue for the motion to

10    dismiss the four-count indictment pending in this case.

11         As I think about this case, Your Honor, I have a story to

12    tell or at least the papers I've submitted to you tell a story

13    and every word of it is true.  If it were a storybook, it

14    would be called, *Selective and Vindictive Prosecution*, and the

15    author of that storybook would be the Government in this case.

16         I want to dispel a really important issue before this

17    Court, that is the alleged personal attacks that the

18    Government has submitted in their paperwork.  They've also

19    said they would be filing a motion in limine for personal

20    attacks, and I want to disabuse anyone in the criminal justice

21    system that this motion to dismiss for animus is anything but

22    personal attacks.

23         I don't know Mr. Wise.  I refuse to judge Mr. Wise, but I

24    do know 12(b).  I do know about the rules, the case law in

25    regard to selective prosecution and vindictive prosecution.

1   And every fact that we've argued in this case came from the

2   Government.  Every document to support it, whether it was an

3   affidavit, whether it was a document or a letter or an e-mail,

4   supports those allegations.  As a 35-year member of the bar, I

5   take no solace or joy in bringing this kind of motion for the

6   first time in my career.  I want to be clear that these

7   allegations are substantiated and certainly not personal

8   attacks on someone who is a member of the bar in this state,

9   as well as ABA and in this country.

10        Their papers suggest, perhaps, that maybe -- and I will

11   put a pin in the whole personal piece, because that's going to

12   be important to the underlying issue regarding vindictive

13   prosecutions.  Not one of us is above reproach, whether it's

14   purposeful or not.  My client, Marilyn Mosby, is here fighting

15   for her liberty, for her life in many ways.  Beyond politics,

16   she's fighting for due process, a clean indictment, and a fair

17   trial in this case.

18        Under 12(b), we have no choice but to file this motion

19   given the ten sets of facts that I'm going to summarize for

20   this Court.  The Government will argue that there has never

21   been a case like this where we can't cite a case that supports

22   dismissal at pretrial.  12(b) lives, though, and you can

23   dismiss the case for vindictive prosecution if you meet the

24   standards set forth by the Supreme Court and the Fourth

25   Circuit.

1          There has never been a case like this, and so in many

2     respects it is a case of first impression.  I've reviewed all

3     of the other cases, post trial, pretrial, but none with this

4     set of facts.  And so, Your Honor, I ask this Court to dismiss

5     this case, dismiss this indictment, and if the Government

6     wants to pursue it, they can pursue it, right?  But they've

7     got to give my client a fair shot, right?  They can't do it

8     because of vindictiveness.  They can't do it because of

9     selectiveness, right?

10          The Government, quite frankly, in their papers accused my

11     client of engaging in fantasy thoughts, if you will, accused

12     her of creating a cloud of victimhood.  Nothing could be more

13     offensive.  Whether she's a sitting public official or not, I

14     think she would take that personally.  But my client has never

15     been a victim.  She's having none of it.  She is a fighter for

16     justice and freedom, liberty and due process rights that in

17     our opinion have been trampled on by the Government and this

18     lead prosecutor.

19          And so Her Honor knows well about 12(b) under the Federal

20     Rules of Criminal Procedure.  Your Honor well knows about the

21     legal construct for vindictive prosecution, and it is clear

22     that we've got to demonstrate animus under *Wilson* which is a

23     Fourth Circuit case.

24          The Court has to look at the totality of the

25     circumstances, and our goal, our standard where we -- our

 1      burden is only the appearance of vindictiveness, or better yet

 2      as the Supreme Court said in *Goodwin*, the reasonable

 3      likelihood of victim -- vindictiveness exists.  That's it.  I

 4      don't have to prove it in this argument.  The Court is going

 5      to take testimony, then so be it, but we don't have to prove

 6      it.  We have to prove a strong likelihood one way or the

 7      other.  And Government -- if we do that, then the burden

 8      shifts to the Government, and this is critical, Your Honor,

 9      the burden of the Government then is to quote, under *Goodwin,*

10      present objective, credible evidence justified as conduct.

11      And as I go through the summary of these ten sets of facts,

12      Her Honor well knows our argument is going to be they simply

13      have not done that, not credibly, and not objectively and we

14      will point that out.

15          Under selective prosecution, that's -- we certainly

16      believe that we can meet that standard.  It's a different

17      standard, though.  Similarly situated individuals were not

18      prosecuted.  That's the first element.  The Government puts a

19      racial component to that.  We've never put that racial

20      component there.  We haven't alleged that they -- if she were

21      white or black or so forth and so on, that somehow she

22      wouldn't be prosecuted.  What we've said is there is no other

23      case in this country -- we haven't been able to find it.

24      Maybe the Government can share that today -- where any

25      individual has been accused or charged with perjury under the

1      CARES Act for seeking their 457(b) funds.

2           I'm not talking about PPP money.  I'm not talking about

3      public funds.  Certainly the Government has prosecuted many

4      across this country, but no one -- no one for 457(b), getting

5      their own money and alleged that they've perjured themselves

6      to do that.  And so the Government has to respond to that in

7      an objective and credible manner under selective prosecution,

8      bad faith.  Well, if we give you the ten sets of facts and

9      they oppose it but not with credibility, the mere fact that we

10     met our burden will meet that second element of bad faith.

11          And so, Your Honor, the story begins Chapter 1 of one

12     point.  On January 5th, 2018, my client, who has been the city

13     prosecutor, State's Attorney for several years now, had a

14     meeting with the U.S. Attorney's Office.  Mr. Wise was invited

15     to that office.  The purpose of the meeting was because

16     Mr. Wise and others had publicly stated in the Gun Tracing

17     Task Force prosecution of corrupt police officers in state

18     court and, perhaps, in federal court.

19          He was summoned there because Ms. Mosby demanded that

20     meeting because the Government, the federal government

21     prosecutors have said in open court, at a bond hearing or bail

22     hearing for one of the Defendants, that there was a leak in

23     her office.  They never talked to her before that.  They

24     didn't have any corroboration.  Notwithstanding what they

25     wrote to this Court, they still don't have any corroboration.

1          THE COURT:  And Mr. Bolden, on that point, because

2     the Court has certainly read the papers very carefully -- I'm

3     going to take off my mask to make sure you can hear me.

4          MR. Bolden:  Okay.

5          THE COURT:  The Court has read the papers from both

6     sides and the information about that.  The standard here, you

7     have to have objective evidence that we're looking at.  And

8     the Court understands the Defense's position, and please

9     correct the Court if the Court misunderstands the position, to

10    primarily be that there is some personal -- genuine personal

11    animus on the part of Mr. Wise.

12         Is that the Defense's position that somehow would meet

13    the standard for vindictive prosecution?  In other words --

14         MR. BOLDEN:  Yes, Your Honor, and I'm getting to

15    that.

16         THE COURT:  Okay.  Well, just let the Court finish

17    the question.

18         So genuine personal animus on the part of Mr. Wise.  And

19    also, the Defense has to show that but for that animus, this

20    particular case would not be brought.  Is that your

21    understanding of your standard?

22         MR. BOLDEN:  Yes, Your Honor, but again that

23    shifting burden is important, too, because we don't have to

24    show -- we don't have to prove vindictiveness now.  All we

25    have to prove is a strong likelihood for it, and then the

1    Government has the --

2              **THE COURT:**  Correct.  There's a presumption --

3              **MR. BOLDEN:**  -- burden of responding.

4              **THE COURT:**  There's a presumption that you can

5    certainly establish, that's correct.  But we were getting into

6    a conversation about some of the bases for the Defense's

7    argument that there is animus here.  And I want to make sure

8    that we're clear about what the legal standard is and who

9    we're talking about, quite frankly, because there's a lot of

10   things in the papers.

11      Go ahead.

12             **MR. BOLDEN:**  Well, Your Honor, I'm not talking about

13   the paper.  The people who believe I have -- who I believe

14   have animus is the lead prosecutor, Mr. Wise, as well as Erek

15   Barron, the U.S. Attorney himself.  And as I go through these

16   set of facts, I will show you in short form why we believe

17   that and how it's manifested itself in this case.

18             **THE COURT:**  And just to be clear, the Court was

19   referring to the parties' papers, not the newspaper.

20             **MR. BOLDEN:**  Yes, ma'am.

21             **THE COURT:**  Go ahead.

22             **MR. BOLDEN:**  I didn't -- I'm 59 now.

23             **THE COURT:**  That's okay.  Go ahead.

24             **MR. BOLDEN:**  So at this meeting, there was a heated

25   exchange with Mr. Wise and others, Mr. Schenning as well, who

```
 1     I believe at the time may have been the acting U.S. Attorney,
 2     about why she wasn't consulted and that they had no
 3     corroboration that the leak in that department -- they had not
 4     even interviewed the ASA who allegedly had been caught on the
 5     tape leaking that there was an investigation, not the federal
 6     investigation.  There were other investigations going on.
 7     There was a heated exchange, the Government conceded -- as I
 8     understand the meeting -- conceded that they had no
 9     corroboration, but her ire was directed at Mr. Wise who had
10     made the public statement.
11          Now, I wasn't at that meeting.  I only know what's been
12     reported, and as a result, if you believe that this Government
13     believes these are personal attacks, then they accept and they
14     take a lot of things personally, especially this lead
15     prosecutor.
16          Now --
17               THE COURT:  Mr. Bolden, just to be clear on the
18     facts.  As the Court understood it, in reading both, again,
19     the Defense's submissions, and the Government's submission,
20     there is no accusation that the Defendant leaked anything.
21     The Court understood it that both parties agree that there was
22     an Assistant State's Attorney that, apparently, was the source
23     of the leak.  Not to get all into the investigation, but that
24     seemed to be the bottom line that both sides were saying to
25     the Court in the papers.
```

1          So what is the animus drawn from this situation as it

2     relates to the Defendant and Mr. Wise?

3          **MR. BOLDEN:**   The animus drawn is the verbal

4     altercation between my client and Mr. Wise and the

5     embarrassment he felt in front of his superiors.   Right?

6          Now, the Government --

7          **THE COURT:**   And when did this happen, Mr. Bolden?

8          **MR. BOLDEN:**   This happened on January 5th, 2018.

9          **THE COURT:**   Okay.

10         **MR. BOLDEN:**   Okay.   Now, the Government's response

11    to that, they tell you all about -- they spend thousands of

12    words, maybe 10,000, laying out this whole GTTF piece, right?

13    But all of -- most of what the Government told you in their

14    papers was irrelevant, because the only thing that we said was

15    that the lead prosecutor suffered embarrassment from this

16    verbal altercation between my client and him, and he was

17    embarrassed because he did not have the corroboration.   The

18    reason that's important to know is because on page 27, they

19    put 40 words, just 40 words, and they say, oh, yeah, Mr. Wise

20    had a meeting, and he went to the meeting, and he may not have

21    had all of his papers with him, but that's all that matters.

22    They don't even describe what happened at the meeting.

23         Our allegation is what happened at the meeting, and

24    whether he -- whether he was embarrassed and developed a

25    personal animus against her.   I can't help it that they didn't

 1    deny that, by the way.  They didn't deny that there was a

 2    meeting.  They just didn't talk about what's in the meeting.

 3    Everything else they wrote is irrelevant, quite frankly,

 4    because both sides probably wouldn't disagree on those facts,

 5    but they still haven't told you what happened at that meeting,

 6    and that's all that matters.  But we know one thing, we know

 7    five days later Mr. Wise, for the first time in his life,

 8    didn't make one contribution but two contributions to the

 9    opponents of my client.  Five days later.

10              THE COURT:  These contributions -- and I'm sure

11    Mr. Wise will have an opportunity to address that when he

12    appears -- but these contributions pertain to an election that

13    occurred in 2018; is that correct?

14              MR. BOLDEN:  Yes, they do.

15              THE COURT:  All right.

16              MR. BOLDEN:  Two of her opponents, the same two

17    opponents are running this year.  But it's not about whether

18    the $200 was going to affect the election or whether the $200

19    was a minimal amount of money.  When we vote and we exercise

20    our First Amendment Rights.  We are choosing who we're going

21    to support.  We're choosing who we think would be the city --

22    the State's Attorney, right?  He didn't give my client any

23    contributions.  It doesn't matter that the people solicited

24    from him.  I don't take any issue with that.  He chose, for

25    the first time in his entire life, to give to two opponents of

1    my client, and now he wants to be the lead prosecutor three or

2    four years later against her.

3              THE COURT:  How exactly do the contributions, in

4    the Defense's view, demonstrate animus --

5              MR. BOLDEN:  Because it creates --

6              THE COURT:  Go ahead.

7              MR. BOLDEN:  It creates an appearance of

8    impropriety.  It certainly, under the DHA rules, has a

9    political consideration to it, but if I'm investing money as a

10   Government servant doing a campaign, I've never done it

11   before, I'm telling the world that I believe those two people

12   would be better State's Attorneys than Ms. Mosby.

13       I am expressing my choice, sure.  But if I've had a

14   verbal altercation five days before and I've never given

15   before, then I'm exercising my right to do that, but I'm

16   sending a message and telling the world, I think these two

17   people will be better, but more importantly, because I had

18   that altercation, because I did that, I'm going to vote

19   against her, or I'm going to put my money against her

20   opponents and hope that she doesn't win.  Now, he's free to do

21   that, but he's not free to do that if he's the federal

22   prosecutor and he wants to be the lead prosecutor in bringing

23   an indictment against her.

24             THE COURT:  Well, then that's why the Court, again,

25   is asking when this all happened.  And the Court is asking

```
1    because the Court wants to be clear.  We're now, again,

2    talking about events that occurred in 2018?

3             MR. BOLDEN:  In 2018.

4             THE COURT:  We're in 2022 now.  We'll talk about --

5             MR. BOLDEN:  But Judge --

6             THE COURT:  -- and there are other issues I know the

7    Court -- that you want to talk to the Court about --

8             MR. BOLDEN:  Yeah.

9             THE COURT:  -- that occurred since then, but these

10   issues occurred in 2018 --

11            MR. BOLDEN:  Yes.

12            THE COURT:  -- and occurred to the Court's

13   recollection --

14            MR. BOLDEN:  But it's important, Judge.  It's

15   important, because there is more --

16            THE COURT:  Mr. Bolden?

17            MR. BOLDEN:  There's more to it, one --

18            THE COURT:  Mr. Bolden?  Mr. Bolden?  Please don't

19   interrupt the Court --

20            MR. BOLDEN:  Oh, I'm sorry.  Go right ahead.

21            THE COURT:  -- just so we can be clear.

22            MR. BOLDEN:  Okay.

23            THE COURT:  Again, the contributions you're

24   discussing and the meeting, as the Court understands you, both

25   occurred in 2018, just as a factual matter?
```

1          **MR. BOLDEN:**  Yep.

2          **THE COURT:**  And to the Court's understanding,

3    Mr. Wise was not the lead prosecutor in this matter at that

4    time, and we'll ask Mr. Wise about that when he comes forward.

5    But I just want to be clear about the chronology, especially

6    because some of the same individuals, as you indicated, are

7    also involved in a more recent election.

8          Please go ahead.

9          **MR. BOLDEN:**  Yes, Your Honor.  And I apologize for

10   interrupting the Court.

11         And so our position is that that combination is a

12   demonstration of animus.  Now, here again, as I go through

13   these sets of facts, right, I will just remind the Court, and

14   I know the Court knows its obligations here, and our

15   obligations is that it is the totality of the circumstances

16   that are at issue.  It's not just one fact, right?  It's a

17   totality that -- and we don't have to prove vindictiveness.

18   We just have to show a strong likelihood for vindictiveness.

19         Set number 3, the origins of the Government tax

20   investigation and whether they -- and whether he -- and

21   whether they coordinated with the Maryland State Bar

22   Association.  In the whole scheme of things, it is probably

23   the least of our facts, but this is what's representative

24   about it.  When my clients got a subpoena in order to -- that

25   they were a target or subject of a tax investigation, the

1   Government refused to talk with us about what the source of

2   the investigation was, what they were looking at, and refused

3   to meet with us, which is something that's done thousands of

4   times across this country.  This Government certainly would

5   not do that.  They protected themselves.  They put themselves

6   in this argument that the 6(e) was a Grand Jury matter, but

7   they can't use 6(e) as a shield and a sword because there are

8   facts and issues before you get to a Grand Jury that we were

9   looking to discuss with them, that we would share exculpatory

10  information with them.  And if you are not interested in

11  talking with us, and you're not interested in sharing -- us

12  sharing any information, and we don't have a basis to share

13  information because you won't talk with us, then it is our

14  position that you're not interested in exculpatory

15  information.  You're only interested, it would seem, in

16  bringing an indictment, because it's unusual not to have any

17  discussion whatsoever.

18       So then the Government sends us -- they send us -- they

19  put it in writing, send us to the Maryland State Bar

20  Association.  We go to the Maryland State Bar Association, and

21  the only thing we can see is that they wanted back up on her

22  tax returns when that's part of their investigation.  We come

23  back to the Government and say, okay, we got that part.  Let's

24  sit down.  Let's talk.  Let's see where we're going with this

25  thing.  They refuse.

1          Now, given how unusual it is to have no conversation and

2   Her Honor knows -- Her Honor knows that the Government doesn't

3   respond to us.  We send letters in writing, and we had to get

4   this Court involved just to do a meet and confer a few months

5   ago -- or last month.  And so you say, well, how does that

6   show animus, if you will?

7          Well, if you're not going to respond to letters and

8   e-mails asking for a meeting, or you either -- you're going to

9   respond and not answer any questions, then it lends itself

10  that there is some animus there when you couple it with the

11  other sets of facts here.

12         Now, what does the Government say?  The Government sent

13  us -- they sent us to the state board, state bar association,

14  and now they criticize us.  We said it started with the state

15  board, and this should be a civil matter, not a criminal

16  matter.  They then say it started before.  They don't tell you

17  when it started, though.  They're free to tell you that.  They

18  didn't tell you where it started, and they sent us to the

19  state bar, so how can we be wrong about that if that's where

20  they sent us?

21         Now, they issued subpoenas before the state bar

22  investigation, but those documents didn't come back until

23  after the date that the state bar association was discussing

24  these issues with my client.  It just further lends itself --

25              **THE COURT:**  Mr. Bolden, again, just so the Court is

 1   clear about the pertinent point.  What is the objective

 2   evidence of animus with regard to the Maryland State Bar

 3   referral just -- I hear you saying --

 4        MR. BOLDEN:  Well, she wasn't -- she wasn't required

 5   to provide backup to the state bar association, and it's our

 6   position that as a result, there was a Grand Jury

 7   investigation opened because she wouldn't do that.  And the

 8   animus would be that simply because she wasn't required to

 9   provide back up for those tax returns, that the United States

10   Attorney's Office for Maryland took up that investigation,

11   when normally it would just be a civil proceeding or a civil

12   audit process under the IRS.

13        THE COURT:  Because again, as the Court understands

14   the Defense's arguments, your primarily focussing on AUSA Wise

15   and alleging that AUSA Wise had some animus.  So how does AUSA

16   Wise fit into this allegation?  First you say Mr. Wise and

17   then you said the United States Attorney's Office.  You've

18   also mentioned --

19        MR. BOLDEN:  Well, I'm talking about Mr. Wise as the

20   lead prosecutor.

21        THE COURT:  Okay.

22        MR. BOLDEN:  That we're being criticized by him and

23   his office for arguing that this case emanated from the state

24   bar association simply because she would not provide backup

25   for her taxes.  And then the Government, under Mr. Wise's

1    leadership, took on this matter and created a Grand Jury --

2    empaneled a Grand Jury simply because she wouldn't give backup

3    to the state bar association.

4         Listen, if they got a different explanation, right, they

5    still haven't told you that explanation.  They just said it

6    started before then.  And so I -- I understand the Court's

7    questions to me, but there is also questions that the

8    Government, from a credibility standpoint and from an

9    objective standpoint, they still haven't answered, and I don't

10   think they've met their burden.  Now, the Court may think I

11   may not have met my burden on some of these facts, but the

12   Government still has the obligation to what is their credible

13   reason for how this investigation started?

14        How does -- how does the U.S. Attorney get involved or

15   even know that there is a -- that there are tax issues with my

16   client?  How do they -- how does that come to them?  You can't

17   presume that there is some contact out there.  All you can do

18   is put together two and two and propose it.  If the Government

19   is not willing to share that, that's their call, but their

20   response is not credible or objective.

21        I'll tell you more, Your Honor.  The Government says that

22   they met with us.  They didn't meet with us.  They did a

23   criminal investigation.  They did a criminal investigation.

24   And -- a criminal tax investigation.  And they proposed

25   certain taxes or tax evasion, as well as perjury charges to my

1    client.

2        Now, in order for them to bring a criminal tax case

3    against my client, they need the DOJ to approve it.  And the

4    proposed charges included two years of tax evasion

5    assessments.  These proposed charges come from Mr. Wise and

6    the Government.

7        What's important about this is two things:  One, they

8    propose charging my client with evasion of assessment for tax

9    year 2020.  They put it in writing.  They sent it to DOJ, and

10   they asked DOJ to approve it.  At the time in September, my

11   client had not even filed their taxes in 2020.  They had not.

12   In regard to the perjury, they refused to tell us what the

13   perjury charges were.

14            **THE COURT:**  And Mr. Bolden --

15        **MR. BOLDEN:**  They're not prejudiced by telling us

16   that --

17            **THE COURT:**  Mr. Bolden?  Mr. Bolden?  The Court is

18   going to interrupt you again just to be clear, because you

19   refer to "they" and "the Government," and it's maybe making

20   the Court's point.

21        The Government is many people.  "They," I'm not sure who

22   are you talking about.  Even within DOJ, there is a U.S.

23   Attorney's Office here in Maryland.  There is a main

24   justice -- you know all of this, but --

25            **MR. BOLDEN:**  Yes, ma'am.

1          **THE COURT:**  -- the Court just wants to be sure that

2     the Court is clear about who you're talking about and what

3     happened because the Court is looking --

4          **MR. BOLDEN:**  I'm talking about Leo Wise --

5          **THE COURT:**  -- the Court is looking to see if there

6     is objective evidence to support the claim that you're

7     bringing your motion under, which the Court understands to be

8     about AUSA Wise and alleged animus with regard to your client.

9          **MR. BOLDEN:**  Right.

10         **THE COURT:**  So if you could help to link it up, that

11    would be helpful so the Court can follow.

12         **MR. BOLDEN:**  Mr. Wise is responsible as the lead

13    prosecutor in this case.  He led the investigation.  He then

14    proposed to DOJ to get approval for evasion of assessment for

15    two counts:  Fraud and false statements, fraud and willfully

16    overvaluing property, and two counts of perjury.  Didn't say

17    that was it.  That's what you got from -- that's what you get

18    from DOJ.  And under the criminal tax rules, we get a taxpayer

19    conference before they indict, before they -- before they give

20    approval for Mr. Wise and the U.S. Attorney's Office to bring

21    a case against my client.

22         The problem with that and what demonstrates the animus is

23    the count for evasion of assessment for tax year 2020, he was

24    proposing to prosecute her for evasion of taxes in 2020 before

25    she had even filed her taxes.  She was set to file her taxes

1   on October 15th because she had got an extension, and he was

2   proposing to DOJ to prosecute her for a tax return that he had

3   never seen before.

4           **THE COURT:**  And what's the evidence to show that

5   particular factual allegation?

6           **MR. BOLDEN:**  Well, we submitted the tax extension to

7   you in our papers.  If not, we can certainly get that to you.

8   But if -- the Court can take judicial notice.  The Government

9   won't object that she had not filed her taxes until October of

10  2020, and these proposed charges went to DOJ well before then.

11  Evasion of assessment.

12          Now, how does a prosecutor -- good faith as it may be --

13  how does a prosecutor in good faith with no vindictiveness,

14  with no selectivity propose getting approval to charge my

15  client with tax evasion when he doesn't even have a tax return

16  to base it upon?  Maybe he can explain that to you.

17          Secondly, the perjury charges, there were nine

18  prosecutors sitting there on the screen.  The nine prosecutors

19  refused to answer one question about any of these charges.  We

20  asked about -- we asked about calculations, numbers.  Where is

21  this coming from?  How did you calculate the loss?  By the

22  way, the loss, if you take out tax year 2020, because they

23  couldn't assess that, the loss for that was something like

24  $5,000.  This shows not only angst, but doggedness to find a

25  way to prosecute my client.

1           Lastly, in regard to that conference, that wasn't a

2    meeting.  It was a farce.  It was a joke.  The perjury

3    charges, we said, well, what's the perjury statement?  There

4    is no prejudice to the Government.  You know, once you perjure

5    a statement, the statement is not going anywhere or changing.

6    The lie is not going anywhere and changing, so tell us the

7    perjury statement so we can have an engaging conversation

8    since we're having this meeting.  They refused.

9           Who refuses to answer a question that doesn't prejudice

10   them?  Who proposes prosecuting my client for a tax year 2020

11   tax return that they don't have?  If you have any doubt about

12   animus right now, somebody has got to explain.  I can't think

13   of a thoughtful way or an objective, credible way to say how

14   you do that.  We believe the DOJ never approved that, and

15   that's why those charges weren't brought.  I don't know about

16   the perjury charge, they may or may not have been the same,

17   but again, the Government is not telling us any of that.

18          And so you had these shifting allegations, if you will.

19   You had these shifting allegations and charges against them.

20   They spent hundreds of thousands of dollars investigating my

21   client for tax charges.  They interviewed her hairdressers,

22   babysitters.  They even went to her churches.

23          My client doesn't make millions of dollars.  It's sad.

24   It's 250,000.  40 percent, that takes 100 grand off.  You're

25   talking about $150,000 worth of income.  Who doggedly pursues

1    someone like that who is a public official?  It makes no

2    sense.  It can only be rooted in animus, if you will.  It can

3    only be rooted in animus.  And then, because they didn't get

4    approval from DOJ -- if I'm wrong, they can tell us -- they

5    didn't get approval, so then what they do is they fall back

6    and bring perjury and false statement charges because they

7    don't need DOJ approval for that.  They don't need DOJ

8    approval for that.

9        And so then they continue to not talk to us, and the

10   failure to put exculpatory evidence into the Grand Jury is

11   required on a DOJ Section 9-11.233.  They won't tell us

12   whether they put exculpatory information in.  We gave it to

13   them.  We did a DOJ Defense brief with lots of exhibits

14   similar to the motion to dismiss.  We gave it to them.  We put

15   it in writing and said, listen, we want this to go in to the

16   Grand Jury.

17       I wrote them three times.  Did you put this in the Grand

18   Jury?  He and Erek Barron ignored that.  They ignored it.  No

19   response.  And then they broadened their investigation.  They

20   started looking at campaign finance violations.

21       Her former treasurer, Carlton Sanders, they put him in

22   the Grand Jury about a $12,000 expenditure reimbursement.  I

23   sent Leo Wise the exculpatory information.  Carlton Sanders

24   told him that, and Carlton Sanders just did an affidavit to us

25   and said, hey, you know, this is what happened in the Grand

1    Jury.  They didn't want to talk about my ex- -- they cut me

2    off, if you will.

3         Now --

4         **THE COURT:**  Mr. Bolden, does that information have

5    anything to do with the charges in this case?  If so, just

6    explain to the Court.

7         **MR. BOLDEN:**  Great question.

8         The Government would tell you, well, we didn't charge her

9    with campaign finance violations, and so as a result, it's not

10   relevant, probative, or material.  Oh, but I'm not litigating

11   that, Judge.  Let me tell you what I'm trying to litigate.

12   That -- that piece, if you're not going to allow him to put in

13   exculpatory evidence, and he's fearless enough to do an

14   affidavit, that gives you a window into animus.  It doesn't

15   matter that they didn't prosecute her for it.  What matters is

16   the Government's conduct on that issue was exculpatory.  You

17   have a witness swearing that he was cut off, and they would

18   not let him tell his exculpatory story.  That's the value of

19   that.  Remember, we're litigating animus and vindictiveness.

20   I'm not litigating whether -- you know, the broader piece here

21   because I think there is enough animus where the Government

22   has failed their burden to be objective, as well as credible

23   responses to that.

24        And so the next set of facts is Grand Jury.  Now, Judge,

25   we can all read.  Three times, Exhibits I, J, L, O, P, you

1    know, they never respond to my letters.  I got to figure out a

2    different writing style, but they never responded.  We know

3    why they never put my client in the Grand Jury.  We know why.

4    They told us.  They kept me on an e-mail I wasn't supposed to

5    get.

6         One of the prosecutors -- it was not Mr. Wise -- one of

7    the prosecutors said -- wrote to Erek Barron and said, I don't

8    believe Scott -- or Scott's not going to follow through on

9    this.  They acknowledge I want to put my client in the Grand

10   Jury.  In their response, they tell you all of these things

11   and then they play wordsmith.  Well, Scott didn't really ask.

12   Read it for yourself.

13        In fact, two days before the indictment dropped, I wrote

14   Erek Barron.  I said, we still want the case dismissed, but

15   listen.  If you're going to -- you know, I said two things.

16   Your -- no one has confirmed that we can put Marilyn Mosby in

17   the Grand Jury.  He wrote back and said, I don't think there

18   is anything to talk about.  Never answered my question, and

19   the next day, the indictment dropped.

20        Now, under the DOJ rules, I don't care what the Supreme

21   Court says in the sense that, at least from the concept of

22   this argument, if the DOJ says it should be looked upon

23   favorably -- and I asked three times and I get ignored and

24   then you drop an indictment, animus.  Without the animus, they

25   would have put her in the Grand Jury.

1          **THE COURT:**  So again, Mr. Bolden, whose animus?

2   Because the Court understands -- the Court understood the

3   Defense's position to be that AUSA Wise harbors genuine animus

4   toward your client.

5          **MR. BOLDEN:**  Yes.  And Erek Barron, too.

6          **THE COURT:**  Okay.  Because we've got a lot of people

7   you're talking about --

8          **MR. BOLDEN:**  Yep.

9          **THE COURT:**  -- and there's a lot of people in the

10  Department of Justice.

11      Okay.  Go ahead.

12          **MR. BOLDEN:**  And the fact that they wouldn't put her

13  in the Grand Jury, and they ignored me -- what did they say?

14  They say we didn't really ask.  I think we asked three or four

15  times.  And so in violation of their DOJ manual, they actually

16  say to you -- in their motion -- they say, DOJ manual not law.

17  We don't really care about that, or words to that effect.

18  They actually put that in writing.  They represent the people

19  for state of -- the United States of America, and they said

20  the DOJ manual doesn't matter.  It's not law, so we don't have

21  to follow it.  Animus.  Because you're empowering animus

22  towards my client if you're not going to have any guardrails

23  up, and you don't know how to carry yourself as a prosecutor

24  because DOJ doesn't matter.  They wrote that.  I did not write

25  that.  I did not write that at all.

1          The indictment cannot be clean if my client's due

2     process rights have been violated.  She would have waived her

3     Fifth -- it's not like me and my client can show up at the

4     Grand Jury door and say, (knocks) let us in.  The Government

5     has got to say something to me, and I put it in writing to

6     them, and they just ignored it.

7          If you don't give me relief on that alone.  What do you

8     do with that?  What do you say to the Government that says,

9     that's okay for a Defense attorney to want to put his client

10    in the Grand Jury.  You don't believe him.  You write that to

11    your boss, but it's okay.  That indictment is clean.  That

12    indictment is not clean.  You just violated her due process

13    rights.  You want to indict her again.  You can go indict her

14    again.  I hope they don't indict her again, but my point is,

15    you've got to put her in if she wants to go in.  The DOJ

16    manual says that.  They don't have a response to that other

17    than saying, it wasn't really clear.  Judge, it was painfully

18    clear.  It was painfully clear.

19          In closing, Your Honor, I would just summarize the

20    race-based investigations.  All we did with the race-based

21    investigations, Mr. Wise, he has a penchant for prosecuting

22    black elected officials.  It was written about in *Politico* and

23    *Time*.  All we did was draw the logical conclusion from his

24    past conduct, that this prosecution is consistent with his

25    history of prosecuting black elected officials.

