IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**MARILYN J. MOSBY,**<br><br>                      **Defendant** | **Criminal No. LKG-22-7** |

The United States of America, by and through its undersigned attorneys, hereby submits this opposition to the Defendant's untimely motion to dismiss Counts 1 and 3 of the Superseding Indictment and for disclosure of any legal instructions given to the grand jury on these counts. ECF 70 (filed June 16, 2022). The Defendant's motion is meritless and should be denied.

## I.    PROCEDURAL HISTORY

On January 13, 2022, and again on March 10, 2022, a federal grand jury sitting in Baltimore indicted the Defendant on two counts of perjury because she falsely claimed to have suffered "adverse financial consequences" from COVID-19 in order to obtain restricted retirement funds that would have been unavailable to her had she not made these false statements. The grand jury also charged the Defendant with two counts of making false statements on multiple mortgage applications in connection with the purchase of two Florida vacation homes.

On February 18, 2022, the Defendant moved to dismiss all the counts in the indictment and to disqualify Government counsel claiming that she was the victim of vindictive and selective prosecution. ECF Nos. 17 and 18. These motions were meritless and were denied by the Court.

As to the Defendant's baseless vindictive prosecution claim, the Court held the following:

> Because the Defense has neither shown with objective evidence that AUSA Wise has acted with personal animus towards Defendant, nor that the Government would

not have brought this case but for such animus, the Court DENIES Defendant's motion to dismiss upon the ground of vindictive prosecution.

Order of April 14, 2022, ECF 52 at 13. As to the Defendant's claim of selective prosecution, the Court held the following:

> For many of the same reasons, the Defense's selective prosecution argument is also problematic. To make a showing of a selective prosecution, the Defense "must 'establish both (1) that similarly situated individuals of a different race were not prosecuted, and (2) that the decision to prosecute was invidious or in bad faith.'" *Venable*, 666 F.3d at 900 (citation omitted).
>
> The Defense neither argues nor shows that similarly situated individuals of a different race than Defendant were not prosecuted for similar offenses. See generally Def. Mot to Dismiss; Def. Reply (failing to show that similarly situated individuals of a different race have not been prosecuted for the offenses charged in this case to establish a selective prosecution). Nor does the Defense show that the prosecution of this case was undertaken in bad faith. See generally Def. Mot to Dismiss; Def. Reply. Given this, the Court must also DENY Defendant's motion to dismiss upon the ground of selective prosecution.

*Id.* at 13.

As to the Moton to Disqualify AUSA Wise, the Court held the following:

As discussed above, the Defense has not shown with objective evidence that AUSA Wise has been motivated by any personal animus towards Defendant in prosecuting this case. The Defense has also not shown that AUSA Wise violated the Maryland Rules of Professional Conduct in connection with the investigation and prosecution of this case. Nor is there any evidence before the Court to show that AUSA Wise violated the Department of Justice Manual during the investigation of this case, by either declining to allow Defendant to testify before the Grand Jury, or by failing to disclose exculpatory information from Defendant's former campaign treasurer to the Grand Jury.

*Id.* at 14.

Despite the Court's clear and unambiguous rulings, immediately after the hearing, the Defendant falsely claimed – on the courthouse steps – that the Court had accepted "most of the defense's arguments as facts." https://www.baltimoresun.com/news/crime/bs-md-ci-cr-mosby-motions-hearing-20220414-ymibtg67b5gw5lp6uu4aeqebsm-story.html. As the *Baltimore Sun*

accurately reported, "Griggsby did not." *Id.* What actually happened was that the Court held that, "[a]ccepting all of the allegations advanced by the Defense to be true, for the purpose of resolving the pending motion to dismiss, these allegations do not individually, or collectively, establish a presumption of a vindictive prosecution in this case." ECF 52 at 12. The Defendant, a lawyer, undoubtedly understood the difference but chose to mispresent what the Court had actually ruled.

Now, the Defendant claims in another motion to dismiss, and in Orwellian fashion, that her lies aren't material, in other words, that they don't matter.

They do.

