IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARILYN J. MOSBY,<br><br>Defendant | Case No. 22-cr-00007-LKG-1 |

**DEFENDANT MARILYN J. MOSBY'S REPLY IN SUPPORT OF MOTION TO
DISMISS COUNTS 1 AND 3 OF THE INDICTMENT, OR ALTERNATIVELY
TO COMPEL PRODUCTION OF THE INSTRUCTIONS OF LAW
PROVIDED TO THE GRAND JURY FOR COUNTS 1 AND 3**

Called to answer for its defective Superseding Indictment, the government invokes the metaphor "Orwellian" to describe State's Attorney Mosby's legally-sound challenge to its allegations. In reality, however, it is the government's response that best fits that descriptor, by embodying Mr. Orwell's observation that "words and meaning have almost parted company." Indeed, the first three pages of the government's brief lack any meaning, because they are spent re-litigating past motions and other irrelevant matters. *See* Gov't Resp. at 1-3. Substantively, too, the government's response relies on a flurry of *ipse dixit* and circular reasoning in an effort to further distract from the legal infirmities State's Attorney Mosby has identified in the Superseding Indictment.

Rather than substantively addressing these critical legal deficiencies, the Response either dismisses them as fact issues that can be addressed at a later time, or misstates and misconstrues the language in the Superseding Indictment and relevant statute, all in a failed attempt to assure this Court that the charges are properly brought. But neither the Superseding Indictment nor the government's response can stand up to application of the controlling law, because more is required to adequately allege perjury in this first-of-its-kind prosecution. The government's empty

assurances that it has met its legal burden are not enough to carry these legally-defective charges to trial. As a result, the Court should dismiss Counts 1 and 3, or in the alternative, compel the government to produce the grand jury transcripts containing the instructions of law for Counts 1 and 3 that were provided to the grand jury.

## ARGUMENT

I.   **COUNTS 1 AND 3 FAIL TO STATE AN OFFENSE AND SHOULD BE DISMISSED**

A.   **Merely Stating That State's Attorney Mosby's Certification Is "Material" Is Not Sufficient To Establish Perjury**

A perjury charge under 18 U.S.C. §1621 requires more than identification of allegedly false statements[1] in a vacuum. The alleged false statements must be *material*—that is, they must have "'a natural tendency to influence, or [be] capable of influencing, *the decision-making body to which [they were] addressed.*" *United States v. Savoy*, 38 F. Supp. 2d 406, 413 (D. Md. 1998) (emphasis added). The allegations in the Superseding Indictment do no such thing. Specifically, they lack "a statement of the essential facts" showing that the "matter" or statement that State's Attorney Mosby certified as true—that is*,* the specific reasons she qualified for the Coronavirus-Related Distribution (CRD)—were, themselves, material. Nor does the Superseding Indictment contain specific facts demonstrating that those reasons were addressed to and capable of influencing a "decision-making body" into determining she was qualified for a CRD and making

---

[1] In an effort to score cheap points and impugn State's Attorney Mosby's credibility, the government glibly remarks that State's Attorney Mosby contends "her [alleged] lies aren't material, in other words, that they don't matter". Gov't Resp. at 3. But surely the government attorneys know that, when stripped of the sarcasm, its statement is *true* as it relates to perjury under 18 U.S.C. § 1621. Alleged falsehoods do not matter—in the context of a perjury charge—if they are not material. *See United States v. Savoy*, 38 F. Supp. 2d 406, 413 (D. Md. 1998) (recognizing that one element of a perjury charge be that the alleged falsehood be about "any material matter"); *see also Neder v. United States*, 527 U.S. 1, 16 (1999) ("In general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed."); *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007) (a statement is material only if it is capable of influencing a decision that the decision-maker is "entitled to" or "able to make"). As State's Attorney Mosby has shown both in her Motion and below, the government has failed to adequately allege materiality.

such a distribution. *See generally* Mosby Mot. at 8-11; *see also Savoy*, 38 F. Supp. 2d at 413 (holding that a "*material matter*" that is, one that is "capable of influencing, the decision-making body to which it was addressed," is a necessary element for a charge of perjury under § 1621).

