**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARILYN J. MOSBY,**<br><br>        **Defendant** | **Criminal No. LKG-22-7** |

## UNITED STATES' OMNIBUS OPPOSITION TO DEFENDANT'S MOTIONS IN LIMINE

The United States of America, by and through its undersigned attorneys, hereby submits

this omnibus response to the following motions filed by the Defendant:

(1) Motion in Limine No. 1 to Preclude the Government's Forensic Expert from Testifying at Trial, ECF 80;

(2) Motion in Limine No. 2 to Preclude the Government's IRS Expert from Testifying at Trial, ECF 81;

(3) Motion in Limine No. 3 to Strike the Term Hardship, Hardship Withdrawal, and Financial Hardship as Prejudicial Surplusage, ECF 82;

(4) Motion in Limine No. 4 to Exclude Evidence of How Withdrawn Funds Were Used, ECF 83; and

(5) Motion in Limine No. 5 to Exclude Evidence of Any Prior Investigations, ECF 84.

For the reasons outlined below, the Defendant's motions are meritless and should be denied.

## REQUEST TO EXCEED PAGE LIMITATIONS

The Government chose to respond to five filings in a single response, which required the

Government to exceed the 35-page limit in Local Rule 105.3.  The Government requests

permission to exceed the page limit rather than separate this single filing into five separate filings.

Contents

I.   BACKGROUND ................................................................................................... 3

II.  ARGUMENT ..................................................................................................... 10

A.  The Defendant's Motion in Limine to Exclude the Government's Forensic Expert from Testifying at Trial Should be Denied Because the Government Does Not Intend to Elicit Expert Testimony from the Witness .................................................................................. 10

1.  Ms. Bender's Testimony Concerning the Rule 1006 Summary Charts She Prepared is Not Expert Testimony ............................................................................................... 10

2.  Ms. Bender Can Be Qualified as An Expert if the Court Concludes that Her Testimony is Expert Testimony; the Government Has Already Provided the Defendant with Disclosures that Satisfy Rule 16(a)(1)(G) ..................................................................................................... 21

3.  If the Disclosure for Ms. Bender is Insufficient, the Appropriate Remedy is for the Government to Supplement it Not the Exclusion of Ms. Bender's Testimony ...................................... 22

B.  The Defendant's Motion in Limine to Exclude the Government's IRS Expert from Testifying at Trial Should Be Denied Because the Government Does Not Intend to Elicit Expert Testimony from the Witness .................................................................................. 23

1.  The Testimony of Revenue Officer Lopes is Not Expert Testimony. ........................... 24

2.  If Necessary, Revenue Agent Lopes Can Be Designated an Expert Witness; He is Certainly Qualified ................................................................................................................... 30

3.  If the Disclosure for Revenue Agent Lopes is Insufficient, the Appropriate Remedy is for the Government to Supplement it Not the Exclusion of His Testimony ................................... 30

C.  The Defendant's Motion in Limine to Strike the Term Hardship, Hardship Withdrawal, and Financial Hardship as Prejudicial Surplusage Should Be Denied Because this it is Not a Motion in Limine, it is Another Untimely Motion Related to the Indictment and it is Meritless ............. 32

1.  The Defendant's Motion to Strike Surplusage Is Not a Proper Motion In Limine ................... 32

2.  The Term "Hardship" Is Neither Inflammatory nor Prejudicial. ........................................... 34

D.  The Defendant's Motion in Limine to Exclude Evidence of How Withdrawn 457(b) Funds Were Used Should Be Denied Because the Fact that they were Used to Buy Vacation Homes is Evidence that the Defendant Did Not Suffer from Adverse Financial Consequences Stemming from COVID-19 as She Falsely Claimed ........................................................................... 39

1.  The Evidence is Relevant and Probative of the Fact that the Defendant Did Not Suffer Adverse Financial Consequences. ........................................................................................... 39

2.  The Evidence is Not Unfairly Prejudicial ............................................................................ 43

E.  The Defendant's Motion in Limine to Exclude Evidence of Any Prior Investigations Should be Denied Because Statements She Authorized Others to Make on Her Behalf in Those Investigative are Relevant to the Offenses Charged in this Case ............................................. 47

1.  The Defendant's Statements in Prior Investigations that Her Businesses Were Not Operational Are Admissible Because They Show She Did Not Experience Adverse Financial Consequences Stemming from COVID-19. ........................................................................................... 48

2

**2.**     *The Defendant's Statements Concerning Tax Debts are Admissible Because They Demonstrate Her Knowledge of the Existence of These Tax Debts When She Submitted Her Mortgage Applications* ................................................................................................................ 51

**III.   CONCLUSION** .......................................................................................................... 53

## I.     BACKGROUND

A federal grand jury sitting in Baltimore returned a four (4) count Indictment against the Defendant on January 13, 2022, and a Superseding Indictment on March 10, 2022.  The Defendant is charged with two counts of perjury, in violation of 18 U.S.C. § 1621 (Counts One and Three) and two counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014 (Counts Two and Four).

Counts One and Three allege that the Defendant committed perjury on two separate occasions.  Count One alleges that on May 26, 2020, the Defendant submitted a request to withdraw $40,000 from her City of Baltimore Deferred Compensation Plan falsely claiming, under penalties of perjury, that she had suffered specific enumerated "adverse financial consequences," all of which can be described generally as financial hardships and specifically as losses in income resulting from the COVID-19 pandemic.  Superseding Indictment Count One ¶¶ 3-6.  Count Three alleges that on December 29, 2020, the Defendant submitted an additional request to withdraw $50,000 from the same City of Baltimore Deferred Compensation Plan again falsely claiming, under penalties of perjury, that she had suffered specific enumerated financial hardships resulting from the COVID-19 pandemic.

The Defendant used the first COVID-19 financial hardship withdrawal as a down payment to purchase an eight (8) bedroom single family home for $545,000 in September 2020.  The Defendant used the second COVID-19 financial hardship withdrawal as a down payment to

purchase a two (2) bedroom condominium for $476,000 in Long Boat Key, Florida, in February 2021.

The City of Baltimore Deferred Compensation Plan in which the Defendant participated was established under 26 U.S.C. § 457(b), and is therefore commonly referred to as a "457(b) plan."  In her withdrawal requests, the Defendant claimed to have suffered from "adverse financial consequences" stemming from to the COVID-19 pandemic, specifically, "[b]eing quarantined, furloughed or laid off[,] Having reduced work hours[,] Being unable to work due to lack of childcare[, or] The closing or reduction of house of a business I own or operate."  *Id.* at ¶ 5.  None of that was true.  *Id.* at ¶ 7.  In fact, the Defendant's gross salary in 2020 was $247,955.58, and it was never reduced.  She received bi-weekly gross pay direct deposits in the amount of $9,183.54 in all the months leading up to her withdrawal in May 2020.  Rather than experiencing a reduction in income in 2020, the Defendant's gross salary in 2020 increased $9,183.54 over her 2019 salary. *Id.* at ¶ 8.

Only state and local governments and some non-profit organizations can offer 457(b) plans to employees.  *Id.* at ¶ 2.  While there are some similarities between 457(b) plans and other types of retirement accounts, there are also notable differences.  For example, an employee in the private sector who participates in a 401(k) plan can make withdrawals prior to retiring but has to pay taxes on the withdrawal and a ten percent penalty.  By contrast, a 457(b) plan participant can only withdraw funds prior to retirement if they leave government service or experience "unforeseeable emergencies," that meet certain legal criteria.  *See* 28 U.S.C. § 457(d).

So, while a 401(k) plan participant can always withdraw funds from their account and pay taxes and penalty, 457(b) plan participants cannot withdraw funds from their account before they

retire unless they leave government service or experience an "unforeseeable emergency" and exhaust their other financial resources.[1]

The Coronavirus Aid, Relief, and Economic Security (CARES) Act created a new withdrawal option in calendar year 2020 only for 457(b) plan participants who were affected by COVID-19.  Superseding Indictment ¶ 2.  Specifically, as it relates to this case, in calendar year 2020, 457(b) plan participants were authorized to make withdrawals if they experienced "adverse financial consequences," again all of which can be described generally as financial hardships, and specifically a loss of income, resulting from: "[b]eing quarantined, furloughed or laid off[,] Having reduced work hours[,] Being unable to work due to lack of childcare[, or] The closing or reduction of house of a business I own or operate."  The CARES Act also provided that plan participants self-certify that they met these criteria.  *Id.* at ¶ 4.

The Defendant exploited those CARES Act provisions in order to obtain $40,000 in May 2020, as charged in Count One, and an additional $50,000 in December 2020, as charged in Count Three.[2]  But for her false statements, the Defendant would not have been able to make the two withdrawals charged in Counts One and Three.  And without those two withdrawals, she would not have been able to make the down payment on either of the two Florida vacation homes she purchased in September 2020 and February 2021.  Simply put, the Defendant's perjury allowed her to leverage $90,000 in funds she should not have had access to in order to buy two vacation

---

[1] If a 457(b) plan participant takes a withdrawal before they retire, either because they leave government service or because they experience an "unforeseeable emergency," they owe taxes on the withdrawal but, unlike 401(k) plan participants, they do not have to pay a 10 percent penalty.

[2] Taxes were withheld by the City of Baltimore's 457(b) plan administrator so the amount of funds wired to the Defendant's checking account was less than the total amount of the withdrawal.

properties.   And the Defendant's false statements extended beyond the COVID-19 financial hardship withdrawals to the mortgage applications for the vacation properties themselves.

The Defendant used the two COVID-19 financial hardship withdrawals as down payments on two vacation homes in Florida she purchased in late 2020 and early 2021.  At the time she made both purchases she owed significant debt to the IRS for unpaid taxes.  That debt dated to tax years 2014 and 2015.  *Id.* at Count Two ¶ 5.  Specifically, when the Defendant and her husband filed their joint return for 2014, they owed the IRS $46,556, which they did not pay, *id.* at ¶5(a), and when they filed their joint return for 2015, they owed the IRS $17,812, which they did not pay, *id.* at ¶5(b).  In tax years 2016, 2017 and 2018, the Defendant and her husband filed joint returns that claimed they were entitled to refunds.  *Id.* at ¶¶ 8, 9 and 10.  However, they never received any of those refunds because the IRS applied them against the Defendant and her husband's outstanding tax debts.  *Id.*  In all of those years, the IRS also sent multiple notices to the Defendant and her husband at the home they shared telling them that they owed unpaid taxes and that their refunds were being applied against those debts.  *Id.* at ¶¶ 6, 7, 8, 9 and 10.

Because the Defendant and her husband did not satisfy their outstanding tax debts, on or about March 3, 2020, the IRS placed a lien on "all property and rights to property belonging to" the Defendant in the amount of the unpaid taxes the Defendant owed the IRS as of that date which was in the amount of $45,022."  *Id.* at ¶ 11.  The lien was not against the home in which the Defendant lived.  *Id.*  The IRS sent the Defendant and her husband, individually, a notice that a lien had been filed against them by certified mail to their home address.  *Id.*

After the IRS filed this lien, on or about June 17, 2020, the Defendant filed her individual income tax return for 2019.  *Id.* at ¶ 13.  For that tax year, 2019, the Defendant and her husband filed separate returns.  *Id.*  On her return, the Defendant claimed a refund of $549.  The Defendant

did not receive that refund, however, because it was applied against taxes the Defendant and her husband owed the IRS.  *Id.*

A little more than a month later, on July 28, 2020, the Defendant signed a contract to purchase an eight (8) bedroom single family home in Kissimmee, Florida for $545,000 and applied for a mortgage from Cardinal Financial in the amount of $490,500.  *Id.* at ¶ 14.  The Defendant closed on that property on September 2, 2020.  *Id.*  On that date she signed a second mortgage application with Cardinal.  The Defendant used the COVID-19 financial hardship withdrawal she had made in May 2020 towards the down payment for this property.

