IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARILYN J. MOSBY,<br><br>Defendant | Case No. 22-cr-00007-LKG-1 |

### DEFENDANT MARILYN J. MOSBY'S OMNIBUS REPLY IN SUPPORT OF MOTIONS IN LIMINE

Defendant State's Attorney Marilyn J. Mosby ("State's Attorney Mosby") submits this omnibus reply in further support of her motions in limine, Doc. Nos. 80, 81, 82, 83, 84. As discussed further below, the government's responses fail to move the needle when it comes to the critical admissibility issues raised in State's Attorney Mosby's motions in limine, and those motions should be granted.

### INTRODUCTION

The most notable aspect of the government's omnibus response to State's Attorney Mosby's motions in limine, Doc. No. 90, is not the legal arguments (none of which have merit); instead, it is the unconscionable public display of State's Attorney Mosby's personal financial information that can be found throughout the government's filing. *See generally* Doc. No. 90, and related attachments. The government's decision to file such information on the Court's public docket late on a Friday evening where it was available for all—including the news media—to see and report on[1] is yet another example of the animus that has infected these proceedings from the

---

[1] *See* Justin Fenton, Prosecutors lay out federal perjury case against Marilyn Mosby in clearest terms yet, *The Baltimore Banner* (Aug. 1, 2022), available at https://www.thebaltimorebanner.com/community/criminal-justice/prosecutors-lay-out-federal-perjury-case-against-marilyn-mosby-in-clearest-terms-yet-VUQTSNPFANEALKOZVRY6I7OUH4/ (outlining in detail the financial information included in the government's filing).

outset. Put simply, the inclusion of such personal information—without redaction—served no discernable purpose, and can only be attributed to a vicious desire to publicly embarrass, humiliate and shame State's Attorney Mosby that the Court should not countenance. This is important for the Court to fully appreciate, because the government is anything but dispassionate in its unbridled pursuit of State's Attorney Mosby, and the real basis for her prosecution.

Setting aside the government's improper effort to embarrass State's Attorney Mosby and to preview its evidence in the court of public opinion, its arguments in opposition to her motions in limine lack merit. In many respects, they only serve to reinforce the defense's position that the government has, at every turn, tried to obtain an unfair advantage in this litigation by any means necessary. This includes the government's response regarding its experts, which ignores the Rules of Criminal Procedure as they relate to the disclosure of expert testimony; and its response to the motion to exclude the terms "hardship" and "financial hardship" that tries to re-write the CARES Act to the government's own ends. As for State's Attorney Mosby's other efforts to exclude plainly irrelevant and prejudicial evidence related to how she used the withdrawn 457(b) funds and the existence of prior unfounded investigations, the government continues with the same tactic of wanting to use this inadmissible evidence to advance a false and inappropriate narrative about State's Attorney Mosby at trial.

Such arguments have no merit and should be viewed skeptically in light of the government's blatant disregard of State's Attorney Mosby's personal privacy. As such, this Court should grant State's Attorney Mosby's motions in limine.

## ARGUMENT

### A.   The Government's Witnesses Are Experts—Not Lay Witnesses

The government's proffered forensic accountant Jenna Bender and IRS Revenue Agent Matthew Lopes both possess—and intend to use at trial—the type of specialized knowledge, skill

2

and experience that tips their testimony from lay witness into the realm of expert testimony. And, because the government never adequately disclosed such testimony as required under Rule 16, exclusion is the proper remedy. None of the government's responses to State's Attorney Mosby's arguments on these points, including denying that its witnesses are experts and dismissing its failure to comply with the rules as merely technical, have any merit. In any event, if the Court determines that State's Attorney Mosby has raised a question about the fundamental nature of these witnesses' testimony (she has), at a minimum the Court should hold a hearing to allow a voir dire of both witnesses so that the defense and the Court can further probe the methods, skills, and knowledge they relied upon to formulate their conclusions and summary charts, and thus determine whether the witnesses cross the line from lay to expert.

