LAW OFFICES
KRAMON & GRAHAM, P. A.
ONE SOUTH STREET
SUITE 2600
BALTIMORE, MARYLAND 21202-3201
TELEPHONE: (410) 752-6030
FACSIMILE: (410) 539-1269
www.kramonandgraham.com

DAVID J. SHUSTER
ALSO ADMITTED IN DC

E-MAIL
dshuster@kg-law.com
DIRECT FACSIMILE
(410) 361-8229

February 12, 2021

**VIA ELECTRONIC MAIL (Isabel.Cumming@baltimorecity.gov)**

Isabel Mercedes Cumming
Inspector General of Baltimore City
Office of the Inspector General
City Hall, Room 635
100 North Holliday Street
Baltimore, Maryland  21202

      RE:    Inspector General's February 9, 2021 Report of Investigation of Baltimore City State's Attorney Marilyn J. Mosby ("Report")
              OIG Case #: 21-0008-I

Dear Ms. Cumming:

      This responds to your Report.  Preliminarily, the publication of your Report brings to a close a frustrating and unnecessary chapter in our client's professional life.  As you know, this ordeal began in July 2020, when the *Baltimore Brew* published a story on Mrs. Mosby's travels. The article was based on information that Mrs. Mosby, herself, reported in her State Ethics disclosure forms.  Mrs. Mosby disclosed her travel on those forms, appreciating that the information was and remains available for inspection by any member of the public.  She never sought to hide anything, and she observes the same standard of transparency in her office.  If anything, as Mrs. Mosby explained to you based on her discussions with Maryland State Ethics Commission, Mrs. Mosby has gone above and beyond what is required to be disclosed on those forms (*i.e.*, "over-reporting" as we have explained throughout the investigation).

      The *Baltimore Brew*, in its headline, referred to our client as a "Peripatetic Prosecutor," erroneously accusing Mrs. Mosby of "pocketing [later changed to "accepting"] $30,000 in reimbursements" for the travel.  A flurry of other news stories then appeared, suggesting wrongdoing on her part.  Comparisons were made to improper financial practices of other elected officials.  Mrs. Mosby began to receive emails from angry constituents calling her a liar and a thief, and demanding that she return money that they thought she had stolen from the taxpayers.  After several unsuccessful attempts to correct the record, our client reached out to the Office of the Inspector General, believing that your office would conduct an unbiased, objective, and independent review.

Isabel Mercedes Cumming
Inspector General of Baltimore City
February 12, 2021
Page 2

---

At every step, Mrs. Mosby fully cooperated with your office. She responded to numerous requests for information. She produced thousands of documents, including: more than 4,000 work emails; personal bank and credit card statements; tax returns; and proof of deductions. She provided her cell phone for forensic analysis. She provided you with the direct contact information of sponsoring organizations and detailed spreadsheets relating to her work-related travel. Because our client had nothing to hide and was eager to bring a conclusion to your expansive investigation, she repeatedly offered to make herself available for interviews by your office. She even offered you the opportunity to speak with her tax advisor. And, of course, you deployed the resources of your office to interview and obtain documents from scores of third parties.

In light of the hundreds of hours and an untold amount of taxpayer resources spent on the OIG's seven-month investigation, you correctly found that taxpayer funds were rarely used and certainly not abused for her work-related travel. Your concerns about the possibility of "double dipping" on her taxes or improper financial dealings were all laid to rest.

While we are certainly pleased with the bottom-line outcome, it is perplexing that you did not give Mrs. Mosby the opportunity to address certain areas of perceived concern that were identified in your Report, but never brought to our attention. Nor did you provide a draft report, as is the generally accepted standard in government audits. *See* 6.6 of the Generally Accepted Government Auditing Standards ("GAGAS")[1] ("**Providing a draft report with findings for review and comment by responsible officials of the audited entity and others helps the auditors develop a report that is fair, complete, and objective**. Including the views of responsible officials results in a report that presents not only the auditors' findings, conclusions, and recommendations but also the perspectives of the audited entity's responsible officials." (emphasis added)). Indeed, on the morning of February 8, you sent another request for information without ever mentioning that your Report would be issued the very next day. We were in the process of responding to your request when, suddenly at 12:30 p.m. on February 9, we received a copy of your Report at the same time you released it to the public.

