IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO.  LKG-22-007 |
| | * | |
| MARILYN MOSBY, | * | UNDER SEAL |
| | * | |
| Defendant. | * | |

*******

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S
## MOTION FOR A TRANSFER OF VENUE

**I.     Introduction**

The Defendant's motion for a transfer of venue asks the Court to disregard longstanding precedent and create a new much lower standard to govern venue transfers within this district. Specifically, the Defendant ignores that the law, in all but the most extreme circumstances, relies on *voir dire* to seat a fair and impartial jury. In fact, the Defendant's motion rests on the premise that this Court is incapable of selecting an unbiased jury. But the collection of news articles the Defendant submits in support of her motion and her citation to the juror questionnaires, which are not a scientifically valid survey of the residents of the Northern Division, do not meet the high burden of showing that the publicity this case has received is so inherently prejudicial that trial proceedings must be presumed to be tainted and that no attempt should be made to seat a jury in the Northern Division. At its base, the Defendant's motion is a request for special treatment for her, different from any other defendant, which is particularly inappropriate because Defendant and her counsel have generated much of the media coverage about which she now complains. The Court should deny the Defendant's motion for an intradistrict transfer of venue.

"The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010). In criminal cases, "[b]oth the

Constitution and the statutes implementing it require that criminal trials be conducted where the crime was 'committed.'" *United States v. Umaña*, 750 F.3d 320, 334 (4th Cir. 2014) (citing U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; 18 U.S.C. §§ 3235–3237; Fed.R.Crim.P. 18). "There is no constitutional right to trial within a division." *United States v. Florence,* 456 F.2d 46, 50 (4th Cir. 1972); *see United States v. Anderson*, 328 U.S. 699, 704, 705 (1946); *Barrett v. United States*, 169 U.S. 218 (1898); *Lafoon v. United States*, 250 F.2d 958 (5th Cir. 1958); *Carrillo v. Squier*, 137 F.2d 648 (9th Cir. 1943); *McNealey v. Johnston*, 100 F.2d 280, 282 (9th Cir. 1938); *cf. Platt v. Minnesota Mining and Manufacturing Co.*, 376 U.S. 240 (1964). Federal Rule of Criminal Procedure 18 provides:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

Fed.R.Crim.P. 18.  Federal Rule of Criminal Procedure 21 allows for transfer of venue under two different bases:

> (a)  **For Prejudice.** Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.
>
> (b)  **For Convenience.** Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice.

Fed.R.Crim.P. 21(a) and (b).  The Defendant appears to move for a transfer based on both the basis of prejudice and convenience, though the portion of the Defendant's motion discussing transfer for convenience essentially covers only the convenience of defense counsel, not the defendant as Fed.R.Crim.P. 18 anticipates. The Government will address why any arguments by

the Defendant for a transfer of venue are not only premature, but also inadequate, under either standard.

> **II.    This Case Should be Tried in the Northern Division Where it was Brought.**
>
>> **a.  The Defendant Fails to Show That She Cannot Obtain a Fair and Impartial Trial in the Northern Division**

The Government shares the desire for a fair and impartial jury to deliver an informed verdict in this matter. However, the Defendant's request for an intradistrict change of venue based on her claims of prejudicial publicity is not tailored for this purpose and would instead result in the Court breaking new ground with far-reaching ramifications for any prosecutions generating news coverage. The Defendant's motion lacks scientific basis for its conclusions, or any basis in fact. Rather in place of evidence, the motion substitutes the Defendant's thoughts and impressions about how she is perceived by the media. Not only has the Defendant fallen short of establishing the type of inherently prejudicial publicity required for a venue transfer, but the Defendant also disregards the time-honored process of *voir dire* that ensures a fair and impartial jury in this country.

