## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARILYN J. MOSBY,**<br><br>**Defendant** | **Criminal No. LKG-22-7** |

### UNITED STATES' OMNIBUS MOTION TO EXCLUDE DEFENDANT'S EXPERTS

The United States of America, by and through its undersigned attorneys, moves this Court to exclude the testimony of defense expert witnesses Jerome Schmitt and Eric Forster.

### REQUEST TO EXCEED PAGE LIMITATIONS

The United States chose to file an omnibus motion to exclude two separate defense experts, which required the Government to exceed the 35-page limit in Local Rule 105.3. The United States requests permission to exceed the page limit rather than separate this single filing into two separate filings.

[this space intentionally left blank]

## Table of Contents

**INTRODUCTION** ................................................................................................................ 3

**THE LAW** ......................................................................................................................... 4

**ARGUMENT** .................................................................................................................... 6

**I.    Schmitt's Testimony Should Be Excluded** ........................................................... 6

    A.    Schmitt's Opinion that the Defendant Suffered "Adverse Financial Consequences" Based on a Decline in Her "Net Worth" Should Be Excluded ............................................................ 7

        *1.    The CARES Act Does Not Recognize a Decline in Net Worth as an Event that Entitles a Plan Participant to Make a Coronavirus Related Distribution* ............................................. 7

        *2.    Schmitt Stopped His Net Worth Analysis on March 31, 2020, Two Months Before the Defendant Took Her First CRD on May 26, 2020, and Nine Months Before the Defendant Took Her Second CRD on December 29, 2020* ................................................................................. 13

        *3.    Schmitt's Net Worth Analysis is Not Reliable Because He Included Mahogany Elite in it Without Valuing Mahogany Elite* ............................................................................. 15

        *4.    Schmitt's Opinion that the Defendant Suffered Adverse Financial Consequences is Unreliable Because He Failed to Follow Professional Standards In Order to Reach It* ................ 16

        *5.    Schmitt's Net Worth Analysis Should Be Excluded Pursuant to Rule 403* ............ 18

    B.    Schmitt's Opinions About the Pandemic's Effect on the Travel Industry and on  Mahogany Elite are Irrelevant and Unreliable .............................................................................. 19

        *1.    Schmitt's Opinions about the Pandemic's Effect on Mahogany Elite are Irrelevant Because Mahogany Elite Did Not Close or Reduce its Hours Because it Was Never Operational* ... 19

        *2.    Schmitt's Opinions about Mahogany Elite are Unreliable Because They Are Not Based on Sufficient Facts or Data* ........................................................................................ 22

        *3.    Schmitt's Opinions About the Effects of the Pandemic on the Travel Industry and on Mahogany Elite Should Be Excluded Pursuant to Rule 403* ....................................... 25

**II.    Schmitt Should be Precluded From Testifying About Conversations He Had With the Defendant Because They are Inadmissible Hearsay** .................................................. 26

**III.    Forster's Testimony Should Be Excluded** ......................................................... 31

    *A.    Forster's Opinions are Not Reliable Because They Are Not Based on Any Principles or Methodologies Reliably Applied to the Facts in this Case; They are the Ipse Dixit of Forster* .......... 32

    *B.    Forster's Opinion that the Defendant Maintained "Exclusive Control" Over Her Kissimmee Property is Irrelevant Because the Jury Can Determine Whether the Agreement the Defendant Signed with a Vacation Home Management Company Violated the Second Home Rider* ........................... 36

    *C.    Forster's Opinion that the Second Home Rider Allowed the Defendant to Rent Her Kissimmee Property is Irrelevant Because that is Not a Fact At Issue* ............................................. 38

    *D.    Forster's Opinions Should Be Excluded Pursuant to Rule 403* ........................... 39

**CONCLUSION** ............................................................................................................... 39

## **INTRODUCTION**

On October 7, 2022, defense counsel provided the government with supplemental expert disclosures for Jerome B. Schmitt (hereafter "Schmitt"), *see* Attachment 1, and Eric Forster (hereafter "Forster") *see* Attachment 2.

Schmitt, according to his curriculum vitae, is a "Certified Public Accountant in Pennsylvania and is accredited in Business Valuation and certified in Financial Forensics, and is a Certified Fraud Examiner."  Appendix 1 to Attachment 1.  Mr. Schmitt has never been qualified as an expert in a federal criminal trial.

Eric Forster, according to the curriculum vitae provided by the Defendant, is:

> … a national real estate consultant who provides expert counsel for companies involved in litigation, economic losses or regulation disputes in the real estate/mortgages arena. His primary areas of expertise include risk management, market analysis, damage calculations, and brokers' standards of care and practices.

Attachment 2 at 2.  The Government notes that none of these topics are at issue in this case. Further, Forster has never been qualified as an expert in a federal criminal trial, which is not surprising since his areas of expertise appear entirely to focus on civil and regulatory issues related to real estate.[1]  In fact, the way defense counsel describes Forster's experience as a testifying expert is as follows: "Over the course of his career, he has presented expert testimony in legal matters involving lending institutions, real estate firms and numerous federal cases involving TILA and RESPA violations."  "TILA" appears to refer to the "The Truth in Lending Act" a federal law enacted in 1968 to help protect consumers in their dealings with lenders and creditors.  "RESPA" appears to refer to "The Real Estate Settlement Procedures Act" which provides consumers with

---

[1] Forster appears to have testified in a single criminal case, in state court, which, according to his curriculum vitae was "People v. Albito (trial testimony) San Diego (D) Case # 37-2011-00079327. Defrauding a federal lender." There is no date provided when this trial occurred.

improved disclosures of settlement costs and to reduce the costs of closing by the elimination of referral fees and kickbacks.  Neither statute is at issue in this case.

When it comes to expert testimony, the district court is the gatekeeper.  It is an important role: "[E]xpert witnesses have the potential to be both powerful and quite misleading [;]" the court must "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579. 588  (1993).  The anticipated testimony of Schmitt and Forster is neither and should be excluded.

## THE LAW

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court emphasized that Rule 702 requires district courts to perform a critical "gatekeeping" function concerning the admissibility of expert scientific [and technical] evidence.  *See Daubert*, 509 U.S. at 588; *Kumho*, 526 U.S. at 152.

"Implicit in the text of Rule 702, the *Daubert* Court concluded, is a district court's gatekeeping responsibility to 'ensur[e] that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597). Thus, *Daubert* establishes that Rule 702 focuses on two threshold inquiries: reliability and relevance. The "reliability" component requires the court to "ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods.'" *Nease*, 848 F.3d at 229 (quoting *Oglesby v. Gen. Motor Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). The "relevance" component requires the court to find that the proposed testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. "Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021).

Furthermore, "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Importantly the application of Rule 403 in the context of expert witnesses differs from its application in the context of lay witnesses. As the Supreme Court explained in *Daubert*, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (1993) (internal quotations omitted).

Because the trial court under *Daubert* acts as the "gatekeeper" for expert testimony at trial, it must conduct these inquiries into the reliability and relevance of proposed expert testimony

before trial. Failing to "ensure the reliability of the evidence on the front end," "before it is presented to the jury," abdicates the district court's "gatekeeping function." *Nease*, 848 F.3d at 230-31. This "preliminary assessment" is conducted pursuant to Federal Rule of Evidence 104(a). *Daubert*, 509 U.S. at 595. Rule 104(a) provides that:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges."

As the Supreme Court described in *Daubert*, "[t]hese matters should be established by a preponderance of proof." *Id.* at 593 note 10 (*citing Bourjaily v. United States*, 483 U.S. 171, 175–176 (1987)).

"The proponent of the [expert] testimony must establish its admissibility by a preponderance of proof." *Cooper*, 259 F.3d at 199; *Morris v. Biomet, Inc.*, 491 F. Supp. 3d 87, 97 (D. Md. 2020).

"Courts of appeals apply an abuse of discretion standard when reviewing a trial court's decision to admit or exclude expert testimony." *Cooper*, 259 F.3d at 200 (4th Cir. 2001); *see General Electric Co. v. Joiner*, 522 U.S. 136, 138–39 (1997).

## ARGUMENT

### I.    Schmitt's Testimony Should Be Excluded

The October 7, 2022, disclosure for Schmitt reveals that he intends to offer opinions on two topics. The first is "Analysis of Ms. Mosby's Financial Condition and Effect of the Pandemic," *see* Attachment 1 at 7-12, and the second is "Analysis of the Effects of the Pandemic on the Travel Industry and Mahogany Elite, *see id.* at 12-16.

