IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**MARILYN J. MOSBY,**<br><br>**Defendant** | **Criminal No. LKG-22-7** |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR A HEARING AND SANCTIONS AS A RESULT OF THE GOVERNMENT'S FAILURE TO DISCLOSE BRADY MATERIALS**

The United States of America, by its undersigned counsel, submits this opposition to the Defendant's Motion for a Hearing and Sanctions as a Result of the Government's Failure to Disclose Brady Materials (hereafter "*Brady* motion"). ECF 160-1. The Defendant claims that the Government has violated *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny because it produced a summary of an interview, on FBI Form 302, of an interview with David Randall, Executive Director, of the Baltimore City Employees' and Elected Officials Retirement Systems, which is attached as Exhibit 1 (hereafter referred to as the Randall 302), on September 2, 2022, and not sooner than that date. The argument is meritless and the Defendant's motion for "a hearing to evaluate appropriate sanctions on the Government" should be denied.

I. THE LAW

The Fourth Circuit has held that "a *Brady* violation has three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, i.e., it must have prejudiced the defense at trial." *Monroe v. Angelone*, 323 F.3d 286, 299–300 (4th Cir. 2003)

(*citing Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  The Defendant cannot make out any of these elements.

**II.      ARGUMENT**

**A. The Randall 302 is Inculpatory Not Exculpatory Because It Establishes that the Defendant's Self-Certifications Were Highly Material**

First, the Randall 302 is not favorable to the Defendant.  In fact it is inculpatory rather than exculpatory.  The Defendant claims that the Randall 302 is exculpatory because the Defendant filed a motion to dismiss Counts One and Three arguing that the self-certifications she made that she suffered adverse financial consequences stemming from COVID-19 were immaterial because they were not "capable of influencing the Employees and Elected Officials Retirement System and Nationwide." Mot. at 4-5.  The Defendant in her *Brady* motion writes that, "In the interview, the interviewee [Mr. Randall] makes clear that the statements made by Ms. Mosby were not capable of influencing his/her office." *Id.* at 5.  That is not true.  Mr. Randall told the FBI that the Defendant's self-certifications were highly material.  Here is what Mr. Randall told the FBI, in its entirety, on this subject:

> Randall said the only way for a participant to withdrawal money from a 457b plan was either after separation/retirement or due to an unforeseen emergency. He said a participant may never take a loan from their 457b plan. He said but there is a caveat: the CARES Act allowed all retirement plan participants the ability to take a withdrawal due to Covid 19 hardship. Randall said that he reports to the Board of Trustees, and together they decided that they would not allow the 401a participants to take withdrawals, but they would allow the 457b participants to take withdrawals. He said the withdrawals due to Covid 19 hardship were only allowed from January 1, 2020 through December 31, 2020.
>
> Randall said he did not like the "self certification" of the withdrawals due to the Covid 19 hardship. He explained that the intent of the law (CARES Act) was to allow participants to withdraw money only if they were negatively affected financially because of the pandemic. He said that participants who wanted to take withdrawals from their 457b plans due to the Covid 19 hardship only had to self certify, or fill out the form and submit it. He said his staff could not question the certifications, they only could process it.

> Randall said that for participants to withdraw funds from their 457b under the unforeseen emergency reason (not Covid 19), they have to provide documented proof of the emergency that is certified and then it goes before his office's General Counsel, who then decides if the participant qualifies.

Exhibit 1 at 1.  According to Mr. Randall, the self-certification not only was *capable* of influencing his agency's decision whether or not to release the 457(b) participant's funds, it *did* influence them and caused them to approve the withdrawal.  As he explained, his office did not question the self-certifications; they relied on them, and their veracity.  By contrast, for non-COVID 19 related "unforeseen emergencies," the Baltimore City Retirement System required "documented proof of the emergency," and evaluated those documents to determine if a participant qualifies for a withdrawal.  Randall's testimony completely undermines the Defendant's argument.  If the Baltimore City Retirement System required documentation that someone suffered adverse financial consequences from COVID-19, then the self-certifications might be immaterial.  But because they don't, the self-certifications are more material not less.

