## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARILYN J. MOSBY,**<br><br>**Defendant** | **Criminal No. LKG-22-7** |

### UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF STEVEN BUTLER AND JOSHUA JOHNSTON

The United States of America, by its undersigned counsel, submits this opposition to the Defendant's Motion to Exclude Expert Testimony of Steven Butler and Joshua Johnston.  ECF 156.  The motion is meritless and should be denied.

## Table of Contents

**I.   THE EXPERT TESTIMONY OF STEVEN BUTLER IS ADMISSBLE** ............ 2

    **A.   All of Mr. Butler's Expert Opinions Are Relevant to the Allegations in the Superseding Indictment** ................................................................................ 3

    **B.   Mr. Butler Has Not Reached Any Inadmissible Legal Conclusions** ............ 11

**II.   THE EXPERT TESTIMONY OF JOSHUA JOHNSTON IS ADMISSBLE** . 15

    **A.   Johnston's Opinion that the Defendant Did Not Suffer Adverse Financial Consequences Stemming from COVID 19 is Admissible to Rebut the Defense Expert's Opinion that She Did** ............................................................................ 16

    **B.   Johnston's Opinions Regarding The Defendant's Non-Operational Travel Business, Mahogany Elite, are Admissible to Rebut The Defendant's Expert's Opinions Concerning Mahogany Elite** ................................................................ 17

    **C.   Johnston's Opinions that Schmitt has Violated the AICPA Code of Professional Ethics is Highly Probative to the Court's Determination of Whether Schmitt's Opinions are Reliable and Will Aid the Jury in Evaluating Them if Schmitt is Not Excluded** ...................................................................................... 20

# I.     THE EXPERT TESTIMONY OF STEVEN BUTLER IS ADMISSBLE

Steven Butler is a highly qualified expert in mortgage lending, having served as the president of three banks.  As he describes in his disclosure, which is Exhibit 1 to this filing:

1.      I began my banking career in 1971 and my consulting career in 1986. My consulting practice includes forensic accounting matters, litigation consulting and expert testimony, consulting to financial institutions, and consulting to businesses on banking matters.

2.      As a banker and consultant, I have experience in lending matters including commercial loans, "OREO," asset-based loans, consumer loans, mortgage lending, subprime and predatory lending, and letters of credit. I have extensive experience with the origination, underwriting, closing, monitoring, servicing, and collection of mortgage loans.

3.      My experience includes serving as loan officer, senior loan officer, regional loan manager and president at financial institutions and as a Director of Dispute Consulting Services for a "Big Four" accounting firm, the Director of Financial Institutions Consulting for a national accounting firm, as well as serving as the president and/or director of three different banks during my banking career. I have also served as a bank's interim CEO, Compliance Officer, and Director during my consulting career.

4.      I have an undergraduate degree in industrial management/business and economics from Wilmington College and attended the Certificate in Financial Management Program at the University of Denver's Graduate School of Business, and I am a Certified Fraud Examiner. I have also supplemented my formal education with continuing professional education courses every year since the beginning of my career in 1971.

5.      I have testified in State and District Courts, Bankruptcy Courts, arbitrations, mediations, and public hearings. I have been qualified by and testified as an expert in courts in California, Colorado, Florida, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Pennsylvania, Rhode Island, Tennessee, and Virginia. My curriculum vitae and a listing of prior testimony for the past four years is attached as an Exhibit to this Declaration.

Expert Disclosure of Steven Butler (Exhibit 1) at ¶¶ 1-5.

**A. All of Mr. Butler's Expert Opinions Are Relevant to the Allegations in the Superseding Indictment**

The Defendant claims, under the sub-heading "The General Workings Of Mortgage Companies is [sic] Irrelevant" that "Mr. Butler spends much of his disclosure describing how mortgage applications are processed by mortgagors." Mot. at 3. That is not true. Mr. Butler's testimony about the mortgage banking industry is directly tied to allegations in the Superseding Indictment, as discussed in detail below.

The Defendant claims Butler's expert testimony is "irrelevant" because "how a mortgage company uses the information provided by mortgage applications has no tendency to make any fact of consequence more or less probable than it would be without the putative evidence." *Id.* This argument ignores the elements of 18 U.S.C. § 1014.

The third element of a 1014 violation is as follows:

> The third element the government must establish is that the defendant made or caused such false statement to be made for the purpose of influencing in any way the mortgage lending business' action.

> The quoted words almost define themselves. The emphasis of the statute is upon the person making the false statement. Thus, to act for the purpose of influencing the mortgage lending business means that the person making the false statement intended that **the mortgage lending business take action based on that statement.**

> The government is not required to prove that the mortgage lending business actually relied upon the alleged false statement.

Sand, Siffert, Modern Fed. Jury Instructions, Instruction No. 37:20 (emphasis added). The anticipated testimony of Mr. Butler, a former bank president and expert in mortgage lending, will aid the jury in understanding how a mortgage lending institution could "take[] action," based on the information provided by the Defendant in her mortgage application. Specifically, Butler will

help the jury understand how each of the Defendant's false statements could "influenc[e] in any way the mortgage lending business' action."

