IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

MARILYN J. MOSBY,

Defendant

Criminal No. LKG 22-7

Expert Disclosure of Steven I. Butler, CFE

1. I began my banking career in 1971 and my consulting career in 1986. My consulting practice includes forensic accounting matters, litigation consulting and expert testimony, consulting to financial institutions, and consulting to businesses on banking matters.

2. As a banker and consultant, I have experience in lending matters including commercial loans, "OREO," asset-based loans, consumer loans, mortgage lending, subprime and predatory lending, and letters of credit. I have extensive experience with the origination, underwriting, closing, monitoring, servicing, and collection of mortgage loans.

3. My experience includes serving as loan officer, senior loan officer, regional loan manager and president at financial institutions and as a Director of Dispute Consulting Services for a "Big Four" accounting firm, the Director of Financial Institutions Consulting for a national accounting firm, as well as serving as the president and/or director of three different banks during my banking career. I have also served as a bank's interim CEO, Compliance Officer, and Director during my consulting career.

4. I have an undergraduate degree in industrial management/business and economics from Wilmington College and attended the Certificate in Financial Management Program at the University of Denver's Graduate School of Business, and I am a Certified Fraud Examiner. I have also supplemented my formal education with continuing professional education courses every year since the beginning of my career in 1971.

5. I have testified in State and District Courts, Bankruptcy Courts, arbitrations, mediations, and public hearings. I have been been qualified by and testified as an expert in courts in California, Colorado, Florida, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Pennsylvania, Rhode Island, Tennessee, and Virginia. My curriculum vitae and a listing of prior testimony for the past four years is attached as an Exhibit to this Declaration.

Based on my education and experience as well as my review of the documents produced in this matter as listed on the attached Exhibit, I am prepared to testify as follows:

6. The approval of a residential mortgage loan follows a process that evaluates the borrower(s) based on their Character, Capacity, Collateral, Capital and Conditions. Known as the "Five Cs of Credit," these characteristics allow the mortgage loan originator "Lender" to determine the borrower's ability and willingness to repay the mortgage loan, the value of the underlying collateral, the borrower's capital position and the conditions surrounding the loan request as well as the borrower's employment.

7. In particular, the borrower's Capacity is determined by comparing the borrower's gross monthly income to the monthly debt obligations the borrower has. This calculation is known as the borrower's "DTI" or Debt to Income ratio. Critically, an overstatement of income, or an understatement of debt, will result in a false DTI calculation which would lead to an improper loan approval.

8. In addition, the Conditions under which a loan is being approved will determine the inherent risk of the loan. For example, a first mortgage loan to an owner occupying borrower is the least risky of mortgage loans a lender can make. A loan for a second home to an owner occupying borrower rises to the next level of risk. And a loan for an investment property, one that is rented out for income, is the most risky mortgage loan type.

9. The risk associated with a mortgage loan establishes factors such as the amount of money that can be borrowed (the Loan-To-Value Ratio"), and the interest rate and fees that the borrower will be charged for the loan, in other words, the cost of the loan to the borrower. In my experience, a loan for an investment property will require a larger down payment (typically 20% or 25% of the cost of the property) resulting in a lower loan-to-value ratio (typically 75% or 80%) due to the inherent risk as opposed to a less risky loan for a second home.

10. Finally, a borrower's Capital is also an important factor for the lender to determine, as the borrower must have and demonstrate to the lender sufficient funds to close on the mortgage loan including the down payment and closing costs, and also have sufficient cash reserves to allow for making the principal, interest, tax and insurance payments on the loan for at least an initial period of time as established by the lender's underwriting guidelines and loan program guides.

11. If a borrower lacks sufficient Capital to close the loan, the lender may allow a gift of money to the borrower which would be demonstrated by a "Gift Letter."

12. Beginning in 2014, and through the filing of a tax lien on March 3, 2020, Marilyn Mosby and her husband owed back taxes to the IRS, which by March 23, 2020, amounted to over $69,000.

