United States District Court for
the District of Maryland

**United States**

v.

**Marilyn Mosby**

No. 1:22-cr-7-LKG

**Motion for Early Determination of
CARES Act Jury Instructions**

The uniqueness of this prosecution calls out for the Court's early determination of CARES Act-related jury instructions so that both parties, as they prepare for trial, have a common understanding of the law the jury will apply to counts one and three of the superseding indictment.

In those counts, the government alleges Marilyn Mosby committed perjury when she submitted a withdrawal-of-funds form to her retirement plan indicating she had suffered "adverse financial consequences" because of covid—a prerequisite to taking an early withdrawal under the Coronavirus Aid, Relief, and Economic Security (CARES) Act. This prosecution is the first of its kind in the nation: neither Mrs. Mosby nor the government has identified a single other case in which prosecutors have charged perjury based on a purported misrepresentation about covid-related "adverse financial consequences." Given the absence

1

of any similar prior cases, the CARES Act's failure to define "adverse financial consequences," and the lack of any executive-branch guidance on which Mrs. Mosby could have relied when she submitted the withdrawal form, the contours of liability for perjurious statements about "adverse financial consequences" are hazy. It is unclear, from the bare statutory text, exactly what the government must prove to secure a conviction under 18 U.S.C. § 1621 or what defenses Mrs. Mosby may put on. And this pervasive uncertainty, in turn, makes it difficult for Mrs. Mosby to prepare for trial. Without knowing the precise nature of the charged crime or what theories of defense the Court will permit, Mrs. Mosby cannot determine what evidence to put on, which experts to notice, or on what bases to challenge the government's case.

Specifically, the parties remain divided over a number of purely legal issues that the Court has not yet resolved, each of which will set the parameters of trial and the legal guideposts for the jury to follow on counts one and three:

- How are "adverse financial consequences" defined or measured? Among other things, do courts and juries look to income, net worth, or some other metric? Is the standard subjective or objective?

- Does the size of a CARES Act withdrawal have to match, dollar for dollar, the extent of "adverse financial consequences" suffered by a retirement-plan participant?

- Must withdrawn funds be used to offset or mitigate the "adverse financial consequences" that authorized a withdrawal?

- If a person makes multiple CARES Act withdrawals, must she suffer additional adverse financial consequences between each withdrawal, or can the subsequent withdrawals be based on the adverse financial consequence that authorized the initial withdrawal?

- A perjury conviction requires proving that a statement is "capable of influencing" the "decision-making body to which it was addressed." Can a retirement plan count as a "decision-making body" if it lacks discretion to deny a withdrawal to someone who self-certifies that she has suffered adverse financial consequences?

To streamline trial preparation (e.g., determining what witnesses to call and for which topics) and pre-trial litigation (e.g., selecting motions in limine), and to avoid delays during trial (e.g., objections to evidence or argument), Mrs. Mosby respectfully moves the Court to set an accelerated schedule for preliminarily deciding a limited number of CARES Act-related jury-instruction disputes well in advance of trial. Deciding those questions now will not prejudice the government. To the contrary, it will allow both parties—and the Court—to be better prepared for a fair and efficient trial. As the Court has repeatedly noted, it is the Court's responsibility, *and not the parties'*, to educate the jury on the law by defining key terms found in, and obligations imposed by, the CARES Act. Mrs. Mosby simply asks the Court to discharge that responsibility slightly ahead of the normal schedule so that both sides have a shared understanding of the law that will shape the presentation of evidence on the perjury counts, and that the jury will use to determine whether the government has proven guilt beyond a reasonable doubt.

I.  **Procedural background**

    A.  **The government charges Mrs. Mosby with perjury based on withdrawals she made from her retirement account.**

On March 10, 2022, a grand jury returned a superseding indictment charging Mrs. Mosby with two counts of perjury, under 18 U.S.C. § 1621. Those charges arise out of two withdrawals Mrs. Mosby made from her City of Baltimore Deferred Compensation Plan ("the Plan") in May and December of 2020. According to the indictment, the Plan is what's known as a "457(b) plan"—so called because of the provision of the Internal Revenue Code governing it—which means participants generally may not make withdrawals unless they retire, leave government service, or experience "unforeseen emergencies that meet certain legal criteria." ECF 23 at 1-2; *see also* ECF 26 at 5. Congress temporarily relaxed

the withdrawal requirements, however, when it passed the CARES Act in March of 2020. ECF 23 at 1-2. Relevant here, § 2202 of the CARES Act permitted 457(b) participants to take "coronavirus-related distributions" (CRDs) in calendar year 2020 if they

> experience[d] adverse financial consequences as a result of being quarantined, being furloughed or laid off or having work hours reduced due to [covid], being unable to work due to lack of child care due to such virus or disease, closing or reducing hours of a business owned or operated by the individual due to such virus or disease, or other factors as determined by the Secretary of the Treasury (or the Secretary's delegate).

