**United States District Court for**
**the District of Maryland**

|  |  |
|---|---|
| **United States**<br><br>**v.**<br><br>**Marilyn Mosby** | **No. 1:22-cr-7-LKG** |

**Motion to Sever Counts One and Three from**
**Counts Two and Four**

Marilyn Mosby is charged with two counts each of perjury and mortgage fraud. The perjury counts allege that on two occasions in 2020, Mrs. Mosby withdrew funds from her retirement account after attesting falsely on withdrawal forms that she had suffered "adverse financial consequences" because of the covid-19 pandemic. The mortgage fraud counts, in turn, allege she made false statements when applying for loans that—in combination with her withdrawn retirement funds—she used to buy a house and a condominium. Although the facts supporting the two sets of counts may appear to form a single narrative arc, a joint trial on the perjury and mortgage fraud counts would prejudice Mrs. Mosby's right to a fair trial. The Fourth Circuit has recognized at least three forms of prejudice a defendant may suffer from joinder of counts—all of which are implicated here.

First, despite the purported link between the two sets of offenses, no evidence

relevant to the perjury counts would be admissible at a trial solely on the mortgage fraud counts, and vice versa. Because of this mutual inadmissibility, there is a serious risk that "the jury may confuse and cumulate the evidence, and convict [Mrs. Mosby] of one or both crimes when it would not convict [her] of either if it could keep the evidence properly segregated." *United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976). Second, both the perjury and mortgage fraud counts allege, in essence, that Mrs. Mosby made false statements on financial forms so she could purchase additional homes in Florida. This legal and factual similarity will lure the jury into impermissible propensity reasoning, i.e., into "conclud[ing] that [Mrs. Mosby] is guilty of one crime and then find[ing her] guilty of the other because of [her] criminal disposition." *Id.* And third, a joint trial would "confound[]" Mrs. Mosby's ability to present a defense, making it impossible to "assert [her] privilege against self-incrimination with respect to one [set of counts] but not the other." *Id.*

The only way to avoid these multiple forms of prejudice is to try the perjury counts separately from the mortgage fraud counts. The Court should therefore sever counts one and three from counts two and four.

## I.    Procedural background

On March 20, 2022, a grand jury returned a superseding indictment charging Mrs. Mosby with two counts of perjury, under 18 U.S.C. § 1621 (counts one and three), and two counts of mortgage fraud, under 18 U.S.C. § 1014 (counts two and four).

The indictment alleges that as the Baltimore City state's attorney, Mrs. Mosby was enrolled in a deferred compensation plan under section 457(b) of the Internal Revenue Code, which governs retirement plans for state and local government employees. ECF 23 at 1. Typically, participants in "457(b) plans" may withdraw funds from their retirement accounts only when they leave government service or suffer "unforeseen emergencies that

meet certain legal criteria." ECF 23 at 1. But in the Coronavirus Aid, Relief, and Economic Security (CARES) Act, passed in March 2020, Congress temporarily eased those restrictions, allowing participants to take a "coronavirus-related distribution" (CRD) in calendar year 2020 if they

> experience[d] adverse financial consequences as a result of being quarantined, being furloughed or laid off or having work hours reduced due to [covid], being unable to work due to lack of child care due to such virus or disease, closing or reducing hours of a business owned or operated by the individual due to such virus or disease, or other factors as determined by the Secretary of the Treasury (or the Secretary's delegate).

CARES Act, Pub. L. 116-136, § 2202(a)(4)(A)(ii)(III), 134 Stat. 281, 341 (2020).

Count one of the superseding indictment alleges that in May 2020, Mrs. Mosby submitted a withdrawal form to Nationwide, the firm that manages Baltimore City's 457(b) plan, requesting $40,000 from her retirement account. ECF 23 at 2. On that form, Mrs. Mosby checked a box indicating she had "experienced adverse financial consequences stemming from [the coronavirus] as a result of" one of the four circumstances enumerated in § 2202 of the CARES Act ("[b]eing quarantined, furloughed or laid off," "[h]aving reduced work hours," "[b]eing unable to work due to lack of child care," or "[t]he closing or reduction of hours of a business I own or operate"). ECF 23 at 2-3. The indictment alleges Nationwide relied on this attestation, which was false, when it disbursed $40,000 to Mrs. Mosby. ECF 23 at 3-4. Mrs. Mosby allegedly used that money toward the down payment on what the indictment calls a "vacation home" in Kissimmee, Florida. ECF 23 at 4.

In July and September of 2020, Mrs. Mosby applied for a $490,500 mortgage from Cardinal Financial Company to purchase the Kissimmee home. ECF 23 at 8. Count two alleges her application contained a number of false statements. Specifically, she allegedly

(1) did not reveal that she owed taxes to the Internal Revenue Service (IRS), despite a question asking her to disclose all financial liabilities; (2) stated falsely that she was not delinquent or in default on any federal debt; and (3) represented in a "second home rider" that she intended to use the Kissimmee house as a second home, even though she had already signed an agreement authorizing a property-management company to lease the house to renters. ECF 23 at 6-10. As to the tax-related statements, the superseding indictment alleges that Mrs. Mosby and her husband owed the IRS unpaid taxes for years 2014 and 2015, which in March 2020 prompted the IRS to place a lien on "all property and rights to property belonging to" Mrs. Mosby in the amount of the couple's unpaid taxes ($45,022). ECF 23 at 6-8.

Count three parallels count one. It alleges that in December 2020, Mrs. Mosby submitted a second CARES Act withdrawal form to Nationwide, requesting $50,000 from her retirement account. ECF 23 at 11. As she had on the first form, Mrs. Mosby checked a box indicating she had experienced covid-related "adverse financial consequences" as a result of one of § 2202's triggering events ("[b]eing quarantined, furloughed or laid off," "[h]aving reduced work hours," etc.). ECF 23 at 11-12. This statement, according to the indictment, was false. ECF 23 at 12. Mrs. Mosby allegedly used the withdrawn funds toward the down payment on a condominium in Long Boat Key, Florida. ECF 23 at 13.

Finally, count four asserts that in December 2020, January 2021, and February 2021, Mrs. Mosby submitted an application to United Wholesale Mortgage for a loan to purchase the Long Boat Key home. ECF 23 at 15-16. In that application, she allegedly (1) stated falsely that she had lived in Florida for "the past 70 days"; (2) failed to include a federal tax debt on a list of her financial liabilities; (3) indicated she was not delinquent or

in default on any federal debt, notwithstanding overdue taxes owed to the IRS; and (4) represented that her husband had gifted her $5,000 to help cover her down payment, even though he had not. ECF 23 at 15-19.

