United States District Court for
the District of Maryland

| | |
|---|---|
| United States<br><br>v.<br><br>Marilyn Mosby | No. 1:22-cr-7-LKG |

**Motion to Strike Allegations Regarding Mrs. Mosby's Use of Funds
from Counts One and Three of the Superseding Indictment**

Counts one and three of the superseding indictment charge Marilyn Mosby with perjury based on two forms she submitted to her retirement plan in 2020. According to the indictment, Mrs. Mosby falsely indicated on those forms that she had suffered "adverse financial consequences" as a result of the coronavirus, entitling her to take early withdrawals from her retirement account. Counts one and three further allege Mrs. Mosby used those funds toward the down payments on "vacation homes" in Kissimmee and Long Boat Key, Florida.[1] These latter allegations are irrelevant to whether Mrs. Mosby

---

[1] Mrs. Mosby objects to the characterization of the Florida properties as "vacation homes." As will be shown at trial, Mrs. Mosby purchased the homes, in part, with the business intent to operate the homes as rental properties, particularly for families seeking getaways during the pandemic. The evidence will show that consistent with that business plan, Mrs. Mosby engaged a rental-property company to manage the rental bookings and manage the properties, subject to Mrs. Mosby's control and oversight.

1

committed perjury under 18 U.S.C. § 1621. Because they would also prejudice Mrs. Mosby if the jury received a copy of the indictment before beginning deliberations, the Court should strike from counts one and three any allegation about how Mrs. Mosby used the funds she withdrew from her retirement account.

I.   **Procedural background**

On March 10, 2022, a grand jury handed up an indictment charging Mrs. Mosby with two counts of perjury, under § 1621 (counts one and three), and two counts of mortgage fraud, under 18 U.S.C. § 1014 (counts two and four). ECF 23. The perjury counts allege that on two occasions in 2020, Mrs. Mosby submitted paperwork to Nationwide, the firm that manages her municipal retirement plan, asking to withdraw funds from her account. ECF 23 at 2-3, 11-12. Retirement plans like Mrs. Mosby's, which are governed by § 457(b) of the Internal Revenue Code, ordinarily permit participants to withdraw funds only when they leave government service or experience "unforeseen emergencies that meet certain legal criteria." ECF 23 at 1-2. But in March 2020 Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which permitted § 457(b) participants to take a "coronavirus-related distribution" (CRD) in calendar year 2020 if they

> experience[d] adverse financial consequences as a result of being quarantined, being furloughed or laid off or having work hours reduced due to [covid], being unable to work due to lack of child care due to such virus or disease, closing or reducing hours of a business owned or operated by the individual due to such virus or disease, or other factors as determined by the Secretary of the Treasury (or the Secretary's delegate).

CARES Act, Pub. L. 116-136, § 2202(a)(4)(A)(ii)(III), 134 Stat. 281, 341 (2020).

Counts one and three allege that on the withdrawal forms she submitted to Nationwide, Mrs. Mosby checked a box indicating she had suffered "adverse financial consequences" as a result of one of the circumstances enumerated in § 2202 of the CARES

Act. ECF 23 at 3, 12. According to the indictment, these attestations were false, as Mrs. Mosby had not been quarantined, had not been furloughed or laid off, etc.

In response to Mrs. Mosby's first withdrawal request, Nationwide wired $36,000 to Mrs. Mosby in May 2020. ECF 23 at 4. Count one alleges Mrs. Mosby "used the withdrawal toward a down payment for a vacation home in Kissimmee Florida she purchased in September 2020." ECF 23 at 4. Similarly, in response to Mrs. Mosby's second withdrawal request, Nationwide wired $45,000 to Mrs. Mosby in December 2020. ECF 23 at 12-13. Count three alleges Mrs. Mosby "used the withdrawal toward a down payment for a second vacation home in Long Boat Key, Florida, she purchased in February 2021." ECF 23 at 13.

Counts two and four charge Mrs. Mosby with making false statements on the applications she submitted for loans on the two Florida homes. ECF 23 at 10, 18-19.

**II.   Argument**

    **A.   Legal background**

Under Federal Rule of Criminal Procedure 7(c)(1), an "indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Rule 7(d), in turn, provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information."

