United States

v.                                              No. 1:22-cr-7-LKG

Marilyn Mosby

## Renewed Motion for Intra-District Transfer
## to the Southern Division

For close to a decade now, Marilyn Mosby has been a lightning rod in Baltimore City. Her tenure as state's attorney, a role in which she served from 2015 to 2023, was controversial from the start—rocked by highly charged (and unsuccessful) homicide prosecutions in the wake of Freddie Gray's death, and dogged by persistent criticism of her prosecutorial priorities. She endured a steady drip, and sometimes a deluge, of media criticism over alleged ethics violations, investigations by state watchdogs, purported misuse of campaign funds, extensive city-funded travel, and much else. Now, wielding a novel theory of perjury that has never been pursued in a single other case, the government has charged Mrs. Mosby with four federal felonies. It wants to try her before a Baltimore jury, in a city that has been bombarded with negative press coverage of her for years.

Mrs. Mosby cannot receive a fair trial under these conditions. An analysis of Baltimore-area media since the indictment in this case demonstrates that the Northern Division of the District of Maryland, which includes Baltimore City and outlying counties, has been "saturated with prejudicial coverage surrounding Marilyn Mosby, her husband, inadmissible investigations, and political controversies." In particular, coverage of the instant criminal case has been extensive and damaging to Mrs. Mosby's image. A phone survey of Northern Division residents reveals that many of them hold negative views of Mrs. Mosby, believe she is guilty of the crimes charged in the indictment, and doubt she could convince them to change their minds. And the phone survey reveals that, although some potential Southern Division jurors harbor those attitudes as well, the prevalence of such views is meaningfully lower. Holding Mrs. Mosby's trial in the Southern Division would therefore mitigate the substantial prejudicial publicity that this case has generated, making it more likely Mrs. Mosby is tried by a fair and impartial jury. On the other side of the scale, none of the factors relevant to intra-district transfers—such as "the prompt administration of justice" or convenience to the defendant, witnesses, and victims—counsels in favor of keeping this case in the Northern Division.

In light of the newly acquired media analysis and survey results, we now know that a trial in the Northern Division of the District of Maryland threatens Mrs. Mosby's presumption of innocence and her right to a fair trial. She therefore respectfully renews her request that the Court, in the exercise of its broad discretion, order an intra-district transfer of her case to the Southern Division.

## I.      Procedural background

### A.      Mrs. Mosby is indicted for perjury and mortgage fraud.

In January 2022, a lengthy federal investigation into Mrs. Mosby's finances

culminated in the return of a four-count indictment against her in the Northern Division of the District of Maryland. ECF 1. The Northern Division, anchored in Baltimore City, "comprises the counties of Allegany, Anne Arundel, Baltimore, Caroline, Carroll, Cecil, Dorchester, Frederick, Garrett, Harford, Howard, Kent, Queen Anne's, Somerset, Talbot, Washington, Wicomico, and Worcester, and the City of Baltimore." 28 U.S.C. § 100(1). The Southern Division, which is headquartered in Greenbelt, comprises the rest of the state—"the counties of Calvert, Charles, Montgomery, Prince George's, and St. Mary's." *Id.* § 100(2).

A superseding indictment, handed up on March 10, 2022, charged Mrs. Mosby with two counts of perjury, under 18 U.S.C. § 1621, and two counts of mortgage fraud, under 18 U.S.C. § 1014. ECF 23 at 1-19.

The perjury counts are based on withdrawals Mrs. Mosby made from her City of Baltimore retirement account, which is known as a "457(b) plan" because it is governed by section 457(b) of the Internal Revenue Code. ECF 23 at 1-3, 11-12. Ordinarily, 457(b) enrollees may withdraw funds from their accounts only when they leave government service or experience "unforeseen emergencies that meet certain legal criteria." ECF 23 at 1. But in the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Congress allowed 457(b) participants to take a "coronavirus-related distribution" (CRD) in calendar year 2020 if they

> experience[d] adverse financial consequences as a result of being quarantined, being furloughed or laid off or having work hours reduced due to [covid-19], being unable to work due to lack of child care due to such virus or disease, closing or reducing hours of a business owned or operated by the individual due to such virus or disease, or other factors as determined by the Secretary of the Treasury (or the Secretary's delegate).

CARES Act, Pub. L. 116-136, § 2202(a)(4)(A)(ii)(III), 134 Stat. 281, 341 (2020).

On two occasions in 2020, Mrs. Mosby submitted forms to Nationwide, the firm that manages her retirement plan, seeking withdrawals from her account. ECF 23 at 2, 11. She indicated on those forms that she had experienced "adverse financial consequences" resulting from one of the four circumstances enumerated in § 2202 of the CARES Act. ECF 23 at 3, 12. According to the indictment, those statements were false, as Mrs. Mosby did not experience any covid-related "adverse financial consequences." ECF 23 at 3, 12. Nationwide processed Mrs. Mosby's requests and wired her disbursements worth $36,000 and $45,000. ECF 23 at 4, 12-3. The indictment alleges she used those funds toward the down payments on, respectively, a home in Kissimmee, Florida, and a condominium in Long Boat Key, Florida. ECF 23 at 4 12-13.

Generally, the mortgage fraud counts allege that when Mrs. Mosby applied for loans to purchase the two Florida homes, she submitted paperwork containing a number of false statements. Specifically, she allegedly stated falsely (1) that her list of financial liabilities was complete, even though it did not include a tax debt that she and her husband owed the Internal Revenue Service; (2) that she was not delinquent or in default on any federal debt; (3) that she would not give a property-management firm the right to control the Kissimmee home, even though she had previously agreed to let a firm rent out the home; (4) that, as of December 10, 2020, she had lived in the Kissimmee home for "the past 70 days"; and (5) that Mrs. Mosby's husband had gifted her $5,000 to cover the down payment on the Long Boat Key condo. ECF 23 at 10, 15, 18-19.

