## DECLARATION OF BRYAN EDELMAN, Ph.D.

I, Bryan Edelman, solemnly, sincerely, and truly declare and affirm as follows:

## I.    INTRODUCTION

I am the co-founder of Trial Innovations, Inc., a national full-service jury research firm. I have worked as a trial consultant for 20 years and have conducted pretrial and post-trial research on both criminal and civil cases across the country. I have been retained as an expert in over 70 high profile cases to assess the impact of pretrial publicity on the fairness of the trial proceedings including the *State of Colorado v. James Holmes*, *United States v. Robert Bowers*, *State of Florida v. Nikolas Cruz*, and the Flint water crisis.

Counsel for the defendant in *United States v. Marilyn Mosby* retained me to research and evaluate: (1) whether there was extensive and prejudicial pretrial publicity regarding allegations that the former Baltimore State Attorney fraudulently withdrew money from a retirement account during the Covid pandemic to purchase property in Florida and committed perjury; (2) determine if the media coverage has impacted the defendant's ability to obtain a fair and impartial jury in the Northern Division of the District of Maryland; and (3) based on the findings, recommend appropriate remedial measures—for example, a change of venue or intra-district transfer—to protect the Mosby's ability to be tried by a fair and impartial jury. As part of my analysis, I evaluated relevant newsprint, television, and social media coverage surrounding these events and conducted a community attitude survey in the Northern and Southern Divisions of the District of Maryland. These surveys were designed to assess case recognition, familiarity with prejudicial media content, and bias.

Based on my analysis, it is my opinion that the Northern Division jury pool has been exposed to prejudicial pretrial publicity and campaign ads surrounding Marilyn Mosby, unrelated controversies and investigations into her and her husband, alleged false statements on documents related to the two real estate transactions, and conflicting statements about her travel company. Overall, the coverage to date has been prejudicial and creates a strong presumption of guilt. This pretrial publicity has had a significant impact on public opinion toward Ms. Mosby. Despite being a two-term State Attorney, she struggled to fundraise and ultimately finished last in the primaries.

A community attitude survey[1] was conducted to assess the impact of the media coverage on the Northern Division jury pool. Approximately **62%** of the survey respondents had read, seen, or heard of Marilyn Mosby and **62%** were familiar with this case. Case recognition increased to **78%** for those who regularly watch the news and read the newspaper, and to **88%** for survey respondents who regularly watch WBFF Fox 45. In addition, community members had more than just a passing familiarity with the case. Approximately **57%** of survey respondents who knew about the case recognized at least four of seven media items tested in the survey. [2] Seventy-five percent (**75%**) of those familiar with the case had read, seen, or heard that Mosby's tenure as Baltimore's State Attorney was surrounded by controversy and **72%** knew she was under investigation during her term. Another **42%** heard that there had been an investigation into the travel business she started when in office. Forty-six percent (**46%**) of those who were familiar with this potentially inadmissible fact held a "very negative" opinion of Mosby. Sixty-five percent (**65%**) of prospective jurors from the Northern Division familiar with the case or defendant indicated that these controversies would have an impact on their views of the Mosby's credibility if they were jurors in the case, with **31%** indicating that it would have a "very large" impact. These findings are particularly concerning because media coverage surrounding prior investigations and controversies may be inadmissible at trial.

The survey data also suggest that the pretrial publicity has shifted the burden of proof to the defendant. Many community members in the Northern Division hold a "presumption of guilt" in this case. Sixty-eight percent (**68%**) of survey respondents who had heard of Marilyn Mosby or recognized the case reported that she is guilty of making false statements that she suffered financial hardship during the pandemic, with **25%** indicating that she is "definitely guilty." The number who believed the defendant is guilty increased to **80%** for those who recognized four or more media items. In addition, **89%** of survey respondents who indicated that controversies they were familiar with would impact their perceptions of Mosby's credibility reported that she is guilty.

The majority of survey respondents from the Northern Division held strong, fixed opinions. Fifty-seven percent (**57%** ) of those familiar with the defendant or the case reported that Mosby would have a difficult time convincing them that she is <u>not</u> guilty. Once again, bias was significantly related to exposure to pretrial publicity. Sixty-six percent (**66%**) of prospective jurors

---

[1] A community attitude survey is telephone survey which uses a random digit dialing methodology to evaluate case recognition, familiarity with widely reported news content, and prejudgment. Respondents are screened to ensure that they are jury eligible and representative of the jury pool.
[2] These media items are specific pieces of content which were widely reported in the news coverage.

DECLARATION OF BRYAN EDELMAN

who knew three or more of the media items tested in the survey indicated that the defendant would have a difficult time changing their opinion.

Prejudgment was also high in the Southern Division. However, there were nuanced differences. For example, only **42%** of prospective jurors in the Southern Division had heard of Marilyn Mosby and just **45%** knew about this case. In addition, these survey respondents were less familiar with specific items reported by the media. Approximately **44%** recognized four or more media items, 11 percentage points lower than their counterparts in the Northern Division.

In conclusion, given the nature of the pretrial publicity—and its negative impact on the Northern Division jury pool—it is my opinion that the presumption of innocence has been undermined. As such, remedial measures are necessary to protect the defendant's right to a fair and impartial jury. An intra-district transfer or a change of venue to an alternate district less familiar with these events would be an appropriate and efficient measure for ensuring a fair and impartial jury.

## II.    QUALIFICATIONS

**Education and Experience**: A copy of my curriculum vitae can be found in **Appendix A** to this declaration. Upon completion of my undergraduate education, I received an MA and Ph.D. in Social Psychology from the University of Nevada, Reno, and an LL.M. from the University of Kent in the United Kingdom.  My graduate studies have provided me with a broad foundation in both qualitative and quantitative research methodologies as well as statistics

The Social Psychology Program at the University of Nevada is unique in that it is one of the few in the country that has an emphasis on the application of social psychological theory to the legal arena.  During my studies I specialized in jury related issues and examined how attitudes, race, stereotypes, pretrial publicity, and other factors influence juror and jury decision-making.  In this regard, I took coursework addressing topics associated with change of venue motions, the impact of pretrial publicity on jurors' ability to be fair and impartial, and the steps necessary to conduct a change of venue analysis.  The University's association with the National Judicial College and other government agencies also afforded me the opportunity to conduct research with the Public Defender, District Attorney, Court Services, the judiciary, and other institutions in Washoe County, Nevada.

**Research Experience**: While at the University of Nevada, Reno I worked as a Research Assistant and Project Manager at the Grant Sawyer Center for Justice Studies where I assisted with several national surveys, including one that examined the judiciary's understanding and

application of the Daubert standard.  I also explored how jurors "minimize" what they have read, seen, or heard about high profile cases during voir dire.  In addition, I oversaw a study of the Washoe County's pretrial release program and assisted with the development of training programs for foreign justices, court administrators, prosecutors, and defense attorneys who were brought to the United States by the Department of State.

Further, I have conducted and published research on the impact of illegitimate factors on juror decision-making.  This research included developing and testing a model that attempted to explain how factors such as race and empathy influence pre- and post-deliberation sentencing decisions in capital cases.  My research on juror decision-making in capital cases was later published as a book.  Since completing my studies I have also published on the impact of graphic images on jurors, and on methodological issues associated with online survey research.

**Jury Research Experience**: I began working as a trial consultant in 1998 and cofounded Trial Innovations in 2010.  Over the years I have worked on hundreds of criminal and civil cases across the country.  As a trial consultant I have conducted mock trials, focus groups, surveys, post-trial interviews, and other research exercises.  I have consulted in the courtroom and assisted with jury selection on more than 100 cases.  I have also served as a presenter at local bar associations, law firms, national meetings, and conferences.  In addition, I have been invited to conduct MCLE courses related to jury selection by the Public Defender, Alternate Defender, and District Attorney in California, Nevada, and New Mexico.  I have also served as a guest lecturer at the University of Santa Cruz, Saint Mary's College, and Stanford Law School.

**Venue Experience**: As a graduate student, I was trained by Dr. Ronald Dillehay and Dr. Edward Bronson, two of the leading experts in the country on venue and pretrial publicity.  Over the years I have had the opportunity to work with Dr. Bronson on a number of change of venue studies.

I have worked on change of venue issues in several different capacities.  As a researcher I have coded trial transcripts in high profile cases to evaluate how jurors "minimize" their bias and exposure to pretrial publicity during voir dire, and the challenges this phenomenon poses for judges and attorneys.  In addition, I examined the impact of television pretrial publicity on prejudgment of guilt.  I have also presented as a panelist on change of venue issues at the American Society of Trial Consultants' annual conference and been a co-author on the chapter in the "California Criminal Law Procedure and Practice" on change of venue since 2011.

I have conducted content analyses of media coverage on a host of topics and have designed

more than 50 community attitude surveys over the years.  I have been retained as an expert to conduct and evaluate change of venue studies, and also to recommend remedial measures for addressing exposure to pretrial publicity outside of a change of venue.

**Expert Witness Experience**: I have been retained as an expert witness on matters including freedom of religion in China (political asylum hearing), eyewitness identification, and change of venue.  I have testified as an expert witness in person or by declaration in California, Idaho, Colorado, Texas, Michigan, Florida, Massachusetts, Nevada, Pennsylvania, Tennessee, West Virginia, and Washington in state and federal court. In the majority of cases I have been retained to conduct a change of venue study,[3] I have recommended against a change of venue.

## III.    THE INFLUENCE OF ATTITUDES ON COGNITION[4]

There is a substantial body of literature documenting the impact of attitudes on information processing. Attitudes have been shown to have an impact on selective attention, the evaluation of new information, memory recall, and behavior. This research provides insight into how media coverage may lead to juror bias.

Pretrial publicity can have a prejudicial effect on jurors through its impact on the formation of attitudes and beliefs that they bring into the courtroom. Attitudes are not isolated entities but are often linked to other memories, experiences, attitudes, and beliefs. These links can create large networks of attitudes, which are resistant to change. The links between attitudes strengthen with repeated activation. As these links strengthen, the probability increases that the attitudes and underlying beliefs will be consistent with one another and brought to awareness simultaneously. Attitudes that are strongly linked to one another are more easily accessible in memory and more likely to be automatically activated with exposure to the attitude object. Attitudes can be activated automatically without any conscious, intentional processing. This is more likely to occur when an attitude has been repeatedly activated in the past.[5]

When media coverage surrounding a case is broad, extensive, and redundant, strong links between relevant attitudes and beliefs begin to form. If the pretrial publicity creates links between case details, attitudes, and beliefs over the course of a trial, these attitudes are likely to be automatically activated at a subconscious level. As described below, this network of linked

---

[3] These exclude instances where I have been hired to review a change of venue survey, assist with addressing media coverage during voir dire, or review trial transcripts and pretrial publicity as part of a post-conviction appeal.
[4] Cognition is a term referring to the mental processes involved in gaining knowledge and comprehension, including thinking, knowing, remembering, judging and problem solving.
[5] Eagley, A.H., & Chaiken, S. (1993). *The psychology of attitudes.* Florida: Harcourt Brace College Publishers.

attitudes can have an impact on a juror's attention to and evaluation of the evidence and arguments presented in court.

As the network of linked attitudes grows and strengthens, specific attitudes become resistant to change because change requires revisions to other attitudes and beliefs within the network. Resistance to revising well-established attitudes has been shown to lead to biased information processing. When attitudes are strong, there is a tendency to favor arguments and information in support of those attitudes over arguments that may disprove them. The acceptance of a counterargument can create cognitive dissonance.[6] In an effort to avoid cognitive dissonance, information that supports attitudes may be selectively attended to and counterarguments may be distorted or dismissed.[7]

Attitudes can also have an impact on attention and recall. Research has shown that information that supports a preexisting attitude is easier to learn, more accurately retained and easier to recall. The links formed between attitudinally supporting information and preexisting attitudes are stronger than those formed between counterarguments and preexisting attitudes. As a result, the latter is more difficult to retrieve from memory. Further, there is a tendency to produce new beliefs, which support preexisting attitudes and suppress those that run counter to such attitudes.

In sum, when a venue is exposed to prejudicial media coverage surrounding a crime, there is a risk that potential jurors will develop a large network of linked attitudes and beliefs relating to the victim, the defendant, and the crime. These linked attitudes include opinions about the guilt of the defendant, appropriate sentence and evaluations of the evidence presented through the media. When the links between attitudes are strong, they can be activated at a subconscious level and have an impact on jurors' evaluation of the evidence and arguments presented at trial.

Attitudinally supporting arguments will be more closely attended to, evaluated as persuasive, integrated into the existing network of attitudes and beliefs and made easily accessible during deliberations. In contrast, counterarguments and evidence conflicting with well-established attitudes may create cognitive dissonance. As a result, jurors will either ignore this evidence or make cognitive efforts to refute it. This evidence will not establish strong links to preexisting

---

[6] Cognitive dissonance is an uncomfortable feeling caused by holding two contradictory ideas simultaneously. People have a motivational drive to reduce dissonance by changing their attitudes, beliefs, and behaviors or by justifying or rationalizing them.
[7] For example, people list more counterarguments for information that refutes preexisting attitudes than information that supports them.

attitudes and will not be easily accessible during deliberations. When a venue has been saturated with pretrial publicity, these psychological processes can put the defendant at a significant disadvantage, undermine the presumption of innocence, and diminish the prosecution's burden of proof.