1          **THE COURT:**  Are you aware --

2          **MR. BOLDEN:**  My client is a black elected official.

3          **THE COURT:**  Are you aware, Mr. Bolden, of any

4    evidence of Mr. Wise being found to have prosecuted someone

5    because of their race or in particular a black official?

6          **MR. BOLDEN:**  I am not.

7          **THE COURT:**  Okay.  I just want to be clear about --

8          **MR. BOLDEN:**  I am not.

9          **THE COURT:**  -- what the facts are.

10         **MR. BOLDEN:**  In all fairness, Judge, I am not.  But

11   look at the Government's response.  The Government's response

12   tries to make out, like, he was just an employee.  He was the

13   staff director and chief counsel to the office -- to the OCE

14   board.  He was a leading staffer and recommended prosecutions,

15   and at one point all eight of the subjects of that committee

16   that feeds into the House Ethics Committee who does the

17   hearing, all eight of the people they were looking at were

18   members of the CBC.  I'm just saying.  I don't have to prove

19   animus, racial animus.  I raise it.  And if you look at all of

20   the other facts, you get the picture here.

21         Now, the curious case -- and I'll close here, Your

22   Honor.  In the curious case of Erek Barron, the new U.S.

23   Attorney, Shanequa Thomas -- Thompson gave us an affidavit.

24   What a courageous woman.  Do you know how courageous it is for

25   a staffer, staffer to Nick Mosby, all right, who comes forward

 1    and says, once the indictment drops that Erek Barron questions

 2    her ability as she got to be the U.S. -- on how she got to be

 3    the U.S. Attorney -- I'm sorry, the State's Attorney in

 4    Baltimore, that he disliked working with her and did not like

 5    her style and approach.  He then engages in sex talk about

 6    her.  That's in an affidavit.

 7         THE COURT:  Mr. Bolden, again, how is that

 8    allegation relevant to the Defense's -- let me finish -- to

 9    the Defense's argument?  The Court, again, understood the

10    papers to be alleging AUSA Wise had some animus towards your

11    client that gets you to vindictive prosecution.

12         You presented some argument today about the Department of

13    Justice more broadly, and now you're talking about the United

14    States Attorney.

15         Was this comment made -- was this comment made prior to

16    Mr. Barron's tenure at the U.S. Attorney's Office?

17         MR. BOLDEN:  Yes.

18         THE COURT:  What's the connection between that and

19    your legal argument?

20         MR. BOLDEN:  Well, Judge, you can -- I can guarantee

21    you that my arguments about animus are directed at Leo Wise,

22    okay.  My -- in our papers, we've talked about Erek Barron

23    because Erek Barron signed that indictment and Erek Barron

24    shouldn't have signed that indictment if he's got -- if he's

25    said these things about my client before he became U.S.

 1   Attorney, because that shows animus.  That shows -- what's the

 2   last thing they said?  He doesn't like working with her and he

 3   didn't like her style and approach, and then he signs the

 4   indictment and drops an indictment.  Five months before her

 5   election he's doing something about not liking working with

 6   her because he's the U.S. Attorney, and she's still the

 7   State's Attorney, that's animus.

 8        Again, I don't have to prove whether it's true or not, I

 9   just have to raise the issues and make it more likely than

10   less likely that there is some vindictiveness there under the

11   law, and we're raising it because one fact alone may not do

12   it, Your Honor.  But if you look at it in the totality of

13   circumstances, there is a lot going on here.  This isn't some

14   dispassionate prosecutor here who doesn't have an agenda,

15   because everything I've talked about, she's been in their

16   eyesights.

17        And then they say about the election five months

18   before -- they drop the indictment.  They say we don't have to

19   care about the -- about when an election is, yes, you do.

20   Under *Hartman v. Moore,* we gave that to you.  Under the

21   justice manual and under the Lynch manual, yes, you do.  But

22   again, they don't pay attention to the DOJ manuals, so maybe

23   they don't, but that's the law, and it requires.

24        Judge, those are my ten sets of facts.  My point is, you

25   look at it in the totality, and the Government's objective,

1    credible responses simply are not there.  If that's the case,
2    the Court has a number of choices.  You dismiss the
3    indictment.  Double jeopardy has been applied.  They can
4    figure out what to do next, but there is too much animus
5    connected here.
6        In the *Jason Williams* case, the North Carolina Federal
7    District Court -- not North Carolina, New Orleans.  The Court
8    found that they may not have met their burden, but they held
9    an evidentiary hearing, because there's a lot of credibility
10   issues here.  I hear it in your questions.  We could have an
11   evidentiary hearing to get to the bottom of whether there is
12   animus or not, and the objective responses of the Government.
13       The other choice would simply be that if you're not
14   prepared to dismiss the indictment, then remove the lead
15   prosecutor, Leo Wise, and the case goes forward, but we think
16   these are powerful facts.  We think for the sake of the
17   criminal justice system, for the sake of my client, right,
18   that you got to do something about this.  This is not a clean
19   indictment.  The criminal justice system, my client's due
20   process rights, there are a lot of things on trial in regard
21   to these allegations.
22       You cannot accept -- you can accept some and not all of
23   them, but if we reach our burden, you've got to really analyze
24   the Government's responses as to whether they're credible or
25   not.  We submit to you that they are not credible.  You've got

1    those choices.  And we would ask you, again, to dismiss this

2    complaint on under 12(b)(3).

3         Thank you.

4         And Judge, I will reserve time for rebuttal or response

5    in connection not only to this piece but also the other two

6    motions.

7              **THE COURT:**  Thank you so much.

8              **MR. BOLDEN:**  Thank you very much.  And my apologies

9    for interrupting you.  I tend to get excited in my old age.

10             **THE COURT:**  Actually that's not a bad thing.

11        Thank you so much, Mr. Bolden, and we will have you back

12   for a subsequent round.

13        Mr. Wise, if you are presenting on behalf of the

14   Government, the Court welcomes you to the podium.

15             **MR. WISE:**  May it please the Court.  So the one

16   thing I'll agree with Mr. Bolden on is that he told a story.

17   That was the first thing he said.  And I really lost track and

18   I think Your Honor was trying mightily to, sort of, smoke this

19   out.  I really lost track of where I fit once we got past the

20   2018 Gun Trace Task Force information which they -- which we

21   provided to the Court, even though we had no obligation to in,

22   sort of, clearing up the false representations they made about

23   what happened then.

24        After that, it was a lot of "they."  It was a lot of "the

25   Government."  I heard him at one point say, you know, we

 1    didn't meet with them, but then during the taxpayer conference

 2    where we obviously did, there were nine lawyers and nine

 3    lawyers wouldn't tell him.  They have the burden of showing

 4    vindictive and selective prosecution, and they singled me out.

 5    And then they don't even follow through and articulate through

 6    that meandering story how I'm the decision maker.  And the

 7    reality is that I'm not.  I'm a line prosecutor.  I'm one of

 8    three on this case.  I work for the federal government.  You

 9    know, I could no more decide to indict someone than I could

10    authorize air strikes into Russia.

11         Every decision we make is subject to approval by

12    supervisors, approval by the department, and ultimately, of

13    course, this case was returned by the Grand Jury.  And the

14    Grand Jury returned an indictment on not one, but two

15    occasions because Marilyn Mosby didn't tell the truth.  That's

16    why she was indicted.  Not because she's being punished for

17    exercising a legal right, which is what the law requires them

18    to show and what they have not shown in order to make out a

19    claim of vindictive prosecution, and not because the U.S.

20    Attorney whose decision it was to present the indictments to

21    the Grand Jury and who was the first African-American U.S.

22    Attorney in the history of the District of Maryland, decided

23    to prosecute the Defendant because of her race, which is what

24    the law requires her to show and what she has not shown in

25    order to make out a claim of selective prosecution.  For these

1    simple reasons, these two motions -- this motion should be

2    denied.

3        And now the motion to disqualify repeats the same

4    arguments without factual basis or support in the law that the

5    Defendant makes in her motion to dismiss, and for that reason,

6    it should also be denied.  And taken together, these two

7    motions reflect the adage that most of us learned in law

8    school, that if you don't have the facts on your side, attack

9    the law.  If you don't have the law on your side, attack the

10   facts, and if you don't have either, attack the prosecutor.

11        And that's all that these two motions are, a jumble of

12   baseless and poorly reasoned personal attacks on me, Stephen

13   Schenning, Lydia Lawless, and late arriving Erek Barron.

14   Divorced from the law on vindictiveness and selective

15   prosecution.  And these motions also have to be placed in

16   context.  These motions aren't the first time the Defendant

17   and her lawyer made these baseless allegations.  More than a

18   year ago, the Defendant's lawyer, Mr. Bolden, made the same

19   allegations, again, without any support in two letters he

20   wrote to the Department of Justice's Office of Professional

21   Responsibility.

22        He cynically marked these letters "confidential" and then

23   immediately leaked them to the *Baltimore Sun*.  And the

24   Defendant and her lawyer have been going on TV and holding

25   press conferences ever since repeating these talking points.

1    And the department never responded to the personal attacks

2    before the indictment was returned in January of 2022 because

3    we don't comment on investigations, and they know that and

4    they counted on it.  And now that we're in a court of law, as

5    opposed to the court of public opinion, the Defendant has to

6    substantiate these claims and establish that the law provides

7    for the relief she seeks.  And in these two motions, she has

8    utterly failed to do so.  So there really are three questions

9    before the Court.

10        First, has the Defendant met her substantial burden to

11   put forward facts that show actual vindictiveness or a

12   presumption that the circumstances pose -- and this is the key

13   word -- a realistic -- a realistic likelihood of

14   vindictiveness, and I'll address that.

15        Second, has the Defendant cited any authority, any for

16   dismissing an indictment based on the facts actually presented

17   in this case?

18        And third, as with any motion, the arguments make sense,

19   and the answers are no, no, and no.

20        Now, we'll start with the law.  In *Goodwin*, the Supreme

21   Court held that in order to make a claim of vindictive

22   prosecution, Defendants had to show that the prosecution was

23   brought to punish a Defendant for exercising "A protected

24   statutory or constitutional right."  We cited the relevant

25   portion of the *Goodwin* holding on page 15 of our response.

1          The Defendant failed to even acknowledge in the motion

2     that this requirement -- this requirement that was black

3     letter law was in -- was upon her and did not identify any

4     protective, statutory, or Constitutional Right that she was

5     allegedly punished for exercising.

6          In the reply for the first time, the Defense attempted to

7     do so, but they fall short.  On page 4 of the reply, it reads,

8     "But in any event, State's Attorney Mosby's motion does assert

9     a legally protected right, because it makes clear that the

10    Government's vindictiveness has been motivated first by the

11    assertion of her right to seek elected office and second the

12    assertion of her right to present exculpatory evidence in her

13    own Defense."

14         Now, as to the first alleged right, she has the timing

15    backwards.  To make out a vindictiveness claim, a Defendant

16    has to show the prosecution occurred because the Defendant

17    exercised her right.  In other words, the exercise of the

18    right comes first and then the prosecution.  Here, the

19    Defendant didn't exercise her right to seek elective office

20    until two days ago, months after the indictment was brought by

21    the Grand Jury.  At the time she was indicted, she wasn't a

22    declared candidate and -- nor had she filed.

23         As of a press conference on March 16th of 2022, again,

24    almost two months after the indictment, she refused to even

25    answer a reporter's question about whether she was running

1  again.  So she can't claim she was indicted because she

2  exercised her right to run for elective office when her

3  indictment preceded and predated her exercise of that right by

4  months.

5      And as for her right to present exculpatory evidence in

6  her own Defense, the Defendant makes this assertion without

7  any citation of authority.  And, in fact, the law is just the

8  opposite as we quoted in our papers in the *Leverage Funding*

9  *Systems* case, in the *United States versus Gardner,* in the

10 *United States Ex Rel. McCann* versus Thompson and *United States*

11 *versus Grenoble.*  And in the first of those opinions, the

12 Court held further an accused has no right to be called as a

13 witness before the Grand Jury that is considering his or her

14 indictment.  And he or she has no right of cross-examination

15 or of introducing evidence to rebut the prosecutor's

16 presentation.

17     There is nothing unusual about this case in that regard.

18 We do not engage pre-indictment with the Defense in the way

19 Mr. Bolden claims.  I have been doing white collar criminal

20 prosecutions for 17 years.  I have never engaged with a

21 Defendant and their lawyer in advance of an indictment the way

22 he demanded and the way that he claims because we politely and

23 respectfully and professionally, at every turn, declined to

24 engage with, because we were bound by Federal Rule of Evidence

25 6(c) that prevented us from disclosing what was going on in

1    front of the Grand Jury, and that was consistent.  I have

2    never ever engaged with someone the way that he demanded, that

3    he now claims shows animus.

4         Now, in recognition of how weak their arguments are

5    about the rights she is being punished for asserting, the

6    Defendant in their reply, sort of, shifts and says, well, it's

7    just about -- it's not about a single right.  They really

8    quote this *Raymer* case.  It's about the totality of the

9    vindictiveness inquiry, and there they're really mixing apples

10   and oranges.  *Raymer* quotes *Goodwin*, the same part of *Goodwin*

11   that we quoted that said, "Vindictiveness claims rise and fall

12   on whether the Defendant can show that the exercise of a

13   protected right is what resulted in the prosecution."

14        What *Raymer* talks about is that once that has been

15   established, then the totality of the circumstances is

16   examined to determine whether vindictiveness has been

17   established.

18        Now, the Defendant also never addresses the second prong

19   of *Wilson*.  Remember that the standard for a vindictive

20   prosecution requires first that the Defendant show the

21   prosecutor acted with genuine animus toward the Defendant.

22   And, second, that the Defendant would not have been prosecuted

23   but for that animus.  They never even addressed the second

24   prong, and both are required.

25        The Defendant, quite simply, would have been prosecuted

1  because the evidence is overwhelming in this case, as would be

2  shown at trial, and her conduct was egregious.  The Defendant

3  took advantage of a provision in the CARES Act that was meant

4  to help people who had suffered from financial hardship due to

5  the coronavirus.

6      Specifically she claimed, on two occasions, "I have

7  experienced adverse financial consequences stemming from such

8  virus or disease as a result of being quarantined, furloughed,

9  or laid off."  Not true.  "Having reduced work hours."  Not

10  true.  "Being unable to work due to lack of child care."  Not

11  true.  "And the closing or reduction of hours of a business I

12  own or operate."  Not true.

13      Now, the CARES Act authorized 457(b) plan administrators

14  to rely on these self-certifications for COVID-19-related

15  withdrawals.  And this was done so that money could get to

16  people who had lost income quickly because they were

17  struggling, but not the Defendant.  She didn't lose income in

18  2020.  Her income went up over what she made in 2019.  And not

19  only was the conduct egregious, but the amount -- the amount

20  at issue was substantial.

21      The department has been prosecuting COVID-19-related

22  fraud that involves far less money.  And to be clear, 457(b)

23  plans don't work like 401(k) plans.  The Defendant took money

24  out of this retirement account that would have been locked

25  down but for the false statements she made.  It wasn't to

1    simply avoid a penalty.  401(k) plans work that way, 457(b)

2    plans do not.

3        Now, the problem, of course, is that self-certifications

4    also carry a greater risk of fraud, which the Defendant

5    exploited.  And the only way to deter others from abusing

6    various programs that rely on self-certifications like this is

7    to bring perjury charges as the law authorizes the department

8    to do in 28 United States Code 1746.

9        The Defendant, of course, also made multiple false

10   statements in applying for two large mortgages:  One for

11   $490,000 mortgage for the first vacation home, the one in

12   Kissimmee, and the other for $428,000 mortgage, the one in

13   Longboat Key.  And the department prosecutes mortgage fraud

14   every day, and the Defendant has not put forward any evidence

15   that her mortgage fraud would not have been prosecuted.

16       As to their claims of selective prosecution, they,

17   again, failed to cite the black letter law on selective

18   prosecution.  And this is the *Venable* decision in the Fourth

19   Circuit.  "It requires to make this showing, the Defendant

20   must establish that similarly-situated individuals of a

21   different race were not prosecuted, and that the decision to

22   prosecute was invidious or in bad faith" and they again have

23   to establish both prongs to prevail.  In both their motion and

24   their reply, they failed to provide any evidence of

25   similarly-situated Defendants who were not prosecuted.

1    Their argument is that this is the first time it's

2    happened.  Well, under that logic, every time that Congress

3    passed a new law, it could not be enforced because the first

4    Defendant under whom it was prosecuted could claim selective

5    prosecution.  It's simply not what the law requires.  And this

6    is not -- this is not the first COVID-19-related fraud case

7    brought by the department.  And again, the burden is on them

8    to show other cases not pursued, not on us to show that other

9    cases were not pursued.

10    We went through, at length, the factual inaccuracies in

11    their filing, and I'm not going to belabor it.  We had to

12    spend pages and pages untangling what they claim happened in

13    the Gun Trace Task Force investigation, all of which was

14    untrue.  They started by saying I stood up in this courthouse

15    in Wayne Jenkins's guilty plea and for the first time made

16    this allegation that someone from the State's Attorney's

17    Office leaked information to him that he was under -- that

18    there was an investigation.

19    No one on the Defense team -- all of these lawyers --

20    bothered to look at the transcript from that hearing to see

21    that it was Judge Blake, in summarizing the Defendant's plea

22    agreement, where he admitted that he had been tipped off by an

23    Assistant State's Attorney, that was the subject of the guilty

24    plea.

25    Undeterred, Mr. Bolden stands up here again and says

1    there was no corroboration.  As we pointed out, as was

2    described to the Defendant in a letter that Mr. Schenning sent

3    to her, the corroboration included a recording of Jenkins's

4    co-defendants discussing the fact that he had just told them

5    that he had been tipped off, a 17-minute call between Jenkins

6    and an Assistant State's Attorney right before that recording,

7    and then, of course, Jenkins himself admitted it under oath in

8    this courthouse.

9          That's all the corroboration anyone could imagine for

10   something like this.  And that evidence was provided to

11   Magistrate Judge -- then Magistrate Judge Gallagher who

12   detained all of the Defendants in the GTTF based on that

13   information and others.  It was provided to Chief Judge Bredar

14   when there were reviews taken of those detention decisions.

15   It even went to the Fourth Circuit.  So the idea that this was

16   a smear campaign, which is what they said in their papers, in

17   light of all of that evidence, just goes to show what a story

18   this is.

19         Now, they've abandoned the smear campaign.  If you look

20   at the shift from their motion to the reply, you know, in the

21   motion they say that the evidence of the smear campaign -- the

22   two things they cited are the letters that Mr. Bolden wrote to

23   OPR, as if those are evidence of anything.  We provided the

24   transcripts, the guilty plea, and all of the relevant

25   factual -- all of the relevant items for a factual record,

 1    even though we have no burden.

 2        The reply doesn't address any of that.  Instead, they

 3    now change the narrative and say, oh, it's not animus because

 4    of the smear campaign.  It's animus because of this meeting,

 5    right?  This meeting where, according to them, I didn't have

 6    the papers that they asked to see.  You know, the reality is I

 7    barely remember this meeting.  It was that insignificant.

 8    Mr. Bolden kept saying we had a verbal altercation.  I don't

 9    remember what was said in that meeting.

10        I go to a lot of meetings.  I've been in Government a

11    long time.  I wish I could say I've never been in a meeting

12    where someone asked me for something and I didn't have it, but

13    the facts here was, I was coming back from a hearing.  I don't

14    remember what it was.  It was something related to the GTTF.

15    I hadn't been invited to this meeting, wasn't on my calendar.

16    I didn't know it was happening.  Mr. Schenning saw me, asked

17    me to come in, and I looked through what I had to see if I had

18    any of the information that we had proffered to the Court

19    months earlier in the detention hearings, which occurred in

20    the spring of 2017.

21        Again, now we're talking about -- it's still five years

22    ago, but it's January of 2018, and I didn't.  So what?

23    Mr. Schenning wrote the Defendant a letter where he summarized

24    all of that evidence.  They didn't provide it to you, we did.

25    And the most disingenuous thing about this argument is the

 1   Defendant then fired the woman, fired the woman, that tipped

 2   off Jenkins and cited -- and we know exactly what her thinking

 3   was because she then hired a lawyer to threaten the woman that

 4   if the woman ever claimed she was fired for any reason other

 5   than the fact that she tipped off Wayne Jenkins, she would sue

 6   her.

 7           THE COURT:  Mr. Wise, I'd like to talk about a point

 8   you made at the very beginning when you got to the podium that

 9   I think is helpful just to put the claims of animus into

10   context.

11       Can you just explain to the Court, what is your role on

12   this case on behalf of the Government?

13           MR. WISE:  Sure.  So I have two co-counsel:

14   Mr. Delaney and Mr. Zelinsky.  We will -- as Your Honor will

15   see at trial, we will argue to the jury.  We'll have jury

16   addresses.  We'll put on witnesses.  We are co-counsel.  We

17   make decisions, as a group, by consensus.  I don't have more

18   votes than they do.  I don't have the final say.  In the U.S.

19   Attorney's Office, we work collaboratively on cases with

20   co-counsel.  So I am a line assistant just like Mr. Delaney

21   and Mr. Zelinsky on this case?

22           THE COURT:  And do you have a supervisor?  Are there

23   other officials within the U.S. Attorney's Office at levels

24   above you that require approval or reporting back to as

25   appropriate in the case?

1          **MR. WISE:**  More than I'd like to describe.

2          **THE COURT:**  And the Court used to serve at the

3    Department of Justice, so the Court understands its quite a

4    bureaucracy.  I just want to be clear because there are

5    allegations that primarily point to you, and that's why the

6    Court has asked so many questions about who is the they and

7    who are we talking about to know what your role is.  And while

8    you certainly are a valued team member, I'm sure what your

9    role would be in this case -- you're not the only lawyer on

10   the case.  The Court assumes you do have a supervisor you

11   report to within the office?

12         **MR. WISE:**  I do.  I report to the criminal chief.

13   Well, first there is an assistant criminal chief.  There was

14   two at one point, one of them left.  There is an assistant

15   criminal chief.  There is a criminal chief.  There is an

16   executive assistant U.S. Attorney.  There is first assistant

17   U.S. Attorney.  There is a counsel to the U.S. Attorney and

18   then there is the U.S. Attorney, and that's just within our

19   office.

20         There is then, obviously, a whole network of folks at the

21   department because this was -- this case always -- and this is

22   another, you know, serious of factual misstatements they've

23   made.  This case has always had both tax and non-tax charges.

24   And where there are tax charges, there are additional layers

25   of review including, you know, jumping ahead to, again, some

1    of the things that he said that aren't accurate.  You know,

2    the tax division authorizes not only charges, but they also

3    authorized, in every case, the initiation of investigations

4    into tax-related charges.

5         So the idea that I'm some cowboy off on my own, running

6    roughshod over somebody's rights, it's just preposterous.  And

7    I say that not to -- you know, their arguments are what they

8    are, but again, the standard that they have to show, right,

9    there is no evidence of actual vindictiveness.  I mean,

10   that's -- you know, they don't have an e-mail from me or a

11   letter or something I said in any setting of a hearing, a

12   public setting.  I mean, there is no -- they can't point to a

13   single thing I've ever said where I even expressed an opinion

14   about the Defendant.  So they have to -- they have to argue

15   for the presumption, but the presumption is a realistic

16   possibility of vindictiveness, and this is where the wheels

17   really fall off this story, because this Rube Goldberg machine

18   that they've constructed to get to this courtroom is -- first,

19   it was the smear campaign and then that collapsed, again, in

20   2017 and 2018.  Now, it's this embarrassing meeting, again, in

21   2018.  And from that, I was so embarrassed -- again, keeping

22   in mind if any of this is realistic -- I decided I could

23   change the outcome of an election by donating $100, right?

24   And he said, oh, I made two donations five days later --

25   again, facts are important.  I was solicited to make a

1    donation, and I was solicited to make a donation five months

2    later by two people I had formerly worked with.  There is

3    absolutely no evidence of any connection between either the

4    supposedly embarrassing meeting, which they haven't

5    established, and then fast-forward three and a half years

6    later.

7         Again, the standard is realistic.  They'd have you

8    believe that I thought I could realistically affect the

9    outcome of an election with $200.  And when I was

10   unsuccessful, that I lay in wait for three and a half years to

11   launch a federal investigation and get a federal indictment

12   and somehow, although they never explain how, I got the IRS,

13   the FBI, my two experienced co-counsel, three U.S. Attorneys

14   from two different administrations, the tax division, and the

15   leadership at the department to go along with me.  It's just

16   fanciful.

17             **THE COURT:**  I have a couple more questions for you,

18   Mr. Wise, and you've touched on some of the points, but I want

19   to break them out.  Let's talk about the 2018 campaign

20   donations, just to be clear.

21        Were they in 2018?  Is that true?

22             **MR. WISE:**  Yes.

23             **THE COURT:**  Are there any campaign donations related

24   to the current election cycle for State's Attorney?

25             **MR. WISE:**  No.

1          **THE COURT:**  All right.  Just want to be clear about

2     that.  And can you just briefly explain, again, the genesis of

3     your donations in 2018?

4          **MR. WISE:**  Sure.  And again, we submitted the two

5     declarations from Mr. Vignarajah and Mr. Bates where they --

6     and I can give Your Honor the -- Your Honor probably has them,

7     but the Vignarajah declaration is Exhibit 8 and the Bates

8     declaration is Exhibit 9.

9          Mr. Vignarajah explained he was canvassing his former

10    colleagues at the U.S. Attorney's Office, the Attorney

11    General's Office, his law firm ahead of the January filing

12    deadline, and he called me and he asked me if I would donate.

13    And we had been together at the U.S. Attorney's Office when we

14    both started, and he asked me and I said I would.  I said I'd

15    give him a donation.  And as he pointed out in his

16    declaration, I was one of a number of former colleagues,

17    including people working in the U.S. Attorney's Office.  That

18    was in January.  It had absolutely nothing to do with the

19    Defendant.  The timing had nothing to do with this silly

20    meeting.  You know, they can't even explain how a solicited

21    donation could be connected to a meeting that Mr. Vignarajah

22    had nothing to do with.  He reached out to me because he said

23    he was -- you know, as he said in his declaration, because he

24    was reaching out to people that he used to work with.

25          So the facts sever any causal connection between the

1   reason for the donation or the timing, and Mr. Bates equally

2   describes why he -- what his timing was and what his thoughts

3   were.  He saw Mr. Vignarajah's list of donors.  He and I have

4   had cases together.  He reached out to me and I said, yes.

5   And as I said in the -- in our filing, actually, before

6   Mr. Vignarajah had reached out to me, another former colleague

7   who was running for Congress in Virginia reached out to me,

8   and I gave him $100.  I mean, I guess I'm an easy mark, but it

9   had nothing to do -- I don't even know who the colleague in

10  Virginia was running against.  And I gave to Mr. Vignarajah

11  and Mr. Bates because they asked.  And if they hadn't, I

12  wouldn't have, and it was without an eye towards the

13  Defendant.  It was because I knew both of them.  And I don't

14  know if Your Honor has ever been solicited, but it's a little

15  uncomfortable when someone asks you to say no, so I said, yes,

16  and that's it.

17          **THE COURT:**  And let's just also be clear.  As a line

18  Assistant U.S. Attorney, which is your current position, do

19  you have the power to open an investigation on your own or is

20  that something where there is a process within your office?

21          **MR. WISE:**  No, it has to be -- it has to be approved

22  by the criminal chief.

23          **THE COURT:**  And as a line assistant, do you have the

24  power to decide, on your own, when to pursue charges before a

25  Grand Jury?

```
1           MR. WISE:  No.  No.  We have -- so any case I work
2   on, the indictment would have to be approved, again, by the
3   criminal chief and in cases like this, although I'm not going
4   to -- I can't go into deliberations, our office uses an
5   indictment review committee, which includes senior prosecutors
6   from across our office, both divisions, and here in Baltimore
7   and in Greenbelt.  And by our policy and procedure manuals,
8   any cases involving public corruption charges or elected
9   officials have to be submitted to an indictment review
10  committee and be approved.  They then, of course, ultimately,
11  as all cases do, have to be approved by the U.S. Attorney
12  since it's the U.S. Attorney that actually ultimately submits
13  the charges to the Grand Jury.
14          THE COURT:  Okay.  And the Court's last question is
15  a factual question if you can answer it.  The current United
16  States Attorney, was that current United States Attorney in
17  office when the investigation for this matter began?
18          MR. WISE:  No.  As I said, it's gone through -- he's
19  the third U.S. Attorney.  When it began, it was Mr. Hur and
20  then when he resigned, Mr. Lenzner -- it's actually four U.S.
21  Attorneys.  Mr. Lenzner was the U.S. Attorney.  He recused
22  himself.  Mr. Schenning, who was at that time the executive
23  assistant U.S. Attorney, became the U.S. Attorney until
24  Mr. Barron was confirmed by the Senate.  So it's gone through
25  four U.S. Attorneys since.
```

```
 1              As we pointed out, you know, we're -- again, to show
 2        record evidence, there are -- materials have been provided in
 3        discovery that show subpoenas were being issued in the summer
 4        of 2020, again, preceding the tax investigation by the
 5        state -- by the bar counsel, which I can certainly address if
 6        Your Honor is interested in what actually happened on that
 7        question either.
 8              THE COURT:  Thank you so much, Mr. Wise.  Those are
 9        all of the questions the Court has.  If you have more time,
10        you're welcome to continue.
11              MR. WISE:  Am I over -- is that over or is that --
12              LAW CLERK:  Over.
13              MR. WISE:  I know Mr. Bolden went twice as long.
14        I'm happy to continue, Your Honor, although I'm not -- I don't
15        want to wear out my welcome.
16              THE COURT:  Well, the Court doesn't have any
17        questions for you right now.  Those were the main points that
18        we wanted to hear.  I know Mr. Bolden also wishes to come back
19        to the podium.  So, perhaps, we'll just do another round and
20        then you can come back if you have anything further to raise
21        with the Court.
22              MR. WISE:  Thank you, Your Honor.
23              THE COURT:  Thank you so much, Mr. Wise.
24        Mr. Bolden, whenever you're ready, you're welcome to come
25        back to the podium.  And let's try to adhere to the time.  The
```

1    Court can't quite see the clock, so the Court is going to

2    request Justin to let me know when we're out of time, because

3    we do want to get through the proceedings and then hopefully

4    get to a resolution of these motions rather promptly.

5             MR. BOLDEN:  Yes, Your Honor, very briefly.

6             THE COURT:  Go ahead, Mr. Bolden.

7             MR. BOLDEN:  Thank you.

8        You know, Mr. Wise describes himself as a frontline

9    attorney, if you listen to the point from his frontline

10   attorney up to the U.S. Attorney and even DOJ.  On the

11   organizational chart on their website, he is not a frontline

12   attorney, he just told you that.  He just said that to you.

13   He's chief of fraud and public corruption.  Doesn't sound like

14   a frontline attorney to me.  Got a lot of power and authority

15   there.  He decides who gets indicted and who doesn't.  I'm a

16   former prosecutor.  I know what the chief of a section is, and

17   he carries a lot of weight, even if he does have to go get the

18   approvals.  He's not a frontline assistant.  I don't know what

19   you do with that, as an officer of the court, but that's what

20   he said.  I got federal prosecutors on my team.  It's unheard

21   of that you don't meet with the private Defense Counsel.  It's

22   unheard of.  They do it all of the time.

23        And if you look at the DOJ manual -- the DOJ manual, what

24   do you do with that?  That says exculpatory information

25   documents have to put in -- be put in the Grand Jury, that

1    Defendants, subsequent targets, if they want to be put in the

2    Grand Jury, they should be put in the Grand Jury.  What do you

3    do with that?

4        Their end responses got to be credible and it's got to

5    be -- it's got to be credible and it's got to be appropriate.