## II.   MOTION TO DISMISS

The Defendant has moved to dismiss Counts 1 and 3 of the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), which authorizes the filing of a motion that alleges a "defect in the indictment" including "failure to state an offense,"

In support of her motion to dismiss, the Defendant makes two arguments: (1) that the Defendant's sworn statements that she had suffered "adverse financial consequences stemming from" COVID-19 were not material, despite the fact that had she not made them she would not have been able to access $90,000 in her City of Baltimore Deferred Compensation Plan; and (2) that the phrase "adverse financial consequences," is "fundamentally ambiguous" and therefore "insufficient to support a charge of perjury under § 1621." Mot. at 4. Much like the Defendant's prior motions, about which the Defendant herself stated, "We did not expect to prevail," her newest motion is also without merit and should be denied. *See* https://www.baltimoresun.com/news/crime/bs-md-ci-cr-mosby-motions-hearing-20220414-ymibtg67b5gw5lp6uu4aeqebsm-story.html.

3

**A. The Defendant's False Representations that She Suffered Adverse Financial Consequences Stemming from COVID-19 Were Material**

The first argument the Defendant makes as to materiality is that "missing from the Superseding Indictment is a 'statement of the essential facts' showing that the 'matter' or statement that State's Attorney Mosby certified as true, that is, *the specific reasons she qualified for the distribution themselves*, were material." Mot. at 7 (emphasis in original).

This argument ignores the fact that Superseding Indictment alleges in four separate paragraphs that the misrepresentations the Defendant made that she suffered from adverse financial consequences stemming from COVID-19 were material to the decision to approve her distribution request.

In paragraph 4, the Superseding Indictment quotes the specific language from the "City of Baltimore Retirement Savings and Deferred Compensation Plans 457(b) Coronavirus-Related Distribution Request" that informed the Defendant that her representations as to having suffered "adverse financial consequences" stemming from COVID-19 were material. Specifically, that form, which is quoted in the Superseding Indictment, told the Defendant that "[t]he CARES Act permits qualifying members to receive a coronavirus-related distribution," and that "…**the City of Baltimore Deferred Compensation Plan is relying on my certifications in determining that I qualify for a coronavirus-related distribution**. . . " Superseding Indictment ¶ 4 (emphasis in original).

In paragraph 5, the Superseding Indictment then alleged the specific representations that the Defendant falsely certified were true, namely:

4

> ☑ I have experienced adverse financial consequences stemming from such virus or disease as a result of:
> - Being quarantined, furloughed or laid off
> - Having reduced work hours
> - Being unable to work due to lack of child care
> - The closing or reduction of hours of a business I own or operate

Superseding Indictment ¶ 5.

In paragraph 11 the Superseding Indictment alleged that:

At the time and place aforesaid Nationwide, the administrator of the City of Baltimore's Deferred Compensation Plans, did require that distribution requests be in writing and executed in the format provided by 28 U.S.C. § 1746. **It was material to such distribution requests that the applicant certify that s/he met at least one of the qualifications for a distribution as defined under the CARES Act Section 2202(a)(4)(A) as summarized on the distribution request.**

Superseding Indictment ¶ 11. (emphasis added).

And in paragraph 12 the Superseding Indictment alleged that:

At the time and place aforesaid, MOSBY submitted a signed written distribution request to Nationwide, the administrator of the City of Baltimore's Deferred Compensation Plans, which contained the following statement: "I consent to a distribution as elected above **and affirm under penalties for perjury the statements and acknowledgements made in this request.**" This affirmation was made on May 26, 2020, and was signed by MOSBY. The distribution request signed and submitted by MOSBY did falsely state that she experienced **adverse financial consequences stemming from the Coronavirus as a result of being quarantined, furloughed or laid off; having reduced work hours; being unable to work due to lack of childcare; or the closing or reduction of hours of a business she owned or operated.**

Superseding Indictment ¶ 12. (emphasis added).

In sum, as the Superseding Indictment plainly alleges, the four enumerated "adverse financial consequence[s]" stemming from COVID-19 are the statements upon which the City of Baltimore Deferred Compensation Plan relied to determine whether the Defendant qualified for a coronavirus-related distribution. Thus, the Defendant's argument that, "the government's

5

allegations here are akin to saying that a witness' *taking of the oath* to testify truthfully is material instead of the *actual testimony itself*," clearly fails. Mot. at 7, footnote 4. The above cited four misrepresentations are the "actual testimony itself," and the Defendant is unambiguously on notice that she is charged with perjury for having made these false statements and is unambiguously on notice that the City of Baltimore Deferred Compensation Plan told her they would rely on them and did in fact rely when they approved her withdrawal.[1]

The second materiality argument the Defendant makes is that:

[t]he Superseding Indictment fails to set forth facts showing that the alleged false statements were directed to or capable of influencing a "decision-making body" because there is no "decision of [a] decision-making body" as contemplated by § 1621, involved in the process for making a CRD.