For its part, the government claims that the Superseding Indictment *does* contain specific facts, and spends several pages reciting various excerpts from the Superseding Indictment. *See* Gov't Resp. at 4-6. This is pure *ipse dixit*. And, on closer inspection, it is clear that the quoted language is insufficient to make out a perjury charge as a matter of law.

The government claims that the "Superseding Indictment alleges in *four separate paragraphs* [4, 5, 11, and 12] that the misrepresentations the Defendant made that she suffered from adverse financial consequences stemming from COVID-19 were material to the decision to approve her distribution request." This assertion is simply false. At the outset, the Superseding Indictment contains no allegations that the "*misrepresentations the Defendant made* that she suffered from adverse financial consequences stemming from COVID-19 *were material to the decision to approve her distribution request*." And on closer inspection, it is clear that the language in these "four separate paragraphs" does not say what the government claims it does.

In paragraphs 4 and 5, the Superseding Indictment quotes from the 457(b) distribution form, but this is not enough. Gov't Resp. at 4. A quote from a form cannot "fully, directly, and expressly, without any uncertainty or ambiguity, set forth [] the elements [of materiality] necessary to constitute the offense." *United States v. Remarque*, No. SAG-19-0039, 2021 U.S. Dist. LEXIS 28016, at *6 (D. Md. Feb. 12, 2021). As such, the government's claim of sufficiently pleading materiality in those paragraphs fails. In paragraph 12, the Superseding Indictment quotes again from the 457(b) distribution form, this time the affirmation statement, and alleges that State's Attorney Mosby did not experience the enumerated examples of adverse financial consequences.

This does not even use the term "material," much less establish its existence. Paragraph 11 also fails in this respect. As pointed out in State's Attorney Mosby's motion, paragraph 11 alleges that "it was material to *such distribution* requests that the *applicant certify*." But this general statement that certification was material to distribution request is not, as the government falsely claims, a direct allegation that "the misrepresentations the Defendant made … were material to the decision to approve her distribution request." As such, like paragraphs 4, 5, and 12, paragraph 11 fails to sufficiently plead materiality.

The government also incorrectly asserts that the fundamental question at issue here is that because of the certification, State's Attorney Mosby was "able to access $90,000 [from] her City of Baltimore Deferred Compensation Plan." Gov't Resp. at 3. A review of the relevant language, however, reveals that *is not* what the particular certification at issue was about. For example, paragraph 4 of the Superseding Indictment provides that "the [Plan] is relying on my certifications in determining *that I qualify for* a [CRD]." Gov't Resp. at 4 (quoting Superseding Indict. ¶4) (some emphasis removed). But *qualifying for* and *actually receiving a distribution from* a 357(b) plan under the CARES Act are not the same. And the government knows this,[2] because it goes on to acknowledge that when State's Attorney Mosby submitted the 457(b) distribution form to Nationwide "she was not submitting it for Nationwide to decide whether she was qualified based on the veracity of the statements that corresponded to the box she checked, that is, the specific reasons she self-certified qualified her for a distribution." The Plan lacked the authority to make

---

[2] Notably, the government also admits that "the CARES Act for CRDs relieves the retirement plan of any obligation to confirm the veracity of a plan participant's assertions that they suffered from adverse financial consequences stemming from COVID-19." Gov't Resp. at 10. Therefore "the veracity of a plan participant's assertions" is of no consequence and is not material to the plan. This all begs the question, if the plan was not determining qualification, to what or to whom is the truth or falsity of the factors that determine qualification material? Certainly not the plan.

such a determination because qualification is based on self-determination and certification. So the Plan merely paid out the requested distribution upon submission of a completed form.

Given this lack of clarity or consistency, the allegations in the Superseding Indictment that the government cites fail to meet the requirement that perjury allegations show materiality "without any uncertainty or ambiguity." *Savoy*, 38 F. Supp. 2d at 413.

**B.      The Government Cannot Prove Materiality As A Matter Of Law**

As for whether the allegations in Counts 1 and 3 could ever successfully establish materiality as it relates to the perjury charge here (they cannot), the government twists the language in the Superseding Indictment to suit its theory of the case, but ultimately fails to rebut State's Attorney Mosby's arguments for several reasons.