The Defendant made a series of false statements, as charged in Count Two of the Superseding Indictment, in both of those mortgage applications with Cardinal.  First, the application required the Defendant to disclose her liabilities.  The Defendant did not disclose that she owed significant amounts of federal taxes.  Superseding Indictment Count Two ¶ 15.  Second, in response to a different question, "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee," the Defendant indicated "no" despite the fact that she was delinquent in the payment of federal taxes resulting in the IRS filing a $45,022 lien against her on March 3, 2020.  *Id.* at ¶ 16.  Third, at closing on September 2, 2020, the Defendant signed a "Second Home Rider," which provided that she would maintain "exclusive control" over the ownership property and would not "subject the Property to any…agreement that requires the Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property."  *Id.* at 18. The Defendant signed and dated the Second Home Rider below a line that stated, "BY SIGNING BELOW, Borrower accepted and agrees to the terms and covenants contained in this Second Home Rider."  *Id.*  That statement was false because on August 25, 2020, approximately one week before

she signed the Second Home Rider, the Defendant had executed an agreement with a vacation home management company giving the management company control over the rental of the property she ultimately purchased in Kissimmee.  *Id.* at ¶ 17.  The agreement stated, in relevant part, "The Manager will always be obligated to and have the right to offer the Vacation Home for rent during the time of this contract, UNLESS PRE-BOOKED ON THE COMPANIES [sic] COMPUTERISED BOOKING SYSTEM BY OWNER."  *Id.*

By falsely executing the Second Home Rider, the Defendant could obtain a lower interest rate on the mortgage for the property than the one she would have received if she had not executed the Second Home Rider, and reduced the amount of cash the Defendant had to put down in order to buy the home.  *Id.* at ¶ 19.

The Defendant used the second COVID-19 financial hardship withdrawal she made in December 2020, to purchase a second vacation property, a two bedroom condominium in Long Boat Key, Florida, for $476,000 in February 2021.  The Defendant applied for a $428,400 mortgage with Universal Wholesale Mortgage to pay for this property.  Superseding Indictment Count Four ¶ 24.  The Defendant made a number of false statements in the applications for this mortgage, which she signed on January 14, 2021, and then later, at closing, on February 19, 2021. *Id.*

First, the application required the Defendant to disclose her liabilities.  The Defendant did not disclose that she owed significant amounts of federal taxes.  *Id.* at ¶25.

Second, in response to the question, "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee," the Defendant indicated "no" despite the fact that she was delinquent in the payment of federal taxes resulting in the IRS filing a $45,022 tax lien against her on March 3, 2020.  *Id.* at ¶26.

Third, included in the closing documents was a document titled, "ATTENTION SETTLEMENT AGENT," which provided that "The borrower(s) *must* attest to the following statements as a part of closing their loan.  If any of the information below is not true and the borrower cannot attest to ANY part of it, DO NOT PROCEED WITH THE CLOSING AND CONTACT THE LENDER for further guidance." Below this statement the Defendant identified her "Current Financial Obligations," as the mortgage on the Kissimmee, Florida, home she had purchased earlier in 2020, three installment loans, the car loan for her BMW, and a revolving credit card liability.  Below these entries and above her signature was the following attestation: "the above debts/liabilities are all to which I am currently obligated, per my credit report dated JANUARY 9, 2021, and/or any other debts that were presented on my loan application.  There are no additional installment debts, home equity lines or mortgages." The Defendant did not disclose her federal tax debt or the fact that the IRS had filed a $45,022 lien against her on March 3, 2020.

Fourth, in order to close on the Long Boat vacation home, the Defendant needed $35,699.15 in cash. As of January 25, 2021, she had only $31,043.24 in liquid assets in her checking account. *Id.* at ¶ 30.  Rather than wait for her next paycheck, the Defendant submitted a false gift letter to Universal Wholesale Mortgage on February 9, 2021.  *Id.*  In it, she falsely claimed that her husband had made her a gift of $5,000 "to be transferred AT CLOSING" to be applied toward the purchase of the Long Boat Key vacation home.  *Id.*  The letter further stated that the source of the funds was her husband's Municipal Employee Credit Union (MECU) account ending in 0882.  *Id.*  On February 17, 2021, two days before closing, the Defendant's husband wired $5,000 to the escrow agent.  *Id.*  However, the $5,000 was not, in fact, a gift the Defendant's husband made to her, as the Gift Letter represented.  *Id.*  Rather, the Defendant had wired the $5,000 to her husband's MECU account ending in 0882 on February 12, 2021.  *Id.*  Her husband

then transferred the money from that account to his MECU savings account ending in 4022 and then transferred it back to his MECU checking account ending in 0882 before wiring it to the escrow agent.  The Defendant submitted the false gift letter on February 9, 2021, in order to lock in a lower interest rate than she would have received if she waited until she her next paycheck.  *Id.*

Fifth, she drafted a letter, which her loan broker submitted to Universal Wholesale Mortgage in which she claimed to have lived in Florida for 70 days before she submitted her mortgage application on January 14, 2021.  In that January 14, 2021, application the Defendant indicated that the mortgage would be for a primary residence.  Universal Wholesale Mortgage reviewed the letter in which the Defendant indicated she had lived in Florida for 70 days when it reclassified the home from a primary residence to a secondary one.

## II.    ARGUMENT

### A. The Defendant's Motion in Limine to Exclude the Government's Forensic Expert from Testifying at Trial Should be Denied Because the Government Does Not Intend to Elicit Expert Testimony from the Witness

The Defendant's "Motion in Limine to Preclude The Government's Forensic Expert from Testifying at Trial," ECF 80, should be denied because the Government does not intend to elicit expert testimony from the witness.

#### 1. *Ms. Bender's Testimony Concerning the Rule 1006 Summary Charts She Prepared is Not Expert Testimony*

The Government intends to call Jenna Bender, a forensic accountant employed by the FBI, to present several charts that summarize voluminous financial records, pursuant to Federal Rule of Evidence 1006.  "The testimony of the individual who prepares a summary exhibit is not required under Rule 1006, but 'almost always his testimony is indispensable as a practical matter' to authenticate the exhibit." *Herrmann v. United States*, 129 Fed. Cl. 780, 789 (2017) citing *United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014); *Colon–Fontanez v. Municipality of San*

10

*Juan*, 660 F.3d 17, 31–32 (1st Cir. 2011); *United States v. Boesen*, 541 F.3d 838, 848 (8th Cir. 2008); *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 515 n.9 (9th Cir. 1985); *United States v. Behrens*, 689 F.2d 154, 161 (10th Cir. 1982)).

Specifically, these charts summarize the Defendant's bank statements and credit card statements. Specifically, Ms. Bender has added up all the credits to the accounts and all the debits from these accounts. The Government has consistently stated during status conferences with the Court, starting with the very first one, that it intends to call Ms. Bender for this purpose and that what Ms. Bender has done is simply an exercise in arithmetic:

> THE COURT: Okay. And are you considering any expert witnesses? It sounds like you are talking primarily about fact witnesses based upon what you have described to the Court?

> MR. WISE: Yes, Your Honor. We don't anticipate any expert witnesses at this point. We do anticipate calling a forensic accountant from the FBI who we do not believe would need to be qualified as an expert. What the forensic accountant did was – it's really, I would say, arithmetic of reviewing various bank records, credit records, other financial records to -- to come up with, and we will provide these in advance of trial, Rule 1006 summary exhibits related to income and expenses that the defendant had from the relevant time period when the COVID-19 financial hardship withdrawals were made. We will provide those summary exhibits, as the rule provides, in advance of trial.

> We have provided the underlying documents, as the rule requires, in our Rule 16 discovery, and then that witness would testify to those summary exhibits. But, again, we don't believe that it's -- while she is a CPA, it's really not -- it's not complicated accounting. It's really an exercise that's sort of adding up the income and the expenses and then summarizing it.

February 23, 2022, Hearing Transcript at 7:14-8:10.

The Defendant also previously stated during a conference call with the Court that she would move to exclude such testimony on the mistaken belief that it is expert testimony. March 30, 2022, Hearing Transcript at 43:2-7. The Defendant's motion in limine to exclude Ms. Bender's testimony is premised on that misunderstanding.

11

Ms. Bender's testimony is not expert testimony.  Therefore, it should not be excluded on the Defendant's contention that it is.  But even if it was, the Defendant has received disclosures consistent with what Federal Rule of Criminal Procedure 16(a)(1)(G) requires for expert testimony and therefore the Defendant suffers no prejudice.  *See* Exhibit A.  Therefore, she is not entitled to the relief she seeks.  And even if the disclosure she received was insufficient, as she incorrectly claims, the appropriate remedy is to order the Government to supplement the disclosure, not to exclude the testimony outright.

The Government has taken the position that Ms. Bender's testimony is not expert testimony because it does not believe that summarizing financial data amounts to the application of "scientific, technical or other specialized knowledge," as contemplated by Federal Rule of Evidence 702.  The Government does not experience any benefit from taking this position in pretrial litigation or at trial.  Further, even though it was not required to, the Government has made a disclosure for Ms. Bender consistent with what is required for expert testimony.  But the Defendant, consistent with her earlier meritless motions, ascribes ill-intent to the Government's position, about which it has been transparent since the very first status conference in this case, calling it "gamesmanship," and a "surprise attempt to end-run the rules of evidence," and an effort to "present an expert in lay witness clothing."  Mot. at 6.  None of these characterizations are accurate.

The Defendant asserts that Ms. Bender's summary exhibits "are a product of her expert analysis based on her 'specialized education, training and experience."  Mot. at 5.  This is a bizarre contention since the Defendant has never seen Ms. Bender's summary exhibits.  And it is wrong.  Similarly, the Defendant claims:

> Put differently, Ms. Bender is not a lay witness simply testifying about a summary chart she made by doing some simple addition and subtraction.  She will testify

about how she used complex, specialized, and technical forensic accounting techniques and processes to apply technical forensic accounting rules, principles and analysis to the entirety of State [sic.] Attorney's Mosby's finances. This makes her, by definition, an "expert" and not a lay witness, per Rules 701 and 702.

Mot. at 5-6. The Defendant is misrepresenting Ms. Bender's expected testimony. What Ms. Bender will testify about is the following, which was contained in the Government's letter to defense counsel dated July 1, 2022, and which is attached to this filing as Exhibit A:

> Ms. Bender will testify about several summary exhibits she has prepared pursuant to Federal Rule of Evidence 1006. These exhibits will summarize voluminous financial records obtained by the grand jury. Specifically, the exhibits will provide a total number for inflows and a total number for outflows into the Defendant's bank and credit accounts in 2019 and 2020. The bank and credit accounts that Ms. Bender will summarize are the following:
>
> 1) Bank of America account ending in #9041
> 2) MECU account ending in #8205
> 3) MECU account ending in #8200
> 4) Bank of America credit card account ending in #5213
> 5) Chase credit card account ending in #2943
> 6) Citibank credit card account ending in #3104
> 7) Citibank credit card account ending in #8213
> 8) Barclays credit card account ending in #3683
> 9) American Express credit card account ending in #65003 (formerly #64006 and #63008)
> 10) Block token account ending in #hmre
>
> In compliance with Rule 1006, the Government has already produced the records Ms. Bender will summarize in discovery. *See* Fed. R. Evid. 1006 ("The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.").