    **1.    Jenna Bender Possesses Specialized Skills As A Forensic Accountant And Will Be Providing Expert Testimony**

The government admits that Ms. Bender is a forensic accountant—a category of witness that routinely is recognized as an "expert"—but argues that she will not be providing expert testimony. To that end, the government claims that the work performed by Ms. Bender could have been done "by an FBI agent or analyst who had no background in accounting or [by] anyone else who is able to operate a calculator," yet it fails to explain why, if that is in fact true, it tapped someone with specialized skills in forensic accounting to do so. Resp. at 14. Paradoxically, however, the government *also* claims that Ms. Bender is "undoubtedly qualified" to testify as an expert if needed. Resp. at 21. This of course begs the question, is she an expert or is she not? Given that its witness "undoubtedly" has the requisite special skills that an expert typically possesses, the government's effort to cloak such expertise in lay witness clothing should be rejected.

Although claiming all along that Ms. Bender performed "simple addition and subtraction" the government now acknowledges that she will also be "making sure there is no double counting

in instances where, for example, the Defendant transfers money from one account of hers to another or makes a payment and then receives a refund." Resp. at 18. This is a lot more than "simply an exercise in arithmetic" and not a task that can be performed, as the government asserts, by "anyone who can operate a calculator." Resp. at 14. To the contrary, this activity is "a practice that involves the application of accounting, auditing, and investigative skills to *analyze* . . . financial records." *See Union Carbide Corp. & Subsidiaries v. CIR*, T.C. Memo 2009-50, 97 T.C.M. (CCH) 1207 (T.C. 2009), *aff'd*, 697 F.3d 104 (2d Cir. 2012) (emphasis added) (discussing forensic accounting). Put differently, this is an "analy[sis]" performed by a person with a specialized knowledge of accounting—yet the government has failed to disclose the methodology Ms. Bender used to make such a determination. *See id*. Moreover, the summary charts excerpted in the government's brief also contain more than addition and subtraction; as they include conclusions about "Net" totals of the so-called "inflows" and "outflows," *e.g.* Resp. at 15, all of which beg the question of what type of analysis gave rise to those totals and their significance. To be sure, the government's own opposition demonstrates that Ms. Bender will be offering opinions—not just addition and subtraction.

The government's claim that this is mere lay or summary testimony ignores the critical requirement of Federal Rule of Evidence 701 that lay opinion testimony "not [be] based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). "The purpose of this . . . requirement is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in … [Federal Rule of Civil Procedure] 26." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005); *see also United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010)

(excluding law enforcement officer's testimony not limited to the witness's perceptions in particular investigation but based on the witness's specialized "experience and training"); *United States v. Oriedo*, 498 F.3d 593, 603-04 (7th Cir. 2007) (excluding testimony where officer "brought the wealth of his experience as a narcotics officer to bear on [his] observations and made connections for the jury based on that specialized knowledge"). "[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" Rule 701, Advisory Committee Notes to 2000 Amendments (citation omitted). As noted above and in State's Attorney Mosby's motion, Ms. Bender's testimony falls squarely within the purview of Rule 702, and should have been disclosed as such under Rule 16. Because the government failed to do so, that testimony should be excluded. *See generally* Doc. No. 80.

The government contends in the alternative that if Ms. Bender is found to be an expert, then exclusion is not an appropriate remedy and it should be allowed to qualify her as an expert and to supplement its deficient disclosures. But the government is incorrect on the law on this point, because the two cases it cites in support of its end-run of the Court's scheduling order and the criminal rules are easily distinguished and actually offer support for exclusion of Ms. Bender's testimony.