---

[1] GAGAS is also known as "the Yellow Book." It is regarded as the bible of government auditing practices and standards. Noticeably absent from your Report is the statement: "We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives." *See* GAGAS 9.03. Given that your Report does not recite that your investigation complied with GAGAS, it is unclear what standard, if any, was applied to the Report.

Isabel Mercedes Cumming
Inspector General of Baltimore City
February 12, 2021
Page 3

---

It is disappointing that you did not give Mrs. Mosby a chance to respond to your concerns. Although the concerns raised in your Report are minor and appear to be the result of basic misunderstandings of certain matters, Mrs. Mosby would have welcomed an opportunity to discuss them because they are easy to clear up. That is exactly what GAGAS 6.6 contemplates. Because you declined to provide Mrs. Mosby with that opportunity, we will address them here:

1. **"The OIG found that SA Mosby did not request BOE approval for any of her 24 trips. However, at least 15 of those trips required advance BOE approval under BCSAO/City policy." (Report at 6)**

Your conclusion is factually and legally incorrect. Provisions AM 239-1-1 through 240-9 of the Baltimore City Administrative Manual address travel by City representatives. These provisions make clear that Board of Estimate ("BOE") approval is not required unless the City representative wants the City to pay for the trip. In this regard, AM 239-1-1 is titled "Out-of-Town Travel by Elected Officials **Procedure for Requesting Advance Funds or Reimbursement**." (emphasis added). Likewise, 240-1 (cited in your Report) states: "It is the intent of this policy to encourage travel on official City business **by the most economical means**, i.e., discount airfare, and to **maximize City savings** on conference expenses, i.e., early bird registration and number of employees permitted to attend the same conference." (emphasis added). That language makes clear that the objective is to maximize savings for the City.

That point is emphasized further down in the same provision: "The TRAVEL REQUEST form (**28-1418-5016**) applies to any City representative planning to attend a conference, convention, or seminar, whether out-of-town or within City limits. This request must be approved by the appropriate body **if the representative is to have the trip funded by the City**." (emphasis added).

Moreover, AM 240-1 makes clear that any failure to obtain BOE approval simply means that the City is not obligated to reimburse the person for the travel expenses:

> Failure by the employee to properly request travel approval in sufficient time, i.e., 30 calendar days or more, to take advantage of air and conference registration savings **may not be approved for additional funds upon amendment. No reimbursement will be authorized** for an employee who fails to provide appropriate supportive documentation, i.e., required receipts, etc.

(emphasis added).

Isabel Mercedes Cumming
Inspector General of Baltimore City
February 12, 2021
Page 4

---

Given these provisions, your interpretation of the applicable rules is incorrect. Mrs. Mosby was not required to submit a Travel Request form in advance unless she sought "to have the trip funded by the City." Because she did not seek such funding for the 15 trips in question — because those trips were paid for by other entities — there simply was no need to submit a Travel Request form. Yet, citing AM 240-3, your Report states that "travel that costs more than $800, as well as any travel outside of the continental United States regardless of source of funds or cost of trip, must be approved by the BOE." Report at 6. That is an incorrect reading of the applicable provisions. The $800 ceiling appears throughout the relevant provisions. In general, if the City representative seeks reimbursement from **the City** for a trip costing more than $800, the person must submit a Travel Request to obtain BOE approval for the expenditure. "The BOARD of ESTIMATES APPROVAL policy (AM-240-3) applies if certain conditions exist. The following is a list of some of the cases outlined in AM-240-3 which would require the Board of Estimates approval . . . **the reimbursable funds** exceed $800 per City representative. . . . **No reimbursement is authorized** for an employee who fails to provide appropriate supportive documentation, i.e., required receipts, etc." AM-240-1. Thus, your suggestion that Mrs. Mosby was required to obtain approval for those trips that cost a third party (not the City) more than $800 makes no sense because Mrs. Mosby did not seek reimbursement from the City for those trips. The idea is very simple: if an employee wants to be reimbursed by the City for a trip costing more than $800 then he or she must first get BOE approval for the trip. That simply was not the case with respect to the 15 trips at issue.