A defendant may move for an interdistrict transfer based on prejudice, but "is entitled to such a transfer only if 'so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.' " *United States v. Salad*, 915 F. Supp.2d 755, 757 (E.D. Virginia 2012) (citing Fed.R.Crim.P. 21(a)). "The same framework for legal analysis governs intradistrict transfers under Rule 18 of the Federal Rules of Criminal Procedure." *Id.* (citing Fed.R.Crim.P. 18; *United States v. Lentz*, 352 F.Supp.2d 718, 721 n. 5 (E.D.Va.2005)); *see also U.S. v. Higgs*, 353 F.3d 281 (4th Cir. 2003) (affirming District Court's denial of change of venue from Greenbelt to Baltimore, Maryland). The burden of demonstrating

the requisite level of prejudice falls on the defendant. *Salad*, 915 F. Supp.2d at 757 (citing *Wansley v. Slayton*, 487 F.2d 90, 94 (4th Cir.1973)).

In evaluating whether a change of venue is required based on pretrial publicity, a court undertakes a two-step process. *Higgs*, 353 F.3d at 307; *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991). First the Court must determine "whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted," thus resulting in a venue change prior to jury selection. *Id.* (quoting *Bakker*, 925 F.2d at 732). However, "[o]nly in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself." *Id.* (quoting *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987)). Instead, a trial court will ordinarily take the second step of conducting *voir dire* of prospective jurors to determine if actual prejudice exists. *Higgs*, 353 F.3d at 308; *Bakker*, 925 F.2d at 732; *Wansley*, 487 F.2d at 92-93.

Through her cursory motion, the Defendant asks the Court to brush aside the second step of *voir dire* and instead make a premature finding of inherently prejudicial publicity despite a record lacking in anything even approaching what other courts that have ordered a transfer have found. In support of her bold claim, the Defendant appears to cite three principal bases. The first is what she claims to be media coverage that "unfairly maligns" her.[1] ECF #129 at 5. Second, she claims that the size of the jury pool in this district is insufficient to overcome the perceived unfair media coverage. *Id.* at 4-5. Finally, the Defendant concludes that the jury questionnaires prove prejudice despite the fact that, based on her own calculation, 70% of the potential jurors had not formed an opinion about the case that would prevent them maintaining an open mind and

---

[1] The Defendant also states, on page 2 of her motion, "This Court is well aware of the history of negative publicity *and animus* that has plagued this prosecution from its inception." ECF #129 at 2 (emphasis added). To the contrary, the Court has explicitly found that there is no animus in this prosecution. ECF #52 at 11-14. Repeating a falsity over and over again does not make it truth.

36% of the jurors had not even heard or read anything about the case. *Id.* at 9-10. None of the Defendant's claims of prejudice come close to meeting the "extreme circumstances" contemplated by the Fourth Circuit. *Higgs*, 353 F.3d at 307 (citing *Wells*, 831 F.2d at 472).

The Defendant has attached brief abstracts of 62 articles from the *Baltimore Sun*, the *Daily Record*, and *Newsbank*, but provides little to no meaningful analysis of these articles to prove that these articles "frequently and unfairly malign" her, save referencing her own complaint to the Federal Communications Commission. ECF #129 at 5 and Exhibit A. In truth, while there have been articles containing negative commentary about the Defendant, the majority of the articles merely recite facts, and do not opine, let alone opine in a way that could be construed as inflammatory or prejudicial. Instead, the media coverage here can at best be analogized to that found insufficient in *Higgs*, in which the Fourth Circuit found that "although the coverage was not entirely dispassionate or factual, neither was it highly inflammatory." *See Higgs*, 353 F.2d at 308 (citing *United States v. De La Vega*, 913 F.2d 861, 864 (11th Cir. 1990)). Moreover, much of the coverage attached by the Defendant in support of her motion repeats the Defendant's baseless claims of animus by the prosecution which this Court has rejected. In sum, most of these are not articles that support her claim that she has been "unfairly maligned." In fact, article number 1 cited by the Defendant is titled, "In defense of Marilyn Mosby," *See* ECF #129, Exhibit A at 1.