The Government has retained Joshua Johnston to review and analyze the October 7, 2022, Schmitt disclosure.  Mr. Johnston is a Certified Public Accountant ("CPA") who is also certified in Financial Forensics ("CFF") and Accredited in Business Valuations ("ABV") and is a Senior Managing Director with Ankura Consulting Group, LLC.  Mr. Johnston's curriculum vitae is Exhibit A to his report, which is Attachment 3 to this filing.  As Mr. Johnston describes in his disclosure:

> Relevant to this matter, I have more than twenty-four years of experience analyzing financial statements and financial activity of individuals and companies of all sizes. That experience allows me to analyze whether Ms. Mosby's financial situation at and around the time of the Certifications and distributions was consistent with the adverse financial consequences in the CARES Act and the Certifications.

 Attachment 3 at 4.

### A. Schmitt's Opinion that the Defendant Suffered "Adverse Financial Consequences" Based on a Decline in Her "Net Worth" Should Be Excluded

Under the heading "Analysis of Ms. Mosby's Financial Condition and Effect of the Pandemic," defense counsel disclosed that they intend to elicit the following opinion from Schmitt:

> 41.    . . . the first objective of my engagement was to determine whether Ms. Mosby experienced adverse financial consequences in the first quarter of 2020 as a result of the Pandemic.  Based on my analysis of Ms. Mosby's assets, liabilities, and net worth from January 1, 2020 to March 31, 2020, the Pandemic's effect on the U.S. economy, the sudden declines in the value (and increase in volatility) of U.S. equity markets and Ms. Mosby's 457(b) Plan caused by the Pandemic, it is my opinion that, in March 2020, Ms. Mosby experienced adverse financial consequences as a result of the Pandemic.

Attachment 1 at 17.  This opinion is irrelevant and unreliable and should be excluded.

### 1. *The CARES Act Does Not Recognize a Decline in Net Worth as an Event that Entitles a Plan Participant to Make a Coronavirus Related Distribution*

In reaching the conclusion that "in March 2020, Ms. Mosby experienced adverse financial consequences as a result of the pandemic," Schmitt relied exclusively on the fact that the

Defendant's "net worth," as Schmitt measured it, "decreased by approximately $4,500 or 12%" from December 31, 2019, to March 31, 2020.  *See* Attachment 1 at ¶35.  Schmitt's opinion is irrelevant because "net worth" is not one of the definitions of "adverse financial consequences" that Congress identified in the CARES Act as entitling a plan participant to make a Coronavirus Related Distribution ("CRD").  Section 2202(4) of the CARES Act provides the following:

> (4) DEFINITIONS.—For the purposes of this subsection—
>      (A) CORONAVIRUS-RELATED DISTRIBUTION.—Except as provided in paragraph (2), the term "coronavirus-related distribution" means any distribution from an eligible retirement plan made—
> (i) on or after January 1, 2020, and before December 31, 2020,
> (ii) to an individual—
>
> * * *
>
> (III) who experiences adverse financial consequences as a result of being quarantined, being furloughed or laid off or having work hours reduced due to such a virus or disease, being unable to work due to lack of child care due to such virus or disease, closing or reducing hours of a business owned or operated by the individual due to such virus or disease, or other factors as determined by the Secretary of the Treasury (or the Secretary's delegate).

Thus, the statute itself expressly contains the circumstances when a plan participant like the Defendant can receive a CRD.  None of the definitions of "adverse financial consequences" contained in the CARES Act includes a decline in net worth.  Instead, all of them have to do with not being able to work and earn income.

The only events other than the four contained in the CARES Act that may qualify a plan participant to take a CRD are those "determined by the Secretary of the Treasury (or the Secretary's Delegate)."  As of the Defendant's first CRD on May 26, 2020, the Secretary of the Treasury or her delegate had not expanded that list.  On June 19, 2020, the IRS issued Notice 2020-50, which added additional circumstances under which a plan participant could take a CRD to include

8

"having pay or self-employment income reduced due to COVID-19; or having a job offer rescinded or start date for a job delayed due to COVID-19." *See* Attachment 4. This notice was issued before the second CRD the Defendant took on December 2020, but neither of the two additional conditions have anything to do with a decline in the Defendant's net worth.

And the Defendant did not certify that she had experienced a decline in her net worth on the form she submitted to the City of Baltimore in order to receive her two CRDs. Instead, the Defendant certified to the following:

**Participant Coronavirus Certification and Distribution Authorization**

The Coronavirus Aid, Relief and Economic Security Act of 2020 ("CARES Act") was signed into law on March 27, 2020. The CARES Act permits qualifying members to receive a coronavirus-related distribution. I understand that I may receive a distribution of up to $100,000 if I am a **qualified** individual. By making this request, I acknowledge that the amount of coronavirus-related distribution(s) which I may obtain from The City of Baltimore Deferred Compensation Plan is limited to the amount of $100,000 and that I am not exceeding this limit. I further acknowledge that the City of Baltimore Deferred Compensation Plan is relying on my certifications in determining **that I qualify for a coronavirus-related distribution** and that I will not exceed the applicable limit.

By signing this form, **I certify that I meet at least one of the qualifications for a distribution as defined under the CARES Act Section 2202(a)(4)(A) summarized below**: (check one)

☑ I have experienced adverse financial consequences stemming from such virus or disease as a result of:

- Being quarantined, furloughed or laid off
- Having reduced work hours
- Being unable to work due to lack of child care
- The closing or reduction of hours of a business I own or operate

Superseding Indictment Count One ¶¶ 4 & 5. If Congress had wanted to define "adverse financial consequences" to include a reduction in net worth, then it would have written the CARES Act to

9

cover that.  But it didn't.  And if the Secretary of the Treasury or her delegate wanted to expand the statutorily defined circumstances under which a plan participant could take a CRD to include a decline in net worth she could have done so.  But she didn't either.  In fact, the only person to define "adverse financial consequences" to include a decline in net worth is the Defendant's expert. And that's why his testimony on this point is irrelevant.

In sum, as the Supreme Court explained in *Daubert*, "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 509 U.S.  at 591 (1993); *see also United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute").  As the Supreme Court further noted, "The consideration has been aptly described [] as one of "fit." *Id.*  Here the proffered expert testimony, that the Defendant experienced a decline in her net worth does not "fit" with the question before the jury, namely, whether she truthfully certified that she experienced any of the four statutorily enumerated adverse financial consequences contained in the CARES Act because a decline in net worth isn't one of them.

The expert the Government retained to analyze the Schmitt disclosure, Joshua Johnston (hereafter "Johnston"), similarly has concluded that Schmitt's "net worth" opinion is irrelevant as he articulated in the "Executive Summary" to his expert disclosure:

> 4.     The analyses and opinions in the Schmitt Disclosure are not based on the actual specific adverse financial consequences in the CARES Act and the actual representations made by Ms. Mosby, but rather are based on Mr. Schmitt's own interpretation of "adverse financial consequences" that ignores the specific situations in the CARES Act and Certifications. Therefore, the conclusions and opinions contained therein are irrelevant and potentially misleading with respect to whether Ms. Mosby's financial situation made her eligible for CARES Act distributions from her 457(b) Plan.

Attachment 3 at 3.  Johnston expanded on this point in the body of his report:

11.     As a result of the Pandemic, the Congress of the United States of America passed (and the President of the United States signed into law) the CARES Act. Among the many provisions within the CARES Act, a specific provision was established that provided for a withdrawal option for 457(b) Plan participants to request distributions from their retirement accounts ("**Coronavirus-Related Distributions**" or "**CRDs**") if they experienced specific adverse financial consequences of the Pandemic and certified as such ("**Certifications**").   The adverse financial impacts cited in the CARES Act and in the Certifications are specific and all-encompassing - they are not examples of the types of adverse financial consequences that must be experienced to qualify for distributions, but rather are an exhaustive list. The issuance of IRS Notice 2020-50 expanded the list of adverse financial consequences, because the CARES Act list was exhaustive. These specific adverse financial consequences are situations where an individual's current and near-term take home pay and immediately available cash resources are reduced as a consequence of the Pandemic. The CRDs under the CARES Act allowed for long-term retirement funds to be accessed to compensate for a reduction in current cash flow.

12.     Ms. Mosby submitted two requests for CRDs of $40,000 and $50,000 on May 26, 2020, and December 29, 2020, respectively. In making the distribution requests, Ms. Mosby represented in the Certifications that she had experienced one or more of the specific near-term adverse financial consequences cited in the CARES Act and the Certifications:

a.      "Being quarantined, furloughed, or laid off;"

b.      "Having reduced work hours;"

c.      "Being unable to work due to lack of child care;" or,

d.      "The closing or reduction of hours of a business I own or operate."