The Government made this same argument in its opposition to the Defendant's Motion to Dismiss.  *See* ECF 72, filed June 30, 2022.  In that filing the Government stated the following:

> At trial, the United States will present evidence that the certifications the Defendant made were highly material.  Specifically, the evidence will show that the City of Baltimore Deferred Compensation Plan relied on the Defendant's representation that she had suffered adverse financial consequences stemming from COVID-19 in approving the Defendant's withdrawals.  Had she not made these false representations, the withdrawals would not have been approved.
>
> The Defendant concedes, as she must, that the CARES Act provides that a plan administrator "may rely on an individual's certification" that they are qualified.  Mot. to Dismiss at 8.  That means that the Defendant's false representation "ha[ve] a natural tendency to influence, or [are] capable of influencing, the decision-making body to which it was addressed," the very definition of materiality. *Littleton*, 76 F.3d at 618.
>
> The fact that the CARES Act authorizes a retirement plan to rely on a self-certification does not mean that the retirement plan is not making a decision based

3

> on those self-certifications. Just the opposite. The Defendant's argument would only work if the CARES Act directed that a plan may *not* rely on self-certifications. Then, arguably, the Defendant's misrepresentations about having suffered from adverse financial consequences stemming from COVID-19 would be immaterial.
>
> The Defendant argues that when she submitted the 457(b) distribution form to Nationwide "she was not submitting it for Nationwide to decide whether she was qualified based on the veracity of the statements that corresponded to the box she checked, that is, the specific reasons she self-certified qualified her for a distribution." Mot. to Dismiss at 8-9. That is true. The City of Baltimore Deferred Compensation Plan instead relied on the fact that she certified, under penalties of perjury, that her representations were true. Again, that means the representations were highly material, not immaterial. The fact that the Plan didn't have to independently verify the Defendant's representations doesn't mean they didn't rely on them.
>
> The Defendant points to the fact that there are differences between how Coronavirus Related Distributions (CRD) and "hardship" or "emergency" withdrawals from 457(b) plans are administered and how the funds can be used. Mot. to Dismiss at 10. The principal difference is that self-certification authorization contained in the CARES Act for CRDs relieves the retirement plan of any obligation to confirm the veracity of a plan participant's assertions that they suffered from adverse financial consequences stemming from COVID-19. However, that does not mean that the retirement plan can approve a withdrawal without the plan participant certifying that they have suffered from one or more of the four specifically articulated adverse financial consequences stemming from COVID-19. And it does not mean that a plan participant can lie to the plan to obtain the distribution.
>
> Instead of creating the "adverse financial consequences" stemming from COVID-19 distribution, Congress could have written the CARES Act to allow retirement plans to approve distributions during the pandemic whenever a plan participant asked for one. But it didn't. Instead it tied the distribution to specific factual triggers, articulated in Section 2202(a)(4)(A) of the CARES Act. The Defendant's argument is essentially that Congress cared enough to write into the law the specific "adverse financial consequences" that allow a plan participant to make a withdrawal but at the same time the Congress didn't care if the Defendant actually suffered from them. Such an argument is nonsensical.

ECF 72 at 9-10. In response to this argument, the Defendant never claimed that the evidence the Government referred to in the first paragraph quoted above was *Brady* material. Because it was not.

### B. The Randall 302 Was Not Suppressed It Was Produced to the Defendant Which Is How She is Even Able to Make This Argument

Second, even though the Randall 302 is inculpatory and not exculpatory, and therefore, not *Brady* material, the Randall 302 was obviously not suppressed. It was provided to the Defendant on September 2, 2022, which is how they know its contents. Thus, the Defendant cannot make out the second element of a *Brady* violation that the information was suppressed. *Brady*, 373 U.S. at 87 (". . . **suppression** by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective off the good faith or bad faith of the prosecution.") (emphasis added); *Monroe*, 323 F.3d at 299–300.

It is worth noting that when the Randall 302 was produced to the Defendant on September 2, 2022, even though trial was scheduled to begin on September 19, 2022, the Defendant didn't claim it was *Brady* material. The logical inference to draw from that fact is that the Defendant didn't consider it *Brady* material. And the Defendant never indicated to the Government or to the Court that it considered the Randall 302 *Brady* material in the four months from September 2, 2022, when the Defendant received it, until January 9, 2023, when the instant motion was filed. If defense counsel really thought this was *Brady* material, they would not have waited four months to make that claim.

### C. The Randall 302 Was Produced to the Defendant Seven (7) Months Before Trial; Therefore She Has Not Suffered Any Prejudice

Third, in any event, there is no prejudice to the Defendant. Defense counsel received the Randall 302 seven (7) months before the start of trial. Therefore, she cannot establish the third element of a *Brady* violation, namely, that "the suppression must have been material, i.e., it must

have prejudiced the defense at trial." *Monroe*, 323 F.3d at 299–300.  It goes without saying that there has been no trial (and no suppression).

### III. CONCLUSION

For all these reasons, the Defendant's motion should be denied.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

By: _____/s/_____
Leo J. Wise
Sean R. Delaney
Aaron S.J. Zelinsky
Assistant United States Attorneys

### **CERTIFICATE OF SERVICE**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

_____/s/_____
Leo J. Wise
Assistant United States Attorney