First, the Defendant made false statements concerning her liabilities in the loan applications for the Kissimmee vacation home (Count Two) and the Long Boat Key vacation home (Count Four) "for the purpose of influencing in any way the mortgage lending business' action."  Count Two of the Superseding Indictment alleges the following:

### The Kissimmee Vacation Home

14.     On or about July 28, 2020, and again on or about September 2, 2020, at closing, **MOSBY** signed an application for a $490,500 mortgage from Cardinal Financial Company, LLP to purchase a home in Kissimmee, Florida.

15.     The application required **MOSBY** to disclose her liabilities.  **MOSBY** did not disclose that she owed significant amounts of federal taxes.

16.     Further, in response to the question, "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee," **MOSBY** indicated "no" despite the fact that she was delinquent in the payment of federal taxes resulting in the IRS filing a $45,022 lien against her on March 3, 2020.

Superseding Indictment (ECF 23) at Count Two ¶¶ 14-16.   Similarly, Count Four of the Superseding Indictment alleges the following:

### Long Boat Key Vacation Home

* * *

24.     On or about January 14, 2021, and again on or about February 19, 2021, at closing, **MOSBY** signed an application for a $428,400 mortgage from United Wholesale Mortgage to purchase a condominium in Long Boat Key, Florida.

25.     The application required **MOSBY** to disclose her liabilities.  **MOSBY** did not disclose that she owed significant amounts of federal taxes.

26.     In response to the question, "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee," **MOSBY** indicated "no" despite the fact that she was delinquent in the

payment of federal taxes resulting in the IRS filing a $45,022 tax lien against her on March 3, 2020.

* * *

28.     Included in the closing documents was a document titled, "ATTENTION SETTLEMENT AGENT," which provided that "The borrower(s) must attest to the following statements as a part of closing their loan.  If any of the information below is not true and the borrower cannot attest to ANY part of it, DO NOT PROCEED WITH THE CLOSING AND CONTACT THE LENDER for further guidance." Below this statement **MOSBY** identified her "Current Financial Obligations," as the mortgage on the Kissimmee, Florida, home she had purchased earlier in 2020, three installment loans, the car loan for her BMW, and a revolving credit card liability.  **MOSBY** did not disclose her federal tax debt or the fact that the IRS had filed a $45,022 lien against her on March 3, 2020.  Below these entries and above her signature was the following attestation: "the above debts/liabilities are all to which I am currently obligated, per my credit report dated JANUARY 9, 2021, and/or any other debts that were presented on my loan application.  There are no additional installment debts, home equity lines or mortgages."

Superseding Indictment (ECF 23) at Count Four ¶¶ 14-16.

Directly relevant to these allegations, Butler will offer the following expert testimony about how a mortgage lending institution could "take[] action," based on the liabilities an applicant discloses:

6.     The approval of a residential mortgage loan follows a process that evaluates the borrower(s) based on their Character, Capacity, Collateral, Capital and Conditions. Known as the "Five Cs of Credit," these characteristics allow the mortgage loan originator "Lender" to determine the borrower's ability and willingness to repay the mortgage loan, the value of the underlying collateral, the borrower's capital position and the conditions surrounding the loan request as well as the borrower's employment.

7.     In particular, the borrower's Capacity is determined by comparing the borrower's gross monthly income to the monthly debt obligations the borrower has. This calculation is known as the borrower's "DTI" or Debt to Income ratio. Critically, an overstatement of income, or an understatement of debt, will result in a false DTI calculation which would lead to an improper loan approval.

* * *

12.     Beginning in 2014, and through the filing of a tax lien on March 3, 2020, Marilyn Mosby and her husband owed back taxes to the IRS, which by March 23, 2020, amounted to over $69,000.

13.     On July 28, 2020, Ms. Mosby signed a loan application requesting $499,500 for the purchase of a home in Kissimmee Florida. The application indicated that this home would be her primary residence. The application further indicated that she paid only $1.00 in monthly rent, had no other mortgage debt, but had other debts totaling $58,124.00. She did not list the debt owed to the IRS on her application. Moreover, she indicated that she did not have any judgments or delinquent Federal debt. Based on my experience, if a mortgage lender is aware of an unpaid tax liability, the lender would either require that it be paid off or that the borrower provide evidence from the taxing authority that she has entered into a payment plan for the amount owed. That payment amount would then be factored into the borrower's DTI ratio. Moreover, the existence of a potential tax lien due to unpaid taxes presents an additional risk to a lender such that the loan may not be approved at all.

14.     There was a second application in the loan file signed by Ms. Mosby on 9/2/2020 which corrected the loan purpose to "Secondary Residence" but which again did not list the debt owed to the IRS nor did it indicate any judgments or delinquent Federal debt.

15.     By signing these applications, Ms. Mosby was attesting to the lender that the information she provided was true and correct.