13. On July 28, 2020, Ms. Mosby signed a loan application requesting $499,500 for the purchase of a home in Kissimmee Florida. The application indicated that this home would be her primary residence. The application further indicated that she paid only $1.00 in monthly rent, had no other mortgage debt, but had other debts totaling $58,124.00. She did not list the debt owed to the IRS on her application. Moreover, she indicated that she did not have any judgments or delinquent Federal debt. Based on my experience, if a mortgage lender is aware of an unpaid tax liability, the lender would either require that it be paid off or that the borrower provide evidence from the taxing authority that she has entered into a payment plan for the amount owed. That payment amount would then be factored into the borrower's DTI ratio. Moreover, the existence of a potential tax lien due to unpaid taxes presents an additional risk to a lender such that the loan may not be approved at all.

14. There was a second application in the loan file signed by Ms. Mosby on 9/2/2020 which corrected the loan purpose to "Secondary Residence" but which again did not list the debt owed to the IRS nor did it indicate any judgments or delinquent Federal debt.

15. By signing these applications, Ms. Mosby was attesting to the lender that the information she provided was true and correct.

16. Not only was Ms. Mosby's application information false, incomplete, and misleading, as discussed above, the DTI ratio calculated by the lender for this loan would have been false, thereby calling into question the approval of the loan.

17. In conjunction with the closing of this loan, Ms. Mosby also signed a "Second Home Rider" which included the following language:

> "6. **Occupancy.** Borrower will occupy and use the Property as Borrower's second home. Borrower will maintain exclusive control over the occupancy of the Property… and will not subject the Property…to any rental pool or agreement that requires the Borrower either to rent the Property or give a management firm … any control over the occupancy or use of the Property.

18. The Second Home Rider also required that:

> "Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Second Home Rider…

The Second Home Rider was signed on 9/2/2020

19. This Rider also required Ms. Mosby to affirm that she did not

    "...give materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan."

20. Ms. Mosby also entered into a Management and Rental of Vacation Homes Agreement with Executive Villas Florida. This management agreement was signed on 8/25/2020; before Ms. Mosby signed the Second Home Rider. Yet the purpose of entering into a management agreement was "...to procure short-term rentals for the above listed Vacation Home and for the benefit of the owner."

21. According to its records, Ms. Mosby allowed the rental of the Kissimmee property numerous times during 2020 and 2021.

22. Ms. Mosby was in violation of the Second Home Rider even before she signed it, and based on my industry experience, Ms. Mosby was clearly giving control of the property to Executive Villas Florida.

23. This is also an indication that the purchase of this property was primarily for investment purposes, not solely a second residence which is another misrepresentation by Ms. Mosby, which if known by the lender, would nullify the loan pricing and possibly the available loan amount offered by the lender. Moreover, had the lender been made aware of Ms. Mosby's misrepresentations, based on standard banking industry practice, the lender would have nullified the loan approval as the veracity of all information provided by Ms. Mosby would have been called into question.

24. Approximately seven months after closing on the mortgage for the Kissimmee property, Ms. Mosby applied for and was approved for another residential mortgage loan for a condominium in Longboat Key Florida.

25. One of the conditions for the approval of the loan was that Ms. Mosby would be renting her primary residence. It seems that there may have been changes to the original loan application as there were four applications in the loan file; one listed the Longboat Key property as a primary residence, three applications listed the property as a secondary residence. Yet on all four applications, Ms. Mosby indicated "Yes" to the question: Do you intend to occupy the property as your primary residence?"

26. Most importantly, and once again, Ms. Mosby did not list the debt to the IRS on her application, therefore the repayment of that debt was not considered by the lender in approving the loan. This application, as with the Kissimmee property loan application, required that Ms. Mosby provide true and complete information on her loan application, yet she did not. She also certified that she had no judgements against her and that she had no Federal debt. This was also false. Not only was Ms. Mosby's application information false, incomplete, and

misleading, the DTI ratio calculated by the lender for this loan would have been false, thereby calling into question the approval of the loan.