CARES Act, Pub. L. 116-136, § 2202(a)(4)(A)(ii)(III), 134 Stat. 281, 341 (2020).

Count one of the indictment alleges that on May 26, 2020, Mrs. Mosby submitted a withdrawal request to Nationwide, the financial services firm that manages the Plan on Baltimore's behalf. ECF 23 at 2. On that form, Mrs. Mosby checked a box indicating she had "experienced adverse financial consequences stemming from [covid] as a result of" one of the four conditions enumerated in § 2202: "[b]eing quarantined, furloughed or laid off," "[h]aving reduced work hours," "[b]eing unable to work due to lack of child care," or "[t]he closing or reduction of hours of a business I own or operate." ECF 23 at 3. The indictment alleges that this attestation—which induced the Plan to transfer $36,000 to Mrs. Mosby—was false because she had not experienced "adverse financial consequences" stemming from any of the enumerated conditions. ECF 23 at 3. It further alleges Mrs. Mosby used the Plan withdrawal toward the down payment for a supposed "vacation home" in Kissimmee, Florida. ECF 23 at 3-4.

Count three mirrors count one. It alleges that on December 29, 2020, Mrs. Mosby submitted another CARES Act withdrawal request to Nationwide, again attesting that she had suffered "adverse financial consequences . . . as a result of" one of the four circumstances identified in § 2202. ECF 23 at 11-12. According to the indictment, this

4

allegedly false statement caused the Plan to disburse $45,000, which Mrs. Mosby used toward the down payment on a condominium in Long Boat Key, Florida. ECF 23 at 12-13.[1]

### B. The parties' pretrial motions reveal disagreements about (1) the elements of the perjury statute and (2) the nature and scope of withdrawals permitted under the CARES Act.

"The elements of [perjury] are: (1) a 'declaration,' (2) made 'under penalty of perjury,' (3) in which the accused 'willfully subscribes as true,' (4) 'any material matter,' (5) 'which he does not believe to be true.'" *United States v. Savoy*, 38 F. Supp. 2d 406, 413 (D. Md. 1998) (quoting § 1621(2)). In previous pretrial motions, the parties have sparred over the last two of these elements: Were Mrs. Mosby's statements on the Plan withdrawal forms "material"? And did she know them to be false? Litigation of those motions has left unanswered questions about what the government will have to prove to secure a § 1621 conviction, as well as what defenses Mrs. Mosby will be permitted to mount to counts one and three.

#### 1. The meaning of "adverse financial consequences"

The CARES Act permits a 457(b) withdrawal only if a participant suffers "adverse financial consequences," but the Act does not define that term, and neither case law nor Internal Revenue Service regulations provide a definition. More important, these sources did not provide a definition that was available to Mrs. Mosby at the time she submitted the two withdrawal forms that underlie counts one and three. In June 2022, Mrs. Mosby filed a motion to dismiss the § 1621 counts on the ground that "adverse financial consequences" is "fundamentally ambiguous and thus insufficient to support a perjury charge." ECF 70 at

---

[1] In addition, counts two and four charge Mrs. Mosby with mortgage fraud, in violation of 18 U.S.C. § 1014, based on allegedly false statements she made on loan applications for the two Florida homes. ECF 23 at 6-10, 15-19.

12. She cited case law explaining that the perjury statute requires showing a defendant believed her statement was false, and therefore "'answers to fundamentally ambiguous questions cannot support a Perjury conviction.'" ECF 70 at 121 (quoting *United States v. Chujoy*, 207 F. Supp. 3d 626, 651 (W.D. Va. 2016)). The motion explained that although the indictment claims Mrs. Mosby suffered no adverse financial consequences because her salary did not decrease in 2020, the CARES Act does not specify whether "adverse financial consequences" are or are not limited solely to an effect on one's salary. ECF 70 at 15. Nor does the CARES Act make clear whether any "adverse financial consequences" must be "substantial." ECF 70 at 14.