## II.     Argument

### A.     Legal background

Under Federal Rule of Criminal Procedure 8(a), an "indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . [1] are of the same or similar character, or [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan." The Rule recognizes that "the prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses should be tried in a single proceeding." *United States v. Blair*, 661 F.3d 755, 768-69 (4th Cir. 2011). To "promote judicial efficiency," therefore, Rule 8(a) "permits very broad joinder of related counts in the same trial." *Id.*

But "[t]here are situations . . . where the interests promoted by joint trials are outweighed by prejudice to the defendants or the government." *United States v. Verges*, 997 F. Supp. 2d 398, 403 (E.D. Va. 2014). So even if multiple "counts were properly joined" in the indictment, "it does not automatically follow that they [a]re properly tried together." *United States v. Cole*, 857 F.2d 971, 974 (4th Cir. 1988). A party is therefore permitted to seek relief from prejudicial joinder under Federal Rule of Criminal Procedure 14(a), which provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." This Rule "contemplates that joinder under

Rule 8(a) can be proper and, at the same time, severance can be required." *United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005).

Faced with a Rule 14 motion to sever, "a trial court must balance any possible prejudice to the accused against the interests of the efficient administration of justice." *Cole*, 857 F.2d at 974. In general, prejudice to a defendant is sufficient to justify severance "if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Hornsby*, 666 F.3d 296, 309 (4th Cir. 2012) (ellipsis in original). The required prejudice "can take many forms," *United States v. Berg*, 714 F.3d 490, 496 (7th Cir. 2013), and it frequently arises from an "inevitable consequence of a joint trial": "that the jury will be aware of evidence of one crime while considering the defendant's guilt or innocence of another," *Foutz*, 540 F.2d at 736. The Fourth Circuit held in *Foutz* that, among other things, prejudice "may justify the granting of a severance under Rule 14" if:

> (1) the jury may confuse and cumulate the evidence, and convict the defendant of one or both crimes when it would not convict him of either if it could keep the evidence properly segregated; (2) the defendant may be confounded in presenting defenses, as where he desires to assert his privilege against self-incrimination with respect to one crime but not the other; or (3) the jury may conclude that the defendant is guilty of one crime and then find him guilty of the other because of his criminal disposition.

540 F.2d at 736; *see also United States v. Taylor*, 218 F. App'x 249, 250 (4th Cir. 2007) (recognizing continuing validity of *Foutz*'s prejudice categories).[1]

---

[1] The counts in *Foutz* were joined under Rule 8(a)'s "same or similar character" prong, 540 F.2d at 736, but the Fourth Circuit subsequently invoked the opinion's prejudice categories in a case involving other of the Rule's prongs. *See United States v. Goldman*, 750 F.2d 1221, 1224 (4th Cir. 1984) ("In the present case we not only have counts of the indictment alleging offenses which 'are of the same or similar character' but we also have

1.     *Foutz* **category one: confusion and cumulation of evidence**

The first *Foutz* scenario, known as "evidentiary spillover," occurs when a jury relies

on "proof that [a] defendant is guilty of one offense . . . to convict him of a second offense,

even though such proof would be inadmissible [sic] in a second trial for the second offense."

*United States v. Richardson*, 515 F.3d 74, 81-82 (1st Cir. 2008); *see also United States v.*

*Hawkins*, 776 F.3d 200, 206 (4th Cir. 2015) ("Joinder of unrelated charges creates the

possibility that a defendant will be convicted based on considerations other than the facts of

the charged offense.").

Courts weighing a Rule 14 motion based on *Foutz*'s first scenario must "consider the

factual and evidentiary overlap between the counts" that a defendant seeks to sever. *United*

*States v. Cohen*, No. CR. WDQ-14-0310, 2015 WL 2261661, at *28 (D. Md. May 7, 2015).

In particular, courts ask "whether evidence supporting one count could also [be] admitted in

a trial solely on the other count." *United States v. Nettles*, 476 F.3d 508, 516 (7th Cir. 2007);

*accord United States v. Elshinawy*, No. CR ELH-16-0009, 2017 WL 876484, at *18 (D. Md.

Mar. 6, 2017) ("In analyzing the prejudice component, it is important to consider whether, if

there were a severance, evidence under one of the severed counts would in all probability be

admissible at a trial on the other count.").

"[I]f evidence of one of the charged offenses would not be admissible at the trial of

the other charged offense," then "a defendant may be sufficiently prejudiced by a joint trial

to justify severance under Rule 14." *United States v. Downey*, No. 1:09CR109-1, 2009 WL

---

'two or more acts or transactions connected together or constituting parts of a common
scheme or plan.'"); *see also, e.g.*, *United States v. Alexander*, 30 F. Supp. 3d 499, 501-02
(E.D. Va. 2014) (relying on *Foutz* categories where joinder was based on Rule 8(a)'s
second and third prongs).

10681814, at *1 (M.D.N.C. Aug. 13, 2009) (citing *Foutz*, 540 F.2d at 738). Conversely, the "possibility of prejudice is greatly diminished where . . . the evidence of the joined crimes would be mutually admissible for legitimate purposes in separate trials for each offense." *Cole*, 857 F.2d at 974; *see, e.g.*, *United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008) (affirming denial of severance because "even if [the district court] had severed Branch's charges, evidence of Branch's distribution of cocaine base under counts one and two would have been admissible at a trial on counts three and four").

   "Evidentiary overlap" bears not only on the prejudice a defendant might suffer, but also on "the extent to which real efficiencies can be realized" by a joint trial. *United States v. Coleman*, 22 F.3d 126, 132 (7th Cir. 1994); *see also id.* (noting evidentiary overlap "strongly informs both sides of the equation"). When "evidence of one offense would not be admissible at a separate trial for the other, the saving of time effected by a joint trial is minimal." *Foutz*, 540 F.2d at 738. Because evidence of the two offenses is separate and distinct, "the only time saved by such joinder is the selection of one jury rather than two," which means "the only real convenience served by permitting joint trial of unrelated offenses against the wishes of the defendant may be the convenience of the prosecution in securing a conviction." *Id.* This fact counsels in favor of severance. *Id.* (holding district court abused its discretion by denying severance where evidence was not mutually admissible); *see also Coleman*, 22 F.3d at 132 ("[S]eparate counts that for the most part depend on separate evidence save fewer steps when tried together. While only one jury need be impanelled and one trial judge's calendar arranged and background information elicited only once, no comparable savings are realized with respect to the substantive portions of the trial; basically the same complement of witnesses, documents and exhibits will be mustered a single time,

whether in one courtroom or two.").