"The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in an indictment, or not essential to the charge, or unnecessary, or inflammatory." *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006). A district court should grant a motion to strike surplusage if "it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *Id.*

"In determining whether the information is relevant, the question is not whether the

allegations are legally relevant, i.e., would be admissible at trial." *United States v. Afsharjavan*, No. 1:15-CR-144 JCC, 2015 WL 5047438, at *3 (E.D. Va. Aug. 26, 2015). "Because so much material can qualify as legally relevant, such a reading would contravene the explicit language of Rule 7(c)." *United States v. Cooper*, 384 F. Supp. 2d 958, 960 (W.D. Va. 2005). After all, Rule 7(c) "provides that 'the indictment . . . must be a *plain, concise, and definite* written statement of the *essential* facts constituting the offense charged.'" *Id.* (quoting Fed. R. Crim. P. 7(c)) (emphasis in *Cooper*). The plain language of the Rule "contemplates an indictment that merely pleads each of the factual elements of the offense charged. It does not contemplate the inclusion of every piece of evidence that ultimately may be relevant to building a case against the defendant." *Id.* "If it did, a criminal indictment would be free to grow from a 'plain and concise' statement of 'essential' facts to an unreadable monstrosity discussing every piece of evidence that would be conceivably relevant at trial. Indeed, the Government would be free to use an indictment to thoroughly present its case to the jury before the trial even began, at a time when the defendant would not be entitled to defend himself." *United States v. Presgraves*, 658 F. Supp. 2d 770, 783 (W.D. Va. 2009).

On a motion to strike surplusage, therefore, the proper question for relevancy purposes is "whether [certain] material is 'unnecessary' in making out a *prima facie* pleading of the violation." *Cooper*, 384 F. Supp. 2d at 960 (quoting *United States v. Hartsell*, 127 F.3d 343, 353 (4th Cir. 1997)); *see also Afsharjavan*, 2015 WL 5047438, at *3 (same); *Presgraves*, 658 F. Supp. 2d at 783 (same).

B. Discussion

The Court should strike from counts one and three any mention of the uses to which Mrs. Mosby put money withdrawn from her retirement account. Contrary to what the

4

government has argued in prior litigation, such use-of-funds evidence is irrelevant to the elements of a § 1621 violation, and its inflammatory nature would prejudice Mrs. Mosby on the perjury counts.

        1.    **Mrs. Mosby's home purchases are not relevant to the elements of perjury, such as whether she suffered "adverse financial consequences.**

In prior litigation, the government argued that evidence of how Mrs. Mosby used her withdrawn retirement funds bears on whether she suffered "adverse financial consequences," and is therefore relevant to the perjury counts. ECF 90 at 39-43. The government contended "[t]he fact that the funds were used to buy vacation homes is evidence that [Mrs. Mosby] had not, in fact, suffered any adverse financial consequences stemming from COVID-19." ECF 90 at 47. Someone who experiences "adverse financial consequences," the government posited, must be too poor to buy a house, investment property, or similar property.

As Mrs. Mosby explains at greater length in her severance motion, the government's position rests on several interrelated misunderstandings of the CARES Act. *See* ECF ___ at 15-18.

*First,* the government interprets "adverse financial consequences" as a measurement of a person's *absolute* wealth, rather than her *relative* financial position. The government assumes, in other words, that if someone experiences adverse financial consequences, she has little available cash—and, therefore, cannot afford a second home or investment property. But on a plain-text reading of the words, financial consequences qualify as "adverse" as long as they leave someone in a worse position than she was in previously. So a retirement-plan participant suffers "adverse financial consequences" anytime one of § 2202's four circumstances leaves her with less money than she had before, even if the

5

sum total of all cash available to her is still quite large.[2]

***Second,*** the government is apparently under the impression that a CDR can be no larger than the "adverse financial consequences" a withdrawer has suffered. So if a retirement-plan participant loses $5,000 because she is furloughed from her job, then in the government's view, her CDR cannot exceed $5,000. And therefore, the government (apparently) believes, she lacks the cash on hand to buy a second home, because she naturally would use the withdrawn funds to plug the hole left by the furlough. This argument ignores the possibility that the participant had enough cash on hand to purchase a home before she suffered "adverse financial consequences." More important, it creates out of whole cloth a limitation that is nowhere to be found in the CARES Act. That statute does not say a withdrawal must be limited to the size of the adverse financial consequences that occasioned the withdrawal. In fact, the CARES Act suggests a qualifying participant can withdraw up to the $100,000 statutory maximum without regard to the dollar amount of the "adverse financial consequences" she experienced. *See* CARES Act, Pub. L. 116-136, § 2202(a)(2) (A), 134 Stat. 281, 340 (2020) (providing CRDs in a given taxable year "shall not exceed $100,000"). Therefore, when a worker loses $5,000 because of a covid-related furlough, she has every right under the CARES Act to take a withdrawal up to $100,000. Thus the use of withdrawn funds to purchase a home in no way suggests the purchaser did

---

[2] To be clear, Mrs. Mosby is not contending that "adverse financial consequences" is limited to an assessment of whether a person has less total wealth than before the pandemic. Because "adverse financial consequences" is not defined by the CARES Act or any related regulation or authority, the term must be viewed broadly, to include other types of financial loss, such as lost or declining investments, a decline in the market value of an asset, lost business opportunities, and the suspension or termination of the planned launch of a business. Mrs. Mosby's point here is simply that the word "adverse" signals a *relative* assessment of whether a person is *worse off* in some way—however defined—than she was before the pandemic, rather than an *absolute* assessment of that person's finances.

not suffer adverse financial consequences.