### B. Mrs. Mosby files a motion for intra-district transfer, which the Court denies without prejudice.

On November 18, 2022, Mrs. Mosby filed a motion asking the Court to transfer her case from the Northern Division to the Southern Division. ECF 129, 151. She argued that

negative pretrial publicity surrounding her case had poisoned the jury pool in the Northern Division, making it impossible to empanel a fair and impartial jury. ECF 151 at 1-2. The government opposed Mrs. Mosby's request. ECF 142.

On January 17, 2023, the Court entered an order denying Mrs. Mosby's motion without prejudice. ECF 171 at 1. The Court held Mrs. Mosby had not carried her burden of showing pretrial publicity was sufficiently prejudicial to warrant severance, but it left open the possibility that she could make that showing in the future. ECF 171 at 9-11.

### C. An expert in pretrial publicity's impact on jury trials concludes media coverage of Mrs. Mosby in the Northern Division has "threatened" the "presumption of innocence."

In anticipation of renewing her motion for intra-district transfer, Mrs. Mosby retained Dr. Bryan Edelman to study the effects that pretrial publicity has had on the potential jury pool in the Northern Division. Dr. Edelman, who has a master's degree and Ph.D. in social psychology, is the co-founder of Trial Innovations, Inc., a "national full-service jury research firm." Edelman Declaration, attached as Exhibit A, at 1. In over 20 years as a jury consultant, Dr. Edelman has worked on hundreds of civil and criminal cases, conducting mock trials, focus groups, surveys, and post-trial interviews, among other research projects. *Id.* at 1, 4. He has assisted with jury selection in over 100 cases and, in more than 70 cases, has been retained as an expert on the effect of pretrial publicity on the fairness of trial proceedings. *Id.* at 1, 4. Part of Dr. Edelman's work in the latter cases is to advise clients on whether there is a need for remedial measures to mitigate bias. In the majority of cases where he has conducted a venue study for clients, he has recommended against seeking a change of venue. *Id.* at 5.

Mrs. Mosby engaged Dr. Edelman to (1) evaluate the extent and possible prejudice of media coverage in the Northern Division regarding the indictment's allegations against

Mrs. Mosby, (2) determine whether that media coverage has compromised Mrs. Mosby's ability to obtain a fair and impartial jury in the Northern Division, and (3) recommend whether remedial measures are needed to ensure a fair and impartial jury. *Id.* at 1. Dr. Edelman's study consisted of two components: an analysis of Northern Division media coverage of Mrs. Mosby's case, and a "community attitude survey"—i.e., a poll—measuring the views of potential jurors in both the Northern and Southern Divisions. *Id.* As described in more detail below, the media study revealed the Baltimore area has been "saturated with prejudicial coverage" of Mrs. Mosby and her case, which has tainted the Northern Division jury pool. *Id.* at 19. The poll both confirmed this finding and indicated the Southern Division jury pool would be less biased toward Mrs. Mosby. Based on those assessments, Dr. Edelman recommended a change of venue or a transfer to the Southern Division in order to protect Mrs. Mosby's right to a fair and impartial jury.

### 1.     Media survey

To determine the effect of publicity on this case, Dr. Edelman "evaluated relevant newsprint, television, and social media coverage" of the allegations against Mrs. Mosby that has appeared in the Northern Division. *Id.* at 1. Looking to the period between January 13, 2022, (when the indictment was returned) and May 16, 2023, Dr. Edelman found 262 relevant articles in 14 newspapers that cover the Baltimore area.[1] *Id.* at 9.

Some of this coverage stuck to reporting the facts described in the indictment. *See, e.g.*, *id.* ("Prosecutors claim Mosby lied in 2020 about experiencing financial hardship during the pandemic so she could withdraw $81,000 without penalty from her City of

_____

[1] Copies of those articles are attached to this motion as Exhibits B and C.

Baltimore retirement savings account to make down payments on two Florida homes."); *id.* at 10 ("Federal prosecutors also said she lied on her mortgage loan applications by not disclosing a $45,000 federal tax lien and by claiming the property near Orlando was a second home.").

In other cases, however, news coverage reported the indictment's allegations as established facts. *See, e.g.*, *id.* at 9 ("Marilyn Mosby said in mortgage documents she'd use [the] Florida property as [a] second home, then she made it a rental."). And reporting on the government's investigation sometimes left readers with the impression that prosecutors had amassed substantial evidence to back up their allegations. *See, e.g.*, *id.* at 10 ("Federal authorities subpoenaed a wide range of the Mosbys' financial records—tax returns, bank and credit card statements, loan documents and more—as part of their investigation."); *id.* at 11 ("The government has recordings of phone calls between Mosby and the company that manages the city's retirement plan."); *id.* ("Prosecutors possess recorded phone calls between Mosby and Nationwide, the company that manages retirement accounts for Baltimore employees."); *id.* at 16-17 ("The indictment, however, provides no clues as to what prosecutors were after by issuing subpoenas to a city dance studio where the Mosbys sent their children, to Black churches where the Mosbys gave money, and to their private companies and election campaigns."); *id.* at 17 ("Federal prosecutors subpoenaed local churches for records of donations by the couple, while also seeking tax returns, bank and credit card statements, loan documents and canceled checks. Marilyn Mosby's campaign treasurer was subpoenaed and records were requested related to the couple's private travel and businesses.").

Most disturbing, the media's treatment of Mrs. Mosby's case included "critical

commentary" that maligned her character and took her guilt for granted. *Id.* at 12. Dr.

Edelman identified the following examples of prejudicial commentary, among others:

- "What did Mosby do with all that money? It went to buying houses in Florida." *Id.* at 10.

- "The state's attorney's chief response so far has been to claim victimhood." *Id.* at 12.

- "That's it? That's Marilyn Mosby's defense? She tapped into her tax-deferred retirement savings in 2020 because private companies that she established just the year before faced financial hardship due to the pandemic—even though said companies had not conducted any business? That's all she's got?" *Id.* at 13.

- "Essentially, the companies existed, but they had not launched, so how could she claim hardship?" *Id.*

- "So, in May 2020, Mosby applied for financial relief for companies that, in July of that year, she reported as having conducted no business." *Id.*

- "That's why this line of defense looks so shaky. If her businesses were not in operation, where's the hardship? I'm reminded of lyrics from a great Billy Preston song: 'Nothin' from nothin' leaves nothin'.'" *Id.* at 14.