The prejudicial impact of preexisting attitudes is accentuated by the fact that the media coverage underlying them is often biased in favor of the prosecution. Furthermore, news content is encoded under very different circumstances from those found in the courtroom, because the rules of evidence that are strictly enforced at trial do not apply. As such, the persuasive impact of information presented through the news media becomes more significant and engrained in the juror's mind than the evidence presented at trial.

## IV.    THE PREJUDICIAL IMPACT OF PRETRIAL PUBLICITY

There is a body of research within the social sciences that attempts to address the impact of pretrial publicity on decision-making in the courtroom. This literature suggests that pretrial publicity influences evaluations of the defendant, perceptions of criminality, sympathy toward the defendant, pretrial judgments regarding guilt, and final verdicts.[8]

Daftary-Kapur, Penrod, O'Connor, and Wallace (2014) conducted a field study that incorporated real time evidence into the methodology.[9] Participants included jury-eligible community members who were naturally exposed to pretrial publicity over a 14-month period leading up to the trial. Trial summaries were presented online during six sessions over the course of ten weeks.

The researchers reported a pretrial publicity effect that persisted throughout the actual trial. Despite the admonitions to set-aside prejudicial pretrial publicity, participants were biased by the content of the pretrial publicity. Specifically, those exposed to prosecution-oriented articles were

---

[8] *See* Constantini, E., & King, J. (1980-1981). The partial juror: Correlates and causes of prejudgment. *Law and Society review, 15,* 9-40; DeLuca, A.J. (1979). *Tipping the scales of justice. The effects of pretrial publicity.* Unpublished master's thesis, Iowa State University, Ames; Hvistendahl, J.K. (1979). The effect of placement of biasing information. *Journalism Quarterly, 56,* 863-865; Kline, F.G., & Jess, P.H. (1966). Prejudicial publicity: Its effects on law school mock juries. *Journalism Quarterly, 43,* 113-116; Moran, G. & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journalism of Applied Social Psychology, 21,* 345-367; Otto, A.L., Penrod, S., & Dexter, H. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior, 18,* 453-470; Padawer-Singer, A. & Barton A.H. (1975). The impact of pretrial publicity on jurors' verdicts. In R.J. Simon (Ed.) *The jury system in America: A critical overview* (pp. 123-139). Beverly Hills, CA: Sage; Simon, R.J., Eimermann, T.  (1971). The jury finds not guilty: Another look at media influence on the jury. *Journalism Quarterly, 48,* 343-344; Sue, S., Smith, R.E., & Gilbert, R. (1974). Biasing effect of pretrial publicity on judicial decisions. *Journal of Criminal Justice, 2,* 163-171;Tans, M., & Chaffee, S. (1966). Pretrial publicity and juror prejudice. *Journalism Quarterly, 43,* 647-654.
[9] Daftary-Kapur, T., Penrod, S.D., O'Connor, M. & Wallace, B. (2014). Examining pretrial publicity in a shadow jury paradigm: Issues of slant, quantity, persistence, and generalizability. *Law and Human Behavior,* 38(5), 462-477.

DECLARATION OF BRYAN EDELMAN

more punitive in their guilty ratings across all six sessions compared to those exposed to pro-defense pretrial publicity. The amount of the pretrial publicity participants were exposed to also had a significant effect. In addition, the biasing effect of pretrial publicity did not disappear over time. Thus, neither delay nor trial evidence eliminated the pretrial publicity effect on judgments of guilt.

Steblay, et al. (1999) conducted a meta-analysis[10] encompassing 44 research studies on pretrial publicity. The authors reported a statistically significant relationship between pretrial publicity and verdicts.[11] Media coverage addressing the defendant's prior record, the existence of confessions, the heinousness of the crime, and negative character of the defendant have all been shown to have an effect on perceptions of guilt and final verdicts. Furthermore, deliberations may not reduce the biasing impact of pretrial publicity.[12] In fact, Kramer, Kerr, and Carroll (1990), found that deliberations actually accentuated the effects of pretrial publicity on final verdicts.[13]

Dexter, Cutler, and Moran (1992) also reported a significant relationship between pretrial publicity and views toward guilt. Participants were given pretrial publicity a week before the study began. Negative pretrial publicity increased conviction rates, even for subjects who underwent extensive voir dire addressing pretrial publicity.[14]

As demonstrated by Ruva and McEvoy (2007) exposure to pretrial publicity can influence verdicts by affecting perceptions of defendant credibility, ratings of the prosecuting and defense attorneys, and source attribution errors (i.e., misattributing information learned from the media as evidence presented as trial evidence).[15]

Consistent with the experimental literature on attitudes described above, Hope, Memon, and McGeorge (2004) found that jurors exposed to negative pretrial publicity evaluate pro-prosecution evidence more favorably than its actual probative value, a phenomenon coined "pre-

---

[10] A meta-analysis is a statistical analysis of several separate but similar experiments or studies in order to test the pooled data for statistical significance.
[11] Steblay, Jasmina Besirevic, Solomon M. Fulero, Belia Jimenez-Lorente. "The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review", Law and Human Behavior, vol.23, no.2, pp. 219-235, 1999.
[12] Otto, A.L., Penrod, S. & Dexter, H.R. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior*, 18(4), 452-469.
[13] Kramer, G.P., Kerr, N.L., & Carroll, J.S. (1990). Pretrial publicity, judicial remedies, and jury bias. *Law and Human Behavior,* 14(5), 409-438.
[14] Dexter, H., Cutler, B.L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-832.
[15] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-making. *Journal of Experimental Psychology: Applied,* 14(3), 226-235.

DECLARATION OF BRYAN EDELMAN

decisional distortion."[16] Thus, attitudes developed from exposure to pretrial publicity serve as a filter through which later trial evidence is evaluated.

## V.    MEDIA ANALYSIS

A careful effort was made to collect the articles published in newspapers with circulation in the Northern Division of the District of Maryland to assess the extent of coverage surrounding Marilyn Mosby and this case. A search of 14 newspapers with coverage in the Baltimore area uncovered **262** articles published between January 13, 2022 and May 16, 2023.[17]

The nature of the coverage is an important factor to consider when weighing the need for a change of venue. The pretrial publicity to date includes prejudicial details surrounding the pending allegations which may undermine the "presumption of innocence" by creating a "presumption of guilt":

- Prosecutors claim Mosby **lied in 2020** about **experiencing financial hardship** during the pandemic so she could **withdraw $81,000 without penalty** from her City of Baltimore retirement savings account to make **down payments on two Florida homes**: an **eight-bedroom rental near Disney World** and a **condo on the state's Gulf Coast**.

- Mosby also **stated in mortgage documents**, as Baltimore Brew disclosed last March, that she w**ould use one of the condominiums as a second home**, qualifying her for a **lower interest rate**.

- This **statement was false** because one week prior, according to the indictment, **Mosby entered into an agreement with a vacation home management company** to market the property as a **short-term rental**.

- Prosecutors said Mosby **used the $36,000 net she received** from the first withdrawal to **make a down payment on the eight-bedroom condominium** she purchased in Kissimmee, Florida, near Orlando, and the **$45,000 net from the second withdrawal for the condominium she purchased at Longboat Key**.

- Marilyn Mosby **said in mortgage documents she'd use Florida property as second home**, then she **made it a rental**.

---

[16] Hope, L., Memon, A. & McGeorge, P. (2004). Understanding pretrial publicity: Predecisional distortion of evidence by mock jurors. *Journal of Experimental Psychology: Applied,* 10, 111-119.
[17] This includes the: Baltimore Sun, Baltimore Brew, Afro-American, Avenue News. Catonsville Times, Daily Record, Dundalk Eagle, Greyhound, Jewish Times Johns Hopkins News-Letter, Quindecim, Retriever Weekly, Towerlight, and the Towson Times.

- When Mosby took out the $490,500 mortgage on the Kissimmee property, the indictment says, she **signed a second-home rider document which said the borrower will "maintain exclusive control over the occupancy of the Property** . . . and [**will not] give a management firm or any other person or entity any control** over the occupancy or use of the Property."

- But prosecutors said **she failed to disclose** on either application that she had **unpaid federal taxes** from a number of previous years or the **$45,022 lien** against the house she and her husband own in Reservoir Hill.

- Federal prosecutors say Mosby **cited financial hardship** because of the coronavirus pandemic under the federal CARES Act. That enabled her to **withdraw $81,000 from her retirement savings without a penalty** in 2020 for **down payments on the properties in Florida**. During the **same year**, according to the indictment, **her salary climbed by $10,000, to almost $250,000**.

- Federal authorities **subpoenaed** a wide range of the Mosbys' financial records - **tax returns, bank and credit card statements, loan documents and more - as part of their investigation**.

- What did Mosby do with all that money? It **went to buying houses** in **Florida**.

- And the federal indictment claims she **lied on documents related to the financing of those deals**.

- However, federal prosecutors say Mosby **experienced no such hardship and accused her of checking a box affirming under the penalty of perjury that her finances took a blow**.

- Federal prosecutors also said she **lied on her mortgage loan applications by not disclosing a $45,000 federal tax lien** and by **claiming the property near Orlando was a second home**.

- Mosby, whose salary was **unaffected during the pandemic**, **allegedly used the withdrawals to make down payments on two Florida properties**.

- Marilyn Mosby **swore that she had no tax liabilities** on a September 2020 mortgage application for a Florida condominium, the basis for one of the charges against her.

- The existence of the **tax lien was widely reported by the news media**.

- The new details allege that **Mosby falsely claimed that she was receiving $5,000 from her husband**, City Council President Nick Mosby, **as a gift that she could put toward the closing costs** on the home.
- He **moved the $5,000 from his wife into his savings account, then back into his checking account**, from which the gift money was supposed to be sent, **before transferring it to the escrow** agent for the home purchase, the indictment charges.
- The superseding indictment alleges that **Marilyn Mosby submitted the false gift letter in order to lock down a favorable interest rate**.
- The **government has recordings of phone calls between Mosby and the company that manages the city's retirement plan**.
- Prosecutors possess **recorded phone calls between Mosby and Nationwide**, the company that manages retirement accounts for Baltimore employees.
- "Simply put, the defendant's **perjury allowed her to leverage $90,000 in funds she should not have had access to in order to get two vacation homes**."
- Prosecutors said the evidence will show **Mosby did not have reduced work hours; was not "quarantined, furloughed or laid off"; was not unable to work because of a lack of childcare and did not have a business that closed or experienced reduced hours**. Those are the four categories the government established for people to qualify for coronavirus relief.
- Mosby's **defense hasn't offered a concrete explanation** for the **withdrawals** and have filed a motion s**eeking to block prosecutors from telling a jury how Mosby spent the money** she took out of her retirement account.
- Federal prosecutors said in court filings that **the government plans to try to seize Baltimore State's Attorney Marilyn Mosby's Florida Gulf Coast vacation condo** if she's convicted of perjury and mortgage fraud.
- When Mosby purchased the home near Disney World, **she signed a document known as a second home rider promising she would not hire a management company or rent it out for at least a year**.
- However, prosecutors claim that a week before closing, **Mosby signed a contract with a management company, giving it control over renting the home, a violation of her mortgage terms** and grounds for one of the fraud charges.

- The new indictment also charges that Mosby **falsely claimed that she had been living in Florida for 70 days in a letter to the mortgage company.**

The pretrial publicity also outlines some of Mosby's defense theories and efforts to create an alternative narrative to combat some of the negative publicity. However, this coverage often includes critical commentary which calls potential defense strategies into question:

- Supporters have said she is **being targeted for her progressive policies** and **black leaders are often unfairly targeted** for investigations.

- "This **indictment is merely a political ploy by my political adversaries** to unseat me," Mosby said.

- Mosby's attorney, A. Scott Bolden, said Thursday that the **indictment was "bogus" and designed to politically damage Mosby**, who is up for reelection this year

- Mosby said she planned to fight the charges that she called **politically and racially motivated**.

- The state's attorney's chief **response** so far **has been to claim victimhood**.

- Her chief legal defender, A. Scott Bolden, has held a press conference and conducted numerous media interviews declaring her innocence and **accusing federal prosecutors of personal and racial bias** toward his client.

- Mosby's lawyer, A. Scott Bolden, has claimed that the **charges against Mosby are racially and politically motivated**.

- Grigsby also **granted prosecutors' motions** placing **limits on what Mosby's experts could say at trial** and **prohibiting the defense from entering previously disproven evidence of personal and racial animus** on the government's behalf.

- At a news conference last month, Bolden provided a defense in the case, **saying that Mosby was eligible to make early withdrawals without facing penalties.** He said that **her private businesses, Mahogany Elite Travel, Mahogany Elite Enterprises LLC, and Mahogany Elite Consulting, detailed in her financial disclosures in 2020, were impacted by the pandemic**.

- A spokeswoman for **Mosby said in 2020 that the businesses were not yet active and were considered "a long-term venture."**

- **Marilyn Mosby is claiming in new court filings that she did not know about a federal tax lien** that is central to the government's allegation that she lied on loan applications for two properties in Florida.