6    I can't think of the word that I used before, but he never

7    responded to that Grand Jury -- the -- and the exculpatory

8    information.  If you don't do that, how is that a clean

9    indictment under their own rules?  It may not be the law, I

10   got you.  It may not be the law, and I'm not arguing it's the

11   law, but I don't know what you do if you -- if you were to --

12   if you were to reject this motion from us, what do you -- and

13   when I say you, I mean, you generally.  Just theoretically.

14   What do you do with that reality?  If it's a clean indictment,

15   and I'm going let it go forward if you don't resolve that we

16   put in writing exculpatory evidence, and we put in writing our

17   client wanted to go in the Grand Jury.  If you argue that it

18   doesn't break the law, but it violates the DOJ manual, then

19   where does that leave us?  In no man's land.  That can't be

20   the case.

21       My federal prosecutors meet with Defense lawyers all the

22   time.  It's unheard of before an indictment, just unheard of.

23   You were in DOJ, if you believe that, okay, but I got to tell

24   you, the DOJ manual has got to mean something.  It doesn't

25   mean that the law doesn't allow it.  The representatives for

```
1        the people for the state or for the United States of America

2        have got to rely on something.

3            In connection to the Goodwin case and this protected

4        right, that line of cases goes to the vindictiveness charges

5        or allegations, not pretrial, but post trial.  There are a

6        line of cases like that.  And I understand the argument about

7        the right, and I understand Mr. Wise's position that you've

8        got to exercise the right.  He's right about that, but those

9        aren't our cases.  Our cases -- and there is no case law that

10       says you can't bring this motion pretrial in the cases like

11       U.S. v. Williams in New Orleans or the cases for United

12       States versus DeMarco, those are cases where the Court's

13       granted some pretrial relief.  And they granted the relief

14       because it -- whether they exercised the right or not, they

15       didn't have a chance to exercise their right because it was

16       pretrial.  And so those cases that Mr. Wise isolated don't --

17       aren't really on point.

18           The political donation, I say again that's all

19       irrelevant what he told you, because the point is that the

20       animus pretrial -- and it could be two or three years out.

21       Our argument still is he chose them over her.  He was saying

22       with that $200 that they would make a better elected officials

23       than her.  And okay, he's free to do that, but now he's the

24       lead prosecutor and now he's prosecuting her months before the

25       election.
```

1          Now, I understand the trial got put off and, you know,

2    the new election date is a certain date and stuff, but at the

3    point in time when these decisions were being made, it

4    mattered as far as we're concerned.  And if you're the chief

5    of the fraud section, you're not a frontline assistant.

6    You've got -- you've got independence and you've got power

7    within that organization.

8          So if you go to DOJ, if you go to all of those other

9    individuals, you're going with the moniker of chief of the

10   fraud section, and you're the point person.  In fact, people

11   work for you.  You manage them because of your experience, in

12   all fairness, to his expertise.  So it's just not fair for him

13   to say that he's just a frontline assistant and he went

14   through a lot of people and tax people approved this and blah,

15   blah, blah.

16         Where is the tax indictment?  Where is the tax

17   indictment?  Pretrial animus is still -- you don't have to be

18   protecting a right, per se.  And so, Your Honor, again we

19   would stand by our motion.

20         The other thing is, Judge, if you don't believe -- if you

21   don't believe these ten allegations and how we've interpreted

22   them, then let's hold a hearing, an evidentiary hearing,

23   because I have serious questions about Mr. Wise's credibility

24   while he was standing here.

25         And secondly on the motions, on the opposition motion,

 1       they still -- in his presentation still didn't answer a lot of

 2       the questions.  He says he doesn't remember what happened at

 3       the meeting, but there are ten other sets of facts that he

 4       just certainly hasn't answered.  Let's find out.  Let's have

 5       an evidentiary hearing.  We'll put on witnesses under

 6       cross-examination in front of the Court, and let's find out

 7       what the truth is and what's accurate, right, regardless of

 8       how we interpret these issues.

 9            And so if I -- Court's -- I've got about eight minutes,

10       if I could have the Court's indulgence just for a second.

11       Excuse me, Your Honor.

12            I'll leave you with this on my rebuttal.  The

13       Government, Mr. Wise, continues to say we prosecute fraud in

14       the CARES Act all of the time.  It's just not true.  If you

15       were to ask him, name another case like this, I would -- it

16       would be challenging.  I would like to hear whether he or

17       anyone else in the Department of Justice family has ever

18       prosecuted someone under clear for 457(b), but for Mr. Wise --

19       but for Mr. Wise, she would not be in this position at least

20       not with the 457(b).  And they've never prosecuted anybody

21       else in the country, and the idea was to get money out.  I

22       agree with him there; it was.

23            And there was no review process for it, right?  It's

24       unclear whether it was even material because if you don't have

25       a review process for it, then you're operating on good faith,

1    and how does he know whether she lied or not?  Well, listen to

2    the evidence, this is a time to argue about that, but he

3    brought it up.  How does he know she wasn't financially

4    impacted?  We're going to find out.  We've got ten witnesses.

5    We're going to put on a full case.

6         So Your Honor, again, but for what I call an unclean

7    indictment, my client wouldn't be in this position.  And I

8    think there are enough facts there where the burden has been

9    shifted.  I don't think the Government's arguments in writing

10   or today have the credibility or the relevance to what we're

11   saying pretrial.  And I would stand by our motion and ask the

12   Court to dismiss this indictment for those reasons given

13   therein.

14        Thanks.

15            **THE COURT:**  Thank you so much, Mr. Bolden.  Before

16   you step away --

17            **MR. BOLDEN:**  Oh, sorry.

18            **THE COURT:**  -- because one motion we have not

19   discussed today is the motion for a Bill of Particulars.  Is

20   the Defense still pursuing that motion?  I know it was filed

21   before the superseding indictment initially.

22            **MR. BOLDEN:**  Yes, Your Honor.  I would stand on our

23   papers as the day is long, but I will point out one thing to

24   the Court, why it's important to get the Bill of Particulars

25   for all of the reasons that we've given.

1          One of the Bill of Particulars is, in the superseding

2      indictment, the Government adds facts and says that my client

3      signed a rider agreement to give up control of her rental

4      property -- is it Longboat Key on the rental property?  Second

5      rider?

6                    **THE DEFENDANT:**  Kissimmee.

7                    **MR. BOLDEN:**  Huh?

8                    **MR. QURESHI:**  Kissimmee.

9                    **THE DEFENDANT:**  Kissimmee.

10                   **MR. BOLDEN:**  Kissimmee.  On the Kissimmee property.

11     And that she gave up control two weeks before she signed the

12     mortgage agreement, and then the mortgage agreement -- the

13     mortgage agreement represents that you can't give up control

14     of this property to anyone under any circumstances.  There, if

15     you look at those two documents, it doesn't say what the

16     Government says in their indictment.  It says the mortgage

17     company -- the mortgage agreement says you can't give up

18     control of this property.  The rider agreement -- or the

19     management company agreement, I'm sorry, that she contracted

20     with two weeks before says -- doesn't say that they have full

21     control over the property.  What it says is that they have the

22     right and control over offering the property, right, offering

23     the property for rent.  And under that circumstances, my

24     client can sign off yea or nay on it.  They can't just go and

25     do that.

1        **THE COURT:**  Okay.  So what is the missing detail

2   from the perspective of the superseding indictment?  You're

3   making arguments about what the documents should correctly

4   read, but what information are you seeking from the Government

5   that would be appropriate under --

6        **MR. BOLDEN:**  Well, I want to know how --

7        **THE REPORTER:**  I'm sorry.  I didn't get the end of

8   that.

9        **MR. BOLDEN:**  I'm sorry.

10     (Reporter clarification.)

11       **THE COURT:**  Okay.  Let's do that last exchange again

12  so we make sure we're clear.

13       **MR. BOLDEN:**  Okay.

14       **THE COURT:**  The Court's only question is -- your

15  point well taken, Mr. Bolden, but how can you bring that back

16  to a Bill of Particulars?  And what in particular are you

17  saying that is missing from the superseding indictment?  It

18  sounds like you're arguing about the proper reading of

19  language in an agreement.  What's the detail that you're

20  asking the Government to provide in a Bill of Particulars?

21       **MR. BOLDEN:**  The following questions that we put in

22  writing.  And with regard to that particular case and in

23  regard to how they -- yeah, in their view of the case, how

24  does Marilyn Mosby's signing of the second home rider on her

25  Kissimmee property mortgage application was false -- that they

1     say was false, since Mosby had entered into the agreement with

2     a vacation home management company one week prior.

3          How is Marilyn Mosby -- how is it that she did not attend

4     and maintain exclusive control over the ownership of the

5     property, given what my interpretation is of those two

6     documents just on the face of the documents?  That's a great

7     example as to why we need additional information, because

8     it's -- in their superseding indictment, those are -- that

9     does not properly represent an inconsistent with what those

10    two documents say.  So they can stand by their superseding

11    indictment if they want, but we certainly are entitled to

12    understand how Marilyn Mosby did that when they -- when they

13    say she didn't -- she did not intend to maintain exclusive

14    control over the ownership of the property.  She did.  Based

15    on those two documents she did.  So tell us how did she not

16    intend to maintain exclusive property then, because the

17    documents speak for themselves.  That's an example of what we

18    expect or what we need for the Bill of Particulars.

19         Other questions that we've indicated in our motion, how

20    did Marilyn Mosby falsely state that she experienced adverse

21    financial consequences stemming from coronavirus as a result

22    of being quarantined, furloughed, laid off, reduced hours, so

23    forth and so on?  The Government says -- their position --

24    they just said it -- was that -- you know, that she had not

25    been adversely affected.  So tell me in their view, that's not

1    in the indictment how that occurred.  Tell me more about why

2    you know that she wasn't affected, that she didn't meet these

3    qualifications.  The only thing the Government says is that

4    her salary was not affected by it, but what about the other

5    factors, right?  What about her other businesses, if you will?

6    And so we want a clear understanding in regard to that part of

7    the indictment so we're clear and we can fully defend her.

8         Third question, how did Marilyn Mosby knowingly make

9    false statements with regard to the tax lien from the mortgage

10   applications in her homes for Kissimmee and Longboat Key?

11   Well there, Your Honor, they say they made false statements.

12   The only thing they say beyond that is that she got and

13   received these tax notices and stuff, right?  But tell -- but

14   how did she knowingly -- they said she knowingly made false

15   statements, how do they know she even got the tax notices.  Is

16   there more there?

17        How do I defend my client when the indictment itself

18   makes these statements, one, the earlier question was not

19   accurate, but here you got to tell me more than you just

20   basically falsely made these statements, right?  And then the

21   second home rider question -- I mean, I stand on the papers,

22   Judge, but we need more information to fully defend our

23   client.  That's really what we're saying.

24        And I would -- you know, I wish we didn't have to -- I

25   know you probably don't want to believe this, I wish we didn't

1     have to include you in this.  I wish we had a better working

2     relationship.  That's been tough for a lot of reasons, but

3     here, the motion for a Bill of Particulars, if you grant that,

4     that gets us there so we can have a clean trial, of course, in

5     September, but we have a good understanding to fully defend

6     our client, especially if my motion, my current motion that we

7     spent a lot of time on is not granted.

8          Thank you.

9          **THE COURT:**  Okay.  Don't go away yet, Mr. Bolden.

10    One little follow-up question on that.

11         **MR. BOLDEN:**  Oh, I'm sorry.

12         **THE COURT:**  And that has to do with the Court's

13    understanding that there's been, you know, quite a bit of

14    disclosures from the Government to the Defense to date.  Is

15    that correct?  Have you received information from the

16    Government?

17         **MR. BOLDEN:**  I don't want to speak inaccurately.

18    Since when the trial got put off you mean or just generally?

19         **THE COURT:**  Since we have been preparing for trial,

20    the Court understood you to be indicating that the superseding

21    indictment is sufficient.  I think one of the points the

22    Government might make is that there has also been disclosures

23    to the Defense during the course of our pretrial proceedings

24    that will help to, perhaps, fill some of the gaps that you are

25    pointing out.  And Court is just basically asking you, do you

1   agree?  And have you received any information from the

2   Defense -- I mean, sorry, from the Government?

3           **MR. BOLDEN:**  We have not received any additional

4   information that would support or remove our desire for a

5   motion for a Bill of Particulars.  We know they are done

6   producing documents actually based on our last -- the

7   conference before last.  But the type of information that they

8   are disclosing certainly doesn't help us in these expanded

9   questions.

10      The Government's position is, listen, the indictment is

11  what it is.  It's very clear.  That's all you really need to

12  know, but we simply disagree with them on that.  And we have

13  not -- now, if you -- Judge, if you are encouraging us to

14  confer with one another and see if they will give us more, I

15  don't have a problem doing that.  I don't have a lot of

16  confidence in it, but hope springs eternal.

17          **THE COURT:**  Thank you so much, Mr. Bolden.

18          **MR. BOLDEN:**  Are you done with me now?

19          **THE COURT:**  Yes.

20          **MR. BOLDEN:**  Okay.

21          **THE COURT:**  Thank you for your indulgence.

22          **MR. BOLDEN:**  Thank you.  I wasn't trying to run away

23  from you.

24          **THE COURT:**  Counsel for the Government, please.

25          **MR. DELANEY:**  Thank you, Your Honor.  Sean Delaney

1      on behalf of the Government.  I'm going to briefly address the

2      Bill of Particulars, and then I'm going to turn the microphone

3      back over to Mr. Wise.

4           Your Honor, the superseding indictment in this matter is

5      a clear roadmap detailing Defendant Marilyn Mosby's lies and

6      how those lies aided her in getting benefits to which she was

7      not entitled.  With surgical precision, it lays out four

8      specific criminal charges detailing nine individual instances

9      when the Defendant knowingly provided false information to

10     either a retirement plan administrator or a lending

11     institution.

12          The indictment alleges each of the essential facts of

13     the crimes, but it goes much further than that.  In

14     approximately 20 pages, the indictment tells a comprehensive

15     narrative of an individual under water in debt to the Internal

16     Review Service, who used dishonest means in an attempt to

17     better her financial state.  The Defendant seeks a Bill of

18     Particulars for more information, but this request is simply

19     an attempt to get the Government to detail precisely how it

20     will prove its case at trial with a trial now months away.

21          Notwithstanding the fact that the indictment already

22     contains much of the information that they seek, the motion

23     asks the Court to essentially create a new standard for what a

24     Bill of Particulars is that is not supported by either the law

25     or the case law.

1        Federal Rule of Criminal Procedure 7C requires the

2    indictment to be a "Plain, concise, and definite written

3    statement of the essential facts constituting the offense

4    charged."  The purpose of the rule is to enable the Defendant

5    to enter a plea and avoid being prosecuted for the same

6    offense at a future date."  Essentially, it's to put the

7    Defendant on notice so the Defendant can respond.  And

8    everything that I've heard from Defense Counsel today

9    indicates to me that Defense Counsel has a response, and they

10   just don't agree with the Government.  This is the purpose of

11   a trial, not a Bill of Particulars.

12       The indictment in this case goes well beyond the low bar

13   required.  And the Defendant's motion seeks information

14   regarding "How or why the Government believes the Defendant

15   made perjurious statement?  How or why the Government believes

16   that the Defendant knowingly made false statements on two

17   mortgage applications?"  I think it's an important point to

18   make, the Defendant's request for how or why the Government

19   believes anything is misplaced.  We're here because a federal

20   Grand Jury in this district has found probable cause that

21   these crimes were committed.

22       The Defendant's failed to cite even a single case that

23   is persuasively in favor of their position of what they asked

24   the Government to give.  I could run through the cases, but I

25   don't -- I've done so in the pleadings already.

1          You know, a Bill of Particulars makes sense in a

2     situation where you have, say, a -- the Government alleges

3     perjury and -- but it doesn't allege either when the perjury

4     occurred or what the false statements were, or the Government

5     alleges a false statement in a multiple page mortgage

6     application, but it doesn't tell you what is alleged to be

7     false in it.  That's not the case here.  We are specific.  We

8     were detailed in this indictment, and the Grand Jury found

9     probable cause.

10          As best as I can make it out, the motion amounts to a

11     request for the Government to prove the Defendant's intent,

12     which is what we're going to do at trial.  That is where we're

13     headed.  The Government is prepared for that trial, and

14     Defense Counsel has to review the evidence and plan their own

15     trial strategy.  It is not incumbent on the Government to

16     explain to them step by step how we're going to prove this

17     case.

18          At the end of the day, the motion for Bill of Particulars

19     should be rejected, and I'll concede the rest of my time to

20     Mr. Wise.

21               **THE COURT:**  Thank you, Counsel.

22          Mr. Wise?

23               **MR. WISE:**  Thank you, Your Honor.

24          So I'll start with, I guess, the first thing Mr. Bolden

25     said.  You know, he really doesn't understand how the U.S.

1    Attorney's Office works.  Makes a big deal out of the fact
2    that I am -- have a collateral responsibility, and that's how
3    they're described in our office, also the chief of our
4    section.  My position is Assistant United States Attorney,
5    that's what we're -- that's our actual position.
6        And I'll share, you know, a little bit of personal
7    information.  When I became chief -- this is how important the
8    role is -- my salary went up by zero.  That's how much --
9    that's how significant this is.  And, you know, we have a lot
10   of titles in the U.S. Attorney's Office.  Mr. Delaney is the
11   deputy chief.  Mr. Zelinsky is the deputy chief of the
12   national security section and cyber crime counsel.
13   Mr. Delaney is also the COVID-19 fraud coordinator.  I think
14   I'm also the office of international affairs coordinator.  I
15   think I've been the district election officer, so we're
16   frontline prosecutors.  That's our day job.
17       You know, I have people that I work with in my section
18   that have been -- and I've been doing this for 17 years, but
19   who have been doing it for decades longer than I have.  I
20   wish, you know, that I could say that what I said carried more
21   weight than others, but it really doesn't, and that was a lot
22   of, sort of, overblown rhetoric about a collateral
23   responsibility that doesn't even pay any more.
24       You know, I wrote down -- I tried to follow some of the
25   oral argument for Mr. Bolden and I found it difficult at

times.  You know, I think one of the things where they're really -- the sand is really shifting underneath them each time they try to explain it is this assertion that the Defendant has to testify in the Grand Jury.  She didn't.  He played word games.  He danced around it.  He's still dancing around it.  And in their reply, we actually go to what they filed.  They concede that they never asked, actually asked for her to testify.

On page 29 they say, during the September 10th, DOJ taxpayer conference -- again, this is the meeting where they keep saying -- they keep saying we didn't meet with them, and then, of course, we met with them at this meeting.  They write, Counsel for State's Attorney Mosby raised the possibility -- raised the possibility of her appearing before the Grand Jury if she were granted so-called Queen-For-A-Day Immunity.

So the best they can do is they say they raised the possibility if we were willing to immunize her.  Now, keep in mind, the whole point of this motion is that this entire case is made up.  It's all of my animus and vindictiveness and bile, so there is nothing -- no one has done anything wrong, but they're asking for immunity.  And, you know, this exchange is a perfect example of how -- I'm trying to think of the right word.  How they played this issue, right?  Because you would think if they wanted her to testify, they would have

1    sent us a letter and said, the Defendant wants to testify,

2    tell us a date, tell us whether she will and give us a date.

3    Instead, the best they can do is point to this verbal

4    statement that he made at the end of the taxpayer conference.

5    It's not recorded anywhere.

6          My recollection is he said she'd like to proffer, in

7    other words, sit for an interview and would you give her a

8    Queen For A Day?  And then she's also considering whether she

9    would ask to testify in the Grand Jury, and that's about as

10   far as it ever went.

11         And then, this is another thing they say in the reply.

12   "It is common for criminal Defendants and their counsel to use

13   hypothetical or conditional language when speaking with the

14   Government."  So whether she wants to testify it was not a

15   hypothetical.  If she wanted to testify, they should have

16   asked and been clear about it.  And again, the black letter

17   law is that a Defendant does not have a right to testify, they

18   almost never do.  I've had them ask and it's not like this.

19   It's not as a hypothetical, we'll raise the possibility.  You

20   get an e-mail or a letter that's clear and unambiguous, but

21   there is no right to, and therefore they can't -- they can't

22   argue there is animus from something she didn't have a right

23   to do.  It's just -- it doesn't make any sense.

24         The other point that he made, I think, when he got back

25   up was, again, that -- you know, he keeps saying we violated

1    the justice manual.  No, we didn't.  He doesn't understand the

2    justice manual.  We didn't say we don't follow it.  We said if

3    you actually look at what it says, it says it's internal

4    guidance for the department.  It's not interpreted by Courts,

5    and that's why it is so susceptible to misrepresentation by

6    Defense lawyers.  And as Mr. Bolden has done, we follow the

7    DOJ manual, the justice manual scrupulously.  There was no --

8    they have no evidence that exculpatory information was not

9    presented to the Grand Jury.

10          You know, they talk about one witness, this Mr. Carlton

11   Sanders, who testified about an $11,000 check in 2018, right?

12   That's what they claim is exculpatory information as to

13   COVID-19 perjury charges in 2020 and mortgage fraud charges in

14   2020 and 2021.  It just doesn't make any sense.  He can stand

15   here and say exculpatory, exculpatory, exculpatory as many

16   times as he wants.  It's total nonsense.  And they haven't

17   carried their burden to show that information wasn't presented

18   to the Grand Jury, they have no way of knowing.  This one

19   witness has no way of knowing.  And that's how our system is

20   designed.

21          One of the astonishing things about this whole argument

22   is the idea that it was an adversarial process or a

23   collaborative process.  It's not.  Pre-indictment, it's a

24   one-way street.  And I've sat in meetings, just like the

25   taxpayer conference, and Defense attorneys come and they say,

1    we've done our own investigation.  We're going to convince you

2    why you shouldn't indict our client.  I've sat in plenty of

3    those meetings.  We don't make disclosure ahead of them the

4    way Ms. Bolden kept demanding and insisting and sort of nasty

5    e-mail and nasty letter, one after another.

6         They come in, they do their job, and they say, here is

7    what we anticipating you're looking at, because they know we

8    can't tell them because of 6(c).  And, you know, early on we

9    tried to engage with them, right, and this was weaponized

10   against us to this day.

11        They said, we can't imagine what any tax charges would be

12   when they got notice that there was a tax investigation.  So

13   we said, look, the bar counsel has raised a whole series of

14   questions about your client's taxes, right?  We can't tell you

15   what the Grand Jury is looking at.  That's black letter law.

16   But as a good faith way to try to engage with them we said,

17   look at what the bar counsel is looking at.  It's not a

18   complicated issue.  It's an individual tax return.  You know,

19   there is questions that can be raised about income.  There is

20   questions that can be raised about deductions, questions that

21   can be raised about credits.  Those are sort of the three

22   things you ever find on a personal income tax, and the bar

23   counsel had raised very specific questions.

24        So we did that in a good faith response -- as a good

25   faith response to them saying, we don't know what's going on.

1    And then they've taken that ever since to say -- and this is

2    literally what they say -- that I'm in a conspiracy with the

3    bar counsel to destroy the Defendant.  That's what our attempt

4    to engage with them was met with.

5        But when we got to the taxpayer conference, there was no

6    exculpatory information presented.  It was, tell us things you

7    can't tell us and then it was calling us names, this time in

8    front of -- me and Mr. Schenning, this time in front of the

9    lawyers for the tax division.  That was -- that was what we

10   got out of that meeting.

11       I've never had multiple meetings with Defendants

12   pre-indictment.  They kept insisting we had to have multiple

13   meetings.  We met.  We listened.  It wasn't particularly

14   productive.  It certainly doesn't show any animus, and this

15   whole story, this is where I just get lost in it.  You know,

16   as if I'm the only one that makes the decision to meet with

17   Defendants when you ask the U.S. Attorney or the U.S.

18   Attorney's Office.  He says it's all me, but then there is

19   nine lawyers present.  He says we're not there, but then we

20   are.

21       I got lost somewhere in this story, to use his word.  And

22   he's never established that I was the one that decided we

23   wouldn't meet with them more than one time.  He's never

24   established that they actually asked for her to testify in the

25   Grand Jury because he can't.  He keeps saying they didn't.  We

1    never got to a decision point on that.  He's never established

2    that exculpatory information wasn't presented by me as some

3    show of animus by me.

4        One of the stranger arguments is they keep saying the

5    fact that we, they think, considered certain charges and

6    didn't bring them is evidence of animus.  They've got it

7    backwards.  That shows there was a thoughtful deliberative

8    process.  You know, they say how do we know, you know, certain

9    things and they fault us for doing a thorough investigation,

10   that we had subpoenaed, you know, a hairdresser.  Well, the

11   way the FBI does a financial investigation is, they look at

12   someone's bank accounts, they look at their credit accounts,

13   and if they can't identify what a payment is for, they send a

14   subpoena.

15       So if they see a name, and it turns out to be a

16   hairdresser, the way you learn that is to actually

17   investigate.  But they try to use that against us as if that

18   somehow shows bad faith that the FBI did a thorough

19   investigation.  That's how we know that the Defendant didn't

20   suffer any financial hardship, because we've seen the outflows

21   into her accounts and the in-flows, and they don't support

22   what she told the plan administrator and what she swore was

23   true.

24       So that's what got us to this place, not this victim

25   fantasy that they've constructed that everybody is out to get

1    the Defendant:  The bar counsel, the city IG, me,

2    Mr. Schenning, now Mr. Barron.  It's all just an attempt to

3    deflect from the Defendant's own conduct and delegitimize

4    anyone who has the temerity to question her behavior, and this

5    is a play that politicians do.

6         You know, Mr. Zelinsky was on the special counsel's

7    staff, so he experienced it on a national level.  It's just

8    like what Trump did, right?  He was one of the 12 angry

9    Democrats, and what did he focus on?  Well, people gave

10   campaign contributions.  Sound familiar?  And it was a witch

11   hunt.  Witch hunt, witch hunt, witch hunt, that's what the

12   politicians always say.

13        I experienced that on a much smaller scale here in

14   Baltimore when we prosecuted the mayor.  The mayor said it was

15   a witch hunt until she pled guilty.  It's just another play.

16   And I get that.  I get that.  And I know that's a hazard of

17   this job, but they certainly have not established -- they're

18   not within a mile of anything that could be vindictive or

19   selective prosecution.

20        Unless Your Honor has any further questions, I'll stop.

21             **THE COURT:**  Thank you so much, Mr. Wise.

22             **MR. WISE:**  Thank you.

23             **THE COURT:**  The Court has indulged both sides in

24   allowing you --

25             **MR. BOLDEN:**  Excuse me, Your Honor.  May I --

1          **THE COURT:**  Just a moment, Mr. Bolden.  Let the

2     Court speak.

3          The Court has indulged both sides in allowing you to go

4     beyond the time allocations as we began our conversation.

5     We're now up to the last round.  I'd like to only have brief

6     remarks, unless there is something really urgent.

7          The Court has carefully heard the points that the parties

8     wish to make with the Court.  The last round is -- I think

9     it's ten minutes.  If you can keep it even shorter than that,

10    quite frankly, I think that's appropriate given the amount of

11    time that the Court has allowed each side to go over.

12         With that, Mr. Bolden, you're welcome to come to the

13    podium and ask your question.

14         **MR. BOLDEN:**  Just very briefly, Your Honor, the

15    Grand Jury piece that Mr. Wise brought up is just misleading.

16    After the COJ [sic] taxpayer conference meeting, we certainly

17    did raise it like that, in that context, right?  But if you

18    look at -- excuse me one second, Your Honor.

19         If you look at --

20         **THE COURT:**  Mr. Bolden, don't talk until you come to

21    the podium.

22         **MR. BOLDEN:**  I'm sorry.

23         **THE COURT:**  We can't hear you.

24         **MR. BOLDEN:**  I'm sorry.  I got ahead of my brain.

25         If you look at Exhibits I, J, L, O, and P, including, as

 1    I said, two days before the indictment dropped and the e-mail

 2    that we cited that came from the Government, they acknowledge,

 3    in that e-mail that I was asking for a Grand Jury appearance.

 4    And we wrote letters with no condition whatsoever, that we

 5    wanted to put her in the Grand Jury.

 6        As I said before, we can't do it by ourselves, and they

 7    ignored all of those requests.  Animus.  They ignored every

 8    one of those requests.  And you can look at the Exhibits, I,

 9    J, L, O, and P.  It's all in the papers.  And again, Mr. Wise

10    can make whatever arguments he wants to make.  The Government

11    is clear to do that, but the reason we don't know about

12    whether any exculpatory information has been put into the

13    Grand Jury, other than for Carlton, was because the Government

14    hasn't said so, and they still haven't said whether they put

15    exculpatory information in the Grand Jury, and the DOJ

16    manual's got to matter to somebody.

17        Same thing with the Grand Jury.  If you concede all in

18    writing, it's kind of hard to get around that part, even if

19    you don't accept the political donations and some of the other

20    stuff, the exculpatory information that we still don't know

21    what was put in that we gave them blindly or the Grand Jury

22    piece.  You can't get around that.  That was in writing to

23    them.  There were no conditions.  The first letter or the

24    first interaction after the taxpayer conference was that, but

25    it quickly moved on beyond that.

```
1          So I have nothing further, Your Honor.  We stand behind
2     our papers and the motion, all three.
3          THE COURT:  Thank you so much, Counsel.  Court
4     appreciates your brevity.
5          Mr. Wise, anything further from the Government?
6          MR. WISE:  Just briefly, Your Honor.  I mean, I keep
7     coming back to, you know, what Mr. Bolden wrote.  And this
8     is -- he said -- he rattled off a number of exhibits.  So this
9     is Exhibit L.  This is his quite nasty e-mail back to
10    Mr. Schenning, on October 28th of 2021, he writes, "Also
11    whether to seek MM going into the Grand Jury is the Defense
12    call" --  the Defense call.  "Not the prosecution call re our
13    Defense strategy.  Doubt as you will, but her appearance
14    should be considered a real possibility."
15         Again, a possibility.  That's as far as they ever got and
16    there is nothing beyond that.  So he can say it as many times
17    as he wants.  He can rattle off exhibit numbers, but again,
18    when you look at the actual facts, it doesn't support what
19    they're saying.
20         Thank you, Your Honor.
21         THE COURT:  Thank you, so much, Mr. Wise.
22         And thank you again to both counsel for your helpful
23    arguments today, as well as the papers that have been
24    submitted to the Court in connection with the Defense's three
25    motions.
```

1      The Court is prepared today to rule on all three of those

2   motions orally if there is no objection from the parties.  The

3   Court's practice is to follow up an oral ruling with a written

4   opinion which more fully lays out the Court's rational and has

5   all of the citations, et cetera, and the Court would do that

6   as promptly as possible after we adjourn today so you would

7   have that as well.  But if there is no objection from the

8   parties, the Court is happy to rule orally so that counsel

9   knows where we are in this case and will just ask formally,

10   any objection from the Government to an oral ruling?

11          **MR. WISE:**  None whatsoever, Your Honor.

12          **THE COURT:**  Mr. Bolden, any objection to an oral

13   ruling?

14          **MR. BOLDEN:**  No, Your Honor.

15          **THE COURT:**  Okay.  And again, that will be followed

16   with a full written opinion.  So this is a brief but hopefully

17   helpful outline of where the Court is going on these issues.

18   The Court will issue its oral ruling now.  With the parties'

19   indulgence, the Court is going to read quite a bit, so make

20   sure it's accurate.

21      The Defendant in this case has moved for a Bill of

22   Particulars to dismiss the superseding indictment in this

23   matter and to disqualify Assistant United States Attorney Leo

24   Wise from further participation in this case.  Both parties

25   have also moved to exceed the page limitations under the

1    Court's local rules, so the Court will briefly address that

2    motion as well.  And for the reasons that Court will state,

3    the Court will deny the Defendant's motion for a Bill of

4    Particulars without prejudice, and we'll talk about the

5    reasons why shortly, will deny the Defendant's motion to

6    dismiss, will deny the Defendant's motion to disqualify AUSA

7    Wise, and will grant both parties' motion to exceed the page

8    limitations.