Mot. to Dismiss at 8.

This argument also ignores the allegations contained in the Superseding Indictment and confuses questions of facts that only the jury can decide with questions of law. "A statement is material if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Littleton*, 76 F.3d 614, 618 (4th Cir. 1996). The Superseding Indictment specifically alleges that the City of Baltimore's Deferred Compensation Plan is the "decision-making body" to whom her false statements were addressed and, as discussed above, that the City of Baltimore's Deferred Compensation Plans relied on her representations in making the decision to approve her distribution request. *See* Superseding Indictment ¶¶ 2-4. At paragraph 2, the Superseding Indictment alleges:

---

[1] The Defendant's assertion that the language in the charging paragraphs "confusingly claims something else was material," is clearly not correct. Mot. to Dismiss at 7. The specific charging language the Defendant quotes expressly cites these four "adverse financial consequences" which were enumerated in the CARES Act, on the Nationwide from that the Defendant filled out to get the distribution and in the Superseding Indictment itself.

6

> **The City of Baltimore provided payroll services, including a Deferred Compensation Plan pursuant to section 457(b) of the Internal Revenue Code (hereafter referred to as a "457(b) plan"),** to the Baltimore City State's Attorney's Office, including for State's Attorney MOSBY. Only state and local governments and some non-profit organizations can offer 457(b) plans to employees. Employees participating in 457(b) plans can contribute a portion of their salary to a retirement account. That money and any earnings accumulated by the employee are not taxed until they are withdrawn. A state or local government employee may withdraw money from their 457(b) plan when they leave their job and must begin taking distributions by the age of seventy and a half years old. Employees may also make withdrawals from a 457(b) plan for unforeseen emergencies that meet certain legal criteria, if all other financial resources are exhausted. The Coronavirus Aid, Relief, and Economic Security (CARES) Act created a new withdrawal option in calendar year 2020 only for 457(b) plan participants who were affected by COVID-19.

Superseding Indictment ¶ 2 (emphasis added).

Then in paragraph 3, the Superseding Indictment alleges that:

> On May 26, 2020, **MOSBY** emailed a "City of Baltimore Retirement Savings and Deferred Compensation Plans 457(b) Coronavirus-Related Distribution Request" **to Nationwide, the financial services firm that managed MOSBY's City of Baltimore Deferred Compensation Plan account.** Using this form, **MOSBY** requested a one-time withdrawal of $40,000 from her City of Baltimore employee retirement account.

Superseding Indictment ¶ 3 (emphasis added).

Paragraph 4 specifically quotes the "City of Baltimore Retirement Savings and Deferred Compensation Plans 457(b) Coronavirus-Related Distribution Request," which told the Defendant that:

> **I further acknowledge that the City of Baltimore Deferred Compensation Plan is relying on my certifications in determining that I qualify for a coronavirus-related distribution** and that I will not exceed the applicable limit.

Superseding Indictment ¶ 4 (emphasis in original).

Thus, the Defendant's argument that, "the Superseding Indictment **fails to set forth facts showing** that the alleged false statements were directed to or capable of influencing a 'decision-

7

making body' fails because the Superseding Indictment specifically alleges that the City of Baltimore Deferred Compensation Plan was the "decision-making body" to whom her false statements were addressed.

The Defendant's argument that "there is no 'decision of [a] decision-making body' as contemplated by § 1621, involved in the process for making a [Coronavirus Related Distribution],'" is a factual question that can only be resolved at trial and cannot be resolved, pretrial, in a motion to dismiss.  Rule 12, which is the basis for the Defendant's motion, offers no relief.  "A district court may dismiss an indictment under Rule 12 where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (quotation omitted). "A court cannot grant the motion to dismiss under Rule 12 if a defendant's legal contentions are inextricably bound up with the facts of the case." *United States v. Pinson*, No. 2:19-CR-00250, 2020 WL 2601659, at *2 (S.D.W. Va. May 21, 2020) (unpublished) (quotation omitted); *United States v. Regaldo*, 497 F. Supp. 3d 56, 58 (E.D.N.C. 2020).  A 12(b) motion is permissible only when it "involves a question of law rather than fact." *United States v. Shabbir*, 64 F. Supp. 2d 479, 481 (D. Md. 1999) (quoting *United States v. Nukida,* 8 F.3d 665, 669 (9th Cir.1993) (citation omitted)).