*First*, the Superseding Indictment fails to sufficiently allege the existence of a "decision-making body" to whom the specific matter is addressed. The government's response claims that the "Superseding Indictment *specifically alleges* that the City of Baltimore's Deferred Compensation Plan is the "decision-making body" to whom her false statements were addressed." *See* Gov't Resp. at 6, 8. This is false. Indeed, the Superseding Indictment does not include the words "decision" or "decision-making body." The government cannot cure its defective indictment by claiming allegations exist when they clearly do not.

Moreover, the government's argument misses the forest for the trees. *See* Gov't Resp. at 6-7 (citing language from the Superseding Indictment that references the Plan itself, but does not identify any *decision* made by the Plan). Specifically, the relevant question is not whether there was a decision-making body, but whether that body had the discretion to make a "decision" on qualification for a CRD. *See* Mosby Mot. at 8. As State's Attorney Mosby made clear, the Plan had no such discretion here. Instead, the Plan made the requested CRD upon receipt of a completed request form, regardless of whether the statements on that form were true or not and without

- 5 -

making its own determination on qualification. *Id.* at 8-11. In fact, the only discretion here was vested in the *requestor* (State's Attorney Mosby), who self-certified the basis for designating the particular distribution as a CRD. *See* Mosby Mot. Ex. 1, at 5-6, 9. At that point, as long as the form was complete, the Plan simply performed its administrative duty and made the distribution.

*Second*, the government's argument that materiality involves a fact question falls flat, because a determination of no materiality can be made here with no additional facts. As detailed in State's Attorney Mosby's motion, the IRS issued multiple guidance documents that lay out in detail the CRD process. The IRS laid out what the plan is and is not obliged to do related to a CRD. It laid out that qualification is based on a participant's self-certification. It laid out the factors for qualification that a plan participant can use as a guide to make that self-determination. It laid out that a plan may rely on that self-certification. The government's perjury charge directly relates to the veracity of factors on qualification for CRD. Therefore, the court has all the information it needs to determine that no materiality exists here, without resort to what the plan did or did not do. As the government admits, the veracity of these factors is of no consequence to the plan because "the CARES Act … relieves the retirement plan of any obligation to confirm the veracity of a plan participant's assertions." Gov't Resp. at 10.

*Third,* the government cites *United States v. Sarihifard*, 155 F.3d 301 (4th Cir. 1998), and claims that deciding materiality is inappropriate under Rule 12 because "a defendant cannot be convicted of perjury or making a false statement unless the government proves beyond a reasonable doubt that the false statement was capable of influencing the decision making body to which it was addressed." *Id.* at 306-07. But this rule was put in place to protect Defendants and to ensure only that a jury can *convict* a defendant after the prosecution proves materiality beyond a reasonable doubt. *Id.* Its purpose is not to allow prosecutors to shirk their responsibility to bring

legally sufficient indictments. Nor does it give prosecutors license to bring meritless charges and drag a defendant through trial while hiding behind the argument that the "jury must decide." Such an interpretation is at odds with the protection offered to defendants by this rule. The government should not be allowed to advance this defective perjury charge by using as a sword a rule that is meant to be a shield to defendants.

*Fourth*, and finally, the government speculates by suggesting that "Congress could have written the CARES Act to allow retirement plans to approve distributions during the pandemic whenever a participant asked for one. But it didn't." Gov't Resp. at 10. In reality, that is exactly what Congress did by allowing self-certification. It takes the qualification decision-making out of the hands of the plan and places it solely with the participant. And when a participant self-determines they are qualified, they fill out the distribution form and ask the plan for the distribution. In other words, Congress wrote "the CARES Act to allow retirement plans to approve distributions during the pandemic whenever a plan participant asked for one."[3]

Moreover, to the extent that the CARES Act CRDs offered a tax benefit, State's Attorney Mosby did not take that either, because she paid all taxes due on her distributions in the tax years she took them. *See* Mosby Mot. at 3. In other words, the government's hypothetical is nothing more than a tempest in a teapot. State's Attorney Mosby was allowed to take *her money* out of her 457(b) Plan at any time, and she did not enjoy any special benefits as a result of taking the distributions at issue here pursuant to the CARES Act. This fact, too, undermines a finding that