Exhibit A (footnote omitted). Ms. Bender's curriculum vitae was also provided to the Defendant at that time. The Government was not required to provide such a disclosure. It did so in an attempt to avoid needless litigation, which is exactly what the Defendant's motion in limine to exclude Ms. Bender amounts to.

The exhibits that Ms. Bender will present to the jury summarize hundreds of pages of bank statements and credit card statements. But that is all they do—summarize them. The summary

exhibits that Ms. Bender has prepared are *not* a product of "specialized education, training and experience" and Ms. Bender *will not* testify that they are the product of "complex, specialized and technical forensic accounting techniques and processes" or "forensic accounting rules, principles and analysis." The summary charts *are* a product of "simple addition and subtraction." They could have been prepared by an FBI agent or analyst who had no background in accounting or anyone else who is able to operate a calculator.

The financial records that Ms. Bender has summarized are too voluminous for the jury to review. As a result, it is precisely the kind of evidence that Federal Rule of Evidence 1006 authorizes a party to summarize. Rule 1006 specifically provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

And that is what happened here. The Government has produced the Defendant's bank statements and credit card statements to her in discovery. While not required by the rules, in this district the Government typically produces summary exhibits in advance of trial. Attached to this filing are the summary charts the Government intends to offer through Ms. Bender. *See* Exhibit B.

The first set of summary charts show inflows and outflows in the Defendant's bank and credit accounts. Chart 1 provides the sum of all inflows and the sum of all outflows for 2019 and 2020:

**Marilyn Mosby**
**Summary of Net Inflows and Net Outflows**
**For the Years 2019 and 2020**

|  | 2019 | 2020 | Difference |
|---|---|---|---|
| **Total Inflows** | 154,948 | 256,542 | 101,594 |
| **Less: Total Outflows** | 154,652 | 210,379 | 55,727 |
| **Net Inflow** | 296 | 46,163 | 45,867 |

Exhibit B.  Again, Ms. Bender arrived at these figures by simply adding up all the credits in the Defendant's bank statements and all the debits on the same bank statements.

Chart 2 presents a summary of the inflows:

**Marilyn Mosby**
**Summary of Inflows**
**For the Years 2019 and 2020**

|  | 2019 | 2020 | Difference |
|---|---|---|---|
| **Payroll - Mayor and City** | 141,450 | 151,268 | 9,818 |
| **Miscellaneous** | 13,498 | 24,274 | 10,776 |
| **Nationwide Retirement** | 0 | 81,000 | 81,000 |
| **Total Inflows** | 154,948 | 256,542 | 101,594 |

15

*Id*.  The inflows into the Defendant's accounts consist almost exclusively of her salary paid by the City of Baltimore, labeled "Mayor and City," since payments into her account are labeled having been made by the "Mayor and City Council."   The payments from the City of Baltimore were recurring across numerous bank statements and, as a result, are precisely the kind of evidence that Rule 1006 contemplates will need to be summarized.   The next most significant inflow the Defendant received in 2020 was the money she withdrew from her retirement account claiming to have suffered from adverse financial consequences stemming from COVID-19, which is the subject of the perjury counts in the Superseding Indictment.  Ms. Bender summed all other inflows and labeled them as "Miscellaneous."

Chart 3 is a summary of outflows:

**Marilyn Mosby**
**Summary of Net Outflows**
**For the Years 2019 and 2020**

|  | 2019 | 2020 | Difference |
|---|---|---|---|
| **Cash Withdrawals** | 1,329 | 658 | (671) |
| **Credit Card Payments** | 68,032 | 70,066 | 2,034 |
| **Loans** | 51,009 | 29,353 | (21,656) |
| **Miscellaneous** | 34,282 | 30,482 | (3,800) |
| **Subtotal** | 154,652 | 130,559 | (24,093) |
| **Kissimmee, FL House** | 0 | 79,820 | 79,820 |
| **Total Outflows** | 154,652 | 210,379 | 55,727 |

*Id*.  Outflows consisted of cash withdrawals, credit card payments, payments on loans and the purchase of the first vacation house in 2020, which occurred in the same year that the Defendant made her two COVID-19 financial hardship withdrawals.  All other outflows are summed and labeled "miscellaneous."

Chart 4 is a summary of the Defendant's credit accounts:

|  | 2019 | 2020 | Difference |
|---|---|---|---|
| **Marilyn Mosby** **Credit Card Summary** **For the Years 2019 and 2020** | | | |
| **Beginning Balance** | $ 23,526 | $ 26,441 | $ 2,915 |
| Purchases | $ 68,697 | $ 43,899 | $ (24,798) |
| Less: Payments | $ 65,782 | $ 69,938 | $ 4,156 |
| **Ending Balance** | $ 26,441 | $ 402 | $ (26,039) |

*Id*.  As the Court can see from the charts themselves, Ms. Bender did not apply any principles of accounting to prepare them.  Again, they are a product of arithmetic.

All of the cases cited by the Defendant support the Government's position that Ms. Bender can and should testify as a summary witness.  The Defendant cites *Certain Underwriters at Lloyd's, London v. Sinkovich*,  232 F.3d 200, 203 (4th Cir. 2000), for the proposition that "A critical distinction between expert witnesses and lay witnesses is that expert witnesses possess some specialized knowledge or skill or education that is not in possession of the jurors." Mot. at 3.  Arithmetic is not "specialized knowledge or skill or education that is not in possession of the jurors."  The Defendant further cites *Certain Underwriters at Lloyd's, London v. Sinkovich*, for

the proposition that "if a witness is offering testimony about "opinions resulting from a process of reasoning which can be mastered only by specialists in the field, that witness is an expert subject to Rule 702 and to the disclosure requirements set forth in Criminal Rule 16." Mot. at 3 citing 232 F.3d at 767 (internal quotations omitted). First, Ms. Bender is not offering any opinions. She is only summarizing the evidence. She will not, for example, offer any opinion as to whether the Defendant suffered adverse financial consequences stemming from COVID-19. That is for the jury to decide. Second, her summary charts do not "result[] from a process of reasoning which can be mastered only by specialists in the field." Again, she is simply adding up credits and debits and making sure there is no double counting in instances where, for example, the Defendant transfers money from one account of hers to another or makes a payment and then receives a refund. The Defendant cites *Union Carbide Corp. & Subsidiaries v. CIR, T.C.* Memo 2009-50, 97 T.C.M. (CCH) 1207 (T.C. 2009), aff'd, 697 F.3d 104 (2d Cir. 2012) for the following definition of forensic account, "a practice that involves the application of accounting, auditing, and investigative skills to analyze . . . financial records." Mot. at 4. While that may be true, Ms. Bender did not apply accounting or auditing or investigative skills to prepare the summary exhibits. Summing debits and credits does not involve principles of accounting or auditing, nor did doing so require any investigation.

While Ms. Bender is a forensic accountant and has been qualified to give expert testimony in other cases, she will not be called to offer expert testimony in this case. The fact that she is a forensic accountant does not mean that any testimony she gives in every case is expert testimony. The testimony she will actually give, as opposed to what the Defendant claims she will testify to, fits squarely within Rule 1006 and is therefore admissible without her being qualified as an expert. Using a witness who could give expert testimony to present summary fact testimony has been

accepted by other courts in this circuit and other circuits.  *See, e.g., United States v. Dukes*, 242 F. App'x 37, 49 (4th Cir. 2007) (district court properly admitted testimony of accountant with the Securities and Exchange Commission, called by the Government as a fact witness, to present financial summary charts); *United States v. Pineda*, 91 F.3d 136 (4th Cir. 1996) (Government produced a summary witness, a federal investigator, to show that Defendant's claim for insurance coverage after a fire was inflated by presenting a series of summary charts which detailed various purchases over a two-year period preceding the fire); *United States v. Foley*, 598 F.2d 1323, 1338 (4th Cir. 1979) (summary charts compiled by a Justice Department economist properly admitted pursuant to Rule 1006);  *United States v. Jennings*, 724 F.2d 436, 443 (5th Cir. 1984) (summary charts presented by fact witness who had received training in accounting procedures and in claim investigations admissible); *Herrmann*, 129 Fed. Cl. at 788–89 ("Although Mr. Cohen has testified as an expert witness in past cases involving foreign tax credits and partnership tax issues, the plaintiffs here are only offering his testimony as a summary witness under Rule 1006. As previously stated, the exhibits summarize documents available to both parties and do not contain any expert analysis or opinions."); *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008) (summary charts showing defendant had source of funds outside her regular income prepared by Government auditor who was not qualified as an expert was admissible); *United States v. Bishop*, 264 F.3d 535, 546 (5th Cir. 2001) (testimony of IRS agent who acted solely as the government's summary witness and not as an expert and the summary exhibits he prepared were admissible).

The Defendant's argument is similar to one made by the defendant in *United States v. Hevener*, which was rejected by the district court in that case. 382 F. Supp. 2d 719 (E.D. Pa. 2005). In *Hevener*, the defendant moved for a new trial pursuant to Federal Rule of Criminal Procedure

33 after having been convicted of mail fraud.  The defendant argued, among other things, that the court improperly admitted the testimony of a summary witness, Mr. Zawacki, who the defendant contended, actually gave expert testimony.  In support of his contention that the summary witness was really an expert witness, the defendant pointed to "statements of [the witness'] background, comments concerning accounting and financial statements, and remarks about missing financial documents in Defendant's records."  *Id*. at 729.  Mr. Zawacki was a certified fraud examiner. Additionally, the Defendant argued that a layperson could not have produced the charts and summaries that the summary witness created from the defendant's records.  The district court rejected the defendant's argument holding that:

> Mr. Zawacki was called as a summary witness to explain the content of charts based on voluminous testimony. The charts were provided to the defendant prior to trial. All of the documents underlying the charts provided were also provided to the defendants-to the defendant prior to trial. The charts were based upon the defendant's own documents, and they included general ledgers, journal entries, checkbooks and the like concerning the operation of the defendant's various financial entities and between and among them.
>
> . . . . .
>
> No testimony was offered as to whether the transactions were fraudulent or evidence inten[t] to defraud, or were consist[ent] with conduct evidencing intent to defraud, or whether they intended to conceal any fraud.

*Id*. at 730 (E.D. Pa. 2005).  The same can be said of Ms. Bender's anticipated testimony in this case.  Therefore, the Defendant's argument should be rejected like it was in *Hevener*.  And in this case, unlike *Hevener*, the Defendant has received a disclosure consistent with what Rule 16 requires for an expert witness.  Therefore, there is no prejudice to the Defendant.

Finally, Ms. Bender testified as a summary witness, and was not qualified as an expert, in *United States v. Dawn Bennett*, Cr. No. 17-472, a securities fraud case tried before Judge Xinis.