*First*, the government cites to a later-vacated opinion in *United States v. W.R. Grace*, 493 F.3d 1119, 1130–31 (9th Cir. 2007), for the proposition that "exclusion is not an automatic remedy." Resp. at 23 (internal quotation marks omitted). But that holding was later vacated by an *en banc* Ninth Circuit panel. In the later decision, the *en banc* panel actually affirmed the district court's exclusion of the witnesses at issue and rejected the government's position (which appears

5

to be the government's suggestion here) that exclusion is appropriate "only when the district court finds the violation of a disclosure order was 'willful and motivated by a desire to obtain a tactical advantage.'" *United States v. W.R. Grace*, 526 F.3d 499, 515 (9th Cir. 2008). As the *en banc* court correctly recognized in *W.R. Grace*, courts have an inherent right to enforce the disclosure requirements in Rule 16, and thus the standard for exclusion is not as high as the government contends. *Id.* at 516.

*Second*, the government cites *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir. 1997). But that case, which dealt with Rule 16 violations, actually held that "the district court *erred by allowing in evidence* as 'lay opinion' evidence by way of specialized opinion testimony by law-enforcement officers." *Id* at 1242 (emphasis added). In other words, the court in that case found that the expert testimony in question *should have been excluded*.[2] Similarly here, exclusion of Ms. Bender's testimony is appropriate.

At bottom, the government offers no valid basis why it should be permitted to introduce expert testimony at this late date. Its failure to provide the adequate and proper disclosures under Rule 16 has and will continue to prejudice State's Attorney Mosby because, at this late stage, with trial mere weeks away, the defense is unable to fully prepare a constitutionally effective defense or locate and prepare a rebuttal expert. The government's voluntary attempt to end-run the rules of evidence and present an expert in lay witness clothing should be rejected. At minimum, in the alternative, the Court should hold a hearing so that the defense may question Ms. Bender and determine the analytical underpinnings of her summary charts.

---

[2] The court held that although exclusion was appropriate and allowing the evidence was error, reversal of the conviction was not warranted.

### 2. Matthew Lopes Is An Expert Under Rules 701 and 702 And Should Be Excluded

As for IRS supervisory revenue officer Matthew Lopes, the government contends that he will testify about and summarize "the amount of taxes the Defendant owed or whether she claimed a refund for tax years 2014-2019 … the Defendant's tax transcripts for those years, the notices that were sent to the Defendant by the IRS during that time period and the lien that was filed against the Defendant and the notice of it provided to her by the IRS in 2020." Resp. at 25. Mr. Lopes will also summarize and explain IRS form notices and the Internal Revenue Manual. *Id.* Yet despite the technical and specialized nature of this testimony, the government again maintains that Mr. Lopes's testimony could be offered by a lay person. *See generally* Resp. at 23-29. As with its forensic accounting expert, however, this is a dramatic oversimplification by the government and yet another attempt to proffer expert testimony in lay witness clothing. It too should be rejected.

The government tries to distinguish between IRS revenue agents generally (who, as State's Attorney Mosby pointed out, are generally expert witnesses) and the testimony Mr. Lopes will offer. In making that argument, however, the government fails to effectively distinguish the cases cited by the defense showing that an IRS revenue agent's "degree and experience qualify [them] as an expert." Doc. No. 81 at 4. For example, the government asserts that the IRS agents in those cases were deemed to be experts because "the proffered testimony related to the tax implications of certain actions or *the calculation of a tax due and owing*." Resp. at 28 (emphasis added). But the government never suggests that such analysis is the *only* basis for qualifying a revenue agent as an expert. And even if that were so, the government admits that Mr. Lopes will conduct his own analysis by reviewing State's Attorney Mosby's "tax returns" and "tax transcripts" and also "testify about the *amount of taxes the Defendant owed*." Resp. at 25 (emphasis added). In other words, by the government's own admission, Mr. Lopes will provide expert testimony.

The government also claims that the cases cited by State's Attorney Mosby are distinguishable because they involved situations where the government was required to prove that there was a tax due and owing. Resp. at 28. Once again, however, the government neglects to mention is that its own Superseding Indictment, which charges that State's Attorney Mosby lied on a mortgage application about not having "federal debt," *does require* the government to prove beyond a reasonable doubt that there was, in fact, a tax due and owing (the basis for the "federal debt" the government claims existed).