Your statement that Mrs. Mosby was required to obtain BOE approval "for travel outside of the continental United States regardless of source of funds or cost of trip" is also incorrect. That statement is an apparent reference to AM 240-3, which provides: "The Board of Estimates must take action on **a Travel Request form** if any of the following conditions exists: . . . the trip will require travel outside the continental United States **regardless of source of funds, cost of trip, or length of absence.**" (emphasis added). AM 240-1 employs a similar phrase ("source or type of funds used to pay for the travel"). The "source of funds" concept does not refer to outside funds used to pay for the trip, but rather refers to the source of the City funds if reimbursement is sought. That point is clear because a Travel Request form is necessary only "if the representative is to have the trip funded by the City." AM 240-1. The phrase "regardless of the source of funds or cost of the trip" is an obvious reference to a source within the City's budgetary control. Otherwise, it simply makes no sense that a City representative would be required to complete a Travel Request form — a form used to obtain reimbursement from the City — for a trip that is never to be funded by the City. Simply put, a "Travel Request form" is not applicable if the City representative does not want "to have the trip funded by the City."

Hence, your legal conclusion — that Mrs. Mosby was required to obtain pre-approval — is incorrect because the trips in question were not funded by the City and she never sought reimbursement or approval for the City to pay for the trips.

Isabel Mercedes Cumming
Inspector General of Baltimore City
February 12, 2021
Page 5

---

Had you raised any concern about BOE approval, or had you shared a draft of your Report as required by generally accepted government audit standards, we could have walked you through these provisions. Even if you had disagreed with our legal analysis, your Report should have, at a minimum, acknowledged that Mrs. Mosby has a good-faith and reasonable legal interpretation, albeit different from yours. Mrs. Mosby demands that you correct this part of your Report.

**2.    "[B]etween 2018 and 2019, SA Mosby traveled out-of-town in her official capacity to attend 24 events and was physically absent from Baltimore City for 85 days." (Report at 10)**

Mrs. Mosby has never disputed her physical absence from Baltimore when she was out of town for work-related trips. She was always transparent about that. Indeed, she publicly disclosed these work trips on her State Ethics forms. But, your Report omits the context for these trips. Mrs. Mosby provided hundreds of documents, including panel and conference agendas, spreadsheets and policies regarding these work-related trips. *See* GAGAS 9.17(c) ("Being complete means that the report contains sufficient, appropriate evidence needed to satisfy the audit objectives and promote an understanding of the matters reported. It also means the report states evidence and findings without omission of significant relevant information related to the audit objectives.").

Your Report makes it appear as though Mrs. Mosby was gallivanting around as a tourist. Her trips were work. The travel was exhausting and took her away from her family. Many of the trips occurred over weekends. Mrs. Mosby outlined for you every work trip that she took; every work colleague that attended; and every substantive policy that she took away from her travels. You decided not to mention any of that in your Report. *Id.*

The fact remains that Mrs. Mosby always considered the trips to be in the best interests of the City and her Office. They provided invaluable opportunities to connect with other law enforcement professionals around the country, share ideas, and learn about new strategies for dealing with crime and improving office operations. Everyone agrees crime as well as the policies and methods of law enforcement officials aimed at reducing crime require serious attention. Mrs. Mosby believes the State's Attorney of Baltimore should do all that can be done to learn about and adopt concepts employed by other states and countries that have proved effective. Mrs. Mosby does not believe that business as usual will work, and she is very interested in exploring approaches that if employed in Baltimore might reduce crime. For these reasons, it is quite common for elected officials, agency heads, and policymakers to travel and gather together as a normal part of their jobs.