The Defendant next attempts to prove her point through an internet search on the respective websites of the *Baltimore Sun* and the *Washington Post*. Specifically, she claims that a search of the *Sun* for the name "Marilyn Mosby," yields substantially more articles than a search for the same name on the *Post*. *See* ECF #129 at 8-9. This argument is unavailing. First, an internet search should not be confused with serious analysis or actual science. Second, the

vast majority of the *Baltimore Sun* articles that appear in such a search do not pertain to this prosecution; rather they are a collection of articles about the Defendant's job as the highest-ranking prosecutor in the city of Baltimore—no wonder there are more search results than in a paper with international circulation based out of Washington, D.C. Finally, the Defendant does not claim, and cannot claim, that these approximately 5,000 unrelated articles all contain prejudicial commentary about the Defendant's guilt in this case. Therefore, they do not contain anything approaching the extreme circumstances needed to justify a venue change.

As the Defendant correctly notes in her motion, the Supreme Court dealt with claims of prejudicial pretrial publicity in *United States v. Skilling*. 562 U.S. 358. In that case—and based on a far more robust record than the one offered by the Defendant in this case—the Court found that negative pretrial publicity surrounding the prosecution of former Enron Chief Executive Officer Jeffrey Skilling did not raise a presumption of prejudice requiring a change of venue. *See id* at 381-82.[2] Of particular note to this case, the *Skilling* Court found that, "Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Id.* at 381 (citing *Irwin v. Dowd*, 366 U.S. 717, 722 (1961)). So, while the Defendant claims she is "inextricably tied to Baltimore," and therefore covered far more frequently, coverage does not equate to prejudice. *See id*; *Bakker*, 925 F.2d at 732 ("Sheer volume of publicity alone does not deny a defendant a fair trial.").

The Defendant claims that a comment by the Government in its motion for a narrowly tailored order pursuant to Local Rules 204 and 603 "alone demonstrates how the jury pool is not

---

[2] In support of their failed motion for a change of venue, the defendants in *Skilling* presented the results of polling they had done in and around Houston to show levels of media saturation in those communities. Here, the Defendant has not presented anything that approaches a scientific basis on which to conclude what the level of media saturation is in the Northern Division.

sufficiently broad or diverse to shield jurors from the barrage of negative press coverage of this case and State's Attorney Mosby." ECF #129 at 4-5. The Defendant misunderstands what the Government said in that motion. The fact that a "large portion of the jury pool is familiar with this case from the media, and [a] substantial portion of the individuals indicated that they had already made up their mind about the case based on press coverage," does not mean that a jury cannot be selected in the Northern Division. Instead, it supports the narrowly tailored order restricting defense counsel's ability to generate further publicity from the courthouse steps. In any event, the Fourth Circuit just recently rejected the same arguments that the Defendant in this case is making in the trial of the members of the Gun Trace Task Force. Taking into account Baltimore's population of 621,000, which is only one part of the Northern Division, the Fourth Circuit found, "That is large enough to reduce the likelihood of prejudice." *Taylor*, 942 F.3d at 223 (citing *Skilling*, 561 U.S. at 382 (noting that there is a "reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals")). Moreover, the Northern Division is comprised not just of the population of Baltimore City, but also of the counties of Allegany (67,729), Anne Arundel (590,336), Baltimore County (849,316), Caroline (33,386), Carroll (173,873), Cecil (103,905), Dorchester (32,489), Frederick (279,835), Garrett (28,702), Harford (262,977), Howard (334,529), Kent (19,270), Queen Anne's (50,798), Somerset (24,584), Talbot (37,626), Washington (154,937), Wicomico (103,980), and Worcester (53,132). Source: *Census.gov/quickfacts* (all population estimates as of July 1, 2021).

This also highlights another fault in the Defendant's motion: the idea that the choice comes down essentially to the Baltimore media market versus the Washington, D.C. media market. That is not the case. It is correct that Baltimore City is in the Northern Division, and the Defendant is likely more well-known in Baltimore City than in the Washington, D.C. metro area.

7

However, a simple look at the map of Maryland shows that the Northern Division includes the counties in the farthest northwest region of the state (Garrett and Alleghany Counties) and the county in the farthest northeast region of the state (Cecil County), as well as the entire eastern shore and the counties furthest south (Somerset and Worcester Counties). The Northern Division is much more than Baltimore City, representing a board cross-section of the State of the Maryland and a deep pool from which to draw a jury venire in this district.