13.     The CARES Act states that factors other than the four listed above may be determined by the Secretary of the Treasury. The IRS issued Notice 2020-50 in June 2020 (after the first Certification and before the second) which extended the applicability of the four specific adverse financial consequences cited in the CARES Act to spouses and household members and added additional consequences of a "reduction in pay (or self-employment income) due to COVID-19 or having a job offer rescinded or start date for a job delayed due to COVID-19." Notice 2020-50 was not issued until after the first Certification in May 2020, and before the second certification in December 2020, however the Certification language Ms.

11

Mosby represented to did not change.

\* \* \*

28.    . . . the Schmitt Disclosure offers irrelevant and potentially misleading analyses and opinions regarding Ms. Mosby's eligibility for CRDs from her 457(b) Plan. Notably, Mr. Schmitt's opinion that "in March 2020, Ms. Mosby experienced adverse financial consequences as a result of the Pandemic" is reached outside of the actual specific "adverse financial consequences" cited in the CARES Act and the Certifications. Disregarding the explicit definition of "adverse financial consequences" in the CARES Act and Certifications, Mr. Schmitt created his own "net worth" standard to determine adverse financial consequences – that of Ms. Mosby's net worth – that is wholly divorced from the actual definition and standards included in the CARES Act and the Certifications ....

29.    Mr. Schmitt's assertion that Ms. Mosby's financial condition was adversely affected by the Pandemic is premised on a decline in Ms. Mosby's total net worth from December 31, 2019, through March 31, 2020.  Given that Ms. Mosby was paying down her liabilities and that her liquidity improved over this period, the sole driver of Ms. Mosby's decline in net worth, as cited by Mr. Schmitt, from December 31, 2019, through March 31, 2020, is the value of her 457(b) Plan.

\* \* \*

37.    As discussed above, the provisions of the CARES Act allowed for long-term retirement funds to be accessed to compensate for a reduction in current income (i.e., the retirement funds were used to plug "holes" in current income caused by the Pandemic).  Reductions in the current value of an individual's retirement account did not impact current income, as those retirement funds were not a source of current income – which is exactly why the CARES Act allowed these long-term retirement funds to be accessed.

38.    The Schmitt Disclosure, while asserting that Ms. Mosby experienced adverse financial consequences resulting from the Pandemic (per his definition), ultimately neglects to consider that the specific adverse financial consequences Ms. Mosby experienced (i.e., the decline in value of Ms. Mosby's 457(b) Plan) did not qualify her to request and receive CRDs from her 457(b) Plan under the provisions of the CARES Act. As noted above, Mr. Schmitt's definition of adverse financial consequences from the Pandemic is untethered from the specific adverse financial consequences enumerated in the CARES Act and the Certifications. Irrespective of the Schmitt Disclosure's silence on whether Ms. Mosby was eligible to request and receive CRDs from her 457(b) Plan under the CARES Act, the Pandemic's impact on the value of Ms. Mosby's 457(b) Plan is irrelevant to whether she had experienced any of the specific adverse financial impacts of the Pandemic she had

attested to in her May 26, 2020, and December 29, 2020, Certifications.

Attachment 3 at 10-11, 14 (footnotes omitted).

> 2. *Schmitt Stopped His Net Worth Analysis on March 31, 2020, Two Months Before the Defendant Took Her First CRD on May 26, 2020, and Nine Months Before the Defendant Took Her Second CRD on December 29, 2020*

Schmitt's "net worth" analysis is also irrelevant because he stopped it as of March 31, 2022.  But that is not when the Defendant took her first CRD.  That occurred on May 26, 2020, *two months later*.  And her second CRD, occurred *nine months later* on December 29, 2020.

Johnston analyzed the Defendant's net worth, using Schmitt's method, as of May 26, 2020, and December 29, 2020, and found the following:

31.    However, as illustrated in Table 3 below (excerpted from Exhibit C), by May 26, 2020 – the date at which Ms. Mosby requested the first $40,000 CRD from her 457(b) Plan and certified that she had suffered adverse financial consequences of the Pandemic – the value of Ms. Mosby's 457(b) Plan had in fact recovered substantially all of the value it had lost from December 31, 2019 through March 31, 2020 – while Ms. Mosby had continued to pay down her debts, resulting in a higher net worth at May 26, 2020, than prior to the Pandemic.

**Table 3**

| | 12/31/2019 | 3/31/2020 | 5/26/2020 | Change (12/31/2019-5/26/2020) |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Checking & Savings Accounts | $ 8,660 | $ 10,176 | $ 11,073 | $ 2,413 |
| Retirement Account | 115,496 | 95,979 | 112,021 | (3,474) |
| **TOTAL ASSETS** | $ 124,156 | $ 106,155 | $ 123,094 | $ (1,062) |
| **TOTAL LIABILITIES** | $ 84,887 | $ 71,408 | $ 54,462 | $ (30,425) |
| **NET WORTH** | $ 39,269 | $ 34,747 | $ 68,632 | $ 29,363 |

32.    Furthermore, as illustrated in Table 4 below (excerpted from **Exhibit C**), by December 29, 2020 – the date at which Ms. Mosby requested the second $50,000 CRD from her 457(b) Plan and certified that she had suffered adverse financial consequences of the Pandemic – Ms. Mosby's net worth had more than tripled from December 31, 2019.

13

**Table 4**

|  | December 31, 2019 | March 31, 2020 | December 29, 2020 | Change (12/31/2019 - 12/29/2020) |
|---|---|---|---|---|
| Assets | $ 124,156 | $ 106,155 | $ 657,068 | $ 532,912 |
| Less: Liabilities | 84,887 | 71,408 | 532,595 | 447,709 |
| Net Worth | $ 39,269 | $ 34,747 | $ 124,473 | $ 85,204 |

33.     Mr. Schmitt's misleading contention that Ms. Mosby's financial condition was adversely impacted by the Pandemic – premised on the decline in value of her 457(b) Plan from December 31, 2019 through March 31, 2020 – not only ignores Ms. Mosby's financial condition at the Certification dates, but also, as demonstrated in Graph 1 below, is supported by analyses that selectively only extend through the date at or around which the value of Ms. Mosby's 457(b) Plan was most adversely affected by the Pandemic.

**Graph 1**



34.     Mr. Schmitt could have calculated Ms. Mosby's net worth as of the date of the Certifications and CRDs but declined to do so, seemingly ignoring the fact that it had recovered by the date of her first Certification and significantly improved by

the date of her second Certification

Attachment 3 at 11-13 (footnotes omitted).

In sum, because the Defendant took her CRDs two and nine months after March 31, 2022, respectively, Schmitt's analysis of her net worth as of March 31, 2022, is irrelevant and should be excluded.

   3. *Schmitt's Net Worth Analysis is Not Reliable Because He Included Mahogany Elite in it Without Valuing Mahogany Elite*

The Schmitt "net worth" analysis is unreliable because it includes Mahogany Elite without actually valuing it. As Johnston explains:

   42.   Mr. Schmitt's analysis of Ms. Mosby's net worth identifies Mahogany Elite as an asset with a value of "N/A," citing that "As a private business, Mahogany Elite Enterprises, LLC does not receive or provide account statements; as such, the values on this schedule remain blank."

   43.   The Schmitt disclosure characterizes an individual's net worth as "equal to the **value** of that person's **assets** less the **value** of her liabilities at a given point in time" [emphasis added]. Statement of Financial Accounting Concepts No. 6 promulgated by the Financial Accounting Standards Board ("**FASB**") defines assets as "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events." Notably, Statement of Financial Accounting Concepts No. 6 does not have exceptions for assets without account statements.

   44.   By including Mahogany Elite as an asset in its analysis of Ms. Mosby's net worth and the impact thereon by the Pandemic, the Schmitt Disclosure contends that Mahogany Elite had some positive value which was adversely impacted by the Pandemic yet neglects to attribute any defined value to Mahogany Elite. Mr. Schmitt's assertion that Mahogany Elite's value was adversely impacted by the Pandemic is contradicted by his failure to establish a defined value for Mahogany Elite as an asset of Ms. Mosby. As a CPA, Mr. Schmitt knows that asset values are not limited to those that only have "account statements." Many assets do not have account statements, including investments in real estate and private companies like Mahogany Elite, yet accountants value such assets all the time. If Mahogany Elite had value that was adversely impact by the Pandemic, it was an asset that could be valued, yet he declines to do so.

Attachment 3 at 16-17 (footnotes omitted). In sum, Schmitt wants to "have his cake and eat it,

too," by including Mahogany Elite in his net worth analysis without actually valuing it.  As a result, it is unreliable and should be excluded.