16.     Not only was Ms. Mosby's application information false, incomplete, and misleading, as discussed above, the DTI ratio calculated by the lender for this loan would have been false, thereby calling into question the approval of the loan.

* * *

24.     Approximately seven months after closing on the mortgage for the Kissimmee property, Ms. Mosby applied for and was approved for another residential mortgage loan for a condominium in Longboat Key Florida.

* * *

26.     Most importantly, and once again, Ms. Mosby did not list the debt to the IRS on her application, therefore the repayment of that debt was not considered by the lender in approving the loan. This application, as with the Kissimmee property loan application, required that Ms. Mosby provide true and complete information on her loan application, yet she did not. She also certified that she had no judgements against her and that she had no Federal debt. This was also false. Not only was Ms. Mosby's application information false, incomplete, and misleading, the DTI ratio calculated by the lender for this loan would have been false, thereby calling into question the approval of the loan.

Expert Disclosure of Steven Butler (Exhibit 1) at ¶¶ 6-7, 12-16, 24 & 26.

Second, the Defendant made false statements in the Kissimmee vacation home mortgage application concerning whether it was a second home or an investment property rented out for income "for the purpose of influencing in any way the mortgage lending business' action."  Count Two of the Superseding Indictment alleges the following:

17.     One week prior to closing on the Kissimmee vacation home, on or about August 25, 2020, **MOSBY** executed an agreement with a vacation home management company giving the management company control over the rental of the property she ultimately purchased in Kissimmee.  The agreement stated, in relevant part, "The Manager will always be obligated to and have the right to offer the Vacation Home for rent during the time of this contract, UNLESS PRE-BOOKED ON THE COMPANIES [sic] COMPUTERISED BOOKING SYSTEM BY OWNER."

18.     As part of the mortgage application for the Kissimmee property, on or about September 2, 2020, **MOSBY** executed a document titled SECOND HOME RIDER, which stated that it was to be "incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned…to secure the Borrower's Note to Cardinal Financial Company…of the same date and covering the Property described in the Security Instrument…"  The Second Home Rider provided that:

> Borrower will occupy and use the Property as Borrower's second home.   Borrower **will maintain exclusive control** over the ownership of the Property, **including short-term rentals, and will not subject the Property to any…agreement that requires the Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property**.  Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Second Home Rider, unless Lender otherwise agrees in writing…

(emphasis added).  **MOSBY** signed and dated the Second Home Rider below a line that stated, "BY SIGNING BELOW, Borrower accepted and agrees to the terms and covenants contained in this Second Home Rider," which was false since **MOSBY** had entered into the agreement with a vacation home management company described above one week prior.

19.    By falsely executing the Second Home Rider, **MOSBY** could obtain a lower interest rate on the mortgage for the property than the one she would have received if she had not executed the Second Home Rider and she was able to make a smaller down payment.

Superseding Indictment (ECF 23) at Count Two ¶¶ 17-19.

Directly relevant to these allegations, Butler will offer the following expert testimony about how a mortgage lending institution could "take[] action," based on whether a mortgage applicant claims a property will be a second home or an investment property that is rented out for income:

8.    In addition, the Conditions under which a loan is being approved will determine the inherent risk of the loan. For example, a first mortgage loan to an owner occupying borrower is the least risky of mortgage loans a lender can make. A loan for a second home to an owner occupying borrower rises to the next level of risk. And a loan for an investment property, one that is rented out for income, is the most risky mortgage loan type.

9.    The risk associated with a mortgage loan establishes factors such as the amount of money that can be borrowed (the Loan-To-Value Ratio"), and the interest rate and fees that the borrower will be charged for the loan, in other words, the cost of the loan to the borrower. In my experience, a loan for an investment property will require a larger down payment (typically 20% or 25% of the cost of the property) resulting in a lower loan-to-value ratio (typically 75% or 80%) due to the inherent risk as opposed to a less risky loan for a second home.

\* \* \*

17.    In conjunction with the closing of this loan, Ms. Mosby also signed a "Second Home Rider" which included the following language:

"6. **Occupancy**. Borrower will occupy and use the Property as Borrower's second home. Borrower will maintain exclusive control over the occupancy of the Property... and will not subject the Property... to any rental pool or agreement that requires the Borrower either to rent the Property or give a management firm ... any control over the occupancy or use of the Property.

18.    The Second Home Rider also required that:

"Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Second Home Rider...

8

The Second Home Rider was signed on 9/2/2020

19.   This Rider also required Ms. Mosby to affirm that she did not

"... give materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan."

20.   Ms. Mosby also entered into a Management and Rental of Vacation Homes Agreement with Executive Villas Florida. This management agreement was signed on 8/25/2020; before Ms. Mosby signed the Second Home Rider. Yet the purpose of entering into a management agreement was "... to procure short-term rentals for the above listed Vacation Home and for the benefit of the owner."

21.   According to its records, Ms. Mosby allowed the rental of the Kissimmee property numerous times during 2020 and 2021.

22.   Ms. Mosby was in violation of the Second Home Rider even before she signed it, and based on my industry experience, Ms. Mosby was clearly giving control of the property to Executive Villas Florida.