27. This loan file also included a Gift Letter which evidenced a gift of $5,000 to Ms. Mosby to enable her to close on the loan. The $5,000 was not in fact a gift that did not require repayment but was merely a transfer of funds back and forth between Ms. Mosby and her husband, Nicholas Mosby. Ms. Mosby was essentially gifting her own money to herself, thereby misrepresenting the source of the funds. This too was a violation of the loan approval by the lender that facilitated the purchase of this second property in Florida.

28. Ms. Mosby has retained Eric Forster to provide expert testimony in this matter. According to his Disclosure, Mr. Forster will testify that it was reasonable for Ms. Mosby to use the residential real estate she purchased as investment / income producing property. Mr. Foster does not define what "reasonable" means as he uses it and, in the context of mortgage lending, that term has no meaning. Further, (1) he did not qualify his opinion even in light of the restriction placed on Ms. Mosby by the terms of the Second Home Riders signed for each of the loans at issue, and (2) he did not address that the information provided by Ms. Mosby was misrepresented, and that she signed the property management agreement prior to signing the Second Home Rider that prohibited her from doing so.

29. According to the defense expert Disclosure, "Mr. Forster will also offer testimony "…that both lenders failed to act with reasonable care and prudence in their processing of Ms. Mosby's mortgage applications." Yet he provides no support for that assertion and makes no mention in his Disclosure of the lender's reliance on the requirement that the borrower provide truthful and complete information in their loan applications. Further, I find nothing in the materials I have reviewed that supports the opinion that these lenders "failed to act with reasonable care and produce in their processing of Ms. Mosby's mortgage applications." To the contrary, based on my experience in mortgage lending, both lenders acted with reasonable care and prudence in their processing of Ms. Mosby's mortgage applications.

30. In the defense Supplemental Disclosure, it states that Mr. Forster "…will testify that Ms. Mosby retained exclusive control over the Kissimmee property." This opinion is contradicted by the management agreement Ms. Mosby entered into with Executive Villas Florida. The management agreement clearly states that "The Manager will always be **obligated** [emphasis added] to and have the right to offer the Vacation Home for rent during the term of this contract." And while Ms. Mosby would have the right to book the property, she would have to book it through the management company booking system. Based on my industry experience, the management company in fact had control over the occupancy of the property.

31. Also as stated in the Supplemental Disclosure, Mr. Forster "...will testify that the "Second Home Rider" allowed Ms. Mosby to rent the property." However, he fails to qualify his comment with the restrictions clearly stated in the Second Home Rider.

32. The Supplemental disclosure also states that, "the facts as described in the Superseding Indictment related to the gift letter, if true, would not have been capable of influencing the lender to reach a different conclusion on closing the loan." This opinion is contradicted by standard practice in mortgage lending. Specifically, if Ms. Mosby misrepresented to the lender that she was receiving a $5,000 gift from her husband, when in fact the funds were her own, the lender would have investigated the misrepresentation to determine if the loan should proceed to closing. Mortgage lenders rely on the representations made by their clients and where there is an indication that an applicant has made a misrepresentation, that calls into question not only the misrepresentation itself but the veracity of the rest of the mortgage application as well.

33. Further, Mr. Forster also misses the point of the use of the gift letter by Ms. Mosby. The issue isn't the use of a gift letter that "...is commonly provided by mortgage brokers to perspective borrowers." The issue is that the funds gifted were Ms. Mosby's own money, which is not the purpose or use of a gift letter.

34. Mr. Foster's opinion, contained in the defense Supplemental Disclosure, that "if the person making the gift had sufficient funds in his or her account at the time of the closing, the terms of this gift letter were met," is not supported by standard mortgage lending practices. If the source of the gift is the borrower then it is not a gift. Further, if the borrower is the source of the funds but has represented the funds as a gift then the borrower has made a material misrepresentation to the lender which, as described above, calls into question the veracity of all the information provided by the applicant to the mortgage lender.

Submitted By: _____

Steven I. Butler, CFE

December 1, 2022