In its response, the government claimed § 2202 of the CARES Act does define "adverse financial consequences"—as "being quarantined, furloughed or laid off," "having reduced work hours," etc. ECF 72 at 12. It denied that "adverse financial consequences" are "tether[ed] . . . *solely* to a person's salary," but it did not explain how adverse financial consequences might manifest other than through a reduction in salary. ECF 72 at 14 (emphasis in original).

The Court denied Mrs. Mosby's motion, concluding the term "adverse financial consequences" is defined with sufficient clarity in § 2202 of the CARES Act:

> [T]he Court reads Section 2202 to define **"adverse financial consequences"** to mean *adverse financial consequences* that are the result of either: (1) being quarantined, furloughed or laid off; (2) having work hours reduced due to the Coronavirus; (3) being unable to work due to lack of child care due to the coronavirus; or (4) closing or reducing hours of a business owned or operated by the individual due to the Coronavirus.

ECF 117 at 8 (emphasis added).

The Court's order makes clear that the only events that can give rise to "adverse financial consequences," thereby authorizing a CRD, are those enumerated in § 2202:

6

(1) being quarantined, furloughed, or laid off; (2) having work hours reduced due to covid; (3) being unable to work due to lack of child care because of covid; and (4) closing or reducing hours of a business due to covid. If a 457(b) participant endures adverse financial consequences for a reason not found on § 2202's list (e.g., refusing to work because he fears infection), then on the Court's view he cannot make a CARES Act withdrawal. But the Court's ruling does not explain how to conceptualize "adverse financial consequences" in the first place. It identifies what circumstances can *cause* "adverse financial consequences" (the four enumerated in § 2202), but it does not say what "adverse financial consequences" *are*. Put differently, the Court's order defines the bolded term in the above block quotation, but it does not define the italicized term.

      The meaning of that italicized language remains unclear. Are "adverse financial consequences" (the italicized version) limited to reductions in salary? Or do they also include other diminutions in net worth, such as reductions in the value of investments that a 457(b) participant owns (e.g., stocks, bonds, retirement accounts)? What about the sudden illiquidity of an asset that a participant had been planning to sell? Does the term reach investments a person makes in her business (such as to start or expand a business) that were not recouped because the business was negatively affected by the pandemic? Must a participant suffer a net financial loss, or can she qualify for a withdrawal even if losses in one area are more than offset by additional income in another? Does it matter that the additional income does not arise from covid-related developments? Are "adverse financial consequences" required to be substantial, or is a de minimis loss (e.g., $100) sufficient to permit a withdrawal? These questions remain open.

### 2. Possible limitations on the size and uses of CARES Act withdrawals

In July 2022, Mrs. Mosby moved in limine to exclude evidence of how she used the money she withdrew from the Plan. ECF 83. She argued that how distributions are used has "no relation to, or bearing on, whether a plan participant is qualified to receive" a CRD, and is therefore irrelevant to the truth or falsity of the participant's statement that she has suffered adverse financial consequences. ECF 83 at 4. To support that view, Mrs. Mosby cited IRS guidance explaining that "'[t]he definition of a coronavirus-related distribution under section 2202(a)(4) of the CARES Act does not limit . . . distributions to amounts withdrawn solely to meet a need arising from COVID-19.'" ECF 83 at 4. Therefore, the IRS guidance instructed, "'the amount of [a] distribution is not required to correspond to the extent of the adverse financial consequences experienced by the qualified individual.'" ECF 83 at 4.

The government's response neither conceded nor disputed that the IRS guidance correctly describes the law governing § 2202 of the CARES Act. ECF 90 at 39-43. Instead, the government simply asserted, without elaboration, that "the fact that [Mrs. Mosby] used the 457(b) withdrawals to buy two vacation homes certainly has 'any tendency' to make it more probable that, at the time of each withdrawal, [Mrs. Mosby] had not actually suffered adverse financial consequences stemming from COVID-19." ECF 90 at 41 (quoting Fed. R. Evid. 401); *see also* ECF 90 at 42 (contending, without explanation, that "the fact that [Mrs. Mosby] used the funds to buy vacation homes is probative of the fact that no adverse financial consequence existed in the first place").