But evidentiary overlap is not determinative. Severance may be required even if, "[t]o prove [one offense], the Government will need to present some evidence that is relevant to, and would be presented as part of a prosecution for, [another offense]." *United States v. Malik*, No. CR MJG-16-0324, 2017 WL 11458498, at \*10 (D. Md. June 22, 2017). Indeed, severance may be necessary even when it results in "a substantially duplicative presentation" of evidence in the two trials. *Id.* That is because "the greater efficiency of a trial without severance must be subordinated to the interest of providing [the defendant] a fair trial on all charges," which she cannot receive if the jury in a joint trial would be "tainted" by "hear[ing] all evidence and argument" relevant to both counts. *Id.* at \*11. Although "the Federal Rules of Criminal Procedure are designed to promote economy and efficiency and to avoid a multiplicity of trials," the Fourth Circuit is "of the strong opinion that the consideration of one's constitutional right to a fair trial cannot be reduced to a cost/benefit analysis." *United States v. Isom*, 138 F. App'x 574, 581 (4th Cir. 2005). While courts should be "concerned with judicial economy and efficiency, [their] overriding concern" must be "that the jury consider only relevant and competent evidence bearing on the issue of guilt or innocence for each individually charged crime separately and distinctly from the other." *Id.*

### 2.    *Foutz* category three: propensity evidence[2]

In the third *Foutz* scenario, the jury concludes "the defendant is guilty of one crime and then find[s] him guilty of the other because of his criminal disposition." 540 F.2d at 736. Severance therefore averts the prejudice of "a verdict based on bad acts and propensity

---

[2] Mrs. Mosby describes the three *Foutz* categories here in the same order (first, third, second) in which she analyzes them below.

evidence rather than on admissible evidence." *Berg*, 714 F.3d at 496. Separate trials respect the foundational rule that the government may not use "evidence of other crimes or bad acts to show bad character or propensity to break the law." *United States v. Siegel*, 536 F.3d 306, 317 (4th Cir. 2008).

### 3. *Foutz* category two: defendant's inability to present a defense

As to the second *Foutz* scenario—where a defendant "desires to assert his privilege against self-incrimination with respect to one crime but not the other"—severance ensures the defendant is not "confounded in presenting defenses." 540 F.2d at 736. The law recognizes that "because of the unfavorable appearance of testifying on one charge while remaining silent on another, and the consequent pressure to testify as to all or none, the defendant may be confronted with a dilemma," i.e., "whether, by remaining silent, to lose the benefit of vital testimony on one count, rather than risk the prejudice (as to either or both counts) that would result from testifying on the other." *Goldman*, 750 F.2d at 1225.

To obtain severance on this ground, a defendant must make "a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Id.* If the defendant demonstrates a "genuine" need to testify on one, and only one, set of counts, the district court must "weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying." *Id.*; *accord, e.g.*, *United States v. Tyson*, 462 F. App'x 402, 406-07 (4th Cir. 2012) (describing the proffer a defendant must make under *Foutz*'s second category).

* * *

Regardless of which *Foutz* scenario is at issue, the party seeking severance "has the burden of demonstrating a strong showing of prejudice." *United States v. Mir*, 525 F.3d 351,

357 (4th Cir. 2008).

**B.      Discussion**

The Court can assume all counts in the superseding indictment were properly joined under Rule 8(a). Nevertheless, severance under Rule 14 is required because Mrs. Mosby's case presents all three categories of prejudice identified in *Foutz*. The admissible evidence relevant to the perjury counts is entirely separate and distinct from the admissible evidence relevant to the mortgage fraud counts. As a result, the jury may "confuse and cumulate" the evidence, convicting Mrs. Mosby of one or both counts "when it would not convict [her] of either if it could keep the evidence properly segregated." *Foutz*, 540 F.2d at 736. The intermixing of perjury and mortgage fraud evidence may also lull the jury into "conclud[ing] that [Mrs. Mosby] is guilty of one crime and then find[ing her] guilty of the other because of [her] criminal disposition." *Id.* Finally, because of differences in the evidence relevant to the perjury and mortgage fraud counts, a joint trial would make it impossible for Mrs. Mosby to assert her privilege against self-incrimination with respect to one set of counts but not the other.

To protect Mrs. Mosby's right to a fair trial, the Court should sever this case into separate trials on the perjury counts and the mortgage fraud counts.

**1.      *Foutz* category one: at a joint trial, the jury may "cumulate and confuse" the evidence to Mrs. Mosby's prejudice.**

**a.      There is no overlap in relevant, admissible evidence between the perjury and mortgage fraud counts.**

When a defendant seeks severance based on evidentiary spillover, the court should begin by "consider[ing] the factual and evidentiary overlap between the counts" that have been joined. *Cohen*, 2015 WL 2261661, at *28. Here, no overlap exists.

### i.      Trial on mortgage fraud only

Start by considering the government's burden at a trial solely on the mortgage fraud counts. A conviction under § 1014 requires the government to prove that: (1) the defendant made a false statement or report relating to a mortgage application, (2) the defendant acted knowingly, (3) the false statement or report was made for the purpose of influencing a mortgage-lending business' actions, and (4) the statement was submitted to a mortgage-lending business. Sand, Siffert, *Modern Federal Jury Instructions*, Instruction No. 17:33 (modified); *see also Elliott v. United States*, 332 F.3d 753, 759 (4th Cir. 2003) (reciting these elements, though in slightly different language). According to the superseding indictment, Mrs. Mosby knowingly made two false statements (or sets of false statements) for the purpose of influencing mortgage lenders.

Count two alleges that in July and September of 2020, Mrs. Mosby submitted a mortgage application to Cardinal Financial Company to finance a home in Kissimmee, Florida. ECF 23 at 8. In that application, Mrs. Mosby allegedly (1) did not inform the lender that she owed taxes to the IRS, despite a question asking for disclosure of all financial liabilities; (2) stated falsely that she was not delinquent or in default on any federal debt; and (3) represented that she would live in the Kissimmee home, even though she had previously signed an agreement authorizing a property-management company to lease the house to renters. ECF 23 at 8-10. Similarly, count four alleges that in December 2020, January 2021, and February 2021, Mrs. Mosby submitted a mortgage application to United Wholesale Mortgage to buy a condominium in Long Boat Key, Florida. ECF 23 at 16. That application allegedly contained a number of false statements: (1) that Mrs. Mosby had spent the previous 70 days living in Florida, (2) that she was not delinquent or in default on any federal debt, and (3) that her husband had given her $5,000 to be applied

toward the purchase of the Long Boat Key condo. ECF 23 at 18-19.