Use-of-funds evidence is not even "legally relevant," i.e., "admissible at trial" under Federal Rule of Evidence 401. *Afsharjavan*, 2015 WL 5047438, at *3. But even if it is, it certainly is not "necessary in making out a *prima facie* pleading of the [perjury statute]." *Cooper*, 384 F. Supp. 2d at 960. If the use-of-funds allegation were removed from counts one and three, those counts would still properly plead violations of § 1621. Because Mrs. Mosby's use of her withdrawn funds is not "necessary to the indictment," it is not "relevant" for Rule 7(d) purposes. *Id.*

### 2. Evidence that Mrs. Mosby used her CARES Act withdrawals to purchase Florida vacation homes is inflammatory and prejudicial.

In addition to being irrelevant, the fact that Mrs. Mosby spent her withdrawn funds to purchase Florida properties—which the government will seek to portray as "vacation" homes"—is "inflammatory and prejudicial." *Williams*, 445 F.3d at 733. The pandemic—and in particular 2020, when Mrs. Mosby made her withdrawals—was a time of severe hardship for millions of Americans, who became sick, lost friends and family, got laid off, experienced anxiety and depression, felt trapped at home, and struggled to take care of children unable to attend school in person. The idea that Mrs. Mosby exploited the cause of that pain and suffering to purchase beachside vacation homes will not sit well with the jury. Such evidence is likely to solicit an emotional reaction, raising the specter that the jurors will convict Mrs. Mosby based not on a finding that she in fact suffered adverse financial consequences, but on their visceral dislike for what will strike them as unseemly behavior.

\* \* \*

To protect Mrs. Mosby against "prejudicial allegations that are neither relevant nor material to the charges made in [the] indictment," the Court should strike any mention in

7

counts one or three of how Mrs. Mosby used the money from her CARES Act withdrawals. *Id.*; *see Presgraves*, 658 F. Supp. 2d at 783-84 (striking surplusage because "[t]he allegations do not form the basis of, and are not necessary to prove, any of the twenty-two counts charged in the first indictment" and "are likely to inflame the jury and unduly prejudice the defendant").

### 3. Alternatively, the Court should decline to send the indictment to the jury room.

If the Court is not inclined to grant Mrs. Mosby's motion to strike, it should instead decline to provide jurors a copy of the indictment before they begin deliberating.

The "'submission of an indictment to the jury is a discretionary matter with the district court.'" *United States v. Liberto*, No. CR RDB-19-0600, 2020 WL 5994959, at *5 (D. Md. Oct. 9, 2020) (quoting *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986)). An indictment is not evidence, *see Williams*, 445 F.3d at 734, and thus there is no need for jurors to have the indictment in front of them while deliberating. Of course, jurors need to know the elements of the charged offenses, but the Court will provide them that information in the jury instructions. *See United States v. Fagot-Maximo*, No. 1:15-CR-290, 2019 WL 2251703, at *5 (E.D. Va. May 23, 2019) ("Because the Court did not provide the indictment to the jury it included the operative charging language from the indictment in its instructions to the jury and provided the jury with copies of those instructions to use during its deliberations."). Moreover, the indictment in this case is a "speaking indictment" that recites a large number of disputed facts. Putting in front of the jurors a document that contains a tidy account of the government's—and only the government's—version of those contested facts will tilt the playing field unfairly toward the prosecution.

8

There is no reason the submit the indictment to the jury in this case, and the Court should decline to do so.

## III.     Conclusion

For the reasons described above, the Court should strike from counts one and three any mention of how Mrs. Mosby used the funds she withdrew from her retirement account. In the alternative, the Court should decline to send the indictment to the jury room.

Respectfully submitted,

/s/ James Wyda  
James Wyda  
Federal Public Defender  
Office of the Federal Public Defender  
100 South Charles Street  
Tower II, 9th Floor  
Baltimore, MD 21201  
Phone: (410) 962-3962  
jim_wyda@fd.org  

/s/ Lucius Outlaw  
Lucius Outlaw  
Outlaw PLLC  
1351 Juniper Street, NW  
Washington, DC 20012  
Phone: (202) 997-3452  
loutlaw3@outlawpllc.com  

/s/ Maggie Grace  
Maggie Grace  
Assistant Federal Public Defender  
Office of the Federal Public Defender  
100 South Charles Street  
Tower II, 9th Floor  
Baltimore, MD 21201  
Phone: (410) 962-3962  
maggie_grace@fd.org