- "Even so, how could she not have known about the lien when the IRS had sent notices individually to both Mosbys a year earlier in February 2020?" *Id.*

- "I mean, if a man of ordinary intellect, such as myself, understands what 'adverse financial consequences' means, certainly a federal judge can. You'd think a graduate of Boston College Law School would, too." *Id.*

In addition, coverage of Mrs. Mosby's federal case frequently referenced other

events from her past that cast her in a negative light. Most if not all of those events are

likely inadmissible at trial. News articles mentioned, for instance, that the Baltimore

inspector general and the Maryland Attorney Grievance Commission had previously

investigated Mrs. Mosby for possible ethical violations; that her "[e]xtensive" travel

outside Baltimore, for which she accepted $30,000 in reimbursements, had made her "a

controversial figure"; that Mrs. Mosby had initially failed to disclose her travel business on

state ethics forms; that her decision to start a private business while in office "raised questions, if not red flags"; that Mrs. Mosby, in violation of Maryland law, used $50,000 in campaign funds to pay her lawyers in this case; that she had previously "handle[d] personal legal problems" with campaign funds on two other occasions; that Mrs. Mosby and her husband failed to pay their water and sewage bill, despite making a combined $375,000 a year; and that in 2021 Mrs. Mosby received a $500 campaign donation purporting to come from her grandfather, who died in 2015. *Id.* at 15-18.

Based on these findings, Dr. Edelman concluded "the Northern Division jury pool has been saturated with prejudicial coverage surrounding Marilyn Mosby, her husband, inadmissible investigations, and political controversies." *Id.* at 19. Much of the media coverage, he wrote in his report, "paints Marilyn Mosby in a negative light," "often portray[ing her] as a controversial and corrupt politician." *Id.* at 34; *see also id.* at 19 (concluding combined effect of that coverage was to "create a negative impression of [Mrs. Mosby]").

## 2.    Community attitude survey

Dr. Edelman's survey measured respondents' familiarity with Mrs. Mosby and this case, the extent of their case knowledge, their attitudes towards Mrs. Mosby and her guilt, and whether the "presumption of innocence" has shifted to a "presumption of guilt." *Id.* at 19. To gauge those attitudes, pollsters conducted phone interviews of 402 jury-eligible residents of the Northern Division and 200 jury-eligible residents of the Southern Division between May 31 and June 15, 2023. *Id.* at 19-20.

The survey confirmed that the extensive media coverage of Mrs. Mosby has prejudiced the Northern Division jury pool against her. Fully 67 percent of Northern Division respondents who had heard of Mrs. Mosby have negative attitudes toward her,

with 36 percent reporting that their opinions are "very negative." *Id.* at 22. Among Northern Division respondents familiar with this case or with Mrs. Mosby, 75 percent had read, seen, or heard that Mrs. Mosby's tenure as state's attorney was surrounded by controversy, and 72 percent knew she was under investigation while in office. *Id.* at 2. And within those latter two subgroups, 65 percent said those controversies and investigations would have an impact on their views of Mrs. Mosby's credibility if they served as jurors in the case, with 31 percent indicating it would have a "very large" impact. *Id.* at 2. When asked to list three adjectives that best describe Mrs. Mosby, 35 percent of Northern Division respondents who had heard of her described her as "corrupt," 20 percent described her as "dishonest" or a "liar," and 17 percent described her as a "thief," "greedy," or "selfish." *Id.* at 23.

Dr. Edelman found that these negative attitudes about Mrs. Mosby increased in tandem with Northern Division respondents' knowledge of her or this case. Survey respondents who frequently consumed local news had extensive case knowledge and were familiar with prejudicial details widely reported in the media. *See id.* at 20. In turn, survey respondents who had extensive knowledge of details widely reported in the media were more likely to believe Mrs. Mosby was guilty and to report that she would have a hard time convincing them that she was *not* guilty. *See id.* at 21.

Crucially, Dr. Edelman's survey also revealed—unsurprisingly—that the Southern Division jury pool differs from the Northern Division jury pool. Substantial numbers of Southern Division jurors who had heard of Mrs. Mosby's case have prejudged her, concluding that she is corrupt, that she is guilty of the charged offenses, and that she would struggle to convince them otherwise. But familiarity with Mrs. Mosby and this case were

significantly lower in the Southern Division.[2] In addition, prospective jurors in the

Southern Division did not demonstrate the same degree of case knowledge from media

exposure as their Northern Division counterparts.

Among the survey's findings are the following:

- **62 percent** of Northern Division respondents had read, seen, or heard of Mrs. Mosby, compared to **42 percent** for the Southern Division. *Id.* at 2-3.

- **62 percent** of Northern Division respondents were familiar with this case, compared to **45 percent** for the Southern Division. *Id.* at 2-3.

- **68 percent** of Northern Division respondents recognized at least three out of seven "media items" relating to Mrs. Mosby's case, compared to **58 percent** for the Southern Division. *Id.* at 21. Recognition of these media items "was significantly related to prejudgment" of Mrs. Mosby's guilt. *Id.* (Media items" refer to specific alleged facts about the case that have been reported in the media. *Id.* at 2 n.2.[3])

- **55 percent** of Northern Division respondents recognized at least four out of seven "media items" relating to Mrs. Mosby's case, compared to **44 percent** for the Southern Division. *Id.* at 21.

- **41 percent** of Northern Division respondents had seen negative campaign ads about Mrs. Mosby while she was running for re-election in 2022, compared to **29 percent** for the Southern Division. *Id.* at 20, 35.

---

[2] The numbers in both divisions are sufficiently troubling that, wherever trial is held, additional voir dire may be necessary to identify venire members whose preexisting attitudes about Mrs. Mosby's case render them unable to serve fairly and impartially. *See Skilling*, 561 U.S. at 389 ("The District Court conducted *voir dire,* moreover, aware of the greater-than-normal need, due to pretrial publicity, to ensure against jury bias. At Skilling's urging, the court examined each prospective juror individually, thus preventing the spread of any prejudicial information to other venire members.").