- The **filings claim that Mosby's husband, City Council President Nick Mosby, did not inform her of a snowballing series of tax issues** he was facing, and that neither knew about a $45,000 lien against their home until a reporter asked about it in October 2020

- **Mosby alleges through her lawyers that her husband made multiple mistakes that led** to the Internal Revenue Service placing a **$45,022 lien** on their Reservoir Hill house

- **She said she was unaware of the lien or of a 2020 IRS delinquency notice**.

- In her recent court filings, **Marilyn Mosby said her husband told her, falsely, that the lien had been paid in 202**0.

- **This assertion forms her "innocent spouse" defense** for signing a mortgage application for a Florida condominium that figures in the federal indictment for her alleged false statements.

- **Nick Mosby stated he did not inform his wife** of a **withdrawal he took from his 401(k) and the resulting tax liability**.

- For 2020, the year in question, **Mosby received her full salary, roughly $250,000,** but her **lawyers say that doesn't matter, arguing she could have dealt with inflation, lack of childcare, having to order food in more or because a planned business venture didn't work out**.

- "Remember, Marilyn Mosby has businesses, if you will**," Bolden said in a January appearance** on Roland Martin's YouTube show. "**And so, those businesses were in the travel space and they were affected by [the coronavirus] and her accountant urged her to take that money**."

- **That's it? That's Marilyn Mosby's defense?** She tapped into her tax-deferred retirement savings in 2020 **because private companies that she established just the year before faced financial hardship due to the pandemic - even though said companies had not conducted any business? That's all she's got?**

- Essentially, the companies existed, **but they had not launched, so how could she claim hardship?**

- So, in May 2020, **Mosby applied for financial relief for companies** that, in July of that year, **she reported as having conducted no business.**

- That's why this **line of defense looks so shaky**. If her businesses were **not in operation, where's the hardship**? I'm reminded of lyrics from a great Billy Preston song: **"Nothin' from nothin' leaves nothin'."**

- In other words, **Baltimore's top prosecutor says that her spouse lied** to her.

- Even so, **how could she not have known about the lien when the IRS had sent notices individually to both Mosbys** a year earlier in February 2020?

- **Offering yet another basis** for Mosby's argument that she was never given notice of the lien, **Bolden says the couple's house is not in her name**.

- In her **annual state ethics disclosure forms**, however, Marilyn **lists herself as holding a direct interest in the house with her spouse**.

- What's more, the **Florida houses she bought in 2020 and 2021 are under her name.** They were transferred to her at the same Reservoir Hill house address without apparent mishap.

- I mean, **if a man of ordinary intellect, such as myself, understands what "adverse financial consequences" means**, certainly a federal judge can. **You'd think a graduate of Boston College Law School would, too**.

- "I ask that you verify that **I have not taken on a single client for these companies, nor have I taken in any money," Mosby wrote in a July 2020 letter** to Cumming. "Any insinuation to the contrary is false, misleading, and unethical."

A significant amount of the media coverage around the indictment appeared during the leadup to the 2022 midterm elections. This pretrial publicity had an impact on public opinion toward Ms. Mosby. Despite being a two-term State Attorney, she struggled to fundraise and ultimately finished last in the primaries:

- An already atypical election that may **be defined by the federal charges against Mosby.**

- In the wake of her federal indictment, **Marilyn Mosby has taken a resounding financial hit**, r**aising a fraction of the money secured by her two rivals** as the race for Baltimore state's attorney enters its final weeks.

- **Bates outraised Mosby by more than $43,000** in the year leading up to the election.

- **Mosby's campaign website and social media accounts have been disabled** for about a month and **her few public comments over that time have focused on her indictment.**

DECLARATION OF BRYAN EDELMAN

- Marilyn Mosby **faces a federal criminal trial that could render her constitutionally ineligible to serve**.

- The incumbent, Baltimore State's Attorney Marilyn Mosby, **is under indictment and expected to face trial** in May, **several months before the primary**.

- Baltimore State's Attorney **Marilyn Mosby faces an uphill battle to overcome a nine-point deficit** to defense attorney Ivan Bates in the Democratic primary for the city's top prosecutor.

- **Mosby finished in last place** in the Democratic primary.

- **She came in third place** in the July **Democratic primary** and is set to leave office when her term ends in January.

Some of the most prejudicial coverage detailed Marilyn Mosby's controversial tenure in office including the prosecution of police officers connected to the death of Freddie Gray, the exercise of prosecutorial discretion with regards to low-level crimes (e.g., theft, drug possession), and ongoing investigations into her finances. Some of this pretrial publicity is particularly concerning because it is likely inadmissible at trial:

- **Political lightening rod**.

- He had defeated two-term incumbent Marilyn Mosby, who has been a **magnet for controversy**, in the Democratic primary this July.

- … see her decision to **not seek convictions for low-level offenses**, such as drug possession, as unacceptably **soft on crime**.

- … **she suffered the disdain of haters** who **couldn't wait to condemn her and to outfit her with a target on her back**.

- For some in the local media she **became the main public official they loved to hate**.

- From the vantage point of moderates to conservatives in the establishment media, **Mosby could just do nothing right**.

- So, by the time she announced last year (during the pandemic) the new, practical policy of her office to **not prosecute for minor drug possession and prostitution**, the **haters were fit to be tied**.

- A **federal judge barred prosecutors** Wednesday from mentioning any of the **previous investigations into Baltimore State's Attorney Marilyn Mosb**y at her perjury and mortgage fraud trial.

- Those investigations – by Baltimore Inspector General Isabel Mercedes Cumming and Maryland Attorney Grievance Commission Bar Counsel Lydia Lawless – came after this **website disclosed Mosby's previously unreported travel company and her sponsored trips to Africa, Europe and elsewhere that took her out of the office for at least 85 days in 2018 and 2019**.

- **Extensive travels and frequent political battles have made her a controversial figure**.

- During **previous investigations**, Mosby **said her businesses, including travel company Mahogany Elite Enterprises LLC, were inoperable**.

- "I ask that you verify that I **have not taken on a single client for these companies, nor have I taken in any money**," Mosby wrote in a July 2020 letter to Cumming. **Now, her lawyers are hinging their defense for Mosby's perjury charges on those businesses**.

- Miller said Mosby had developed a website design and business plan after she formed the LLC, which contradicts statements made by Mosby and her previous lawyers at Kramon & Graham that the company **was a "long-term venture" that had no clients and produced no income**.

- During those investigations, **Mosby and her attorneys repeated that Mahogany Elite Enterprises was "non-operational,"** and Mosby **did not report any income on her state and federal tax returns**.

- Mosby, **under fire for frequent out-of-state travel**, asked the Baltimore in**spector general for an investigation into her travel and consulting businesses** to prove they existed in name only. The inspector general later found **Mosby deducted $5,000 in business expenses on her federal taxes** f**or losses associated with the travel business**.

- **Mosby sold the Disney home in November 2021 for a $150,000 profit.**

- Marilyn Mosby also has f**aced questions about a travel company she formed in 2019 and did not initially disclose on state ethics forms**.

- Marilyn Mosby **took 23 trips in 2018 and 2019, accepting $30,000 in reimbursements**.

- The indictment, however, provides no clues as to what prosecutors were after by issuing **subpoenas to a city dance studio where the Mosbys sent their children, to Black**

churches where the Mosbys gave money, and to their private companies and election campaigns.

- **Gov. Larry Hogan**, who has been **critical of Mosby**…

- **Federal prosecutors subpoenaed local churches for records of donations by the couple, while also seeking tax returns, bank and credit card statements, loan documents and canceled checks.** Marilyn Mosby's **campaign treasurer was subpoenaed** and **records were requested related to the couple's private travel and businesses**.

- …**accused her of being the cause of the city's crime problems.**

- It was not illegal, but it **seemed pretty odd** for a person elected as state's attorney of Maryland's largest city, and one experiencing an epoch of gun violence, **to be establishing private companies while in office**. It raised questions, if not red flags.

- Marilyn Mosby **dipped into her campaign coffers last year to pay nearly $50,000 to lawyers** defending her in a federal criminal probe, despite **Maryland law prohibiting such expenditures.**

- This is the **third time since winning her second term in office that Mosby has used campaign funds to handle personal legal problems**.

- Marilyn Mosby **used campaign funds to pay her defense attorneys**.

- The **finances** of Mosby and her husband, City Council President Nick Mosby, were the **subject of a federal investigation** that spanned over a year.

- "He responded first by discussing rumors about State's Attorney **Mosby's sex life**, then commented, **'I don't understand all the hype around her**, I don't get it. **She was my intern**, and **I don't get how she got where she is**,'" according to a statement Thompson signed earlier this month.

- In subsequent conversations, Thompson said that "**Mr. Barron would tell me how much he disliked working with State's Attorney Mosby**, and how **he didn't like her style and approach**."

- **She has clashed repeatedly with Gov. Larry Hogan** over her office's policies and recently **halted prosecutions of certain nonviolent crimes**, including drug paraphernalia and prostitution offenses.

- But a year later, **Mosby and his wife**, Baltimore State's Attorney **Marilyn Mosby**, are part of the **very problem he lamented**, having **stopped paying the water bill** at their Reservoir Hill residence.

- **Despite a combined yearly income of $375,000, they owe $907.63 for water and sewage usage**, according to records reviewed by The Brew.

- The Mosbys' **finances have been under intense public scrutiny** since they became the **target of a federal criminal probe**.

- He was buried seven years ago, but the **grandfather of Baltimore State's Attorney Marilyn Mosby apparently lives on as a source of campaign cash for her and her husband**, City Council President Nick Mosby.

- **Prescott Thompson, who died on February 22, 2015** at age 82, is listed as **contributing $500 to Marilyn Mosby last year**.

- The question arises because **Nick Mosby recently secured a little-known $58,000 loan from The Harbor Bank of Maryland**, using as **collateral the Thompsons' share of the Reservoir Hill house**.

- Last April, **he and his wife obtained a $58,000 loan from The Harbor Bank of Maryland**, secured by Nick signing as the POA for both Marilyn Thompson and the Estate of Prescott Thompson. **No record has been found indicating there is an estate for Prescott Thompson**.

- The **Baltimore Board of Ethics today ruled that Council President Nick Mosby violated ethics rules** by **accepting cash from "controlled donors."**

- The **ethics board ruled Mosby violated city ethics law** by indirectly **accepting money from "controlled donors"** to the fund, which was established to benefit him and his wife, State's Attorney Marilyn Mosby.

- Nick Mosby, president of the Baltimore City Council, and his wife, State's Attorney Marilyn Mosby, **seem to lurch from one ill-conceived idea to the next.**

- Her time in office was **polarizing and will be remembered for her progressive prosecution policies** and prosecution of police officers as much as for the **investigations into her conduct**.

- **A litany of reasons exist for why individual voters chose not to nominate Mosby** to a third term, but supporters and detractors alike pointed to her **frayed relationships**

**with other city and state agencies**, an inability to reduce violent crime and perceived **vindictiveness** toward those who disagreed with her.

- From the beginning of her tenure as state's attorney, **Mosby clashed with the Baltimore Police Department**. In 2015, she made **national headlines** when she announced her office was charging all six officers **involved in the death of Freddie Gray**.

- …**dismissing the charges against Adnan Syed**, whose case was featured on the hit podcast "Serial."

- …**rocketed to national prominence by bringing charges in the police custody-related death of Freddie Gray** and pushing progressive policies.

My review of the pretrial publicity indicates that the Northern Division jury pool has been saturated with prejudicial coverage surrounding Marilyn Mosby, her husband, inadmissible investigations, and political controversies. The pretrial publicity details the evidence supporting the government's case and serves to create a negative impression of the defendant.

The survey data indicate that the media coverage has negatively impacted the jury pool. For example, **75%** of the Northern Division survey respondents who recognized the case had read, seen, or heard Marilyn Mosby's tenure as State Attorney was surrounded by controversy, and **72%** knew she had been under investigation when in office. The survey data also suggest that the coverage has undermined the "presumption of innocence." A large percentage of prospective jurors have strong opinions which appear to be resistant to change. Sixty-eight percent (**68%**) of Northern Division survey respondents familiar with the defendant or the case believe that she is guilty of making false statements that she suffered financial hardship during the pandemic, and **57%** reported that she would have a difficult time convincing them otherwise.

## VI.   TELEPHONE SURVEY

A telephone survey was conducted in the Northern Division of the District of Maryland. A comparison survey was completed in the Southern Division. Standard methodological practices related to the development of the instrument, interviewer training, sampling, and callbacks were closely followed. All recognition questions were designed to describe the case using the language found in the media coverage. The survey was in the field between May 31st and June 15th of 2023.[18] Ultimately, 402 jury-eligible residents in the Northern Division 200 from the Southern Division,

---

[18] The survey instrument can be found in **Appendix B**.

completed the survey.

Case Recognition

It is my opinion that the results of the telephone survey indicate that there is bias in the Northern Division jury pool against the defendant stemming from exposure to pretrial publicity. Despite the size of the venue, **62%** of jury eligible respondents were familiar the defendant and **62%** had read, seen, or heard about this case. In addition, **41%** of survey respondents had seen negative campaign ads about Marilyn Mosby during the 2022 election cycle. The case recognition rate increased to **78%** for those who regularly follow local news and to **88%** for prospective jurors who regularly watch WBFF Fox 45.