9         The Court would like to start with the motion for a Bill

10   of Particulars.  We didn't spend much time on that today, but

11   there are substantial papers before the Court about that

12   motion.  The Court understands the Defense to raise four areas

13   that it is seeking particulars from the Government.  Briefly

14   they involve how the Defendant falsely stated that she was

15   experiencing adverse financial consequences stemming from the

16   COVID-19 pandemic; secondly, how the Defendant knowingly made

17   false statements about a tax lien on her property in

18   connection with her mortgage application for her homes in

19   Kissimmee and Longboat Key, Florida; thirdly, how Defendant's

20   signing of a second home rider for a Kissimmee, Florida home

21   was also false;

22        And lastly, how Defendant did not intend to, quote,

23   maintain exclusive control over the ownership of the, end

24   quote, Kissimmee, Florida property.

25        As a reminder, in terms of the legal standard the Court

1    applies to the Defense's motion under Rule 7(f), a Bill of

2    Particulars is appropriate when an indictment fails to

3    adequately inform a Defendant of the charges against her.

4        On the other hand, the Supreme Court has held that an

5    indictment is sufficient if it first contains the elements of

6    the offense charged and fairly informs the Defendant of the

7    charges against which she must defend and secondly, enables a

8    Defendant to plead an acquittal or conviction and bar a future

9    prosecution for the same offense.

10       Looking at the superseding indictment here, the Court is

11   satisfied that it meets that standard.  In fact, a superseding

12   indictment is quite detailed, and we've talked a little bit

13   about that today.  There is no dispute that the superseding

14   indictment references the applicable statutes that relate to

15   the offenses in this case and lays out the nature of those

16   offenses.  The superseding indictment also, in the Court's

17   view, contains the essential facts that would be necessary for

18   the Defense to proceed in this case.

19       In particular, the superseding indictment contains detail

20   about how Defendant is alleged to have falsely stated that she

21   experienced adverse financial consequences stemming from the

22   COVID-19 pandemic.  In this regard, there is a screenshot in

23   the superseding indictment that points to the withdraw request

24   at issue in this case and identifies the specific statements

25   that the Government alleges to be false.

        The superseding indictment also identifies the tax lien

 1

that's at issue in this matter and alleges that this tax lien

 2

was placed on Defendant's property on March 3rd of 2021 --

 3

2020 -- pardon me -- further alleges that Defendant received

 4

notice of the filing of the tax lien in March of 2020.

 5

        In addition, the superseding indictment alleges that

 6

Defendant knowingly made false statements by failing to

 7

disclose this tax lien when she signed certain mortgage

 8

applications in 2020 and 2021.  And those mortgage

 9

applications are also identified in the superseding

10

indictment.

11

        In addition, the superseding indictment provides

12

particulars of the Government's false statement charges

13

related to the second home rider -- we talked about that a bit

14

today -- and alleges in Count 2 that Defendant executed an

15

agreement with the vacation home management company in August

16

of 2020 to give the company control over her Kissimmee,

17

Florida property, and that the Defendant executed a second

18

home rider in September of 2020 in which she agreed not to,

19

quote, give a management firm or any other person or entity

20

any control over the occupancy or use, end quote, of this

21

property.  There is also detail in the superseding indictment

22

regarding whether the Defendant intended to maintain exclusive

23

control over the Kissimmee, Florida, property.

24

        Again, in Count 2, the indictment alleges that the

25

1    Defendant agreed to provide a vacation home management company

2    with "Control over this rental property."

3        The Court's also aware that the Government has disclosed

4    additional information to the Defense to date, which also

5    provides additional information related to the charges in this

6    case.  And so given that, the Court just doesn't see a legal

7    basis for granting the Defense's motion for a Bill of

8    Particulars.

9        The Court asked Mr. Bolden about the discovery today

10   because in prior discussions we've talked about -- at least

11   the Court's understanding of the voluminous nature, perhaps,

12   of the information provided by the Government to the Defense.

13   And the Court is sensitive to the challenges that poses in

14   terms of preparation for trial.

15       What the Court would propose at this point is that the

16   parties consult and invite Mr. Bolden to communicate to

17   counsel exactly what you're looking for in terms of

18   information and have been unable to find through a reasonable

19   search and see if we can make some progress.  And so the Court

20   is going to deny the Defense's motion without prejudice.

21       If that process is not successful, Mr. Bolden, you're

22   invited to come back and renew your motion if it would be

23   appropriate in this context to assist the Defense in preparing

24   for trial.  And so, again, the Court would deny the Defense's

25   motion for a Bill of Particulars without prejudice with those

1    instructions to the parties.

2        Turning to the Defense's motion to dismiss -- and we've

3    spent most of our time today on that motion -- the Court will

4    deny that motion.  And the concern that the Court has is that

5    the Defense has not shown with objective evidence that the

6    prosecutors in this case, and in particular, AUSA Wise has

7    acted with any personal animus against the Defendant, nor have

8    they shown that this case would not have been brought but for

9    that animus.

10        In addition, the Defense has not shown that a

11    similarly-situated individual of a different race than

12    Defendant's would have been prosecuted for the similar

13    offenses.  And the Court understands the law to require that

14    showing in connection with the selective prosecution claim.

15    The rules that the Court applies here to establish a

16    vindictive prosecution, the Defense must show, through

17    objective evidence, that AUSA Wise acted with genuine animus

18    towards the Defendant.  And they must also show that the

19    Defendant would not have been prosecuted but for that animus.

20        In other words, the vindictive prosecution doctrine bars

21    a prosecutor from punishing a criminal Defendant for

22    exercising a clearly established right that intercedes to

23    prevent the Government from punishing a Defendant for doing

24    what the law plainly allows her to do.

25        To flesh this out, the Fourth Circuit has advised that a

1    presumption of vindictiveness, which is what, I believe, we

2    are talking about here, typically arise where a Defendant

3    successfully appeals a criminal conviction which requires a

4    retrial, and to be re-prosecuted by the prosecutor.

5        And so in this case, the Defense must show that the

6    circumstances here pose a realistic likelihood of

7    vindictiveness to establish vindictive prosecution.  As we

8    discussed earlier today, the Defense argues that the Court

9    should dismiss this case because AUSA Wise harbors a personal

10   animus towards the Defendant which has influenced the

11   investigation and prosecution of this case.  Mr. Bolden and

12   the Defense have identified a number of factual allegations to

13   support that.  The Court is going to briefly summarize them.

14   They are more fleshed out in the papers.

15       They include that AUSA Wise falsely accused the Defendant

16   of leaking the existence of a federal criminal investigation.

17   That AUSA Wise made political contributions to Defendant's

18   political opponents.  We've confirmed this occurred in 2018.

19   That bar counsel for Maryland -- the Maryland Attorney

20   Grievance Commission improperly referred a tax investigation

21   of the Defendant to the United States Attorney's Office for

22   the District of Maryland.  That FBI agents assigned to

23   investigate this matter "Disrupted a Baltimore City Council

24   meeting to speak with the Defendant's husband, Baltimore City

25   Council President, Nick Mosby."

 1          That FBI agents also served subpoenas on the Defendant's

 2     hairdresser, and her children's dance instructor during a

 3     church service.  That AUSA Wise initially contemplated

 4     bringing criminal tax charges against the Defendant, but

 5     elected not to do so.

 6          That AUSA Wise declined to present exculpatory evidence

 7     before the Grand Jury, and this evidence is pointed to come

 8     from the Defendant's former campaign treasurer.  We discussed

 9     him as well today.

10          That AUSA Wise refused meetings to meet with Defense

11     Counsel.  That AUSA Wise refused to allow Defendant to testify

12     before the Grand Jury.  That the indictment in this case was

13     timed to interfere with the Defendant's political campaign.

14     And also allegations regarding remarks by United States

15     Attorney Erek Barron regarding the Defendant, "Style and

16     approach to work."

17          And lastly, the Defense argues that AUSA Wise has

18     previously been shown to have racial animus in certain

19     investigations or prosecutions of black officials.  The

20     Government, of course, refutes all of these allegations, and

21     the Court will just say as following.  For the purposes of

22     this motion only, the Court will accept the allegations from

23     the Defense as true, because they do not meet the legal

24     standards required to show vindictive or selective

25     prosecution.  Most of the allegations can largely be

1    characterized as objections or differences of opinion as to

2    how the Government has conducted the investigation and

3    prosecution of this case to date.

4         For example, the Defense questions the Government's

5    decisions not to pursue certain charges in this case.  Not to

6    allow the Defendant to testify before the Grand Jury or to

7    grant the Defendant immunity.  Not to meet and confer with

8    counsel.  The Defense also questions the manner in which the

9    Government investigators have served subpoenas, conducted

10   witness interviews, as well as the manner in which prosecutors

11   determine what evidence to put before the Grand Jury.  Such

12   decisions fall well within the broad discretion that

13   prosecutors have in investigating any criminal matter, and

14   there is clear case law on that point which guides the Court.

15        The Defense has also not shown how comments raised and

16   attributed to United States Attorney Barron have any relevance

17   to this investigation or prosecution of this case.  As

18   Mr. Wise has explained, the investigation predated

19   Mr. Barron's presence in office, and also appears to have

20   covered several different United States Attorneys since its

21   origin, nor does the Defense identify any evidence to show

22   that the charges in this case have been brought because of the

23   Defendant's race, which is something that is relevant as the

24   Court understands the selective prosecution claim.

25        AUSA Wise's acknowledged campaign contribution in 2018

1    also does not show personal animus towards the Defendant that

2    would appear to have any impact on the investigation or

3    prosecution of this case.  And because the Defense has neither

4    shown that AUSA Wise has acted with personal animus towards

5    the Defendant, nor that the Government would not have

6    prosecuted this case but for such animus -- again, both must

7    be shown -- the Court will deny the Defense's motion to

8    dismiss upon the basis of vindictive prosecution.

9        For many of the same reasons, the Defense's argument that

10   the indictment should be dismissed for selective prosecution

11   is problematic.  To make this showing, the Defense must

12   establish that both similarly-situated individuals of a

13   different race were not prosecuted, and that the decision to

14   prosecute here was invidious or in bad faith.  A Defendant

15   neither argues nor shows that similarly-situated individuals

16   of a different race than her own were not prosecuted for

17   similar offenses in these proceedings, and so the first step

18   is simply not met.  And there is no evidence before the Court

19   that the prosecution in this case was undertaken in bad faith.

20   And, in fact, the Court is required to presume otherwise

21   absent such evidence.  And so the Court will also deny the

22   Defendant's motion to dismiss upon the grounds of selective

23   prosecution.

24       Lastly, the Court will turn to the alternative relief

25   requested by the Defense, which is to disqualify AUSA Wise

from further participation in this case.  Motions to
disqualify counsel are permitted only where the conflict is
such as to clearly call into question the fair and efficient
administration of justice.  That standard has not been met.
Such circumstances have not been demonstrated to be present in
this case.

As the Court stated previously, the Defense has not shown
that AUSA Wise harbored any personal animus toward the
Defendant that could have motivated the investigation or
prosecution of this case.

The Defense has also not shown that AUSA Wise violated
the Maryland Rules of Professional Conduct in connection with
his involvement in the investigation and prosecution of the
case to date, nor is there any evidence before the Court to
show that AUSA Wise has violated the Department of Justice's
manual during the investigation of this case by either
declining to allow the Defendant to testify before a Grand
Jury or failing to disclose certain exculpatory information
before the Grand Jury.

In addition, the Defense has not identified an actual
conflict of interest in these proceedings that would require
AUSA Wise to recuse from further involvement in this case.
And so for all of those reasons, the Court must also deny the
Defense's motion to disqualify AUSA Wise from these
proceedings.

1           And so to summarize again, the Court will deny the

2    Defendant's motion for a Bill of Particulars without prejudice

3    with the instructions for further consultation among counsel.

4    The Court will deny the Defendant's motion to dismiss the

5    superseding indictment.  The Court will also deny the

6    Defendant's motion to disqualify AUSA Wise.  And lastly, the

7    Court will grant both parties' request to exceed the page

8    limitations in connection with their filings.

9            That concludes the Court's oral ruling on the pending

10   motions.  As previously stated, a written order with much more

11   detail will be provided and forthcoming shortly.

12           At this time, the Court will ask if counsel has any

13   initial questions on the ruling and then we'll talk about

14   where we go from here.

15           Mr. Wise, any questions from the Government at this

16   point?

17                **MR. WISE:**  No, Your Honor.  Thank you.

18                **THE COURT:**  Mr. Bolden, any questions from the

19   Defense?

20                **MR. BOLDEN:**  No, Your Honor.

21                **THE COURT:**  Very well.  The Court had hoped we could

22   also make some progress today since we will be proceeding to

23   prepare for trial with scheduling.

24           Are the parties prepared to talk about scheduling?  And

25   I'll start again with Mr. Wise.

1    Is the Government prepared to talk about further

2    scheduling issues with regard to pretrial proceedings?

3         **MR. WISE:**  Your Honor, Mr. Qureshi and Mr. Delaney

4    talked earlier --

5         **THE COURT:**  Can you come to the podium, Mr. Wise, to

6    make sure we can all hear you and we can transcribe correctly

7    what's being said.

8         **MR. WISE:**  Happy to.

9    I think Mr. Qureshi and Mr. Delaney spoke earlier and

10   proposed some dates that, I think, Mr. Qureshi was going to

11   take back to their team and that Mr. Delaney was going to

12   discuss with Mr. Zelinsky and I about a schedule for expert

13   disclosures, the motions in limine, and responses to those and

14   any other briefing that might be necessary.

15   So we should be in a position to propose a schedule, I

16   think, to the Court shortly once, I think, both sides have had

17   a chance to see what Mr. Delaney and Mr. Qureshi have talked

18   about.

19        **THE COURT:**  Thank you very much, Mr. Wise.

20   Mr. Bolden or Mr. Qureshi, do you want to come up and

21   confirm or state the Defense's view on where we are in terms

22   of scheduling?

23        **MR. QURESHI:**  Good afternoon, Your Honor.  Rizwan

24   Qureshi --

25        **THE COURT:**  Good afternoon.

1          **MR. QURESHI:**  --  on behalf Ms. Mosby.

2      Mr. Wise is correct.  Mr. Delaney and I, at the Court's

3   direction, had an opportunity to confer, but it was at an hour

4   when we were unable to confer with our respective teams.  And

5   just for the Court's indulgence, we had discussed

6   preliminarily deadlines for expert disclosures.  As you may

7   recall, it was an issue of dispute earlier on in this case, as

8   well as related motions in limine, the briefing schedule

9   related to that all leading up to Your Honor's established

10   dates for jury selection, as well as the trial date.

11      So as Mr. Wise has indicated, we'll confer further and

12   anticipate in the coming days to propose a joint consent

13   scheduling order.

14          **THE COURT:**  Thank you so much, Mr. Qureshi.

15          **MR. QURESHI:**  Thank you.

16          **THE COURT:**  So what the Court is hearing is that

17   there is good conversation happening.  It, perhaps, would be

18   helpful to let those conversations continue and then have the

19   parties file a joint status report with the Court with

20   agreed-upon dates.  That seems like a good plan for the Court.

21   Is that -- heads are nodding.  Can someone just verbally

22   confirm that for the record?

23          **MR. WISE:**  Yes, Your Honor.  We think that's a good

24   idea.

25          **MR. BOLDEN:**  Yes, Your Honor.

1        **THE COURT:**   Okay.  Excellent.

2        That is all the Court had on its agenda for today in

3    terms of what we needed to address and resolve.  It's been

4    quite a long afternoon.

5        Again, the Court wants to thank and commend counsel from

6    both sides for their excellent oral presentations today, as

7    well as the high quality of the written submissions in

8    assisting the Court in resolving the pending pretrial motions.

9        As the Court indicated, a written order will be

10    forthcoming shortly.  The Court looks forward to hearing from

11    the parties about our schedule going forward.  The Court is

12    anxious to get a full schedule into place and looks forward

13    to, of course, being available to the parties should we need

14    to address other issues as we proceed.

15        If there is nothing else to discuss today, then the Court

16    suggests we adjourn for the afternoon.  The Court will wish

17    everyone a Happy Passover and Happy Easter, if you celebrate.

18    I look forward to seeing you in the near future.

19        We are adjourned.

20        **THE CLERK:**   All rise.  This Honorable Court now

21    stands in adjournment.

22        (Proceedings concluded 4:13 p.m.)

23

24

25

1

2

3          I, Melissa L. Clark, RPR, do hereby certify that

4     the foregoing is a correct transcript from the stenographic

5     record of proceedings in the above-entitled matter.

6

7                    _____/s/_____
                              Melissa L. Clark
8                         Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$100** [2] - 49:23, 52:8
**$11,000** [1] - 73:11
**$12,000** [1] - 26:22
**$150,000** [1] - 25:25
**$200** [4] - 14:18, 50:9, 57:22
**$428,000** [1] - 43:12
**$490,000** [1] - 43:11
**$5,000** [1] - 24:24

**/**

**/s** [1] - 96:7

**1**

**1** [1] - 9:11
**10,000** [1] - 13:12
**100** [1] - 25:24
**101** [1] - 1:24
**10th** [1] - 71:9
**12** [1] - 77:8
**12(b** [3] - 6:18, 6:22, 7:19
**12(b)** [1] - 5:24
**12(b)(3)** [1] - 35:2
**14** [1] - 1:9
**15** [2] - 3:20, 38:25
**15th** [1] - 24:1
**16th** [1] - 39:23
**17** [2] - 40:20, 70:18
**17-minute** [1] - 45:5
**1746** [1] - 43:8

**2**

**2** [2] - 84:15, 84:25
**20** [3] - 3:11, 3:19, 67:14
**2017** [2] - 46:20, 49:20
**2018** [17] - 9:12, 13:8, 14:13, 16:2, 16:3, 16:10, 16:25, 35:20, 46:22, 49:20, 49:21, 50:19, 50:21, 51:3, 73:11, 87:18, 89:25
**2019** [1] - 42:18
**2020** [16] - 22:9, 22:11, 23:23, 23:24, 24:10, 24:22, 25:10, 42:18, 54:4, 73:13, 73:14, 84:4, 84:5, 84:9, 84:17, 84:19
**2021** [4] - 73:14, 80:10, 84:3, 84:9
**2022** [4] - 1:9, 16:4, 38:2, 39:23
**21201** [1] - 1:24

**250,000** [1] - 25:24
**27** [1] - 13:18
**28** [1] - 43:8
**28th** [1] - 80:10
**29** [1] - 71:9

**3**

**3** [1] - 17:19
**35-year** [1] - 6:4
**3rd** [1] - 84:3

**4**

**4** [1] - 39:7
**40** [3] - 13:19, 25:24
**401(k** [2] - 42:23, 43:1
**410-962-4474** [1] - 1:25
**457(b** [6] - 9:1, 9:4, 42:13, 42:22, 43:1, 59:18
**457(b)** [1] - 59:20
**4:13** [1] - 95:22
**4th** [2] - 1:24, 3:16

**5**

**59** [1] - 11:22
**5th** [2] - 9:12, 13:8

**6**

**6(c** [1] - 40:25
**6(c)** [1] - 74:8
**6(e** [2] - 18:6, 18:7

**7**

**7(f** [1] - 83:1
**7C** [1] - 68:1

**8**

**8** [1] - 51:7

**9**

**9** [1] - 51:8
**9-11.233** [1] - 26:11

**A**

**Aaron** [2] - 1:12, 2:8
**ABA** [1] - 6:9
**abandoned** [1] - 45:19
**ability** [1] - 32:2
**able** [1] - 8:23
**above-entitled** [1] - 96:5

**absent** [1] - 90:21
**absolutely** [2] - 50:3, 51:18
**abusing** [1] - 43:5
**accept** [5] - 12:13, 34:22, 79:19, 88:22
**accommodating** [1] - 5:7
**according** [1] - 46:5
**account** [1] - 42:24
**accounts** [3] - 76:12, 76:21
**accurate** [4] - 49:1, 59:7, 64:19, 81:20
**accusation** [1] - 12:20
**accused** [5] - 7:10, 7:11, 8:25, 40:12, 87:15
**acknowledge** [3] - 28:9, 39:1, 79:2
**acknowledged** [1] - 89:25
**acquittal** [1] - 83:8
**Act** [4] - 9:1, 42:3, 42:13, 59:14
**acted** [4] - 41:21, 86:7, 86:17, 90:4
**acting** [1] - 12:1
**actual** [5] - 38:11, 49:9, 70:5, 80:18, 91:20
**adage** [1] - 37:7
**addition** [4] - 84:6, 84:12, 86:10, 91:20
**additional** [5] - 48:24, 63:7, 66:3, 85:4, 85:5
**address** [8] - 14:11, 38:14, 46:2, 54:5, 67:1, 82:1, 95:3, 95:14
**addressed** [1] - 41:23
**addresses** [2] - 41:18, 47:16
**adds** [1] - 61:2
**adequately** [1] - 83:3
**adhere** [2] - 4:24, 54:25
**adjourn** [2] - 81:6, 95:16
**adjourned** [1] - 95:19
**adjournment** [1] - 95:21
**administration** [1] - 91:4
**administrations** [1] - 50:14
**administrator** [2] - 67:10, 76:22
**administrators** [1] -

42:13
**admitted** [2] - 44:22, 45:7
**advance** [1] - 40:21
**advantage** [1] - 42:3
**adversarial** [1] - 73:22
**adverse** [4] - 42:7, 63:20, 82:15, 83:21
**adversely** [1] - 63:25
**advised** [1] - 86:25
**affairs** [1] - 70:14
**affect** [2] - 14:18, 50:8
**affected** [3] - 63:25, 64:2, 64:4
**affidavit** [5] - 6:3, 26:24, 27:14, 31:23, 32:6
**African** [1] - 36:21
**African-American** [1] - 36:21
**afternoon** [7] - 2:2, 2:10, 2:18, 93:23, 93:25, 95:4, 95:16
**age** [1] - 35:9
**agenda** [2] - 33:14, 95:2
**agents** [3] - 2:14, 87:22, 88:1
**ago** [4] - 19:5, 37:18, 39:20, 46:22
**agree** [5] - 12:21, 35:16, 59:22, 66:1, 68:10
**agreed** [3] - 84:19, 85:1, 94:20
**agreed-upon** [1] - 94:20
**agreement** [11] - 44:22, 61:3, 61:12, 61:13, 61:17, 61:18, 61:19, 62:19, 63:1, 84:16
**ahead** [12] - 11:11, 11:21, 11:23, 15:6, 16:20, 17:8, 29:11, 48:25, 51:11, 55:6, 74:3, 78:24
**aid** [2] - 3:15, 4:21
**aided** [1] - 67:6
**air** [1] - 36:10
**allegation** [5] - 13:23, 20:16, 24:5, 32:8, 44:16
**allegations** [15] - 6:4, 6:7, 25:18, 25:19, 34:21, 37:17, 37:19, 48:5, 57:5, 58:21, 87:12, 88:14, 88:20, 88:22, 88:25
**allege** [1] - 69:3

**alleged** [7] - 5:17, 8:20, 9:5, 23:8, 39:14, 69:6, 83:20
**allegedly** [2] - 12:4, 39:5
**alleges** [9] - 67:12, 69:2, 69:5, 83:25, 84:2, 84:4, 84:6, 84:15, 84:25
**alleging** [2] - 20:15, 32:10
**allocations** [3] - 3:17, 3:19, 78:4
**allotments** [1] - 4:24
**allow** [5] - 27:12, 56:25, 88:11, 89:6, 91:17
**allowed** [1] - 78:11
**allowing** [3] - 5:5, 77:24, 78:3
**allows** [1] - 86:24
**almost** [2] - 39:24, 72:18
**alone** [2] - 30:7, 33:11
**altercation** [5] - 13:4, 13:16, 15:14, 15:18, 46:8
**alternative** [1] - 90:24
**Amendment** [1] - 14:20
**America** [3] - 2:6, 29:19, 57:1
**AMERICA** [1] - 1:3
**American** [1] - 36:21
**amount** [4] - 14:19, 42:19, 78:10
**amounts** [1] - 69:10
**analyze** [1] - 34:23
**angry** [1] - 77:8
**angst** [1] - 24:24
**animus** [63] - 5:21, 7:22, 10:11, 10:18, 10:19, 11:7, 11:14, 13:1, 13:3, 13:25, 15:4, 17:12, 19:6, 19:10, 20:2, 20:8, 20:15, 23:8, 23:22, 25:12, 26:2, 26:3, 27:14, 27:19, 27:21, 28:24, 29:1, 29:3, 29:21, 31:19, 32:10, 32:21, 33:1, 33:7, 34:4, 34:12, 41:3, 41:21, 41:23, 46:3, 46:4, 47:9, 57:20, 58:17, 71:20, 72:22, 75:14, 76:3, 76:6, 79:7, 86:7, 86:9, 86:17, 86:19, 87:10, 88:18, 90:1, 90:4,

90:6, 91:8
**answer** [6] - 19:9,
24:19, 25:9, 39:25,
53:15, 59:1
**answered** [3] - 21:9,
28:18, 59:4
**answers** [1] - 38:19
**Anthony** [3] - 1:16,
1:18, 2:23
**anticipate** [1] - 94:12
**anticipating** [1] - 74:7
**anxious** [1] - 95:12
**apologies** [1] - 35:8
**apologize** [1] - 17:9
**appeals** [1] - 87:3
**appear** [1] - 90:2
**appearance** [4] - 8:1,
15:7, 79:3, 80:13
**appearing** [2] - 2:8,
71:14
**apples** [1] - 41:9
**applicable** [1] - 83:14
**application** [3] -
62:25, 69:6, 82:18
**applications** [4] -
64:10, 68:17, 84:9,
84:10
**applied** [1] - 34:3
**applies** [2] - 83:1,
86:15
**applying** [1] - 43:10
**appreciates** [1] - 80:4
**approach** [4] - 5:2,
32:5, 33:3, 88:16
**appropriate** [6] -
47:25, 56:5, 62:5,
78:10, 83:2, 85:23
**approval** [10] - 23:14,
23:20, 24:14, 26:4,
26:5, 26:7, 26:8,
36:11, 36:12, 47:24
**approvals** [1] - 55:18
**approve** [2] - 22:3,
22:10
**approved** [6] - 25:14,
52:21, 53:2, 53:10,
53:11, 58:14
**APRIL** [1] - 1:9
**April** [1] - 3:16
**areas** [1] - 82:12
**argue** [7] - 5:9, 6:20,
47:15, 49:14, 56:17,
60:2, 72:22
**argued** [1] - 6:1
**argues** [3] - 87:8,
88:17, 90:15
**arguing** [3] - 20:23,
56:10, 62:18
**argument** [18] - 3:2,
3:13, 3:18, 8:4, 8:12,

11:7, 18:6, 28:22,
32:9, 32:12, 32:19,
44:1, 46:25, 57:6,
57:21, 70:25, 73:21,
90:9
**arguments** [13] - 3:22,
4:6, 20:14, 32:21,
37:4, 38:18, 41:4,
49:7, 60:9, 62:3,
76:4, 79:10, 80:23
**arise** [1] - 87:2
**arriving** [1] - 37:13
**articulate** [1] - 36:5
**ASA** [1] - 12:4
**assert** [1] - 39:8
**asserting** [1] - 41:5
**assertion** [4] - 39:11,
39:12, 40:6, 71:3
**assess** [2] - 3:15,
24:23
**assessment** [4] - 22:8,
23:14, 23:23, 24:11
**assessments** [1] -
22:5
**assigned** [1] - 87:22
**assist** [1] - 85:23
**assistant** [10] - 47:20,
48:13, 48:14, 48:16,
52:23, 53:23, 55:18,
58:5, 58:13
**Assistant** [6] - 12:22,
44:23, 45:6, 52:18,
70:4, 81:23
**assisting** [1] - 95:8
**associates** [1] - 2:22
**Association** [3] -
17:22, 18:20
**association** [5] -
19:13, 19:23, 20:5,
20:24, 21:3
**assumes** [1] - 48:10
**astonishing** [1] -
73:21
**attack** [3] - 37:8, 37:9,
37:10
**attacks** [7] - 5:17,
5:20, 5:22, 6:8,
12:13, 37:12, 38:1
**attempt** [4] - 67:16,
67:19, 75:3, 77:2
**attempted** [1] - 39:6
**attend** [1] - 63:3
**attention** [1] - 33:22
**attorney** [5] - 30:9,
55:9, 55:10, 55:12,
55:14
**Attorney** [42] - 2:19,
9:13, 11:15, 12:1,
12:22, 14:22, 21:14,
31:23, 32:3, 32:14,

33:1, 33:6, 33:7,
36:20, 36:22, 39:8,
44:23, 45:6, 48:16,
48:17, 48:18, 50:24,
51:10, 52:18, 53:11,
53:12, 53:16, 53:19,
53:21, 53:23, 55:10,
70:4, 71:13, 75:17,
81:23, 87:19, 88:15,
89:16
**Attorney's** [16] - 9:14,
20:10, 20:17, 22:23,
23:20, 32:16, 44:16,
47:19, 47:23, 51:10,
51:13, 51:17, 70:1,
70:10, 75:18, 87:21
**Attorneys** [5] - 15:12,
50:13, 53:21, 53:25,
89:20
**attorneys** [1] - 73:25
**attributed** [1] - 89:16
**audit** [1] - 20:12
**August** [1] - 84:16
**AUSA** [26] - 20:14,
20:15, 23:8, 29:3,
32:10, 82:6, 86:6,
86:17, 87:9, 87:15,
87:17, 88:3, 88:6,
88:10, 88:11, 88:17,
89:25, 90:4, 90:25,
91:8, 91:11, 91:15,
91:22, 91:24, 92:6
**author** [1] - 5:15
**authority** [3] - 38:15,
40:7, 55:14
**authorize** [1] - 36:10
**authorized** [2] - 42:13,
49:3
**authorizes** [2] - 43:7,
49:2
**available** [2] - 3:23,
95:13
**avoid** [2] - 43:1, 68:5
**aware** [3] - 31:1, 31:3,
85:3

**B**

**babysitters** [1] - 25:22
**backup** [3] - 20:5,
20:24, 21:2
**backwards** [2] -
39:15, 76:7
**bad** [7] - 9:8, 9:10,
35:10, 43:22, 76:18,
90:14, 90:19
**bail** [1] - 9:21
**Baltimore** [8] - 1:24,
2:19, 32:4, 37:23,
53:6, 77:14, 87:23,

87:24
**BALTIMORE** [1] - 1:9
**bank** [1] - 76:12
**bar** [18] - 6:4, 6:8,
19:13, 19:19, 19:21,
19:23, 20:5, 20:24,
21:3, 54:5, 68:12,
74:13, 74:17, 74:22,
75:3, 77:1, 83:8,
87:19
**Bar** [4] - 17:21, 18:19,
18:20, 20:2
**barely** [1] - 46:7
**Barron** [15] - 11:15,
26:18, 28:7, 28:14,
29:5, 31:22, 32:1,
32:22, 32:23, 37:13,
53:24, 77:2, 88:15,
89:16
**Barron's** [2] - 32:16,
89:19
**bars** [1] - 86:20
**base** [1] - 24:16
**based** [6] - 30:20,
38:16, 45:12, 63:14,
66:6
**baseless** [2] - 37:12,
37:17
**bases** [1] - 11:6
**basis** [4] - 18:12, 37:4,
85:7, 90:8
**Bates** [4] - 51:5, 51:7,
52:1, 52:11
**became** [3] - 32:25,
53:23, 70:7
**BEFORE** [1] - 1:8
**began** [3] - 53:17,
53:19, 78:4
**begin** [2] - 4:11, 5:2
**beginning** [1] - 47:8
**begins** [1] - 9:11
**behalf** [6] - 2:19, 5:8,
35:13, 47:12, 67:1,
94:1
**behavior** [1] - 77:4
**behind** [2] - 2:22, 80:1
**belabor** [1] - 44:11
**believes** [4] - 12:13,
68:14, 68:15, 68:19
**benefits** [1] - 67:6
**best** [3] - 69:10, 71:17,
72:3
**better** [6] - 8:1, 15:12,
15:17, 57:22, 65:1,
67:17
**between** [6] - 13:4,
13:16, 32:18, 45:5,
50:3, 51:25
**beyond** [6] - 6:15,
64:12, 68:12, 78:4,