And the Fourth Circuit has specifically addressed materiality as a jury question:

> In fact, a defendant cannot be convicted of perjury or making a false statement unless the government proves beyond a reasonable doubt that the false statement was capable of influencing the decision making body to which it was addressed. Again, the jury is the ultimate arbiter of whether the government has met its burden of proof.

*United States v. Sarihifard*, 155 F.3d 301, 306–07 (4th Cir. 1998) (internal citations omitted).

At trial, the United States will present evidence that the certifications the Defendant made were highly material. Specifically, the evidence will show that the City of Baltimore Deferred Compensation Plan relied on the Defendant's representation that she had suffered adverse financial consequences stemming from COVID-19 in approving the Defendant's withdrawals. Had she not made these false representations, the withdrawals would not have been approved.

The Defendant concedes, as she must, that the CARES Act provides that a plan administrator "may rely on an individual's certification" that they are qualified. Mot. to Dismiss at 8. That means that the Defendant's false representation "ha[ve] a natural tendency to influence, or [are] capable of influencing, the decision-making body to which it was addressed," the very definition of materiality. *Littleton*, 76 F.3d at 618.

The fact that the CARES Act authorizes a retirement plan to rely on a self-certification does not mean that the retirement plan is not making a decision based on those self-certifications. Just the opposite. The Defendant's argument would only work if the CARES Act directed that a plan may *not* rely on self-certifications. Then, arguably, the Defendant's misrepresentations about having suffered from adverse financial consequences stemming from COVID-19 would be immaterial.

The Defendant argues that when she submitted the 457(b) distribution form to Nationwide "she was not submitting it for Nationwide to decide whether she was qualified based on the veracity of the statements that corresponded to the box she checked, that is, the specific reasons she self-certified qualified her for a distribution." Mot. to Dismiss at 8-9. That is true. The City of Baltimore Deferred Compensation Plan instead relied on the fact that she certified, under penalties of perjury, that her representations were true. Again, that means the representations were

9

highly material, not immaterial. The fact that the Plan didn't have to independently verify the Defendant's representations doesn't mean they didn't rely on them.

The Defendant points to the fact that there are differences between how Coronavirus Related Distributions (CRD) and "hardship" or "emergency" withdrawals from 457(b) plans are administered and how the funds can be used. Mot. to Dismiss at 10. The principal difference is that self-certification authorization contained in the CARES Act for CRDs relieves the retirement plan of any obligation to confirm the veracity of a plan participant's assertions that they suffered from adverse financial consequences stemming from COVID-19. However, that does not mean that the retirement plan can approve a withdrawal without the plan participant certifying that they have suffered from one or more of the four specifically articulated adverse financial consequences stemming from COVID-19. And it does not mean that a plan participant can lie to the plan to obtain the distribution.

Instead of creating the "adverse financial consequences" stemming from COVID-19 distribution, Congress could have written the CARES Act to allow retirement plans to approve distributions during the pandemic whenever a plan participant asked for one. But it didn't. Instead it tied the distribution to specific factual triggers, articulated in Section 2202(a)(4)(A) of the CARES Act. The Defendant's argument is essentially that Congress cared enough to write into the law the specific "adverse financial consequences" that allow a plan participant to make a withdrawal but at the same time the Congress didn't care if the Defendant actually suffered from them. Such an argument is nonsensical.

The Defendant further claims that "checking the box is required to completely fill out the form," and thus is "merely relevant but not material." *Id*. The Defendant cites two cases in support of this "relevant" but not "material" distinction, a decision of the United States Supreme Court

from 1956, *Weinstock v. United States*, 231 F.2d 699 (1956) and a decision of the Second Circuit, *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007). Neither one of these cases bears any resemblance to the charges and facts in this case and, as a result, neither one supports the contention that the Defendant's representations were relevant but not material.