---

[3] The government mischaracterizes States' Attorney Mosby's position as being that "Congress didn't care if the Defendant actually suffered" adverse financial consequences. This argument also fails to support materiality. The IRS unambiguously states that "CRDs are permitted *without regard to the qualified individual's need for funds*, and the amount of the distribution is *not required to correspond* to the extent of the adverse financial consequences experienced by the qualified individual." *See* Mosby Mot. Ex. 1, at 6 (emphasis added). The government also ignores the fact that the two other boxes on the Distribution form in no way relate to a participant's financial situation. *See* Mosby Mot. Ex. 4 at 3. Further, this is not a violation of the CARES Act charge, this is perjury; so whether or not the government cared about whether a participant suffered adverse financial consequences is of no consequence to whether the specific representations were material to the decision making, if any, of the plan.

any statement she made was material to her ability to get her money. Counts 1 and 3 should be dismissed.

## II.     DISMISSAL OF COUNTS 1 & 3 IS REQUIRED BECAUSE THE TERM "ADVERSE FINANCIAL CONSEQUENCES" IS FUNDAMENTALLY AMBIGUOUS

Whether a retirement plan participant suffered an "adverse financial consequence" is fundamentally ambiguous because the statute from where the phrase is derived, Section 2202 of the CARES Act, does not define it, nor is it defined on the distribution form or in any guidance promulgated by the IRS.[4] There are also no regulations or case precedent defining the phrase and providing a standard to be applied in the perjury context or otherwise. And as detailed in State's Attorney Mosby's Motion, industry experts agree that the term is ambiguous and undefined. In fact, the only entity with a contrary view is the government, for the first time, in its response. But its proffered "definition" is wrong, for several reasons.

*First*, the government claims that the CARES Act defines "Adverse Financial Consequences" and inserts a quote from the "Definitions" provisions of Section 2202. The problem with this argument is that the term being defined in that section is "Coronavirus-Related Distribution" *not* "adverse financial consequences."

*Second*, the government claims that the Distribution Form "defines 'adverse financial consequences' using the four specific definitions contained in Section 2202." Gov't Resp. at 12. But this argument is circular and lacks common sense. The "four specific definitions" to which the

---

[4] To the extent the government claims it has not tethered "adverse financial consequences" to a reduction in State's Attorney Mosby's salary, its response indicates otherwise. *See* Gov't Resp. at 13 (identifying three of the "adverse financial consequences" and stating that if any of them had occurred, State's Attorney Mosby's "salary would have decreased."). As noted in State's Attorney Mosby's motion, however, this is an oversimplification and inaccurate. *See* Mosby Mot. at 15-16.

government refers are the four factors an applicant considers when making their self-certification. Specifically:

> ☑ I have experienced adverse financial consequences stemming from such virus or disease as a result of:
> - Being quarantined, furloughed or laid off
> - Having reduced work hours
> - Being unable to work due to lack of child care
> - The closing or reduction of hours of a business I own or operate

The government's reasoning is circular because it uses the four factors to simultaneously *define* "adverse financial consequences" *and be the cause of* those "adverse financial consequences." By the government's absurd reasoning, therefore, if someone suffers a heart attack *as a result of* having bad cholesterol, being obese and not exercising, the definition of heart attack is bad cholesterol, being obese and not exercising. Or, if someone experiences nausea as a result of turbulence while flying, the definition of nausea is turbulence while flying. This reasoning strains credulity.

At bottom, it was clear and widely accepted that at the time State's Attorney Mosby made her CRD, the term "adverse financial consequences" was undefined and fundamentally ambiguous, and the government has pointed to nothing showing otherwise. As such, the government's interpretation of "adverse financial consequences" "cannot support a Perjury conviction." *United States v. Chujoy*, 207 F. Supp. 3d 626, 651 (W.D. Va. 2016).

## III.   THE GOVERNMENT INAPPROPRIATELY INSERTS A "HARDSHIP" STANDARD INTO SECTION 2202

The government further illustrates how "adverse financial consequences" is undefined and without a clear and unambiguous meaning by erroneously inserting the "financial hardship" standard in its place. But the two are not the same, and the government's substitution does not even

pass the common sense test. "Hardship" connotes systemic financial difficulties; whereas "adverse financial consequences" connotes, at most, isolated incidents of lost income or currency. Put differently, the person who loses $20 in a Las Vegas airport slot machine during a layover can be said to have suffered a financial loss or suffered adverse financial consequences, while the addicted gambler who *consistently loses* and has no job or home due to the addiction is in a permanent state of suffering from financial hardship. The government ignores this critical distinction.