In that case, Ms. Bender created a number of summary exhibits like she has done in this case.  Ms. Bender testified that she had prepared charts "summarizing the financial activity in the DJB Holdings bank accounts, in Ms. Bennett's personal bank accounts, as well as credit cards and various loan documents."  *United States v. Dawn Bennett*, Cr. No. 17-472, Trial Transcript at 91:19-21, October 10, 2018 (Exhibit C).    For example, one chart Ms. Bender prepared was "a summary chart that outlines the total charges by vendor or payee for Ms. Bennett's personal credit cards, American Express, Citi cards and Barclays cards for the time period of January 2015 through September of 2017."  *Id.* at 93:5-8.  This is similar to the chart that Ms. Bender has prepared summarizing the Defendant's credit accounts in this case.  Ms. Bender prepared another chart in the Bennett case that was a "a summary chart which outlines the net inflows or the net money that came into DJB Holdings, LLC bank accounts from Ms. Bennett, compared to the net money that came in from individuals into DJB Holdings, LLC banks accounts for the period of January of 2012 through September of 2017."  *Id*. at 97:6-10.  This chart is similar to the chart that Ms. Bender has created in this case summarizing inflows into the Defendant's bank accounts.  Finally, Ms. Bender also prepared a number of summary exhibits in that case that were more sophisticated than the ones she has prepared in this case and yet she was not qualified as an expert and need not have been.

2. *Ms. Bender Can Be Qualified as An Expert if the Court Concludes that Her Testimony is Expert Testimony; the Government Has Already Provided the Defendant with Disclosures that Satisfy Rule 16(a)(1)(G)*

In any event, if the Court were to find that Ms. Bender's testimony is expert testimony, then the Government will move to qualify her as an expert.  She is undoubtedly qualified to present the summary exhibits she has prepared.  The Government has already provided the Defendant with a disclosure for Ms. Bender commensurate with what Federal Rule of Criminal Procedure

16(a)(1)(G) requires for expert testimony, even though it was not required to and is providing with this filing the summary exhibits prepared by Ms. Bender.

The Defendant complains that the Government was required to "provide a summary of her expert testimony disclosing to the defendant what Ms. Bender will testify to about the results of her forensic accounting analysis and provide the defense with the actual summary exhibit." Mot. at 6. Ms. Bender did not perform a "forensic accounting analysis." So the Government can't disclose one. Further, the Defendant is wrong that the Government is required to provide the "actual summary exhibit." As the Fourth Circuit has held, "[Rule 1006] requires only that the summarized documents, and not the summaries themselves, be made available to the opposing party at a "reasonable time and place." *United States v. Dukes*, 242 F. App'x 37, 49 (4th Cir. 2007). Nonetheless, the Government, as is common, intended to provide the summary exhibits themselves to the Defendant in advance of trial and has done so with this filing.

While the Defendant, unprofessionally, calls the Government's July 1, 2022, disclosure "mealy-mouthed," whatever that means, she fails to identify how it is insufficient. It is also ironic that the Defendant attacks the Government's disclosure, which it was not even required to make, when her disclosures for her expert witnesses were so woefully inadequate, as the Government pointed out in its Motion for Adequate Disclosure and to Exclude, ECF 79. In that filing, the Government detailed precisely how the Defendant's disclosure for its experts were deficient.

### 3. If the Disclosure for Ms. Bender is Insufficient, the Appropriate Remedy is for the Government to Supplement it Not the Exclusion of Ms. Bender's Testimony

Even if the Government's disclosure for Ms. Bender were insufficient, the appropriate remedy is to order the Government to supplement its disclosure, not to exclude Ms. Bender's testimony. *United States v. W.R. Grace*, 493 F.3d 1119, 1130–31 (9th Cir. 2007), *on reh'g en banc,* 526 F.3d 499 (9th Cir. 2008) ("Even had the district court found that the government violated

a constitutional provision, a federal statute or a legitimate discovery order, exclusion is not an automatic remedy."). *See United States v. Figueroa-Lopez,* 125 F.3d 1241, 1247 (9th Cir. 1997) (addressing Rule 16). "Exclusion can be 'a too harsh remedy' for discovery violations and generally is "an appropriate remedy for a discovery rule violation only where 'the omission was willful and motivated by a desire to obtain a tactical advantage.'" *W.R. Grace*, 493 at 1130 *quoting United States v. Finley,* 301 F.3d 1000, 1018 (9th Cir. 2002); *Taylor v. Illinois,* 484 U.S. 400, 415 (1988).

Ms. Bender's Rule 1006 summary exhibits are plainly not the product of "scientific, technical or other specialized knowledge," such that she must be qualified as an expert. But if the Court concludes she should be, then she undoubtedly can be. And the Defendant has received a disclosure consistent with what Rule 16(a)(1)(G) requires for expert testimony so the Defendant has suffered no prejudice from the Government's conclusion that her testimony is not expert testimony. For all these reasons, the Defendant's motion to exclude her testimony should be denied.

### B.  The Defendant's Motion in Limine to Exclude the Government's IRS Expert from Testifying at Trial Should Be Denied Because the Government Does Not Intend to Elicit Expert Testimony from the Witness

The Defendant's "Motion in Limine to Preclude the Government's IRS Expert from Testifying at Trial," ECF 81, should be denied because the Government does not intend to elicit expert testimony from Revenue Officer Matthew Lopes. Like with Ms. Bender, the in this motion concerning Revenue Agent Lopes, the Defendant appears to conflate the question of whether a witness *could* be qualified as a witness in a criminal trial with the question of whether the proposed testimony is expert witness testimony. The anticipated testimony of Revenue Officer Lopes is far from expert testimony by any measure; rather it is essentially that of a custodial or summary

witness.  Even if the Defendant's arguments were to be credited, the Government has provided a sufficient expert disclosure for Revenue Officer Lopes—far more than the Defendant has provided for her own expert witnesses.  The Defendant's motion to preclude testimony of Revenue Officer Lopes therefore should be dismissed.

### 1.  The Testimony of Revenue Officer Lopes is Not Expert Testimony.

The Defendant's motion is not well-reasoned in reaching its conclusion that Revenue Officer Lopes' testimony should be considered expert testimony.  The motion appears to draw conclusions based solely on the Revenue Officer Lopes' education and experience, rather than on his expected testimony, in the process citing inapposite cases that are not helpful to the current set of facts.

Revenue Officer Lopes' testimony is relevant to Counts Two and Four, making false statements on a loan application, in violation of 18 U.S.C. § 1014.  The Defendant is alleged to have falsely stated on two separate mortgage applications in that she "certified the only liabilities that [she] had were those disclosed in the application, when in truth and fact, as [she] knew, she owed significant amounts of federal taxes," and "that she was not presently delinquent or in default on any Federal debt, when in truth and in fact, as [she] knew, she was delinquent in paying her taxes resulting in the IRS filing a $45,022 lien against her on March 3, 2020."  Superseding Indictment Count Two ¶ 20, Count Four ¶ 31.  The Superseding Indictment lays out in detail many of the notices sent to the Defendant and her husband over the course of the years, part of the evidence used to demonstrate that the Defendant knew that she was in debt to the Internal Revenue Service despite her statements to the contrary.  On July 1, 2022, the Government provided the Defendant with a disclosure for Revenue Officer Lopes modeled on what Rule 16(a)(1)(G)

requires for expert witnesses in an effort to avoid needless litigation over the matter, which is

exactly what this motion amounts to.  That disclosure contained the following:

> Revenue Officer Lopes will testify about the amount of taxes the Defendant owed or whether she claimed a refund for tax years 2014-2019, all of which is reflected in her tax returns, the Defendant's tax transcripts for those years, the notices that were sent to the Defendant by the IRS during that time period and the lien that was filed against the Defendant and the notice of it provided to her by the IRS in 2020. These documents, the tax returns, tax transcripts, the notices and the lien have all been provided in discovery.

> As to IRS form notices for which a physical copy is not maintained by the IRS, Revenue Officer Lopes will read from the Internal Revenue Manual ("IRM") for the applicable tax year and identify the language that was used in the forms sent to the Defendant and her husband.  A copy of the relevant sections of these IRMs was previously provided to you and the relevant language is on the following pages:
> •        Form CP 14 sent on November 2, 2015: IRM (published November 7, 2014), Section 3.14.1, page 308.
> •        Form CP 14 sent on November 28, 2016: IRM (published November 10, 2015), Section 3.14.1, page 317.
> •        Form CP 49 sent on November 13, 2017: IRM (published October 20, 2016), Section 3.14.1, page 340.
> •        Form CP 49 sent on September 24, 2018: 2017 IRM (published November 9, 2017), Section 3.14.1, page 346
> •        Form CP 49 sent on November 11, 2019: IRM (published October 30, 2018), Section 3.14.1, page 357.
> •        Form CP 71C sent on March 23, 2020: IRM (published September 17, 2019), Section 21.3.1, page 30.
> •        Form CP 42 sent on July 27, 2020: IRM (published September 17, 2019), Section 21.3.1, page 22.

Exhibit A. Revenue Lopes curriculum vitae was also provided to the Defendant at that time.  As

with the disclosure for Ms. Bender, the Government was not required to provide this disclosure.

As the disclosure makes clear the Government intends to call Revenue Officer Lopes to

summarize IRS records that are, for the most part, already certified as business records under

Federal Rule of Evidence 902(11) and therefore will be admitted into evidence.  The primary

exhibits he will summarize are IRS "Account Transcripts" for the tax years 2014 through 2019.

These account transcripts, broken down by tax year, present a chronological log of interactions for

each tax year between the Defendant and her husband, and the IRS.  For example, each account transcript shows the date a tax return was filed, and the amount stated as owed on the return.  The transcripts also show credits given to the Defendant when a payment was made towards a tax debt for a given year, and the date such payment was received.  In addition, the transcripts reflect the dates on which letters were sent to the Defendant by the IRS to notify her of various events, such as the fact that she owed money for unpaid taxes for a given year, or a notice that her tax refund was applied by the IRS to satisfy a part of the past debt.

Much of the testimony of Revenue Officer Lopes will give will consists of him reading from the transcripts to the jury or reviewing the contents of copies of the actual forms maintained by the IRS.  Sometimes, Revenue Officer Lopes will be the sponsoring witness for copies of actual notices sent to the Defendant's residence.  These were produced to the Defendant in discovery in March.  However, as the disclosure quoted above makes clear, there are some forms for which the IRS does not maintain a physical copy due to the sheer volume of storage space that would be required.[3]  The Internal Revenue Manual runs on for hundreds of pages and includes descriptions

---

[3] The language in the Government's disclosure of July 1, 2022, repeated some of the information that had been provided to the Defendant during discovery in March.  *See* Letter to A. Scott Bolden from Leo Wise, Sean Delaney and Aaron Zelinsky dated March 29, 2022 (Exhibit E). That letter contained the following:

> The Internal Revenue Service does not maintain a physical copy of all form letters sent to taxpayers.  As to the forms for which there is no physical copy, we are providing you with a copy of the relevant pages from the Internal Revenue Manual that reference certain forms sent per the IRS transcripts provided to you:

- Form CP 14 sent on November 2, 2015: IRM (published November 7, 2014), Section 3.14.1, page 308.
- Form CP 14 sent on November 28, 2016: IRM (published November 10, 2015), Section 3.14.1, page 317.
- Form CP 49 sent on November 13, 2017: IRM (published October 20, 2016), Section 3.14.1, page 340.
- Form CP 49 sent on September 24, 2018: 2017 IRM (published November 9, 2017), Section 3.14.1, page 346

of various notices sent to taxpayers, including the specific language contained in those notices, among other information.  The disclosure lists the specific form notices by number, and the date they were sent as reflected in the transcript.  The disclosure also informs the Defendant of the specific pages in the Internal Revenue Manual where the language used in the notices could be found.  Revenue Officer Lopes will read the form notice numbers from the transcript and then go to the relevant page in the Internal Revenue Manual and read the specific language that was included in the notice. The Government has previously stated in status conferences with the Court that an IRS witness would be called to testify about these issues and that this testimony was not expert testimony.   For example, during the status conference on May 23, 2022, the Government said the following:

> The defense received a number of notices from the IRS and those are voluminous. So we intend to call an IRS employee who will say notice -- and the notices are identified by number in the indictment, but particular notice, that number is the following and then there's a document which is included in discovery that identifies what those notices are.
>
> So those two areas, sort of financial records and [audio gap] we think are appropriate for summary fact witnesses, but to avoid having to litigate over whether the expert witnesses will make the kind of disclosures that one makes with an expert witness to take the issue off the table.