At bottom, Mr. Lopes is a tax lawyer who holds an LLM in taxation from Georgetown University and has been an IRS revenue officer since 2009, and he will be offering testimony summarizing and explaining tax returns, tax transcripts, IRS forms and the Internal Revenue Manual. Mr. Lopes is clearly not a lay witness but is instead an expert as per Rules 701 and 702, and is subject to the corresponding disclosure requirements in Rule 16.

Here, as with the government's forensic expert, the evidence proffered by the government's IRS revenue officer should be excluded. The government's failure to provide the adequate and proper disclosures under Rule 16 here will also prejudice State's Attorney Mosby because, at this late stage, with trial mere weeks away, the defense is unable to fully prepare a constitutionally effective defense or locate and prepare a rebuttal expert. Similarly, if the Court determines that there is a question about whether Mr. Lopes will offer expert testimony, at a minimum it should hold a hearing in advance of trial where the scope and nature of his testimony can be explored.

  **B.**  **The Terms "Hardship" And "Financial Hardship" Should Be Stricken From The Superseding Indictment And The Government Should Be Precluded From Using Those Terms At Trial**

The government's response regarding State's Attorney Mosby's motion to strike the terms "hardship" and "financial hardship" from the Superseding Indictment and to preclude those terms'

use at trial reveals the lengths to which the government is willing to go to rely on this invented and inaccurate standard at trial. On analysis, however, its arguments lack merit.

*First*, the government incorrectly claims that a motion to strike surplusage can never be brought as a motion in limine but points to no rule or law that would prohibit doing so. Resp. at 33-34. In fact, district courts, including courts in the Fourth Circuit, have considered and granted motions in limine to strike surplusage from an indictment. *See, e.g., United States v. Zuspan*, No. 3:11-00235, 2012 U.S. Dist. LEXIS 107593, at *1 (S.D. W. Va. Aug. 1, 2012) ("With regard to Defendant's Motion in Limine to Strike Excessive Surplusage from Indictment the Court … GRANTED the motion with respect to paragraph 7"); *see also United States v. Kidwell*, 217 F. App'x 441, 444-45 (6th Cir. 2007) (noting that the district court "granted Kidwell's motion in limine to strike Kidwell's alias "Hemp" from the indictment, and to preclude the use of the alias by the Government at trial"); *United States v. Carter*, Case No. 94 CR 628, 1995 U.S. Dist. LEXIS 11597, at *29 (N.D. Ill. Aug. 3, 1995) ("Defendant's *Motion in Limine to Strike Surplusage From the Indictment was granted* by agreement of the parties.").

Moreover, the government also ignores that the defense's motion seeks a second form of relief—that the Court preclude the use of the terms "hardship" and "financial hardship" from the evidence and argument at trial. *See generally* Doc. No. 82. This, too, is an appropriate motion in limine. *See Dorman v. Anne Arundel Med. Ctr.*, No. MJG-15-1102, 2018 U.S. Dist. LEXIS 89627, at *31 (D. Md. May 29, 2018) (granting motion in limine to preclude the use of certain terms at trial). State's Attorney Mosby's motions thus were properly brought, and the government's attempt to create a rule prohibiting such motions where one does not exist should be rejected.

*Second*, the government's argument that it should be allowed to use the term hardship in this prosecution—even though Congress never included that term in Section 2202 of the CARES

Act—is a nonstarter. *See* Resp. at 34-39. Unable to dispute the plain language of the operative statute, the government cites media articles and cherry picks inapplicable government documents erroneously claiming that the word "hardship" has been used as "a shorthand for adverse financial consequences." *Id.* at 36. This is nonsensical. But what is even more concerning is that the government appears to think that such dubious sources provide the standard to be applied to its perjury charges against State's Attorney Mosby. Indeed, the heart of the government's perjury charges are the alleged false representations State's Attorney Mosby made on her Section 2202 CRD distribution form *about experiencing adverse financial consequences*. As such, the only standard by which the jury can judge State's Attorney Mosby's actions is the standard promulgated by Congress in Section 2202, which unequivocally and undisputedly *does not require a plan participant to experience "financial hardship" to qualify for a CRD*—despite the government's efforts to shoehorn that standard into this prosecution. As State's Attorney Mosby has repeatedly argued, neither section 2202 nor the CRD form contain the word "hardship," so the government cannot charge her with falsely stating she suffered "financial hardship" if the word "hardship" appears nowhere on the form she signed.