Isabel Mercedes Cumming
Inspector General of Baltimore City
February 12, 2021
Page 6

---

You know this first hand:

 

The Baltimore City OIG is recognized by other organizations as a best practice example in government oversight. The Inspector General was invited last year to speak in Atlanta, Georgia about Baltimore's OIG as the City of Atlanta contemplated creating its own OIG. Atlanta Mayor Keisha Lance Bottoms and the Atlanta City Council signed legislation creating the City of Atlanta's first-ever Office of Inspector General in January 2020 using Baltimore City as a model!

For example, when Mrs. Mosby traveled to Portugal and Germany, she traveled with a large group of prosecutors and learned about drug decriminalization and safe consumption spaces. That knowledge has led to substantive policy changes that she implemented in the City that have benefited the public.

One such trip was to Washington, DC to learn about anti-violence and crime reduction strategies with local, state, and federal law enforcement partners. Another trip was to Chicago along with law enforcement partners in the police department and Mayoral staff to learn about their implementation in Strategic Decision Support Systems, which they attributed to driving down crime. Most of the trips were domestic, as you know from the materials that Mrs. Mosby provided. You had full access to her staff, who would have confirmed for you that she was in constant, regular contact while she was away. While traveling, Mrs. Mosby consistently stepped out of meetings to take calls; fielded media inquiries; and never missed an important trial or event.

It is notable that your Report uses the phrase "physically absent," as if to suggest that Mrs. Mosby was somehow not doing her job or missing in action. Whether she was physically in her office, or traveling on work-related trips, or working remotely by virtue of the pandemic (as many people are doing), she was always on the job and fully engaged in the responsibilities of her Office. It is regrettable that you couched your Report in a way to suggest otherwise. You should immediately correct the record in that regard.

It is also notable that you focused so much of your Report on a trip to Virginia. The name of the venue (Salamander Resort & Spa) and the fact that it promotes itself as a resort seem to have captured your attention. Any professional (whether in government or private industry) who travels as a regular part of his or her job knows that conferences and events are often held at facilities that promote themselves as "resorts" or "spas" (*e.g.*, "Hyatt Regency Chesapeake Bay Golf Resort, Spa and Marina"). But, you made it seem as though this was a vacation, which it was not.

Isabel Mercedes Cumming
Inspector General of Baltimore City
February 12, 2021
Page 7

---

This was a conference of Black female prosecutors from across the country. This group represents 1% of all prosecutors in the country. It was an opportunity for these industry colleagues to share ideas and discuss strategies for dealing with the unique challenges that they face as African-American female prosecutors, including harassment, intimidation, and threats against them. There is nothing wrong with them gathering to cope with those challenges (indeed, it is commendable). The sponsoring organization for this three-day event is a reputable organization. The event included sessions led by experts and clinicians. That you would portray the event as a spa treatment is unfortunate. And, finally on this subject, as the *Sun* editorial recently acknowledged, there was nothing inappropriate with the Executive Protection Unit (EPU) transporting Mrs. Mosby to this event (had you cared to ask, Mrs. Mosby would have explained that the EPU is charged with transporting Mrs. Mosby to and from locations, and this is a normal part of the unit's function).[2]

3.      **"SA Mosby listed a number of gifts on her 2018 and 2019 financial disclosure forms; many of those listed on the 2018 form do not provide a value. SA Mosby's spokesperson publicly stated that any gifts she received in 2018 and 2019 had been donated to the BCSAO Winter Solstice auction. However, the OIG found no evidence indicating that SA Mosby had donated a single gift to any past auctions." (Report at 10).**

This is a gross misstatement. The majority of the gifts in question are gifts that Mrs. Mosby reported on ethics disclosure forms that were not required to be disclosed. They included such items as mugs, plaques, tee shirts, and personal gifts received from colleagues and friends that she was under no obligation to report. Furthermore, Mrs. Mosby was never required to donate these items to victims of crime and needy families; however, that is what she did and does. Uncontroverted evidence of that fact was produced to you.