Finally, the two continuances caused by the Defendant's failure to properly comply with expert notifications have ensured that over a year will have passed since indictment in this matter. While that is not the four years that passed between the collapse of Enron and the trial of Jeffrey Skilling, it has allowed the hotly contested election for City State's Attorney to pass. Moreover, this is not a case where a trial "swiftly followed a widely reported crime." *See Skilling*, 561 U.S. at 383. (citing *Rideau v. Lousiana* 373 U.S. 723, 724 (1963)).

The record is replete with courts denying defendants the same or similar relief that the Defendant seeks here—in cases much more widely-reported, salacious, and controversial than this case. However, that does not mean that such relief is unattainable—to the contrary, it requires a real showing of inherent prejudice. A review of cases meeting that standard shows the inadequacy of the Defendant's request here. For example, *Rideau v. Lousiana* involved a bank robbery where the defendant kidnapped three employees and killed one. 373 U.S. 723 (1963). Wilbert Rideau's twenty-minute, in-depth confession to the Sheriff was conducted without counsel present and apparently recorded without the defendant's knowledge. It was then broadcast on television on three separate occasions to tens of thousands of people in a small Louisiana parish. A motion for a change of venue was denied and the defendant was convicted after trial. The Supreme Court reversed, stating, "[F]or anyone who has ever watched television

the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726. The Court referred to the case as "kangaroo court proceedings" and found they violated due process. *Id.* at 726.

In *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Court addressed the prosecution of Sam Sheppard, accused of bludgeoning his pregnant wife to death. The Court detailed a barrage of media coverage of the investigation that far exceeds anything at issue here, including the names and addresses of the 75 members of the jury venire being published in all three area newspapers, which resulted in anonymous letters and telephone calls as well as calls from friends to all prospective jurors about the impending prosecution. *Id.* at 335-42. Nonetheless, the Court still stated that it could not "say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone . . ." *Id.* at 354. The Court pointed to a "carnival atmosphere at trial," stating that "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom." *Id.* at 355, 358. For example, a television broadcast carried a staged interview of the judge as he entered the courthouse, the court permitted photographers to take pictures of the jury in the box, and, "[t]he day before the verdict was rendered—while the jurors were at lunch and sequestered by two bailiffs—the jury was separated into two groups to pose for photographs which appeared in the newspapers." *Id.* at 343-45. By contrast, this case contains nothing like these or any other cases that met the standards required for a transfer based on prejudicial pretrial publicity, and no serious attempt to compare the cases can stand up to scrutiny.

The Court would also be wise to consider the Fourth Circuit's finding in *Bakker*, the fraud prosecution of televangelist James O. Bakker, that in deciding whether to presume pretrial prejudice based on pre-trial publicity it was proper to consider the source of the publicity. 925 F.2d at 733. There, the Fourth Circuit found that Bakker "both before and after his indictment, engaged in a calculating media campaign to deny any wrongdoing" and regain control of his corporation. *Id.* There, the Defendant appeared in national television interviews such as *Nightline* and *Sally Jesse Raphael*. The Fourth Circuit stated:

> While Bakker had every right to protest his innocence, he must recognize that his pre-trial acts and statements invited media attention. In our view, a defendant should not be allowed to manipulate the criminal justice system by generating publicity and then using that same publicity to support his claim that the media attention surrounding his case created a presumption of prejudice.

*Id.* Through the Defendant and her defense counsel's interviews and press conferences—including those on the courthouse steps that are the subject of additional motions practice—the defense strategy has involved the media from the beginning. To now claim prejudice on its basis is at odds with those actions. If the Defendant thought that she would be prejudiced by pretrial publicity, she should not have attempted to generate so much of it.