       4.   *Schmitt's Opinion that the Defendant Suffered Adverse Financial Consequences is Unreliable Because He Failed to Follow Professional Standards In Order to Reach It*

In reaching the opinion that "Ms. Mosby experienced adverse financial consequences in the first quarter 2020 as a result of the Pandemic," Schmitt failed to "reliably appl[y]" "reliable principles and methods to the facts of this case," specifically, the professional standards applicable to CPAs, in violation of Rule 702.  The Fourth Circuit have identified adherence to professional standards as an indicia of reliability.  *See United States v. Crisp*, 324 F.3d 261, 269 (4th Cir. 2003) ("The district court also heard evidence from which it was entitled to find the existence of professional standards controlling the technique's operation. Those standards provide adequate assurance of consistency among fingerprint analyses."); *United States v. Rose*, 672 F.Supp.2d 723, 724 (D. Md. 2009) (same); *see, e.g., Atl. Coast Pipeline, LLC v. 0.07 Acre, More or Less, in Nelson Cnty., Virginia*, 396 F. Supp. 3d 628, 647 (W.D. Va. 2019) (district court admitted expert opinion testimony because analysis complied with Uniform Standards of Professional Appraisers); *see, e.g., Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 707, 725 (W.D. Va. 2004) (district court admitted expert opinion testimony because analysis complied with "professional standards and scientific methodology used by experts in fire and explosion investigations, and set forth in [National Fire Prevention Association Guide for Fire Explosion Investigations]).  If adherence to professional standards is an indicia of reliability, then departures from those norms indicates a lack of reliability, as is apparent here.

      Johnston has analyzed Schmitt's disclosure and has identified the following breaches in professional standards:

46.     As a member of the [American Institute of Certified Public Accountants "AICPA"] and as a licensed CPA providing forensic accounting services, Mr. Schmitt is subject to the professional standards enumerated in the AICPA Code of Professional Conduct ("**Code of Conduct**") and by the AICPA's Forensic and Valuation Services ("**FVS**") Executive Committee Statement on Standards for Forensic Services ("**SSFS No. 1**").

47.     In rendering his opinions, however, Mr. Schmitt has violated certain professional standards – notably, the standards of due professional care, professional competence, and sufficient relevant data.

\* \* \*

49.     Mr. Schmitt states that he was engaged to analyze and offer opinions regarding this matter "within a reasonable degree of accounting and professional certainty," which is consistent with the AICPA's standard of due professional care that Mr. Schmitt must adhere to – that a CPA must "[e]xercise due professional care in the performance of professional services." Due care is further characterized in the Code of Conduct as "impos[ing] the responsibility to render services promptly and **carefully**, to be **thorough**, and to observe applicable technical and ethical standards" [emphasis added].   In neglecting to consider evidence in the documents he relied upon which contradicts his assertion that Ms. Mosby experienced adverse financial consequences from the Pandemic, Mr. Schmitt fails to be careful and thorough. As demonstrated in the Schmitt Disclosure (and as discussed above), Ms. Mosby was actively paying down her consumer, student loan, and automobile debts through March 2020, and the balances of her cash accounts had in fact increased from December 31, 2019, to March 31, 2020, thereby indicating that Ms. Mosby's financial condition in fact improved over the first quarter of 2020 from a net cash flow (i.e., liquidity) perspective.

50.     Further, by the dates she made the Certifications, her retirement account balances – the sole driver of Mr. Schmitt's opinion that Ms. Mosby was adversely financially impacted – had recovered and significantly improved. Mr. Schmitt, however, disregards any indicia of Ms. Mosby's improved financial position and rather premises the entirety of his assertion that Ms. Mosby experienced adverse financial consequences from the Pandemic solely upon the decline in value of her 457(b) Plan from December 31, 2019, to March 31, 2020, despite his review of (and reliance upon) documents produced in this matter which point to the contrary.

51.     Further violating the AICPA's standard of due professional care, Mr. Schmitt forgoes any consideration of Ms. Mosby's use of the funds distributed to her from her 457(b) Plan. Despite his review of (and reliance upon) evidence indicating that the funds distributed to Ms. Mosby were used to invest in real estate in Florida, Mr. Schmitt does not address how these actions are clearly not indicative of an individual that is experiencing adverse financial consequences.

52.     The Code of Conduct and SSFS No. 1 define the professional standard of professional competence as "undertak[ing] only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence."   The Code of Conduct characterizes due care as that which "imposes the obligation to perform professional services **to the best of a member's ability**" [emphasis added]. In declining to attribute any defined value to Mahogany Elite, which, as an accredited ABV, he should be competent to do, Mr. Schmitt fails to adhere to the AICPA's standards of due professional care and professional competence. Mr. Schmitt opines that Mahogany Elite had value which was adversely affected by the Pandemic's impact on the travel industry yet declines to assign any value to Mahogany Elite because it "does not receive or provide account statements" and because its value was "not known or readily available to Ms. Mosby in the first quarter of 2020."   However, what was or was not known by Ms. Mosby in the first quarter of 2020 is irrelevant to the professional standards Mr. Schmitt is subject to as a CPA providing forensic accounting and expert witness services. Rather than calculate and assign a value to Mahogany Elite (which, as a CPA holding the advanced credential of ABV, he should be well-qualified to do), Mr. Schmitt has instead neglected his obligations under the AICPA's standards of due professional care and professional competence in concluding that Mahogany Elite had value but it could not be determined for his analysis because it was not known to Ms. Mosby in the first quarter of 2020 and that Mahogany Elite does not receive or provide account statements.

Attachment 3 at 17-20.

### 5.  *Schmitt's Net Worth Analysis Should Be Excluded Pursuant to Rule 403*

Assuming for the sake of argument that Schmitt's net worth analysis has any probative value, it is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay and wasting time, and should therefore be excluded. Fed. R. Evid. 403.   As described above, a decline in net worth is not one of the circumstances contained in the text of the CARES Act that entitles an individual to take a CRD.  Allowing Schmitt to testify at length about his analysis, therefore, risks confusing and misleading the jury, would waste the jury's time and cause an undue delay in the trial.  For these reasons, Schmitt's net worth analysis should be excluded pursuant to Rule 403.

18

B. <u>Schmitt's Opinions About the Pandemic's Effect on the Travel Industry and on Mahogany Elite are Irrelevant and Unreliable</u>

Under the heading "Analysis of the Effects of the Pandemic on the Travel Industry and Mahogany Elite," defense counsel disclosed that they intend to elicit the following opinions from Schmitt:

> 56.    Based on my research and analysis, the travel industry in the United States was severely and negatively affected by the Pandemic in 2020.

> 57.    Mahogany Elite's business prospects were adversely affected by the drastic decline in travel caused by the Pandemic, as its ability to launch an inaugural event and generate revenue in 2020 was significantly diminished.

Attachment 1 at 16.  These opinions are irrelevant and unreliable and should be excluded.

> 1. *Schmitt's Opinions about the Pandemic's Effect on Mahogany Elite are Irrelevant Because Mahogany Elite Did Not Close or Reduce its Hours Because it Was Never Operational*

Schmitt's opinions about the travel industry generally and Mahogany Elite specifically are irrelevant.  Section 2202(a)(4)(A) defines adverse financial consequences stemming from COVID-19 to include "the closing or reduction of hours of a business I own or operate."  Mahogany Elite did not "close" or experience a "reduction of hours," because it was never operational.  We know that because the Defendant herself and her agents repeatedly said that prior to her indictment in this case.  On July 15, 2020, the Defendant approved a statement to be issued from the director of communications for the Baltimore City State's Attorney's Office which stated, in the Defendant's own voice, that her travel business was a "long-term venture, hence the reason why there are no clients and I have not received a single cent in revenue.  There are no plans to operate the company while I am State's Attorney."  *See* ECF 110-2 at 15-16.  On July 20, 2020, the Defendant herself wrote a letter in which she stated that "I have not taken a single client for these companies,"

19

referring to her travel business and others, "nor have I taken in any money.  Any insinuation to the contrary is false, misleading and unethical." *Id.* at 19-20.  On August 19, 2020, personal counsel for the Defendant wrote a letter in which counsel stated: "On July 2, only 19 business days after the State disclosures were due, [Ms. Mosby] amended her financial disclosures to ensure she accounted for the *three non-operational business* that were established in 2019." *Id.*   at 34-36 (emphasis added).  Similarly, on January 21, 2021, the Chief Counsel for the Office of that State's Attorney for Baltimore City wrote a letter authorized by Ms. Mosby stating that attached were "articles of incorporation for the State's Attorney's *inoperable businesses.*" *Id.* at 23-24 (emphasis added). On February 12, 2021, personal counsel again wrote a letter on behalf of Ms. Mosby stating, "As [Ms. Mosby] explained, the companies are *brand new and are not yet conducting business.*" *Id.* at 46-48 (emphasis added).[2]  Because the Defendant did not operate any travel business, any testimony on such a business' ability to generate revenue is irrelevant.