23.   This is also an indication that the purchase of this property was primarily for investment purposes, not solely a second residence which is another misrepresentation by Ms. Mosby, which if known by the lender, would nullify the loan pricing and possibly the available loan amount offered by the lender. Moreover, had the lender been made aware of Ms. Mosby's misrepresentations, based on standard banking industry practice, the lender would have nullified the loan approval as the veracity of all information provided by Ms. Mosby would have been called into question.

Expert Disclosure of Steven Butler (Exhibit 1) at ¶¶ 8-9 & 17-23.

Third, the Defendant made false statements in the Long Boat Key vacation home mortgage application concerning whether she had received a gift of $5,000 from her husband "for the purpose of influencing in any way the mortgage lending business' action."  Count Four of the Superseding Indictment alleges the following:

30.   In order to close on the Long Boat Key vacation home, MOSBY needed $35,699.15 in liquid assets. As of January 25, 2021, she had only $31,043.24 in liquid assets available in her checking account, leaving her approximately $4,656 short to close. Rather than wait for her next paycheck to be deposited into her checking account, MOSBY submitted a false gift letter to Universal Wholesale Mortgage on February 10, 2021. In it, she falsely claimed that her husband had

made her a gift of $5,000 "to be transferred AT CLOSING" to be applied toward the purchase of the Long Boat Key vacation home.  The letter further stated that the source of the funds was her husband's Municipal Employee Credit Union (MECU) account ending in 0882.  On February 17, 2021, two days before closing, MOSBY's husband wired $5,000 to the escrow agent.  However, the $5,000 was not, in fact, a gift MOSBY's husband's made to her, as the Gift Letter represented.  Rather, MOSBY had wired the $5,000 to her husband's MECU account ending in 0882 on February 12, 2021.  As of that date, her husband had less than $5,000 in his checking account.  Her husband then transferred the money from that account to his MECU savings account ending in 4022 and then transferred it back to his MECU checking account ending in 0882 before wiring it to the escrow agent.  MOSBY submitted the false gift letter on February 10, 2021, in order to lock in a lower interest rate than she would have received if she waited until her next paycheck was deposited into her checking account.

Superseding Indictment (ECF 23) at Count Four ¶ 30.

Directly relevant to these allegations, Butler will offer the following expert testimony about

how a mortgage lending institution could "take[] action," based on a gift letter:

> 10.     Finally, a borrower's Capital is also an important factor for the lender to determine, as the borrower must have and demonstrate to the lender sufficient funds to close on the mortgage loan including the down payment and closing costs, and also have sufficient cash reserves to allow for making the principal, interest, tax and insurance payments on the loan for at least an initial period of time as established by the lender's underwriting guidelines and loan program guides.

> 11.     If a borrower lacks sufficient Capital to close the loan, the lender may allow a gift of money to the borrower which would be demonstrated by a "Gift Letter."

* * *

> 27.     This loan file [for the Long Boat Key vacation home] also included a Gift Letter which evidenced a gift of $5,000 to Ms. Mosby to enable her to close on the loan. The $5,000 was not in fact a gift that did not require repayment but was merely a transfer of funds back and forth between Ms. Mosby and her husband, Nicholas Mosby. Ms. Mosby was essentially gifting her own money to herself, thereby misrepresenting the source of the funds. This too was a violation of the loan approval by the lender that facilitated the purchase of this second property in Florida.

Expert Disclosure of Steven Butler (Exhibit 1) at ¶ 27.

The Defendant concedes that "the Court has already ruled that general testimony about the mortgage lending business is inadmissible." Mot. at 4. And that is why the Court excluded much of the testimony of the defense expert Eric Forster, because it was "general testimony about the mortgage lending business." By contrast, for the reasons articulated above, the testimony of Steven Butler is narrowly tailored to the allegations contained in the Superseding Indictment.

## B. Mr. Butler Has Not Reached Any Inadmissible Legal Conclusions

The Defendant asserts that Mr. Butler's conclusion that the Defendant's "application information was 'false, incomplete and misleading' is just saying Ms. Mosby is guilty in other words …" Mot. at 5. Even if that characterization of Butler's opinion were true, which it is not, then that would *not* be a ground to exclude it. Federal Rule of Evidence 704 provide that, "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a).

The other opinions that the Defendant objects to as "impermissible legal conclusions," are all offered in rebuttal to opinions offered by the Defendant's own expert Eric Forster. The Government has moved to exclude Forster's opinions because they are irrelevant and unreliable. *See* United States' Omnibus Motion to Exclude the Defendant's Experts at 31-39 (ECF 163). If the Court grants the Government's motion, the Government will not need to elicit rebuttal testimony from Butler that contradicts Forster's opinions. But if Forster's testimony is admitted, the Government will need Butler to rebut Forster's claims.