The Court denied Mrs. Mosby's motion. Like the government's response, the Court's order did not address whether the IRS guidance correctly states the law governing

§ 2202 of the CARES Act. *See* ECF 105 at 19. And like the government's response, it did not explain the causal chain that links (1) Mrs. Mosby's use of the distributions to purchase a house and condo, to (2) the conclusion that she did not suffer adverse financial consequences. *See* ECF 105 at 19.

The result is that the parties do not know whether they can rely on the IRS guidance when arguing to the jury, whether admission of the use-of-funds evidence will be limited in any way, or what arguments the government will be permitted to make about Mrs. Mosby's use of the withdrawn funds.

### 3. The existence of a "decision-making" body

In a perjury prosecution, a "statement is material if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Spirito*, 36 F.4th 191, 207 (4th Cir. 2022). As part of her June 2022 motion to dismiss, Mrs. Mosby argued counts one and three are infirm because they fail to allege her statements were "directed to or capable of influencing a 'decision-making body.'" ECF 70 at 8. The reason for that failure, she argued, is that "there is no 'decision of a decision-making body' as contemplated by § 1621, involved in the process for making a CRD." ECF 70 at 8. Rather than "decid[ing] whether she was qualified based on the veracity of the statements" on her withdrawal forms, Nationwide relied on Mrs. Mosby's self-certification, per the IRS guidance. ECF 70 at 8-9. Mrs. Mosby's theory, in other words, was that when the recipient of a withdrawal form has no discretion to deny a self-certifying participant's request, that recipient is not an influenceable "decision-making body" for purposes of the perjury statute. *See* ECF 70 at 8-11.

The government responded that the Plan is a "decision-making body" under § 1621 and that the trial evidence will show the Plan relied on Mrs. Mosby's self-certifications

when approving her withdrawals. ECF 72 at 6-9. But the government did not directly address the legal question of whether, for § 1621 purposes, an administrator with no discretion to deny a self-certified withdrawal form can qualify as a "decision-making body" capable of being influenced. *See* ECF 72 at 8-10.

The Court denied Mrs. Mosby's motion, concluding the indictment sufficiently alleged that she directed her statements to the Plan, which relied on them when approving her withdrawals. ECF 117 at 7. As to Mrs. Mosby's legal argument that a discretion-less administrator cannot qualify as a "decision-making body," the Court simply noted that "[t]he jury for this case will be the ultimate arbiter" of whether the government "can meet its burden at trial to show that the statements in [Mrs. Mosby's] withdrawal requests were material." ECF 117 at 7. Thus the Court's ruling neither endorsed nor rejected the proposition that, as a matter of law, a § 1621 "decision-making body" must enjoy some discretion to deny withdrawals to self-certifiers.

## II.     Argument

Pretrial litigation has revealed numerous unsettled legal questions about the CARES Act, specifically the eligibility requirements for CARES Act withdrawals and whether the Act limited how withdrawals could be used. There is also the equally pressing question of whether those requirements and limitations were knowable by Mrs. Mosby (or any person who obtained a withdrawal) at the times relevant to this prosecution. The Court will have to decide those questions eventually, and fairness and efficiency counsel in favor of doing so sooner rather than later. Because this prosecution is the first of its kind, both sides would benefit from receiving clear jury instructions on the CARES Act well before trial. To that end, the Court should require the parties to submit and brief a limited number of jury instructions related solely to the law governing the CARES Act, hold a hearing on

10

those instructions, and resolve the disputed CARES Act instructions well in advance of trial.

Mrs. Mosby recognizes that courts in this district typically direct the parties to submit proposed jury instructions fairly close to the trial date—i.e., no more than a month or two before trial—and wait to resolve any disputes until a charge conference at the close of the evidence. Consistent with that practice, the current scheduling order in this case calls for submission of proposed jury instructions by September 15, 2023, roughly six weeks before trial begins. ECF 194 at 2. But this practice is not set in stone, and it can be altered to meet the unique circumstances of this case. Mrs. Mosby is unaware of any rule or other authority that prohibits courts from deciding jury-instruction issues sooner, and in general, jury-instruction matters lie within a district court's discretion. *See United States v. Odum*, 65 F.4th 714, 721 (4th Cir. 2023). To the extent the Federal Rules of Criminal Procedure speak to this issue at all, they provide only that a district court "must inform the parties before closing arguments how it intends to rule on [any] requested instructions." Fed. R. Crim. P. 30(a). The Court is therefore free to resolve disputed instructional issues well before trial begins.