At a trial limited to the mortgage fraud counts, the government (presumably) would introduce the loan applications Mrs. Mosby submitted; IRS documents pertaining to her tax debt, such as her tax returns, notices of deficiency, withholdings of tax refunds, and the lien the IRS placed on her property; the agreement she executed with the property-management company for the Kissimmee home; and a letter she sent to United Wholesale Mortgage attesting that she had lived in Florida for the preceding 70 days, among other things. But, to demonstrate that statements on Mrs. Mosby's mortgage applications were knowingly false, the government would *not* be allowed to introduce any evidence that bears in any way on the perjury alleged in counts one and three, such as the CARES Act forms she submitted to Nationwide, pay stubs from calendar year 2020, or other records of her employment by Baltimore City.

The latter evidence might shed light on whether statements on her *CARES Act forms* were knowingly false, but it sheds no light at all on whether statements on her *mortgage applications* were knowingly false. Whether Mrs. Mosby committed perjury as alleged in counts one and three does not bear on the factual questions the jury must decide concerning counts two and four: (1) whether Mrs. Mosby made false statements, (2) whether she acted knowingly, (3) whether the false statements were made for the purpose of influencing the mortgage lenders, and (4) whether the statements were submitted to mortgage lending businesses. *See* Sand, Siffert, *Modern Federal Jury Instructions*, Instruction No. 17:33; *Elliott*, 332 F.3d at 759. Indeed, absent from counts two and four are any allegations that Mrs. Mosby made any false statement to her mortgage lenders about having financed the down payments through CARES Act withdrawals. Accordingly, evidence relating to Mrs.

Mosby's alleged CARES Act-related perjury would be entirely inadmissible at a trial on the mortgage fraud counts.

### ii.        Trial on perjury only

The same is true in reverse. To secure a perjury conviction, the government must show "(1) a 'declaration,' (2) made 'under penalty of perjury,' (3) in which the accused 'willfully subscribes as true,' (4) 'any material matter,' (5) 'which he does not believe to be true.'" *United States v. Savoy*, 38 F. Supp. 2d 406, 413 (D. Md. 1998) (quoting § 1621(2)). The perjury counts allege Mrs. Mosby willfully made false statements when she indicated on her CARES Act withdrawal forms that she had suffered "adverse financial consequences" as a result of covid. ECF 23 at 4-5, 13-14. The government's relevant, admissible evidence on these counts would likely include Mrs. Mosby's CARES Act withdrawal forms; records relating to her financial status, such as bank statements and pay stubs; and testimony supposedly demonstrating that Mrs. Mosby did not experience any of the four circumstances enumerated in § 2202 of the CARES Act, i.e., that she was not quarantined, furloughed or laid off, did not see a reduction in work hours, was not unable to work because of child care, and did not experience the "closing or reduction of hours of a business [she] own[ed] or operate[d]." ECF 23 at 3.

But evidence bearing on the alleged mortgage fraud would *not* be relevant and admissible in a perjury-only trial. The fact that Mrs. Mosby submitted mortgage applications containing supposedly false statements about her taxes (and other matters) does not retroactively bear on (1) whether she made "declaration[s]" by checking the "adverse financial consequences" boxes on her CARES Act forms, (2) whether those declarations were made "under penalty of perjury," (3) whether she "willfully subscribe[d]" those declarations as true, (4) whether the matters in those declarations were

"material," or (5) whether she did not believe those declarations to be true. *See Savoy*, 38 F. Supp. 2d at 413. At a trial dedicated solely to the perjury counts, therefore, none of the mortgage-fraud evidence would be admissible.

> **b.      Contrary to the government's view, Mrs. Mosby's home purchases are irrelevant to whether she suffered "adverse financial consequences," which is an element of the perjury counts.**

The government has previously argued that, in a trial on the perjury counts, the Court should admit evidence that Mrs. Mosby used her withdrawn funds to purchase the two Florida homes. The government claimed such evidence is "relevant and probative of the fact that [Mrs. Mosby] did not suffer adverse financial consequences." ECF 90 at 39. In the government's view, "the fact that [Mrs. Mosby] used the 457(b) withdrawals to buy two vacation homes certainly has 'any tendency' to make it more probable that, at the time of each withdrawal, [Mrs. Mosby] had not actually suffered adverse financial consequences stemming from COVID-19." ECF 90 at 41 (quoting Fed. R. Evid. 401).

Mrs. Mosby is at a disadvantage in responding to this argument because the government never explained *how* her use of withdrawn funds supposedly demonstrated that she did not suffer adverse financial consequences; instead, the government simply repeated that bare conclusion over and over. *See* ECF 90 at 39 ("[T]he fact that [the funds] were used to buy vacation homes is evidence that [Mrs. Mosby] did not suffer from adverse financial consequences."); *id.* ("[H]ow [Mrs. Mosby] used the funds is evidence that goes directly to an essential element in this case: whether [she] falsely stated that she experienced adverse financial consequences as a result of COVID-19."); *id.* at 42 ("[T]he fact that [Mrs. Mosby] used the funds to buy vacation homes is probative of the fact that no adverse financial consequences existed in the first place."); *id.* at 43 ("[Mrs. Mosby's] use

of the fraudulently obtained funds is relevant to prove that she was never entitled to withdraw those funds in the first place."); *id.* at 45 ("[Evidence of how Mrs. Mosby used the funds] is certainly probative of whether she was entitled to receive the funds."); *id.* ("[E]vidence of how [Mrs. Mosby] spent the funds is relevant to whether she was entitled to withdraw those funds in the first place."); *id.* at 47 ("[T]he fact that the funds were used to buy vacation homes is evidence that [Mrs. Mosby] had not, in fact, suffered adverse financial consequences stemming from COVID-19.").

Nevertheless, to the extent Mrs. Mosby can divine the government's logic, it appears to rest on the following syllogism: (1) someone who has suffered adverse financial consequences is in poor financial shape, (2) new homes are expensive, and therefore (3) someone who has suffered adverse financial consequences cannot afford to buy a new home. Despite a certain superficial appeal, this argument does not stand up to scrutiny; it rests on a number of unstated assumptions that lack any basis in the CARES Act's text.

>   i.   **It is possible to simultaneously (1) suffer adverse financial consequences and (2) have large amounts of cash and other liquid assets on hand.**

First, the government's position assumes that anyone who has endured adverse financial consequences finds herself destitute or cash-starved as a result. In other words, the government appears to believe that when someone experiences adverse financial consequences, her finances are tenuous not only in a relative sense (meaning she has less money in her bank account than she did before covid), but also in an absolute sense (meaning the total amount of money in her bank account is very small). On that understanding of the term, it might make sense to conclude that someone who purchases a half-million-dollar house has not suffered "adverse financial consequences."