[3] The poll asked respondents whether they had ever read, seen, or heard that: (1) Mrs. Mosby failed to disclose a lien for unpaid taxes on mortgage applications for the Florida homes; (2) Mrs. Mosby used money from her retirement account to purchase two homes in Florida; (3) Mrs. Mosby told investigators before the pandemic started that her travel company was not operating and had no income; (4) Mrs. Mosby's tenure as state's attorney for Baltimore City was surrounded by controversy; (5) Mrs. Mosby was under investigation during her tenure as state's attorney; or (6) there was an investigation into Mrs. Mosby's travel business while she was in office. *Id.* at 21-22. According to Dr. Edelman, the seventh media item is not included in his declaration because it was not significantly related to prejudgment of Mrs. Mosby's case.

- **45 percent** of Northern Division respondents described Mrs. Mosby as "somewhat" or "very" corrupt, compared to **26 percent** for the Southern Division. *Id.* at 22.

- Of those who were familiar with either Mrs. Mosby or this case:

  o **68 percent** of Northern Division respondents believe Mrs. Mosby is guilty of making false statements about suffering covid-related "adverse financial consequences," compared to **65 percent** for the Southern Division. *Id.* at 20.

  o **25 percent** of Northern Division respondents believe Mrs. Mosby is "definitely guilty" of making false statements about suffering covid-related "adverse financial consequences," compared to **17 percent** for the Southern Division. *Id.*

- **41 percent** of Northern Division respondents said Mrs. Mosby would have a hard time convincing them that she is *not* guilty, compared to **36 percent** for the Southern Division. *Id.* at 20-21.

Synthesizing these results, Dr. Edelman wrote in his report that "the results of the telephone survey indicate that there is bias in the Northern Division jury pool against [Mrs. Mosby] stemming from exposure to pretrial publicity." *Id.* at 20. Survey data "suggest that the coverage [in the Northern Division] has undermined the 'presumption of innocence,'" and "[a] large percentage of prospective [Northern Division] jurors have strong opinions which appear to be resistant to change." *Id.* at 19; *see also id.* at 20 ("The survey data also indicate that the 'presumption of innocence' has been shifted to a 'presumption of guilt' [in the Northern Division]."). Given the difference in polling results between the Northern and Southern divisions, Dr. Edelman concluded an intra-district transfer "would be the most efficient and effective prophylactic measure to mitigate the prejudicial impact of pretrial publicity." *Id.* at 35.

**II.     Argument**

**A.     Relevant law**

"Article III requires that 'the Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed,' and the Sixth Amendment reinforces this command by mandating that 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.'" *United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323, 328 (4th Cir. 2012) (quoting U.S. Const. art. III, § 2, cl. 3 and U.S. Const. amend. VI) (ellipsis in original). "These constitutional mandates are codified in Federal Rule of Criminal Procedure 18, which provides that 'the government must prosecute an offense in a district where the offense was committed.'" *Id.*

Although the Sixth Amendment entitles defendants to a trial in the state and "district" where the crime occurred, "[t]here is no constitutional right to trial within a *division*." *United States v. Florence*, 456 F.2d 46, 50 (4th Cir. 1972) (emphasis added); *accord United States v. Lipscomb*, 299 F.3d 303, 339 (5th Cir. 2002) ("There is no basis for inferring the existence of a constitutional right to trial within the *division* where a criminal defendant lives or where a crime was committed." (emphasis in original)). Nevertheless, Rule 18 previously "required trial in the division in which the offense was committed." *United States v. Burns*, 662 F.2d 1378, 1381 (11th Cir. 1981). That requirement was removed in 1966, however, and today "a division of a federal judicial district is no longer a unit of venue in criminal cases." *Id.* at 1382; *see also* Fed. R. Crim. P. 18 advisory committee's notes to 1966 amendments. Following the 1966 amendment, "there is no constitutional or statutory requirement that a defendant's trial take place in a specific courtroom or *division* within a federal judicial district." *United States v. Erwin*, 155 F.3d

818, 824 (6th Cir. 1998) (en banc) (emphasis in original). Rather, Rule 18 simply provides that a district court "must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Fed. R. Crim. P. 18.

### 1. Rule 18 authorizes parties to seek intra-district transfer based on prejudice.

When a party wishes to move a criminal case from one of a district's divisions to another, the party may file a motion for intra-district transfer under Rule 18.[4] *See, e.g.*, *United States v. Salerian*, No. 1:13CR00017, 2014 WL 279584, at *3 (W.D. Va. Jan. 24, 2014); *United States v. Salko*, No. CRIM. A. 1:07-CR-286, 2008 WL 2444515, at *1-2 (M.D. Pa. June 13, 2008). Rule 18 vests district courts with "discretion" to decide which division is most appropriate for a given case. *Florence*, 456 F.2d at 50; *see also United States v. Alvarado*, 647 F.2d 537, 539 (5th Cir. 1981) (referencing district courts' "broad discretion"); *United States v. Stanko*, 528 F.3d 581, 584 (8th Cir. 2008) (same). In applying that discretion to a motion for intra-district transfer, courts should consider "the prompt administration of justice" and "convenience" to the defendant, witnesses, and any victims, Fed. R. Crim. P. 18, as well as "other factors," which "commonly include, but are not necessarily limited to, docket management, courthouse space and security, and . . . pretrial publicity." *Lipscomb*, 299 F.3d at 340, 342; *see also United States v. Merrill*, 513 F.3d 1293, 1304 (11th Cir. 2008) (same), *abrogation on other grounds recognized by United States v. Gonzalez-Gonzalez*, 2023 WL 2301444, at *7 (11th Cir. Mar. 1, 2023); *United*

---

[4] "The Federal Rules of Criminal Procedure distinguish between intradistrict and interdistrict transfers. Intradistrict transfers are governed by Rule 18 of the Federal Rules of Criminal Procedure, while interdistrict transfers are governed by Rule 21." *United States v. Mathis*, No. 3:14CR00016, 2015 WL 5012159, at *3 (W.D. Va. Aug. 21, 2015).