Presumption of Guilt

The survey data also indicate that the "presumption of innocence" has been shifted to a "presumption of guilt." Approximately **68%** of prospective jurors in the Northern Division who were familiar with the defendant or case believe she is guilty of making false statements that she suffered financial hardship during the pandemic, with **25%** falling into the "definitely" guilty category. Furthermore, **57%** of those who have been exposed to media coverage reported that Mosby would have a difficult time convincing them that she is not guilty.

Comparison Venue

The difference between case recognition in the Southern Division compared to the Northern Division was statistically significant. Approximately **42%** of jury eligible respondents in the Southern Division were familiar Marilyn Mosby, 20 percentage points lower than their counterparts in the Northern Division. A similar pattern was found with regards to case recognition. Approximately **45%** of survey respondents recognized the case, which was 17 percentage points lower than in the Northern Division. In addition, only **29%** of survey respondents in the Southern Division had seen negative campaign ads about Marilyn Mosby during the 2022 election cycle.

Prejudgment was similar in the Southern Division for those prospective jurors who had been exposed to negative media coverage related to Marilyn Mosby or this case. Approximately **65%** of survey respondents reported that she is guilty of making false statements. However, opinions were not as strong as those found in the Northern Division. Only **17%** fell into the "definitely" guilty compared to **25%** in the Northern Division. For those exposed to negative pretrial publicity in the Southern Division, a large percentage held fixed opinions. Sixty-six percent (**66%**) of this group reported that Mosby would have a difficult time convincing them that she is

not guilty. This represents **36%** of the total jury pool compared to **41%** in the Northern Division.

<u>Case Knowledge</u>

Members of the Northern Division jury pool recognized some of the more prejudicial details widely reported in the coverage. Sixty-eight percent (**68%**) of respondents were familiar with at least three of the seven media items incorporated into the survey, and **55%** recognized four or more media items. Prospective jurors in the Southern Division were less familiar with specific details reported by the media. Fifty-eight percent (**58%**) recognized three or more media items and **44%** were familiar with four or more.

Consistent with the social science literature, case knowledge was significantly related to prejudgment. For example, **80%** of Northern Division survey respondents who were familiar with four or more media items reported that Mosby is guilty, and **66%** indicated that she would have a difficult time convincing them otherwise.

Several of the media items widely reported in the media and tested in the survey were significantly related to prejudgment. These media items are reported in the table below. Approximately **81%** of prospective jurors who knew Marilyn Mosby failed to disclose a lien for unpaid taxes on the mortgage applications for the Florida homes believe she is guilty and **66%** reported that he would have a difficult time convincing them otherwise. In addition, **77%** of those who had heard Marilyn Mosby's tenure as Baltimore's State Attorney was surrounded by controversy maintained that she is guilty, and **65%** held a fixed opinion.

Survey respondents were asked what impact the controversies or investigations they knew about would have on their views of Mosby's credibility if they were jurors in the case. Approximately **65%** reported that it would have a "somewhat" or "very" large impact with **31%** falling into the latter category. Eighty-nine percent (**89%**) of these respondents indicated that Mosby was guilty and **79%** reported that she would have a difficult time convincing them otherwise.

| Have you read, seen, or heard if… | Believe Mosby is guilty | Mosby would have difficult time convincing not guilty |
|---|---|---|
| Have you read, seen, or heard if Marilyn Mosby failed to disclose a lien for unpaid taxes on the | **81%** | **66%** |

| | | |
|---|---|---|
| mortgage applications for the Florida homes? | | |
| Have you read, seen, or heard if Marilyn Mosby used the money from her retirement account to purchase two homes in Florida? | **79%** | **69%** |
| Have you read, seen, or heard if Marilyn Mosby told investigators before the pandemic started that her travel company was not operating and had no income? | **79%** | **-** |
| Have you read, seen, or heard if Marilyn Mosby's tenure as Baltimore's State Attorney was surrounded by controversy? | **77%** | **65%** |
| Have you read, seen, or heard if Marilyn Mosby was under investigation during her tenure as Baltimore's State Attorney? | **76%** | **64%** |
| Have you read, seen, or heard if there had been an investigation into the travel business Marilyn Mosby started when she was in office? | **76%** | **67%** |

***NOTE: The relationships between the media items and measures of prejudgment in the table are statistically significant.***

<u>Negative Impressions of the Defendant in the Northern Division Jury Pool</u>

Much of the media coverage paints Marilyn Mosby in a negative light. She is often portrayed as a controversial and corrupt politician. Sixty-seven percent (**67%**) of survey respondents from the Northern Division have developed negative opinions of the former State Attorney, with **36%** reporting a "very negative" opinion. These opinions were significantly related to prejudgment. Ninety-five percent (**95%**) of survey respondents from the Northern Division who have a "very negative" opinion of Mosby believed she is guilty and **72%** reported that she would have a difficult time changing their mind.

Prospective jurors in the Northern Division also rated the former State Attorney as more corrupt than other prominent government officials. Approximately **45%** reported that she was "somewhat" or "very" corrupt which was higher than President Biden (**40%**), Governor Wes Moore (**19%**), and Mayor Brandon Scott (**25%**). These opinions had a significant impact on perceptions of guilt. Approximately **87%** of prospective jurors from the Northern Division who believe Mosby is corrupt also reported that she is guilty and **69%** indicated that she would have a difficult time convincing them otherwise. In contrast, just **26%** of the Southern Division reported that Mosby is "somewhat" or "very" corrupt.

The Northern Division jury pool was exposed to prejudicial campaign ads during the 2022

midterm primaries. Approximately **41%** of survey respondents recalled seeing negative campaign ads about Mosby. These ads further contributed to the negative atmosphere in the community around the defendant. Survey respondents were asked to provide three adjectives which they believe best describe Marilyn Mosby. Their responses demonstrate the negative impact the media coverage and campaign ads had on prospective jurors in the Northern Division. Thirty-five percent (**35%**) of survey respondents who had heard of Mosby described her as "corrupt." In addition, **20%** described her as "dishonest" or a "liar." Another **17%** described Mosby as a "thief," "greedy," or "selfish."

Survey respondents were also asked what they had read, seen, or heard about Marilyn Mosby and what they recalled from 2022 campaign ads. Many prospective jurors from the Northern Division referenced details surrounding this case, recalled inadmissible controversies (e.g., gift cards, water bill), and descriptions of her as a corrupt public official:

- There are **so many conspiracies** about her.
- That she **stole money** from her office.
- She is a **corrupt** politician.
- She **lies** about everything.
- That she **abused her political power**.
- That she is **corrupt** and **stole money** from the **community**.
- How **incompetent** she was.
- She **lied** on her application, broke the law, and **did not want to prosecute criminals**.
- She **falsely claimed financial hardship**.
- Just heard several things **about the gift cards**.
- I heard about **corruption and scandal with her husband**.
- I **hope she's guilty** and I am waiting for her to the trial. Her **husband should also be in jail**.
- I heard she **stole some money**.
- She **did not pay her water bill**.
- She is **corrupt**.
- Her **integrity** is **compromised**.
- **Corrupt**.
- About **corruption** and financial interests.

- **Gift cards** that were supposed to be given out. **She took a great number of them** and spent the money on herself.
- That she **stole money from the community** and used it for her own good.
- I've seen her in the news that she's **very corrupt**. She is a **thief**. She uses money to get what she wants.
- Mostly that **she lied** about bunch of things.
- That she is a **corrupt** representative.
- She **lied** about the **border**.
- She is **not honest**.
- She's **corrupt**.
- Relationship with **vendors** and **about her husband spending all of his money**.
- Quite a few **cases of hers were just completely wrong**. Cases that she prosecuted and some of the one that she didn't prosecute. Why did you prosecute this? **Let them burn down the town** and **steal** and did not do anything about it.
- **News on social media** about her **corruption**.
- **Corruption** about the **taxes** and houses in Florida.
- She is **hiding something**. She is **corrupt**.
- **Corrupt**.
- I have **seen and heard about her corruption**.
- Regarding **her trial about the Covid pandemic**.
- Making **false mortgage applications**.
- Relating to the **purchases of two vacation homes in Florida**.
- She used **money that was not her to purchase houses**.
- She is a **thief steal money** from the people.
- She is **hiding something**. She is **corrupt**.
- That she is **not trustworthy**.
- There are **several reports of her not prosecuting criminals** and **false tax declarations**.
- She used a **financial hardship to withdrawal money** from her retirement accounts.
- Under **investigation for fraud**.
- That she's **corrupt or hiding something**.

- About her being involved in **different crimes**.
- **Controversies** about her office.
- That she has a **trial coming up**, and that she **stole money from the community**.
- **Corruption** in the city and something about **stealing money**.
- I think she **filed for the Covid awards or benefits**.
- She's a **piece of shit** that **steals money from people**.
- She's involved in **different crimes** about monetary matters
- That she is a **corrupt official**.
- That she is **corrupt** and **violated the law**.
- She has been **charged with perjury** and **making false mortgage applications** related to the purchase of two houses.
- She is **corrupt** and **loves to manipulate others**.
- She **gets paid for letting the criminals get away**.
- She is **corrupt**.
- Negative feedback about **funding** and **corruption**.
- She is **hiding something and is corrupt**.
- Using her **power for personal gain**.
- Read that she is **corrupt** and **using campaign money**.
- She has **committed** a **felony** and **mismanaged finances of the city**.
- **Mostly bad** things and a **court case**.
- Negative things about her on the news about **retirement funds**.
- What I have read is **mostly negative**.
- Her **corruption**.
- I heard that she is **dishonest**.
- They said that she **lied** on an **application**. She **lied** on some documents.
- Just a **lot of bad things** about what she **did during the pandemic**.
- Investigators argue that she **knowingly lied to take a hardship withdrawal** from her retirement.

## VII.  ABILITY TO SELECT A FAIR AND IMPARTIAL JURY IN VENUES SATURATED WITH MEDIA COVERAGE

When a jury pool has been inundated to media coverage, the trial court and parties are

faced with unique challenges, which are not present in most cases. In high profile cases, many prospective jurors enter the courtroom with extensive knowledge and attitudes about the case, defendant, and victims. However, it is often difficult for prospective jurors to predict how case-specific knowledge and opinions may affect them over the course of a trial. Prospective jurors may also unintentionally omit exposure to specific media items during voir dire when asked what they recall hearing about the case. These items, however, may become salient and recalled from memory once witness testimony begins. The research also shows that information learned from media exposure can be misattributed as evidence presented at trial.[19]

Given these factors, it is important to ferret out during voir dire the full extent of exposure to pretrial publicity, case-specific attitudes, impressions of the defendant, and potential motivations to serve. However, the prejudicial effects of preexisting attitudes can occur at both a conscious and subconscious level, meaning jurors who profess impartiality may not be fully aware of their bias or how it may affect them as the trial unfolds. This can make it difficult to identify potential prejudice during the jury selection process. The Supreme Court has recognized the limitations of the voir dire process as a remedy where potentially prejudicial pretrial publicity is an issue. In *Irvin v. Dowd*, the Court concluded:

> No doubt, each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see." With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.[20]

State appellate courts have also expressed concerns about notions that voir *dire* can rebalance the scales once they have been unfairly tipped by improper influence:

> By this logic, it would be permissible to improperly influence a jury panel so long as we have a competent set of attorneys and a diligent trial judge willing to parse through the venire and eliminate any potential bias injected in the jury by that improper influence. **That is not the way or judicial system works.  Litigants**

---

[19] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-making. *Journal of Experimental Psychology: Applied,* 14(3), 226-35.
[20] *Irvin v. Dowd*, 366 U.S. 717, 727-28 (1960).

DECLARATION OF BRYAN EDELMAN

**should enter the courtroom on an equal basis, not one made equal by the hard work of conducting voir dire on a bias panel** [Emphasis added].[21]

Research on voir dire shows that these concerns are justified. Jurors are often reluctant to disclose relevant experiences, relationships or opinions that may lead to bias, even when pretrial publicity is not an issue. One study found that while 71% of jurors had a fixed opinion regarding guilt, only 15% admitted so during the voir dire.[22] Marshall obtained questionnaires from 277 former jurors in two counties and found that 18% of those jurors admitted to withholding information during voir dire.[23] Seltzer reported that approximately 39% of jurors who were interviewed after trial should have come forward in response to questions regarding crime victimization or knowledge of police officers during jury selection, but failed to do so.[24]

Many aspects of the large group voir dire format deter juror candor. Federal Court Judge Gregory Mize published his findings after experimenting with an expanded voir dire procedure in 30 federal criminal trials over a nine-month period, which included individual interviews with every venire member who failed to respond to his general opening questions. Judge Mize reported that approximately 28% of members of each panel failed to respond to the dozens of questions posed in open court, an average of about 16 people per trial. However, when questioned in private, one in five of these silent jurors disclosed personal information that was relevant to the case. In 90% of the trials, between one and four of these silent jurors expressed bias that led to their removal for cause.[25]

A search of appellate opinions shows that juror disclosure has led to several mistrials by undermining a defendant's fair trial rights. For example, in *U.S. v. Colombo*, 869 F.2d 149 (2d Cir. 1989), a juror failed to disclose when asked during voir dire that her brother-in-law was a lawyer for the government. She did not mention this fact because she wanted to sit on the jury for the case. In *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), a juror answered "no" when the panel was asked if anyone had ever been the victim of a crime. After the guilt phase, the defense learned that her brother had been shot and killed six years earlier. When questioned, she told the judge that she answered "no" because she, "thought the shooting was an accident, not a crime." Her brother had

---

[21] Recent decision from the Court of Appeals Seventh District of Texas: William A. Brewer III v. Lennox Hearth Products, LLC et al. (2018) No. 07-16-00121-CV
[22] Fahringer, H.P. (1980). In the valley of the blind: A primer on jury selection in a criminal case. *Law and Contemporary Problems,* 43, 116-36.
[23] Marshall, L.L. (1983). Juror, judge, and counsel perceptions of voir dire. Ph.D. dissertation, Boston University.
[24] Seltzer, R. (1991). Juror honesty during the voir dire. *Journal of Criminal justice*, 19, 451.462.
[25] Mize, G.E. (1999). On better jury selection: Spotting UFO jurors before they enter the jury room, *Connecticut Review Spring,* 33.