79:25, 80:16
**big** [1] - 70:1
**bile** [1] - 71:21
**Bill** [22] - 3:4, 60:19,
60:24, 61:1, 62:16,
62:20, 63:18, 65:3,
66:5, 67:2, 67:17,
67:24, 68:11, 69:1,
69:18, 81:21, 82:3,
82:9, 83:1, 85:7,
85:25, 92:2
**bit** [5] - 65:13, 70:6,
81:19, 83:12, 84:14
**black** [10] - 8:21,
30:22, 30:25, 31:2,
31:5, 39:2, 43:17,
72:16, 74:15, 88:19
**blah** [3] - 58:14, 58:15
**Blake** [1] - 44:21
**blindly** [1] - 79:21
**board** [3] - 19:13,
19:15, 31:14
**bolden** [3] - 16:16,
16:18, 22:14
**Bolden** [47] - 1:14,
2:20, 4:17, 5:1, 5:9,
10:1, 10:4, 12:17,
13:7, 16:18, 19:25,
22:17, 27:4, 29:1,
31:3, 32:7, 35:11,
35:16, 37:18, 40:19,
44:25, 45:22, 46:8,
54:13, 54:18, 54:24,
55:6, 60:15, 62:15,
65:9, 66:17, 69:24,
70:25, 73:6, 74:4,
78:1, 78:12, 78:20,
80:7, 81:12, 85:9,
85:16, 85:21, 87:11,
92:18, 93:20
**BOLDEN** [70] - 2:18,
4:18, 5:4, 10:14,
10:22, 11:3, 11:12,
11:20, 11:22, 11:24,
13:3, 13:8, 13:10,
14:14, 14:16, 15:5,
15:7, 16:3, 16:5,
16:8, 16:11, 16:14,
16:17, 16:20, 16:22,
17:1, 17:9, 20:4,
20:19, 20:22, 22:15,
22:25, 23:4, 23:9,
23:12, 24:6, 27:7,
29:5, 29:8, 29:12,
31:2, 31:6, 31:8,
31:10, 32:17, 32:20,
35:8, 55:5, 55:7,
60:17, 60:22, 61:7,
61:10, 62:6, 62:9,
62:13, 62:21, 65:11,

65:17, 66:3, 66:18, 66:20, 66:22, 77:25, 78:14, 78:22, 78:24, 81:14, 92:20, 94:25
**bond** [1] - 9:21
**boosted** [1] - 4:5
**boss** [1] - 30:11
**bothered** [1] - 44:20
**bottom** [2] - 12:24, 34:11
**bound** [1] - 40:24
**brain** [1] - 78:24
**break** [2] - 50:19, 56:18
**Bredar** [1] - 45:13
**brevity** [1] - 80:4
**brief** [4] - 3:1, 26:13, 78:5, 81:16
**briefed** [1] - 3:8
**briefing** [2] - 93:14, 94:8
**briefly** [8] - 51:2, 55:5, 67:1, 78:14, 80:6, 82:1, 82:13, 87:13
**bring** [7] - 22:2, 23:20, 26:6, 43:7, 57:10, 62:15, 76:6
**bringing** [5] - 6:5, 15:22, 18:16, 23:7, 88:4
**broad** [1] - 89:12
**broadened** [1] - 26:19
**broader** [1] - 27:20
**broadly** [1] - 32:13
**brought** [9] - 10:20, 25:15, 38:23, 39:20, 44:7, 60:3, 78:15, 86:8, 89:22
**burden** [17] - 8:1, 8:7, 8:9, 9:10, 10:23, 11:3, 21:10, 21:11, 27:22, 34:8, 34:23, 36:3, 38:10, 44:7, 46:1, 60:8, 73:17
**bureaucracy** [1] - 48:4
**business** [1] - 42:11
**businesses** [1] - 64:5

## C

**calculate** [1] - 24:21
**calculations** [1] - 24:20
**calendar** [1] - 46:15
**campaign** [14] - 15:10, 26:20, 27:9, 45:16, 45:19, 45:21, 46:4, 49:19, 50:19, 50:23, 77:10, 88:8, 88:13, 89:25

**candidate** [1] - 39:22
**cannot** [2] - 30:1, 34:22
**canvassing** [1] - 51:9
**care** [4] - 28:20, 29:17, 33:19, 42:10
**career** [1] - 6:6
**carefully** [4] - 3:9, 3:12, 10:2, 78:7
**CARES** [4] - 9:1, 42:3, 42:13, 59:14
**Carlton** [5] - 26:21, 26:23, 26:24, 73:10, 79:13
**Carolina** [2] - 34:6, 34:7
**carried** [2] - 70:20, 73:17
**carries** [1] - 55:17
**carry** [2] - 29:23, 43:4
**case** [90] - 2:4, 2:6, 2:13, 3:15, 5:10, 5:11, 5:15, 5:24, 6:1, 6:17, 6:21, 6:23, 7:1, 7:2, 7:5, 7:23, 8:23, 10:20, 11:17, 20:23, 22:2, 23:13, 23:21, 27:5, 28:14, 31:21, 31:22, 34:1, 34:6, 34:15, 36:8, 36:13, 38:17, 40:9, 40:17, 41:8, 42:1, 44:6, 47:12, 47:21, 47:25, 48:9, 48:10, 48:21, 48:23, 49:3, 53:1, 56:20, 57:3, 57:9, 59:15, 60:5, 62:22, 62:8, 67:20, 67:25, 68:12, 68:22, 69:7, 69:17, 71:19, 81:9, 81:21, 81:24, 83:15, 83:18, 83:24, 85:6, 86:6, 86:8, 87:5, 87:9, 87:11, 88:12, 89:3, 89:5, 89:14, 89:17, 89:22, 90:3, 90:6, 90:19, 91:1, 91:6, 91:10, 91:14, 91:16, 91:22, 94:7
**CASE** [1] - 1:4
**cases** [17] - 7:3, 44:8, 44:9, 47:19, 52:4, 53:3, 53:8, 53:11, 57:4, 57:6, 57:9, 57:10, 57:11, 57:12, 57:16, 68:24
**caught** [1] - 12:4
**causal** [1] - 51:25
**CBC** [1] - 31:18
**celebrate** [1] - 95:17

**certain** [8] - 21:25, 58:2, 76:5, 76:8, 84:8, 88:18, 89:5, 91:18
**certainly** [16] - 6:7, 8:15, 9:3, 10:2, 11:5, 15:8, 18:4, 24:7, 48:8, 54:5, 59:4, 63:11, 66:8, 75:14, 77:17, 78:16
**certifications** [3] - 42:14, 43:3, 43:6
**certify** [1] - 96:3
**cetera** [1] - 81:5
**challenges** [1] - 85:13
**challenging** [1] - 59:16
**chance** [2] - 57:15, 93:17
**change** [2] - 46:3, 49:23
**changing** [2] - 25:5, 25:6
**Chapter** [1] - 9:11
**characterized** [1] - 89:1
**charge** [3] - 24:14, 25:16, 27:8
**charged** [3] - 8:25, 68:4, 83:6
**charges** [34] - 21:25, 22:4, 22:5, 22:13, 24:10, 24:17, 24:19, 25:3, 25:15, 25:19, 25:21, 26:6, 27:5, 43:7, 48:23, 48:24, 49:2, 49:4, 52:24, 53:8, 53:13, 57:4, 67:8, 73:13, 74:11, 76:5, 83:3, 83:7, 84:13, 85:5, 88:4, 89:5, 89:22
**charging** [1] - 22:8
**chart** [1] - 55:11
**check** [1] - 73:11
**chief** [15] - 31:13, 48:12, 48:13, 48:15, 52:22, 53:3, 55:13, 55:16, 58:4, 58:9, 70:3, 70:7, 70:11
**Chief** [1] - 45:13
**child** [1] - 42:10
**children's** [1] - 88:2
**choice** [3] - 6:18, 15:13, 34:13
**choices** [1] - 34:2, 35:1
**choosing** [2] - 14:20, 14:21
**chose** [2] - 14:24,

57:21
**chronology** [1] - 17:5
**church** [1] - 88:3
**churches** [1] - 25:22
**Circuit** [5] - 6:25, 7:23, 43:19, 45:15, 86:25
**circumstances** [9] - 7:25, 17:15, 33:13, 38:12, 41:15, 61:14, 61:23, 87:6, 91:5
**citation** [1] - 40:7
**citations** [1] - 81:5
**cite** [3] - 6:21, 43:17, 68:22
**cited** [5] - 38:15, 38:24, 45:22, 47:2, 79:2
**city** [3] - 9:12, 14:21, 77:1
**City** [2] - 87:23, 87:24
**civil** [3] - 19:15, 20:11
**claim** [11] - 23:6, 36:19, 36:25, 38:21, 39:15, 40:1, 44:4, 44:12, 73:12, 86:14, 89:24
**claimed** [2] - 42:6, 47:4
**claims** [7] - 38:6, 40:19, 40:22, 41:3, 41:11, 43:16, 47:9
**clarification** [1] - 62:10
**Clark** [3] - 1:23, 96:3, 96:7
**clean** [8] - 6:16, 30:1, 30:11, 30:12, 34:18, 56:8, 56:14, 65:4
**clear** [31] - 6:6, 7:21, 11:8, 11:18, 12:17, 16:1, 16:21, 17:5, 20:1, 22:18, 23:2, 30:17, 30:18, 31:7, 39:9, 42:22, 48:4, 50:20, 51:1, 52:17, 59:18, 62:12, 64:6, 64:7, 66:11, 67:5, 72:16, 72:20, 79:11, 89:14
**clearing** [1] - 35:22
**clearly** [2] - 86:22, 91:3
**clerk** [1] - 4:20
**CLERK** [2] - 54:12, 95:20
**client** [41] - 6:14, 7:7, 7:11, 7:14, 9:12, 13:4, 13:16, 14:9, 14:22, 15:1, 19:24, 21:16, 22:1, 22:3,

22:8, 22:11, 23:8, 23:21, 24:15, 24:25, 25:10, 25:21, 25:23, 28:3, 28:9, 29:4, 29:22, 30:3, 30:9, 31:2, 32:11, 32:25, 34:17, 56:17, 60:7, 61:2, 61:24, 64:17, 64:23, 65:6, 74:2
**client's** [3] - 30:1, 34:19, 74:14
**clients** [1] - 17:24
**clock** [2] - 4:20, 55:1
**close** [1] - 31:21
**closing** [2] - 30:19, 42:11
**cloud** [1] - 7:12
**co** [5] - 45:4, 47:13, 47:16, 47:20, 50:13
**co-counsel** [4] - 47:13, 47:16, 47:20, 50:13
**co-defendants** [1] - 45:4
**Code** [1] - 43:8
**COJ** [1] - 78:16
**collaborative** [1] - 73:23
**collaboratively** [1] - 47:19
**collapsed** [1] - 49:19
**collar** [1] - 40:19
**collateral** [2] - 70:2, 70:22
**colleague** [2] - 52:6, 52:9
**colleagues** [2] - 51:10, 51:16
**combination** [1] - 17:11
**coming** [4] - 24:21, 46:13, 80:7, 94:12
**commend** [1] - 95:5
**comment** [2] - 32:15, 38:3
**comments** [1] - 89:15
**Commission** [1] - 87:20
**committed** [1] - 68:21
**committee** [3] - 31:15, 53:5, 53:10
**Committee** [1] - 31:16
**common** [1] - 72:12
**communicate** [1] - 85:16
**company** [6] - 61:17, 61:19, 63:2, 84:16, 84:17, 85:1
**complaint** [1] - 35:2
**complicated** [1] -

74:18
**component** [2] - 8:19, 8:20
**comprehensive** [1] - 67:14
**concede** [3] - 69:19, 71:7, 79:17
**conceded** [2] - 12:7, 12:8
**concept** [1] - 28:21
**concern** [1] - 86:4
**concerned** [1] - 58:4
**concise** [1] - 68:2
**concluded** [1] - 95:22
**concludes** [1] - 92:9
**conclusion** [1] - 30:23
**condition** [1] - 79:4
**conditional** [1] - 72:13
**conditions** [1] - 79:23
**Conduct** [1] - 91:12
**conduct** [6] - 8:10, 27:16, 30:24, 42:2, 42:19, 77:3
**conducted** [2] - 89:2, 89:9
**confer** [6] - 19:4, 66:14, 89:7, 94:3, 94:4, 94:11
**conference** [11] - 23:19, 25:1, 36:1, 39:23, 66:7, 71:10, 72:4, 73:25, 75:5, 78:16, 79:24
**conferences** [1] - 37:25
**confidence** [1] - 66:16
**confidential** [1] - 37:22
**confirm** [2] - 93:21, 94:22
**confirmed** [3] - 28:16, 53:24, 87:18
**conflict** [2] - 91:2, 91:21
**Congress** [2] - 44:2, 52:7
**connected** [2] - 34:5, 51:21
**connection** [11] - 3:12, 32:18, 35:5, 50:3, 51:25, 57:3, 80:24, 82:18, 86:14, 91:12, 92:8
**consensus** [1] - 47:17
**consent** [1] - 94:12
**consequences** [4] - 42:7, 63:21, 82:15, 83:21
**consideration** [1] - 15:9

**considered** [3] - 3:12, 76:5, 80:14
**considering** [2] - 40:13, 72:8
**consistent** [2] - 30:24, 41:1
**conspiracy** [1] - 75:2
**constituting** [1] - 68:3
**constitutional** [1] - 38:24
**Constitutional** [1] - 39:4
**construct** [1] - 7:21
**constructed** [2] - 49:18, 76:25
**consult** [1] - 85:16
**consultation** [1] - 92:3
**consulted** [1] - 12:2
**contact** [1] - 21:17
**contains** [4] - 67:22, 83:5, 83:17, 83:19
**contemplated** [1] - 88:3
**context** [4] - 37:16, 47:10, 78:17, 85:23
**continue** [4] - 26:9, 54:10, 54:14, 94:18
**continues** [1] - 59:13
**contracted** [1] - 61:19
**contribution** [2] - 14:8, 89:25
**contributions** [8] - 14:8, 14:10, 14:12, 14:23, 15:3, 16:23, 77:10, 87:17
**Control** [1] - 85:2
**control** [12] - 61:3, 61:11, 61:13, 61:18, 61:21, 61:22, 63:4, 63:14, 82:23, 84:17, 84:21, 84:24
**conversation** [5] - 11:6, 19:1, 25:7, 78:4, 94:17
**conversations** [1] - 94:18
**conviction** [2] - 83:8, 87:3
**convince** [1] - 74:1
**coordinated** [1] - 17:21
**coordinator** [2] - 70:13, 70:14
**coronavirus** [2] - 42:5, 63:21
**correct** [6] - 10:9, 11:5, 14:13, 65:15, 94:2, 96:4
**Correct** [1] - 11:2
**correctly** [2] - 62:3,

93:6
**corroboration** [8] - 9:24, 9:25, 12:3, 12:9, 13:17, 45:1, 45:3, 45:9
**corrupt** [1] - 9:17
**corruption** [2] - 53:8, 55:13
**Council** [2] - 87:23, 87:25
**counsel** [29] - 3:6, 3:18, 3:22, 4:6, 4:21, 31:13, 47:13, 47:16, 47:20, 48:17, 50:13, 54:5, 66:24, 70:12, 72:12, 74:13, 74:17, 74:23, 75:3, 77:1, 80:22, 81:8, 85:17, 87:19, 89:8, 91:2, 92:3, 92:12, 95:5
**Counsel** [2] - 2:10, 55:21, 68:8, 68:9, 69:14, 69:21, 71:13, 80:3, 88:11
**counsel's** [1] - 77:6
**Count** [2] - 84:15, 84:25
**count** [2] - 5:10, 23:23
**counted** [1] - 38:4
**country** [5] - 6:9, 8:23, 9:4, 18:4, 59:21
**counts** [2] - 23:15, 23:16
**couple** [2] - 19:10, 50:17
**courageous** [2] - 31:24
**course** [10] - 36:13, 43:3, 43:9, 45:7, 53:10, 65:4, 65:23, 71:12, 88:20, 95:13
**court** [7] - 9:18, 9:21, 38:4, 38:5, 55:19, 80:3
**COURT** [96] - 1:1, 2:2, 2:10, 2:16, 2:24, 4:16, 4:19, 10:1, 10:5, 10:16, 11:2, 11:4, 11:18, 11:21, 11:23, 12:17, 13:7, 13:9, 14:10, 14:15, 15:3, 15:6, 15:24, 16:4, 16:6, 16:9, 16:12, 16:16, 16:18, 16:21, 16:23, 17:2, 19:25, 20:13, 20:21, 22:14, 22:17, 23:1, 23:5, 23:10, 24:4, 27:4, 29:1, 29:6, 29:9, 31:1, 31:3,

31:7, 31:9, 32:7, 32:18, 35:7, 35:10, 47:7, 47:22, 48:2, 50:17, 50:23, 51:1, 52:17, 52:23, 53:14, 54:8, 54:16, 54:23, 55:6, 60:15, 60:18, 62:1, 62:11, 62:14, 65:9, 65:12, 65:19, 66:17, 66:19, 66:21, 66:24, 69:21, 77:21, 77:23, 78:1, 78:20, 78:23, 80:3, 80:21, 81:12, 81:15, 92:18, 92:21, 93:5, 93:19, 93:25, 94:14, 94:16, 95:1
**Court** [153] - 1:23, 2:12, 3:1, 3:2, 3:9, 3:11, 3:16, 3:18, 3:22, 3:25, 4:3, 4:4, 4:8, 4:10, 5:1, 5:5, 5:17, 6:20, 6:24, 7:4, 7:24, 8:2, 8:4, 9:25, 10:2, 10:5, 10:8, 10:9, 10:16, 11:18, 12:18, 12:21, 12:25, 15:24, 15:25, 16:1, 16:7, 16:19, 16:24, 17:10, 17:13, 17:14, 19:4, 19:25, 20:13, 21:10, 22:17, 23:1, 23:2, 23:3, 23:5, 23:7, 23:11, 24:8, 27:6, 28:21, 29:2, 32:9, 34:2, 34:7, 35:14, 35:15, 35:21, 38:9, 38:21, 40:12, 46:18, 47:11, 48:2, 48:3, 48:6, 48:10, 54:9, 54:16, 54:21, 55:1, 59:6, 60:12, 60:24, 65:20, 65:25, 67:23, 77:23, 78:2, 78:3, 78:7, 78:8, 78:11, 80:24, 81:1, 81:5, 81:8, 81:17, 81:18, 81:19, 82:1, 82:2, 82:3, 82:9, 82:11, 82:12, 82:25, 83:4, 83:10, 85:6, 85:9, 85:13, 85:15, 85:19, 85:24, 86:3, 86:4, 86:13, 86:15, 87:8, 87:13, 88:21, 88:22, 89:14, 89:24, 90:7, 90:18, 90:20, 90:21, 90:24, 91:7, 91:14, 91:23, 92:1, 92:4, 92:5, 92:7, 92:12, 92:21, 93:16,

94:16, 94:19, 94:20, 95:2, 95:5, 95:8, 95:9, 95:10, 95:11, 95:15, 95:16, 95:20, 96:8
**Court's** [19] - 16:12, 17:2, 21:6, 22:20, 53:14, 57:12, 59:9, 59:10, 62:14, 65:12, 81:3, 81:4, 82:1, 83:16, 85:3, 85:11, 92:9, 94:2, 94:5
**courthouse** [2] - 44:14, 45:8
**courtroom** [3] - 3:24, 4:1, 49:18
**Courts** [1] - 73:4
**covered** [1] - 89:20
**COVID-19** [4] - 70:13, 73:13, 82:16, 83:22
**COVID-19-related** [3] - 42:14, 42:21, 44:6
**cowboy** [1] - 49:5
**create** [1] - 67:23
**created** [1] - 21:1
**creates** [2] - 15:5, 15:7
**creating** [1] - 7:12
**credibility** [5] - 9:9, 21:8, 34:9, 58:23, 60:10
**credible** [11] - 8:10, 9:7, 21:12, 21:20, 25:13, 27:22, 34:1, 34:24, 34:25, 56:4, 56:5
**credibly** [1] - 8:13
**credit** [1] - 76:12
**credits** [1] - 74:21
**crime** [1] - 70:12
**crimes** [2] - 67:13, 68:21
**CRIMINAL** [1] - 1:4
**Criminal** [3] - 2:7, 7:20, 68:1
**criminal** [23] - 5:20, 19:15, 21:23, 21:24, 22:2, 23:18, 34:17, 34:19, 40:19, 48:12, 48:13, 48:15, 52:22, 53:3, 67:8, 72:12, 86:21, 87:3, 87:16, 88:4, 89:13
**critical** [1] - 8:8
**criticize** [1] - 19:14
**criticized** [1] - 20:22
**cross** [2] - 40:14, 59:6
**cross-examination** [2] - 40:14, 59:6
**curious** [2] - 31:21, 31:22

**current** [5] - 50:24,
52:18, 53:15, 53:16,
65:6
**cut** [2] - 27:1, 27:17
**cyber** [1] - 70:12
**cycle** [1] - 50:24
**cynically** [1] - 37:22

## D

**dance** [1] - 88:2
**danced** [1] - 71:5
**dancing** [1] - 71:5
**date** [11] - 19:23, 58:2,
65:14, 68:6, 72:2,
85:4, 89:3, 91:14,
94:10
**dates** [3] - 93:10,
94:10, 94:20
**days** [8] - 14:7, 14:9,
15:14, 28:13, 39:20,
49:24, 79:1, 94:12
**deadline** [1] - 51:12
**deadlines** [1] - 94:6
**deal** [1] - 70:1
**debt** [1] - 67:15
**decades** [1] - 70:19
**decide** [2] - 36:9,
52:24
**decided** [3] - 36:22,
49:22, 75:22
**decides** [1] - 55:15
**decision** [2] - 36:6,
36:11, 36:20, 43:18,
43:21, 75:16, 76:1,
90:13
**decisions** [5] - 45:14,
47:17, 58:3, 89:5,
89:12
**declaration** [4] - 51:7,
51:8, 51:16, 51:23
**declarations** [1] - 51:5
**declared** [1] - 39:22
**declined** [2] - 40:23,
88:6
**declining** [1] - 91:17
**deductions** [1] - 74:20
**defend** [5] - 64:7,
64:17, 64:22, 65:5,
83:7
**Defendant** [86] - 1:6,
1:13, 12:20, 13:2,
36:23, 37:5, 37:16,
37:24, 38:5, 38:10,
38:15, 38:23, 39:1,
39:15, 39:16, 39:19,
40:6, 40:21, 41:6,
41:12, 41:18, 41:20,
41:21, 41:22, 41:25,
42:2, 42:17, 42:23,

43:4, 43:9, 43:14,
43:19, 44:4, 45:2,
46:23, 47:1, 49:14,
51:19, 52:13, 67:5,
67:9, 67:17, 68:4,
68:7, 68:14, 68:16,
71:4, 72:1, 72:17,
75:3, 76:19, 77:1,
81:21, 82:14, 82:16,
82:22, 83:3, 83:6,
83:8, 83:20, 84:4,
84:7, 84:15, 84:18,
84:23, 85:1, 86:7,
86:18, 86:19, 86:21,
86:23, 87:2, 87:10,
87:15, 87:21, 88:4,
88:11, 88:15, 89:6,
89:7, 90:1, 90:5,
90:14, 91:9, 91:17
**DEFENDANT** [2] -
61:6, 61:9
**Defendant's** [24] - 3:3,
37:18, 44:21, 68:13,
68:18, 68:22, 69:11,
77:3, 82:3, 82:5,
82:6, 82:19, 84:3,
86:12, 87:17, 87:24,
88:1, 88:8, 88:13,
89:23, 90:22, 92:2,
92:4, 92:6
**defendants** [1] - 45:4
**Defendants** [8] - 9:22,
38:22, 43:25, 45:12,
56:1, 72:12, 75:11,
75:17
**Defense** [49] - 2:17,
3:4, 10:19, 26:13,
30:9, 39:6, 39:13,
40:6, 40:18, 44:19,
55:21, 56:21, 60:20,
65:14, 65:23, 66:2,
68:8, 68:9, 69:14,
73:6, 73:25, 80:11,
80:12, 80:13, 82:12,
83:18, 85:4, 85:12,
85:23, 86:5, 86:10,
86:16, 87:5, 87:8,
87:12, 88:10, 88:17,
88:23, 89:4, 89:8,
89:15, 89:21, 90:3,
90:11, 90:25, 91:7,
91:11, 91:20, 92:19
**Defense's** [19] - 10:8,
10:12, 11:6, 12:19,
15:4, 20:14, 29:3,
32:8, 32:9, 80:24,
83:1, 85:7, 85:20,
85:24, 86:2, 90:7,
90:9, 91:24, 93:21
**definite** [1] - 68:2

**deflect** [1] - 77:3
**delaney** [1] - 94:2
**DELANEY** [1] - 66:25
**Delaney** [11] - 1:12,
2:7, 47:14, 47:20,
66:25, 70:10, 70:13,
93:3, 93:9, 93:11,
93:17
**delegitimize** [1] - 77:3
**deliberations** [1] -
53:4
**deliberative** [1] - 76:7
**demanded** [3] - 9:19,
40:22, 41:2
**demanding** [1] - 74:4
**DeMarco** [1] - 57:12
**Democrats** [1] - 77:9
**demonstrate** [2] -
7:22, 15:4
**demonstrated** [1] -
91:5
**demonstrates** [1] -
23:22
**demonstration** [1] -
17:12
**denied** [2] - 37:2, 37:6
**deny** [14] - 14:1, 82:3,
82:5, 82:6, 85:20,
85:24, 86:4, 90:7,
90:21, 91:23, 92:1,
92:4, 92:5
**Department** [6] -
29:10, 32:12, 37:20,
48:3, 59:17, 91:15
**department** [10] -
12:3, 36:12, 38:1,
42:21, 43:7, 43:13,
44:7, 48:21, 50:15,
73:4
**deputy** [2] - 70:11
**describe** [2] - 13:22,
48:1
**described** [2] - 45:2,
70:3
**describes** [2] - 52:2,
55:8
**designed** [1] - 73:20
**desire** [1] - 66:4
**destroy** [1] - 75:3
**detail** [6] - 62:1, 62:19,
67:19, 83:19, 84:22,
92:11
**detailed** [2] - 69:8,
83:12
**detailing** [2] - 67:5,
67:8
**detained** [1] - 45:12
**detention** [2] - 45:14,
46:19
**deter** [1] - 43:5

**determine** [2] - 41:16,
89:11
**developed** [1] - 13:24
**DHA** [1] - 15:8
**differences** [1] - 89:1
**different** [9] - 8:16,
21:4, 28:2, 43:21,
50:14, 86:11, 89:20,
90:13, 90:16
**difficult** [1] - 70:25
**directed** [2] - 12:9,
32:21
**direction** [1] - 94:3
**director** [1] - 31:13
**disabuse** [1] - 5:20
**disagree** [2] - 14:4,
66:12
**disclose** [2] - 84:8,
91:18
**disclosed** [1] - 85:3
**disclosing** [2] - 40:25,
66:8
**disclosure** [1] - 74:3
**disclosures** [4] -
65:14, 65:22, 93:13,
94:6
**discovery** [2] - 54:3,
85:9
**discretion** [1] - 89:12
**discuss** [4] - 4:11,
18:9, 93:12, 95:15
**discussed** [2] - 60:19,
87:8, 88:8, 94:5
**discussing** [3] -
16:24, 19:23, 45:4
**discussion** [1] - 18:17
**discussions** [1] -
85:10
**disease** [1] - 42:8
**dishonest** [1] - 67:16
**disingenuous** [1] -
46:25
**disliked** [1] - 67:16
**dismiss** [19] - 3:5,
5:10, 5:21, 6:23, 7:4,
7:5, 26:14, 34:2,
34:14, 35:1, 37:5,
60:12, 81:22, 82:6,
86:2, 87:9, 90:8,
90:22, 92:4
**dismissal** [1] - 6:22
**dismissed** [2] - 28:14,
90:10
**dismissing** [1] - 38:16
**dispassionate** [1] -
33:14
**dispel** [1] - 5:16
**display** [1] - 4:21
**dispute** [2] - 83:13,
94:7

**disqualify** [8] - 3:6,
37:3, 81:23, 82:6,
90:25, 91:2, 91:24,
92:6
**Disrupted** [1] - 87:23
**DISTRICT** [3] - 1:1,
1:1, 1:8
**district** [2] - 68:20,
70:15
**District** [3] - 34:7,
36:22, 87:22
**division** [3] - 49:2,
50:14, 75:9
**DIVISION** [1] - 1:2
**divisions** [1] - 53:6
**divorced** [1] - 37:14
**doctrine** [1] - 86:20
**document** [2] - 6:2,
6:3
**documents** [10] -
19:22, 55:25, 61:15,
62:3, 63:6, 63:10,
63:15, 63:17, 66:6
**doggedly** [1] - 25:25
**doggedness** [1] -
24:24
**DOJ** [32] - 22:3, 22:9,
22:10, 22:22, 23:14,
23:18, 24:2, 24:10,
25:14, 26:4, 26:7,
26:11, 26:13, 28:20,
28:22, 29:15, 29:16,
29:20, 29:24, 30:15,
33:22, 55:10, 55:23,
56:18, 56:23, 56:24,
58:8, 71:9, 73:7,
79:15
**dollars** [2] - 25:20,
25:23
**donate** [1] - 51:12
**donating** [1] - 49:23
**donation** [6] - 50:1,
51:15, 51:21, 52:1,
57:18
**donations** [5] - 49:24,
50:20, 50:23, 51:3,
79:19
**done** [10] - 8:13,
15:10, 18:3, 42:15,
66:5, 66:18, 68:25,
71:21, 73:6, 74:1
**donors** [1] - 52:3
**door** [1] - 30:4
**double** [1] - 34:3
**doubly** [1] - 4:5
**doubt** [2] - 25:11,
80:13
**down** [3] - 18:24,
42:25, 70:24
**draw** [1] - 30:23

**drawn** [2] - 13:1, 13:3
**drop** [2] - 28:24, 33:18
**dropped** [3] - 28:13, 28:19, 79:1
**drops** [2] - 32:1, 33:4
**due** [7] - 6:16, 7:16, 30:1, 30:12, 34:19, 42:4, 42:10
**during** [5] - 36:1, 65:23, 71:9, 88:2, 91:16

## E

**e-mail** [8] - 6:3, 28:4, 49:10, 72:20, 74:5, 79:1, 79:3, 80:9
**e-mails** [1] - 19:8
**early** [1] - 74:8
**Easter** [1] - 95:17
**easy** [1] - 52:8
**effect** [1] - 29:17
**efficient** [1] - 91:3
**effort** [1] - 3:16
**egregious** [2] - 42:2, 42:19
**eight** [3] - 31:15, 31:17, 59:9
**either** [9] - 4:12, 19:8, 37:10, 50:3, 54:7, 67:10, 67:24, 69:3, 91:16
**elected** [7] - 30:22, 30:25, 31:2, 39:11, 53:8, 57:22, 88:5
**election** [12] - 14:12, 14:18, 17:7, 33:5, 33:17, 33:19, 49:23, 50:9, 50:24, 57:25, 58:2, 70:15
**elective** [2] - 39:19, 40:2
**element** [2] - 8:18, 9:10
**elements** [1] - 83:5
**emanated** [1] - 20:23
**embarrassed** [3] - 13:17, 13:24, 49:21
**embarrassing** [2] - 49:20, 50:4
**embarrassment** [2] - 13:5, 13:15
**empaneled** [1] - 21:2
**employee** [1] - 31:12
**empowering** [1] - 29:21
**enable** [1] - 68:4
**enables** [1] - 83:7
**encouraging** [1] - 66:13