### B. The Phrase "Adverse Financial Consequences" is Not "Fundamentally Ambiguous"

The Defendant next argues that counts one and three should be dismissed because the phrase "adverse financial consequences," is "fundamentally ambiguous" and therefore "insufficient to support a charge of perjury under § 1621." Mot. at 4. The Defendant claims that Section 2202 of the CARES Act does not define "adverse financial consequences." It does. Section 2202 of the CARES Act provides:

> (4) **DEFINITIONS**.—For purposes of this subsection—
>
> (A) CORONAVIRUS-RELATED DISTRIBUTION.—Except as provided in paragraph (2), the term ''coronavirus-related distribution'' means any distribution from an eligible retirement plan made—
>
> (i) on or after January 1, 2020, and before December 31, 2020,
>
> (ii) to an individual—
>
> (I) who is diagnosed with the virus SARS–CoV–2 or with coronavirus disease 2019 (COVID–19) by a test approved by the Centers for Disease Control and Prevention,
>
> (II) whose spouse or dependent (as defined in section 152 of the Internal Revenue Code of 1986) is diagnosed with such virus or disease by such a test, or
>
> (III) **who experiences adverse financial consequences as a result of being quarantined, being furloughed or laid off or having work hours reduced due to such virus or disease, being unable to work due to lack of child care due to such virus or disease, closing or reducing hours of a business owned or operated by the individual due to such virus or disease, or other factors as determined by the Secretary of the Treasury (or the Secretary's delegate).**
>
> (B) EMPLOYEE CERTIFICATION.—The administrator of an eligible retirement plan may rely on an employee's certification that the employee satisfies the conditions of subparagraph (A)(ii) in determining whether any distribution is a coronavirus-related distribution.

11

The Coronavirus Aid, Relief, and Economic Security (CARES) Act (2020), Public Law 116-136, 116th Congress (emphasis added).  Thus the CARES Act specifically provides four definitions, in the alternative, for "adverse financial consequences."

The Defendant also claims that the "adverse financial consequences" is not defined on the distribution form.  It is.  The "City of Baltimore Retirement Savings and Deferred Compensation Plans 457(b) Coronavirus-Related Distribution Request," which the Defendant filled out and which is quoted in paragraph 5 the Superseding Indictment defines "adverse financial consequences" using the four specific definitions contained in Section 2202:

> ☑ I have experienced adverse financial consequences stemming from such virus or disease as a result of:
> - Being quarantined, furloughed or laid off
> - Having reduced work hours
> - Being unable to work due to lack of child care
> - The closing or reduction of hours of a business I own or operate

Superseding Indictment ¶ 5.

The Defendant next argues that "[c]onfronted by this fundamental ambiguity, the government has created multiple standards for 'adverse financial consequences.'"  Mot. to Dismiss at 15.  It has not and what the Defendant calls "standards" are factual allegations that cannot be resolved pretrial in a motion to dismiss.  The Superseding Indictment alleges that

> **MOSBY** had not experienced adverse financial consequences stemming from the Coronavirus as a result of "being quarantined, furloughed or laid off" or "having reduced work hours" or "being unable to work due to lack of childcare" or "the closing or reduction of hours of a business I own or operate."

Superseding Indictment ¶ 7 (emphasis in original).  The evidence at trial will show that the Defendant did not, in fact, experience any of the four enumerated definitions of "adverse financial consequences."  The evidence at trial will show that she was not "quarantined, furloughed or laid

off" from the Baltimore City State's Attorney's Office, which was her only source of employment in 2020. The evidence at trial will also show that she did not have reduced work hours at the Baltimore City State's Attorney's Office in 2020. The evidence at trial will show that the Defendant was not "unable to work due to lack of childcare." And finally, the evidence at trial will show that the Defendant did not own or operate a business that closed or experienced a reduction of hours.

The Defendant next argues that the Superseding Indictment's allegations about her salary, which was her only source of income in 2020, are "pure fiction by the government, because nothing about Section 2202 supports a finding that 'adverse financial consequences' is dictated by a person's salary." Mot. to Dismiss at 15. There is nothing fictional about the Superseding Indictment's allegations about the Defendant's salary. The specific allegation in the Superseding Indictment is the following:

> In fact, **MOSBY's** gross salary in 2020 was $247,955.58, and it was never reduced. She received bi-weekly gross pay direct deposits in the amount of $9,183.54 in all the months leading up to her "City of Baltimore Retirement Savings and Deferred Compensation Plans 457(b) Coronavirus-Related Distribution Request" in May 2020. Rather than experiencing a reduction in income in 2020, **MOSBY's** gross salary in 2020 increased over her gross salary in 2019, which was $238,772.04.