The government is right that "Congress chose to use "hardship" to describe a specific kind of withdrawal from a 457(b) plan." But what the government conveniently ignores is that Congress also chose to use a "hardship" standard in other sections of the CARES Act. Yet what Congress *did not do* is use "hardship" to describe the standard for a coronavirus distribution under Section 2202. The word "hardship" appears nowhere in the text of Section 2202 or the Distribution Form. And it is settled law that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acted intentionally and purposely in excluding the particular language." *United States v. Espinoza-Leon*, 873 F.2d 743, 746 (4th Cir. 1989) (citing *See Russello v. United States*, 464 U.S. 16, 23 (1983)). As such, the government cannot unilaterally decide (for the sole purpose of indicting State's Attorney Mosby), to add a term or standard to a statute where Congress has chosen not to. The government cannot unilaterally decide to change Congress' standard of "adverse financial consequences" to "financial hardship." *Id.* Indeed, Congress has expressly made the distinction between a hardship withdrawal and a coronavirus-related withdrawal:

> *Unlike hardship distributions*, CRDs could be included in taxable income in 2020 alone or included equally over 2020, 2021, and 2022, and the amount of the CRD may be recontributed to an individual's account within three years.

Library of Cong. Elizabeth A. Myers, Cong. Research Serv., R46837, *The CARES Act: Selected Data on Coronavirus-Related Distribution and Loan Usage in 2020* (July 13, 2021).

The government would prefer to ignore this distinction. But prosecutorial discretion does not extend to adding words or contrary meanings to statutes to facilitate prosecutions. The government cannot simply label something a "Hardship Withdrawal" when Congress has expressly distinguished a CRD from a hardship withdrawal. Nor can the government allege that the standard for qualification for a CRD is "financial hardship" when neither Section 2202 of the CARES Act nor the Distribution form contains the word "hardship." The government's claim that the four examples of adverse financial consequences "are all hardships of one kind or another" is unsupported and conclusory, and thus of no consequence. As such, the government's attempt to insert the word "hardship" and a "financial hardship" standard into Section 2202 should be rejected.

## IV. ALTERNATIVELY, THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE THE INSTRUCTIONS OF LAW PRESENTED TO THE GRAND JURY REGARDING COUNTS 1 AND 3.

As discussed at length above, the government's response evidences at least an oversimplification—if not a fundamental misunderstanding—of the legal issues in this first-of-its-kind prosecution. That evidence, in turn, lends support for State's Attorney Mosby's contention that the government's legal instructions to the grand jury were likely flawed as well. Given this, the Court should order disclosure of the grand jury instructions of law as they relate to the perjury counts or, at minimum, order an *in camera* review of those instructions so that State's Attorney Mosby and ultimately the Court can determine whether—as she suspects—the government's perjury allegations are built on nothing more than a house of cards.

The government's response to State's Attorney Mosby's request for alternative relief takes a familiar tact—calling her request a fishing expedition and insisting that she has not met her

sk

burden of showing "particularized need." Gov't Resp. at 16-17. Once again, the government's glib response fails to carry the day.

As an initial matter, this is not a fishing expedition. The government's inappropriate labeling of Counts 1 and 3 as "Hardship Withdrawals" and its improper insertion of a "hardship" standard alone provides raises serious concerns about how the government instructed the grand jury in this case. But as explained here and in the Motion, there are additional concerning reasons that justify a review of the grand jury instructions for Counts 1 and 3, namely, the government's unsupported and circular definition of "adverse financial consequences" and the failure of the Superseding Indictment to properly allege that a material matter affected a decision-making body.