---

- Form CP 49 sent on November 11, 2019: IRM (published October 30, 2018), Section 3.14.1, page 357.
- Form CP 71C sent on March 23, 2020: IRM (published September 17, 2019), Section 21.3.1, page 30.
- Form CP 42 sent on July 27, 2020: IRM (published September 17, 2019), Section 21.3.1, page 22.

If you need us to send you a copy of the entire relevant section of the Internal Revenue Manual for each of these years, please let us know and we will be happy to do so.

May 23, 2022, Hearing Transcript at 10:4-15.  As the Government said it would do, and in an attempt to avoid needless litigation, the Government went so far as to provide an expert disclosure for Revenue Officer Lopes, despite not being required to do so.

Nothing about Revenue Officer Lopes' testimony requires the application of "scientific, technical or other specialized knowledge," nor does it require the witness to render an opinion, as contemplated by Federal Rule of Evidence 702.  It certainly does not involve principles of tax calculation or any advanced degree.  It simply requires the witness to read from a document.  Nonetheless, the Defendant claims, incorrectly, that "IRS agents are by nature, expert witnesses," as though that somehow transforms this simple testimony to expert opinion testimony involving specialized knowledge.  No witnesses are "by nature" expert witnesses.  In its most favorable light, the Defendant's motion appears based on the identity of the witness as an IRS Revenue Officer, and not based on his actual proffered testimony.

The Defendant's string cite of cases for the proposition that "IRS employees of this nature are consistently qualified as experts when testifying on the issues which the government plans to elicit testimony," is misleading and completely inapposite to Revenue Officer Lopes' expected testimony.  *See* ECF 81 at 4-5.  In each of these cases the defendant was charged with tax crimes.  Each involved testimony by an IRS employee that the *Government* sought to illicit in the form of expert testimony.  Moreover, in each of these cases, the proffered testimony related to the tax implications of certain actions or the calculation of a tax due and owing.  Such testimony is routinely necessary in a prosecution for tax evasion, where the Government is required to prove that there was a tax due and owing.  This is not such a case.

Even still, while testimony regarding tax computations by an IRS employee can be treated as expert testimony, it is also routinely admitted as *non*-expert summary testimony, a fact that is

absent from Defendant's conclusory motion.  For example, the Sixth Circuit has held that IRS witnesses, whether testifying as an expert witness or merely as a summary witness, may offer an opinion about the tax treatment of a particular transaction.  *United States v. Sabino*, 247 F.3d 1053, 1067-1068 (6th Cir. 2011) (finding no error when a non-expert summary witness "calculated the taxes that the [defendants] owed based on the evidence at trial.").  The First Circuit has likewise found that IRS agents doing basic tax computations based on the admitted evidence at trial were merely summary witnesses, not expert witnesses.  *See United States v. Stierhoff*, 549 F.3d 19, 27-28 (1st Cir. 2008) (discussing and affirming testimony by revenue agent as summary testimony). The Fifth Circuit has allowed summary testimony by an IRS agent who did not serve as an expert. *United States v. Bishop*, 264 F.3d 535, 546-548 (5th Cir. 2001).  And of course, the Fourth Circuit has also allowed IRS agent testimony without requiring the witness be qualified as an expert. *United States v. Amick*, 232 F.3d 890, 2000 WL 1566351 (4th Cir. 2000) (unpublished) (finding that the testimony of two IRS agents was not based on expert knowledge, that the agents were instead "fact witnesses," and that one of the agents, "for the most part, [] only testified to the general factors used by the IRS to determine whether a transfer constituted a loan or income, and avoided the specific facts of this case.").

But these cases, just like those cited by the Defendant in her motion, do not actually discuss testimony as simple as that required of Revenue Officer Lopes in this case.  Here, Revenue Officer Lopes will not be required to compute the taxes due and owing by the Defendant, because this is not a prosecution for tax evasion.  The fact at issue is whether the Defendant made a false statement to a mortgage lending business, namely that she was not presently delinquent or in default on any Federal debt.  The evidence at trial will show that the Defendant *knew* she owed taxes, because she received notices stating it.  The amount of taxes she owed or refund to which she was entitled

will not need expert computation, because the numbers come from the tax returns the Defendant filed.  It does not take an expert to read a notice that says, "you have unpaid taxes" or "Notice of Lien Filing."

### 2. If Necessary, Revenue Agent Lopes Can Be Designated an Expert Witness; He is Certainly Qualified

In any event, if the Court concludes that the testimony that Revenue Officer Lopes will be called to give is expert testimony, then the Government will move to have him designated as such. He is certainly qualified to give the testimony summarized in the disclosure as his curriculum vitae makes clear.

### 3. If the Disclosure for Revenue Agent Lopes is Insufficient, the Appropriate Remedy is for the Government to Supplement it Not the Exclusion of His Testimony

The Defendant claims that she has not received adequate disclosure of Revenue Officer Lopes testimony, even though the Government has provided her with a disclosure that it was not required to make.  And this, despite the fact that the Defendant sought a continuance in her trial for the stated purpose of preparing her own expert disclosures, only to turn over disclosures for *actual* expert testimony that contained virtually no specificity about the expert's opinions and how they reached them.  Even if the testimony of Revenue Officer Lopes is considered expert testimony, the Government has already provided the Defendant with sufficient notice under Federal Rule of Criminal Procedure 16(a)(1)(G).

The Government, in its discovery production in March, provided physical copies of the IRS Transcripts, tax returns, and notices it intends to use, as well as the pages in the Internal Revenue Manual containing the form language on notices for which a physical copy was not retained.  *See* Exhibit E.  The Government has also provided the qualifications of Revenue Officer Lopes, who will sponsor those exhibits.  The Defendant's claim that "the government is trying to

present an expert witness in lay witness clothing" would be laughable if it was not said seriously. The allegation that the Government is "evading full compliance with its expert disclosure obligations" is further empty rhetoric from the Defendant.

Even if the Government's disclosure for Revenue Officer Lopes were insufficient, the appropriate remedy is to order the Government to supplement its disclosure, not to exclude the testimony. *United States v. W.R. Grace*, 493 F.3d 1119, 1130–31 (9th Cir. 2007), on reh'g en banc, 526 F.3d 499 (9th Cir. 2008) ("Even had the district court found that the government violated a constitutional provision, a federal statute or a legitimate discovery order, exclusion is not an automatic remedy."). *See United States v. Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir.1997) (addressing Rule 16). "Exclusion can be 'a too harsh remedy' for discovery violations and generally is "an appropriate remedy for a discovery rule violation only where 'the omission was willful and motivated by a desire to obtain a tactical advantage.'" W.R. Grace, 493 at 1130 quoting United States v. Finley, 301 F.3d 1000, 1018 (9th Cir. 2002); Taylor v. Illinois, 484 U.S. 400, 415 (1988).

The Defendant's motion to exclude the testimony of Revenue Officer Lopes is just another attempt to shield the jury from hearing relevant evidence that it can use to decide the Defendant's guilt or innocence.  The testimony does not consist of expert testimony, regardless of the qualifications of the witness to provide expert testimony.  Even if the Court finds that the proffered evidence is expert testimony, the Government has provided adequate notice to the Defendant.  For these reasons, the Defendant's motion to exclude Revenue Officer Lopes' testimony should be denied.

**C.  The Defendant's Motion in Limine to Strike the Term Hardship, Hardship Withdrawal, and Financial Hardship as Prejudicial Surplusage Should Be Denied Because this it is Not a Motion in Limine, it is Another Untimely Motion Related to the Indictment and it is Meritless**

*1.  The Defendant's Motion to Strike Surplusage Is Not a Proper Motion In Limine*

The Defendant's "Motion in Limine to Strike the Term Hardship, Hardship Withdrawal, and Financial Hardship as Prejudicial Surplusage," ECF 82, should be denied because it is not a motion in limine and because the use of the term is neither inflammatory nor prejudicial.

First, this motion is not a motion in limine. Motions in limine seek to exclude particular pieces of evidence.  The Defendant's motion to strike surplusage concerns the indictment's language and is therefore a motion under Fed R. Crim. P. 7(b), not one in limine. *See Intelligent Verification Systems, LLC v. Microsoft Corp.* 2015 WL 1518099, at *9 (E.D.Va. March 31, 2015) ("although *not specifically provided for* in the Federal Rules of Evidence, motions in limine have evolved under the federal courts' inherent authority to manage trials.") (emphasis added). This Court should not allow the Defendant to circumvent its filing deadlines and procedures by improperly captioning its pleading as an in limine motion. This is the second untimely motion related to the Superseding Indictment that the Defendant has filed.  After filing pretrial motions within the deadlines imposed by the Court, the defense counsel said they wanted to file additional pretrial motions during the May 23, 2022, status conference.  The Court specifically instructed the Defendant to file a motion for leave before filing any additional pretrial motions.

> THE COURT: Now let's talk about these pretrial motions, Mr. Qureshi. The Court has a couple of thoughts about that. Number one as we discussed, you obviously already had a possibility for pretrial motions that occurred many months ago in this case. The Court appreciates that your client may have additional motions that she wishes to file. The Court's suggestion would be if that continues to be the case, that you notify the Court of that and that you follow along the same schedule we have for the other motions as potential dates for those motions. It really is very late in the process and it sounds like some of those issues may very well be able to be

addressed by some of the other motions being filed. What are your thoughts about approaching the issue that way?

MR. QURESHI: Just so I'm understanding the Court correctly, Your Honor, is it the Court's preference that the defense if we choose to file, if Ms. Mosby chooses to file additional pretrial motions, to file it -- file them or file it by the July 1st deadline?

THE COURT: I think what I'm asking you to do, Mr. Qureshi, is to seek leave to file. Contact the Court prior to that date and if the Court grants you leave you will follow the same briefing schedule.

Two concerns the Court has: Number one is that we've already had extensive briefing of pretrial motions in this case and obviously our trial schedule has moved, but nonetheless we really have been past that phase in the case. There's quite a bit of additional work to be done and frankly, not as much time as we would like to hope to have to complete that work. So really the idea of additional pretrial motions gives the Court pause.

With that said and given the fact as you explained to the Court you're not prepared today to talk in great detail about those motions, what the Court would be willing to do is to allow the defense to come back and seek leave closer to the date for when we are going to have briefing on other motions, to seek leave at that time and demonstrate good cause where appropriate for additional motions to be filed. And if the Court grants you that leave, then you'll be able to follow the same schedule we already have set to address whatever issues you wish to address in that setting.

May 23, 2022, Hearing Transcript at 20:25-22:14. The Defendant either doesn't understand what a motion in limine is or has decided to ignore the Court's clear instructions to file a motion for leave prior to filing any additional pretrial motions.