The government is free to speculate that "the four enumerated definitions of 'adverse financial consequences' contained within the CARES Act can all be understood as hardships," Opp. at 35, but this speculation cannot be a basis for prosecuting State's Attorney Mosby. And the fact that media articles have "used the term hardship as a shorthand for adverse financial consequences" is of no consequence and is irrelevant to the perjury charges. Congress chose not to use "hardship" in relation to a CRD under section 2202, so it does not matter that "planadvisor.com" or any other source, including the government, chooses to do so. *See United States v. Espinoza-Leon*, 873 F.2d 743, 746 (4th Cir. 1989) (citing *See Russello v. United States*,

464 U.S. 16, 23 (1983)). "Where Congress includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that Congress acted intentionally and purposely in excluding the particular language." *Id.*

The government's improper effort to add to the relevant statutory language should be rejected and the terms "hardship" and a "financial hardship" should be stricken from the Superseding Indictment and be precluded from use in evidence and argument at trial.

### C. How State's Attorney Mosby Used The Withdrawn 457(b) Funds Is Irrelevant And Thus Deeply Prejudicial

The government's arguments related to the probative value of *how* State's Attorney Mosby used the funds she withdrew from her 457(b) account are all built on a false premise. In particular, they all turn on the (incorrect) assumption that *how* State's Attorney Mosby spent the withdrawn funds has some bearing on her mental state as it relates to the CRD certification that she suffered "adverse financial consequences" as a result of the coronavirus pandemic. The two points are entirely unrelated, and the government essentially admits as much in its response when it draws that very same distinction: "the Defendant is not alleged to have improperly *used* the funds. She is charged with improperly *obtaining* them." Resp. at 44. In other words, as State's Attorney Mosby argued in her motion, there is a critical distinction between *obtaining* the funds and *using* them. Doc. No. 83 at 3-8. By conflating those two distinct actions, the government threatens to prejudice State's Attorney Mosby by opening the door to the jury convicting her based on their feelings about what she did with the money. That is not permitted, and the government should be precluded from presenting this irrelevant and prejudicial evidence to the jury as it relates to the perjury charges.

As for relevance, the government contends that "the fact that the Defendant used the 457(b) withdrawals to buy two vacation homes certainly has 'any tendency' to make it more probable

that, at the time of each withdrawal, the Defendant had not actually suffered adverse financial consequences stemming from COVID-19." Resp. at 41. This is simply not the case, however, because State's Attorney Mosby's understanding of having suffered "adverse financial consequences" *could not have been affected* by any view about how she might have spent the money, because she was free to spend the money in any way she saw fit.

Indeed, the IRS's guidance regarding Section 2202 CRDs says exactly that:

The definition of a [CRD] under section 2202(a)(4) of the CARES Act does not limit these distributions to amounts withdrawn solely to meet a need arising from COVID-19. Thus, for example, for an individual who is a qualified individual as a result of experiencing adverse financial consequences as described above, [**CRDs**] **are permitted without regard to the qualified individual's need for funds, and the amount of the distribution is not required to correspond to the extent of the adverse financial consequences experienced by the qualified individual**.

Doc. No. 70-1 at 6 (emphasis added).