Mrs. Mosby provided you with a detailed ledger that was produced by her Crime Control and Prevention division, where she donated several gifts in 2018 to needy families. With respect to 2019, as Mrs. Mosby explained to you on several occasions (in writing and in person), there were several gifts that she "slated or intended" to be auctioned at her 2020 Winter Solstice. But that auction never occurred because the 2020 Winter Solstice was canceled as a result of the pandemic. These items, all of which she disclosed on her ethics forms, were still in the original packages and gift bags and had not been opened. Mrs. Mosby even provided you with photographs of these items. She explained to you why the gifts had not yet been auctioned

---

[2] Your Report (at 3) also notes that Mrs. Mosby explained that she advised you that the absence of this trip on her disclosure forms was an error. Although she did explain to you that, as a result of an oversight, she did not list the trip on her disclosure form, she also explained to you that she later learned from the State Ethics Commission that this trip (along with others) was not even required to have been listed in the first place. It is unclear why you decided to omit that point.

Isabel Mercedes Cumming
Inspector General of Baltimore City
February 12, 2021
Page 8

---

(again, because the 2020 Winter Solstice event was canceled).  Mrs. Mosby also informed you that, following the recommendation of the State Ethics Commission, three of the 2019 gifts "intended to be auctioned" (*e.g.*, hair oil, CBD products, and a votive candle) were sent back to those who gifted them.  As you do note in your Report, the remaining gifts are all still in her office still intending to be auctioned at the next Winter Solstice event.

Lastly, on this subject, on February 8-9 when we were in the process of responding to your February 8 request for additional information (before we received your Report the next day), Mrs. Mosby was preparing an estimate of values for those items.  Had you asked about these things during your interview of Mrs. Mosby on February 3, or had you given Mrs. Mosby a meaningful opportunity to respond to your February 8 request, you would have learned that the items are of nominal monetary value and the Maryland State Ethics Commission was not at all concerned about them.

4.  **Your Report (at 9) notes that, although our client said her companies were not operational, she took a tax deduction for expenses related to the companies.**

Here, again, your Report is misleading.  The companies that our client formed in 2019 are not operational.  That is what she said.  As she explained, the companies are brand new and are not yet conducting business.  There were, however, expenses in connection with establishing the companies and with other activities before they could become operational.  The deduction was proper and based on professional tax advice.  In any event, it is difficult to perceive why you, as Inspector General for Baltimore City, would be wading into this subject given that no City funds or resources were involved.

\*     \*     \*

Mrs. Mosby requested this investigation with the understanding that your Office would adhere to its core principle, as you have described it, "to pursue the truth with an objective mind, without prejudice, and regardless of politics."  Pursuant to the principles set forth in Chapter 3 ("Ethics, Independence, and Professional Judgment") and in 8.16 ("Audit risk is the possibility that the auditors' findings, conclusions, recommendations, or assurance may be improper or incomplete . . . ") of GAGAS, Mrs. Mosby demands that you correct your Report to fix the misstatements and inaccuracies outlined above.  When you issue a corrected Report, please include a copy of this letter as an exhibit.

Isabel Mercedes Cumming
Inspector General of Baltimore City
February 12, 2021
Page 9

Sincerely,

*David J. Shuster*

Sincerely,

*Andrew Jay Graham*

DJS/AJG/sas
cc:     Marilyn J. Mosby, Esquire (Via Electronic Mail)