### b. The Voir Dire Process, Not a Transfer, is the Appropriate Mechanism to Ensure a Fair and Impartial Jury

The voir dire process that has been agreed to by the parties in consultation with the Court is an effective means at ensuring a fair and impartial jury. The Defendant's attempts to utilize jury questionnaires to seek a venue change only serves to highlight the effectiveness of the process in identifying any jurors with potential biases, while simultaneously proving a substantial portion of the venire has no knowledge of this case whatsoever. As a result, any potential issues presented by pre-trial publicity of this matter—fueled by defense counsel's

repeated inappropriate and incorrect assertions to the media—will be addressed by the *voir dire* process.

The Defendant's motion speaks to a portion of the jurors who indicated that they had formed an opinion about the case, but it does not necessarily follow that those jurors leaned in any one particular direction. The motion also shows that, by the Defendant's own calculation, over a third of the potential jurors had not read or heard anything about the case. Regardless, the motion acknowledges that the vast majority of potential jurors had the ability to maintain an open mind. The Defendant's cherry-picked quotes from a few of the questionnaires do not change this fact either. In fact, what the Defendant has proven is that the parties and the Court worked together to produce a comprehensive questionnaire that can be used to assess the individual biases of potential jurors. This will then be coupled with additional in-court *voir dire* by the Court to explore remaining issues, as well as challenges for cause and peremptory challenges. This is the way trials are conducted. Again, as the Supreme Court made clear in *Skilling*, "our decisions . . . 'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.' " 561 U.S. at 380 (quoting *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975).

    **c. To the extent the Defendant seeks a transfer based on convenience, such a claim lacks merit.**

It is not entirely clear how to treat the portion of the Defendant's motion addressing convenience. The Defendant references the language in Fed.R.Crim.P 18 pertaining to giving "due regard for the convenience of the defendant, any victim, and the witnesses," though there is also a passage in Fed.R.Crim.P. 21(b) pertaining to transfer based on convenience. Regardless, no such claims of inconvenience have been made by the defendant—who lives and works in Baltimore City—at any point in the last year. Moreover, even the section of the Defendant's

motion regarding convenience states, "For her part, State's Attorney Mosby will not be inconvenienced by having to travel to Greenbelt for the trial if it means that the trial will be fair and free of undue pretrial publicity and prejudice." ECF #129 at 8. This essentially acknowledges that the motion is not on the basis of convenience for the Defendant—nor is there any claim that it is more convenient for any witness to testify in Greenbelt as opposed to Baltimore.[3]

Rather, the motion appears based on the convenience of the portion of the defense team that is based out of Washington, D.C. In fact, members of the defense team are based in Washington, D.C., as well as Baltimore, Chicago, and Virginia. The Defendant cites no legal authority that either Fed.R.Crim.P. 18 or 21 is meant to support a location for trial that is convenient for some of the defense counsel in the case, nor has the Fourth Circuit or any court in this district, to the Government's knowledge, made a finding that it does. Adopting the Defendant's position would create a precedent that, any time a defendant obtains counsel based in Washington, D.C., venue should be shifted to Greenbelt. Regardless, because the crime occurred in Baltimore, and the Defendant lives and works in Baltimore, there appears no basis for a transfer based on convenience.

### III.   Conclusion

As the Supreme Court stated long ago: "[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United*

---

[3] While the Defendant cites the distance between the Baltimore and Greenbelt Divisions as "approximately 30 miles and less than an hour's drive apart," rush hour traffic can make that drive substantially more complicated. *See* ECF #129 at 7.

*States*, 98 U.S. 145, 155-56 (1879). However, the remedy sought by the Defendant would upend the *voir dire* process for no reason other than conjecture by the Defendant that she is a victim of unfair bias on the part of anyone who disagrees with her. To the contrary, this case shows that the justice system is functioning properly and will continue to function properly to ensure that a fair and impartial jury is empaneled to hear the evidence in this matter. The Northern Division for the District of Maryland is the appropriate venue for this matter to proceed. The Defendant's motion should be denied.

        Respectfully submitted,

        Erek L. Barron
        United States Attorney

By: _____/s/_____
        Leo J. Wise
        Sean R. Delaney
        Aaron S.J. Zelinsky
        Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

        \_\_\_/s/_____
        Sean R. Delaney
        Assistant United States Attorney