Schmitt's disclosure also states that Mahogany Elite was not operational in 2020.  He writes:

> 42.    Ms. Mosby formed Mahogany Elite in May 2019.  Based on my discussion with Ms. Mosby, the original business plan for Mahogany Elite was to provide out-of-town retreats and conferences focused on self-care and networking for black women professionals. I also understand from discussions with Ms. Mosby that she attended a similar event called the Odyssey Network Business Retreat, an experience that inspired her to create Mahogany Elite.

---

[2] These letters, all of which were authorized by the Defendant, qualify as an exception to hearsay under Fed. R. Evid. 802(d)((2)(d) (excepting a "statement made by the party's agent or employee on a matter within the scope of that relationship and while it existed."). The Government will offer sanitized versions of these letters for admission in evidence.  These versions will not indicate that they were written in the context of prior investigations and thus will not be inconsistent with the Court's Memorandum Opinion and Order of September 8, 2022.  The Government has moved for leave to file a motion in limine to admit these letters in this sanitized form because the parties have been unable to reach a stipulation as to them.

43.     In 2019, in addition to registering Mahogany Elite with the state of Maryland, Ms. Mosby also obtained a domain name through GoDaddy.com and retained a third party to develop a logo and website for Mahogany Elite. Based on my discussion with Ms. Mosby, I understand that, as of the end of 2019, she intended to complete the design of a logo and website, launch Mahogany Elite and host at least one event in 2020.

* * *

52.     The travel industry was severely and negatively affected by the Pandemic in 2020, as discussed above and as evidenced by the substantial declines in volume, revenue and value associated with the airline, hotel and cruise industries. Based on my discussions with Ms. Mosby, she decided not to organize an inaugural event for Mahogany Elite in 2020 once the Pandemic's effect on the travel industry became apparent.

Attachment 1 at 12 and 15 (footnotes omitted).  Thus, as Schmitt stated, the Defendant "*intended to complete the design of a logo and website, launch Mahogany Elite and host at least one event in 2020*," but changed her mind before she did any of those things.

Johnston reached a similar conclusion that Schmitt's opinions concerning Mahogany Elite are irrelevant because it was never operational, as described in his disclosure:

25.     The Schmitt Disclosure notes that Ms. Mosby formed an entity named Mahogany Elite in May 2019, which would provide conferences and retreats "focused on self-care and networking for black women professionals," and, but for the Pandemic's impact on the travel industry, would begin to generate revenue in 2020.

26.     However, by Mr. Schmitt's own admission, Mahogany Elite was not yet operational as of 2020, had not generated any revenue or income, and Ms. Mosby had taken little to no steps to begin operations. Ms. Mosby's contemplated business venture had no employees, no observable inputs or outputs, and no capital expenditures. Per Mr. Schmitt's disclosure, the only costs associated with Mahogany Elite that Ms. Mosby would have incurred as of 2020 were those related to registering the entity with the state of Maryland, obtaining the entity's domain name, and retaining a third party to develop marketing collateral for Mahogany Elite. In fact, as of 2020, Ms. Mosby had, as the Schmitt Disclosure notes, only "intended" to design Mahogany Elite's logo and website.  Because Mahogany Elite was not operational in 2020, it had not "opened its doors" and thus did not close or reduce its hours. Mahogany Elite was not generating any cash flow for Ms. Mosby

21

and thus she did not experience any reduction in self-employment income or cash flow as a result of the Pandemic.

Attachment 3 at 9-10 (footnotes omitted).

> 2. *Schmitt's Opinions about Mahogany Elite are Unreliable Because They Are Not Based on Sufficient Facts or Data*

Schmitt's opinion that "Mahogany Elite's business prospects were adversely affected by the drastic decline in travel caused by the Pandemic, as its ability to launch an inaugural event and generate revenue in 2020 was significantly diminished," *see* Attachment 1 at ¶ 57, is not "based on sufficient facts or data," and is not the "product of reliable principles and methods" that Schmitt "reliably applied" to the "facts of the case" and therefore violates Rule 702. *See* Fed. R. Evid. 702. "Rule 702 also requires courts "to verify that expert testimony is 'based on sufficient facts or data.'" *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 920 (D.S.C. 2016) (*quoting E.E.O.C. v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015). Thus, "trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Id.*

In his disclosure, Schmitt identifies conversations he had with the Defendant herself as bases for his opinions:

> 42.    Ms. Mosby formed Mahogany Elite in May 2019. **Based on my discussion with Ms. Mosby**, the original business plan for Mahogany Elite was to provide out-of-town retreats and conferences focused on self-care and networking for black women professionals. **I also understand from discussions with Ms. Mosby** that she attended a similar event called the Odyssey Network Business Retreat, an experience that inspired her to create Mahogany Elite.

> 43.    In 2019, in addition to registering Mahogany Elite with the state of Maryland, Ms. Mosby also obtained a domain name through GoDaddy.com and retained a third party to develop a logo and website for Mahogany Elite. **Based on my discussion with Ms. Mosby,** I understand that, as of the end of 2019, she intended to complete the design of a logo and website, launch Mahogany Elite and

22

host at least one event in 2020.

* * *

> 52.    The travel industry was severely and negatively affected by the Pandemic in 2020, as discussed above and as evidenced by the substantial declines in volume, revenue and value associated with the airline, hotel and cruise industries. **Based on my discussions with Ms. Mosby,** she decided not to organize an inaugural event for Mahogany Elite in 2020 once the Pandemic's effect on the travel industry became apparent.

Attachment 3 at 12 and 15 (emphasis added).  However, Schmitt admits that he has done nothing to determine whether the information provided to him by the Defendant is an accurate basis for his opinions.   Specifically, he discloses that, "I have not tested, nor have I been asked to audit or test the accuracy and integrity of, the documents and information provided to me."  Attachment 1 at 7-8, ¶ 27.  Further, Schmitt treated statements provided to him by "party representatives" of the Defendant different from the statements provided to him by the Defendant directly.  At paragraph 27 of his disclosure Schmitt writes:

> I have relied on the documents and information produced in this matter that have been provided to me.  Where statements made by **party representatives** have been relied upon, I have used the documents and information provided to us to confirm such statements.

*Id.* (emphasis added).  The Defendant is not a "party representative."  Therefore, by his own account, Schmitt did not even attempt to *confirm* the statements the Defendant made to him using the information that was expressly provided to him for this purpose.  Therefore, his opinions concerning Mahogany Elite are not based on "sufficient facts or data" and are not the "product of reliable principles and methods" that were "reliably applied" to the facts of the case and should be excluded.

Johnson has reached a similar conclusion.  As he opines in his disclosure:

41.     The Schmitt Disclosure notes that "Mahogany Elite's business prospects were adversely affected by the drastic decline in travel caused by the Pandemic, as its ability to launch an inaugural event and generate revenue in 2020 was significantly diminished," thereby implying that Ms. Mosby was eligible to receive distributions from her 457(b) Plan resulting from "the closing or reduction of hours of a business [she owned] or [operated]" per the Certifications. Mr. Schmitt reaches such opinions based on no objectively verifiable evidence other than his discussions with Ms. Mosby. As discussed above, Mahogany Elite was not operational in 2019 or 2020, had generated no revenue or positive income, and Ms. Mosby therefore did not experience the specific adverse financial consequences of the Pandemic related to business ownership per the Certifications.

Attachment 3 at 16-17 (footnotes omitted).

Schmitt also identifies data about the "travel industry" as another basis for his opinion

concerning Mahogany Elite:

50.     From a business valuation perspective, the overwhelming majority of publicly traded companies in the travel sector experienced sharp declines in value in March 2020, as investors accounted for the risk of a prolonged Pandemic on both leisure and business travel. As an illustration of the effect of the Pandemic on the travel industry, I prepared **Exhibit C** which recounts the change in value of some of the largest, most well-known companies in the travel sector. As shown on **Exhibit C**, the value of all these companies declined from December 31, 2019 to May 26, 2020 and, for most of the companies, the value remained below pre-Pandemic levels through December 31, 2020.

51.     In addition to a decline in the valuation of most travel-related businesses in 2020, there was an increase in investor uncertainty regarding the future of the travel industry (at least on a short-term basis). As shown on **Exhibit C**, there was a significant uptick in trading volatility associated with the majority of the entities identified from December 31, 2019 to May 26, 2020, reflecting the increased uncertainty in investor expectations caused by the Pandemic.