As described in detail below, if Butler's opinions are impermissible legal conclusions, then Forster's are as well and should be excluded for that reason. This contradiction, arguing that Butler's opinions are inadmissible legal conclusions while attempting to offer the same opinions through their own expert, suggests that the Defendant is abandoning Forster as an expert and no

longer intends to call him.  If that is the case, defense counsel should make that clear in their reply.
If that is not the case, defense counsel should address this glaring contradiction.

First, the Defendant claims that Mr. Butler's opinions that, "Ms. Mosby was in violation
of the Second Home Rider even before she signed it and based [his] industry experience, Ms.
Mosby was clearly giving control of the property to Executive Villas Florida," and "[b]ased on
[his] industry experience, the management company in fact had control over occupancy of the
property," are impermissible legal conclusions.  Mot. at 5.  Yet, the Defendant intends to elicit the
opposite opinion from her own expert, Eric Forster.  Specifically, the Defendant has disclosed the
following:

> 4.      Mr. Forster will testify that Ms. Mosby retained exclusive control over the
> Kissimmee property.  The basis for Mr. Forster's opinion is his review of the
> "Executive Villas Property Management Agreement" (USA-014213-18), his
> experience in reviewing similar property management agreements as a mortgage
> industry expert, and the review of relevant documents in his files, which are
> attached as EXHIBIT C.

Supplemental Expert Disclosure of Eric Forster (Exhibit 2) at ¶ 4.  If Butler is not permitted to
offer an opinion about the agreement between the Defendant and Executive Villas, then the same
rule would apply to exclude the testimony on this topic by Forster, Defendant's purported expert.

If the Court excludes Forster's opinion that, "Ms. Mosby retained exclusive control over
the Kissimmee property," based on Forster's review of the agreement between the Defendant and
Executive Villas, then the Government will not need to call Butler in rebuttal to contradict that
opinion.  However, if the Defendant is allowed to call Forster to offer his opinion that "Ms. Mosby
retained exclusive control over the Kissimmee property," then the following opinion offered by
the Butler, the Government's expert, to the contrary is clearly admissible:

> 30.      In the defense Supplemental Disclosure, it states that Mr. Forster "... will
> testify that Ms. Mosby retained exclusive control over the Kissimmee property."
> This opinion is contradicted by the management agreement Ms. Mosby entered into

> with Executive Villas Florida. The management agreement clearly states that 'The Manager will always be obligated [emphasis added] to and have the right to offer the Vacation Home for rent during the term of this contract." And while Ms. Mosby would have the right to book the property, she would have to book it through the management company booking system. Based on my industry experience, the management company in fact had control over the occupancy of the property.

Expert Disclosure of Steven Butler (Exhibit 1) at ¶ 30.   If Forster can opine on control, then the

Government should be able to put on a rebuttal witness to do the same.

Similarly, the Defendant's intention to offer the following opinion from Forster is also

impermissible based on the argument she has made to exclude Butler's opinions:

> Mr. Forster will testify that the "Second Home Rider" allowed Ms. Mosby to rent the property. The basis for Mr. Forster's opinion is his review of the "Second Home Rider" (USA-005283), his knowledge of second home riders acquired through his experience as a mortgage industry expert, how second home riders are used in the mortgage lending industry, and his review of the Second Home Rider in this case as compared to second home riders typically used in the mortgage lending industry. Exemplars of second home riders typically used in the mortgage lending industry, reviewed by Mr. Forster and serving, in part, as the basis for his opinion, are attached as EXHIBIT D.

Supplemental Expert Disclosure of Eric Forster (Exhibit 2) at ¶ 5.  If the Court excludes Forster's

opinion that  the "Second Home Rider" allowed Ms. Mosby to rent the property," based on

Forster's review of the agreement between the Defendant and Executive Villas, then the

Government will not need to call Butler in rebuttal to contradict that opinion.  However, if the

Defendant is allowed to call Forster to offer his opinion that "Second Home Rider" allowed Ms.

Mosby to rent the property," then the following opinion offered by the Butler, the Government's

expert, to the contrary is clearly admissible:

> 30.     In the defense Supplemental Disclosure, it states that Mr. Forster "... will testify that Ms. Mosby retained exclusive control over the Kissimmee property." This opinion is contradicted by the management agreement Ms. Mosby entered into with Executive Villas Florida. The management agreement clearly states that 'The Manager will always be obligated [emphasis added] to and have the right to offer the Vacation Home for rent during the term of this contract." And while Ms. Mosby would have the right to book the property, she would have to book it through the

management company booking system. Based on my industry experience, the management company in fact had control over the occupancy of the property.

31.    Also as stated in the Supplemental Disclosure, Mr. Forster "...will testify that the "Second Home Rider" allowed Ms. Mosby to rent the property." However, he fails to qualify his comment with the restrictions clearly stated in the Second Home Rider.

Expert Disclosure of Steven Butler (Exhibit 1) at ¶¶ 30-31.

Second, the Defendant's argument that Butler's testimony about the Defendant's phony

gift letter is impermissible legal opinion also means that her expert's opinion about the gift letter

is an impermissible legal opinion.  Specifically, the Defendant claims that "Mr. Butler's discussion

of the gift letter continues in same vein, offering legal conclusions rather than expert opinion."