There is good reason to do so here. Unlike in many cases, the Court and the parties in this case do not have the benefit of pattern jury instructions or a well-developed body of case law explaining what exactly the government must prove to secure a conviction or what defenses a defendant can mount. As far as Mrs. Mosby can tell, this case is the first in which anyone has been prosecuted for falsely claiming, in a CARES Act withdrawal form, that she suffered "adverse financial consequences" because of covid. The CARES Act is only three years old, and other prosecutions related to the Act have focused on different

misconduct, such as fraud in procuring Paycheck Protection Program funds. As a result, neither case law nor model jury instructions provide the guidance on which litigants and courts can usually rely in federal prosecutions.

The upshot is that a number of legal questions about the interaction of 18 U.S.C. § 1621 and § 2202 of the CARES Act remain unsettled. While this Court has held "adverse financial consequences" must *result* from one of the four circumstances enumerated in § 2202, it has not offered any guidance on what "adverse financial consequences" *are* to begin with. *See supra*, Part I.B.1. The Court also has not indicated whether it agrees with the IRS guidance—and will instruct the jury—that (1) § 2202 withdrawal amounts need not be limited to the size of a 457(b) participant's "adverse financial consequences," and (2) the CARES Act does not require that withdrawn funds be used for any particular purpose, such as offsetting or mitigating those adverse financial consequences. Nor has the Court signaled its view on whether the CARES Act requires intermittent adverse financial consequences between multiple withdrawals—a question that neither IRS guidance nor any comparable source answers. And the Court has yet to express an opinion on Mrs. Mosby's argument that the entity to which an allegedly false statement is addressed cannot qualify as a § 1621 "decision-making body" if it relies on self-certification and therefore lacks authority to deny certain requests.

These questions are all legal matters, amenable to resolution before trial, without awaiting the evidence presented to the jury. And as this Court has already observed in resolving prior motions, "'it is the responsibility—and the duty—of the court to state to the jury the meaning and applicability of appropriate law, leaving to the jury the task of determining the facts which may or may not bring the challenged conduct within the scope

of the court's instruction as to the law.'" ECF 105 at 14 (quoting *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 366-67 (4th Cir. 1986)). Indeed, the Court wrote in its order denying Mrs. Mosby's dismissal motion that "[t]o the extent that Defendant remains concerned about the definition of 'adverse financial consequences,' the appropriate remedy is for the Court to instruct the jury on the meaning of this term under the CARES Act." ECF 117 at 9 n.2.

Given the lack of case law and the novelty of the CARES Act, the parties cannot know at this juncture what those instructions will say, which leaves them unable to prepare properly for trial. Without a firm understanding of the elements of a § 1621 violation and the legal theories that will be available to argue to the jury, the parties cannot meaningfully decide what witnesses to call, which experts to notice, what exhibits to prepare, or a myriad of other matters. Nor can Mrs. Mosby make an informed choice about whether to exercise her constitutional right to testify in her own defense. Determining the content of certain CARES Act jury instructions now, rather than during trial, will facilitate pretrial preparation, make further pretrial motions practice more efficient, reduce the number of issues that must be decided mid-trial, and lessen the risk that yet another continuance will be required. And early resolution of instructional disputes would protect Mrs. Mosby's right to "a fair trial in a fair tribunal"—a "basic requirement of due process." *Strickland v. United States*, 32 F.4th 311, 343 (4th Cir. 2022). It is difficult to receive "a fundamentally fair trial," as due process requires, *Plymail v. Mirandy*, 8 F.4th 308, 317 (4th Cir. 2021), if a large number of novel legal questions crucial to guilt or innocence remain unresolved at the start of trial, leaving Mrs. Mosby and her counsel in the dark about what facts will be legitimate subjects of argument at trial. *See also United States v. Godwin*, 272 F.3d 659,

677 n.21 (4th Cir. 2001) (noting Due Process Clause ensures "fundamental fairness" in criminal trials). Finally, knowing the parameters of CARES Act liability now may assist the parties in reaching some kind of pretrial resolution they would otherwise be unable to reach.