But the CARES Act does not define "adverse financial consequences" in that way. It

does not say adverse financial consequences must be so severe that they leave a retirement-plan participant in poverty, nor does it establish any kind of ceiling for the pre-covid income a participant may have earned in order to take a withdrawal. Fortune 500 executives were just as eligible to withdraw funds as were people earning minimum wage, as long as they had suffered "adverse financial consequences." And under a plain-text reading of that phrase, a retirement-plan participant need only be worse off financially than she was before the pandemic—even if her bank account still contains large quantities of cash. Someone who earns a million dollars a year, but who loses two weeks' salary because she was "quarantined," has suffered "adverse financial consequences" that qualify her for a CARES Act withdrawal, notwithstanding that she may have millions of dollars in her bank account. Thus the fact that withdrawn funds are used on an expensive item, such as a house, does not in any way suggest the withdrawer has not endured adverse financial consequences. The government seeks to impose an on-the-brink-of-bankruptcy requirement that the statute does not contain.

### ii.   A CRD can exceed the size of the adverse financial consequences that triggered a withdrawal.

Second, and relatedly, the government assumes a CARES Act withdrawal can be no greater, in total dollars, than the adverse financial consequences that occasioned the withdrawal. That is, the government seems to believe that if, as a result of "being furloughed or laid off or having work hours reduced," a retirement-plan participant makes $50,000 less than she would have in a non-covid world, then her withdrawal cannot exceed $50,000. And because the withdrawal leaves her with no more money on hand than she would have had absent covid, she will be unable to afford an expensive item like a new home. Thus that person's purchase of a home indicates she must not have suffered adverse

financial consequences. Or so the argument (apparently) goes.

Even on its own terms, this argument does not work. Someone who, in February of 2020, was preparing to buy a home, but who got laid off a month later, was perfectly free under the CARES Act to take a withdrawal in the amount of her lost income and then proceed with her pre-planned house purchase, for which she already had sufficient funds.

More important, nothing in the CARES Act limits a withdrawal to the amount of the adverse financial consequences that a retirement-plan participant has experienced. The statute imposes only one restriction on the size of CRDs: they "shall not exceed $100,000" in "any taxable year." CARES Act, Pub. L. 116-136, § 2202(a)(2) (A), 134 Stat. 281, 340 (2020). So if a participant suffered $5,000 worth of adverse financial consequences, she had every right to take a distribution worth $30,000 or $75,000 (or some other amount), which she was then entitled to spend on a new home (or anything else). In this way, someone who sustained adverse financial consequences might actually be *better* positioned to buy a new home than someone who did not.

This result, though perhaps counterintuitive at first blush, makes sense: one of Congress' chief aims in passing the CARES Act was to flood the economy with money, hoping the infusion of cash would stave off a vicious recession. Requiring a dollar-for-dollar match between "adverse financial consequences" and the corresponding withdrawal would undermine that goal by reducing the amount of money injected into the economy. The government's position—that using a CRD to make a large purchase disproves the existence of adverse financial consequences—is therefore inconsistent with both the text and the purpose of the CARES Act.

### iii.   Regardless, the Court should exclude use-of-funds evidence under Rule 403.

In any event, even assuming Mrs. Mosby's home purchases had some minimal probative value as to the perjury counts, use-of-funds evidence would still be inadmissible at a perjury-only trial. Federal Rule of Evidence 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Evidence that Mrs. Mosby used her CRDs to buy what the government terms "vacation homes" implicates several of these considerations.

***First,*** use-of-funds evidence will "confus[e] the issues" and "mislead[] the jury." Such evidence perhaps suggests that, following her withdrawals, Mrs. Mosby had access to a moderately large amount of cash, i.e., enough to purchase the Florida homes. But as explained above, the determinative fact for "adverse financial consequences" purposes is not the *absolute* amount of money Mrs. Mosby had on hand, but rather the *relative* amount—did covid leave her worse off financially than she would have been otherwise? The distinction between these two questions is a fine one; it will be easy for jurors to assume—wrongly—that if someone has taken a financial hit because of covid, she is in no position to buy new homes. Jurors are likely to attach significant weight to the fact that Mrs. Mosby was financially secure enough to purchase two homes, even though, as a logical matter, that fact "is of little or no evidentiary value." *In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913, 920-22 (4th Cir. 2016) (holding district court properly excluded evidence based on confusing the issues and misleading the jury). Thus use-of-funds evidence will only "distract[] the jury from its

principal purpose": deciding covid's *relative* effect on Mrs. Mosby's finances. *United States v. Zayyad*, 741 F.3d 452, 462 (4th Cir. 2014) (affirming exclusion of evidence based on confusing the issues and misleading the jury).

Further, if the government attempts to conflate these issues in its argument to the jury, as it has indicated it will, Mrs. Mosby will be forced to explain to the jury that, in fact, spending CRD funds on a second home does not suggest the absence of adverse financial consequences. Because that explanation is nuanced and complex, defense counsel will have to parse the CARES Act's text at some length and spend considerable time dispelling the misimpression left by the government's argument. Sometimes, extended argument about fine points of law is unavoidable, as when the dispute is determinative of an essential element of the charged crime. But that is not this case. Use-of-funds evidence would, at most, circumstantially bolster the inference that Mrs. Mosby did not suffer adverse financial consequences. It therefore cannot justify the sideshow that is sure to ensue.

***Second,*** use-of-funds evidence would cause "unfair prejudice," which occurs when evidence has "an undue tendency . . . to influence a jury to make a decision for reasons unrelated to the probative value of the evidence." *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 719 (4th Cir. 2014). Covid imposed severe hardships on a large swath of the population. Millions of people fell ill, lost loved ones, were laid off, quarantined for extended periods, scrambled to find childcare, experienced loneliness or depression, and generally felt at their wits' end. Against this backdrop, the image of Mrs. Mosby using her covid withdrawals to purchase so-called "vacation homes" would be highly inflammatory. Jurors are liable to perceive her as entitled and out of touch,

and to want to convict her on that basis. And that risk is heightened by Mrs. Mosby's status as a public figure—someone entrusted by the members of public to put their interests above her own. The use-of-funds evidence therefore risks a guilty verdict "unrelated to the probative value of the evidence," *id.*, and that risk "is disproportionate to the probative value of the offered evidence," *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006).

* * *

The bottom line is that the way Mrs. Mosby used her withdrawals is inadmissible to prove she did not suffer adverse financial consequences. As a result, no evidence relevant to the mortgage fraud counts, such as Mrs. Mosby's purchase of two Florida homes, would be admissible at a separate trial on the perjury counts, and vice versa.