*States v. Forlani*, No. 1:11CR491, 2012 WL 3524751, at *2, 5 (N.D. Ohio Aug. 14, 2012) (same); 2 Charles Alan Wright, Federal Practice & Procedure, Crim. § 305 (4th ed.) (same).

Certain other factors are *not* relevant to the Rule 18 analysis. Specifically, when deciding whether "to relocate a trial within a judicial district," a district court "need not be guided by where the events giving rise to the case occurred." *United States v. Reardon*, No. 1:21-CR-00061-LEW, 2022 WL 2237660, at *1 (D. Me. June 22, 2022). Nothing in the Constitution, the U.S. Code, or the Federal Rules of Criminal Procedure puts a thumb on the scale in favor of holding trial in the same division where the alleged offenses occurred. Indeed, the District of Maryland, unlike some other federal district courts, apparently does not even have a local rule that dictates which criminal cases are assigned to which division. *See, e.g.*, *United States v. McDonald*, No. 5:21-CR-00012, 2023 WL 2574991, at *1 (W.D. Va. Mar. 20, 2023) ("Local Rule 2(c) for the Western District of Virginia . . . states: 'Upon the return of an indictment by any grand jury, it shall be filed in the division in which the crime charged is alleged to have occurred and assigned to the judge next in rotation for that division.'").

While a previous version of Rule 18 presumptively required trial to occur in the division where the events charged in the indictment took place, the federal advisory committee eliminated that requirement in 1966. That amendment "makes it quite clear that in fixing the place of trial the court may disregard the division where the crime was committed." *United States v. Cates*, 485 F.2d 26, 28 (1st Cir. 1974). The "Committee Note to the [1966] Amendment does not reflect any desire for uniformity" between the "division where the indictment was handed down" and "the division where the offense occurred." *Id.*

at 28. Because "a division of a federal judicial district is no longer a unit of venue in criminal cases," *Burns*, 662 F.2d at 1382, the location of the charged conduct does not weigh in favor of holding trial in one division rather than another.

### 2. To obtain a transfer, a defendant is not required to show that pretrial publicity in the division of indictment has caused substantial prejudice.

The burden to show that intra-district transfer is appropriate is on the party seeking it. *McDonald*, 2023 WL 2574991, at *2. But the burden is a light one. The moving party "is not required to show truly compelling circumstances for change of venue, but rather that all relevant things considered, the case would be better off transferred to another [division]." *United States v. Chitolie*, No. 3:10-CR-0020, 2010 WL 2384550, at *3 (D.V.I. June 8, 2010) (assessing request for intra-district transfer); *see also United States v. Schock*, No. 16-CR-30061, 2016 WL 7156461, at *2 (C.D. Ill. Dec. 7, 2016) ("[The moving party] need only show that, 'all relevant things considered, the case would be better off transferred to another [division].'" (quoting *Matter of Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995)) (analyzing intra-district transfer).

In opposing Mrs. Mosby's initial transfer motion, the government argued that a pretrial transfer based on negative media coverage is appropriate only in "extreme circumstances," when press accounts are overwhelmingly prejudicial. ECF 142 at 5. The government claimed that, prior to trial, a district court may order a publicity-based intra-district transfer only if "'the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted.'" ECF 142 at 4 (quoting *United States v. Higgs*, 353 F.3d 281, 307 (4th Cir. 2003)).

That argument misstates the proper legal standard.[5] In the appellate cases the government cited, the question was whether the district court had abused its discretion by denying a transfer. *See* ECF 142 at 3-7 (citing *United States v. Higgs*, 353 F.3d 281, 307-09 (4th Cir. 2003); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991)).[6] The abuse-of-discretion question turns on whether a transfer was "required" under the circumstances. *See, e.g.*, *Higgs*, 353 F.3d at 307 ("The determination of whether a change of venue is *required* as a result of pretrial publicity involves a two-step process." (emphasis added)).

But the fact that "an intradistrict transfer is not *required* absent a strong showing of prejudice" is "subtly different than the assertion that a defendant [must] make a strong showing of prejudice to *permit* transfer." *United States v. Barnes*, No. 3:19-CR-0047, 2021 WL 1230485, at *1 n.2 (D.V.I. Mar. 31, 2021) (emphasis added). The "plain text of Rule 18 imposes no 'strong showing of prejudice'" requirement, *id.*, nor a requirement that a defendant show pretrial publicity to be "so inherently prejudicial that trial proceedings must be presumed to be tainted," *Higgs*, 353 F.3d at 307. Thus a district court is perfectly free to grant an intra-district transfer absent such a showing—even if refusal to do so would not warrant reversal on appeal. As the *Barnes* court put it, "While it is true that a

---

[5] Mrs. Mosby's initial transfer motion also cited the "so inherently prejudicial" language, but without suggesting that transfer is permissible *only* when that standard is satisfied. ECF 151 at 4. To the extent her prior briefing created any confusion, Mrs. Mosby apologizes for the error.

[6] The government's briefing also cited *Skilling v. United States*, 561 U.S. 358 (2010). ECF 142 at 6. But that case involved only a due process challenge, not a challenge based on the Federal Rules of Criminal Procedure. 561 U.S. at 378 n.11. And in any event, the Court in *Skilling* noted that the standard of review for a challenge of the latter type would be abuse of discretion. *Id.*