DECLARATION OF BRYAN EDELMAN

been pistol-whipped four times and shot in the back of the head.

Problems such as these have also been reported in high profile cases. For example, in the 2012 murder trial of Matthew Stebbins, who had been charged in a shooting death at a homeless shelter, a mistrial was declared after a juror announced during deliberations that she had a previous issue with violent crime. One of her children had been shot in the head. She failed to raise her hand during jury selection when asked if anyone had been a victim of a violent crime. According to her, "she did not think it was going to be an issue."[26]

A $6.5M judgment was overturned in the high profile police corruption lawsuit against the Public Defender surrounding the Rampart Division in Los Angeles County.  It was uncovered after the verdict that one of the jurors—Jennifer Salinas—had concealed knowledge of the scandal during jury selection.  She did not raise her hand when asked if anyone had some knowledge of events surrounding the Rampart Division. Later it was discovered that Salinas had played a prominent role in a movie titled "Gang Warz" that was based on the Rampart Division. Other jurors on the panel corroborated that she was very familiar with the scandal and discussed aspects that were not in the evidence.[27]

Prospective jurors in cases with extensive media coverage enter the courtroom with case-specific knowledge gleaned from the media, social media, and discussions with friends, family members, and co-workers. Uncovering the full extent of jurors' case-specific knowledge and opinions in high profile cases can be extremely difficult. Jury selection as a judicial remedy to address such bias relies on two factors: 1) that jurors can access their source of bias and 2) are willing to report it. In one study where researchers tested the effectiveness of extended voir dire, participants in the experimental condition were exposed to pretrial publicity a week before the experiment.[28] Prior to viewing a trial, they were subjected to minimal or extended voir dire. The attorney in the extended voir dire condition explained how pretrial publicity may inappropriately impact decision-making, asked jurors to hold each other accountable for not discussing pretrial publicity, obtained public commitments to base their verdict solely on the evidence presented in court, and to ensure that fellow jurors did the same. The researchers ultimately found that educating

[26] Villarreal, M. (2012, March 12). Judge declares mistrial in Corpus Christi murder case. *Corpus Christi Caller Times*. Retrieved February 10, 2015, from http://www.caller.com/news/local-news/crime/judge-declares-mistrial-in-corpus-christi-murder.
[27] Ellis, S.M. (2008, January 22). Appeals court orders new trial in suit against public defender. *Metropolitan News-Enterprise*. Retrieved February 12, 2015, from http://www.metnews.com/articles/2008/ovan012208.htm.
[28] Dexter, H. R., Cutler, B. L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-32.

DECLARATION OF BRYAN EDELMAN

jurors on the potential impact of pretrial publicity did not eliminate the effects of pretrial publicity.

High profile cases also create a unique challenge during jury selection known as the "minimization effect."[29] This concept refers to prospective jurors' attempts to minimize the full extent of their exposure to pretrial publicity. During voir dire, prospective jurors try to downplay their knowledge of the case using qualifiers such as, "just," "nothing other than," "only," "a little bit," and "that's all." In an archival study that analyzed the jury selection transcripts from five high profile cases, 69% of prospective jurors used minimization language when questioned by the judge or attorneys.[30]

Another challenge in cases with significant media coverage surrounds the difficulty jurors have during voir dire to recall every detail they have read, seen, or heard about a case. These types of open-ended "recall" questions require significant cognitive effort and often result in incomplete recollection. This phenomenon is an inherent limitation in how memory works. For example, if someone is asked to recall everything they know about the movie *Star Wars,* their description would likely miss important details they are familiar with. Memory is much more accurate when answering "recognition" questions: *Have you read, seen, or heard if Darth Vader was Luke Skywalker's father?*

This concern is not mere speculation. In a 2017 change of venue hearing in Texas, community residents exposed to detailed pretrial publicity over several years were called as witnesses.[31] During the hearing they were asked to recall everything they knew about the case. Following the "recall" question, they were asked a number of "recognition" questions about specific prejudicial and potentially inadmissible media items they failed to mention. The hearing demonstrated the limitations in memory [Emphasis added]:

Q. Can you tell the Court the facts that you know about the State of Texas versus John Feit as it relates to Irene Garza?

A.  [Description of basic facts]

Q. Is that it?

A.  **Let's see. I believe so.**

Q. Now, Ms. Perez, have you read, seen, or heard about John Feit **giving a confession to**

---

[29] Bronson, E. (1989). The effectiveness of *voir dire* in Discovering Prejudice in High Publicity Cases: An archival Study of The Minimization Effect.
[30] Edelman, B., Dahir, V.B., & Dillehay, R. (2011). Paper presented at the meeting of the American Society of Trial Consultants.
[31] *State of Texas v. John Feit*, CR-0464-16-A (2017).

DECLARATION OF BRYAN EDELMAN

**a priest**?

A. **Yes.**

Q. **And you didn't mention that a few minutes ago?**

A. I'm sorry.  **There were two that I remember.  They mentioned that there were two confessions that he made to two priests.**

Q. Okay.  Have you read, seen, or heard about whether or not Ms. Irene Garza **was alleged to have been raped?**

A. **I read, yes.**

Q. Now having refreshed your memory a few minutes ago, **are there any other facts that you have read, seen, or heard that you haven't told the Court about**?

A. **I don't believe so.**

Q.  Okay.  Have your read, seen, or heard that **John Feit was transferred to a monastery after this**?

A. **I did read that, yes.**

This limitation in memory recall has been demonstrated in a number of high profile cases around the country. For example, in a change of venue survey in Sonora, California, 95% of survey respondents recognized at least one additional detail reported in the media from the closed-ended recognition questions that they failed to mention in the open-ended recall question. A near identical trend (96%) was found in another high profile case in Nashville, Tennessee.[32] For example, when asked, "What have you read, seen, or heard about the case," one respondent answered, "Bits and pieces on the news. They were just talking about the case." However, he later recognized several media items including that: 1) the shooting was captured on video by surveillance cameras in the area and played on the television news and internet; and 2) the public approved a ballot measure in the last election to create a community oversight board to monitor the Metro Nashville Police Department. Both were prejudicial items widely reported in the media.

A similar pattern was found in this case. For example, only **30%** of the Northern Division survey respondents mentioned controversies or investigations into Marilyn Mosby when asked the common "recall" question posed during voir dire: *What have you read, seen, or heard about this case?* However, **72%** of survey respondents later remembered that she had been under investigation when asked the "recognition" question: *Have you read, seen, or heard if Marilyn*

---

[32] *State of Tennessee v. Andrew Delke*, Case No. 2019-A-26 and *People of the State of California v. Diane Anderson*, Case No.: CRF53011.

*Mosby was under investigation during her tenure as Baltimore's State Attorney*? Ninety-six percent (**96%**) of prospective jurors who recognized this media item failed to mention it in their open-ended response. Only one (**1**) survey respondent recalled the investigation into Mosby's travel business in their open-ended response. However, **42%** recognized this media item when asked: *Have you read, seen, or heard if there had been an investigation into the travel business Marilyn Mosby started when she was in office?*

On average, less than one (**0.6**) case detail was recalled from memory and reported in response to the recall question. In contrast, survey respondents recognized an average of **3.8** additional media items when later asked a battery of recognition questions. Ultimately, **98%** of survey respondents recognized at least one additional media item they failed to mention in their open-ended answer. Many Northern Division survey respondents also used "minimization language" or incomplete responses when asked what they knew about the case. Most of these prospective jurors later recognized items widely reported in the pretrial publicity (see table below).

| What have you read, seen, or heard about these events? [recognize the case] | Number of media items recognized |
|---|---|
| A lot but no opinion | 7 of 7 |
| That she is in a bad situation right now | 7 of 7 |
| A little just what the news reported. | 4 of 7 |
| Only on the news. | 6 of 7 |
| Don't recall | 6 of 7 |
| From the news and social media | 6 of 7 |
| I remember seeing something on the news about it. | 6 of 7 |
| She stole money and bought a house. | 6 of 7 |
| Perjury case or something about taxes | 5 of 7 |
| About her issue during the pandemic | 5 of 7 |
| I really do not know much about it. | 5 of 7 |
| Not much, I don't have any information | 5 of 7 |
| Not much information | 5 of 7 |
| Nothing recently | 5 of 7 |
| Based on the media she is corrupt | 5 of 7 |
| Marilyn Mosby is prepared to face perjury and mortgage fraud charges. | 5 of 7 |
| She used the money from her retirement account to purchase homes in Florida. | 5 of 7 |
| She's claiming financial hardship but her lifestyle contradicts her claims. | 5 of 7 |
| She had a financial issue about a home in Florida | 5 of 7 |
| Can't recall | 4 of 7 |
| Not much about it | 4 of 7 |
| Not much at this time | 4 of 7 |
| Very little actually | 4 of 7 |
| They said she is guilty | 4 of 7 |
| I haven't really heard much about it but some parts are all bad | 3 of 7 |
| I have seen it on social media and on TV | 3 of 7 |

| Not much | 3 of 7 |
|---|---|
| Not too much | 3 of 7 |
| Nothing | 3 of 7 |
| I have seen it on the TV news and local news | 3 of 7 |

The inability to provide a full account of everything a juror knows about a case puts the defendant in an untenable position. Counsel must choose to either rely on an open-ended question—known to generate incomplete recall—or ask media specific recognition questions, which are more diagnostic but risk exposing prospective jurors to extrajudicial information they may not be familiar with.

Prospective jurors' inability to recall the full extent of their exposure to pretrial publicity can undermine the value of voir dire as a corrective measure for identifying and ferreting out bias in high profile cases. If jurors are unable to fully recall from memory their detailed knowledge about a case when asked an open-ended question, it makes it difficult for counsel to effectively exercise challenges. This problem is exacerbated when there is extensive reporting around inadmissible content or disputed facts. Incomplete recall also poses a problem for the trial court when exercising its discretion to weigh prospective jurors' self-reports about their ability to be fair and impartial and rule on cause challenges.

This predicament is compounded by research, which suggests that professions of impartiality should not always be taken at face value. Part of the challenge media coverage presents surrounds jurors' efforts to guess how exposure to pretrial publicity may affect their evaluations of the evidence. Given the difficulties that such a guess poses, it is not surprising that claims of impartiality in high profile cases have been shown to be unreliable. A study on the prejudicial impact of pretrial publicity found that 62% of jury-eligible residents said they could be fair and impartial and decide the case solely on the basis of the evidence presented. However, only 39% said they could put knowledge of the media out of his or her mind.[33]

Another obstacle is the well-documented tendency for individuals to respond in a manner that will be viewed favorably by others, which has been coined the "social desirability" effect. This phenomenon has been researched and found in a multitude of disciplinary settings, including the courtroom. Socially desirable responses are more likely to occur when individuals become focused on the public aspects of themselves. Public awareness of oneself can become particularly salient in a courtroom setting where prospective jurors are asked questions by an authority figure

---

[33] Moran, C., & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology*, 21(5), 345-67.

DECLARATION OF BRYAN EDELMAN

in front of a public audience. Jones, for example, reported that participants appeared to alter their answers to reflect what they thought a judge wanted to hear rather than what they actually thought.[34] When potential jurors learn through the jury selection process that the law requires them to be fair and impartial, there is a risk that they will overstate their ability to set aside their knowledge and beliefs in order to create a favorable public impression.

Also referred to as response bias and demand characteristics, the effect causes the juror (interviewee) to pick up the subtle and overt clues as to what a lawyer or judge (interviewer) wants to hear. During voir dire a clear, strong message is often sent to prospective jurors: good jurors are not supposed to have prejudicial information or biases about the case. If they do, then they should set them aside and decide the case solely on the law and the evidence presented in court.[35] When this is established, many prospective jurors will adjust their public statements to meet to these courtroom norms.