**end** [6] - 56:4, 62:7, 69:18, 72:4, 82:23, 84:21
**enforced** [1] - 44:3
**engage** [5] - 40:18, 40:24, 74:9, 74:16, 75:4
**engaged** [2] - 40:20, 41:2
**engages** [1] - 32:5
**engaging** [3] - 4:8, 7:11, 25:7
**enter** [1] - 68:5
**entered** [1] - 63:1
**entire** [2] - 14:25, 71:19
**entitled** [3] - 63:11, 67:7, 96:5
**entity** [1] - 84:20
**equally** [1] - 52:1
**Erek** [12] - 11:14, 26:18, 28:7, 28:14, 29:5, 31:22, 32:1, 32:22, 32:23, 37:13, 88:15
**especially** [3] - 12:14, 17:5, 65:6
**Esq** [10] - 1:11, 1:12, 1:12, 1:14, 1:15, 1:15, 1:16, 1:18, 1:19, 1:19
**essential** [3] - 67:12, 68:3, 83:17
**essentially** [2] - 67:23, 68:6
**establish** [7] - 11:5, 38:6, 43:20, 43:23, 86:15, 87:7, 90:12
**established** [9] - 41:15, 41:17, 50:5, 75:22, 75:24, 76:1, 77:17, 86:22, 94:9
**et** [1] - 81:5
**eternal** [1] - 66:16
**Ethics** [1] - 31:16
**evasion** [8] - 21:25, 22:4, 22:8, 23:14, 23:23, 23:24, 24:11, 24:15
**event** [1] - 39:8
**events** [1] - 16:2
**evidence** [36] - 8:10, 10:7, 20:2, 23:6, 24:4, 26:10, 27:13, 31:4, 39:12, 40:5, 40:15, 42:1, 43:14, 43:24, 45:10, 45:17, 45:21, 45:23, 46:24, 49:9, 50:3, 54:2, 56:16, 60:2, 69:14,

73:8, 76:6, 86:5, 86:17, 88:6, 88:7, 89:11, 89:21, 90:18, 90:21, 91:14
**Evidence** [1] - 40:24
**evidentiary** [4] - 34:9, 34:11, 58:22, 59:5
**ex** [1] - 27:1
**Ex** [1] - 40:10
**exactly** [3] - 15:3, 47:2, 85:17
**examination** [2] - 40:14, 59:6
**examined** [1] - 41:16
**example** [4] - 63:7, 63:17, 71:23, 89:4
**exceed** [2] - 81:25, 82:7, 92:7
**excellent** [2] - 95:1, 95:6
**exception** [1] - 4:2
**exchange** [4] - 11:25, 12:7, 62:11, 71:22
**excited** [1] - 35:9
**exclusive** [5] - 63:4, 63:13, 63:16, 82:23, 84:23
**exculpatory** [25] - 18:9, 18:14, 26:10, 26:12, 26:23, 27:13, 27:16, 27:18, 39:12, 40:5, 55:24, 56:7, 56:16, 73:8, 73:12, 73:15, 75:6, 76:2, 79:12, 79:15, 79:20, 88:6, 91:18
**excuse** [2] - 59:11, 77:25, 78:18
**executed** [2] - 84:15, 84:18
**executive** [2] - 48:16, 53:22
**exercise** [7] - 14:19, 39:17, 39:19, 40:3, 41:12, 57:8, 57:15
**exercised** [3] - 39:17, 40:2, 57:14
**exercising** [5] - 15:15, 36:17, 38:23, 39:5, 86:22
**Exhibit** [3] - 51:7, 51:8, 80:9
**exhibit** [1] - 80:17
**exhibits** [3] - 3:11, 26:13, 80:8
**Exhibits** [3] - 27:25, 78:25, 79:8
**existence** [1] - 87:16
**exists** [1] - 8:3
**expanded** [1] - 66:8

**expect** [1] - 63:18
**expenditure** [1] - 26:22
**experience** [1] - 58:11
**experienced** [6] - 42:7, 50:13, 63:20, 77:7, 77:13, 83:21
**experiencing** [1] - 82:15
**expert** [2] - 93:12, 94:6
**expertise** [1] - 58:12
**explain** [6] - 24:16, 25:12, 27:6, 47:11, 50:12, 51:2, 51:20, 69:16, 71:3
**explained** [2] - 51:9, 89:18
**explanation** [2] - 21:4, 21:5
**exploited** [1] - 43:5
**expressed** [1] - 49:13
**expressing** [1] - 15:13
**extension** [2] - 24:1, 24:6
**eye** [1] - 52:12
**eyesights** [1] - 33:16

## F

**face** [1] - 63:6
**fact** [15] - 6:1, 9:9, 17:16, 28:13, 29:12, 33:11, 40:7, 45:4, 47:5, 58:10, 67:21, 70:1, 76:5, 83:11, 90:20
**factors** [1] - 64:5
**facts** [31] - 6:19, 7:4, 8:11, 9:8, 11:16, 12:18, 14:4, 17:13, 17:23, 18:8, 19:11, 21:11, 27:24, 31:9, 31:20, 33:24, 34:16, 37:8, 37:10, 38:11, 38:16, 46:13, 49:25, 51:25, 59:3, 60:8, 61:2, 67:12, 68:3, 80:18, 83:17
**factual** [9] - 16:25, 24:5, 37:4, 44:10, 45:25, 48:22, 53:15, 87:12
**failed** [7] - 4:19, 27:22, 38:8, 39:1, 43:17, 43:24, 68:22
**failing** [2] - 84:7, 91:18
**fails** [1] - 83:2
**failure** [1] - 26:10

**fair** [4] - 6:16, 7:7, 58:12, 91:3
**fairly** [1] - 83:6
**fairness** [2] - 31:10, 58:12
**faith** [12] - 9:8, 9:10, 24:12, 24:13, 43:22, 59:25, 74:16, 74:24, 74:25, 76:18, 90:14, 90:19
**fall** [5] - 26:5, 39:7, 41:11, 49:17, 89:12
**false** [20] - 23:15, 26:6, 35:22, 42:25, 43:9, 62:25, 63:1, 64:9, 64:11, 64:14, 67:9, 68:16, 69:4, 69:5, 69:7, 82:17, 82:21, 83:25, 84:7, 84:13
**falsely** [5] - 63:20, 64:20, 82:14, 83:20, 87:15
**familiar** [1] - 77:10
**family** [1] - 59:17
**fanciful** [1] - 50:16
**fantasy** [2] - 7:11, 76:25
**far** [4] - 42:22, 58:4, 72:10, 80:15
**farce** [1] - 25:2
**fast** [1] - 50:5
**fast-forward** [1] - 50:5
**fault** [1] - 76:9
**favor** [1] - 68:23
**favorably** [1] - 28:23
**FBI** [5] - 50:13, 76:11, 76:18, 87:22, 88:1
**fearless** [1] - 27:13
**federal** [11] - 9:18, 9:20, 12:5, 15:21, 36:8, 50:11, 55:20, 56:21, 68:19, 87:16
**Federal** [1] - 1:23, 7:19, 34:6, 40:24, 68:1
**feeds** [1] - 31:16
**felt** [1] - 13:5
**few** [2] - 3:1, 19:4
**Fifth** [1] - 30:3
**fighter** [1] - 7:15
**fighting** [2] - 6:14, 6:16
**figure** [2] - 28:1, 34:4
**file** [3] - 6:18, 23:25, 94:19
**filed** [6] - 22:11, 23:25, 24:9, 39:22, 60:20, 71:7
**filing** [5] - 5:19, 44:11,

51:11, 52:5, 84:5
**filings** [1] - 92:8
**fill** [1] - 65:24
**final** [1] - 47:18
**finance** [2] - 26:20, 27:9
**financial** [8] - 42:4, 42:7, 63:21, 67:17, 76:11, 76:20, 82:15, 83:21
**financially** [1] - 60:3
**finish** [2] - 10:16, 32:8
**fired** [3] - 47:1, 47:4
**firm** [3] - 2:21, 51:11, 84:20
**First** [1] - 14:20
**first** [29] - 6:6, 7:2, 8:18, 14:7, 14:25, 20:16, 35:17, 36:21, 37:16, 38:10, 39:6, 39:10, 39:14, 39:18, 40:11, 41:20, 43:11, 44:1, 44:3, 44:6, 44:15, 48:13, 48:16, 49:18, 69:24, 79:23, 79:24, 83:5, 90:17
**fit** [2] - 20:16, 35:19
**five** [8] - 14:7, 14:9, 15:14, 33:4, 33:17, 46:21, 49:24, 50:1
**flesh** [1] - 86:25
**fleshed** [1] - 87:14
**Floor** [1] - 1:24
**Florida** [5] - 82:19, 82:20, 82:24, 84:18, 84:24
**flows** [1] - 76:21
**focus** [1] - 77:9
**focussing** [1] - 20:14
**fold** [1] - 3:4
**folks** [1] - 48:20
**follow** [9] - 23:11, 28:8, 29:21, 36:5, 65:10, 70:24, 73:2, 73:6, 81:3
**follow-up** [1] - 65:10
**followed** [1] - 81:15
**following** [2] - 62:21, 88:21
**FOR** [1] - 1:1
**Force** [3] - 9:17, 35:20, 44:13
**foregoing** [1] - 96:4
**form** [1] - 11:16
**formally** [1] - 81:9
**former** [6] - 26:21, 51:9, 51:16, 52:6, 55:16, 88:8
**formerly** [1] - 50:2
**forth** [3] - 6:24, 8:21,

63:23
**forthcoming** [2] - 92:11, 95:10
**forward** [11] - 17:4, 31:25, 34:15, 38:11, 43:14, 50:5, 56:15, 95:10, 95:11, 95:12, 95:18
**four** [7] - 5:10, 15:2, 29:14, 53:20, 53:25, 67:7, 82:12
**four-count** [1] - 5:10
**Fourth** [5] - 6:24, 7:23, 43:18, 45:15, 86:25
**frankly** [4] - 7:10, 11:9, 14:3, 78:10
**fraud** [13] - 23:15, 42:22, 43:4, 43:13, 43:15, 44:6, 55:13, 58:5, 58:10, 59:13, 70:13, 73:13
**free** [6] - 4:7, 4:22, 15:20, 15:21, 19:17, 57:23
**freedom** [1] - 7:16
**front** [5] - 13:5, 41:1, 59:6, 75:8
**frontline** [8] - 55:8, 55:9, 55:11, 55:14, 55:18, 58:5, 58:13, 70:16
**full** [4] - 60:5, 61:20, 81:16, 95:12
**fully** [7] - 3:8, 4:5, 4:7, 64:7, 64:22, 65:5, 81:4
**Funding** [1] - 40:8
**funds** [2] - 9:1, 9:3
**furloughed** [2] - 42:8, 63:22
**future** [3] - 68:6, 83:8, 95:18

# G

**Gallagher** [1] - 45:11
**games** [1] - 71:5
**gaps** [1] - 65:24
**Gardner** [1] - 40:9
**General's** [1] - 51:11
**generally** [2] - 56:13, 65:18
**genesis** [1] - 51:2
**genuine** [5] - 10:10, 10:18, 29:3, 41:21, 86:17
**given** [6] - 6:19, 15:14, 19:1, 60:12, 60:25, 63:5, 78:10, 85:6
**goal** [1] - 7:25

**Goldberg** [1] - 49:17
**Goodwin** [7] - 8:2, 8:9, 38:20, 38:25, 41:10, 57:3
**government** [2] - 9:20, 36:8
**Government** [92] - 2:4, 3:7, 5:15, 5:18, 6:2, 6:20, 7:5, 7:10, 7:17, 8:7, 8:8, 8:9, 8:18, 8:24, 9:3, 9:6, 9:20, 11:1, 12:7, 12:12, 13:6, 13:13, 15:10, 17:19, 18:1, 18:4, 18:18, 18:23, 19:2, 19:12, 20:25, 21:8, 21:12, 21:18, 21:21, 22:6, 22:19, 22:21, 24:8, 25:4, 25:17, 27:8, 27:21, 30:4, 30:8, 34:12, 35:14, 35:25, 46:10, 47:12, 59:13, 61:2, 61:16, 62:4, 62:20, 63:23, 64:3, 65:14, 65:16, 65:22, 66:2, 66:24, 67:1, 67:19, 68:10, 68:14, 68:15, 68:18, 68:24, 69:2, 69:4, 69:11, 69:13, 69:15, 72:14, 79:2, 79:10, 79:13, 80:5, 81:10, 82:13, 83:25, 85:3, 85:12, 86:23, 88:20, 89:2, 89:9, 90:5, 92:15, 93:1
**Government's** [12] - 12:19, 13:10, 27:16, 31:11, 33:25, 34:24, 39:10, 60:9, 66:10, 84:13, 89:4
**Grand** [54] - 18:6, 18:8, 20:6, 21:1, 21:2, 26:10, 26:16, 26:17, 26:22, 26:25, 27:24, 28:3, 28:9, 28:17, 28:25, 29:13, 30:4, 30:10, 36:13, 36:14, 36:21, 39:21, 40:13, 41:1, 52:25, 53:13, 55:25, 56:2, 56:7, 56:17, 68:20, 69:8, 71:4, 71:15, 72:9, 73:9, 73:18, 74:15, 75:25, 78:15, 79:3, 79:5, 79:13, 79:15, 79:17, 79:21, 80:11, 88:7, 88:12, 89:6, 89:11, 91:17, 91:19

**grand** [1] - 25:24
**grant** [4] - 65:3, 82:7, 89:7, 92:7
**granted** [4] - 57:13, 65:7, 71:15
**granting** [1] - 85:7
**great** [2] - 27:7, 63:6
**greater** [1] - 43:4
**Greenbelt** [1] - 53:7
**Grenoble** [1] - 40:11
**Grievance** [1] - 87:20
**GRIGGSBY** [1] - 1:8
**grounds** [1] - 90:22
**group** [1] - 47:17
**GTTF** [3] - 13:12, 45:12, 46:14
**guarantee** [1] - 32:20
**guardrails** [1] - 29:22
**guess** [2] - 52:8, 69:24
**guidance** [1] - 73:4
**guides** [1] - 89:14
**guilty** [4] - 44:15, 44:23, 45:24, 77:15
**Gun** [3] - 9:16, 35:20, 44:13

# H

**hairdresser** [3] - 76:10, 76:16, 88:2
**hairdressers** [1] - 25:21
**half** [2] - 50:5, 50:10
**hand** [1] - 83:4
**Happy** [3] - 93:8, 95:17
**happy** [2] - 54:14, 81:8
**harbored** [1] - 91:8
**harbors** [2] - 29:3, 87:9
**hard** [1] - 79:18
**hardship** [2] - 42:4, 76:20
**Hartman** [1] - 33:20
**hazard** [1] - 77:16
**headed** [1] - 69:13
**heads** [1] - 94:21
**hear** [8] - 4:9, 10:3, 20:3, 34:10, 54:18, 59:16, 78:23, 93:6
**heard** [3] - 35:25, 68:8, 78:7
**hearing** [13] - 9:21, 9:22, 31:17, 34:9, 34:11, 44:20, 46:13, 49:11, 58:22, 59:5, 94:16, 95:10
**hearings** [1] - 46:19
**heated** [2] - 11:24, 12:7

**held** [4] - 34:8, 38:21, 40:12, 83:4
**help** [5] - 13:25, 23:10, 42:4, 65:24, 66:8
**helpful** [6] - 5:7, 23:11, 47:9, 80:22, 81:17, 94:18
**Henry** [1] - 1:19
**hereby** [1] - 96:3
**high** [1] - 95:7
**himself** [4] - 11:15, 45:7, 53:22, 55:8
**hired** [1] - 47:3
**history** [2] - 30:25, 36:22
**hold** [1] - 58:22
**holding** [2] - 37:24, 38:25
**home** [10] - 43:11, 62:24, 63:2, 64:21, 82:20, 84:14, 84:16, 84:19, 85:1
**homes** [2] - 64:10, 82:18
**Honor** [57] - 2:5, 2:8, 2:13, 2:18, 4:15, 4:18, 5:4, 5:8, 5:11, 7:4, 7:19, 7:20, 8:8, 8:12, 9:11, 10:14, 10:22, 11:12, 17:9, 19:2, 21:21, 30:19, 31:22, 33:12, 35:18, 47:14, 51:6, 52:14, 54:6, 54:14, 54:22, 55:5, 58:18, 59:11, 60:6, 60:22, 64:11, 66:25, 67:4, 69:23, 77:20, 77:25, 78:14, 78:18, 80:1, 80:6, 80:20, 81:11, 81:14, 92:17, 92:20, 93:3, 93:23, 94:23, 94:25
**Honor's** [1] - 94:9
**HONORABLE** [1] - 1:8
**Honorable** [1] - 95:20
**hope** [3] - 15:20, 30:14, 66:16
**hoped** [1] - 92:21
**hopefully** [4] - 3:14, 4:22, 55:3, 81:16
**hour** [1] - 94:3
**hours** [3] - 42:9, 42:11, 63:22
**House** [1] - 31:16
**hundreds** [1] - 25:20
**hunt** [5] - 77:11, 77:15
**Hur** [1] - 53:19
**husband** [1] - 87:24
**hypothetical** [3] - 72:13, 72:15, 72:19

## I

**idea** [5] - 45:15, 49:5, 59:21, 73:22, 94:24
**identified** [3] - 84:10, 87:12, 91:20
**identifies** [2] - 83:24, 84:1
**identify** [3] - 39:3, 76:13, 89:21
**IG** [1] - 77:1
**ignored** [7] - 26:18, 28:23, 29:13, 30:6, 79:7
**imagine** [2] - 45:9, 74:11
**immediately** [1] - 37:23
**immunity** [2] - 71:22, 89:7
**Immunity** [1] - 71:16
**immunize** [1] - 71:18
**impact** [1] - 90:2
**impacted** [1] - 60:4
**important** [11] - 5:16, 6:12, 10:23, 13:18, 16:14, 16:15, 22:7, 49:25, 60:24, 68:17, 70:7
**importantly** [1] - 15:17
**impression** [1] - 7:2
**improperly** [1] - 87:20
**impropriety** [1] - 15:8
**IN** [1] - 1:1
**in-flows** [1] - 76:21
**inaccuracies** [1] - 44:10
**inaccurately** [1] - 65:17
**include** [3] - 3:10, 65:1, 87:15
**included** [2] - 22:4, 45:3
**includes** [1] - 53:5
**including** [3] - 48:25, 51:17, 78:25
**income** [6] - 25:25, 42:16, 42:17, 42:18, 74:19, 74:22
**inconsistent** [1] - 63:9
**incumbent** [1] - 69:15
**independence** [1] - 58:6
**indicated** [4] - 17:6, 63:19, 94:11, 95:9
**indicates** [1] - 68:9
**indicating** [1] - 65:20
**indict** [6] - 23:19, 30:13, 30:14, 36:9, 74:2

**indicted** [4] - 36:16, 39:21, 40:1, 55:15
**indictment** [81] - 3:6, 5:10, 6:16, 7:5, 15:23, 18:16, 28:13, 28:19, 28:24, 30:1, 30:11, 30:12, 32:1, 32:23, 32:24, 33:4, 33:18, 34:3, 34:14, 34:19, 36:14, 38:2, 38:16, 39:20, 39:24, 40:3, 40:14, 40:18, 40:21, 50:11, 53:2, 53:5, 53:9, 56:9, 56:14, 56:22, 58:16, 58:17, 60:7, 60:12, 60:21, 61:2, 61:16, 62:2, 62:17, 63:8, 63:11, 64:1, 64:7, 64:17, 65:21, 66:10, 67:4, 67:12, 67:14, 67:21, 68:2, 68:12, 69:8, 73:23, 75:12, 79:1, 81:22, 83:2, 83:5, 83:10, 83:12, 83:14, 83:16, 83:19, 83:23, 84:1, 84:6, 84:11, 84:12, 84:22, 84:25, 88:12, 90:10, 92:5
**indictments** [1] - 36:20
**individual** [6] - 4:2, 8:25, 67:8, 67:15, 74:18, 86:11
**individuals** [6] - 8:17, 17:6, 43:20, 58:9, 90:12, 90:15
**indulged** [2] - 77:23, 78:3
**indulgence** [4] - 59:10, 66:21, 81:19, 94:5
**influenced** [1] - 87:10
**inform** [1] - 83:3
**information** [39] - 10:6, 18:10, 18:12, 18:13, 18:15, 26:12, 26:23, 27:4, 35:20, 44:17, 45:13, 46:18, 55:24, 56:8, 62:4, 63:7, 64:22, 65:15, 66:1, 66:4, 66:7, 67:9, 67:18, 67:22, 68:13, 70:7, 73:8, 73:12, 73:17, 75:6, 76:2, 79:12, 79:15, 79:20, 85:4, 85:5, 85:12, 85:18, 91:18
**informs** [1] - 83:6

**initial** [1] - 92:13
**initiation** [1] - 49:3
**inquiry** [1] - 41:9
**insignificant** [1] - 46:7
**insisting** [2] - 74:4, 75:12
**instances** [1] - 67:8
**instead** [2] - 46:2, 72:3
**institution** [1] - 67:11
**instructions** [1] - 86:1, 92:3
**instructor** [1] - 88:2
**intend** [3] - 63:13, 63:16, 82:22
**intended** [1] - 84:23
**intent** [1] - 69:11
**interaction** [1] - 79:24
**intercedes** [1] - 86:22
**interest** [1] - 91:21
**interested** [5] - 18:10, 18:11, 18:14, 18:15, 54:6
**interfere** [1] - 88:13
**Internal** [1] - 67:15
**internal** [1] - 73:3
**international** [1] - 70:14
**interpret** [1] - 59:8
**interpretation** [1] - 63:5
**interpreted** [2] - 58:21, 73:4
**interrupt** [2] - 16:19, 22:18
**interrupting** [2] - 17:10, 35:9
**interview** [1] - 72:7
**interviewed** [2] - 12:4, 25:21
**interviews** [1] - 89:10
**introduce** [1] - 2:12
**introducing** [1] - 40:15
**introductions** [1] - 2:17
**investigate** [2] - 76:17, 87:23
**investigating** [2] - 25:20, 89:13
**investigation** [37] - 12:5, 12:6, 12:23, 17:20, 17:25, 18:2, 18:22, 19:22, 20:7, 20:10, 21:13, 21:23, 21:24, 23:13, 26:19, 44:13, 44:18, 50:11, 52:19, 53:17, 54:4, 74:1, 74:12, 76:9, 76:11, 76:19, 87:11,

87:16, 87:20, 89:2, 89:17, 89:18, 90:2, 91:9, 91:13, 91:16
**investigations** [6] - 12:6, 30:20, 30:21, 38:3, 49:3, 88:19
**investigators** [1] - 89:9
**investing** [1] - 15:9
**invidious** [2] - 43:22, 90:14
**invite** [2] - 5:1, 85:16
**invited** [3] - 9:14, 46:15, 85:22
**invites** [1] - 3:22
**involve** [1] - 82:14
**involved** [3] - 17:7, 19:4, 21:14
**involvement** [1] - 91:13, 91:22
**involves** [1] - 42:22
**involving** [1] - 53:8
**ire** [1] - 12:9
**irrelevant** [3] - 13:14, 14:3, 57:19
**IRS** [2] - 20:12, 50:12
**isolated** [1] - 57:16
**issue** [13] - 3:17, 5:16, 6:12, 14:24, 17:16, 27:16, 42:20, 71:24, 74:18, 81:18, 83:24, 84:2, 94:7
**issued** [2] - 19:21, 54:3
**issues** [12] - 4:13, 16:6, 16:10, 18:8, 19:24, 21:15, 33:9, 34:10, 59:8, 81:17, 93:2, 95:14
**items** [1] - 45:25
**itself** [4] - 11:17, 19:9, 19:24, 64:17

## J

**January** [6] - 9:12, 13:8, 38:2, 46:22, 51:11, 51:18
**Jason** [1] - 34:6
**Jenkins** [4] - 45:5, 45:7, 47:2, 47:5
**Jenkins's** [2] - 44:15, 45:3
**jeopardy** [1] - 34:3
**job** [3] - 70:16, 74:6, 77:17
**joint** [2] - 94:12, 94:19
**joke** [1] - 25:2
**joy** [1] - 6:5
**Judge** [14] - 16:5,

16:14, 27:11, 27:24, 31:10, 32:20, 35:4, 44:21, 45:11, 45:13, 58:20, 64:22, 66:13
**JUDGE** [1] - 1:8
**judge** [3] - 5:23, 30:17, 33:24
**judicial** [1] - 24:8
**jumble** [1] - 37:11
**jumping** [1] - 48:25
**Jury** [54] - 18:6, 18:8, 20:6, 21:1, 21:2, 26:10, 26:16, 26:18, 26:22, 27:1, 27:24, 28:3, 28:10, 28:17, 28:25, 29:13, 30:4, 30:10, 36:13, 36:14, 36:21, 39:2, 40:13, 41:1, 52:25, 53:13, 55:25, 56:2, 56:7, 56:17, 68:20, 69:8, 71:4, 71:15, 72:9, 73:9, 73:18, 74:15, 75:25, 78:15, 79:3, 79:5, 79:13, 79:15, 79:17, 79:21, 80:11, 88:7, 88:12, 89:6, 89:11, 91:18, 91:19
**jury** [3] - 47:15, 94:10
**Justice** [4] - 29:10, 32:13, 48:3, 59:17
**justice** [10] - 5:20, 7:16, 22:24, 33:21, 34:17, 34:19, 73:1, 73:2, 73:7, 91:4
**Justice's** [2] - 37:20, 91:15
**justified** [1] - 8:10
**Justin** [2] - 4:22, 55:2

## K

**keep** [6] - 71:11, 71:18, 76:4, 78:9, 80:6
**keeping** [2] - 4:21, 49:21
**keeps** [2] - 72:25, 75:25
**kelley** [1] - 1:15
**Kelley** [1] - 2:21
**kept** [4] - 28:4, 46:8, 74:4, 75:12
**Key** [4] - 43:13, 61:4, 64:10, 82:19
**key** [1] - 38:12
**kind** [2] - 6:5, 79:18
**Kissimmee** [13] - 43:12, 61:6, 61:8, 61:9, 61:10, 62:25,

64:10, 82:19, 82:20,
82:24, 84:17, 84:24
**knocks** [1] - 30:4
**knowing** [2] - 73:18,
73:19
**knowingly** [7] - 64:8,
64:14, 67:9, 68:16,
82:16, 84:7
**knows** [7] - 7:19, 7:20,
8:12, 17:14, 19:2,
81:9

## L

**lack** [1] - 42:10
**laid** [2] - 42:9, 63:22
**land** [1] - 56:19
**language** [2] - 62:19,
72:13
**large** [1] - 43:10
**largely** [1] - 88:25
**last** [8] - 19:5, 33:2,
53:14, 62:11, 66:6,
66:7, 78:5, 78:8
**lastly** [5] - 25:1, 82:22,
88:17, 90:24, 92:6
**late** [1] - 37:13
**launch** [1] - 50:11
**law** [36] - 4:20, 5:24,
29:16, 29:20, 33:11,
33:23, 36:17, 36:24,
37:4, 37:7, 37:9,
37:14, 38:4, 38:6,
38:20, 39:3, 40:7,
43:7, 43:17, 44:3,
44:5, 51:11, 56:9,
56:10, 56:11, 56:18,
56:25, 57:9, 67:24,
67:25, 72:17, 74:15,
86:13, 86:24, 89:14
**LAW** [1] - 54:12
**Lawless** [1] - 37:13
**lawyer** [6] - 37:17,
37:18, 37:24, 40:21,
47:3, 48:9
**lawyers** [7] - 36:2,
36:3, 44:19, 56:21,
73:6, 75:9, 75:19
**lay** [1] - 50:10
**layers** [1] - 48:24
**laying** [1] - 13:12
**lays** [3] - 67:7, 81:4,
83:15
**lead** [11] - 7:18, 11:14,
12:14, 13:15, 15:1,
15:22, 17:3, 20:20,
23:12, 34:14, 57:24
**leadership** [2] - 21:1,
50:15
**leading** [2] - 31:14,

94:9
**leak** [3] - 9:22, 12:3,
12:23
**leaked** [3] - 12:20,
37:23, 44:17
**leaking** [2] - 12:5,
87:16
**learn** [1] - 76:16
**learned** [1] - 37:7
**least** [5] - 5:12, 17:23,
28:21, 59:19, 85:10
**leave** [2] - 56:19,
59:12
**led** [1] - 23:13
**left** [1] - 48:14
**legal** [7] - 7:21, 11:8,
32:19, 36:17, 82:25,
85:6, 88:23
**legally** [1] - 39:9
**lending** [1] - 67:10
**lends** [2] - 19:9, 19:24
**length** [1] - 44:10
**Lenzner** [2] - 53:20,
53:21
**Leo** [7] - 1:11, 2:7,
23:4, 26:23, 32:21,
34:15, 81:23
**less** [2] - 33:10, 42:22
**letter** [12] - 6:3, 39:3,
43:17, 45:2, 46:23,
49:11, 72:1, 72:16,
72:20, 74:5, 74:15,
79:23
**letters** [7] - 19:3, 19:7,
28:1, 37:19, 37:22,
45:22, 79:4
**level** [1] - 77:7
**levels** [1] - 47:23
**Leverage** [1] - 40:8
**liberty** [2] - 6:15, 7:16
**lie** [1] - 25:6
**lied** [1] - 60:1
**lien** [6] - 64:9, 82:17,
84:1, 84:2, 84:5,
84:8
**lies** [2] - 67:5, 67:6
**life** [3] - 6:15, 14:7,
14:25
**light** [1] - 45:17
**likelihood** [6] - 8:3,
8:6, 10:25, 17:18,
38:13, 87:6
**likely** [3] - 33:9, 33:10
**limine** [3] - 5:19,
93:13, 94:8
**limitations** [3] - 81:25,
82:8, 92:8
**line** [7] - 12:24, 36:7,
47:20, 52:17, 52:23,
57:4, 57:6

**link** [1] - 23:10
**list** [1] - 52:3
**listen** [6] - 21:4, 26:15,
28:15, 55:9, 60:1,
66:10
**listened** [1] - 75:13
**literally** [1] - 75:2
**litigate** [1] - 27:11
**litigating** [3] - 27:10,
27:19, 27:20
**litigation** [1] - 2:11
**lives** [1] - 6:22
**LKG-22-0007** [1] - 1:5
**LKG-22-7** [1] - 2:7
**local** [1] - 82:1
**locked** [1] - 42:24
**logic** [1] - 44:2
**logical** [1] - 10:23
**Lombard** [1] - 1:24
**Longboat** [4] - 43:13,
61:4, 64:10, 82:19
**look** [20] - 7:24, 31:11,
31:19, 33:12, 33:25,
44:20, 45:19, 55:23,
61:15, 73:3, 74:13,
74:17, 76:11, 76:12,
78:18, 78:19, 78:25,
79:8, 80:18, 95:18
**looked** [2] - 28:22,
46:17
**looking** [12] - 10:7,
18:2, 18:9, 23:3,
23:5, 26:20, 31:17,
74:7, 74:15, 74:17,
83:10, 85:17
**looks** [2] - 95:10,
95:12
**lose** [1] - 42:17
**loss** [3] - 24:21, 24:22,
24:23
**lost** [5] - 35:17, 35:19,
42:16, 75:15, 75:21
**low** [1] - 68:12
**Lydia** [1] - 37:13
**LYDIA** [1] - 1:8
**Lynch** [1] - 33:21