Superseding Indictment ¶ 8 (emphasis in original). And this is what the evidence at trial will show. The fact that the Defendant's salary never decreased and, in fact increased, is relevant to whether the defendant suffered adverse financial consequences stemming from COVID-19 because the evidence at trial will show that if the Defendant had been "quarantined, furloughed or laid off" her salary would have decreased. Similarly, if the Defendant experienced "reduced work hours" her salary would have decreased. And finally, if the Defendant had been "unable to work due to lack of childcare," the Defendant's salary would have decreased.

Relatedly, the Defendant's argument that the Superseding Indictment "tether[s] adverse financial consequences *solely* to a person's salary" ignores the allegations contained in the Superseding Indictment. Mot. to Dismiss at 16. As quoted above, the Superseding Indictment, at paragraph 7 alleges:

> 7. **MOSBY** had not experienced adverse financial consequences stemming from the Coronavirus as a result of "being quarantined, furloughed or laid off" or "having reduced work hours" or "being unable to work due to lack of childcare" or "the closing or reduction of hours of a business I own or operate."

Superseding Indictment ¶ 7 (emphasis in original). The Superseding Indictment then alleges, in a separate paragraph, that:

> 8. In fact, **MOSBY's** gross salary in 2020 was $247,955.58, and it was never reduced. She received bi-weekly gross pay direct deposits in the amount of $9,183.54 in all the months leading up to her "City of Baltimore Retirement Savings and Deferred Compensation Plans 457(b) Coronavirus-Related Distribution Request" in May 2020. Rather than experiencing a reduction in income in 2020, **MOSBY's** gross salary in 2020 increased over her gross salary in 2019, which was $238,772.04.

Superseding Indictment ¶ 8 (emphasis in original). Thus, the Superseding Indictment does not "tether[s] adverse financial consequences *solely* to a person's salary," as the Defendant incorrectly claims.

The Defendant next claims that the government "changes the standard for qualification for a Section 2202 CRD by improperly equating 'adverse financial consequences' (the language in the statute) with 'financial hardship.'" Mot. to Dismiss at 16. Like allegations concerning the Defendant's salary, the Defendant claims the use of the word "hardship" to describe the four enumerated definitions of "adverse financial consequences" as "hardships" "illustrates the phrase's fundamental ambiguity."

The Defendant goes so far as to call this a "insidious change," which, like all of her accusations, is baseless hyperbole.

14

The Government first notes that the Defendant asserts that the Superseding Indictment uses the word "hardship" in two paragraphs, paragraphs 5 and 14, although she does not articulate which count she is referring to. In neither Count One nor Three does paragraph 5 make any reference to "hardship." Also, Count One does not contain a paragraph 14. Count Three does and it refers to the four enumerated definitions of "adverse financial consequences" as "hardships." Paragraph 13 of Count One contains identical language. And the four enumerated definitions of "adverse financial consequences" can all be understood as hardships. The word "hardship" has both practical and legal definitions. While the Congress chose to use "hardship" to describe a specific kind of withdrawal from a 457(b) plan, that does not mean that the word, in practical terms, also does not describe the four enumerated definitions of "adverse financial consequences" in the CARES Act. The Defendant notes that Black's Law Dictionary defines a "consequence" as a "result that follows an effect of something that came before" and defines "hardship" as "privation" or "suffering." Mot. to Dismiss at 17. But the Defendant's argument ignores the fact that Congress chose to describe the "consequences" as "adverse financial ones." And these definitions are not mutually exclusive. In plan terms, the four definitions of "*adverse financial consequences*" are all hardships of one kind or another. In practical terms, "being quarantined, furloughed or laid off" is a privation and is therefore a hardship; "having reduced work hours" is a privation and therefore a hardship; "being unable to work due to lack of childcare" is a privation and therefore a hardship; and "the closing or reduction of hours of a business I own or operate," is a privation and therefore a hardship.

### III. MOTION FOR DISCLOSURE OF LEGAL INSTRUCTIONS GIVEN TO THE GRAND JURY

The Defendant has moved, in the alternative, for production of grand jury transcripts "containing the instructions of law for Counts 1 and 3 that were provided to the grand jury,"

pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii).  The basis for the Defendant's motion is (1) "Counts 1 and 3 are based on a theory of perjury that has never been prosecuted," an factual assertion that she offers no support for and, frankly, has no way of determining and (2) the fact that two sub-headings within the Superseding Indictment refer to the Defendant's withdrawals as "COVID 19 HARDSHIP WITHDRAWAL[s]" and the fact that the Superseding Indictment referred to the four definitions of "adverse financial consequences" as "enumerated financial hardships."  Neither of these are a basis for the disclosure of any legal instructions given to the grand jury.