State's Attorney Mosby has met her burden of demonstrating a particularized need for disclosure, because she has exposed myriad shortcomings in the Superseding Indictment. *See United States v. Stevens*, 771 F. Supp. 2d 556, 568 (D. Md. 2011);[5] *accord United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (dismissing indictment because the "defendants were seriously prejudiced by the cumulative effect of the government's misleading statements of law" to the grand jury). State's Attorney Mosby's request is narrowly targeted and aimed at uncovering the "erroneous and prejudicial legal advice" that was likely given by the prosecutor in this first-of-its-kind prosecution. *Stevens*, 771 F. Supp. 2d at 564. Given the uniqueness of this perjury prosecution, there should be no "presumption of regularity" here, *see* Gov't Resp. at 16 (internal

---

[5] The government attempts to distinguish *United States v. Stevens*, a case State's Attorney Mosby cites for the unremarkable proposition that disclosure of grand jury instructions may be appropriate where it is likely that the government may have given improper legal instructions to the grand jury. *See* Mosby Mot. at 19-20. The government misreads that case, and overstates State's Attorney Mosby's reliance on it. In particular, the government ignores that the court in that case, on motion by the defendant, did in fact review the grand jury transcripts for errors of law. *Stevens* 771 F. Supp. 2d at 564. Ultimately, however, the broader point is that the government's focus on *Stevens* is misplaced, because the critical issue before the Court is whether State's Attorney Mosby has made a "particularized showing" that disclosure (or *in camera* review) is warranted. She has, and this Court should order such disclosure or *in camera* review.

quotation marks omitted).[6] As State's Attorney Mosby has shown, there is a substantiated and warranted concern that the grand jury, to State's Attorney Mosby's prejudice, was infected with the government's profoundly mistaken understanding of the standards and process for a CRD request and the government's make-it-up-as-it-goes-along approach for Counts 1 and 3.

**CONCLUSION**

For all these reasons, State's Attorney Mosby requests that this Court (a) dismiss Counts 1 and 3 of the Superseding Indictment, or alternatively (b) order the production of the grand jury transcripts containing the instructions of law concerning Counts 1 and 3 that were provided to the grand jury(ies) who returned the indictment and superseding indictment

Dated: July 8, 2022                    Respectfully Submitted,


                                       /s/ A. Scott Bolden

                                       A. Scott Bolden (*admitted pro hac vice*)
                                       Rizwan A. Qureshi (*admitted pro hac vice*)
                                       Reed Smith LLP
                                       1301 K Street, N.W.
                                       Suite 1000 - East Tower
                                       Washington, D.C. 20005-3373
                                       Telephone: +1 202 414 9200
                                       Facsimile: +1 202 414 9299
                                       RQureshi@ReedSmith.com
                                       ABolden@ReedSmith.com

                                       Kelley Miller (*admitted pro hac vice*)
                                       Reed Smith LLP
                                       7900 Tysons One Place, Suite 500
                                       McLean, Virginia 22102
                                       Telephone: + 1 703 641 4200
                                       Facsimile: +1 703 641 4340
                                       KMiller@ReedSmith.com

                                       Anthony R. Todd (*admitted pro hac vice*)
                                       Reed Smith LLP

---

[6]The government engages in circular reasoning by suggesting that State's Attorney Mosby was somehow required to offer support for the contention that no other prosecution like this one has ever been brought. *See* Gov't Resp. at 16. But even if she were required to do so (and she is not), it is telling that despite State's Attorney Mosby's repeated assertions that this prosecution is unique, the government has never cited any other similar prosecution.

10 South Wacker Drive
40th Floor
Chicago, IL 60606-7507
Telephone: + 312.207.1000
Facsimile: + 312.207.6400
ATodd@ReedSmith.com

Gary E. Proctor (Bar No. 27936)
Law Offices of Gary E. Proctor, LLC
8 E. Mulberry Street
Baltimore, Maryland 21202
Telephone: (410) 444-1500
garyeproctor@gmail.com

Lucius T. Outlaw III (Bar No. 20677)
Outlaw PLLC
1351 Juniper St. NW
Washington, DC 20012
Telephone: (202) 997-3452
loutlaw3@outlawpllc.com

*Counsel for Defendant Marilyn J. Mosby*

- 14 -

**<u>CERTIFICATE OF SERVICE</u>**

I certify that, on July 8, 2022, this document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will then serve a notification of the filing to the registered parties of record.

*/s/ A. Scott Bolden*<br>A. Scott Bolden