A motion in limine is "any motion, whether made before or during trial, to exclude *anticipated prejudicial evidence* before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40, n. 2 (1984) (emphasis added). "Such motions are 'designed to narrow the *evidentiary issues* for trial and to eliminate unnecessary trial interruptions.'" *Changzhou Kaidi Elec. Co. v. Okin Am., Inc.*, 102 F. Supp. 3d 740, 745 (D. Md. 2015) (quoting *Louzon v. Ford*

*Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013)). "The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain *forecasted evidence*, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal citations omitted) (emphasis added). "A motion in limine to preclude evidence calls on the court to make a preliminary determination on the admissibility of the evidence under Rule 104 of the Federal Rules of Evidence." *Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (internal citations omitted).

A motion to strike surplusage is thus not a motion in limine. *See, e.g.*, *United States v. Cooper*, 384 F. Supp. 958, 959 (W.D.Va. 2005) (noting that the Court was considering a motion in limine regarding evidentiary issues and a *separate* motion under Fed. R. Crim. P. 7 to strike surplusage); *United States v. Chance*, 2011 WL 5548966 (D. Md 2011) ("Presently pending before the Court are two motions and three motions in limine" and listing the motion to strike surplusage separately from the three motions in limine).

This Court should deny the Defendant's motion because it is not one properly brought as an in limine filing.

### 2. The Term "Hardship" Is Neither Inflammatory nor Prejudicial.

A motion to strike surplusage pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure only should be granted if the language at issue "is (1) not relevant to the charges; (2) inflammatory; and (3) prejudicial." *United States v. Pleasant*, 125 F.Supp.2d 173, 184 n. 9 (E.D.Va.2000) (citation omitted); *accord United States v. Hartsell*, 127 F.3d 343, 353 (4th Cir.1997) (declining to strike surplusage because "even if the paragraphs were unnecessary ... we find no indication whatsoever that they were prejudicial"). *See generally*, 1 Charles Alan Wright,

Nancy J. King, Susan R. Klein, & Andrew D. Leipold, Federal Practice and Procedure § 127 (3d ed.1999).

The use of the word "hardship" in this context is neither prejudicial nor inflammatory. The defense claims that the term "hardship . . . connotes 'suffering' and 'privation,'" citing Black's Law Dictionary and therefore is different form the "adverse" requirement in "adverse financial consequences." *See*, ECF 82, at 4. But the Defendant ignores the full definition of hardship contained in the very source she cites. According to Black's Law Dictionary, "hardship," means "Privation; suffering *or adversity*." Backs Law Dictionary (11th ed. 2019). Thus, the term "hardship," "hardship withdrawal," and "financial hardships" are ways of describing the "*adverse* financial consequences*" that the Defendant falsely certified she experienced. Indeed, a normal person would readily describe actions liked being furloughed, laid off, and losing hours as a hardship, because it presents an adversity.

In addition, as the Government argued in its response to the Defendant's untimely second motion to dismiss, ECF 70, the four enumerated definitions of "adverse financial consequences" contained within the CARES Act can all be understood as hardships. Focusing just on the partial definition of hardship that the Defendant chose to include in her motion, the Defendant notes that Black's Law Dictionary defines a "consequence" as a "result that follows an effect of something that came before" and defines "hardship" as "privation" or "suffering." Mot. to Dismiss at 17. But the Defendant's argument ignores the fact that Congress chose to describe the "consequences" as "adverse financial" ones. And these definitions are not mutually exclusive. In plain terms, the four definitions of "*adverse financial* consequences" are all hardships of one kind or another. In practical terms, "being quarantined, furloughed or laid off" is a privation and is therefore a hardship; "having reduced work hours" is a privation and therefore a hardship; "being unable to

work due to lack of childcare" is a privation and therefore a hardship; and "the closing or reduction of hours of a business I own or operate," is a privation and therefore a hardship.

Indeed, the IRS itself uses the shorthand of "hardship" to describe coronavirus-related distributions in certain circumstances. *See, e.g.*, IRS Notice 2020-50, at 19 ("If a service provider receives a distribution from an eligible retirement plan that constitutes a coronavirus-related distribution, that distribution will be considered *a hardship distribution* pursuant to § 1.401(k)-1(d)(3) for purposes of § 1.409A-3(j)(4)(viii)).  Other government agencies aliso characterize the coronavirus distribution using the term "hardship." *See, e.g.,* SEC Bulletin, June 3, 2020, COVID-19 Related Early Withdrawals from Retirement Accounts—Be Careful of Fraudsters and other Bad Actors Targeting Your Retirement, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/covid-19-related-early-withdrawals-retirement-accounts-be   ("Unfortunately, fraudsters and other bad actors are using these CARES Act benefits, which are intended for those facing *economic hardship from COVID-19*, to promote high-risk, high-fee investments and other inappropriate products and strategies.") (emphasis added).  Popular articles have similarly used the term hardship as a shorthand for adverse financial consequences.  *See, e.g.*, Emily Guy Birken & Benjamin Curry, *Don't Miss These CARES Act Retirement Benefits*, Forbes, Dec. 16, 2020, available   at   https://www.forbes.com/advisor/retirement/cares-act-retirement-benefits/   ("Valid Covid-19-related *hardships* include a positive coronavirus diagnosis for the account owner, their spouse or a dependent; a lay-off, furlough, reduction in hours, inability to work or lack of childcare because of Covid-19; a delayed or rescinded job offer because of Covid-19; or Covid-related closing or reduced hours for a business owned by the account holder or their spouse") (emphasis added); John Manganaro, *Warn Your Clients: Don't Abuse Coronavirus Hardship Withdrawals*, PlanAdviser, June 11, 2020, available at https://www.planadviser.com/exclusives/warn-clients-

dont-abuse-coronavirus-hardship-withdrawals/ ("'Still,' one attorney explains, 'the plan administrator may, but is not required to, obtain certification from the plan participant that they have suffered *the necessary hardship*'") (emphasis added).

Further, the fact that the term "hardship" has a legal definition in another part of the Internal Revenue Code does not mean that its use in this context, as a practical and factual term, will confuse the jury. The allegations in the Superseding Indictment come directly from Section 2202 of the CARES Act. The Superseding Indictment quotes Section 2202 for the definition of "adverse financial consequences," contained in that statute, namely, as "being furloughed or laid off or having work hours reduced due to such virus or disease, being unable to work due to lack of childcare due to such virus or disease, closing or reducing hours of a business owned or operated by the individual due to such virus or disease." Superseding Indictment Count One ¶¶ 5, 7, 10 & 12; Count Three ¶¶ 5, 8, 11 & 13.

The Defendant asserts that Congress "expressly distinguished a hardship withdrawal from a retirement fund from a coronavirus-related withdrawal ("CRD") from the same." Mot. at 3. That is not accurate. The Defendant cites a Congressional Research Service report that draws a distinction between the coronavirus-related distributions or "CRDs" that the Defendant received in this case and what the author of that repot refers to as "hardship distributions," noting that CRDs and "hardship distributions" have different tax treatment. *See* Mot. at 3, fn 1. A report by the Congressional Research Service is not "Congress." The Defendant cites nothing in the text of the CARES Act or its legislative history or any other authority for the proposition that "Congress expressly distinguished a hardship withdrawal from a retirement fund from a coronavirus-related withdrawal ("CRD")." Further, the report that the Defendant cites was authored in July 2021, after

the CARES Act was signed into law, so it could not have been considered by Congress when it was drafting the CARES Act.

The Defendant's argument that a CRD and a "hardship withdrawal" are distinct falls apart when one looks at the Internal Revenue Code itself. The Defendant makes much of the fact that the word "hardship" does not appear in the CARES Act. Mot. at 3. It also does not appear in Section 457(b). Section 457(b) provides for distributions for an "unforeseeable emergency" that occurs "before retirement or Severance from Employment." *See* 26 U.S.C. § 457. That is what the author of the Congressional Research Service report is referring to an "unforeseeable emergency," when she talks about "hardship withdrawals." In any event, the definition for an "unforeseeable emergency," is different than the definition of "adverse financial consequences" stemming from COVID-19. The IRS has provided guidance on what constitutes an "unforeseeable emergency," as follows:

> Specifically, an unforeseeable emergency is defined in Plan Y as a **severe financial hardship** of the participant resulting from any of the following: an illness or accident of the participant, the participant's spouse, or the participant's dependent (as defined in § 152(a)); loss of the participant's property due to casualty (including the need to rebuild a home following damage to a home not otherwise covered by homeowner's insurance, e.g., as a result of a natural disaster); the need to pay for the funeral expenses of the participant's spouse or dependent (as defined in § 152(a)); or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the participant.

Revenue Ruling 2010-27 at 40-41 (Exhibit D) (emphasis added). First, it is worth noting that the IRS describes an "unforeseeable emergency," as a "*severe* financial hardship." Nowhere in the Superseding Indictment is the term "*severe* financial hardship" used which further distinguishes the practical way the term is used in the Superseding Indictment from the way in which it is used in the Revenue Ruling cited above. Second, the Superseding Indictment obviously does not reference any of the examples given in that Revenue Ruling. Thus, there is no confusion as to

the definition of "adverse financial consequences," that is used in the Superseding Indictment or that would be presented at trial.  Put another way, the Superseding Indictment does not import the definition of a an "unforeseeable emergency," when it uses the term "hardship."

The Defendant's motion to strike surplusage is untimely and is not a motion in limine. For this reason alone it should be denied.  But if the Court considers the motion, it should nonetheless be denied because the use of the term "hardship" is neither inflammatory nor prejudicial.  Instead, it accurately captures, as a practical matter, the adverse financial consequences defined in the CARES Act.

> **D. The Defendant's Motion in Limine to Exclude Evidence of How Withdrawn 457(b) Funds Were Used Should Be Denied Because the Fact that they were Used to Buy Vacation Homes is Evidence that the Defendant Did Not Suffer from Adverse Financial Consequences Stemming from COVID-19 as She Falsely Claimed**

Defendant's "Motion in Limine to Exclude Evidence of How Withdrawn Funds Were Used," ECF 83, should be denied because  how she used the funds is evidence that goes directly to an essential element in this case: whether Defendant falsely stated that she experienced adverse financial consequences as a result of COVID-19.  Further, the Defendant's attempt to claim unfair prejudice stemming from this relevant evidence fails to reach the high standards required for exclusion.  For the reasons that follow, the Defendant's motion should be denied.

> *1. The Evidence is Relevant and Probative of the Fact that the Defendant Did Not Suffer Adverse Financial Consequences.*

Federal Rule of Evidence 401 states that, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence to determining the action."  Fed. R. Evid. 401.  To be relevant, evidence must possess logical probative value toward some fact that is legally of consequence to the case.  Relevance must be "determined in the context of facts and arguments in a particular case."  *Sprint/United*

*Management Co. v. Mendelsohn*, 552 U.S. 379 (2008). A "fact of consequence" under Rule 401 is not limited to the ultimate issue or elements in a case. Instead, a fact of consequence can be any step along a path of inference that leads to an "ultimate fact." *Old Chief v. United States*, 519 U.S. 172, 179 (1997). "To be relevant, evidence need not conclusively decide the issue in the case, nor make the proposition appear more probable, but it must in some degree advance the inquiry." *United States v. Causey*, 748 F.3d 310, 316 (7th Cir. 2014).