The government's attempt to attach significance to the sentence "for an individual who is a qualified individual as a result of experiencing adverse financial consequences as defined above," is a nonstarter. Resp. at 42. There is no dispute that qualification is a prerequisite for a CRD, but as shown above and in State's Attorney Mosby's motion, the applicant's mental state about having experienced "adverse financial consequences" is a separate inquiry that is unrelated to how that individual intended to spend the withdrawn funds. The government's argument seems to assume that because State's Attorney Mosby did not use the withdrawals to pay a pending bill or satisfy a pressing financial obligation,[3] it somehow made her more willing to lie on her self-certification. This is simply wrong, because as the IRS has said, State's Attorney Mosby was free to spend or intend to spend the withdrawn funds "without regard" to the basis for her request. Thus, whatever

---

[3] This, too, is an assumption on the government's part, as it has not put forward any evidence of State's Attorney Mosby's motivation for withdrawing the money. Such evidence is a necessary starting point to even begin the relevancy analysis.

intent State's Attorney Mosby may have had related to the use of the funds, it was completely irrelevant to how she *obtained* them—which is the only relevant question as it relates to the perjury charges in the Superseding Indictment. Put differently, whether State's Attorney Mosby ultimately intended to purchase vacation properties at the time she submitted her CRD requests is not a fact that "is of consequence in determining" whether those requests were truthful, and thus it should be excluded. Fed. R. Evid. 401(b).

As for prejudice, all of the government's arguments are dead on arrival in light of the conclusion above that the evidence is entirely irrelevant to the perjury charges, because irrelevant evidence is inadmissible. *See* Fed. R. Evid. 402. But even beyond that, the government's argument reveals that it wants the jury to improperly conflate having purchased the properties with the enumerated "adverse financial consequences" by assuming—incorrectly—that because she did not pay a bill or satisfy a financial obligation, she must have been untruthful about having suffered an adverse financial consequence as a result of the pandemic. As discussed above, however, the two are unrelated.

As for the government's argument that evidence of how State's Attorney Mosby spent the withdrawn funds does not rise to the level of prejudicial, Resp. at 44-45, it is based on little more than the government's own condescension and say-so. *See* Resp. at 45 ("To submit that the jury would be so incensed and enraged by the fact that the Defendant purchased vacation homes . . . that they could not be rational demonstrates a very low regard for jurors in this District."). But the government's argument on this point is again built on a false premise, *i.e.*, that the evidence in question has probative value. As discussed above, it does not. Thus, the Rule 403 balancing analysis does not favor admissibility. *See United States v. Pryba*, 678 F. Supp. 1225, 1235 (E.D. Va. 1988) (finding that irrelevant proposed expert testimony should be excluded under Rule 403

13

because its limited (if any) probative value was outweighed by the prejudicial effect); *contra United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996) ("Because the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility.").

Notably, neither of the cases the government cites in support of its characterization of the Rule 403 balancing test change the analysis here, because the underlying evidence at issue in both *United States v. Masters*, 622 F.3d 83, 87 (4th Cir. 1980) and in *United States v. Greenwood*, 796 F.2d 49, 53 (4th Cir. 1986) was not in dispute. And, in any event, both cases involved questions about Rule 404(b) evidence that was similar to the charged conduct. Neither of these facts are true here. Moreover, to the extent the government purports to know whether the jury will react to the facts here with "emotionalism or irrationality," *Greenwood*, 796 F.2d at 53, it does not offer any legal authority to support its position. Nor could it, because the government cannot know whether members of the jury—still reeling from the hardships of a 2½-year-and-counting global pandemic—may be incensed by the notion of someone purchasing vacation homes during that time. In all likelihood, at least some will be.