Attachment 1 at 15. Schmitt then concedes that "Mahogany Elite, which was in the pre-revenue,

development stage at the onset of the Pandemic, is obviously not directly comparable to a large,

publicly traded company in the travel sector." *Id.* at 15, ¶ 53. So, by Schmitt's own account, his

analysis of "large, publicly traded company[ies] in the travel sector," are not a basis upon which

to form an opinion about Mahogany Elite, a non-operational "pre-revenue, development stage

24

company" with no employees, no customers, no capital expenditures, not even a business plan. Despite the fact that he has undercut his own opinion in this way he then offers the following opinion: "However, the overall decline in travel activity in 2020 caused by the Pandemic that negatively affected the travel sector of U.S. equity markets would **undoubtedly** have also negatively affected Mahogany Elite's prospects for success and its ability to attract customers had it launched in 2020 as Ms. Mosby originally planned." *Id.*  Simply declaring something is "undoubtable" does not give it a foundation, let alone a reliable one.

Johnston reached a similar conclusion about Schmitt's attempt to connect large publicly traded companies like Disney and Carnival to Mahogany Elite:

> 45.    The Schmitt Disclosure attempts to equivocate Mahogany Elite's inability to commence operations in 2020 with the Pandemic's impact on the value of publicly traded entities in the travel industry.  However, by Mr. Schmitt's own admission, a sole proprietorship in the "pre-revenue, development stage" is not comparable to publicly traded entities with multibillion-dollar market capitalizations.  Mr. Schmitt's attempt to equivocate the Pandemic's impact on Mahogany Elite with that on the entities illustrated in Exhibit C of the Schmitt Disclosure is irrelevant and potentially misleading.

Attachment 3 at 17.

> 3. *Schmitt's Opinions About the Effects of the Pandemic on the Travel Industry and on Mahogany Elite Should Be Excluded Pursuant to Rule 403*

Assuming for the sake of argument that Schmitt's net worth analysis has any probative value, it is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay and wasting time, and should therefore be excluded. Fed. R. Evid. 403.   For the reasons outlined above, Schmitt's testimony is a vehicle for the Defendant's self-serving hearsay statements, made to him in preparation for this trial, and therefore it presents a substantial danger of unfair prejudice.  For these reasons, Schmitt's net worth analysis should be excluded pursuant to Rule 403.

## II. Schmitt Should be Precluded From Testifying About Conversations He Had With the Defendant Because They are Inadmissible Hearsay

In addition to the Defendant's conversations not being a reliable bases for his opinion, they

are also inadmissible hearsay that should be excluded.  As quoted above, in his disclosure, Schmitt

describes the following conversations he had with the Defendant herself:

> 42.    Ms. Mosby formed Mahogany Elite in May 2019.  **Based on my discussion with Ms. Mosby**, the original business plan for Mahogany Elite was to provide out-of-town retreats and conferences focused on self-care and networking for black women professionals. **I also understand from discussions with Ms. Mosby** that she attended a similar event called the Odyssey Network Business Retreat, an experience that inspired her to create Mahogany Elite.

> 43.    In 2019, in addition to registering Mahogany Elite with the state of Maryland, Ms. Mosby also obtained a domain name through GoDaddy.com and retained a third party to develop a logo and website for Mahogany Elite. **Based on my discussion with Ms. Mosby,** I understand that, as of the end of 2019, she intended to complete the design of a logo and website, launch Mahogany Elite and host at least one event in 2020.

> \* \* \*

> 52.    The travel industry was severely and negatively affected by the Pandemic in 2020, as discussed above and as evidenced by the substantial declines in volume, revenue and value associated with the airline, hotel and cruise industries. **Based on my discussions with Ms. Mosby,** she decided not to organize an inaugural event for Mahogany Elite in 2020 once the Pandemic's effect on the travel industry became apparent.

Attachment 3 at 12 and 15 (emphasis added).  Schmitt should be precluded from testifying about

these self-serving hearsay conversations at trial.

The admissibility of these statements turns on Federal Rule of Evidence 703.  That rule

provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them

26

to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703; *Daubert*, 509 U.S. at 595 ("Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."). There is nothing in the Schmitt disclosures that establishes that this is the case here. On that basis alone the Defendant's hearsay statements should be excluded.

To the contrary, as Johnston explains, Schmitt has departed from the relevant professional standards by declining to determine whether the statements made to him by the Defendant are accurate. In other words, experts in Schmitt's field would not reasonably rely on these statements under these circumstances. As quoted above, Johnston has determined that:

> 47.     In rendering his opinions, however, Mr. Schmitt has violated certain professional standards – notably, the standards of due professional care, professional competence, and sufficient relevant data.

> 48.     Mr. Schmitt represents that "Where statements made by party representatives have been relied upon, I have used the documents and information provided to us to confirm such statements." Such a statement is at least superficially consistent with the professional standard of sufficient relevant data that Mr. Schmitt must adhere to – that a CPA must "obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed." However, Mr. Schmitt fails to obtain such sufficient relevant data and comply with professional standards when he relies solely on "discussions with Ms. Mosby" as the basis of his opinions regarding Mahogany Elite's ability to generate revenue and profits. The Schmitt Disclosure refers to Mahogany Elite's business plan and notes that Ms. Mosby had retained a third party to develop a logo and website for Mahogany Elite; however, Mr. Schmitt does not cite to Mahogany Elite's business plan or any documentary evidence regarding retention of the third party, nor does he even indicate that he has asked for these documents from Ms. Mosby to corroborate her statements. Rather than relying on documentary evidence to support his opinions, Mr. Schmitt instead bases Mahogany Elite's pre-Pandemic business plan and prospects solely on discussions with Ms. Mosby and her state of mind and intentions with respect to Mahogany Elite.

Attachment 3 at 18.

As this Court has held:

In the first place, the language of Rule 703 quoted above, while permitting the introduction of facts and data relied upon by the expert if meeting the reasonable reliance test stated in the quoted language, does not compel the admission of any evidence desired by a litigant simply because that otherwise inadmissible evidence can be styled by one expert witness as something he relied upon in reaching his opinion.

*United States v. Mest*, 789 F.2d 1069, 1074 (4th Cir. 1986).  And that is precisely what is occurring here.  Defense counsel is attempting to use Schmitt as a proxy for the Defendant testifying.  But Rule 703 is not a backdoor to present statements of a criminal defendant to the jury without subjecting the defendant to cross-examination.

While the Fourth Circuit has not addressed a situation such as the one presented here, where a criminal Defendant is attempting to elicit self-serving hearsay through an expert witness, other courts have.  In *United States v. Rodriguez*, the defendant was convicted of assault on federal property.  651 Fed.Appx. 44, 46 (2d Cir. 2016).  At trial, the district court excluded testimony from an expert witness, Dr. Sasha Bardey, that in forming his expert opinion, he relied on the defendant's statements that, prior to the incident, (1) the victim was clenching his fists and (2) the defendant felt threatened.  *Id.*  The defendant argued that these statements were central to his claim at trial that he acted in self-defense.  *Id.*  The district court determined that the defendant's statements to Dr. Bardey, which were made in preparation for trial, were unreliable because the defendant was an interested witness with "a clear motive to lie." *Id.*  Further, the statements were unsworn and there was no opportunity for cross-examination because Rodriguez did not testify at trial.  *Id.* at 46-47.  On appeal, the Second Circuit found that it was not an abuse of discretion for

the district court to have excluded these statements.  *Id.*  The Second Circuit reasoned that:

> It is not clear what if anything the proffered hearsay statements about the events surrounding the assault on [the victim] would add to the jury's understanding of Dr. Bardey's expert opinion that [the defendant] suffered from Post–Traumatic Stress Disorder stemming from traumatic incidents in his childhood.   The district court recognized that the jury would rely on the hearsay testimony for its truth and the expert would be repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the [defendant] to circumvent the rules prohibiting hearsay.

*Id.* at 47 (internal quotations omitted).

The facts in this case raise the same issues and, as a result, Schmitt, like Dr. Bardey in *Rodriquez*, should be precluded from testifying about the Defendant's hearsay statements to him. The Defendant's decision not to even attempt to host an "inaugural event" in 2020, does not add to Schmitt's opinions about the effect of the COVID-19 on the "travel industry."  *See* Attachment 1 at 16 ("Based on my research and analysis, the travel industry in the United States was severely and negative affected by the Pandemic in 2020.").  Like the jury in *Rodriguez*, the jury here will "rely on the hearsay testimony for its truth and the expert [will] be repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the [defendant] to circumvent the rules prohibiting hearsay."  Schmitt even admits that he has  not "appl[ied] any expertise whatsoever," to the hearsay statements provided by the Defendant to him.  Specifically, as discussed above, he disclosed that, "I have not tested, nor have I been asked to audit or test the accuracy and integrity of, the documents and information provided to me."  Attachment 1 at 7-8, ¶ 27.  Further, Schmitt has declined to even *confirm* the self-serving hearsay statements provided to him by the Defendant with information provided to him by defense counsel.  *Id.*  And just like in *Rodriquez*, the Defendant's statements to Schmitt were made in preparation for trial and are unreliable because the defendant is "an interested witness with a clear motive to lie."  *Id.* at 46.