Mot. at 5.  Here is what Mr. Butler actually said about the Defendant's phony gift letter:

27.    This loan file also included a Gift Letter which evidenced a gift of $5,000 to Ms. Mosby to enable her to close on the loan. The $5,000 was not in fact a gift that did not require repayment but was merely a transfer of funds back and forth between Ms. Mosby and her husband, Nicholas Mosby. Ms. Mosby was essentially gifting her own money to herself, thereby misrepresenting the source of the funds. This too was a violation of the loan approval by the lender that facilitated the purchase of this second property in Florida.

Supplemental Expert Disclosure of Eric Forster (Exhibit 2) at ¶ 27.  But here is what her

expert, Forster, said about the Gift Letter:

Mr. Forster will also testify that the facts as described in the Superseding Indictment related to the gift letter, if true, would not have been capable of influencing the lender to reach a different conclusion on closing the loan. Mr. Forster will also testify that if the person making the gift had sufficient funds in his or her account at the time of the closing, the terms of this gift letter were met. The basis for Mr. Forster's opinion is his review of the gift letter [USA-013835], his expertise in both what a gift letter is and why it is requested, and the review of relevant documents in his files, which are attached as EXHIBIT E.

Supplemental Expert Disclosure of Eric Forster (Exhibit 2) at ¶ 6.  If the Court excludes

Forster's opinions about the gift letter, then the Government will not need to call Butler in

rebuttal to contradict those opinions.  However, if the Defendant is allowed to call Forster

to offer the disclosed opinions about the gift letter, then the following opinion offered by

the Butler, the Government's expert, to the contrary is clearly admissible:

> 32.     The Supplemental disclosure also states that, "the facts as described in the Superseding Indictment related to the gift letter, if true, would not have been capable of influencing the lender to reach a different conclusion on closing the loan." This opinion is contradicted by standard practice in mortgage lending. Specifically, if Ms. Mosby misrepresented to the lender that she was receiving a $5,000 gift from her husband, when in fact the funds were her own, the lender would have investigated the misrepresentation to determine if the loan should proceed to closing. Mortgage lenders rely on the representations made by their clients and where there is an indication that an applicant has made a misrepresentation, that calls into question not only the misrepresentation itself but the veracity of the rest of the mortgage application as well.

> 33.     Further, Mr. Forster also misses the point of the use of the gift letter by Ms. Mosby. The issue isn't the use of a gift letter that"...is commonly provided by mortgage brokers to perspective borrowers." The issue is that the funds gifted were Ms. Mosby's own money, which is not the purpose or use of a gift letter.

> 34.     Mr. Foster's opinion, contained in the defense Supplemental Disclosure, that "if the person making the gift had sufficient funds in his or her account at the time of the closing, the terms of this gift letter were met," is not supported by standard mortgage lending practices. If the source of the gift is the borrower then it is not a gift. Further, if the borrower is the source of the funds but has represented the funds as a gift then the borrower has made a material misrepresentation to the lender which, as described above, calls into question the veracity of all the information provided by the applicant to the mortgage lender.

Expert Disclosure of Steven Butler (Exhibit 1) at ¶¶ 32-34.

## II.     THE EXPERT TESTIMONY OF JOSHUA JOHNSTON IS ADMISSBLE

Joshua Johnston is a Certified Public Accountant ("CPA") who is also certified in Financial

Forensics ("CFF") and Accredited in Business Valuations ("ABV") and is a Senior Managing

Director with Ankura Consulting Group, LLC.  Mr. Johnston's disclosure is Exhibit 3 to this filing.

As Mr. Johnston describes in his disclosure:

> Relevant to this matter, I have more than twenty-four years of experience analyzing financial statements and financial activity of individuals and companies of all sizes. That experience allows me to analyze whether Ms. Mosby's financial situation at

and around the time of the Certifications and distributions was consistent with the adverse financial consequences in the CARES Act and the Certifications.

Expert Disclosure of Joshua Johnston (Exhibit 3) at 4.

A. **Johnston's Opinion that the Defendant Did Not Suffer Adverse Financial Consequences Stemming from COVID 19 is Admissible to Rebut the Defense Expert's Opinion that She Did**

The Defendant asserts that "the bulk of Mr. Johnson's disclosure concerns his attempt to argue that Ms. Mosby did not experience 'adverse financial consequences.' The problem here is obvious: whether Ms. Mosby experienced 'adverse financial consequences' is a legal question." Mot. at 6. No it is not. Whether Ms. Mosby experienced adverse financial consequences is a factual question that Mr. Johnson can aid the jury in determining pursuant to Federal Rule of Evidence 702.