The opinion in *United States v. Laughlin*, 768 F. Supp. 957 (N.D.N.Y. 1991), is instructive. There, where the defendants were charged with violating the Resource Conservation and Recovery Act, the government moved in limine "for a pre-trial determination regarding the elements of" an RCRA violation so that it would "not be required to prove unnecessary facts at trial." *Laughlin*, 768 F. Supp. at 958, 960. The defendant objected to the request as "premature," contending that jury instructions on "the essential elements of the charged RCRA offense" were "more appropriately resolved at a jury charge conference near the close of the proof." *Id.* at 960. But the court concluded that "because of the unsettled state of the law with regard to the elements of a [RCRA] violation," it was "proper to resolve th[e] matter before trial." *Id.*; *accord United States v. Hofschulz*, No. 18-CR-145-PP, 2021 WL 2911246, at *1 (E.D. Wis. July 12, 2021) ("provid[ing] the parties with the court's preliminary ruling on specific, disputed [jury] instructions" in response to government's request); *Cont'l Materials Corp. v. Affiliated FM Ins. Co.*, No. 10-CV-02900-JLK-KLM, 2012 WL 5430955, at *2 (D. Colo. Nov. 7, 2012) (ordering parties to submit proposed instructions 40 days before trial, "[g]iven the complexity of the coverage issues presented and the premium [the court] place[s] on the development and finalization of jury instructions before trial").

Crucially, the government will suffer no prejudice if Mrs. Mosby's request is granted. The parties will eventually have to submit revised proposed jury instructions in

14

any event, *see* ECF 194 at 2, and the Court will eventually have to resolve any differences in the parties' submissions. Mrs. Mosby is simply asking that a small portion of this unavoidable task—involving a limited number of CARES Act-related instructions—be completed earlier than currently planned. The government will not be prejudiced by doing now what it will inevitably have to do anyway. Nor will the government be prejudiced if the Court settles the CARES Act jury instructions several months before jury selection, rather than on the fly at trial. In fact, the government, just as much as Mrs. Mosby, will benefit from receiving clarity on the law of the CARES Act well before the date provided by the current scheduling order.[2]

Mrs. Mosby therefore requests that the Court amend the scheduling order to require an early resolution of a limited number of proposed jury instructions relating to the law and scope of the CARES Act. Specifically, Mrs. Mosby proposes the following schedule for deciding CARES Act jury-instruction disputes:

| | |
|---|---|
| **August 14, 2023** | Parties file requested jury instructions on the law of the CARES Act and supportive briefing. |
| **August 28, 2023** | Parties file responsive briefs. |
| **September 11, 2023** | The Court holds a hearing on disputed jury instructions. |

This proposed schedule would give the parties almost two months to prepare for trial while knowing the law that will govern counts one and three. While the change in the

---

[2] The parties' prior proposed jury instructions reveal that they are far apart on some of the disputed issues described above. Mrs. Mosby, for instance, previously requested the Court to instruct the jury that the CARES Act "does not require that the amount of [a] withdrawal be correlated in any way with the adverse financial consequence experienced by any individual who received a coronavirus related distribution. For example, if an individual was laid off as a result of Covid-19, and therefore was deprived of $10,000 of income, that individual was not limited to a withdrawal of $10,000 from his or her retirement account." ECF 166 at 54. The government objected to that instruction. ECF 166 at 54.

parties' deadline for submitting proposed instructions would be modest, relative to the current schedule, the difference in their ability to prepare for a fair and efficient trial would be substantial.

Undersigned counsel have spoken to counsel for the government, who advised that at this time the government opposes Mrs. Mosby's request.

### III. Conclusion

For the reasons described above, Mrs. Mosby requests that the Court set an expedited schedule for preliminarily deciding a limited number of CARES Act-related jury instructions well ahead of trial.


Respectfully submitted,

| | |
|---|---|
| /s/ James Wyda | /s/ Lucius Outlaw |
| James Wyda | Lucius Outlaw |
| Federal Public Defender | Outlaw PLLC |
| Office of the Federal Public Defender | 1351 Juniper Street, NW |
| 100 South Charles Street | Washington, DC 20012 |
| Tower II, 9th Floor | Phone: (202) 997-3452 |
| Baltimore, MD 21201 | loutlaw3@outlawpllc.com |
| Phone: (410) 962-3962 | |
| jim_wyda@fd.org | |

/s/ Maggie Grace
Maggie Grace
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
maggie_grace@fd.org