<blockquote>c. <b>The mutual inadmissibility of evidence on the perjury and mortgage fraud counts requires severance.</b></blockquote>

Prejudice warranting severance may exist whenever "evidence supporting one count" would not "also [be] admitted in a trial solely on the other count." *Nettles*, 476 F.3d at 516. That is the case here, where there is no overlap in relevant, admissible evidence between the perjury and mortgage fraud counts. *See also Downey*, 2009 WL 10681814, at *1 ("[I]if evidence of one of the charged offenses would not be admissible at the trial of the other charged offense . . . , a defendant may be sufficiently prejudiced by a joint trial to justify severance under Rule 14.").

Additional considerations support severance as well.

<blockquote>i. <b>Evidence on the two sets of counts is not "easily segregated."</b></blockquote>

Although mutual inadmissibility does not necessarily require severance in every case, courts are more inclined to sever when evidence on separate counts is not "easily

21

segregated." *Blair*, 661 F.3d at 770. This case fits that description. To begin, the jury is likely to view evidence of the perjury and mortgage fraud counts as part of a single, seamless whole: Mrs. Mosby took money out of her retirement account so she could spend it on new homes. The evidence supporting the two sets of counts coheres into a simple narrative that will make it difficult for the jury to compartmentalize the separate counts. Far from being "easily segregated," the evidence on the two sets of counts is ineluctably interconnected.

Worse, the government has signaled that it hopes to highlight this connection by injecting mortgage fraud evidence into the jury's consideration of the perjury counts. Specifically, the government intends to argue that certain evidence of mortgage fraud (Mrs. Mosby's purchase of new homes) establishes an element of the perjury counts (that she did not suffer adverse financial consequences). *See* ECF 90 at 39-43. Contaminating consideration of the perjury counts in this way is likely to "confuse" the jury. *Foutz*, 540 F.2d at 736. For the reasons explained above, use of CRD funds to buy a home does nothing to suggest a lack of adverse financial consequences. Yet the government's argument has the kind of surface-level appeal that will lead astray jurors untrained in the law and unfamiliar with the intricacies of the CARES Act. That argument is likely to strike many jurors as intuitively right, even if, on closer inspection, it falls apart. In short, jurors will be susceptible to the government's attempt to use conduct that was lawful under the CARES Act (purchasing properties in Florida) to prove an unlawful mental state (knowledge of falsity)—an improper manipulation of the law.

A joint trial therefore presents a serious risk that the jury will misunderstand the law in the same way the government misunderstands the law, and will convict Mrs. Mosby

on the perjury counts even though "it would not convict [her] of [those counts] if it could keep the evidence properly segregated." *Id.*

### ii.    The government's evidence is not "overwhelming."

The weakness of the government's case also counsels in favor of severance. When "evidence of both crimes is overwhelming," a joint trial may not be so prejudicial as to require severance. *Foutz*, 540 F.2d at 733; *see also United States v. Jamar*, 561 F.2d 1103, 1107 (4th Cir. 1977) (noting that "substantial, direct evidence of guilt" undermines need for severance); *Blair*, 661 F.3d at 770 (affirming denial of severance where "government presented overwhelming evidence of Blair's guilt on the money laundering charges"). But this is not such a case.

To secure a perjury conviction, the government will have to prove that Mrs. Mosby acted "willfully," § 1621—i.e., that she "d[id] not believe" a statement on her CARES Act withdrawal forms was true, *Savoy*, 38 F. Supp. 2d at 413; *see also* Sand, Siffert, *Modern Federal Jury Instructions*, Instruction 48:11. The government's theory is that Mrs. Mosby did not believe she had suffered adverse financial consequences as a result of § 2202's enumerated circumstances. Proving that fact will require showing that, as of the days on which Mrs. Mosby made her withdrawals, she understood "adverse financial consequences" to mean whatever this Court ultimately determines it means. And that will be no easy task.

As Mrs. Mosby's motion for early jury instructions explains, the meaning of "adverse financial consequences" is far from clear. *See* ECF ___ at 5-10. In 2020, when Mrs. Mosby submitted her withdrawal forms, the CARES Act was only months old; the statute did not define "adverse financial consequences"; and no case law had elaborated the meaning of that term. It was unclear then—as it still is today—whether courts measuring

23

"adverse financial consequences" looked to income, net worth, or some other metric; whether adverse financial consequences had to surpass a certain threshold dollar amount; and whether a retirement-plan participant could suffer adverse financial consequences if her business, which otherwise was on track to open, never got off the ground because of the pandemic. Moreover, it was, and remains, unclear whether the standard used to measure "adverse financial consequences" is a subjective one based on the defendant's personal understanding of the term or an objective, "reasonable person" one. The definitional ambiguity surrounding "adverse financial circumstances" will make it hard for the government to prove that Mrs. Mosby *knew* her CARES Act withdrawal forms contained false statements, even if those statements turn out to have been false under the definition this Court crafts *ex post*.

As for the mortgage fraud counts, substantial evidence indicates Mrs. Mosby did not know any statements on her loan applications to be false.

Mrs. Mosby's Husband, Nick Mosby, has issued a sworn statement attesting that he prepares and files the couple's taxes without Mrs. Mosby's involvement. *See* Statement of Nick Mosby, attached as Exhibit A, at 1. Although Mr. Mosby asks Mrs. Mosby to confirm her income figures on the couple's returns, she otherwise has no role in reviewing or submitting those returns. *Id.* Mr. Mosby explained that the tax deficiencies identified in the superseding indictment arose because he—without informing Mrs. Mosby—made early withdrawals from his retirement account, for which he neglected to withhold sufficient taxes. *Id.* He attempted to resolve those deficiencies on his own, and "[a]ll phone calls, correspondence and agreements with the Internal Revenue Service [were] with [him] and not with [his] wife." *Id.* at 2. According to Mr. Mosby, he did not inform Mrs. Mosby that

the IRS had placed a lien on their property until October 13, 2020. *Id.* She was therefore unaware of that lien when she applied for a mortgage for the Kissimmee home.

As for the application for the Long Boat Key mortgage, Mrs. Mosby anticipates Mr. Mosby will testify at trial that, before she submitted that application, he led her to believe he had settled the IRS debt. Mr. Mosby's public actions corroborate that account. On November 24, 2020, he held a press conference at which he announced he had paid off the tax lien.[3] Mrs. Mosby submitted her application for the Long Boat Key mortgage just weeks later. In addition, Gilbert Bennett, the broker who facilitated the purchase of both Florida homes, told the FBI that the title searches for Mrs. Mosby's Florida homes likely did not reveal the tax lien, since those searches simply look to whether the house being purchased is clear of any liens. Gilbert Bennett FD-302, attached as Exhibit B, at 1. Thus the loan-approval process would not have put Mrs. Mosby on notice that her property was subject to a lien. Finally, sometime after the loans were executed, Bennett received a call from Mrs. Mosby, who had recently learned the tax lien had in fact not been paid off. *Id.* Bennett told the FBI that Mrs. Mosby "was livid because it was news to her" and "she thought her husband took care of it because it was his deal to clear up." *Id.*

Bennett also said in his FBI interview that a second home rider, like the one Mrs. Mosby executed as part of the mortgage for the Kissimmee home, does not prevent the homeowner from renting out a property that serves as a second home. *Id.* at 2. As long as the homeowner uses the home for a limited period of time and does not relinquish full

--------

[3] Peter Shen, *Nick Mosby says he paid his federal tax lien*, Baltimore Brew (Nov. 24, 2020), https://www.baltimorebrew.com/2020/11/24/nick-mosby-says-he-paid-his-federal-tax-lien/.

control over it, she is free to rent out the home through a property-management company. *Id.* This evidence suggests Mrs. Mosby did not believe the attestations in the second home rider were false.