Similarly, the government cited *United States v. Taylor*, 942 F.3d 205, 222 (4th Cir. 2019), which did not involve a transfer request, but rather a "motion to dismiss the indictment or, in the alternative, to continue the trial for three months, due to pretrial publicity." ECF 142 at 7. Regardless, the *Taylor* court reviewed denial of that motion for abuse of discretion as well. *Id.*

defendant must make a strong showing of prejudice to have his or her conviction vacated for a district court's refusal to grant an intradistrict transfer, that is not the applicable standard here," in district court. 2021 WL 1230485, at *1 n.2; *see also United States v. Ackal*, No. CR 16-00048-ALL, 2016 WL 4922854, at *5 (W.D. La. Sept. 14, 2016) ("[I]n cases where a defendant appeals the denial of an intra district transfer, the Fifth Circuit has found that such a transfer is not *required* absent a strong showing of prejudice." (emphasis in original)); *cf. United States v. Harshbarger*, No. 12-40119-JAR, 2013 WL 172865, at *2 (D. Kan. Jan. 16, 2013) ("Relying on *United States v. Lawson*, the government argues that Defendant must show specific prejudice from remaining in the current district in order to justify the transfer request, but *Lawson* only states that a district court does not abuse its discretion when it refuses to transfer a defendant who has not shown a specific prejudice. *Lawson* does not speak to what may justify a transfer, and the Court adopts the standard that 'it is enough if, all relevant things considered, the case would be better off transferred to another district.'").

The result is that district courts may transfer a case intra-district even if trial in one division would be only marginally more prejudicial to the defendant than trial in another, and even if the defendant has not shown that pretrial publicity "is so inherently prejudicial that trial proceedings must be presumed to be tainted." ECF 142 at 4 (quoting *Higgs*, 353 F.3d at 307); *see, e.g.*, *Mathis*, 2015 WL 5012159, at *2-5 (ordering intra-district transfer without considering "so inherently prejudicial" standard or any other heightened standard of prejudice); *United States v. Cloud*, No. 1:19-CR-02032-SMJ-1, 2021 WL 9406685, at *1-3 (E.D. Wash. Dec. 14, 2021) (same); *United States v. Christensen*, No. 17-CR-20037-JES-JEH, 2018 WL 6382050, at *2-7 (C.D. Ill. Dec. 6, 2018) (same); *Forlani*, 2012 WL

18

3524751, at *5 (same); *United States v. Weinberger*, No. 2:06 CR 230 PS, 2011 WL

5040674, at *1-3 (N.D. Ind. Oct. 24, 2011) (same); *United States v. Barrett*, No. 2:20-CR-

16-KS-MTP, 2021 WL 1739241, at *2 n.4 (S.D. Miss. May 3, 2021) (granting intra-district

transfer on other grounds but adding, without reference to any heightened prejudice

standard, that "[t]he Court also believes that it would be very difficult, if not impossible, to

seat an unbiased jury, given the amount of publicity related cases have received in the

Hattiesburg area").

### B.     Discussion

The Court should exercise its discretion to transfer Mrs. Mosby's case to the

Southern Division. As Dr. Edelman's report demonstrates, the Northern Division jury pool

has been tainted by prolonged, negative media coverage of Mrs. Mosby generally and this

case in particular. Large percentages of Northern Division jurors hold negative views of

Mrs. Mosby and this case that would make it hard for them to serve fairly and impartially.

And while some potential Southern Division jurors may be biased against Mrs. Mosby as

well, they are neither as negative nor as fixed in their views as residents of the Northern

Division. On the flip side, none of the Rule 18 factors—e.g., efficiency, convenience to

victims, etc.—counsels in favor of keeping this case in the Northern Division. The Court

should therefore move this case to the Southern Division to protect Mrs. Mosby's right to a

fair trial.

### 1.     The negative pretrial publicity surrounding Mrs. Mosby and this case warrant an intra-district transfer to the Southern Division.

An intra-district transfer may be justified if "pretrial publicity" prejudices a

defendant. *Lipscomb*, 299 F.3d at 342. Here, the years-long onslaught of negative media

coverage in the Baltimore area threatens to deprive Mrs. Mosby of her right to a fair and

impartial jury.

Dr. Edelman's media analysis catalogued the extensive coverage of this case in the Baltimore-area press. In addition to detailing the allegations and evidence against her, press reports at times treated the indictment's allegations as established facts, highlighted the extensive evidence-gathering the government conducted during its investigation of Mrs. Mosby, expressed a belief in Mrs. Mosby's guilt, and placed this case in the context of the numerous other scandals that have engulfed Mrs. Mosby over the years—from multiple ethical investigations and failure to disclose her business on state ethics forms, to repeated illegal use of campaign funds, receipt of donations from long-dead relatives, and failure to pay her bills. *See supra*, Part II.C.1. Evidence of those other scandals would be inadmissible at trial in this case. Taken together, the media reports "saturated" the Northern Division with "prejudicial coverage" of Mrs. Mosby and this case. Ex. A at 19.

As Dr. Edelman's phone survey makes clear, the unrelenting negative coverage has taken a toll. Sixty-seven percent of jury-eligible Northern Division residents who had heard of Mrs. Mosby view her negatively, including 36 percent whose opinion is "very negative." *Id.* at 22. Of those who knew that Mrs. Mosby had been investigated while in office or that her tenure had been surrounded by controversy, 65 percent said those facts would negatively impact their view of Mrs. Mosby's credibility, with 31 percent saying it would have a "very large" impact. *Id.* at 34. When asked to describe Mrs. Mosby, significant percentages of Northern Division respondents picked words like "corrupt," "dishonest," "liar," "thief," "greedy," and "selfish." *Id.* at 23. Almost half the respondents who had heard of Mrs. Mosby remembered seeing negative campaign ads about her during her 2022 re-election effort. *Id.* at 20.

By contrast, media coverage of Mrs. Mosby's case has been less pervasive in the Southern Division. The percentage of respondents who have read, seen, or heard about Mrs. Mosby is 20 points higher in the Northern Division than the Southern Division; the percentage who are familiar with Mrs. Mosby's case is 17 points higher; the percentage familiar with the case who recognized at least three "media items" is 10 points higher; the percentage familiar with the case who recognized at least four "media items" is 13 points higher; and the percentage who saw negative campaign ads about Mrs. Mosby is 13 points higher. *See supra*, Part I.C.2. Consistent with the social science literature, the more information a prospective juror knows about Mrs. Mosby's case, the more likely they are to "prejudg[e]" the case and demonstrate strong opinions that are resistant to change. *See* Ex. A at 21.