The social desirability effect is found even in instances when the jury pool has been exposed to extreme forms of prejudicial media coverage. In *Rideau*, the jury pool was exposed to a taped 20-minute interview in the jail between the defendant and Sheriff.[36] In the interrogation, the defendant confessed to the murder of three people during a bank robbery. A soundtrack was added to the recording and the interview aired three times on television within a few months leading up to trial. Three of the 12 seated jurors had seen the televised interrogation. Despite the highly prejudicial nature of such a sensational televised confession, all three jurors told the court during voir dire that they could "lay aside any opinion, give the defendant the presumption of innocence as provided by law, base their decision solely upon the evidence, and apply the law as given by the court."[37]

Accordingly, a juror's professed ability to be fair and impartial should not be taken at face value in cases where there is substantial prejudicial pretrial publicity. This is less of an issue when dealing with the tangential experiences, limited case knowledge, and general attitudes jurors

---

[34] Jones, S. (1987). Judge versus attorney conducted voir dire: An empirical investigation of juror candor. *Law and Human Behavior,* 11(2), 131-46. Responses were inconsistent with what had been reported earlier in a questionnaire.
[35] The same "good citizen" impulse leads a number of respondents in telephone surveys to claim that they are registered
to vote when in fact they are not. Silver, B., et al., "Who Overreports Voting?" 80 American Political Science Review 613 (1986). Book publishers have long said that if survey respondents had actually read all the books they reported having read recently when they are surveyed, the book publishing business would be the most profitable business in the country. These effects, in response to an anonymous telephone pollster, are amplified in the presence of real authority figures in the courtroom and makes it difficult to assess problematic attitudes in prospective jurors.
[36] *Rideau v. Louisiana*, 373 U.S. 723 (1963).
[37] *Id*. at 732.

DECLARATION OF BRYAN EDELMAN

typically bring with them into the courtroom. There is little evidence, however, to suggest that individuals can forget or dissociate themselves from specific attitudes, emotions, and beliefs about the defendant and case developed from exposure to media coverage.

## VII.   CONCLUSION

The Northern Division jury pool has been exposed to prejudicial pretrial publicity and campaign ads surrounding Marilyn Mosby, unrelated controversies and investigations into her and her husband, alleged false statements on documents related to the two real estate transactions, and conflicting statements about her travel company. The survey data indicate that this pretrial publicity has had an impact on the jury pool. Approximately **62%** of the survey respondents had read, seen, or heard of Marilyn Mosby and **62%** were familiar with this case. Case recognition increased to **78%** for those who regularly watch the news and read the newspaper, and to **88%** for survey respondents who regularly watch WBFF Fox 45.

Northern District residents have also retained extensive case knowledge from exposure to pretrial publicity. Fifty-five percent (**55%**) of survey respondents were familiar with at least four of seven media items tested in the survey. Seventy-five  percent (**75%**) of those familiar with the case had read, seen, or heard that Mosby's tenure as Baltimore's State Attorney was surrounded by controversy and **72%** knew she was under investigation during her time in office. Sixty five percent (**65%**) of prospective jurors from the Northern Division indicated that these controversies would have an impact on their views of Mosby's credibility if they were jurors in the case, with **31%** indicating that it would have a "very large" impact.

Prospective jurors who recognized the case exhibited strong bias and a "presumption of guilt." Sixty-eight percent (**68%**) of survey respondents who had heard of Marilyn Mosby or recognized the case reported that she is guilty of making false statements that she suffered financial hardship during the pandemic, with **25%** indicating that she is "definitely guilty." Furthermore, **57%** of those familiar with the defendant or case reported that Mosby would have a difficult time convincing them that she is not guilty. The number who maintained that Mosby is guilty increased to **80%** for those who recognized four or more media items. In addition, **89%** of survey respondents who indicated that the controversies and investigations they were familiar with would impact their perceptions of Mosby's credibility also believe she is guilty.

Much of the media coverage paints Marilyn Mosby in a negative light. She is often portrayed as a controversial and corrupt politician. Sixty-seven percent (**67%**) of survey respondents from the Northern Division have developed a negative opinion of the former State

Attorney, with **36%** reporting a "very negative" opinion. These opinions were also significantly related to prejudgment. Ninety-five percent (**95%**) of survey respondents from the Northern Division who hold a "very negative" opinion of the defendant believe she is guilty and **72%** reported that she would have a difficult time changing their mind.

The jury pool was also exposed to prejudicial campaign ads during the midterm primaries. Approximately **41%** of survey respondents from the Northern Division recalled seeing negative campaign ads about Marilyn Mosby. In addition, **35%** of survey respondents who had heard of her described Mosby as "corrupt" and **20%** reported that she is "dishonest" or a "liar." Another **17%** described Mosby as a "thief," "greedy," or "selfish."

Overall, these findings are particularly concerning given the limitations of voir dire as a tool for assessing the full extent of prospective jurors' case knowledge in high profile cases. Consistent with the research literature, survey respondents offered incomplete recall when asked the common open-ended question, "What have you read, seen, or heard about the case?" Almost all survey respondents (**98%**) later recognized at least one additional media item they failed to report in their open-ended answer and averaged **3.8** additional media items. [38] For example, only one survey respondent mentioned that Marilyn Mosby's travel business was under investigation when she was in office. However, **42%** remembered hearing about this detail when asked a closed-ended recognition question later in the survey.[39]

Jurors' inability to fully recall what they know about a high profile case undermines the value of voir dire as a tool for ferreting out bias. If jurors are unable to fully disclose what they have read, seen, or heard then neither the Court nor defense counsel can properly weigh self-professions of impartiality and exercise challenges.

In conclusion, given the nature of the pretrial publicity and negative campaign ads—and their negative impact on the jury pool—I believe the "presumption of innocence" in the case against Marilyn Mosby has been threatened. As such, remedial measures are necessary to protect the defendant's Constitutional rights to a fair and impartial trial. It is my opinion that a change of venue or intra-district transfer would be the most efficient and effective prophylactic measure to mitigate the prejudicial impact of pretrial publicity.

---

[38] Participants were first asked the open-ended recall question (what have you read, seen, or heard about this case?) and were later asked closed-ended recognition questions.

[39] Have you read, seen, or heard if there had been an investigation into the travel business Marilyn Mosby started when she was in office?

I declare under penalty of perjury under the laws of the State of California that the foregoing facts are true and correct, except as to facts stated upon information and belief, which facts I believe to be true.

Executed on June 29, 2023

_____
Bryan Edelman

## APPENDIX A: CURRICULUM VITA

### BRYAN EDELMAN, PH.D.

6257 Westover Dr. • Oakland, California  94611
(415) 944-9989 •  bryan@trialinnovations.com

#### PROFESSIONAL EXPERIENCE

**Trial Innovations,** Oakland and Los Angeles, California                                    **2011-Current**
Co-founder
- Design and implement jury research
- Conduct community survey research on jury issues
- Serve as expert witness on venue, survey jury issues, and eyewitness identification

- Assist with jury selection, juror questionnaire design, etc.
- Provide trial consulting services
- Provide in-house legal education
- Conduct post-trial juror interviews
- Conduct consumer insight research for fortune 500 companies (e.g., Facebook, Google)

**The Jury Research Institute,** Alamo, California                                    **2005-2010**
Senior Trial Consultant
- Conducted multi-stage qualitative and quantitative research (e.g., focus groups, mock trials, shadow juries)
- Served as expert witness (e.g., change of venue motions)
- Designed and conducted telephone and online survey research
- Conducted post-trial juror interviews
- Provided trial consulting services
- Analyzed qualitative and quantitative data
- Served as speaker and visiting lecturer at conferences, universities, law firms, and Bar Associations

**The National Jury Project,** Oakland, California                                        **2005**
Associate Trial Consultant
- Conducted qualitative and quantitative research
- Analyzed quantitative and qualitative data from prospective juror questionnaires
- Interpreted research results and developed strategy recommendations
- Assisted with crafting opening statements and closing arguments

**Trial Science, Inc.,** Reno, Nevada                                                 **1999-2003**
Associate Trial Consultant
- Conducted focus groups and mock trials
- Analyzed quantitative and qualitative data
- Presented findings and recommendations to trial team
- Developed jury selection profiles

**Grant Sawyer Center for Justice Studies,** Reno, Nevada                             **2000-2003**
Project Manager, "Predicting Failure in Pre-trial Release Programs in Washoe County"
- Designed and implemented an evaluation of the Washoe County pre-trial release program
- Oversaw data collection (over 40,000 cases) and analyzed data
- Served as an ombudsman between trial courts, police departments, Court Services, and the judicial sub-committee
- Presented findings to the Court Services Sub-Committee and at international conferences

Research Associate, "Minimization of Pre-Trial Publicity Knowledge during Voir Dire"
- Co-developed research methodology
- Performed content analysis of trial transcripts from high profile cases
- Analyzed data

Research Associate, "Science in the Courtroom"
- Co-developed survey codebook
- Completed content analysis of judges' responses regarding the Daubert standard

Research Associate, "Judicial Workload Pilot Project"
- Completed telephone interviews with judges
- Conducted content analysis of qualitative data from interviews

## EXPERT WITNESS & VENUE EXPERIENCE[40]

*State of West Virginia v. Joshua Phillips* (2022).  Conducted community attitude survey and testified in change of venue hearing.  Recommended change of venue.

*State of Colorado v. Barry Morphew* (2022).  Conducted community attitude survey.  Recommended change of venue.

*United States v. Robert Bowers* (2022).  Conducted community attitude survey.  Recommended change of venue.

*State of Washington v. David Nickels* (2021).  Conducted community attitude survey.  Recommended change of venue.

*United States v. James Cloud* (2021).  Conducted community attitude survey.  Recommended change of venue.

*State of Florida v. Nikolas Cruz* (2021).  Analysis of media coverage and testified in closure hearing.

*State of Nevada v. James Biela* (2021).  Conducted post-conviction analysis (media coverage, defense motions, and reviewed jury selection transcripts).

*State of Minnesota v. Alex Kueng (2021*).  Conducted community attitude survey.  Pending.

*United States v. Robert Bowers* (2021).  Conducted community attitude survey.  Pending.

*People v. Nikolas Cruz* (2021).  Conducted community attitude survey.  Testified in closure hearing.

*Timaero Ireland Limited v. The Boeing Company* (2020).  Conducted community attitude survey.  Pending.

*State of Tennessee v. Andrew Delke* (2019).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Diane Anderson* (2019).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Tennessee v. Nikolaus Johnson* (2019).  Conducted content analysis of media coverage and reviewed jury selection transcripts.  Testified at post-conviction hearing.

*People v. Jason Van Dyke* (2018).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Brian Cooks* (2017).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended remedial measures during jury selection [Case settled].

*People v. Johnathan Feit* (2017).  Conducted community attitude survey.  Conducted community attitude survey.  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Jonathan Renfro* (2017).  Conducted community attitude survey.  Did not make recommendations regarding remedial measures.

---

[40] This is not an exhaustive list and does not include some current cases which are still pending.

*People v. Kenneth Rossy* (2017).   Conducted preliminary media analysis.  Recommended moving forward with community attitude survey.

*Angelo Harmon et al. v. The Salvation Army, et al* (2017).  Conducted community attitude survey.  Did not make any recommendations.

*United States v. Charles Banks* (2016). Conducted community attitude survey.  Recommended change of venue.

*United States v. Jessie Con-ui* (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

*People v. Lubrin, et al.* (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

*Melissa Mays, et al., v. Rick Snyder, et al.* (2016).  Conducted community attitude survey.  Recommended change of venue.

People v. Balser and Robinson (2016).  Conducted preliminary media analysis.  Recommended against moving forward with venue study.

United States v. Dredd (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

People v. Romero (2016): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Morales (2016). Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended remedial measures during jury selection [Granted].

People v Williams (2015). Conducted community attitude survey.  Recommended against a change of venue.

Commonwealth v. Chism (2015). Approved by Court to assist with crafting juror questionnaire to address pretrial publicity.

U.S. v. Blankenship (2015). Conducted community attitude survey for the DOJ.

U.S. v. Sablan (2014). Conducted community attitude story and submitted a declaration.  Recommended a change of venue [Granted].

People v. Bealer (2014). Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing and transfer hearing.  Recommended a change of venue [Granted].

People v. Ware, et al. (2014). Conducted content analysis of media coverage and grand jury transcript.  Submitted a declaration recommending that the grand jury transcript remain sealed [Granted].

People v. Castillo (2014).  Conducted community attitude survey [Venue hearing denied].

People v. Shirakawa (2014). Conducted community attitude survey Recommended against a change of venue.

People v. Holmes (2014): Conducted content analysis of media coverage.  Recommended a change of venue [Denied].

People v. Tree (2014): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Hoyt (2014): Reviewed pretrial publicity, juror questionnaires, and voir dire transcript. Recommended that trial counsel should have pursued change of venue.

People v. Duran (2014). Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. White (2013): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Vega (2013): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Ayers (2013): Conducted community attitude survey.  Recommended against a change of venue.

People v. Lucero (2013): Conducted community attitude survey.  Recommended against a change of venue.

People v. Bennett (2013): Conducted media analysis.  Recommended against a change of venue.

People v. Deloney (2012): Testified as expert witness regarding literature on the accuracy of eyewitness identification, memory, cognition, and suggestive questioning.

People v. Ortega, et al. (2012):  Conducted community attitude survey and content analysis of pretrial publicity. Testified as expert witness about results, the impact of pretrial publicity on attitudes, memory, jury selection, and jury-decision making.