## M

**ma'am** [2] - 11:20,
22:25
**machine** [1] - 49:17
**Magistrate** [2] - 49:1
**mail** [8] - 6:3, 28:4,
49:10, 72:20, 74:5,
79:1, 79:3, 80:9
**mails** [1] - 19:8
**main** [2] - 22:23, 54:17
**maintain** [5] - 63:4,
63:13, 63:16, 82:23,

84:23
**maker** [1] - 36:6
**man's** [1] - 56:19
**manage** [1] - 58:11
**management** [5] -
61:19, 63:2, 84:16,
84:20, 85:1
**manifested** [1] - 11:17
**manner** [3] - 9:7, 89:8,
89:10
**manual** [5] - 29:15,
29:16, 29:20, 30:16,
33:21, 55:23, 56:18,
56:24, 73:1, 73:2,
73:7, 91:16
**manual's** [1] - 79:16
**manuals** [2] - 33:22,
53:7
**March** [3] - 39:23,
84:3, 84:5
**MARILYN** [1] - 1:5
**Marilyn** [12] - 2:6,
2:19, 5:8, 6:14,
28:16, 36:15, 62:24,
63:3, 63:12, 63:20,
64:8, 67:5
**mark** [1] - 52:8
**marked** [1] - 37:22
**MARYLAND** [2] - 1:1,
1:9
**Maryland** [12] - 1:24,
17:21, 18:19, 18:20,
20:2, 20:10, 22:23,
36:22, 87:19, 87:22,
91:21
**mask** [5] - 4:4, 4:8,
4:9, 5:5, 10:3
**masked** [1] - 4:1
**masking** [1] - 3:25
**material** [2] - 27:10,
59:24
**materials** [1] - 54:2
**matter** [19] - 3:3,
14:23, 16:25, 17:3,
18:6, 19:15, 19:16,
21:1, 27:15, 29:20,
29:24, 53:17, 67:4,
79:16, 81:23, 84:2,
87:23, 89:13, 96:5
**mattered** [1] - 58:4
**matters** [5] - 4:10,
4:13, 13:21, 14:6,
27:15
**mayor** [2] - 77:14
**McCann** [1] - 40:10
**mean** [10] - 49:9,
49:12, 52:8, 56:13,
56:24, 56:25, 64:21,
65:18, 66:2, 80:6
**meandering** [1] - 36:6

**means** [1] - 67:16
**meant** [1] - 42:3
**meet** [17] - 6:23, 8:16,
9:10, 10:12, 18:3,
19:4, 21:22, 36:1,
55:21, 56:21, 64:2,
71:11, 75:16, 75:23,
88:10, 88:23, 89:7
**meeting** [33] - 9:14,
9:15, 9:20, 11:24,
12:8, 12:11, 13:20,
13:22, 13:23, 14:2,
14:5, 16:24, 19:8,
25:2, 25:8, 46:4,
46:5, 46:7, 46:9,
46:11, 46:15, 49:20,
50:4, 51:20, 51:21,
59:3, 71:10, 71:12,
75:10, 78:16, 87:24
**meetings** [6] - 46:10,
73:24, 74:3, 75:11,
75:13, 88:10
**meets** [1] - 83:11
**Melissa** [2] - 96:3,
96:7
**melissa** [1] - 1:23
**member** [3] - 6:4, 6:8,
48:8
**members** [1] - 31:18
**mention** [1] - 4:19
**mentioned** [2] - 20:18
**mere** [1] - 9:9
**message** [1] - 15:16
**met** [9] - 9:10, 21:10,
21:11, 21:22, 34:8,
38:10, 71:12, 75:4,
75:13, 90:18, 91:4
**microphone** [1] - 67:2
**might** [2] - 65:22,
93:14
**mightily** [1] - 35:18
**mile** [1] - 77:18
**Miller** [2] - 1:15, 2:21
**millions** [1] - 25:23
**mind** [2] - 49:22,
71:19
**minimal** [1] - 14:19
**minutes** [5] - 3:19,
3:20, 3:21, 59:9,
78:9
**misleading** [1] - 78:15
**misplaced** [1] - 68:19
**misrepresentation** [1]
- 73:5
**missing** [2] - 62:1,
62:17
**mission** [1] - 3:14
**misstatements** [1] -
48:22
**misunderstands** [1] -

10:9
**mixing** [1] - 41:9
**MM** [1] - 80:11
**moment** [1] - 78:1
**money** [9] - 9:2, 9:5,
14:19, 15:9, 15:19,
42:15, 42:22, 42:23,
59:21
**moniker** [1] - 58:9
**month** [1] - 19:5
**months** [10] - 19:4,
33:4, 33:17, 39:20,
39:24, 40:4, 46:19,
50:1, 57:24, 67:20
**Moore** [1] - 33:20
**morning** [1] - 5:6
**mortgage** [17] - 43:11,
43:12, 43:13, 43:15,
61:12, 61:13, 61:16,
61:17, 62:25, 64:9,
68:17, 69:5, 73:13,
82:18, 84:8, 84:9
**mortgages** [1] - 43:10
**MOSBY** [1] - 1:5
**Mosby** [17] - 2:7, 2:20,
5:8, 6:14, 9:19,
15:12, 28:16, 31:25,
36:15, 63:1, 63:3,
63:12, 63:20, 64:8,
71:13, 87:25, 94:1
**Mosby's** [3] - 39:8,
62:24, 67:5
**most** [5] - 13:13, 37:7,
46:25, 86:3, 88:25
**motion** [58] - 5:9,
5:19, 5:21, 6:5, 6:18,
23:7, 26:14, 29:16,
37:1, 37:3, 37:5,
38:18, 39:1, 39:8,
43:23, 45:20, 45:21,
56:12, 57:10, 58:19,
58:25, 60:11, 60:18,
60:19, 60:20, 63:19,
65:3, 65:6, 66:5,
67:22, 68:13, 69:10,
69:18, 71:19, 80:2,
82:2, 82:3, 82:5,
82:6, 82:7, 82:9,
82:12, 83:1, 85:7,
85:20, 85:22, 85:25,
86:2, 86:3, 86:4,
88:22, 90:7, 90:22,
91:24, 92:2, 92:4,
92:6
**motions** [20] - 3:3,
3:8, 3:14, 35:6, 37:1,
37:7, 37:11, 37:15,
37:16, 38:7, 55:4,
58:25, 80:25, 81:2,
91:1, 92:10, 93:13,

94:8, 95:8
**motivated** [2] - 39:10,
91:9
**move** [1] - 3:1
**moved** [6] - 3:4, 3:5,
3:6, 79:25, 81:21,
81:25
**MR** [100] - 2:5, 2:13,
2:18, 4:15, 4:18, 5:4,
10:4, 10:14, 10:22,
11:3, 11:12, 11:20,
11:22, 11:24, 13:3,
13:8, 13:10, 14:14,
14:16, 15:5, 15:7,
16:3, 16:5, 16:8,
16:11, 16:14, 16:17,
16:20, 16:22, 17:1,
17:9, 20:4, 20:19,
20:22, 22:15, 22:25,
23:4, 23:9, 23:12,
24:6, 27:7, 29:5,
29:8, 29:12, 31:2,
31:6, 31:8, 31:10,
32:17, 32:20, 35:8,
35:15, 47:13, 48:1,
48:12, 50:22, 50:25,
51:4, 52:21, 53:1,
53:18, 54:11, 54:13,
54:22, 55:5, 55:7,
60:17, 60:22, 61:7,
61:8, 61:10, 62:6,
62:9, 62:13, 62:21,
65:11, 65:17, 66:3,
66:18, 66:20, 66:22,
66:25, 69:23, 77:22,
77:25, 78:14, 78:22,
78:24, 80:6, 81:11,
81:14, 92:17, 92:20,
93:3, 93:8, 93:23,
94:1, 94:15, 94:23,
94:25
**multiple** [4] - 43:9,
69:5, 75:11, 75:12
**must** [8] - 43:20, 83:7,
86:16, 86:18, 87:5,
90:6, 90:11, 91:23

# N

**name** [3] - 5:8, 59:15,
76:15
**names** [1] - 75:7
**narrative** [2] - 46:3,
67:15
**nasty** [3] - 74:4, 74:5,
80:9
**national** [2] - 70:12,
77:7
**nature** [2] - 83:15,
85:11

**nay** [1] - 61:24
**near** [1] - 95:18
**necessary** [2] - 83:17,
93:14
**need** [8] - 22:3, 26:7,
63:7, 63:18, 64:22,
66:11, 95:13
**needed** [1] - 95:3
**network** [1] - 48:20
**never** [29] - 6:20, 7:1,
7:14, 8:19, 9:23,
15:10, 15:14, 24:3,
25:14, 28:1, 28:2,
28:3, 28:18, 38:1,
40:20, 41:2, 41:18,
41:23, 46:11, 50:12,
56:6, 59:20, 71:7,
72:18, 75:11, 75:22,
75:23, 76:1
**new** [4] - 31:22, 44:3,
58:2, 67:23
**New** [2] - 34:7, 57:11
**newspaper** [1] - 11:19
**next** [4] - 3:15, 27:24,
28:19, 34:4
**Nick** [2] - 31:25, 87:25
**nine** [6] - 24:17, 24:18,
36:2, 67:8, 75:19
**NO** [1] - 1:4
**non** [1] - 48:23
**non-tax** [1] - 48:23
**none** [3] - 7:3, 7:15,
81:11
**nonsense** [1] - 73:16
**normally** [1] - 20:11
**North** [2] - 34:6, 34:7
**NORTHERN** [1] - 1:2
**nothing** [10] - 7:12,
40:17, 51:18, 51:19,
51:22, 52:9, 71:21,
80:1, 80:16, 95:15
**notice** [4] - 24:8, 68:7,
74:12, 84:5
**notices** [2] - 64:13,
64:15
**notwithstanding** [2] -
9:24, 67:21
**number** [6] - 3:10,
17:19, 34:2, 51:16,
80:8, 87:12
**numbers** [2] - 24:20,
80:17
**Nunez** [2] - 1:19, 2:23
**Nunez-Henry** [1] -
1:19

# O

**oath** [1] - 45:7
**object** [1] - 24:9

**objection** [4] - 81:2,
81:7, 81:10, 81:12
**objections** [1] - 89:1
**objective** [13] - 8:10,
9:7, 10:7, 20:1, 21:9,
21:20, 23:6, 25:13,
27:22, 33:25, 34:12,
86:5, 86:17
**objectively** [1] - 8:13
**obligation** [2] - 21:12,
35:21
**obligations** [2] -
17:14, 17:15
**obviously** [4] - 4:8,
36:2, 48:20
**occasions** [2] - 36:15,
42:6
**occupancy** [1] - 84:21
**occurred** [11] - 14:13,
16:2, 16:9, 16:10,
16:12, 16:25, 39:16,
46:19, 64:1, 69:4,
87:18
**OCE** [1] - 31:13
**October** [3] - 24:1,
24:9, 80:10
**OF** [3] - 1:1, 1:3, 1:7
**offense** [4] - 68:3,
68:6, 83:6, 83:9
**offenses** [4] - 83:15,
83:16, 86:13, 90:17
**offensive** [1] - 7:13
**offering** [2] - 61:22
**Office** [18] - 9:14,
20:10, 20:17, 22:23,
23:20, 32:16, 37:20,
44:17, 47:19, 47:23,
51:10, 51:11, 51:13,
51:17, 70:1, 70:10,
75:18, 87:21
**office** [16] - 9:15, 9:23,
20:23, 31:13, 39:11,
39:19, 40:2, 48:11,
48:19, 52:20, 53:4,
53:6, 53:17, 70:3,
70:14, 89:19
**officer** [2] - 55:19,
70:15
**officers** [1] - 9:17
**Official** [2] - 1:23, 96:8
**official** [4] - 7:13,
26:1, 31:2, 31:5
**officials** [6] - 30:22,
30:25, 47:23, 53:9,
57:22, 88:19
**old** [1] - 35:9
**once** [5] - 25:4, 32:1,
35:19, 41:14, 93:16
**one** [51] - 4:2, 6:13,
8:6, 9:4, 9:11, 9:22,

14:6, 14:8, 16:17,
17:16, 22:7, 24:19,
28:6, 28:16, 31:15,
33:11, 35:15, 35:25,
36:7, 36:14, 43:10,
43:11, 43:12, 44:19,
48:14, 51:16, 60:18,
60:23, 61:1, 63:2,
64:18, 65:10, 65:21,
66:14, 71:1, 71:21,
73:10, 73:18, 73:21,
73:24, 74:5, 75:16,
75:22, 75:23, 76:4,
77:8, 78:18, 79:8
**one-way** [1] - 73:24
**open** [2] - 9:21, 52:19
**opened** [1] - 20:7
**opening** [1] - 3:20
**operate** [1] - 42:12
**operating** [1] - 59:25
**opinion** [6] - 7:17,
38:5, 49:13, 81:4,
81:16, 89:1
**opinions** [1] - 40:11
**opponents** [6] - 14:9,
14:16, 14:17, 14:25,
15:20, 87:18
**opportunity** [2] -
14:11, 94:3
**oppose** [1] - 9:9
**opposed** [1] - 38:5
**opposite** [1] - 40:8
**opposition** [2] - 3:7,
58:25
**OPR** [1] - 45:23
**oral** [10] - 3:2, 3:12,
3:17, 70:25, 81:3,
81:10, 81:12, 81:18,
92:9, 95:6
**orally** [2] - 81:2, 81:8
**oranges** [1] - 41:10
**order** [9] - 3:17, 17:24,
22:2, 36:18, 36:25,
38:21, 92:10, 94:13,
95:9
**organization** [1] - 58:7
**organizational** [1] -
55:11
**origin** [1] - 89:21
**origins** [1] - 17:19
**Orleans** [2] - 34:7,
57:11
**otherwise** [1] - 90:20
**ourselves** [1] - 79:6
**outcome** [2] - 49:23,
50:9
**outflows** [1] - 76:20
**outline** [1] - 81:17
**overblown** [1] - 70:22
**overvaluing** [1] -

23:16
**overwhelming** [1] - 42:1
**own** [12] - 9:5, 39:13, 40:6, 42:12, 49:5, 52:19, 52:24, 56:9, 69:14, 74:1, 77:3, 90:16
**ownership** [3] - 63:4, 63:14, 82:23

**P**

**p.m** [1] - 95:22
**page** [8] - 13:18, 38:25, 39:7, 69:5, 71:9, 81:25, 82:7, 92:7
**pages** [3] - 44:12, 67:14
**painfully** [2] - 30:17, 30:18
**pandemic** [2] - 82:16, 83:22
**Paola** [2] - 1:19, 2:23
**paper** [1] - 11:13
**papers** [23] - 5:12, 6:10, 7:10, 10:2, 10:5, 11:10, 11:19, 12:25, 13:14, 13:21, 24:7, 32:10, 32:22, 40:8, 45:16, 46:6, 60:23, 64:21, 79:9, 80:2, 80:23, 82:11, 87:14
**paperwork** [1] - 5:18
**pardon** [1] - 84:4
**part** [7] - 10:11, 10:18, 18:22, 18:23, 41:10, 64:6, 79:18
**participating** [2] - 2:14, 4:3
**participation** [2] - 81:24, 91:1
**particular** [7] - 10:20, 24:5, 31:5, 62:16, 62:22, 83:19, 86:6
**particularly** [1] - 75:13
**Particulars** [22] - 3:5, 60:19, 60:24, 61:1, 62:16, 62:20, 63:18, 65:3, 66:5, 67:2, 67:18, 67:24, 68:11, 69:1, 69:18, 81:22, 82:4, 82:10, 83:2, 85:8, 85:25, 92:2
**particulars** [2] - 82:13, 84:13
**parties** [15] - 3:2, 3:9, 3:10, 3:16, 12:21,

78:7, 81:2, 81:8, 81:24, 85:16, 86:1, 92:24, 94:19, 95:11, 95:13
**parties'** [4] - 11:19, 81:18, 82:7, 92:7
**passed** [1] - 44:3
**Passover** [1] - 95:17
**past** [2] - 30:24, 35:19
**pay** [2] - 33:22, 70:23
**payment** [1] - 76:13
**penalty** [1] - 43:1
**penchant** [1] - 30:21
**pending** [3] - 5:10, 92:9, 95:8
**people** [20] - 11:13, 14:23, 15:11, 15:17, 22:21, 29:6, 29:9, 29:18, 31:17, 42:4, 42:16, 50:2, 51:17, 51:24, 57:1, 58:10, 58:14, 70:17, 77:9
**per** [1] - 58:18
**percent** [1] - 25:24
**perfect** [1] - 71:23
**perhaps** [6] - 6:10, 9:18, 54:19, 65:24, 85:11, 94:17
**perjure** [1] - 25:4
**perjured** [1] - 9:5
**perjurious** [1] - 68:15
**perjury** [15] - 8:25, 21:25, 22:12, 22:13, 23:16, 24:17, 25:2, 25:3, 25:7, 25:16, 26:6, 43:7, 69:3, 73:13
**permitted** [1] - 91:2
**person** [2] - 58:10, 84:20
**personal** [19] - 5:17, 5:19, 5:22, 6:7, 6:11, 10:10, 10:18, 12:13, 13:25, 37:12, 38:1, 70:6, 74:22, 86:7, 87:9, 90:1, 90:4, 91:8
**personally** [2] - 7:14, 12:14
**perspective** [1] - 62:2
**persuasively** [1] - 68:23
**pertain** [1] - 14:12
**pertinent** [1] - 20:1
**picture** [1] - 31:20
**piece** [7] - 6:11, 13:12, 27:12, 27:20, 35:5, 78:15, 79:22
**pin** [1] - 6:11
**place** [2] - 76:24,

95:12
**placed** [2] - 37:15, 84:3
**Plain** [1] - 68:2
**plainly** [1] - 86:24
**Plaintiff** [2] - 1:3, 1:10
**plan** [5] - 42:13, 67:10, 69:14, 76:22, 94:20
**plans** [4] - 42:23, 43:1, 43:2
**play** [3] - 28:11, 77:5, 77:15
**played** [2] - 71:5, 71:24
**plea** [5] - 44:15, 44:21, 44:24, 45:24, 68:5
**plead** [1] - 83:8
**pleadings** [1] - 68:25
**pled** [1] - 77:15
**plenty** [1] - 74:2
**podium** [9] - 3:23, 5:2, 35:14, 47:8, 54:19, 54:25, 78:13, 78:21, 93:5
**point** [28] - 8:14, 9:12, 10:1, 20:1, 22:20, 30:14, 31:15, 33:24, 35:25, 47:7, 48:5, 48:14, 49:12, 55:9, 57:17, 57:19, 58:3, 58:10, 60:23, 62:15, 68:17, 71:19, 72:3, 72:24, 76:1, 85:15, 89:14, 92:16
**pointed** [4] - 45:1, 51:15, 54:1, 88:7
**pointing** [1] - 65:25
**points** [6] - 37:25, 50:18, 54:17, 65:21, 78:7, 83:23
**police** [1] - 9:17
**policy** [3] - 3:25, 53:7
**politely** [1] - 40:22
**political** [6] - 15:9, 57:18, 79:19, 87:17, 87:18, 88:13
**politicians** [2] - 77:5, 77:12
**Politico** [1] - 30:22
**politics** [1] - 6:15
**poorly** [1] - 37:12
**portion** [1] - 38:25
**pose** [2] - 38:12, 87:6
**poses** [1] - 85:13
**position** [17] - 10:8, 10:9, 10:12, 17:11, 18:14, 20:6, 29:3, 52:18, 57:7, 59:19, 60:7, 63:23, 66:10, 68:23, 70:4, 70:5,

93:15
**possibility** [7] - 49:16, 71:14, 71:18, 72:19, 80:14, 80:15
**possible** [1] - 81:6
**post** [2] - 7:3, 57:5
**power** [4] - 52:19, 52:24, 55:14, 58:6
**powerful** [1] - 34:16
**PPP** [1] - 9:2
**practice** [1] - 81:3
**pre** [3] - 40:18, 73:23, 75:12
**pre-indictment** [3] - 40:18, 73:23, 75:12
**preceded** [1] - 40:3
**preceding** [1] - 54:4
**precisely** [1] - 67:19
**precision** [1] - 67:7
**predated** [2] - 40:3, 89:18
**prejudice** [6] - 25:4, 25:9, 82:4, 85:20, 85:25, 92:2
**prejudiced** [1] - 22:15
**preliminarily** [1] - 94:6
**preliminary** [4] - 4:10, 4:12, 4:13
**preparation** [1] - 85:14
**prepare** [1] - 92:23
**prepared** [5] - 34:14, 69:13, 81:1, 92:24, 93:1
**preparing** [2] - 65:19, 85:23
**preposterous** [1] - 49:6
**presence** [1] - 89:19
**Present** [1] - 1:17
**present** [9] - 3:22, 4:6, 8:10, 36:20, 39:12, 40:5, 75:19, 88:6, 91:5
**presentation** [2] - 40:16, 59:1
**presentations** [1] - 95:6
**presented** [6] - 32:12, 38:16, 73:9, 73:17, 75:6, 76:2
**presenting** [1] - 35:13
**President** [1] - 87:25
**press** [2] - 37:25, 39:23
**presume** [2] - 21:17, 90:20
**presumption** [6] - 11:2, 11:4, 38:12, 49:15, 87:1

**pretrial** [13] - 3:3, 6:22, 7:3, 57:5, 57:10, 57:13, 57:16, 57:20, 58:17, 60:11, 65:23, 93:2, 95:8
**prevail** [1] - 43:23
**prevent** [1] - 86:23
**prevented** [1] - 40:25
**previously** [3] - 88:18, 91:7, 92:10
**primarily** [3] - 10:10, 20:14, 48:5
**private** [1] - 55:21
**probable** [2] - 68:20, 69:9
**probative** [1] - 27:10
**problem** [3] - 23:22, 43:3, 66:15
**problematic** [1] - 90:11
**procedure** [1] - 53:7
**Procedure** [2] - 7:20, 68:1
**proceed** [2] - 83:18, 95:14
**proceeding** [2] - 20:11, 92:22
**PROCEEDINGS** [1] - 1:7
**Proceedings** [1] - 95:22
**proceedings** [8] - 4:3, 55:3, 65:23, 90:17, 91:21, 91:25, 93:2, 96:5
**process** [13] - 6:16, 7:16, 20:12, 30:2, 30:12, 34:20, 52:20, 59:23, 59:25, 73:22, 73:23, 76:8, 85:21
**producing** [1] - 66:6
**productive** [1] - 75:14
**Professional** [2] - 37:20, 91:12
**professionally** [1] - 40:23
**proffer** [1] - 72:6
**proffered** [1] - 46:18
**programs** [1] - 43:6
**progress** [2] - 85:19, 92:22
**promptly** [2] - 55:4, 81:6
**prong** [2] - 41:18, 41:24
**prongs** [1] - 43:23
**proper** [1] - 62:18
**properly** [1] - 6:20
**property** [20] - 23:16, 61:4, 61:10, 61:14,

61:18, 61:21, 61:22, 61:23, 62:25, 63:5, 63:14, 63:16, 82:17, 82:24, 84:3, 84:18, 84:22, 84:24, 85:2
**propose** [6] - 21:18, 22:8, 24:14, 85:15, 93:15, 94:12
**proposed** [6] - 21:24, 22:4, 22:5, 23:14, 24:10, 93:10
**proposes** [1] - 25:10
**proposing** [2] - 23:24, 24:2
**prosecute** [8] - 23:24, 24:2, 24:25, 27:15, 36:23, 43:22, 59:13, 90:14
**prosecuted** [20] - 8:18, 8:22, 9:3, 31:4, 41:22, 41:25, 43:15, 43:21, 43:25, 44:4, 59:18, 59:20, 68:5, 77:14, 86:12, 86:19, 87:4, 90:6, 90:13, 90:16
**prosecutes** [1] - 43:13
**prosecuting** [5] - 25:10, 30:21, 30:25, 42:21, 57:24
**prosecution** [42] - 5:25, 6:23, 7:21, 8:15, 9:7, 9:17, 10:13, 30:24, 32:11, 36:4, 36:19, 36:25, 37:15, 38:22, 39:16, 39:18, 41:13, 41:20, 43:16, 43:18, 44:5, 77:19, 80:12, 83:9, 86:14, 86:16, 86:20, 87:7, 87:11, 88:25, 89:3, 89:17, 89:24, 90:3, 90:8, 90:10, 90:19, 90:23, 91:10, 91:13
**Prosecution** [1] - 5:14
**prosecutions** [4] - 6:13, 31:14, 40:20, 88:19
**prosecutor** [23] - 7:18, 9:13, 11:14, 12:15, 13:15, 15:1, 15:22, 17:3, 20:20, 23:13, 24:12, 24:13, 29:23, 33:14, 34:15, 36:7, 37:10, 41:21, 55:16, 57:24, 86:21, 87:4
**prosecutor's** [1] - 40:15
**prosecutors** [12] -

9:21, 24:18, 28:6, 28:7, 53:5, 55:20, 56:21, 70:16, 86:6, 89:10, 89:13
**protected** [5] - 18:5, 38:23, 39:9, 41:13, 57:3
**protecting** [1] - 58:18
**protective** [1] - 39:4
**prove** [11] - 8:4, 8:5, 8:6, 10:24, 10:25, 17:17, 31:18, 33:8, 67:20, 69:11, 69:16
**provides** [3] - 38:6, 84:12, 85:5
**provision** [1] - 42:3
**public** [8] - 7:13, 9:3, 12:10, 26:1, 38:5, 49:12, 53:8, 55:13
**publicly** [1] - 9:16
**punish** [1] - 38:23
**punished** [3] - 36:16, 39:5, 41:5
**punishing** [2] - 86:21, 86:23
**purpose** [4] - 4:4, 9:15, 68:4, 68:10
**purposeful** [1] - 6:14
**purposes** [1] - 88:21
**pursue** [4] - 7:6, 52:24, 89:5
**pursued** [2] - 44:8, 44:9
**pursues** [1] - 25:25
**pursuing** [1] - 60:20
**put** [44] - 6:11, 8:19, 13:19, 15:19, 18:5, 18:19, 21:18, 22:9, 26:10, 26:12, 26:14, 26:17, 26:21, 27:12, 28:3, 28:9, 28:16, 28:25, 29:12, 29:18, 30:5, 30:9, 30:15, 38:11, 43:14, 47:9, 47:16, 55:25, 56:1, 56:2, 56:16, 58:1, 59:5, 60:5, 62:21, 65:18, 68:6, 79:5, 79:12, 79:14, 79:21, 89:11
**puts** [1] - 8:18

## Q

**qualifications** [1] - 64:3
**quality** [1] - 95:7
**quarantined** [2] - 42:8, 63:22
**Queen** [2] - 71:15, 72:8
**Queen-For-A-Day** [1] - 71:15
**questions** [26] - 19:9, 21:7, 32:1, 34:10, 38:8, 48:6, 50:17, 54:9, 54:17, 58:23, 59:2, 62:21, 63:19, 66:9, 74:14, 74:19, 74:20, 74:23, 77:20, 89:4, 89:8, 92:13, 92:15, 92:18
**quickly** [2] - 42:16, 79:25
**quite** [12] - 7:10, 11:9, 14:3, 41:25, 48:3, 55:1, 65:13, 78:10, 80:9, 81:19, 83:12, 95:4
**quote** [6] - 8:9, 41:8, 82:22, 82:24, 84:20, 84:21
**quoted** [2] - 40:8, 41:11
**quotes** [1] - 41:10
**QURESHI** [4] - 61:8, 93:23, 94:1, 94:15
**Qureshi** [9] - 1:15, 2:20, 93:3, 93:9, 93:10, 93:17, 93:20, 93:24, 94:14

## R

**race** [9] - 30:20, 31:5, 36:23, 43:21, 86:11, 89:23, 90:13, 90:16
**race-based** [2] - 30:20
**racial** [4] - 8:19, 31:19, 88:18
**raise** [6] - 31:19, 33:9, 54:20, 72:19, 78:17, 82:12
**raised** [9] - 71:13, 71:14, 71:17, 74:13, 74:19, 74:20, 74:21, 74:23, 89:15
**raising** [1] - 33:11
**rather** [1] - 55:4
**rational** [1] - 81:4
**rattle** [1] - 80:17
**rattled** [1] - 80:8

**Raymer** [3] - 41:8, 41:10, 41:14
**Raymond** [1] - 1:19
**re** [2] - 80:12, 87:4
**re-prosecuted** [1] - 87:4
**reach** [1] - 34:23
**reached** [4] - 51:22, 52:4, 52:6, 52:7
**reaching** [1] - 51:24
**read** [6] - 10:2, 10:5, 27:25, 28:12, 62:4, 81:19
**reading** [2] - 12:18, 62:18
**reads** [1] - 39:7
**ready** [2] - 5:2, 54:24
**real** [1] - 80:14
**realistic** [4] - 38:13, 49:15, 49:22, 50:7, 87:6
**realistically** [1] - 50:8
**reality** [3] - 36:7, 46:6, 56:14
**really** [20] - 5:16, 28:11, 29:14, 29:17, 30:17, 34:23, 35:17, 35:19, 38:8, 41:7, 41:9, 49:17, 57:17, 64:23, 66:11, 69:25, 70:21, 71:2, 78:6
**reason** [6] - 13:18, 21:13, 37:5, 47:4, 52:1, 79:11
**reasonable** [2] - 8:2, 85:18
**reasoned** [1] - 37:12
**reasons** [8] - 47:1, 60:12, 60:25, 65:2, 82:2, 82:5, 90:9, 91:23
**rebut** [1] - 40:15
**rebuttal** [3] - 3:21, 35:4, 59:12
**received** [5] - 64:13, 65:15, 66:1, 66:3, 84:4
**recent** [1] - 17:7
**recognition** [1] - 41:4
**recollection** [2] - 16:13, 72:6
**recommended** [1] - 31:14
**record** [4] - 45:25, 54:2, 94:22, 96:5
**recorded** [1] - 72:5
**recording** [2] - 45:3, 45:6
**recuse** [1] - 91:22
**recused** [1] - 53:21

**reduced** [2] - 42:9, 63:22
**reduction** [1] - 42:11
**Reed** [1] - 2:21
**refer** [1] - 22:19
**references** [1] - 83:14
**referral** [1] - 20:3
**referred** [1] - 87:20
**referring** [1] - 11:19
**reflect** [1] - 37:7
**refuse** [2] - 5:23, 18:25
**refused** [8] - 18:1, 18:2, 22:12, 24:19, 25:8, 39:24, 88:10, 88:11
**refuses** [1] - 25:9
**refutes** [1] - 88:20
**regard** [13] - 5:25, 20:2, 22:12, 23:8, 25:1, 34:20, 40:17, 62:22, 62:23, 64:6, 64:9, 83:22, 93:2
**regarding** [5] - 6:12, 68:14, 84:23, 88:14, 88:15
**regardless** [1] - 59:7
**reimbursement** [1] - 26:22
**reject** [1] - 56:12
**rejected** [1] - 69:19
**Rel** [1] - 40:10
**relate** [1] - 83:14
**related** [7] - 46:14, 49:4, 50:23, 84:14, 85:5, 94:8, 94:9
**relates** [1] - 13:2
**relationship** [1] - 65:2
**relevance** [1] - 60:10, 89:16
**relevant** [6] - 27:10, 32:8, 38:24, 45:24, 45:25, 89:23
**relief** [5] - 30:7, 38:7, 57:13, 90:24
**rely** [3] - 42:14, 43:6, 57:2
**remain** [1] - 4:1
**remarks** [3] - 3:1, 78:6, 88:14
**remember** [6] - 27:19, 41:19, 46:7, 46:9, 46:14, 59:2
**remind** [2] - 3:18, 17:13
**reminder** [2] - 3:24, 82:25
**remove** [5] - 4:4, 4:7, 4:9, 34:14, 66:4
**removing** [1] - 5:5