Rule 6(e)(3)(E)(ii) provides that, "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter . . . (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  This provision is not an invitation to engage in a fishing expedition to search for grand jury wrongdoing and abuse when there are no grounds to believe that any wrongdoing or abuse has occurred.  *United States v. Loc Tien Nguyen*, 314 F.Supp.2d 612, 616 (E.D.Va. 2004).  This is precisely what the defendant seeks, a fishing expedition, born out of the hope that the Government took some action the Defendant can make the subject of additional baseless motions practice.  "Because grand jury proceedings are entitled to a strong presumption of regularity, a defendant seeking disclosure of grand jury information under Rule 6(e)(3)(E)(ii) bears the heavy burden of establishing that 'particularized and factually based grounds exist to support the proposition that irregularities in the grand jury proceedings may create a basis for dismissal of the indictment.'" *Id*. (citing *Hamling v. United States*, 418 U.S. 87, 139 n. 23 (1974)). "Thus, courts should not reveal the secrecy of grand jury proceedings unless there is a "'strong showing of particularized need.'" *United States v. Johnson*, 2013 WL 3880148,

at *1 (D.S.C. Jul. 26, 2013) (quoting *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443, (1983)); *see also Dennis v. United States*, 384 U.S. 855, 870, 86 (1966). "Generally, this requires the moving party to show that without access to the materials, the 'defense would be greatly prejudiced' or 'an injustice would be done.'" *United States v. Eury*, No. 1:20CR38-1, 2021 WL 276227, at *12 (M.D.N.C. Jan. 27, 2021) (citing *United States v. Procter & Gamble Co.,* 356 U.S. 677, 682 (1958)).

The Defendant has failed to meet her burden.  They offer no authority for the proposition that the first time a prosecution is brought on a specific set of facts that fact alone establishes particularized need for the grand jury transcripts they request.  And there is none.  To be clear, the perjury statute at issue is not new.  Its application to the CARES Act is obviously something that could only occur more recently since the CARES Act was enacted in 2020.  Further, the use of the word "hardship" to describe what plainly are hardships does not establish particularized need.  Finally, they never address how the "defense would be greatly prejudiced" or "an injustice would be done," if disclosure was not ordered because they cannot.

The Defendant erroneously cites *United States v. Stevens* in support of her position that she has demonstrated particularized need.  Mot. to Dismiss at 19.  However, a review of the district court's memorandum opinion in the *Stevens* case reveals that the district court did not base its decision on the particularized showings advanced by Stevens, namely, that the grand jury may have received an erroneous legal instruction on the advice of counsel defense.  *United States v. Stevens*, 771 F.Supp.2d 556, 564 (D.Md. 2011).  Thus, the decision in *Stevens* does not support the Defendant's argument.  The government, in responding to Stevens' motion for disclosure of the legal instructions given to the grand jury, apparently filed with the district court, under seal for the court's *in camera* review, a redacted grand jury transcript that revealed that a grand juror had

17

asked a question about the advice of counsel defense. *Id*. The Government's redacted transcript did not include the Government's answer to the grand juror's question. *Id*. The district court then ordered the Government to disclose the answer the prosecutor had given to the grand juror's question and the district court then disclosed a brief excerpt from the grand jury transcripts to Stevens to allow for further briefing on whether the grand jury was properly instructed on the advice of counsel defense. *Id*. The court's order makes no reference to the arguments set forth in Stevens' briefs and does not indicate whether a particularized showing would have been made absent the Government's admission of the fact that a grand juror specifically raised a question about the advice of counsel defense. Thus, *Stevens* does not address the issue before this Court, namely, whether the Defendant has met her burden of showing particularized need for disclosure.

## IV.     CONCLUSION

For the foregoing reasons the Defendant's motion should be denied.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

By:     _____/s/_____
Leo J. Wise
Sean R. Delaney
Aaron S.J. Zelinsky
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

___/s/_____
Leo J. Wise
Assistant United States Attorney

18