The Defendant is charged in Counts One and Three of the indictment with committing perjury, based on the submission of two fraudulent 457(b) Coronavirus-related Distribution Requests in which she willfully and knowingly stated that she experienced adverse financial consequences stemming from the Coronavirus, such as being quarantined, furloughed, or laid off; having reduced work hours, being unable to work due to lack of child care, or the closing or reduction of hours of a business she owned or operated. Superseding Indictment Count One ¶ 10, Count Three ¶ 11.

The elements of perjury, in violation of 18 U.S.C. § 1621, are as follows:

First, that the defendant, under penalty of perjury, subscribed as true, written information submitted to Nationwide, the administrator of the City of Baltimore's Retirement Savings and Deferred Compensation Plans;

Second, that the defendant made false statements as to matters about which the defendant subscribed as true as set forth in the indictment;

Third, that the matters as to which it is charged that the defendant made false statements were material to the issues under inquiry by the City of Baltimore's Deferred Compensation Plan;

Fourth, that such false statements were willfully made.

Sand, Siffert, *Modern Fed. Jury Instructions,* Instruction No. 48:3.

The evidence at trial will show that the Defendant did not suffer any Coronavirus-related "adverse financial consequences" stemming from COVID-19 when she made her withdrawals. There are four enumerated definitions of adverse financial consequences of which the Defendant was made aware when she requested her withdrawal, each of which relate to a diminution of income on the part of the claimant, and none of which were applicable to the Defendant. The jury will hear testimony from the City of Baltimore's payroll department that the Defendant was not quarantined, furloughed, or laid off, nor did she have reduced work hours, all of which would have resulted in a decrease in her salary. The evidence will instead show that the Defendant's salary increased from 2019 to 2020. The evidence will further show that the Defendant was not "unable to work due to lack of childcare." On the contrary, the Defendant continued to work full-time during the pandemic as she had done before it. And finally, the Defendant did not own or operate a business that closed or experienced a reduction of hours. The evidence will include statements from the Defendant and others whom she authorized to make such statements that she had no plans to operate her travel business, Mahogany Elite Entities, during her time as State's Attorney.

In addition to these facts, the fact that the Defendant used the 457(b) withdrawals to buy two vacation homes certainly has "any tendency" to make it more probable that, at the time of each withdrawal, the Defendant had not actually suffered adverse financial consequences stemming from COVID-19. *See* Fed. R. Evid. 401. Whether she did in fact suffer adverse financial consequences stemming from COVID-19 is of consequence in this matter because it goes to the second element of the perjury offense, namely, whether her statements that she had suffered adverse financial consequences stemming from COVID-19 were false. *See Old Chief*, 519 U.S. at 179.

The Defendant confuses the legal issue of whether she was required by law to use the 457(b) withdrawal for any particular purpose with the factual issue of whether her use of the withdrawal to buy vacation homes is evidence that she had not suffered adverse financial consequences stemming from COVID-19.   ECF 83 at 4.   In support of her legal argument, she cites guidance from the IRS, which provides that

> The definition of a coronavirus-related distribution under section 2202(a)(4) of the CARES Act does not limit these distributions to amounts withdrawn solely to meet a need arising from COVID-19.   Thus, for example, **for an individual who is a qualified individual as a result of experiencing adverse financial consequences as defined above**, coronavirus-related distributions are permitted without regard to the qualified individual's need for the funds, and the amount of distribution is not required to correspond to the extent of the adverse financial consequences experienced by the qualified individual.

ECF 70-1 at 6 (emphasis added).   In framing the evidentiary value of how she used the funds, the Defendant wants the Court to focus solely on the first part of that guidance, the legal conclusion that the CARES Act "does not limit these distributions to amounts withdrawn solely to meet a need arising from COVID-19."   But the very next sentence presents the factual question that is addressed, in part, by how she used the money, namely, whether she had, in fact, suffered adverse financial consequences from COVID-19.   Even if the Defendant was free to use the funds as she saw fit, she was only entitled to withdraw those funds if she had suffered an adverse financial consequence.   She had not.   And the fact that she used the funds to buy vacation homes is probative of the fact that no adverse financial consequence existed in the first place.

Each of the four enumerated adverse financial consequences in the CARES Act ties back to the inability of the claimant to work.   This is separate and apart from stimulus funds that the Government distributed, which also could be spent in any way the taxpayer saw fit but were not based on a showing of an inability to work.   In many ways, the Defendant's argument here rehashes the same argument she made in her motion to dismiss claiming that her fraudulent representations

42

were not material.  See ECF No. 16.  The reality is that telling the truth matters.  The laws are written for a reason, and the Defendant was required to follow them.  Her use of the fraudulently obtained funds is relevant to prove that she was never entitled to withdraw those funds in the first place.

### 2.  The Evidence is Not Unfairly Prejudicial

The Defendant next argues that how she used the proceeds of her 457(b) withdrawal is unfairly prejudicial, or that introduction of this evidence would confuse the jury or waste time. None of this is true and her argument falls far short of the Fourth Circuit's high bar for exclusion of relevant evidence under Federal Rule of Evidence 403.  Rather, her requested remedy would confuse the issues more and serve no purpose other than to excise a portion of evidence relevant to show the Defendant's lack of any adverse financial consequences.

The Fourth Circuit has repeatedly stressed that where the evidence sought to be excluded under Rule 403 "is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996).  Likewise, in *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007), the Fourth Circuit emphasized that the exclusion of evidence pursuant to Rule 403 should be ordered only rarely, because the general policy of the Federal rules is that all relevant material should be laid before the jury.  *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007). *See also United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979) ("[T]he application of Rule 403 is to be cautious and sparing.").

Of course, the mere fact that evidence damages a defendant's case is not a basis for excluding probative evidence, because "[e]vidence that is highly probative invariably will be prejudicial to the defense." *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998); *see*

*also* 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 404.21(3)(b) Joseph M. McLaughlin, 2d Ed. 2002) (discussing that unfair prejudice "does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence").  Instead, "unfair" prejudice "damages an opponent for reasons other than its probative value, for instance, an appeal to emotion," *United States v. Mohr*, 318 F.3d 613, 619-20 (4th Cir. 2003), or because it serves to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180 (1997).

Rule 403 provides that the Court must find that the probative value of the evidence is "substantially outweighed" by one or more of a list of potential dangers, the first cited by the Defendant being the danger of "unfair prejudice." *See* ECF 83 at 5.  By the Defendant's formulation, the evidence of how the Defendant used the proceeds of the 457(b) withdrawal would "improperly impugn" the Defendant's character based on "the mistaken belief that she acted improperly and unlawfully in how she used" the funds. *Id.*  The Defendant also hypothesizes that the jury would convict her "due to animosity or jealousy" about her purchases. *Id.*  None of these arguments have merit.  The prejudices articulated by the Defendant are only imagined.

The argument that presenting to the jury how she used the funds would "impugn" her because it would be based on the "mistaken belief that she acted improperly and unlawfully in how she used" the funds, is a straw man.  The Defendant is not alleged to have improperly *used* the funds.  She is charged with improperly *obtaining* them.  As a result, the Government's proof at trial is not that the Defendant's use of these funds to purchase vacation homes was itself a violation of the law.  As the Defendant has pointed out, there were no restrictions on such purchases, so there would be little with which to "improperly impugn" the Defendant.  But, for the reasons

44

articulated above, this evidence is certainly probative of whether she was entitled to receive the funds.

The Defendant also falls short in her attempts to connect evidence of the purchase of these homes to "animosity or jealousy," on the part of potential jurors. The Fourth Circuit has long affirmed that the showing of undue prejudice required by Rule 403 permits exclusion of relevant evidence only where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior. *Masters*, 622 F.2d at 87; *United States v. Greenwood*, 796 F.2d 49, 53 (4th Cir. 1986) ("The prejudice which the rule is designed to guard against is jury emotionalism or irrationality."). To submit that the jury would be so incensed and enraged by the fact that the Defendant purchased vacation homes with these funds that they could not be rational demonstrates a very low regard for jurors in this District. The proffered prejudice comes nowhere close to the level required for exclusion. Even still, any perceived prejudice can be overcome by a cautionary jury instruction, which are given great weight in the Fourth Circuit. *See, e.g., United States v. Sterling*, 860 F.3d 233, 248 (4th Cir. 2017); *United States v. Byers*, 649 F.3d 197, 210-11 (4th Cir. 2011); *United States v. Van Metre*, 150 F.3d 339, 351-53 (4th Cir. 1998); *United States v. Love*, 134 F.3d 595, 603 (4th Cir. 1998 *United States v. Queen*, 132 F.3d 991, 997-98 (4th Cir. 1997).

Nor does the defense succeed in its claims that such evidence would confuse the issues or waste time. The Defendant again gives little credit to a jury's ability to follow instructions as to the purpose for which relevant evidence should be used. Here, for the reasons stated above, evidence of how the Defendant spent the funds is relevant to whether she was entitled to withdraw those funds in the first place. The Defendant is free to make the counter argument—that the Defendant had suffered adverse financial consequences and, once in possession of the funds, she

decided to use those funds for down payments on vacation homes.  A jury can then examine all the available evidence, consider arguments from both sides, and come to a conclusion on the facts. There is no danger that these facts are somehow so confusing that a jury would lose track of the evidence.  Certainly, it would not be a waste of their time to learn them.

Moreover, the timing and fact of the purchase of these properties by the Defendant are going to be in evidence at this trial anyways due to the allegations that the Defendant made false statements on her mortgage applications.  The jury will also be presented with a summary of the Defendant's bank and credit accounts as part of the proof the Government will offer that the Defendant did not experience adverse financial consequences stemming from COVID-19.  The jury will see, from this summary, that the Defendant used the COVID-19 withdrawals to fund the purchase of the two vacation homes.  There is simply no way to excise those facts from this case. In fact, the Defendant might suffer "unfair" prejudice, or a jury might be confused if, for example, the summary of her bank accounts showed the $81,000 in funds she received from the 457(b) plan but didn't identify the 457(b) plan as the source of those funds.  The jury would be left to wonder where the Defendant, an elected official at the time, got that much money to buy the vacation homes?

Finally, it is worth nothing that the Defendant does not cite a single case that supports exclusion of this evidence.  The only citations she makes in her "Applicable Law" section is to Rule 401 and 403 themselves.  And there is no authority that supports her position.

The Defendant's authority-less motion confuses the relevance of the evidence she seeks to exclude—to show that she had not suffered adverse financial consequences stemming from COVID-19—with a straw man legal issue—whether she was required to use the money for any particular purpose.  And her claims of unfair prejudice are not realistic.  This case is simple: the

Defendant was not entitled to withdraw funds from her 457(b) plan because she had not suffered adverse financial consequences.  The fact that the funds were used to buy vacation homes is evidence that she had not, in fact, suffered any adverse financial consequences stemming from COVID-19.  While the Defendant is free to argue otherwise, the jury is entitled to hear this evidence and draw their own conclusions.  Defendant's motion to exclude such evidence at ECF 83 should be denied.