As for confusing the issues and wasting time, there is no dispute that irrelevant issues are both confusing and a waste of time and should be excluded. *See* Rule 402; *see also United States v. Iskander*, 407 F.3d 232, 238-39, n.4 (4th Cir. 2005) (affirming exclusion of part of witness's testimony on ground that it was irrelevant, but even if it was "marginally relevant under Rule 403," it would still be excludable as being a waste of time and confusing). To the extent the government argues that the evidence will come in anyway as it relates to evidence related to State's Attorney Mosby's "bank and credit accounts," however, Resp. at 46, its argument should be rejected because a jury instruction can easily dispense with any juror speculation about where the funds

came from. *See, e.g., Carter v. Ky.*, 450 U.S. 288, 303 (1981) (acknowledging the "unique power of the jury instruction to reduce [juror] speculation to a minimum"). Jurors do not need an answer to every question they may have regarding the evidence put before them—especially when the questions and answers are irrelevant and prejudicial. The Court is responsible for keeping the jury focused on the questions that matter and to not let them be distracted with those that do not—that is the purpose of jury instructions. Evidence regarding how State's Attorney Mosby spent the withdrawn 457(b) funds should be excluded.

### D. The Government Does Not Meaningfully Challenge State's Attorney Mosby's Argument That The Prior Investigations Are Irrelevant And Excludable

The government argues that evidence of past investigations into State's Attorney Mosby should be admitted, but in support of that argument, merely points to four statements made in the context of those investigations that the government contends are relevant to the instant charges. The government does not, however, address the broader point, argued in State's Attorney Mosby's motion, that it should be prohibited from presenting evidence of the *existence* of the Office of Inspector General of Baltimore City ("OIG") and State Bar investigations and related findings. *See* Doc. No. 83 at 4-8. Nor can the government respond to that challenge, because the underlying facts of those investigations are entirely irrelevant to the instant charges, and thus the probative value of such evidence is substantially outweighed by the risk of unfair prejudice. These prior, unfounded investigations and the underlying facts giving rise to them have no bearing on the elements of either perjury or false statements made on a mortgage application. In entirely failing to address this argument, the government appears to concede that indeed the unfounded allegations surrounding travel reimbursements and uncharged alleged tax violations are irrelevant to the present charges.

Federal Rule of Evidence 403 makes clear that "evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice." Fed. R. Evid. 403. Courts have relied on Rule 403 to exclude evidence of other lawsuits where it would tend to confuse the jury. *See Glover v. Oppleman, et al.*, 178 F. Supp. 2d 622, 633 (W. D. Va. 2001) (court excluded evidence of prior lawsuits because "[s]ubstantially outweighing the very weak probative value of this evidence [was] an [overwhelming] risk of unfair prejudice to the defendant."). Similarly, evidence of other investigations involving allegations of tax violations or other bad acts would without question unfairly prejudice State's Attorney Mosby. Neither the tax issues nor the travel reimbursements being investigated resulted in any charges or civil action taken against State's Attorney Mosby. The admission of such evidence would place upon State's Attorney Mosby an undue burden of explaining the circumstances at issue in the other investigations—investigations that ultimately did not lead to any state bar discipline or criminal tax violations.

Moreover, to the extent that the underlying details or existence of these investigations comes out at trial, there is a high risk that the jury will consider them to be improper character or propensity evidence, which violates Federal Rule of Evidence 404(b). Rule 404(b) makes evidence of prior "bad acts" inadmissible to show that a party acted in conformity therewith. *See* ECF 83 at 5-6. As State's Attorney Mosby argued, the State Bar and OIG investigations do not have any relationship to the charged crimes of perjury or false statements on a mortgage application. *See United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994). Permitting evidence of uncharged—and ultimately unfounded—allegations giving rise to these investigations would be unfairly prejudicial in this context because these investigations are not inextricably linked.

The Fourth Circuit has consistently held that uncharged conduct is admissible where it "arose out of the same . . . series of transactions as the charge offense . . . or is necessary to complete