And just like in *Rodriquez*, the Defendant's statements to Schmitt are "unsworn" and there will be no opportunity for cross-examination if the defendant does not testify at trial, something she has every right to decline to do.

> The district court's decision in *Emigh v. Consolidated Rail Corporation* is also instructive:

> The reasonable reliance requirement of Rule 703 exists because the rule permits experts to rely upon and disclose hearsay. As such, Rule 703 is akin to an exception to the hearsay rule, and like all exceptions, full disclosure of the hearsay source underlying the testifying expert's opinion depends on its trustworthiness and reliability. *Id.* Rule 703 contemplates that experts often rely upon third party reports when making a decision and that this customary reliance is itself an extraneous indicia of trustworthiness sufficient to justify the dispensing of cross-examination. *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1245 (E.D.N.Y.1985). It is assumed that the expert, having met the expert qualification test of Rule 702, has the skill to properly evaluate the hearsay and assign it appropriate probative value. *Id.* at 1245.

710 F. Supp. 608, 611–12 (W.D. Pa. 1989).  But here, as Schmitt himself admits, he has not even attempted to "evaluate the hearsay and assign it appropriate probative value." *Id*.  Again, Schmitt expressly states that, "I have not tested, nor have I been asked to audit or test the accuracy and integrity of, the documents and information provided to me," and that he only attempted to "confirm" statements provided to him by "party representatives" with documents and information provided to him and not the Defendant herself.   As the court in *Emigh v. Consolidated Rail Corporation* reasoned further:

> However, we do not believe that the reasonable reliance requirement permits a court to relinquish its independent responsibilities to determine if the underlying source meets the most minimum standards of reliability and trustworthiness as a prerequisite to admissibility. *See* Fed. R. Evid. 104(a), 401, 403. J. Weinstein & M. Berger, supra, at 703–25–27. Although Rule 703 has greatly relaxed the law regarding the type of information on which an expert may base his opinion, it has not gone so far as to eliminate the requirement that an expert ground his opinion on reliable data rather than speculation. *Barrel of Fun, Inc. v. State Farm Fire & Cas. Co.,* 739 F.2d 1028, 1033 (5th Cir.1984).

> We realize that, as a general rule, questions relating to the basis of an expert's opinion affect the weight and credibility to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. Sometimes, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that source. S. Saltzburg & K. Redden, supra, at 672. Accordingly, when the underlying source is so unreliable as to render it more prejudicial than probative, making it inadmissible under Rule 403, Rule 703 cannot be used as a backdoor to get the evidence before the jury.

*Id.*   And that is precisely the case here.  The unsworn statements made in preparation for litigation by a criminal defendant with a "motive to lie," as the district court found in *Rodriguez*, are so unreliable that they are more prejudicial than probative and therefore must be excluded pursuant to Rule 703.  Schmitt's opinions are plainly a backdoor to try and get the Defendant's self-serving statements before the jury without subjecting her to cross-examination.

### III.    Forster's Testimony Should be Excluded

In their October 7, 2022, disclosure, defense counsel disclosed that Eric Forster, whom they identify as a "national real estate consultant," *see* Attachment 2 at 2, will offer the following opinions:

> 4.    Mr. Forster will testify that Ms. Mosby retained exclusive control over the Kissimmee property. The basis for Mr. Forster's opinion is his review of the "Executive Villas Property Management Agreement" (USA-014213-18), his experience in reviewing similar property management agreements as a mortgage industry expert, and the review of relevant documents in his files, which are attached as EXHIBIT C.

> 5.    Mr. Forster will testify that the "Second Home Rider" allowed Ms. Mosby to rent the property. The basis for Mr. Forster's opinion is his review of the "Second Home Rider" (USA-005283), his knowledge of second home riders acquired through his experience as a mortgage industry expert, how second home riders are used in the mortgage lending industry, and his review of the Second Home Rider in this case as compared to second home riders typically used in the mortgage lending industry. Exemplars of second home riders typically used in the mortgage lending industry, reviewed by Mr. Forster and serving, in part, as the basis for his opinion, are attached as EXHIBIT D.

6.    Mr. Forster will testify that gift letters of the type involved in this case are commonly requested by mortgage brokers and, moreover, that exemplar gift letters and/or gift letter language is commonly provided by mortgage brokers to prospective borrowers. Mr. Forster will also testify that the facts as described in the Superseding Indictment related to the gift letter, if true, would not have been capable of influencing the lender to reach a different conclusion on closing the loan. Mr. Forster will also testify that if the person making the gift had sufficient funds in his or her account at the time of the closing, the terms of this gift letter were met. The basis for Mr. Forster's opinion is his review of the gift letter [USA-013835], his expertise in both what a gift letter is and why it is requested, and the review of relevant documents in his files, which are attached as EXHIBIT E.

Attachment 3 at 1. The opinions contained in the supplemental disclosure for Forster should be excluded because they are irrelevant and unreliable.

A.   *Forster's Opinions are Not Reliable Because They Are Not Based on Any Principles or Methodologies Reliably Applied to the Facts in this Case; They are the Ipse Dixit of Forster*

In order to be admissible, Rule 702 requires the Defendant to establish by a preponderance of the evidence that Forster's opinions are "the product of reliable principles and methods," and that Forster "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "Reliability is to be determined by the 'principles and methodology' employed by the expert." *Montgomery v. CSX Transportation, Inc.,* 230 F. Supp. 3d 447, 451 (D. Md. 2017) *quoting Holesapple v. Barrett*, 5 Fed.Appx. 177, 179 (4th Cir. 2001). "Without testing, supporting literature in the pertinent field, peer reviewed publications[,] or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so,'" what is also referred to as the "ipse dixit," of the expert. *Sardis*, 10 F.4th at 292 (quoting *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019)). As Judge Hollander further noted in *Blair*,

"nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d

508 (1997). Indeed, "*ipse dixit*" is the "hallmark of an unreliable opinion." *Sardis*, 10 F.4th at 295, 296.

No. CR ELH-19-00410, 2021 WL 5040334, at *6 (D. Md. Oct. 29, 2021); *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 355–56 (D. Md. 2021) (same); *Montgomery v. CSX Transportation, Inc.,* 230 F. Supp. 3d 447, 451 (D. Md. 2017) (same); *Young v. Swiney*, 23 F. Supp. 3d 596, 612 (D. Md. 2014) (same); *Pugh v. Louisville Ladder, Inc.*, 361 Fed.Appx. 448, 454 n.4 (4th Cir. 2010); *accord Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993) ("[W]e are unprepared to agree that 'it is so if an expert says it is so.' ") (citation omitted). "Expert testimony rooted in subjective belief or unsupported speculation does not suffice." *Zuckerman v. Wal–Mart Stores E., L.P.*, 611 Fed.Appx. 138, 138 (4th Cir. 2015) (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786) (internal quotation marks omitted).  That is precisely what the Defendant has proffered—opinions rooted in Forster's subjective belief.

First, Forster's opinion that "Ms. Mosby retained exclusive control over the Kissimmee property," is the ipse dixit of Forster, or in other words, it is so because Forster says it is so.   The sole basis for Mr. Forster's opinion is his review of the: ]

> Executive Villas Property Management Agreement" (USA-014213-18), his experience in reviewing similar property management agreements as a mortgage industry expert, and the review of relevant documents in his files, which are attached as EXHIBIT C.

Attachment 3 at 1, ¶ 4.   Thus, Forster is relying on his *experience* as the only methodology he is applying.  "While a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque, the district court must nonetheless require an experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" *United*

*States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007); *United States v. Muleshe*, No. 5:15-MJ-01409-RN-1, 2016 WL 4742267, at *4 (E.D.N.C. Sept. 12, 2016); *SMD Software, Inc. v. Emove, Inc.*, 945 F. Supp. 2d 628, 644 (E.D.N.C. 2013).  The disclosure for Forster fails to "explain how his experience" in real estate leads to the conclusion that "Ms. Mosby retained exclusive control over the Kissimmee property," "why his experience" in real estate is a sufficient basis for his opinion and "how [his] experience [in real estate] is "reliably applied to the facts."  *Wilson*, 484 F.3d at 274.  Instead, defense counsel merely disclose the opinion they intend to elicit and cite Forster's experience and the documents he reviewed as its basis.  This is insufficient and therefore the opinion must be excluded.