Further if the Court were to adopt the Defendant's argument, it would need to exclude the Defendant's own expert Jerome Schmitt. On October 7, 2022, the Defendant provided the following disclosure for Jerome Schmitt, which is Exhibit 4 to this filing:

> 14.     I have been engaged by Reed Smith ("Counsel") on behalf of Ms. Mosby to analyze and offer opinions, within a reasonable degree of accounting and professional certainty, regarding:
>
> > a.     The effect of the Pandemic on Ms. Mosby's personal financial condition, including her income, expenses, assets, debts, and net worth to assess **whether Ms. Mosby's financial condition was materially adversely affected by the Pandemic in the first quarter of 2020.**
>
> * * *
>
> 41.     As noted above, the first objective of my engagement was to determine whether Ms. Mosby experienced adverse financial consequences in the first quarter of 2020 as a result of the Pandemic. Based on my analysis of Ms. Mosby's assets, liabilities, and net worth from January 1, 2020 to March 31, 2020, the Pandemic's effect on the U.S. economy, the sudden declines in the value (and increase in volatility) of U.S. equity markets and Ms. Mosby's 457(b) Plan caused by the Pandemic, **it is my opinion that, in March 2020, Ms. Mosby experienced adverse financial consequences as a result of the Pandemic.**

* * *

55.    Based on my analysis, **Ms. Mosby experienced adverse financial consequences in the first quarter 2020 as a result of the Pandemic.**

Supplemental Expert Disclosure of Jerome Schmitt (Exhibit 4) at ¶¶ 14, 41 & 55 (emphasis added).

In their motion, defense counsel fail to explain or even address how if Johnston concludes that the Defendant did *not* experience adverse financial consequences as a result of COVID 19 that is an impermissible legal conclusion but it is not an impermissible legal conclusion for their expert, Schmitt, to conclude that she *did*.  These two positions cannot be reconciled.    If Schmitt can testify to the matter, so too can Johnston. The same logic applies to both.

The Government has moved to exclude Schmitt's opinion that the Defendant suffered adverse financial consequences stemming from COVID 19 because they are irrelevant and unreliable.  *See* United States' Omnibus Motion to Exclude the Defendant's Experts at 7-18 (ECF 163).  If the Court excludes Schmitt's opinions that the Defendant did not experience adverse financial consequences then the Government will not need to call Johnston in rebuttal to contradict those opinions.  However, if the Defendant is allowed to call Schmitt to opine that the Defendant did not suffer adverse financial consequences from COVID-19, then the opinions in the Johnston disclosure to the contrary are clearly admissible.

**B. Johnston's Opinions Regarding The Defendant's Non-Operational Travel Business, Mahogany Elite, are Admissible to Rebut The Defendant's Expert's Opinions Concerning Mahogany Elite**

The Defendant claims that Mr. Johnston's opinion that he has "seen no evidence to suggest that Ms. Mosby's contemplated business venture, Mahogany Elite Enterprises, LLC ("Mahogany Elite"), served as an appropriate basis for withdrawals from her 457(b) Plan," is a legal conclusion. It is not.  It is an opinion based on the facts that Mr. Johnston has reviewed and the application of

his specialized knowledge as a CPA and expert in business valuation.  It is also being offered to

rebut the opinions that the Defendant intends to elicit from her own expert, Schmitt.  Specifically,

the Supplemental Schmitt disclosure contains the following:

> 14.    I have been engaged by Reed Smith ("Counsel") on behalf of Ms. Mosby to analyze and offer opinions, within a reasonable degree of accounting and professional certainty, regarding:
>
> * * *
>
> b.    The financial and economic effect of COVID-19 on the travel industry and Mahogany Elite Enterprises, LLC ("Mahogany Elite"). Specifically, I have been engaged to analyze and provide testimony regarding (1) the losses suffered by many travel businesses in 2020 as a result of the Pandemic and (2) the ability of an early-stage travel-related company, such as Mahogany Elite, to generate revenue and profits in 2020 after COVID-19 was declared a pandemic.
>
> * * *
>
> C.    Effects of Pandemic on Mahogany Elite
>
> 52.    The travel industry was severely and negatively affected by the Pandemic in 2020, as discussed above and as evidenced by the substantial declines in volume, revenue and value associated with the airline, hotel and cruise industries. Based on my discussions with Ms. Mosby, she decided not to organize an inaugural event for Mahogany Elite in 2020 once the Pandemic's effect on the travel industry became apparent.
>
> 53.    Mahogany Elite, which was in the pre-revenue, development stage at the onset of the Pandemic, is obviously not directly comparable to a large, publicly traded company in the travel sector. **However, the overall decline in travel activity in 2020 caused by the Pandemic that negatively affected the travel sector of U.S. equity markets would undoubtedly have also negatively affected Mahogany Elite's prospects for success and its ability to attract customers had it launched in 2020 as Ms. Mosby originally planned.**
>
> 54.    The Pandemic severely hampered the revenue and value of some of the largest, most well- known businesses in the travel sector. From a financial and accounting perspective, large, well-capitalized businesses were in a better position to weather the decline in commercial activity caused by the Pandemic than small, development stage companies which lack the resources of their larger publicly-traded counterparts. **In my opinion, Mahogany Elite's business prospects were negatively affected by the drastic decline in travel caused by the Pandemic because its ability to launch an inaugural event and generate revenue in 2020 were significantly and adversely affected.**

18

* * *

56.      Based on my research and analysis, the travel industry in the United States was severely and negatively affected by the Pandemic in 2020.