Ultimately, of course, the jury may or may not credit the above evidence. But regardless, it is certainly compelling enough that the government's case cannot be characterized as "overwhelming." *Foutz*, 540 F.2d at 733.

### iii.    The increased efficiency of a joint trial would be minimal.

In addition, the lack of evidentiary cross-admissibility means a joint trial will produce only very limited efficiencies. If "evidence of one offense would not be admissible at a separate trial for the other, the saving of time effected by a joint trial is minimal." *Foutz*, 540 F.2d at 738. That is the case here. Based on the superseding indictment and the discovery produced to date, it appears that the only witness who might provide relevant, admissible evidence as to both the perjury and mortgage fraud counts is Mrs. Mosby. She might, for example, testify at the perjury trial about how her travel business caused her "adverse financial consequences," and testify at the mortgage fraud trial about why she did not realize her property was subject to a tax lien. But no government witnesses would have to show up to testify at two separate trials, and the only efficiency realized by a joint trial would be "the selection of one jury rather than two." *Id.* The Fourth Circuit has indicated that such minor economies are insufficient to justify a joint trial. *See id.* When "the only real convenience served by permitting joint trial of unrelated offenses against the wishes of the defendant [is] the convenience of the prosecution in securing a conviction," denying severance can be an abuse of discretion. *Id.*

For that reason, district courts in the Fourth Circuit frequently subordinate de

minimis gains in judicial economy to a defendant's fair-trial right. *See, e.g.*, *Malik*, 2017

WL 11458498, at *11 (ordering severance even though bifurcated trials would require three

to four more days than joint trial); *United States v. Cureton*, No. CR RDB-16-0087, 2017

WL 780707, at *2 (D. Md. Mar. 1, 2017) ("[T]he prejudicial spillover effect of trying

Cureton for both conspiracies outweighs the Government's concerns as to judicial

economy."); *United States v. Simmons*, 163 F. Supp. 3d 317, 324 (E.D. Va. 2016) (ordering

severance and holding "concerns of judicial economy" did not justify joint trial where "the

overlap between the two sets of charges, in terms of evidence to be presented at trial[,]

seem[ed] slight"); *United States v. Sherman*, No. 1:10CR00039, 2011 WL 11186, at *2

(W.D. Va. Jan. 4, 2011) (concluding "the interests of judicial efficiency" were

"outweigh[ed]" by evidentiary "spillover effect" of joint trial); *Downey*, 2009 WL

10681814, at *3 ("[B]ased on the information presented, it appears that the evidence at the

two trials would be distinct, involving different witnesses and different evidence, and

would not be duplicative. Therefore, considerations of judicial economy do not weigh

significantly against a severance."); *United States v. Gunn*, 968 F. Supp. 1089, 1095 (E.D.

Va. 1997) ("[W]hile judicial economy would be somewhat impaired if the instant motion to

sever were granted, the likelihood of prejudice to Gunn if his motion were denied would be

much greater. Accordingly, the motion to sever Count II [is] granted.").

### d.   Severance is required even if use-of-funds evidence is admissible as to the perjury counts.

Finally, assuming for sake of argument that evidence of how Mrs. Mosby used her

withdrawals is admissible to prove the perjury counts, severance is still required. The

hypothetical admissibility of such evidence suggests, at most, that a joint trial would not

violate Mrs. Mosby's fair-trial rights as to the *perjury* counts. But it does not alter the

calculus as to the *mortgage fraud* counts, since there still is no perjury-related evidence

that would be admissible at a mortgage fraud trial. The government has never argued that

any of the facts surrounding Mrs. Mosby's CARES Act withdrawals have any relevance to

whether she made false statements on her mortgage applications, and she cannot conceive

of how the government might attempt to draw a connection. The result is that "evidence of

one of the charged offenses would not be admissible at the trial of the other charged

offense." *Downey*, 2009 WL 10681814, at *1 (citing *Foutz*, 540 F.2d at 738).

Severance is therefore required to protect Mrs. Mosby's right to a fair trial on the

mortgage fraud counts—regardless of whether a joint trial would cause her prejudice

relative to the perjury counts.

> **2.     *Foutz* category three: a joint trial risks a conviction predicated on impermissible propensity reasoning.**

Severance is required for a second, independently sufficient reason: at a joint trial,

"the jury may conclude that [Mrs. Mosby] is guilty of one crime and then find [her] guilty

of the other because of [her] criminal disposition." *Foutz*, 540 F.2d at 736.

The American legal system embodies "the revered and longstanding policy" that a

defendant must be "tried for *what* he did, not *who* he is." *United States v. Hall*, 858 F.3d

254, 266 (4th Cir. 2017) (emphasis in original). To that end, Federal Rule of Evidence

404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to

prove a person's character in order to show that on a particular occasion the person acted in

accordance with the character." Evidence of that type is both "'of slight probative value'"

and "'very prejudicial,'" with the result that it "'tends to distract the trier of fact from the

main question of what actually happened on the particular occasion.'" *Hall*, 858 F.3d at

270 (quoting Fed. R. Evid. 404(a) advisory committee's note to 1972 proposed rule).

While a "layman[]" may view propensity evidence as "logically relevant to [a defendant's] guilt or innocence of a specific crime, the law regards the inference from general to specific criminality [as] so weak, and the danger of prejudice so great, that it attempts to prevent conviction on account of a defendant's bad character." *Foutz*, 540 F.2d at 736. The ban on bad-acts evidence is meant to guard against "the danger that this type of evidence will overly influence the finders of fact and thereby persuade them to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Hall*, 858 F.3d at 266. Absent that protection, there is a "risk" that "the government could deploy the [bad] act as a character smear that might actually infect the entirety of the trial—by portraying the defendant in the eyes of the jury as a person deserving of particular condemnation almost irrespective of the various forms of misconduct of which he stood accused." *United States v. Briley*, 770 F.3d 267, 277 (4th Cir. 2014).