The disparity in case familiarity is reflected in respondents' attitudes about Mrs. Mosby's case. Relative to Southern Division respondents, the percentage of Northern Division respondents who consider Mrs. Mosby "somewhat" or "very" corrupt is 19 points higher. Among those who are familiar with Mrs. Mosby or her case, Northern Division respondents are three percentage points more likely to believe she is guilty, eight points more likely to believe she is "definitely guilty," and five points more likely to say Mrs. Mosby will have a hard time convincing them that she is *not* guilty. *See id.*

Mrs. Mosby recognizes that some of these differences are not enormous. But they are, as Dr. Edelman noted, statistically significant. *Id.* at 20. And as explained above, to obtain an intra-district transfer, a defendant need not demonstrate "truly compelling circumstances." *Chitolie*, 2010 WL 2384550, at *3. All she must show is that, "'all relevant things considered, the case would be better off transferred to another [division].'" *Schock*,

2016 WL 7156461, at *2 (quoting *Balsimo*, 68 F.3d at 187). The fact that jurors in the

Northern Division are more likely to deem Mrs. Mosby "definitely guilty," and to believe

she couldn't change their minds, demonstrates that this "case would be better off

transferred to [the Southern Division]." The existence of *some* biased jurors in one division

is not a reason to keep a case in another division with *more* biased jurors. *See Weinberger*,

2011 WL 5040674, at *1 ("Broader coverage in national magazines and television shows

remains a concern wherever trial is held, but removing the proceedings from the immediate

area of the most long-standing, frequent and intense media coverage is clearly appropriate

and in the interest of justice here.").

Further, prejudicial media coverage is likely to swell as the trial date approaches.

Dr. Edelman's phone survey was in the field at a time (May 31 to June 15, 2023) when

news reports about Mrs. Mosby's case had likely dropped off significantly. This case

generated a burst of press when Mrs. Mosby was indicted in January 2022, when the first

round of pretrial motions was litigated in summer 2022, and when Mrs. Mosby's prior

counsel withdrew in January 2023. But nothing of much interest to the press has happened

since then. The Court can be confident, however, that there will be "a resurgence of

coverage as the trial draws near." *Cloud*, 2021 WL 9406685, at *4 (granting severance). In

the weeks and months leading up to trial, the Baltimore-area media will no doubt be

following and reporting on this case in detail and at length, across all forms of media—

print, television, radio, and social media. There is no reason to believe Southern Division

media will cover the case anywhere near as thoroughly.

The expected upsurge in media coverage is important because "[t]he recency of

prejudicial publicity is important in determining whether such publicity is likely to affect

an accused's right to a fair trial." *Wansley v. Slayton*, 487 F.2d 90, 93 (4th Cir. 1973). As a result, the Northern-Southern disparity reflected in Dr. Edelman's survey—and the attendant prejudice of a Northern Division trial—will only grow.

Two other publicity-related considerations militate in favor of transfer as well.

*First,* Mrs. Mosby is constitutionally entitled to testify in her own defense, and she may well exercise that right in this case. *See United States v. Woods*, 710 F.3d 195, 200 (4th Cir. 2013) ("A defendant's right to testify in his own defense is rooted in the Constitution's Due Process Clause, Compulsory Process Clause, and Fifth Amendment right against self-incrimination."). The inter-division disparities in attitudes towards Mrs. Mosby will burden her choice of whether to exercise this fundamental constitutional right. As Mrs. Mosby's severance motion explains, *see* ECF ___ at 32, she has "important testimony to give concerning one [set of counts]." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984). Yet 45 percent of jury-eligible Northern Division residents consider Mrs. Mosby "somewhat" or "very" corrupt, versus only 26 percent in the Southern Division. This 19-point gap suggests significantly more Northern Division jurors than Southern Division jurors would be inclined to reject the "important testimony" she has to give in her defense. Moving trial to the Southern Division would mitigate the burden that juror attitudes have imposed on Mrs. Mosby choice of whether to testify.

*Second,* the greater taint in the Northern Division would hamper "the prompt administration of justice." Fed. R. Crim. P. 18. "Because of the extensive publicity" surrounding Mrs. Mosby's case, "a much larger jury pool would have to be assembled in the [Northern] Division in order to seat a fair and impartial jury." *Mathis*, 2015 WL 5012159, at *3. The larger venire "would consume judicial resources" and "protract the

trial proceedings." *Id.*

### 2. No other factors outweigh the prejudice that a Northern Division trial would cause Mrs. Mosby.

To the extent any of the Rule 18 factors militate against transfer at all, they fall well short of outweighing the prejudice that a Northern Division trial would produce. In short, there is no reason *not* to transfer this case to the Southern Division.

**First,** holding trial in the Southern Division would not impair "the prompt administration of justice." Fed. R. Crim. P. 18. This is not a case in which, for example, intra-district transfer would entail assigning the case to a different judge, requiring a trial continuance so the new judge could familiarize herself with the record. *See Barnes*, 2021 WL 1230485, at *4 (rejecting government's argument that intra-district transfer would impede prompt administration of justice: "[i]f the trial in this matter is transferred to St. Croix, it would not be held before Chief Judge Lewis, but rather the undersigned would continue to preside"). Nor can Mrs. Mosby conceive of any other reason that moving her trial to the Southern Division would delay the proceedings.

**Second,** a transfer would not negatively affect "the convenience of the defendant, any victim, [or] the witnesses." Fed. R. Crim. P. 18. For starters, Mrs. Mosby would suffer no inconvenience from attending trial in the Southern Division. Insofar as the Court believes Mrs. Mosby actually would be inconvenienced by moving the trial out of the Northern Division, she waives her right to trial there. *See Ackal*, 2016 WL 4922854, at *2 (noting "the right to be tried in a particular division [i]s a personal and technical right which can be waived").