People v. Bey (2011): Conducted community attitude survey and content analysis of pretrial publicity. Testified as expert witness about results, the impact of pretrial publicity on attitudes, memory, jury selection, and jury-decision making.

Johnson, et al. v. BART, et al. (2011).  Conducted community attitude survey.  Recommended against filing a change of venue motion.

People v. Fowler (2011): Conducted community attitude survey. Recommended certain communities be excluded from the venue [Granted]

People v. Sanchez, et al (2011): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Loughner (2011): Conducted media analysis.

Huang Xiu Mei, New York (2007): Expert witness in political asylum hearing.

Weather Shield v. Bostik (2005): Evaluated plaintiff's change of venue motion.

Olympic Pipeline Company v. Washington (2002).  Assisted with content analysis of media coverage.

## PUBLICATIONS AND PRESENTATIONS

Bronson, E. Edelman, B., & Philipsborn, J.T. (2022). Change of Venue.  In N. Yuenger (Ed.), *California criminal law procedure and practice*. Oakland: Continuing Education of the Bar.

Gordan, N. & Edelman, B. (2020). Self-Assessments About Fairness in the Robert Durst Case.  Presented at the American Psychology Law Society Annual Conference, New Orleans, LA.

Edelman, B. (2018). *Psychology of the Jury.* Presented at the American Board of Trial Advocates MIT Program, Sacramento, CA.

Edelman, B. (2018). *Preventing Runaway Juries*. Presented at the Michigan Defense Trial Counsel's Annual Meeting, MT Pleasant, MI.

Edelman, B. (2018). *Trial Consulting 101*. Presented at the American Psychological Association, Division 41, Memphis, TN.

Edelman, B. (2018). *Trial Consulting 101*. Presented at American Society of Trial Consultants Conference, Ft Worth, TX.

Edelman, B. (2016). *Conducting an Effective Jury Selection*. Presented at Santa Barbara Bar Association Bench and Bar Conference, Santa Barbara, CA.

Edelman, B. (2015). *Trial Consulting 101*. Presented at American Society of Trial Consultants Conference, Nashville, TN.

Edelman, B. (2015). *Effective Jury Selection Lunch and Learn*. Sponsored by Thomas Reuters (Oakland).

Edelman, B. (2015). *The Social Psychology of Jurors and Juries*. Presented at Washoe County Alternate Defender, Reno, NV.

Edelman, B. (2013). *The Social Psychology of Jurors and Juries*. Presented at Washoe County Alternate Defender, Reno, NV.

Edelman, B. (2013).  *Police Liability.* Presented at the Lorman Education Services Seminar in Santa Rosa.

Edelman, B., & Canon, D. (2012). *The Social Psychology of Jurors and Juries*. Presented at Office of the Public Defender, Albuquerque, NM.

Edelman, B. (2013).  *Police Liability.* Presented at the Lorman Education Services Seminar in Sacramento.

Edelman, B., & Canon, D. (2012). *The Social Psychology of Jurors and Juries*. Presented at Office of the Public Defender, Albuquerque, NM.

Edelman, B. (2011). Using online surveys to conduct jury research. *The Jury Expert,* 23(6), 51-54.

Edelman, B. (2011). Juror race and capital sentencing. *The Jury Expert,* 23(4), 47-49.

Bronson, E., Dillehay, R. Edelman, B., & Rountree, W. (2011). *Analyzing Pretrial Publicity in the New-Media Universe.* Presented at the American Society of Trial Consultants Conference.

Edelman, B. (2010). *CLE: Selecting your Jury*.  Presented at White and Williams, LLP, Philadelphia, PA.
Edelman, B. (2010). *Trial Consulting 101*. Presented at the University of Nevada, Reno.

Edelman, B. (2009). The impact of graphic injury photographs on liability verdicts and non-economic damage awards. *The Jury Expert,* 21(5), 1-4.

Edelman, B. (2009) *Online Research Tools to Evaluate Cases.* Presented at the Santa Clara County Bar Association.

Edelman, B. (2009).  *Psychology in the Courtroom: Selecting Your Jury.* Presented at the Monterey County Bar Association.

Edelman, B. (2008).  *Striking the Jury.* Visiting lecturer at Stanford Law School.

Edelman (2008).  *Communicating with the Jury.* Presented at the International Symposium on Life Care Planning, Phoenix.

Edelman (2007).  *Race, Empathy, and Capital Punishment.*  Visiting lecturer at the University of California, Santa Cruz.

Edelman, B. *Racial Prejudice, Juror Empathy, and Sentencing in Death Penalty Cases.* (New York: LFB Scholarly Publishing LLC, 2006).

Edelman, B. & J.T. Richardson, (2005). Imposed limitations on freedom of religion in China and the margin of appreciation doctrine: A legal analysis of the crackdown on the Falun Gong and other "evil cults." *The Journal of Church and State,* 47(2), 243-267.

Richardson, J.T., & Edelman, B., Cult controversies and legal developments concerning new religions in Japan and China. In D.H. Davis & G. Besier (Eds.), *International Perspectives on Freedom and Equality of Religious Belief*, Waco: (Dawson Institute of Church-State Studies, Baylor University, 2002), reprinted in J.T. Richardson (Ed), *Regulating Religion Case Studies from Around the World*. (United States: Kluwer Academic/Plenum Publishers, 2004), pp. 359-380.

Edelman, B. & Richardson, J.T. (2003).  Falun Gong and the law: Development of legal social control in China. *Nova Religio*, 6(2), pp. 312-331.

Edelman, B., Dillehay, R.C., Bennett, D., & Hinxman, C. (2002). *The difficulties of collecting data in a local justice system*. Presented at the annual meeting of the Pacific Sociological Association, Vancouver, Canada.

Edelman, B. & Richardson, J.T. (2002). *Falun Gong and the law*.  Presented at the annual meeting of the Society for the Study of Religion, Houston, TX.

Edelman, B. & Richardson, J.T. (2002). *The crackdown on the Falun Gong: Western influence and the development of the anti-cult movement in China*.  Presented at the Society for the Scientific Study of Religion annual conference, Salt Lake City, Utah.

Richardson, J.T. & Edelman, B. (2001). *Cult controversies and legal developments in Japan and China*. Presented at the annual conference on "New Religions," Heidelberg, Germany.

| EDUCATION | |
|---|---|
| **LL.M.,** International Law, with Distinction, University of Kent, Canterbury, United Kingdom | **2004** |
| **Ph.D.,** Interdisciplinary Social Psychology, University of Nevada, Reno, Nevada | **2003** |
| **B.S.,** Magna Cum Laude, Psychology, Florida State University, Tallahassee, Florida | **1997** |

**APPENDIX B: SURVEY INSTRUMENT**

# S C R E E N I N G   F O R M -   N O R T H E R N   D I V I S I O N
Cell

**Intro1.** Hello.  My name is (your name) calling from the (Survey Company Name).  We are not selling anything and this is not a political poll.  We're doing a public opinion survey among local residents to obtain opinions about an upcoming case in your community.  Your cooperation is very important because your household was selected at random by

DECLARATION OF BRYAN EDELMAN

computer as being representative of your county.  Again, we are not selling anything and this is not a political poll.

*[IF RESPONDENT HESITATES TO COOPERATE, SAY: **If you like, you can verify the authenticity of the survey by calling NAME at SURVEY COMPANY during regular office hours; call collect PHONE NUMBER.***

S0.    *[Do Not Read]* **Does the respondent have a reasonable working knowledge of English?**

> 1..........Yes
> 2..........No → → →*Discontinue Survey*

S1.    **First, what county do you live in?**

> 1……………….    Anne Arundel
> 2……………..    Baltimore
> 3……………….    Baltimore City
> 4……………….    Caroline
> 5……………….    Carroll
> 6……………….    Cecil
> 7……………….    Dorchester
> 8……………….    Frederick
> 9……………….    Harford
> 10……………….    Howard
> 11……………….    Kent
> 12……………….    Talbot
> 13……………….    Washington
> 97……………..    Other → → → *Discontinue Survey*
> 98……………….    Don't know → → → *Discontinue Survey*
> 99……………….    Refused → → →*Discontinue Survey*

S2.    **Have I reached you on your cell phone or landline?**

> 1..........Cell phone
> 2..........Landline

S3.    **Are you a U.S. citizen who is 18 or older and registered to vote in [county identified in S1]?**

> 1..........Yes
> 2..........No → → → →*Discontinue Survey*
> 9..........Refused → →*Discontinue Survey*

S4.    **Are you in a place where you can safely talk on the phone and answer my questions?**

> 1..........Yes→ → →   *SKIP to Main Questionnaire*

2..........No → → → →

S4a     **When is a safe time for me to call you back?**

Timed Callback..........1 → → → → *[Callback date/time: _____]*
Refused            9 → → → → *Discontinue Survey*

# M A I N   Q U E S T I O N N A I R E

Before I begin asking you questions, I'd like you to know that there are no right or wrong answers and that you are free to respond with a "<u>don't know</u>" or "<u>no opinion</u>" answer to any question.  All of your answers will remain confidential!

Q1.  I'm going to read you a list of current and former local, state, and federal government representatives. As I read each one, please tell me if you believe they are very corrupt, somewhat corrupt, not too corrupt, or not at all corrupt. First,

**randomized name from below**:

Next, **randomized name**:

**[Randomize the list]**

President Joe Biden
Governor Wes Moore
Former Baltimore state attorney Marilyn Mosby [Mowz-Bee]
Baltimore Mayor Brandon Scott

Very corrupt............... 1
Somewhat corrupt.......... 2
Not too corrupt……....... 3
Not at all corrupt……...... 4
No opinion……........... 5
Don't know.................... 8
Refused/NA.................. 9

Q2a. Have you read, seen, or heard of former Baltimore state attorney Marilyn Mosby [Mowz-Bee]?

Yes........................................... 1
No............................................. 2 **[GO TO Q5A]**
No opinion............................... 5 **[GO TO Q5A]**
Don't know............................... 8 **[GO TO Q5A]**
Refused/NA............................. 9 **[GO TO Q5A]**

Q2b. What is your opinion of Marilyn Mosby [Mowz-Bee]? Is it very positive; somewhat positive; somewhat negative; or very negative?

Very positive............... 1
Somewhat positive ……. 2
Somewhat negative …… 3
Very negative ………… 4
No opinion……........... 5
Don't know.................... 8
Refused/NA.................. 9

Q2c. Why do you feel that way about Marilyn Mosby [Mowz-Bee]?

Q2d. What three words do you believe best describe Marilyn Mosby [Mowz-Bee]?

Q3a. What have you read, seen, or heard about Marilyn Mosby [Mowz-Bee]?

Q4a.  During the 2022 election cycle, did you see or hear any negative television ads, radio ads, social media ads, or paper campaign mailers about Marilyn Mosby [Mowz-Bee]?

| | |
|---|---|
| Yes............................................ | 1 |
| No.............................................. | 2 |
| No opinion................................. | 5 |
| Don't know............................... | 8 |
| Refused/NA.............................. | 9 |

Q4b.  What negative information about Marilyn Mosby do you recall from these campaign ads?

Q5a. Now I'd like to ask you about an upcoming trial in Baltimore.  Back in 2022  Marilyn Mosby was charged with falsely claiming that she suffered financial hardship during the COVID-19 pandemic so that she could withdraw money from her retirement account. Have you read, seen, or heard anything about this case?

| | |
|---|---|
| Yes…………................. | 1 [**SKIP TO Q7a**] |
| No…………................. | 2 [**SKIP TO Q5b**] |
| No opinion…………... | 5 [**SKIP TO Q5b**] |
| Don't know................ | 8 [**SKIP TO Q5b**] |
| Refused/NA............... | 9 [**SKIP TO Q5b**] |

Q5b.  Marilyn Mosby used the money from her retirement account to purchase two homes in Florida. Have you read, seen, or heard anything about this case?

Yes…………1 [**SKIP TO Q7a**]
No…………..2 [**SKIP TO Q6a IF "YES" TO Q2a; SKIP TO Q10 IF "NO" TO Q2a**]
No opinion… 5 [**SKIP TO Q6a IF "YES" TO Q2a; SKIP TO Q10 IF "NO" TO Q2a**]
Don't know....8 [**SKIP TO Q6a IF "YES" TO Q2a; SKIP TO Q10 IF "NO" TO Q2a**]
Refused/NA..9 [**SKIP TO Q6a IF "YES" TO Q2a; SKIP TO Q10 IF "NO" TO Q2a**]

---

Q6a.   Based on what you have read, seen, or heard about Marilyn Mosby, do you believe she is definitely guilty; probably guilty; probably not guilty; or definitely not guilty of making false statements that she suffered financial hardship during the pandemic?

| | |
|---|---|
| Definitely guilty | 1 |
| Probably guilty | 2 |
| Probably not guilty | 3 |
| Definitely not guilty | 4 |
| No opinion | 5 |
| *Other | 7 |
| Don't know | 8 |

DECLARATION OF BRYAN EDELMAN

Refused/NA                              9

*Record responses

**THE RESPONSE OPTIONS SHOULD BE ROTATED FOR HALF THE SAMPLE**

Q6b. Given what you have read, seen, or heard about Marilyn Mosby, would she have a difficult time convincing you that she **is not—repeat is not—** guilty of making false statements that she suffered financial hardship during the pandemic?