**renew** [1] - 85:22
**rent** [1] - 61:23
**rental** [3] - 61:3, 61:4, 85:2
**repeating** [1] - 37:25
**repeats** [1] - 37:3
**reply** [8] - 39:6, 39:7, 41:6, 43:24, 45:20, 46:2, 71:6, 72:11
**report** [3] - 48:11, 48:12, 94:19
**reported** [1] - 12:12
**Reported** [1] - 1:22
**REPORTER** [1] - 62:7
**Reporter** [2] - 1:23, 96:8
**reporter** [1] - 62:10
**reporter's** [1] - 39:25
**reporting** [1] - 47:24
**represent** [2] - 29:18, 63:9
**representations** [1] - 35:22
**representative** [1] - 17:23
**representatives** [1] - 56:25
**represents** [1] - 61:13
**reproach** [1] - 6:13
**request** [6] - 55:2, 67:18, 68:18, 69:11, 83:23, 92:7
**requested** [1] - 90:25
**requests** [2] - 79:7, 79:8
**require** [3] - 47:24, 86:13, 91:21
**required** [7] - 20:4, 20:8, 26:11, 41:24, 68:13, 88:24, 90:20
**requirement** [2] - 39:2
**requires** [8] - 33:23, 36:17, 36:24, 41:20, 43:19, 44:5, 68:1, 87:3
**reserve** [1] - 35:4
**resigned** [1] - 53:20
**resolution** [1] - 55:4
**resolve** [3] - 3:14, 56:15, 95:3
**resolving** [1] - 95:8
**respectfully** [1] - 40:23
**respective** [1] - 94:4
**respects** [1] - 7:2
**respond** [5] - 9:6, 19:3, 19:7, 19:9, 28:1, 68:7
**responded** [4] - 3:7, 28:2, 38:1, 56:7

**responding** [1] - 11:3
**response** [12] - 13:10, 21:20, 26:19, 28:10, 30:16, 31:11, 35:4, 38:25, 68:9, 74:24, 74:25
**responses** [7] - 3:20, 27:23, 34:1, 34:12, 34:24, 56:4, 93:13
**responsibility** [2] - 70:2, 70:23
**Responsibility** [1] - 37:21
**responsible** [1] - 23:12
**rest** [1] - 69:19
**result** [5] - 12:12, 20:6, 27:9, 42:8, 63:21
**resulted** [1] - 41:13
**retirement** [2] - 42:24, 67:10
**retrial** [1] - 87:4
**return** [4] - 24:2, 24:15, 25:11, 74:18
**returned** [3] - 36:13, 36:14, 38:2
**returns** [2] - 18:22, 20:9
**review** [6] - 48:25, 53:5, 53:9, 59:23, 59:25, 69:14
**Review** [1] - 67:16
**reviewed** [2] - 3:9, 7:2
**reviews** [1] - 45:14
**rhetoric** [1] - 70:22
**rider** [8] - 61:3, 61:5, 61:18, 62:24, 64:21, 82:20, 84:14, 84:19
**Rights** [1] - 14:20
**rights** [6] - 7:16, 30:2, 30:13, 34:20, 41:5, 49:6
**rise** [2] - 41:11, 95:20
**risk** [1] - 43:4
**Rizwan** [3] - 1:15, 2:20, 93:23
**roadmap** [1] - 67:5
**role** [4] - 47:11, 48:7, 48:9, 70:8
**rooted** [2] - 26:2, 26:3
**roughshod** [1] - 49:6
**round** [4] - 35:12, 54:19, 78:5, 78:8
**rounds** [1] - 3:20
**RPR** [2] - 1:23, 96:3
**Rube** [1] - 49:17
**Rule** [3] - 40:24, 68:1, 83:1
**rule** [3] - 68:4, 81:1,

81:8
**rules** [7] - 5:24, 15:8, 23:18, 28:20, 56:9, 82:1, 86:15
**Rules** [2] - 7:20, 91:12
**ruling** [6] - 81:3, 81:10, 81:13, 81:18, 92:9, 92:13
**run** [3] - 40:2, 66:22, 68:24
**running** [5] - 14:17, 39:25, 49:5, 52:7, 52:10
**Russia** [1] - 36:10

## S

**sad** [1] - 25:23
**sake** [2] - 34:16, 34:17
**salary** [2] - 64:4, 70:8
**sand** [1] - 71:2
**Sanders** [4] - 26:21, 26:23, 26:24, 73:11
**sat** [2] - 73:24, 74:2
**satisfied** [1] - 83:11
**saw** [2] - 46:16, 52:3
**scale** [1] - 77:13
**schedule** [5] - 93:12, 93:15, 94:8, 95:11, 95:12
**scheduling** [5] - 92:23, 92:24, 93:2, 93:22, 94:13
**scheme** [1] - 17:22
**Schenning** [9] - 11:25, 37:13, 45:2, 46:16, 46:23, 53:22, 75:8, 77:2, 80:10
**school** [1] - 37:8
**Scott** [5] - 1:14, 2:20, 5:9, 28:8, 28:11
**Scott's** [1] - 28:8
**screen** [1] - 24:18
**screenshot** [1] - 83:22
**scrupulously** [1] - 73:7
**se** [1] - 58:18
**Sean** [3] - 1:12, 2:7, 66:25
**search** [1] - 85:19
**seated** [1] - 2:2
**Second** [1] - 61:4
**second** [3] - 9:10, 38:15, 39:11, 41:18, 41:22, 41:23, 59:10, 62:24, 64:21, 78:18, 82:20, 84:14, 84:18
**secondly** [4] - 24:17, 58:25, 82:16, 83:7
**section** [6] - 55:16,

58:5, 58:10, 70:4, 70:12, 70:17
**Section** [1] - 26:11
**security** [1] - 70:12
**see** [15] - 4:22, 4:23, 18:21, 18:24, 23:5, 44:20, 46:6, 46:17, 47:15, 55:1, 66:14, 76:15, 85:6, 85:19, 93:17
**seeing** [1] - 95:18
**seek** [4] - 39:11, 39:19, 67:22, 80:11
**seeking** [3] - 9:1, 62:4, 82:13
**seeks** [3] - 38:7, 67:17, 68:13
**seem** [1] - 18:15
**selection** [1] - 94:10
**selective** [15] - 5:25, 8:15, 9:7, 36:4, 36:25, 37:14, 43:16, 43:17, 44:4, 77:19, 86:14, 88:24, 89:24, 90:10, 90:22
**Selective** [1] - 5:14
**selectiveness** [1] - 7:9
**selectivity** [1] - 24:14
**self** [3] - 42:14, 43:3, 43:6
**self-certifications** [3] - 42:14, 43:3, 43:6
**Senate** [1] - 53:24
**send** [4] - 18:18, 18:19, 19:3, 76:13
**sending** [1] - 15:16
**sends** [1] - 18:18
**senior** [1] - 53:5
**sense** [6] - 26:2, 28:21, 38:18, 69:1, 72:23, 73:14
**sensitive** [1] - 85:13
**sent** [8] - 19:12, 19:13, 19:18, 19:20, 22:9, 26:23, 45:2, 72:1
**September** [4] - 22:10, 65:5, 71:9, 84:19
**series** [1] - 74:13
**serious** [2] - 48:22, 58:23
**servant** [1] - 15:10
**serve** [1] - 48:2
**served** [2] - 88:1, 89:9
**Service** [1] - 67:16
**service** [1] - 88:3
**set** [7] - 3:23, 6:24, 7:4, 11:16, 17:19, 23:25, 27:24
**sets** [7] - 6:19, 8:11, 9:8, 17:13, 19:11,

33:24, 59:3
**setting** [2] - 49:11, 49:12
**sever** [1] - 51:25
**several** [4] - 2:13, 2:22, 9:13, 89:20
**sex** [1] - 32:5
**Shanequa** [1] - 31:23
**share** [5] - 8:24, 18:9, 18:12, 21:19, 70:6
**sharing** [2] - 18:11, 18:12
**shield** [1] - 18:7
**shift** [1] - 45:20
**shifted** [1] - 60:9
**shifting** [4] - 10:23, 25:18, 25:19, 71:2
**shifts** [2] - 8:8, 41:6
**short** [2] - 11:16, 39:7
**shorter** [1] - 78:9
**shortly** [4] - 82:5, 92:11, 93:16, 95:10
**shot** [1] - 7:7
**show** [30] - 10:19, 10:24, 11:16, 17:18, 19:6, 24:4, 30:3, 36:18, 36:24, 38:11, 38:22, 39:16, 41:12, 41:20, 44:8, 45:17, 49:8, 54:1, 54:3, 73:17, 75:14, 76:3, 86:16, 86:18, 87:5, 88:24, 89:21, 90:1, 91:15
**showing** [4] - 36:3, 43:19, 86:14, 90:11
**shown** [12] - 36:18, 36:24, 42:2, 86:5, 86:8, 86:10, 88:18, 89:15, 90:4, 90:7, 91:7, 91:11
**shows** [7] - 24:24, 33:1, 41:3, 76:7, 76:18, 90:15
**sic** [1] - 78:16
**side** [5] - 3:11, 4:12, 37:8, 37:9, 78:11
**sides** [9] - 3:20, 3:21, 10:6, 12:24, 14:4, 77:23, 78:3, 93:16, 95:6
**sign** [1] - 61:24
**signed** [5] - 32:23, 32:24, 61:3, 61:11, 84:8
**significant** [1] - 70:9
**signing** [2] - 62:24, 82:20
**signs** [1] - 33:3
**silly** [1] - 51:19

**similar** [3] - 26:14, 86:12, 90:17
**similarly** [6] - 8:17, 43:20, 43:25, 86:11, 90:12, 90:15
**similarly-situated** [5] - 43:20, 43:25, 86:11, 90:12, 90:15
**simple** [1] - 37:1
**simply** [12] - 8:12, 20:8, 20:24, 21:2, 34:1, 34:13, 41:25, 43:1, 44:5, 66:12, 67:18, 90:18
**single** [3] - 41:7, 49:13, 68:22
**singled** [1] - 36:4
**sit** [2] - 18:24, 72:7
**sitting** [2] - 7:13, 24:18
**situated** [6] - 8:17, 43:20, 43:25, 86:11, 90:12, 90:15
**situation** [2] - 13:1, 69:2
**smaller** [1] - 77:13
**smear** [5] - 45:16, 45:19, 45:21, 46:4, 49:19
**Smith** [1] - 2:21
**smoke** [1] - 35:18
**so-called** [1] - 71:15
**solace** [1] - 6:5
**solicited** [5] - 14:23, 49:25, 50:1, 51:20, 52:14
**someone** [10] - 6:8, 26:1, 31:4, 36:9, 41:2, 44:16, 46:12, 52:15, 59:18, 94:21
**somewhere** [1] - 75:21
**sorry** [10] - 16:20, 32:3, 60:17, 61:19, 62:7, 62:9, 65:11, 66:2, 78:22, 78:24
**sort** [6] - 35:18, 35:22, 41:6, 70:22, 74:4, 74:21
**sound** [2] - 55:13, 77:10
**sounds** [1] - 62:18
**source** [2] - 12:22, 18:1
**speaking** [3] - 4:2, 4:4, 72:13
**special** [1] - 77:6
**specific** [4] - 67:8, 69:7, 74:23, 83:24
**Specifically** [1] - 42:6

**spend** [3] - 13:11, 44:12, 82:10
**spent** [3] - 25:20, 65:7, 86:3
**spring** [1] - 46:20
**springs** [1] - 66:16
**staff** [2] - 31:13, 77:7
**staffer** [3] - 31:14, 31:25
**stand** [7] - 58:19, 60:11, 60:22, 63:10, 64:21, 73:14, 80:1
**standard** [14] - 7:25, 8:16, 8:17, 10:6, 10:13, 10:21, 11:8, 41:19, 49:8, 50:7, 67:23, 82:25, 83:11, 91:4
**standards** [2] - 6:24, 88:24
**standing** [1] - 58:24
**standpoint** [2] - 21:8, 21:9
**stands** [2] - 44:25, 95:21
**start** [4] - 38:20, 69:24, 82:9, 92:25
**started** [9] - 19:14, 19:16, 19:17, 19:18, 21:6, 21:13, 26:20, 44:14, 51:14
**starting** [1] - 4:13
**state** [18] - 6:8, 9:17, 19:13, 19:14, 19:19, 19:21, 19:23, 20:5, 20:23, 21:3, 29:19, 54:5, 57:1, 63:20, 67:17, 82:2, 93:21
**State** [4] - 17:21, 18:19, 18:20, 20:2
**State's** [13] - 2:19, 9:13, 12:22, 14:22, 15:12, 32:3, 33:7, 39:8, 44:16, 44:23, 45:6, 50:24, 71:13
**statement** [11] - 12:10, 25:3, 25:5, 25:7, 26:6, 68:3, 68:15, 69:5, 72:4, 84:13
**statements** [13] - 23:15, 42:25, 43:10, 64:9, 64:11, 64:15, 64:18, 64:20, 68:16, 69:4, 82:17, 83:24, 84:7
**STATES** [3] - 1:1, 1:3, 1:8
**States** [20] - 2:6, 2:8, 20:9, 20:17, 29:19, 32:14, 40:9, 40:10,

43:8, 53:16, 57:1, 57:12, 70:4, 81:23, 87:21, 88:14, 89:16, 89:20
**status** [1] - 94:19
**statutes** [1] - 83:14
**statutory** [2] - 38:24, 39:4
**stemming** [4] - 42:7, 63:21, 82:15, 83:21
**stenographic** [1] - 96:4
**step** [4] - 60:16, 69:16, 90:17
**Stephen** [1] - 37:12
**steps** [1] - 3:15
**still** [16] - 9:25, 14:5, 21:5, 21:9, 21:12, 28:14, 33:6, 46:21, 57:21, 58:17, 59:1, 60:20, 71:5, 79:14, 79:20
**stood** [1] - 44:14
**stop** [1] - 77:20
**story** [10] - 5:11, 5:12, 9:11, 27:18, 35:16, 36:6, 45:17, 49:17, 75:15, 75:21
**storybook** [2] - 5:13, 5:15
**stranger** [1] - 76:4
**strategy** [2] - 69:15, 80:13
**Street** [1] - 1:24
**street** [1] - 73:24
**strikes** [1] - 36:10
**strong** [3] - 8:6, 10:25, 17:18
**struggling** [1] - 42:17
**stuff** [3] - 58:2, 64:13, 79:20
**Style** [1] - 88:15
**style** [3] - 28:2, 32:5, 33:3
**subject** [3] - 17:25, 36:11, 44:23
**subjects** [1] - 31:15
**submission** [1] - 12:19
**submissions** [3] - 3:10, 12:19, 95:7
**submit** [1] - 34:25
**submits** [1] - 53:12
**submitted** [6] - 5:12, 5:18, 24:6, 51:4, 53:9, 80:24
**subpoena** [2] - 17:24, 76:14
**subpoenaed** [1] - 76:10

**subpoenas** [4] - 19:21, 54:3, 88:1, 89:9
**subsequent** [2] - 35:12, 56:1
**substantial** [3] - 38:10, 42:20, 82:11
**substantiate** [1] - 38:6
**substantiated** [1] - 6:7
**successful** [1] - 85:21
**successfully** [1] - 87:3
**sue** [1] - 47:5
**suffer** [1] - 76:20
**suffered** [2] - 13:15, 42:4
**sufficient** [2] - 65:21, 83:5
**suggest** [1] - 6:10
**suggests** [1] - 95:16
**summarize** [4] - 6:19, 30:19, 87:13, 92:1
**summarized** [1] - 46:23
**summarizing** [1] - 44:21
**summary** [1] - 8:11
**summer** [1] - 54:3
**summoned** [1] - 9:19
**Sun** [1] - 37:23
**superiors** [1] - 13:5
**superseding** [21] - 60:21, 61:1, 62:2, 62:17, 63:8, 63:10, 65:20, 67:4, 81:22, 83:10, 83:11, 83:13, 83:16, 83:19, 83:23, 84:1, 84:6, 84:10, 84:12, 84:22, 92:5
**supervisor** [2] - 47:22, 48:10
**supervisors** [1] - 36:12
**support** [9] - 6:2, 14:21, 23:6, 37:4, 37:19, 66:4, 76:21, 80:18, 87:13
**supported** [1] - 67:24
**supports** [2] - 6:4, 6:21
**supposed** [1] - 28:4
**supposedly** [1] - 50:4
**Supreme** [5] - 6:24, 8:2, 28:20, 38:20, 83:4
**surgical** [1] - 67:7
**susceptible** [1] - 73:5
**swearing** [1] - 27:17
**sword** [1] - 18:7
**swore** [1] - 76:22
**system** [4] - 5:21,

34:17, 34:19, 73:19
**Systems** [1] - 40:9

## T

**talks** [1] - 41:14
**tape** [1] - 12:5
**target** [1] - 17:25
**targets** [1] - 56:1
**Task** [3] - 9:17, 35:20, 44:13
**tax** [45] - 17:19, 17:25, 18:22, 20:9, 21:15, 21:24, 21:25, 22:2, 22:4, 22:8, 23:18, 23:23, 24:2, 24:6, 24:15, 24:22, 25:10, 25:11, 25:21, 48:23, 48:24, 49:2, 49:4, 50:14, 54:4, 58:14, 58:16, 64:9, 64:13, 64:15, 74:11, 74:12, 74:18, 74:22, 75:9, 82:17, 84:1, 84:2, 84:5, 84:8, 87:20, 88:4
**tax-related** [1] - 49:4
**taxes** [8] - 20:25, 21:25, 22:11, 23:24, 23:25, 24:9, 74:14
**taxpayer** [8] - 23:18, 36:1, 71:10, 72:4, 73:25, 75:5, 78:16, 79:24
**team** [6] - 2:11, 5:6, 44:19, 48:8, 55:20, 93:11
**teams** [1] - 94:4
**temerity** [1] - 77:4
**ten** [9] - 3:21, 6:19, 8:11, 9:8, 33:24, 58:21, 59:3, 60:4, 78:9
**tend** [1] - 35:9
**tenure** [1] - 32:16
**terms** [5] - 82:25, 85:14, 85:17, 93:21, 95:3
**testified** [1] - 73:11
**testify** [12] - 71:4, 71:8, 71:25, 72:1, 72:9, 72:14, 72:15, 72:17, 75:24, 88:11, 89:6, 91:17
**testimony** [1] - 8:5
**THE** [102] - 1:1, 1:1, 1:8, 2:2, 2:10, 2:16, 2:24, 4:16, 4:19, 10:1, 10:5, 10:16, 11:2, 11:4, 11:18,

11:21, 11:23, 12:17, 13:7, 13:9, 14:10, 14:15, 15:3, 15:6, 15:24, 16:4, 16:6, 16:9, 16:12, 16:16, 16:18, 16:21, 16:23, 17:2, 19:25, 20:13, 20:21, 22:14, 22:17, 23:1, 23:5, 23:10, 24:4, 27:4, 29:1, 29:6, 29:9, 31:1, 31:3, 31:7, 31:9, 32:7, 32:18, 35:7, 35:10, 47:7, 47:22, 48:2, 50:17, 50:23, 51:1, 52:17, 52:23, 53:14, 54:8, 54:16, 54:23, 55:6, 60:15, 60:18, 61:6, 61:9, 62:1, 62:7, 62:11, 62:14, 65:9, 65:12, 65:19, 66:17, 66:19, 66:21, 66:24, 69:21, 77:21, 77:23, 78:1, 78:20, 78:23, 80:3, 80:21, 81:12, 81:15, 92:18, 92:21, 93:5, 93:19, 93:25, 94:14, 94:16, 95:1, 95:20
**themselves** [4] - 9:5, 18:5, 63:17
**theoretically** [1] - 56:13
**therefore** [1] - 72:21
**therein** [1] - 60:13
**they've** [12] - 3:6, 5:18, 7:6, 9:5, 21:10, 45:19, 48:22, 49:18, 59:20, 75:1, 76:6, 76:25
**thinking** [1] - 47:2
**third** [3] - 38:18, 53:19, 64:8
**thirdly** [1] - 82:19
**Thomas** [1] - 31:23
**Thompson** [2] - 31:23, 40:10
**thorough** [2] - 76:9, 76:18
**thoughtful** [2] - 25:13, 76:7
**thoughts** [2] - 7:11, 52:2
**thousands** [3] - 13:11, 18:3, 25:20
**threaten** [1] - 47:3
**three** [17] - 3:4, 3:7, 15:1, 26:17, 27:25, 28:23, 29:14, 36:8, 38:8, 50:5, 50:10,

50:13, 57:20, 74:21, 80:2, 80:24, 81:1
**three-fold** [1] - 3:4
**THURSDAY** [1] - 1:9
**timed** [1] - 88:13
**timing** [4] - 39:14, 51:19, 52:1, 52:2
**tipped** [4] - 44:22, 45:5, 47:1, 47:5
**titles** [1] - 70:10
**today** [24] - 2:14, 3:3, 3:14, 3:24, 4:25, 8:24, 32:12, 60:10, 60:19, 68:8, 80:23, 81:1, 81:6, 82:10, 83:13, 84:15, 85:9, 86:3, 87:8, 88:9, 92:22, 95:2, 95:6, 95:15
**today's** [2] - 3:12, 3:17
**Todd** [3] - 1:16, 1:18, 2:23
**together** [4] - 21:18, 37:6, 51:13, 52:4
**took** [4] - 20:10, 21:1, 42:3, 42:23
**total** [1] - 73:16
**totality** [7] - 7:24, 17:15, 17:17, 33:12, 33:25, 41:8, 41:15
**touched** [1] - 50:18
**tough** [1] - 65:2
**toward** [3] - 29:4, 41:21, 91:8
**towards** [7] - 29:22, 32:10, 52:12, 86:18, 87:10, 90:1, 90:4
**Trace** [2] - 35:20, 44:13
**Tracing** [1] - 9:16
**track** [3] - 4:21, 35:17, 35:19
**trampled** [1] - 7:17
**transcribe** [1] - 93:6
**TRANSCRIPT** [1] - 1:7
**transcript** [2] - 44:20, 96:4
**transcripts** [1] - 45:24
**treasurer** [2] - 26:21, 88:8
**trial** [20] - 6:17, 7:3, 34:20, 42:2, 47:15, 57:5, 58:1, 65:4, 65:18, 65:19, 67:20, 68:11, 69:12, 69:13, 69:15, 85:14, 85:24, 92:23, 94:10
**tried** [2] - 70:24, 74:9
**tries** [1] - 31:12
**true** [10] - 5:13, 33:8,

42:9, 42:10, 42:11, 42:12, 50:21, 59:14, 76:23, 88:23
**Trump** [1] - 77:8
**truth** [2] - 36:15, 59:7
**try** [5] - 4:24, 54:25, 71:3, 74:16, 76:17
**trying** [4] - 27:11, 35:18, 66:22, 71:23
**turn** [4] - 4:23, 40:23, 67:2, 90:24
**turning** [1] - 86:2
**turns** [1] - 76:15
**TV** [1] - 37:24
**twice** [1] - 54:13
**two** [42] - 14:8, 14:16, 14:25, 15:11, 15:16, 21:18, 22:4, 22:7, 23:15, 23:16, 28:13, 28:15, 35:5, 36:14, 37:1, 37:6, 37:11, 37:19, 38:7, 39:20, 39:24, 42:6, 43:10, 45:22, 47:13, 48:14, 49:24, 50:2, 50:13, 50:14, 51:4, 57:20, 61:11, 61:15, 61:20, 63:5, 63:10, 63:15, 68:16, 79:1
**type** [1] - 66:7
**typically** [1] - 87:2

## U

**U.S** [39] - 9:14, 11:15, 12:1, 21:14, 22:22, 23:20, 31:22, 32:2, 32:3, 32:16, 32:25, 33:6, 36:19, 36:21, 47:18, 47:23, 48:16, 48:17, 48:18, 50:13, 51:10, 51:13, 51:17, 52:18, 53:11, 53:12, 53:19, 53:20, 53:21, 53:23, 53:25, 55:10, 57:11, 69:25, 70:10, 75:17
**ultimately** [3] - 36:12, 53:10, 53:12
**unable** [3] - 42:10, 85:18, 94:4
**unambiguous** [1] - 72:20
**unclean** [1] - 60:6
**unclear** [1] - 59:24
**uncomfortable** [1] - 52:15
**under** [31] - 6:18, 7:19, 7:22, 8:9, 8:15, 8:25, 9:7, 15:8, 20:12,

20:25, 23:7, 23:18, 28:20, 33:10, 33:20, 33:21, 35:2, 44:2, 44:4, 44:17, 45:7, 56:9, 59:5, 59:18, 61:14, 61:23, 62:5, 67:15, 81:25, 83:1
**underlying** [1] - 6:12
**underneath** [1] - 71:2
**understood** [5] - 12:18, 12:21, 29:2, 32:9, 65:20
**undertaken** [1] - 90:19
**undeterred** [1] - 44:25
**unheard** [4] - 55:20, 55:22, 56:22
**United** [20] - 2:6, 2:8, 20:9, 20:17, 29:19, 32:13, 40:9, 40:10, 43:8, 53:15, 53:16, 57:1, 57:11, 70:4, 81:23, 87:21, 88:14, 89:16, 89:20
**UNITED** [3] - 1:1, 1:3, 1:8
**unless** [2] - 77:20, 78:6
**unsuccessful** [1] - 50:10
**untangling** [1] - 44:12
**untrue** [1] - 44:14
**unusual** [3] - 18:16, 19:1, 40:17
**up** [26] - 3:23, 18:21, 20:9, 20:10, 23:10, 29:23, 30:3, 35:22, 42:18, 44:14, 44:25, 55:10, 60:3, 61:3, 61:11, 61:13, 61:17, 65:10, 70:8, 71:20, 72:25, 78:5, 78:15, 81:3, 93:20, 94:9
**urgent** [1] - 78:6
**uses** [1] - 53:4
**utterly** [1] - 38:8

## V

**vacation** [4] - 43:11, 63:2, 84:16, 85:1
**vaccinated** [2] - 4:5, 4:7
**value** [1] - 27:18
**valued** [1] - 48:8
**Vanderhyden** [2] - 1:19, 2:23
**various** [1] - 43:6
**Venable** [1] - 43:18
**verbal** [5] - 13:3, 13:16, 15:14, 46:8,

72:3
**verbally** [1] - 94:21
**versus** [4] - 40:9, 40:10, 40:11, 57:12
**victim** [3] - 7:15, 8:3, 76:24
**victimhood** [1] - 7:12
**view** [5] - 15:4, 62:23, 63:25, 83:17, 93:21
**Vignarajah** [4] - 51:5, 51:7, 51:9, 51:21, 52:6, 52:10
**Vignarajah's** [1] - 52:3
**Vindictive** [1] - 5:14
**vindictive** [16] - 5:25, 6:12, 6:23, 7:21, 10:13, 32:11, 36:4, 36:19, 38:21, 41:19, 77:18, 86:16, 86:20, 87:7, 88:24, 90:8
**Vindictiveness** [1] - 41:11
**vindictiveness** [22] - 7:8, 8:1, 8:3, 10:24, 17:17, 17:18, 24:13, 27:19, 33:10, 37:14, 38:11, 38:14, 39:10, 39:15, 41:9, 41:16, 49:9, 49:16, 57:4, 71:20, 87:1, 87:7
**violated** [5] - 30:2, 30:12, 72:25, 91:11, 91:15
**violates** [1] - 56:18
**violation** [1] - 29:15
**violations** [2] - 26:20, 27:9
**Virginia** [2] - 52:7, 52:10
**virus** [1] - 42:8
**voluminous** [1] - 85:11
**vote** [2] - 14:19, 15:18
**votes** [1] - 47:18
**vs** [2] - 1:4, 2:6

## W

**wait** [1] - 50:10
**waived** [1] - 30:2
**walk** [1] - 5:6
**walk-through** [1] - 5:6
**wants** [12] - 7:6, 15:1, 15:22, 16:1, 23:1, 30:15, 72:1, 72:14, 73:16, 79:10, 80:17, 95:5
**water** [1] - 67:15
**Wayne** [2] - 44:15, 47:5

ways [1] - 6:15
weak [1] - 41:4
weaponized [1] - 74:9
wear [1] - 54:15
website [1] - 55:11
week [1] - 63:2
weeks [2] - 61:11, 61:20
weight [2] - 55:17, 70:21
welcome [7] - 2:3, 2:10, 2:24, 54:10, 54:15, 54:24, 78:12
welcomes [1] - 35:14
whatsoever [3] - 18:17, 79:4, 81:11
wheels [1] - 49:16
white [2] - 8:21, 40:19
whole [8] - 6:11, 13:12, 17:22, 48:20, 71:19, 73:21, 74:13, 75:15
willfully [1] - 23:15
Williams [2] - 34:6, 57:11
willing [2] - 21:19, 71:18
Wilson [2] - 7:22, 41:19
win [1] - 15:20
window [1] - 27:14
WISE [24] - 2:5, 2:13, 4:15, 35:15, 47:13, 48:1, 48:12, 50:22, 50:25, 51:4, 52:21, 53:1, 53:18, 54:11, 54:13, 54:22, 69:23, 77:22, 80:6, 81:11, 92:17, 93:3, 93:8, 94:23
wise [46] - 4:13, 4:14, 5:23, 9:14, 9:16, 10:11, 10:18, 11:14, 11:25, 12:9, 13:2, 13:4, 13:19, 14:7, 14:11, 17:3, 17:4, 20:16, 20:19, 22:5, 23:12, 23:20, 28:6, 30:21, 35:13, 47:7, 50:18, 54:8, 54:23, 55:8, 57:16, 59:13, 59:18, 59:19, 67:3, 69:20, 69:22, 77:21, 78:15, 79:9, 80:5, 80:21, 89:18, 92:25, 94:11
Wise [37] - 1:11, 2:7, 20:14, 20:15, 20:16, 23:4, 23:8, 26:23, 29:3, 31:4, 32:10,

32:21, 34:15, 81:24, 82:7, 86:6, 86:17, 87:9, 87:15, 87:17, 88:3, 88:6, 88:10, 88:11, 88:17, 90:4, 90:25, 91:8, 91:11, 91:15, 91:22, 91:24, 92:6, 92:15, 93:5, 93:19, 94:2
wise's [3] - 20:25, 57:7, 58:23
Wise's [1] - 89:25
wish [8] - 4:7, 46:11, 64:24, 64:25, 65:1, 70:20, 78:8, 95:16
wishes [2] - 4:11, 54:18
witch [5] - 77:10, 77:11, 77:15
withdraw [1] - 83:23
withdrawals [1] - 42:15
witness [5] - 27:17, 40:13, 73:10, 73:19, 89:10
witnesses [3] - 47:16, 59:5, 60:4
woman [5] - 31:24, 47:1, 47:3, 47:4
word [6] - 5:13, 38:13, 56:6, 71:5, 71:24, 75:21
words [8] - 10:13, 13:12, 13:19, 29:17, 39:17, 72:7, 86:20
wordsmith [1] - 28:11
works [1] - 70:1
world [2] - 15:11, 15:16
worth [1] - 25:25
write [4] - 29:24, 29:25, 30:10, 71:13
writes [1] - 80:10
writing [13] - 18:19, 19:3, 22:9, 26:15, 28:2, 29:18, 30:5, 56:16, 60:9, 62:22, 79:18, 79:22
written [8] - 3:9, 30:22, 68:2, 81:3, 81:16, 92:10, 95:7, 95:9
wrote [13] - 9:25, 14:3, 26:17, 28:7, 28:13, 28:17, 29:24, 37:20, 45:22, 46:23, 70:24, 79:4, 80:7

**Y**

year [6] - 14:17, 22:9, 23:23, 24:22, 25:10, 37:18
years [9] - 9:13, 15:2, 22:4, 40:20, 46:21, 50:5, 50:10, 57:20, 70:18
yourself [2] - 28:12, 29:23

**Z**

Zelinsky [7] - 1:12, 2:8, 47:14, 47:21, 70:11, 77:6, 93:12
zero [1] - 70:8