> **E. The Defendant's Motion in Limine to Exclude Evidence of Any Prior Investigations Should be Denied Because Statements She Authorized Others to Make on Her Behalf in Those Investigative are Relevant to the Offenses Charged in this Case**

The Defendant's "Motion to Exclude Evidence of Any Prior Investigations," ECF 84, should be denied because the Defendant, via authorized agents, has made at least four statements in prior investigations that are relevant to the charges in this case.  This evidence, which is highly probative of elements of the offenses charged – in particular the Defendant's state of mind at the time she committed the offenses – should not be excluded. For example, three statements made by her agents during other investigations concerned businesses the Defendant claimed at that time were not operational. An additional statement made on her behalf in the course of the Baltimore City Inspector General Investigation shows, contrary to the Defendant's claims that she was aware of having outstanding tax debt when she applied for a mortgage in January and February 2021. All four statements and the existence of the prior investigation are admissible to show the Defendant's knowledge and state of mind at the time she made the charged statements described further below.  Simply put, the statements made and the prior investigations are admissible to show that the Defendant told the truth in public when it helped her, and then lied in private for financial gain.

"The general rule is that relevant evidence is admissible." *United States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993); see Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also Old Chief v. United States*, 519 U.S. 172, 178-179 (1997) (evidence is relevant if it is "a step on one evidentiary route" to establishing an element of an offense). Relevance is therefore "determined in the context of the facts and arguments in a particular case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008).

> **1.** *The Defendant's Statements in Prior Investigations that Her Businesses Were Not Operational Are Admissible Because They Show She Did Not Experience Adverse Financial Consequences Stemming from COVID-19.*

On August 19, 2020, personal counsel for the Defendant wrote a letter to the Baltimore City Inspector General (IG) on behalf of the Defendant regarding an August 13, 2020, IG request for documents. In that letter, counsel stated: "On July 2, only 19 business days after the State disclosures were due, [Ms. Mosby] amended her financial disclosures to ensure she accounted for the *three non-operational business* that were established in 2019." *See Attachment A*, at 4 (emphasis added). Similarly, on January 21, 2021, the Chief Counsel for the Office of that State's Attorney for Baltimore City wrote a letter authorized by Ms. Mosby stating that attached were "articles of incorporation for the State's Attorney's *inoperable businesses.*" *See Attachment C*, at 2 (emphasis added). On February 12, 2021, personal counsel again wrote to the Inspector General on behalf of Ms. Mosby stating, "As [Ms. Mosby] explained, the companies are *brand new and are not yet conducting business.*" *See Attachment C*, at 8 (emphasis added).[4]

---

[4] These letters, all of which were authorized by the Defendant, qualify as an exception to hearsay under Fed. R. Evid. 802(d)((2)(d) (excepting a "statement made by the party's agent or employee on a matter within the scope of that relationship and while it existed."

These statements made in prior investigations are directly relevant to the charges of perjury in Counts 1 and 3. To prove that charge, the government must show, among other things, that the Defendant willfully made a false declaration on a material matter she did not believe to be true. *See* 18 U.S.C. § 1621. As charged in the indictment, on both May 26, 2020, and December 29, 2020, the Defendant falsely affirmed under penalty of perjury that she "experienced adverse financial consequences stemming from the Coronavirus as a result of being quarantined, furloughed or laid off; having reduced work hours; being unable to work due to lack of childcare; *or the closing or reduction of hours of a business that she owned." See* ECF 23, at 3, ¶10 ; *Id* at 12, ¶5 (emphasis added). In order to prove perjury, the government must prove that the Defendant did not meet any of those criteria. The Defendant's statements in prior investigations that her businesses were inoperable are clearly relevant in proving that element of the offense, that the Defendant did not suffer from the "closing or reduction of hours of a business that she owned."

The probative value of these statements is underscored by the public statements of defense counsel, who have claimed that "Marilyn Mosby had businesses, if you will, and so those businesses were in the travel space and they *were affected by [coronavirus]." See Baltimore's Mosby Indicted, Voting Rights, Jamaican Immigrant Murdered, NFL & Black Coaches* (Jan 14, 2022), available at https://www.youtube.com/watch?v=g9fLGrqb6xY (9:55) (emphasis added). In other words, defense counsel claims that the business (which the Defendant clearly stated were inoperable multiple times to other investigators) were, in fact, operable and the source of her COVID-related loss. The Defendant's vocal public statements to Bar Counsel and the Baltimore City IG to the contrary thus help to prove her perjury in the 457(b) withdrawals. Contrary to her counsel's argument, the business were *not* "affected by" COVID-19, because they were never operational, as the Defendant herself admitted in the course of other investigations.

These statements made in the prior investigation should not be excluded under Federal Rule of Evidence 403, which provides a court "may" be excluded "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This standard is "somewhat exacting," *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 555 (D.C. Cir. 1993), and a decision to exclude otherwise relevant evidence under Rule 403 is "an extraordinary remedy to be used sparingly." *United States v. Libby*, 467 F. Supp. 2d 1, 20 (D.D.C. 2006). For the reasons just discussed, the statements in prior investigations are substantial: they provide critical evidence that the Defendant was not operating any businesses at the time she falsely certified that she experienced adverse financial consequences stemming from COVID-19.

Contrary to the Defendant's arguments that the existence of prior investigations will confuse the jury, this evidence will do just the opposite: they will show the jury the Defendant's prior statements were made in a context where she had every reason to focus on their truthfulness: they were carefully considered and crafted by the Defendant, and not made off-the-cuff.  The statements were made in a matter of great importance to the Defendant, on which she focused considerable attention.  And they were made in a context where the Defendant did not have an incentive to lie. In other words, the Defendant told the truth in those earlier investigations when it helped her, and then lied and said the opposite when that served her interests.

Rule 403 does not "generally require the government to sanitize its case" or "to tell its story in a monotone." *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998).  The government is entitled to present its evidence in a manner that "creat[es] a coherent narrative" of the Defendant's "thoughts and actions in perpetrating the offense for which he is being tried." *Old Chief v. United States*, 519 U.S. 172, 192 (1997). Rule 403 "focuses on the 'danger of unfair

prejudice,' and gives the court discretion to exclude evidence only if that danger 'substantially outweigh[s]' the evidence's probative value." *Gartmon*, 146 F.3d at 1021 (emphases and alteration in original). For purposes of the Rule, "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief*, 519 U.S. at 180. Having made repeated public statements that directly contradict her claims when she made her COVID-19 hardship withdrawals, the Defendant cannot now complain that her own repeated statements in prior investigations are too prejudicial for the jury to see.

The Government will thus introduce these statements to show that the Defendant told the truth in prior investigations and then said just the opposite in certifying her purported eligibility for early retirement withdrawals.

### 2. The Defendant's Statements Concerning Tax Debts are Admissible Because They Demonstrate Her Knowledge of the Existence of These Tax Debts When She Submitted Her Mortgage Applications

On January 6, 2021, the Defendant's personal counsel sent a letter addressed to Bar Counsel, enclosing two documents. The Defendant was copied on the letter. The first was an IRS Installment Agreement dated December 16, 2018. This installment agreement covered the tax debt that the Defendant and her husband jointly owed the IRS for tax years 2014 and 2015. The Defendant's husband signed the agreement but the Defendant did not, even though there is a place for "Spouse's signature (if a joint liability)" and this was a joint liability. The Installment Agreement reflected that a payment of $776 would be made on February 1, 2019, and that $776 would be paid on the first of each month thereafter. The second document was an "Annual Installment Agreement Statement" dated August 29, 2019, that again, covered the tax debt she and her husband jointly owed the IRS. *See* Attachment D, at 1. The Installment Agreement statement showed that the only payment that that had been made under the Installment Agreement which her

husband signed was $669 on May 1, 2019.  The Defendant has claimed in a letter to the Department

of Justice, which she attached as an exhibit to her motion to dismiss the indictment which the Court

denied that:

> [I]n November 2020, [the defendant's] husband, Nick Mosby – who
> handled all communications with the IRS about the tax lien and made all payments
> on the lien from his personal bank account – informed State's Attorney Mosby as
> well as the public (incorrectly) that the lien had been paid off . . . These dates are
> important because State's Attorney Mosby submitted a mortgage application on
> September 2, 2020 (before she became aware of the lien) and then again on
> February 19, 2021 (after her husband told her the lien had been paid off). Neither
> of these applications disclosed the lien, because State's Attorney Mosby was not
> aware that the lien existed at the time either of them were submitted.

ECF 17-17, at 10 (emphasis).  In making this argument, the Defendant purports to offer a defense

to Counts 2 and 4, which charge the Defendant with – among other things – failing to disclose the

IRS lien.   According to her lawyers, the Defendant thought the tax debt had been entirely paid off

in November 2020, because (according to her lawyers) the Defendant's husband lied to her.

However, the existence of the January 6, 2021, letter to bar counsel contradicts this defense.

That letter shows that the Defendant not only knew the loan had not been paid off on January 6,

2021, her counsel *enclosed a copy of the ongoing installment agreement and a statement along

with it that showed only a single payment had been made*.  Far from believing that her husband

had paid everything off, the Defendant's counsel's statements in the letter thus show that on

January 14, 2021 (and again at closing on February 19, 2021), the Defendant was well aware of

the tax debt she and her husband owed the IRS and the existence of a plan to repay it.   And the

Defendant failed to disclose the tax lien and answered falsely when she denied whether she was

currently delinquent on any federal debt. *See* ECF 23, at 16, ¶26.   The Defendant's

acknowledgement of the existence of the delinquent tax debt (and the repayment plan) *eight days*

before her second mortgage application, makes it more probable that she made a false statement on the mortgage application when she denied the tax debt's existence. *See* 18 U.S.C. 1014.

Just as with the statements concerning the Defendant's businesses, the fact that the Defendant's lawyer made these statements about the tax debt and a payment plan in a prior investigation – at the precise time the Defendant denied the existence of any tax debt in her mortgage applications – only serves to underscore their probative value, since they were carefully considered and made in a matter of great importance to the Defendant in a public setting, where she did not have the opportunity to obtain financial benefit from her private lies.[5]   There is no doubt that the fact that the Defendant made statements regarding the tax debt in an ongoing investigation at the same time she denied the existence of that debt to the bank (and later claimed she thought it had already been paid at that time) have high probative value related to her state of mind at the time she submitted the false mortgage applications charged in Count 4.

The existence of prior investigations provides important context to the Defendant's statements made in the course of those investigations. And they lend support to the government's contention that those statements – not the Defendant's subsequent lies when it financially suited her – were the truth.  Thus, evidence of the prior investigations, including the statements described above, should be admitted.

## III.    CONCLUSION

What all the Defendant's motions in limine have in common, including the one that isn't even a motion in limine, is that they are attempts to create issues where none exists.   The Government is not trying to call expert witnesses as lay witnesses.  Ms. Bender and Revenue Agent

---

[5] Should the court have any concerns regarding the existence of the investigations, the Court can instruct the jury that other investigations are not indicative of guilt, and the jury should consider only the evidence presented to them in this matter.

Lopes are paradigmatic summary witnesses.  The use of the word "hardship" to describe the enumerated adverse financial consequences contained in the CARES Act is clearly appropriate given the definition of that word in practical terms.  How the Defendant used her COVID-19 withdrawals is probative of the fact that she had not suffered any of the adverse financial consequences she falsely claimed to have suffered in order to get the money.  Finally, statements by her agents in other investigations are relative to the charges in this case.

     For these and the reasons articulated above, the Defendant's motions should be denied.


    Respectfully submitted,

    EREK L. BARRON
    UNITED STATES ATTORNEY

By:   _____/s/_____
    Leo J. Wise
    Sean R. Delaney
    Aaron S.J. Zelinsky
    Assistant United States Attorneys




**CERTIFICATE OF SERVICE**


I hereby certify that this filing was served on the Defendant via ECF electronic filing.

    ____/s/_____
    Leo J. Wise
    Assistant United States Attorney