the story of the crime on trial." *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994) (allowing testimony describing the defendant's drug transactions with suppliers not named in the indictment because the testimony was predicate evidence necessary to provide context to the charged drug distribution scheme and how the defendant fit in the larger drug distribution operation); *compare United States v. McBride*, 676 F.3d 385, 396 (4th Cir. 2012) (holding that testimony of a separate encounter with law enforcement for a drug sale that occurred a year prior to the charged drug sale was not necessary to complete the story of the charged crime because the earlier drug sale was never connected to the charged drug sale*); see also United States v. Sutherland*, 921 F.3d 421, 430 (4th Cir. 2019); *United States v. Palacios*, 677 F.3d 234, 245 (4th Cir. 2012); *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009). "[F]or evidence of uncharged conduct to be admissible to "complete the story" of a charged offense, the evidence must be *probative of an integral component of the crime on trial* or provide information without which the factfinder would have an incomplete or inaccurate view of other evidence or the story of the crime itself." *United States v. Brizuela*, 962 F.3d 784, 795 (4th Cir. 2020) (emphasis added).

The OIG investigation centering on State's Attorney Mosby's official travel reimbursements is entirely irrelevant to the charged crimes. State's Attorney Mosby's travel reimbursements are not integral to the charged crimes of perjury or false statements. The origins of the State Bar inquiry are also entirely unrelated to the instant charges. *See* Doc. No. 17 at 7-10. That the State Bar investigation ultimately shifted in focus to the tax lien placed against State's Attorney Mosby and her husband is also unrelated to the instant charges. State's Attorney Mosby turned over her available tax returns to the State Bar and yet no State Bar disciplinary action or tax charges have resulted from this inquiry or in the instant case. While the government argues that her statements pursuant to that investigation are relevant to her knowledge of the continued

17

existence of the tax lien and intent in making the allegedly false statements she has been charged with, the underlying facts giving rise to the State Bar inquiry and that the State Bar inquiry existed are not inextricably linked to the charged crimes nor do they complete the story of the charged crimes. Evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. *United States v. Johnson*, 617 F.3d 286, 296-97 (4th Cir. 2010). The risk that the jury will consider these two separate investigations that do not directly relate to the elements of the charged crimes for improper character or propensity evidence outweighs its minimal—if any—probative value.

To the extent that the Court finds relevant and admissible any statements the government seeks to admit that were made pursuant to the OIG or State Bar investigations, the defense respectfully requests that the Court grant a limiting instruction for the proper use of these statements and prohibit the government from introducing improper propensity evidence in the form of evidence about the underlying facts giving rise to those investigations.

## CONCLUSION

For the foregoing reasons, State's Attorney Mosby respectfully requests that this Court grant her motions in limine, Doc. Nos. 80, 81, 82, 83, and 84.

Dated: August 5, 2022                                  Respectfully Submitted,


/s/ *A. Scott Bolden*

A. Scott Bolden (*admitted pro hac vice*)
Rizwan A. Qureshi (*admitted pro hac vice*)
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
Telephone: +1 202 414 9200
Facsimile: +1 202 414 9299
RQureshi@ReedSmith.com
ABolden@ReedSmith.com

Kelley Miller (*admitted pro hac vice*)
Reed Smith LLP
7900 Tysons One Place, Suite 500
McLean, Virginia 22102
Telephone: + 1 703 641 4200
Facsimile: +1 703 641 4340
KMiller@ReedSmith.com

Anthony R. Todd (*admitted pro hac vice*)
Reed Smith LLP
10 South Wacker Drive
40th Floor
Chicago, IL 60606-7507
Telephone: + 312.207.1000
Facsimile: + 312.207.6400
ATodd@ReedSmith.com

Gary E. Proctor (Bar No. 27936)
Law Offices of Gary E. Proctor, LLC
8 E. Mulberry Street
Baltimore, Maryland 21202
Telephone: (410) 444-1500
garyeproctor@gmail.com

Lucius T. Outlaw III (Bar No. 20677)
Outlaw PLLC
1351 Juniper St. NW
Washington, DC 20012
Telephone: (202) 997-3452
loutlaw3@outlawpllc.com

*Counsel for Defendant Marilyn J. Mosby*

## **CERTIFICATE OF SERVICE**

I certify that, on August 5, 2022, this document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will then serve a notification of the filing to the registered parties of record.

                                                    */s/ A. Scott Bolden*
                                                    A. Scott Bolden