Second, Forster's opinion that "Second Home Rider" allowed Ms. Mosby to rent the property," suffers from the same lack of a reliable basis.  Like the previous opinion, it is the ipse dixit of Forster.  The bases for this opinion, as described in the disclosure are the following:

> The basis for Mr. Forster's opinion is his review of the "Second Home Rider" (USA-005283), his knowledge of second home riders acquired through his experience as a mortgage industry expert, how second home riders are used in the mortgage lending industry, and his review of the Second Home Rider in this case as compared to second home riders typically used in the mortgage lending industry. Exemplars of second home riders typically used in the mortgage lending industry, reviewed by Mr. Forster and serving, in part, as the basis for his opinion, are attached as EXHIBIT D.

Attachment 3 at 1.  Forster is again relying on his *experience* as the only methodology he is applying but disclosure for Forster fails to "explain how his experience" in real estate leads to the conclusion that "Second Home Rider" allowed Ms. Mosby to rent the property," "why his experience" in real estate is a sufficient basis for his opinion and "how [his] experience [in real estate] is "reliably applied to the facts."  *Wilson*, 484 F.3d at 274.  Instead, defense counsel merely disclose the opinion they intend to elicit and cite Forster's experience and the documents he

reviewed as the only basis for the testimony.  This is insufficient and therefore the opinion must be excluded.

Third, Forster's opinion that "the facts as described in the Superseding Indictment related to the gift letter, if true, would not have been capable of influencing the lender to reach a different conclusion on closing the loan," is perhaps the  most glaring example of the ipse dixit of an expert. The basis for Mr. Forster's opinion is "his review of the gift letter [USA-013835], his **expertise** in both what a gift letter is and why it is requested, and the review of relevant documents in his files, which are attached as EXHIBIT E."  Attachment 3 at 1 (emphasis added).  While this is another opinion based on experience, the disclosure for Forster fails to "explain how his experience" in real estate leads to this conclusion, that "the facts as described in the Superseding Indictment related to the gift letter, if true, would not have been capable of influencing the lender to reach a different conclusion on closing the loan,"  "why his experience" in real estate is a sufficient basis for his opinion and "how [his] experience [in real estate] is "reliably applied to the facts." *Wilson*, 484 F.3d at 274.  Instead, defense counsel merely disclose the opinion they intend to elicit and cite Forster's experience and the documents he reviewed as the only basis for the testimony.  This is insufficient and therefore the opinion must be excluded.

Further, the disclosure is also inadequate.  It fails to articulate why Forster thinks that the "the facts as described in the Superseding Indictment related to the gift letter, if true, would not have been capable of influencing the lender to reach a different conclusion on closing the loan," and should be excluded on this basis as well.

Finally, Forster's opinion that "if the person making the gift had sufficient funds in his or her account at the time of the closing, the terms of this gift letter were met," suffers from the same

lack of a reliable basis as all his other opinions.  Again, the basis for Mr. Forster's opinion is "his review of the gift letter [USA-013835], his expertise in both what a gift letter is and why it is requested, and the review of relevant documents in his files, which are attached as EXHIBIT E." Attachment 3 at 1.  The disclosure for Forster fails to "explain how his experience" in real estate leads to this conclusion, "why his experience" in real estate is a sufficient basis for his opinion and "how [his] experience [in real estate] is "reliably applied to the facts."  *Wilson*, 484 F.3d at 274. Instead, defense counsel merely disclose the opinion they intend to elicit and cite Forster's experience and the documents he reviewed as the only basis for the testimony.  This is insufficient and therefore the opinion must be excluded.

   B. *Forster's Opinion that the Defendant Maintained "Exclusive Control" Over Her Kissimmee Property is Irrelevant Because the Jury Can Determine Whether the Agreement the Defendant Signed with a Vacation Home Management Company Violated the Second Home Rider*

   The opinion that "Mr. Forster will testify that Ms. Mosby retained exclusive control over the Kissimmee property should be excluded because it is irrelevant.  "In order to be considered relevant, the proposed expert testimony must appear to be helpful to the trier of fact. *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 584 (E.D.N.C. 2015), aff'd, 874 F.3d 370 (4th Cir. 2017) (*citing Daubert*, 509 U.S. at 591–92. "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir.1993).  Comparing the plain language of the Second Home Rider to the Defendant's agreement with Executive Villas is clearly "within the everyday knowledge and experience of a lay juror."

   Count Two of the Superseding Indictment charges the Defendant with submitting a false mortgage application in violation of 18 U.S.C. § 1014 because the Defendant signed a "Second

Home Rider" that stated, in relevant part:

> Borrower will occupy and use the Property as Borrower's second home.  Borrower **will maintain exclusive control** over the ownership of the Property, **including short-term rentals, and will not subject the Property to any…agreement that requires the Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property.**  Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Second Home Rider, unless Lender otherwise agrees in writing[.]

Superseding Indictment Count Two ¶ 18.  The Superseding Indictment alleges that this was a false statement because one week prior to signing this Second Home Rider the Defendant had entered into an agreement with a vacation home management company, Executive Villas.  That agreement provided, in relevant part, that ""The Manager will always be obligated to and have the right to offer the Vacation Home for rent during the time of this contract, UNLESS PRE-BOOKED ON THE COMPANIES [sic] COMPUTERISED BOOKING SYSTEM BY OWNER."  Superseding Indictment Count Two, ¶ 17.  Whether the agreement with Executive Villas violated the Second Home Rider is a question a lay jury can easily answer.  Lay jurors sign simple contracts every day and do so, and understand them, without hiring experts to explain them.  Thus, the jury's determination will not be aided by Forster's opinion.

Whether the Defendant "retained exclusive control over the Kissimmee property," is a factual question that Forster is not qualified to testify to because he lacks personal knowledge of the matter.  *See* Fed. R. Evid. 602.  Andy Booth, the owner of Executive Villas, the management company that the Defendant gave control of the Kissimmee property to, will testify that his company had control over the Kissimmee property.  He will testify that Executive Villas could and did rent the property to tenants without obtaining the Defendant's permission in advance.  He will testify that the Defendant had no authority to overrule Executive Villas' decision over whom

to rent the property out to because it was done via an automated internet portal.  And Booth will testify that the Defendant needed to book time in the Kissimmee property through Executive Villas and could not stay there unless she did.  Further, Booth will testify, that if a member of the public had already rented out the Kissimmee property, the Defendant could not stay there unless Executive Villas, voluntarily, was able to arrange for an alternative rental for the prospective tenant.

C.  *Forster's Opinion that the Second Home Rider Allowed the Defendant to Rent Her Kissimmee Property is Irrelevant Because that is Not a Fact At Issue*

Forster's testimony that the "Second Home Rider" allowed Ms. Mosby to rent the property," is also irrelevant because it is not a fact at issue in this case.  The first factor a proponent of expert testimony must satisfy under Rule 702 is that the "expert's … specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue."  Fed. R. Evid. 702.

"The governing hypothesis of any criminal prosecution, for the purpose of determining relevancy of evidence introduced, consists of elements of the offense charged and any relevant defenses raised to defeat criminal liability." *United States v. Walker*, 32 F.4th 377, 388 (4th Cir.), *cert. denied sub nom. Anthony Walker v. United States*, 143 S. Ct. 450 (2022); *United States v. Lamberty*, 778 F.2d 59, 60–61 (1st Cir. 1985) (*citing United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. Unit A Aug. 1981)).  The Superseding Indictment does not allege that the Defendant was prohibited from renting her Kissimmee home.  Therefore, Forster's opinion that she could rent it will not "help the trier of fact to understand the evidence or determine a fact in issue," because it does not relate to an element of the offense or a defense.  Further, whether she could rent it, and did rent it, is a factual question of which Forster lacks personal knowledge.  Therefore, pursuant

to Rule 602, his opinion on the matter should be excluded.  Andy Booth will testify that the Defendant had the ability to rent the property to family or friends or other guests and did so on occasion.

### D.  Forster's Opinions Should Be Excluded Pursuant to Rule 403

Assuming for the sake of argument that Forster's opinions have any probative value, it is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay and wasting time, and should therefore be excluded.  Fed. R. Evid. 403. For the reasons articulated above, all of Forster's ipse dixit opinions "have the potential to be both powerful and quite misleading," because they are irrelevant and unreliable.  *Cooper*, 259 F.3d at 199.  Forster's opinion that "the 'Second Home Rider' allowed Ms. Mosby to rent the property," also risks confusing the jury since that is not a fact at issue in this case.  For these reasons Forster's opinions should be excluded pursuant to Rule 403.

## <u>CONCLUSION</u>

For the foregoing reasons, the testimony of Jerome Schmitt and Eric Forster should be excluded.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

By: _____/s/_____
Leo J. Wise
Sean R. Delaney
Aaron S.J. Zelinsky
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

_____/s/_____
Leo J. Wise
Assistant United States Attorney