57.      Mahogany Elite's business prospects were adversely affected by the drastic decline in travel caused by the Pandemic, as its ability to launch an inaugural event and generate revenue in 2020 was significantly diminished.

Supplemental Expert Disclosure of Jerome Schmitt (Exhibit 4) at ¶¶ 14, 52-55 & 56-57.  These opinions are clearly being offered to support an argument that defense counsel has indicated he will offer at trial, namely, that the Defendant's decision not to operate Mahogany Elite entitled her to take a Coronavirus related distribution.  Defense Counsel Bolden said on Roland S. Martin's broadcast on January 14, 2022, that, "Marilyn Mosby had businesses, if you will, and so those businesses were in the travel space and they *were affected by [coronavirus]*." *See Baltimore's Mosby Indicted, Voting Rights, Jamaican Immigrant Murdered, NFL & Black Coaches* (Jan 14, 2022), available at https://www.youtube.com/watch?v=g9fLGrqb6xY (9:55) (emphasis added).  In other words, defense counsel claims that the business (which the defendant clearly stated were inoperable multiple times) were, in fact, operable and the source of her COVID-related loss.   On January 17, 2022, Defense Counsel Bolden held a news conference where he similarly told reporters, "These were businesses that were starting. As a result, that does not disqualify her from, along with some other facts that we have to present, that certainly absolve her of any wrongdoing." Jessica Anderson, "Baltimore State's Attorney Marilyn Mosby's Lawyer Offers Defense, Saying She    Qualified    Under   he   CARES   Act,"   THE   BALTIMORE   SUN,   January   17, 2022,https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-mosby-press-conference-20220117-7xyuhle5bbfvnetmmpanodcv4e-story.html.

The Government has moved to exclude Schmitt's opinions regarding Mahogany Elite because they are irrelevant and unreliable.  *See* United States' Omnibus Motion to Exclude the Defendant's Experts at 19-25 (ECF 163).  If Schmitt's opinions concerning Mahogany Elite are excluded, then the Government will not need to call Johnston to rebut them.  However, if the Defendant is allowed to call Schmitt to opine about the effects of the COVID-19 Pandemic on the travel industry and on Mahogany Elite, then the opinions in the Johnston disclosure concerning Mahogany Elite are clearly admissible.

### C. Johnston's Opinions that Schmitt has Violated the AICPA Code of Professional Ethics is Highly Probative to the Court's Determination of Whether Schmitt's Opinions are Reliable and Will Aid the Jury in Evaluating Them if Schmitt is Not Excluded

Lastly, the Defendant argues that Johnston's opinion that Schmitt violated the AICPA Code of Professional Ethics should be excluded because, "even if true, the code of professional conduct of a private professional body is not at question [sic.] in this case."  Mot. at 9.  To the contrary, the opinion that Schmitt violated the AICPA Code is highly probative to the question before this Court in its role as gatekeeper, namely, whether Schmitt's proposed testimony is reliable.   As the Government argued in its Omnibus  Motion to Exclude Defendant's Experts, ECF 163, the Fourth Circuit have identified adherence to professional standards as an indicia of reliability.  *See United States v. Crisp*, 324 F.3d 261, 269 (4th Cir. 2003) ("The district court also heard evidence from which it was entitled to find the existence of professional standards controlling the technique's operation. Those standards provide adequate assurance of consistency among fingerprint analyses."); *United States v. Rose*, 672 F.Supp.2d 723, 724 (D. Md. 2009) (same); *see, e.g., Atl. Coast Pipeline, LLC v. 0.07 Acre, More or Less, in Nelson Cnty., Virginia*, 396 F. Supp. 3d 628, 647 (W.D. Va. 2019) (district court admitted expert opinion testimony because analysis complied with Uniform Standards of Professional Appraisers); *see, e.g., Tunnell v. Ford Motor Co.*, 330 F.

Supp. 2d 707, 725 (W.D. Va. 2004) (district court admitted expert opinion testimony because analysis complied with "professional standards and scientific methodology used by experts in fire and explosion investigations, and set forth in [National Fire Prevention Association Guide for Fire Explosion Investigations]).  If adherence to professional standards is an indicia of reliability, then departures from those norms indicates a lack of reliability, as is apparent here.

The Government has moved to exclude the testimony of Schmitt precisely because it is unreliable for this and other reasons, articulated in the Government's Omnibus Motion to Exclude the Defendant's Experts.  ECF 163.  If Schmitt is not excluded, then Johnston's testimony about Schmitt's adherence to professional standards will be aid the jury in determining what weight to give Schmitt's testimony at trial.

## III.    CONCLUSION

For all these reasons, the Defendant's motion should be denied.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

By:    _____/s/_____
Leo J. Wise
Sean R. Delaney
Aaron S.J. Zelinsky
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

_____/s/_____
Leo J. Wise
Assistant United States Attorney