Because the danger of propensity-based reasoning in this case is substantial, severance is required. *See Hawkins*, 776 F.3d at 211 (in case involving bad-acts evidence, holding district court abused discretion by denying severance because "defendant's general propensity to commit crimes can have a substantial and injurious effect or influence in determining the jury's verdict").

At a joint trial, the jury would be asked to decide whether Mrs. Mosby lied on her CARES Act withdrawal forms while aware of evidence purporting to show she lied on her mortgage applications. And it would be asked to decide whether she lied on her mortgage applications while aware of evidence purporting to show she lied on her CARES Act withdrawal forms. It is not hard to envision how a "layman[]," *Foutz*, 540 F.2d at 736,

would respond to this task—by concluding that if Mrs. Mosby lied on one set of forms, she probably lied on the other as well.

In a case featuring offenses that differ significantly in character—e.g., carjacking and crossing the border illegally—it might be possible for a jury to resist the conclusion that guilt of one offense suggests guilt of the other. But Mrs. Mosby's case is not like that. The core wrong alleged in both sets of offenses is the same: making false statements on financial documents. And those offenses involve the same common nucleus of operative facts, relating to Mrs. Mosby's use of retirement funds to purchase additional homes in Florida. It is simply implausible that a jury, confronting offenses with so much legal and factual overlap, would not be tempted into impermissible propensity reasoning.

*Simmons*, in which the defendant was also charged with two sets of fraud-related offenses, exemplifies the problem. There, counts one through five of the indictment charged the defendant with "defrauding the government and government contractors by falsely representing that he was employed by the Central Intelligence Agency ('CIA') as an Outside Paramilitary Special Operations Officer"; counts six and seven charged the defendant with "defrauding a private individual by making false claims concerning a non-existent real estate investment." *Simmons*, 163 F. Supp. 3d at 318. The defendant moved to sever counts six and seven from counts one through five, and the district court granted the motion. *Id.* at 319. The facts underlying the two sets of offenses were "completely different," which warranted severance because "'there [wa]s a serious risk that the jury [could] confuse and cumulate the evidence and convict the defendant of' the charges related to real estate fraud and the charges related to government and government contractor fraud 'when it would not convict him of either set of charges if it could keep the

evidence properly segregated.'" *Id.* at 321 (quoting *Foutz*, 540 F.2d at 736).

At the same time, and despite their factual dissimilarity, the "crux" of the two sets of offenses was the same: "fraud" committed via "false claims" or "false statements." *Id.* In consequence, there was a "serious risk" that jurors, having concluded the defendant was guilty of one set of counts, would "be primed to find the same defendant guilty" of "unrelated" counts, and thus "unable to make a fair, unbiased assessment as to whether [the] defendant committed" the latter. *Id.* at 321-22. Evidence of one set of counts, in other words, would "make [the] defendant appear, in the eyes of a jury, more likely to have committed an unrelated [set of counts]." *Id.* at 324. The *Simmons* court therefore granted severance on the additional basis that "there [wa]s a serious risk that 'the jury [might] conclude that the defendant [wa]s guilty of' Counts 1 through 5 'and then find him guilty of' Counts 6 and 7 'because of his criminal disposition.'" *Id.* at 321 (quoting *Foutz*, 540 F.2d at 736).

This case presents the same risk. At a joint trial, bad-acts evidence would "overly influence" the jury, *Hall*, 858 F.3d at 266, and only a severance can head off that danger. *See also, e.g.*, *Foutz*, 540 F.2d at 736-39 (holding district court abused discretion by failing to sever two bank-robbery counts because jury may have convicted defendant based on supposed "criminal disposition"); *United States v. Riley*, 21 F. Supp. 3d 540, 547-48 (D. Md. 2014) (ordering severance because there was serious risk that jury would use evidence of defendant's prior conviction to infer "criminal disposition" and convict him of unrelated counts as a result).

### 3.    *Foutz* category two: trying the perjury and mortgage fraud counts together would confound and frustrate Mrs. Mosby's ability to testify in her own defense.

In *Foutz*'s second scenario, a defendant is prejudiced if she is "confounded in presenting defenses, as where [she] desires to assert [her] privilege against self-incrimination with respect to one crime but not the other." 540 F.2d at 736. Explaining why a joint trial would cause this type of prejudice requires discussion of sensitive, privileged information that Mrs. Mosby cannot be required to divulge to the public or the prosecution. Contemporaneous with this motion, she is therefore seeking leave to file a short supplemental brief, ex parte and under seal, in which she argues the applicability of *Foutz* category two. Because that filing "makes a convincing showing that [Mrs. Mosby] has both important testimony to give concerning one [set of offenses] and strong need to refrain from testifying on the other," *Goldman*, 750 F.2d at 1225, severance is required.

But even when a defendant cannot satisfy *Goldman*'s demanding appellate standard, district courts sometimes grant severance in their discretion if it appears possible—but by no means certain—that a joint trial will put a defendant in the "dilemma" described in *Foutz*. *Id.* In *United States v. Oaks*, 285 F. Supp. 3d 876, 881-82 (D. Md. 2018), for example, the defendant asserted only that "it [wa]s 'reasonable' and 'plausible' that he 'may wish to testify as to Count Ten, but not Counts One through Nine.'" The government complained that a "claim that it is 'conceivable' he 'may' want to testify falls short of showing a 'genuine' and 'serious risk of prejudice,'" but the court ordered severance anyway. *Id.* at 882. Similarly, the court in *United States v. Gray*, 78 F. Supp. 2d 524, 532 (E.D. Va. 1999), severed counts upon concluding merely that "it [wa]s easy to imagine that defendant may wish to testify on his own behalf" on some charges but not others.

Even if this Court concludes Mrs. Mosby's supplemental brief does not satisfy the

*Goldman* test, it at least makes a showing similar to those in *Oaks* and *Gray*. The Court

should therefore sever the perjury and mortgage fraud counts in its discretion.

## III.     Conclusion

Courts "must not shirk their duties under Rule 14" and "should vigilantly monitor" a

case to ensure a defendant does not suffer "unfairness" from joinder of counts. *Coleman*,

22 F.3d at 134. Here, that imperative requires severance. Mrs. Mosby respectfully requests

that the Court sever counts one and three from counts two and four.

Respectfully submitted,

/s/ James Wyda
James Wyda
Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
jim_wyda@fd.org

/s/ Lucius Outlaw
Lucius Outlaw
Outlaw PLLC
1351 Juniper Street, NW
Washington, DC 20012
Phone: (202) 997-3452
loutlaw3@outlawpllc.com

/s/ Maggie Grace
Maggie Grace
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
maggie_grace@fd.org

**EXHIBITS A AND B**

**FILED UNDER SEAL**