As for "victim[s]," the perjury counts allege, in essence, that Mrs. Mosby made a false statement in order to get access to her own money. Those counts therefore have no

discernible victims. As far as the superseding indictment indicates, the mortgage fraud counts are victimless as well. There is no allegation that either Cardinal Financial Company or United Wholesale Mortgage suffered any financial loss as a result of Mrs. Mosby's statements on her loan applications, and it is unclear in what other way those banks could qualify as "victims" of Mrs. Mosby's alleged crimes. *See* ECF 23 at 8-10, 16-19.

Finally, witnesses would not suffer any meaningful inconvenience from having to testify in Greenbelt rather than Baltimore. Many of the government's witnesses are likely to be people who do not live in the Baltimore-Washington area, such as representatives of Nationwide, Cardinal Financial Company, and United Wholesale Mortgage. For such out-of-state witnesses, "the two venues are equally convenient." *United States v. Rothenberg*, No. 20-CR-00266-JST-1, 2021 WL 4704581, at *2 (N.D. Cal. Aug. 13, 2021); *see also, e.g.*, *United States v. Oury*, No. 4:19-CR-80, 2021 WL 2942521, at *4 (S.D. Ga. July 13, 2021) (finding "convenience of . . . the witnesses" is irrelevant to intra-district transfer when witnesses will be traveling from out of state); *United States v. Walters*, No. 2:19-CR-51-KS-MTP, 2020 WL 1964533, at *2 (S.D. Miss. Apr. 23, 2020) (same).

And even for any potential witnesses who live in Baltimore, the inconvenience of traveling to Greenbelt for a single day of testimony will be extremely minor. Depending on traffic and weather conditions, driving from Baltimore to Greenbelt takes somewhere in the neighborhood of 35-50 minutes. Hundreds if not thousands of people make that commute everyday; many more commute even longer distances. Courts routinely treat such minimal differences in accessibility as immaterial to intra-district transfer under Rule 18. *See, e.g.*, *Oury*, No. 4:19-CR-80, 2021 WL 2942521, at *3 (observing that in *United States v.*

*Merrill*, 513 F.3d 1293, 1303–04 (11th Cir. 2008), Eleventh Circuit held witnesses "were not greatly inconvenienced by having to travel to Fort Lauderdale instead of Miami"); *id.* at *4 (attaching no weight to extra half hour that witnesses would have to drive to attend trial in Statesboro, compared with Savannah); *Walters*, 2020 WL 1964533, at *2 (concluding "Gulfport is no less convenient for . . . the witnesses in this case than Hattiesburg," given that "Gulfport is only 70 miles south of Hattiesburg—an hour's drive if traffic conditions are favorable"); *Forlani*, 2012 WL 3524751, at *3 (noting that "one hour additional time of travel by interstate highway did not weigh strongly" in transfer analysis); *Christensen*, 2018 WL 6382050, at *5 ("The Court does not believe that the witnesses in this case will be unduly inconvenienced by traveling to Peoria," which "is only about 92 miles—an hour and a half drive—from the Urbana courthouse."); *Rothenberg*, No. 20-CR-00266-JST-1, 2021 WL 4704581, at *2 (noting that Oakland-San Francisco trip is "a short commute that many individuals residing in both cities make daily with the aid of public transportation").

Any witness inconvenience resulting from a Greenbelt trial therefore pales in comparison to the prejudice Mrs. Mosby will suffer if trial is held in Baltimore. *See Mathis*, 2015 WL 5012159, at *4 ("The court recognizes that Roanoke will be a longer drive for some of the victims and witnesses. However, the court is convinced that any inconvenience to victims and witnesses is outweighed by the other relevant factors discussed above [including pretrial publicity], which militate in favor of transferring venue to the Roanoke Division."); *Cloud*, 2021 WL 9406685, at *4 ("[T]he Court recognizes that most victims and witnesses in this case are from Yakima. The Court is sympathetic to any inconvenience that transferring this case to Spokane will cause for these individuals. . . . [But the] Court is convinced that any inconvenience is outweighed by the effects of the

pretrial publicity—which militate in favor of transferring this matter to Spokane.").

**Third,** none of the other factors identified in the case law provides any reason to keep this case in the Northern Division. Mrs. Mosby does not anticipate that a transfer to the Southern Division would adversely affect the Court's "docket management," *Lipscomb*, 299 F.3d at 342, but she is happy to work with the Court to resolve any minor issues that a transfer might occasion. And there is no difference in "courthouse space and security" that would justify denying a transfer to the Southern Division. *Id.* The Greenbelt courthouse, like the Baltimore courthouse, has ample space for a trial.

**Fourth,** as explained above, it is of no moment that the events alleged in the indictment took place in the Northern Division. *See Reardon*, 2022 WL 2237660, at *1; *Cates*, 485 F.2d at 28. Nothing in federal law—not the Constitution, the U.S. Code, the Federal Rules of Criminal Procedure, or anything else—establishes a presumption that cases should be tried in the division where the charged conduct occurred. It appears this case was originally assigned to the Northern Division merely because the government charged it there, and this Court has historically assigned cases on that basis. But that "'historical fact'" is "irrelevant" to whether an intra-district transfer is appropriate on "the specific facts of this case." *Ackal*, 2016 WL 4922854, at *5 (quoting *Lipscomb*, 299 F.3d at 341). As the Fifth Circuit explained in *Lipscomb*, "[s]uch reference to the court's prior venue practice verges on circularity and runs the risk of creating a *per se* rule that violates Rule 18's focus on the facts of each case." 299 F.3d at 341.

In short, as against the prejudice Mrs. Mosby would suffer from a trial in the Northern Division, nothing in Rule 18 weighs in favor of keeping the trial there. There is no reason *not* to transfer this case to the Southern Division.

### III. Conclusion

For the reasons described above, the Court should exercise its discretion to transfer this case to the Southern Division.

Respectfully submitted,

/s/ James Wyda
James Wyda
Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
jim_wyda@fd.org

/s/ Lucius Outlaw
Lucius Outlaw
Outlaw PLLC
1351 Juniper Street, NW
Washington, DC 20012
Phone: (202) 997-3452
loutlaw3@outlawpllc.com

/s/ Maggie Grace
Maggie Grace
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
maggie_grace@fd.org