Yes............................................ 1
No............................................. 2
No opinion…………………... 5
Don't know.............................. 8
Refused/NA.............................. 9

**SKIP TO Q9D**

Q7a.   Based on what you have read, seen, or heard about Marilyn Mosby and this case, do you believe she is <u>definitely</u> <u>guilty</u>; <u>probably</u> <u>guilty</u>; <u>probably</u> <u>not</u> <u>guilty</u>; or <u>definitely</u> <u>not</u> <u>guilty</u> of making false statements that she suffered financial hardship during the pandemic?

Yes, definitely                      1
Yes, probably                       2
No, probably not                   3
No, definitely not                  4
No opinion                           5
*Other                               7
Don't know                          8
Refused/NA                          9

*Record responses

**THE RESPONSE OPTIONS SHOULD BE ROTATED FOR HALF THE SAMPLE**

Q7b. Given what you have read, seen, or heard about Marilyn Mosby and this case, would she have a difficult time convincing you that she **is not—repeat is not—** guilty of making false statements that she suffered financial hardship during the pandemic?

Yes............................................ 1
No............................................. 2
No opinion…………………... 5
Don't know.............................. 8
Refused/NA.............................. 9

Q8. What have you read, seen, or heard about this case?

Q9.  As you may know, the media have reported a number of things about these events.  Some people may remember some things, while others may remember other things.  We're interested in what you may remember, even if you already told me in one of the previous questions.

[**ONLY** THOSE WHO ANSWERED "YES" ON Q4A SHOULD BE ASKED QUESTION Q9A]

Q9a.  Have you read, seen, or heard if Marilyn Mosby used the money from her retirement account to purchase two homes in Florida?

| | |
|---|---|
| Yes........................................... | 1 |
| No............................................. | 2 |
| No opinion................................ | 5 |
| Don't know................................ | 8 |
| Refused/NA............................ | 9 |

[EVERYONE WHO ANSWERED "YES" ON Q4A OR Q4B SHOULD BE ASKED Q9B-Q9H]

Q9b.  Have you read, seen, or heard if Marilyn Mosby failed to disclose a lien for unpaid taxes on the mortgage applications for the Florida homes?

| | |
|---|---|
| Yes........................................... | 1 |
| No............................................. | 2 |
| No opinion................................ | 5 |
| Don't know................................ | 8 |
| Refused/NA............................ | 9 |

Q9c.  Have you read, seen, or heard if Marilyn Mosby's attorney said her travel company experienced financial hardship during the Covid pandemic?

| | |
|---|---|
| Yes........................................... | 1 |
| No............................................. | 2 |
| No opinion................................ | 5 |
| Don't know................................ | 8 |
| Refused/NA............................ | 9 |

Q9d.  Have you read, seen, or heard if Marilyn Mosby's tenure as Baltimore's State Attorney was surrounded by controversy?

| | |
|---|---|
| Yes........................................... | 1 |
| No............................................. | 2 |

|                              |     |
|------------------------------|-----|
| No opinion.............................. | 5 |
| Don't know.............................. | 8 |
| Refused/NA............................. | 9 |

Q9e  Have you read, seen, or heard if Marilyn Mosby was under investigation during her tenure as Baltimore's State Attorney?

|                              |     |
|------------------------------|-----|
| Yes............................................ | 1 |
| No............................................. | 2 |
| No opinion.............................. | 5 |
| Don't know.............................. | 8 |
| Refused/NA............................. | 9 |

**SKIP TO Q9F IF "YES" TO Q9D <u>OR</u> Q9E; SKIP TO Q9G IF "NO" TO Q9D <u>AND</u> Q9E.**

Q9f.   If you were a juror in this case, what impact would the controversies or investigations that you know about have on your views of Marilyn Mosby's credibility?  Would they have a very large impact; a somewhat large impact; a somewhat small impact; or no impact?

|                              |     |
|------------------------------|-----|
| Very large impact............... | 1 |
| Somewhat large impact…. | 2 |
| Somewhat small impact…… | 3 |
| No impact…….. | 4 |
| No opinion……............. | 5 |
| Don't know.................... | 8 |
| Refused/NA................. | 9 |

Q9g.  Have you read, seen, or heard if there had been an investigation into the travel business Marilyn Mosby started when she was in office?

|                              |     |
|------------------------------|-----|
| Yes............................................ | 1 |
| No............................................. | 2 |
| No opinion.............................. | 5 |
| Don't know.............................. | 8 |
| Refused/NA............................. | 9 |

Q9h.  Have you read, seen, or heard if Marilyn Mosby told investigators before the pandemic started that her travel company was not operating and had no income?

|                              |     |
|------------------------------|-----|
| Yes............................................ | 1 |
| No............................................. | 2 |
| No opinion.............................. | 5 |

DECLARATION OF BRYAN EDELMAN

|  |  |
|---|---|
| Don't know.............................. | 8 |
| Refused/NA............................. | 9 |

Q10.  Finally, I have a couple of more questions to be sure we have included all groups in this survey.  All of your answers will remain confidential.

[ASK EVERYONE]

Q10a.  First, how often do you read a hard copy or online version of a newspaper?  Would you say you read it every day, several times a week, once or twice a week, less often than once a week, or never?

|  |  |
|---|---|
| Every day................................... | 1  (GO TO Q10b) |
| Several times a week............................ | 2  (GO TO Q10b) |
| Once or twice a week............................ | 3 (GO TO Q10b) |
| Less often than once a week.............. | 4 (GO TO Q10b) |
| Never………………………….. | 5 (GO TO 11) |
| Don't know........................................... | 8 (GO TO 10b) |
| Refused/NA......................................... | 9 (GO TO Q10b) |

Q10b.  What newspapers do you read?  I am interested in both local and out-of-town papers.

(PROBE) Do you read any other papers?

[RECORD UP TO 4 NEWSPAPERS]

INSTRUCTION: DO NOT READ THE LIST OF NEWSPAPERS TO RESPONDENTS.

| LOCAL PUBLICATIONS |  |
|---|---|
| Aberdeen News | 1 |
| Aegis, The | 2 |
| African Examiner | 3 |
| Annapolis Gazette | 4 |
| Annapolis Junction News | 5 |
| Arbutus News | 6 |
| Baltimore Brew | 7 |
| Baltimore Chronicle & The Sentinel | 8 |
| Baltimore City Paper | 9 |
| Baltimore Fishbowl | 10 |
| Baltimore Jewish Times | 11 |
| Baltimore News | 12 |
| Baltimore Star | 13 |
| Baltimore Sun | 14 |
| Baltimore Times | 15 |
| Bay Net, The | 16 |
| Bay Times | 17 |

| | |
|---|---|
| Bay Weekly | 18 |
| BayNet | 19 |
| Bayside Gazette | 20 |
| Bowie News | 21 |
| Calvert Recorder | 22 |
| Capital Gazette | 23 |
| Capital, The | 24 |
| Carroll County Times | 25 |
| Carroll Standard | 26 |
| Catholic Review | 27 |
| Catoctin Banner | 28 |
| Catonsville News | 29 |
| Cecil Whig | 30 |
| Charles County News | 31 |
| Charles News | 32 |
| Chesapeake Today, The | 33 |
| Chincoteague Beacon | 34 |
| College Park News | 35 |
| Columbia Flier | 36 |
| Columbia News | 37 |
| Community Times | 38 |
| Cowboyron News | 39 |
| Crofton Online | 40 |
| Cumberland Times-News | 41 |
| Daily Maryland, The | 42 |
| Daily Record | 43 |
| Daily Times, The | 44 |
| Delmarva Now | 45 |
| Dorchester Banner | 46 |
| Dorchester Star | 47 |
| Dundalk Eagle | 48 |
| East County Times | 49 |
| Edgewood News | 50 |
| Emmitsburg News-Journal | 51 |
| Enquirer Gazette | 52 |
| Enterprise | 53 |
| Essex News | 54 |
| Frederick News-Post | 55 |
| Gaithersburg News | 56 |
| Garrett County Gazette | 57 |
| Gazette, The | 58 |
| God's Telegraph | 59 |
| Greenbelt News Review | 60 |
| Guilford Gazette | 61 |
| Herald-Mail | 62 |
| Hometown Annapolis | 63 |

| | |
|---|---|
| Howard County Times | 64 |
| Hyattsville News | 65 |
| Journal, The | 66 |
| Kent County News | 67 |
| Kent Island Bay Times, The | 68 |
| Laurel Leader | 69 |
| Maryland Coast Dispatch | 70 |
| Maryland Daily Examiner | 71 |
| Maryland Gazette | 72 |
| Maryland Independent | 73 |
| Maryland Leader | 74 |
| Maryland News | 75 |
| Metro Weekly | 76 |
| Montgomery Village News | 77 |
| News Caroline | 78 |
| Ocean City Today | 79 |
| Owings Mills News | 80 |
| Perryville News | 81 |
| Picket News | 82 |
| Prince Georges County News | 83 |
| Queen Annes County News | 84 |
| Record Observer | 85 |
| Republican, The | 86 |
| Rockville News | 87 |
| Salisbury Independent | 88 |
| Sentinel, The | 89 |
| Silver Spring Penguin | 90 |
| Southern Maryland News | 91 |
| St Mary's Today | 92 |
| Star Democrat | 93 |
| Takoma Park News | 94 |
| Takoma Voice | 95 |
| Talbot Spy | 96 |
| Times Record | 97 |
| Towerlight, The | 98 |
| Tubman City News | 99 |
| Urban Sentinel | 100 |
| Washington's Voz | 101 |
| Westminster News | 102 |
| Woodsboro-Walkersville Times | 103 |
| **OUT OF STATE PUBLICATIONS** | |
| New York Times | 201 |
| USA Today | 202 |
| Wall Street Journal | 203 |
| Washington Post | 204 |

| Other: Specify _____ | 997 |
| Don't know | 998 |
| Refused/NA | 999 |

Q11. How often do you listen to local news on the radio or watch it on television?  Do you listen to or watch local news:  every day, several times a week, once or twice a week, less often than once a week, or never?

|  |  |
|---|---|
| Every day................................................ | 1 |
| Several times a week............................ | 2 |
| Once or twice a week............................ | 3 |
| Less often than once a week.............. | 4 |
| Never……………………………….. | 5 |
| Don't know............................................ | 8 |
| Refused/NA.......................................... | 9 |

Q12. How often do you watch local news on WBFF Fox 45?  Do you watch local news on WBFF Fox 45:  every day, several times a week, once or twice a week, less often than once a week, or never?

|  |  |
|---|---|
| Every day................................................ | 1 |
| Several times a week............................ | 2 |
| Once or twice a week............................ | 3 |
| Less often than once a week.............. | 4 |
| Never……………………………….. | 5 |
| Don't know............................................ | 8 |
| Refused/NA.......................................... | 9 |

Q13.  How often do you see local news or news related updates online or on social media sites such as Facebook or Twitter?  Do you see them every day, several times a week, once or twice a week, less often than once a week, or never?

|  |  |
|---|---|
| Every day................................................ | 1 |
| Several times a week............................ | 2 |
| Once or twice a week............................ | 3 |
| Less often than once a week.............. | 4 |
| Never……………………………….. | 5 |
| Don't know............................................ | 8 |
| Refused/NA.......................................... | 9 |

Q14. What city or town do you live in or nearest?_____

Q15.  Could you please tell us how old you are?

(DO NOT READ RESPONSES.  IF RESPONDENT ANSWERS, E.G., "OVER 30," PROBE)

|  |  |
|---|---|
| 18-24...................................... | 1 |

```
25-34....................................    2
35-44....................................    3
45-54....................................    4
55-64....................................    5
65 or over ............................    6
Refused/NA  ......................    9
```

Q16.  Regardless of race, are you of Hispanic, Latino, or Spanish origin?

```
Yes .....................................    1
No .......................................    2
Don't know ..........................    8
Refused/NA ..........................    9
```

Q17.  Could Regardless of your Hispanic, Latino, or Spanish origin, what is your race?  Are you white, African American, Asian, Pacific Islander, American Indian, a member of some other race, or of mixed race?

```
White…………..…………..    1
African American …………    2
Asian………………………..    3
Pacific Islander…………….    4
American Indian ………….    5
Mixed……………………….    6
Other: Specify_____    97
Don't know………………...    98
Refused/NA………………..    99
```

Q18.  Finally, for statistical purposes only, we need to know if you have ever been convicted of a felony.

```
Yes .....................................    1
No .......................................    2
Don't know ..........................    8
Refused/NA ..........................    9
```

Q19.  (NOTE GENDER OF RESPONDENT)

```
Female …………................    1
Male …………………………    2
```

Well, those are all the questions that I have.  Lastly, let me verify that I dialed ___-_____.
Again, my name is (*Your First Name*), and on occasion a small percentage of people like you are called back just to verify that this interview actually took place.  May I please have your first

DECLARATION OF BRYAN EDELMAN

name, and first name <u>only</u>, so my supervisor will know whom to ask for in case this interview is verified? Thank you for your time and have a good (evening/day)!

Respondent Name:_____   Phone (    )_____-_____
Interview Date:_____        End