**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARILYN J. MOSBY,**<br><br>          **Defendant** | **Criminal No. LKG-22-7** |

## UNITED STATES' OMNIBUS OPPOSITION TO DEFENDANT'S MOTIONS

The United States of America, by and through its undersigned attorneys, hereby submits this omnibus response to the following motions filed by the Defendant:

(1) Motion to Sever Counts One and Three from Counts Two and Four, ECF 207;

(2) Motion to Strike Allegations Regarding Mrs. Mosby's Use of Funds from Counts One and Three of the Superseding Indictment, ECF 211; and

(3) Motion for Early Determination of CARES Act Jury Instructions, ECF 206;[1]

## I.      Introduction

The Defendant's three motions each seek to relitigate issues this Court has already decided. The Defendant presents no reason why this Court should walk again the well-trodden path of its previous reasoned and careful decisions. Indeed, the Defendant often fails to address or even acknowledge the Court's prior rulings. Because they lack merit and are unsupported by case law, each of the Defendant's motions should be rejected.

---

[1] Pursuant to the Court's revised scheduling order at ECF 214, the Government will file a response to the Defendant's Renewed Motion for Intra-District Transfer to the Southern Division at ECF 212 by August 11, 2023.

The Defendant's motion for severance contradicts this Court's clear decision on the admissibility of the Defendant's use of the proceeds of her COVID-19 hardship withdrawal. And granting severance would delay a resolution of this matter. The Defendant's motion to strike surplusage is trained at this same evidence even though the Court has already deemed it relevant at trial, and with substantial probative value outweighing any hypothetically unfair prejudice. Finally, the Defendant's motion regarding jury instructions claims confusion over the meaning of the phrase "adverse financial consequences," while repeatedly acknowledging that the Court has already ruled against the Defendant on this topic, too.

This case has always been based on the straightforward premise that everyone must follow the law. The facts of this case are not complicated, and neither is the law. There is no reason to relitigate issues this Court has already decided. It is time to move forward to trial.

## II.     The Defendant's Motion for Severance is Without Merit and Would Further Delay a Final Resolution of this Case

The Defendant's motion seeking severance of her perjury and mortgage fraud charges (ECF 207) should be denied because the properly joined charges present none of the harms of which the Defendant complains. The character of the charges—two relating to withdrawals from a retirement plan and two relating to false mortgage applications—are sufficiently distinct that there is no likelihood that a jury will confuse the issues. Moreover, because of the Court's clear ruling that the Defendant disregards, evidence that the Defendant used her COVID hardship withdrawals for the purpose of down payments on multiple vacation properties is admissible at trial to prove a lack of adverse financial consequences. There is no propensity risk in this case meriting severance because a properly instructed jury is more than capable of separating the two types of charges and making individual determinations on each of them.

Finally, the Defendant has not demonstrated that she would be confounded in attempting to present a defense as to certain charges, but not others, because were she to take the stand, her credibility would be at issue, making it proper to question her on either set of false statements. Instead of serving the interests of justice, the Defendant's proposed remedy would merely delay proceedings further and unnecessarily cause two sets of trials requiring two sets of jury panels who will ultimately hear similar information.

As an initial matter, the Defendant has conceded that the charges in this case have been properly joined under Rule 8(a). *See* ECF 207 at 11. That concession is appropriate, because the charges clearly are based on the same set of acts and transactions: they each involve the Defendant's financial decisions over an approximate one-year period spanning 2020 to 2021. Moreover, "[j]oinder is the 'rule rather than the exception.'" *United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008) (quoting *United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995)). There is "a strong interest in favor of joinder of offenses," *United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000), and joinder under Rule 8 does not impose an onerous set of requirements, *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003). Broad joinder under Rule 8(a) promotes judicial efficiency by avoiding "needless duplication of judicial proceedings, . . . particularly where evidence of one charge would be admissible to prove another charge[.]" *United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008) (citations omitted).  Indeed, "the prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses should be tried in a single proceeding." *United States v. Blair*, 661 F.3d 755, 768-69 (citation omitted) (4th Cir. 2011).  *See also United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988) (Rule 8 "reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused"); *United States v. Werner*, 620 F.2d 922, 928 (2d

Cir. 1980) (noting "the important policy behind this branch of Rule 8(a) and other provisions of Rule 8, namely, that of trial convenience and economy of judicial and prosecutorial resources, considerations of particular weight," and rejecting motion for severance where granting it would have required two witnesses to testify at both resulting trials). Thus, joinder between two charges is particularly appropriate where evidence of one charge is admissible to prove the other. *Branch*, 537 F.3d at 341.

In cases like this, where joinder under Rule 8(a) is proper, "the defendant's only recourse is to convince the court that the charges should be severed under Rule 14 – *a difficult task.*" *Blair*, 661 F.3d at 768 (emphasis added). Rule 14(a) provides that the district court "may order separate trials of counts" "[i]f the joinder of offenses . . . in an indictment . . . or a consolidation for trial appears to prejudice a defendant or the government[.]" Fed. R. Crim. P. 14(a). The Fourth Circuit has repeatedly characterized those situations in which a discretionary severance is appropriate under Rule 14 as "rare." *United States v. Hornsby,* 666 F.3d 296, 308-09 (4th Cir. 2012); *United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005).

The party requesting severance under Rule 14 "bears the burden of demonstrating 'a *strong* showing of prejudice[.]'" *Branch*, 537 F.3d at 341 (quoting *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir.1984)) (emphasis added). It is not sufficient for a defendant to show that a separate trial might offer him or her a better chance of acquittal, or to show that joinder will make the defense's task more difficult. *Goldman*, 750 F.2d at 1225; *see also Zafiro v. United States*, 506 U.S. 534, 540 (1993) ("[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."). Courts have recognized that the inherent prejudice of a joint trial is insufficient to justify severance under Rule 14 and the judicial inefficiency, inconvenience, and expense wrought by severance. *See United States v.*

*Santoni,* 585 F.2d 667, 674 (4th Cir. 1978) ("The trial court must weigh the inconvenience and expense to the government and witnesses of separate trials against the prejudice to the defendants inherent in a joint trial[.]"); *United States v. Simmons*, 163 F. Supp.3d 317, 322 (E.D. Va. 2016) ("Severance is appropriate only if the risk of actual prejudice outweighs the interest in [the] efficient administration [of] justice."). "[A] district court should grant a severance under Rule 14 *only* if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Hornsby*, 666 F.3d at 309 (4th Cir. 2012) (quoting *Zafiro*, 506 U.S. at 539).

An early Fourth Circuit decision interpreting Rule 14 identified three distinct forms of prejudice that could merit a permissive severance of offenses: (1) if there is a serious likelihood that the jury would confuse and cumulate the evidence relating to the various offenses; (2) if the defendant would be confounded in attempting to present a defense as to certain charges because of their joinder with others for trial; and (3) if there is a substantial risk that the jury may decide that since the defendant is guilty of one offense or group of offenses, he has a criminal propensity and is therefore likely to be guilty of the other. *United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976); *United States v. Gray*, 78 F. Supp. 2d 524, 532 (E.D. Va. 1999).

Contrary to the Defendant's claims that the joinder of charges in this case represents each of the above three forms of prejudice, the Superseding Indictment is a simple, straightforward document that tells the complete story of the Defendant's individual frauds over the course of approximately one year in a comprehensive manner that any juror will be able to readily understand and evaluate. Because of the nature and elements of the two distinct fraud charges, there is no risk that jurors will make a determination based upon propensity. To the extent that the Defendant feels constrained in presenting her defense, this is the result of her own actions, and

certainly not a basis to selectively hide parts of the story from the jury, which is tasked with evaluating her actions. Rather than the "rare" case calling for severance, the Defendant cannot show any prejudice, let along the "strong" showing the law requires to justify the inefficiency, inconvenience, and expense wrought by severance. *See Goldman*, 750 F.2d at 1225; *Hornsby*, 666 F.3d at 308-09; *Cardwell*, 433 F.3d at 387; *Branch*, 537 F.3d at 341; *Santoni,* 585 F.2d at 674.

Contrary to the Defendant's argument, the evidence of the Defendant's CARES Act fraud and her mortgage fraud overlap. Both frauds require the jury to review the Defendant's finances at the time of the acts to analyze the elements of the offenses. To conduct this exercise twice would be duplicative and unnecessary, particularly given the lack of prejudice from joinder in this case. At the heart of the Defendant's position is her repeated failure to acknowledge the Court's ruling in its September 8, 2022 Memorandum Opinion and Order at ECF 105. Specifically, the Defendant states that "Contrary to the government's view, Mrs. Mosby's home purchases are irrelevant to whether she suffered 'adverse financial consequences[.]'" ECF 207, at 15.  But this is not "the Government's view." It is the Court's ruling.

The Defendant's argument that there is no overlap in the evidence of the Defendant's perjury and mortgage fraud is essentially a recitation of the same arguments she made in ECF 83—an argument that this Court already soundly rejected. The Defendant thus contradicts findings of the Court that are the law of the case. *See Fusaro v. Howard*, 19 F.4th 357, 367 (4th Cir. 2021) ("Generally, the law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"); *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (*quoting Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16, (1988)).

In the Memorandum Opinion and Order at ECF #105, under the heading, "**The Court Declines to Exclude Evidence Regarding How the Defendant Used Her Distribution Funds**," the Court stated as follows:

> Defendant's request that the Court bar evidence about how she used the funds withdrawn from her 457(b) plan is also unconvincing. Defendant argues that this information is either irrelevant, or its relevance is substantially outweighed by concerns about unfair prejudice, confusing the jury and wasting time during trial. Def. 4th Mot. at 3-6; *see also* Fed. R. Evid. 401, 403. **Because evidence about how Defendant used her withdrawn funds is relevant to, and highly probative of, whether Defendant suffered "adverse financial consequences" due to the coronavirus, the Court declines to exclude this evidence**.

> It is well-established that "[e]vidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact of consequence in determining the action." Fed. R. Evid. 401. **Here, evidence about how Defendant used her withdrawn funds is relevant to determining whether she experienced "adverse financial consequences" due to the coronavirus—a central issue for both the perjury and false statements charges in this case.** *See generally* Superseding Indictment.

> **Defendant has also not shown that the probative value of this evidence is *substantially* outweighed by a danger of unfair prejudice, confusing the jury, or wasting time.** *See* Fed. R. Evid. 403. While Defendant argues with some persuasion that evidence about how she used the withdrawn funds could elicit jealousy or misgivings by the jury, such concerns do not substantially outweigh the probative value of this evidence to a central issue in this case. **And so, the Court declines to exclude this evidence at trial.**

ECF #105 at 19-20 (emphasis added). The Court has already definitively rejected the Defendant's principal argument that evidence of how the Defendant used her withdrawn funds is irrelevant. *See id.*

Any prejudice based on the notion that the jury may unfairly confuse or cumulate the evidence cannot justify prejudice in a case where, if severed, the same evidence would be presented in both trials. *See United States v. Jamar*, 561 F. 2d 1103, 1106-07 (4th Cir. 1977) (noting that "if the evidence of all the joined crimes would be mutually admissible for legitimate purposes in

separate trials for each offense (assuming no joinder), the possibilities of prejudice from the fact

of joinder no longer present themselves so forcefully"); *United States v. Milan*, No. 1:09CR228,

2009 WL 3448432, at *1 (E.D. Va. Oct. 23, 2009) ("defendant will suffer no unfair prejudice from

the joinder of these counts because evidence relating to the obstruction of justice count is relevant

and would be presented in a trial on the fraudulent acts, and evidence relating to the fraudulent

acts is relevant and would be presented in a trial for obstruction of justice"). And the Court has

already ruled this evidence is admissible, proving the overlap of evidence between the two sets of

charges.

The Defendant's motion creates a confusing straw man argument that misstates the

Government's position on the relevance and admissibility of the Defendant's use of her COVID

withdrawals. ECF #207 at 15-18. The Defendant states first, "the government's position assumes

that anyone who has endured adverse financial consequences finds herself destitute or cash-starved

as a result." ECF #207 at 16. This is not so. The Defendant continues: "The government seeks to

impose an on-the-brink-of-bankruptcy requirement that the statute does not contain." *Id.* at 17.

This is not true. Then the Defendant states, "the government assumes a CARES Act withdrawal

can be no greater, in total dollars, than the adverse financial consequences that occasioned the

withdrawal." *Id.* This is equally false.

The Government has never made these arguments. Indeed, the Defendant cites no occasion

on which the Government did so. The inaccurate and unsubstantiated characterizations above are

nothing more than mere *ipse dixit*, unsupported by facts. Nor were the false characterizations above

in any way used by *this Court* when it expressly found that, "Because evidence about how

Defendant used her withdrawn funds **is relevant to, and highly probative of**, whether Defendant

suffered 'adverse financial consequences' due to the coronavirus, the Court declines to exclude this evidence." ECF 105 at 19 (emphasize added).

Indeed, the Defendant's attempt to relitigate her failed previous motion through what is styled as a motion for severance is most obviously evident on page 19, where she argues that evidence of her home purchases should be excluded under Federal Rule of Evidence 403. This was *precisely* a subject of the denied motion. *See* ECF 83. The Court rejected this argument in ECF 105, ruling, "[w]hile Defendant argues with some persuasion that evidence about how she used the withdrawn funds could elicit jealousy or misgivings by the jury, such concerns do not substantially outweigh the probative value of this evidence to a central issue in this case." ECF 105 at 19-20. The Defendant tilts at windmills that do not exist. Rather than argue against the Court's unambiguous ruling, the Defendant argues against statements the Government never made. The attempt is futile. The Defendant's position is as wrong today as it was in July of 2022.

Even if "every bit of evidence that was admissible in [a] joint trial might not be admissible . . . in separate trials," there is "no particular danger that the jury would cumulate such evidence." *See United States v. Carmichael*, 685 F.2d 903, 910 (4th Cir. 1982). There are two distinct sets of crimes, with two counts of each crime. Neither crime is particularly complicated, and neither requires a degree in finance to understand. Because of their simplicity, a jury can separate the individual transactions and apply the facts of each to the individual law. Moreover, there is nothing about this case that would result in a jury making a decision based on propensity any more than the multitude of charges that are joined in this and other districts across the nation every single day. A jury is certainly able to understand that lying on an application to withdraw funds from your retirement account does not make it more likely that you lie on your mortgage application.

The Defendant claims that she has important testimony to give as to one set of alleged frauds but cannot do so because of the other set of alleged frauds. *See* ECF 207 at 32. The Government cannot respond in detail to such a supposition without knowing more about the proposed statements. Nonetheless, the entire concept is flawed. It is the defendant's acts that create her dilemma, not the charges, and not whether she faces them in one or two trials. Moreover, if the Defendant takes the stand, her veracity is undoubtedly of importance to the jury. She should therefore be questioned about her demonstrably false statements, including those made either on her hardship request, or her mortgage applications. Therefore, the concept that she can hide one false statement or the other from the jury when she testifies is incorrect. The Defendant also submits a series of arguments involving untested evidence that has not withstood cross examination or analysis in somewhat of a preview of her potential defense at trial. *See* ECF 207 at 23-26. This section does not advance the discussion in any meaningful way, because it does not demonstrate a showing or prejudice that would exist absent severance.

The Defendant appears to believe that separate trials might offer her a better chance of acquittal or make her defense more challenging to mount. This is precisely what courts have found to be insufficient to merit severance without a strong showing of prejudice. *See Zafiro*, 506 U.S. at 540; *Goldman*, 750 F.2d at 1225. Such a strong showing of prejudice is not present here. There is nothing particularly special that sets this prosecution apart from other simple fraud prosecutions—certainly nothing that merits the resource and time expenditure that severance would cause on both the courts and potential jury pool.

### III.    The Defendant's Motion to Strike Surplusage is Contrary to the Court's Prior Ruling (ECF 211)

Having twice previously failed to gain dismissal of the indictment—the second time on the grounds that the Superseding Indictment fails to state an offense—the Defendant now seeks to strike two sentences from the 21-page document by claiming they are "surplusage." *See* ECF 211; *see also* ECF 52 (Mem. Opinion and Order) and 117 (Mem. Opinion and Order on Defendant's Second Motion to Dismiss Superseding Indictment). The first sentence the Defendant seeks to strike, found at Paragraph 9 of Count One reads, "**MOSBY** used the withdrawal toward a down payment for a vacation home in Kissimmee Florida she purchased in September 2020." The second sentence the Defendant seeks to strike, found at Paragraph 10 of Count Three reads, "**MOSBY** used the withdrawal toward a down payment for a second vacation home in Long Boat Key, Florida, she purchased in February 2021."[2]

The Defendant states: "Contrary to what the government has argued in prior litigation, such use-of-funds evidence is irrelevant to the elements of a § 1621 violation, and its inflammatory

---

[2] In footnote 1 of ECF #211, Defendant objects to reference of the Florida properties as "vacation homes." The Defendant states, "As will be shown at trial, Mrs. Mosby purchased the homes, in part, with the *business intent* to operate the homes as *rental properties*, particularly for families seeking *getaways* during the pandemic" *Id*. (italics added).

As an initial matter, this claim belies the Second Home Rider the Defendant signed for the Kissimmee property, which stated that "Borrower will occupy and use the Property as Borrower's second home." *See* Superseding Indictment Count Two at ¶ 18. Moreover, it contradicts the letter Defendant submitted to her loan broker on December 10, 2020, which again referred to the Kissimmee property as "the perfect second home," and stated, as to the Long Boat Key property, that the Defendant "want[s] to purchase it as a **second vacation home**." *See* Superseding Indictment Count Four at ¶ 22 (emphasis added).

Notwithstanding the Defendant's own reference to the Long Boat Key property as a "second vacation home," the Government sees no distinction between the word "getaway" and the word "vacation." Moreover, the fact that the Defendant claims that she intended the Florida properties as vacation homes for *other* people does not change their character as vacation homes.

nature would prejudice Mrs. Mosby on the perjury counts." ECF 221 at 4-5. This statement, just like her argument in the motion for severance discussed above, contradicts clear findings of the Court on this matter that are the law of the case. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. at 815-16; *Fusaro v. Howard*, 19 F.4th at 367; *United States v. Aramony*, 166 F.3d 655 at 661.

As stated above, the Court ruled, in part, in ECF 105 under the heading, "**The Court Declines to Exclude Evidence Regarding How the Defendant Used Her Distribution Funds**," as follows:

- Because evidence about how Defendant used her withdrawn funds is relevant to, and highly probative of, whether Defendant suffered "adverse financial consequences" due to the coronavirus, the Court declines to exclude this evidence.

- Here, evidence about how Defendant used her withdrawn funds is relevant to determining whether she experience "adverse financial consequences" due to the coronavirus—a central issue for both the perjury and false statements charges in this case.  *See generally* Superseding Indictment.

- Defendant has also not shown that the probative value of this evidence is *substantially* outweighed by a danger of unfair prejudice, confusing the jury, or wasting time.  *See* Fed. R. Evid. 403.

- [T]he Court declines to exclude this evidence at trial.

ECF 105 at 19-20. As stated in the above section, the Court has already definitively rejected Defendant's principal argument that evidence of how the Defendant used her withdrawn funds is irrelevant. *See id.*

Even setting aside the Court's clear consideration and rejection of the Defendant's argument, the Defendant cannot here meet the standard for the relief. "The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in an indictment, or not essential to the charge, or unnecessary, or inflammatory." *United States v. Williams*, 445 F.3d 724, 733 (2006) (quoting *United States v. Poore*, 594 F.2d 39,

41 (4th Cir. 1997)). "[A] motion to strike surplusage from the indictment should be granted *only if* it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *Id.* at 733 (citing *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998) and *United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006) ("[I]nformation that is prejudicial yet relevant to the indictment, must be included for any future conviction to stand and information that is irrelevant need not be struck if there is no evidence that the defendant was prejudiced by its inclusion.").

As made clear in the Government's response to the Defendant's previous failed attempt to keep this evidence from the jury, "The fact that the funds were used to buy vacation homes is evidence that [the defendant] had not, in fact, suffered any adverse financial consequences stemming from COVID-19." ECF 90 at 47. And this Court has previously so ruled: "evidence about how Defendant used her withdrawn funds is relevant to, and highly probative of, whether Defendant suffered 'adverse financial consequences' due to the coronavirus." ECF 105, at 19. Just as in the motion seeking severance, the Defendant again overstates the Government's position on the relevance of the evidence, then proceeds to tear down the straw man rather than address the Government's actual arguments and this Court's ruling. The evidence is not about being "too poor to buy a house, investment property, or similar property," *See* ECF 211 at 5.

The evidence at trial will be that the Defendant did not use the proceeds of her fraudulent withdrawal to mitigate adverse financial consequences that stemmed from COVID-19. Rather, she used the withdrawal to buy two vacation homes. The fact that she did so is clearly relevant to the fact that no adverse financial consequences existed, not because she was "too poor" to buy an investment property, but because she appears not to have had an adverse financial consequence for which to use any of the funds. Nor has the Government staked out the position, as the Defendant

mistakenly claims, that "a CDR can be no larger than the 'adverse financial consequences' a withdrawer has suffered." ECF 211 at 6. This is an incorrect statement of the law that the Government has never endorsed, no matter how many times the Defendant repeats it in various forms. The argument harkens back to the same argument the Defendant unsuccessfully made when she tried to strike this evidence as unfairly prejudicial. To this, the Government replied:

> The Defendant is not alleged to have improperly *used* the funds. She is charged with improperly *obtaining* them. As a result, the Government's proof at trial is not that the Defendant's use of these funds to purchase vacation homes was itself a violation of the law. As the Defendant has pointed out, there were no restrictions on such purchases, so there would be little with which to "improperly impugn" the Defendant. But, for the reasons articulated above, this evidence is certainly probative of whether she was entitled to receive the funds.

ECF 90 at 44-45.

The Defendant cites to several District Court cases in Virginia for the proposition that the Court should use a different standard for the definition of "relevance" than the standard of "legal relevance," found in Fed. R. of Evid. 401. *See, e.g. United States v. Afsharjavan*, 2015 WL 5047438 at *3 (E.D. Va 2015) ("In determining whether the information is relevant, the question is not whether the allegations are legally relevant, *i.e.*, would be admissible at trial."); *United States v. Presegraves*, 658 F.Supp.2d 770, 783 (W.D. Va 2009) (same); *United States v. Cooper*, 384 F.Supp.2d 958, 960 (W.D. Va 2005) ("Rather, as described by the Fourth Circuit in *[United States v.] Hartsell*, 127 F.3d [343] at 353 [4th Cir. 1997], the question is whether the material is "unnecessary in making out a *prima facie* pleading of that violation."). The Fourth Circuit does not appear to have definitively ruled on whether there is a different standard for relevance in the

context of motions to strike surplusage, while the *Cooper* decision does not appear aligned with other federal courts.[3]

Regardless of what definition the Court assigns to the term "relevance" though, it is clear that the two sentences to which the Defendant objects should not be stricken from the Superseding Indictment, because the evidence meets all definitions of the word. The Defendant's straw man argument glosses over the fact that there is no evidence the Defendant used *any* of the proceeds of her COVID withdrawal to mitigate the adverse financial consequences she falsely claimed— because no such adverse consequences existed. The relevance of this evidence has been extensively briefed and litigated. The Court has ruled the use of the funds is relevant. Because of this ruling, it cannot be potential surplusage. *See Williams* 445 F.3d at 733.

Even still, this evidence is neither inflammatory nor prejudicial, both of which are also prerequisites for striking it as surplusage. *See Williams*, 445 F.3d 733; *Afsharjavan*, 2015 WL 5047438 at *3. In ECF 105, this Court stated, "[w]hile Defendant argues with some persuasion that evidence about how she used the withdrawn funds could elicit jealousy or misgivings by the

---

[3] *See, e.g.*, *United States v. Pacific Gas and Electric Company*, 2014 WL 4954040 at *4 (N.D. California 2014) ("The Court declines to follow *Cooper's* narrow standard of relevance for surplusage purposes. As discussed above, the approach in the Ninth Circuit has been to use a broader standard than the one articulated by the out-of-circuit court in *Cooper*."); *United States v. Paulus*, 2015 WL 13735785 at *3 (E.D. Ky. 2015) ("[I]f the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant.)" (citing *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993) quoting *United States v. Thomas*, 875 F.2d 559, 562 n. 2 (6th Cir. 1989); *United States v. Jimenez*, 824 F.Supp. 351, 369-70 (S.D.N.Y. 1993) ("It has long been the policy of courts within the Southern District to refrain from tampering with indictments . . . As [the defendant] candidly admits, motions to strike supposed surplusage are rarely granted . . . Further, '[m]options to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial' . . . That standard is an exacting one.") (internal citations removed and quoting, in relevant part, *United States v. Claytor*, 52 F.R.D. 360, 361 (S.D.N.Y. 1971); *United States v. Scarpa*, 913 F.2d 993, 1013 (2d. Cir. 1990); *United States v. Napolitano*, 552 F. Supp. 465 (S.D.N.Y. 1992).

jury, such concerns do not substantially outweigh the probative value of this evidence to a central issue in this case." ECF 105 at 19-20. A fair reading of the Court's ruling is that there may be some prejudice that stems from this evidence. Of course, "[e]vidence that is highly probative invariably will be prejudicial to the defense." *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998); *United States v. Queen*, 132 F.3d 991, 998 (4th Cir.1997) (noting that while evidence "was prejudicial, it was only prejudicial because it was so highly probative"); *see also* 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 404.21(3)(b) Joseph M. McLaughlin, 2d Ed. 2002) (discussing that unfair prejudice "does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence"). To the extent this evidence is "prejudicial," it is prejudicial merely in the sense that it is probative of the Defendant's crime. Highly probative language should not be struck as surplusage. Moreover, the evidence is not inflammatory in any sense, not the least of which in a manner that would support the Defendant's broad request for relief of striking it from the Superseding Indictment. The Government's position has remained the same on the issues in this case through repeated rounds of litigation during which the Defendant has made the same failed arguments in different formulations. The Court should once again deny the Defendant's motion.[4]

---

[4] The Government defers to the Court's practice on whether the indictment should go back with the jury for deliberations. *See* ECF 211 at 8-9. We submit however that doing so would greatly aid the jury in understanding the allegations against the Defendant—which is all the document represents—and there is nothing unfairly prejudicial in it which would tilt the playing field in any direction.

**IV.     The Defendant's Motion for Early Jury Instructions is Unnecessary**

Finally, the Defendant moves for what she styles as an "Early Determination of CARES Act Jury Instructions." It is unclear which specific jury instructions the Defendant seeks to have decided early (no clear instructions are listed, numbered, or proposed), but even this motion stands in contrast to rulings of the Court. To the extent there is some genuine issue the Court should resolve for the benefit of the parties in a streamlined presentation to the jury, the Government does not oppose the concept of discussing jury instructions early. However, there is a reason trial courts usually wait until the presentation of evidence is complete to conduct charging conferences: jury instructions often depend on the evidence presented and the arguments made by counsel. More importantly at this stage, however, is that the "confusion" the Defendant cites, is really no confusion at all. The Defendant has tried to attack the language of the indictment in this case repeatedly, and the Court has consistently ruled against these attempts, all the while keeping the focus on the simple letter of the law. There is no confusion on the meaning of adverse financial consequences, and there is no confusion on the elements of the offenses the Defendant faces at trial.

Both the Government and the Defendant filed joint jury instructions in this case on July 15, 2022, one year ago. These jury instructions were then updated in another joint filing on January 16, 2023. The Defendant's motion calls for an "early determination of CARES-Act-related jury instructions," but does not specify precisely which jury instructions she is referring to. Referring to ECF 166, the more recent joint submission by the parties, the jury instructions relating to Counts One and Three begin on page 38 with Instruction Number 27 and continue to page 57. Presumably, these are the instructions that are the subject of this motion.

The Defendant repeatedly cites that this prosecution is "the first of its kind," as though this statement itself has some intrinsic meaning that sets it apart from other routine fraud prosecutions. ECF 206 at 1, 10. But despite what the Defendant says, this is a relatively routine prosecution. Perjury has been a crime for as long as the Republic. *See A*ct of Apr. 30, 1790, ch. 9, 1 Stat. 112 (Law by the First Congress establishing federal crimes for among other things, perjury). Section 1621, under which the Defendant has been charged, has been a part of Title 18 for as long as Title 18 has existed. *See* 62 Stat, 683 (June 25, 1948). Modern Federal Jury Instructions by Leonard B. Sand, the generally preferred pattern jury instructions in this District, clearly lay out the elements of perjury. These pattern jury instructions make up pages 38 to 51 of the parties' joint submission, specifically Instructions 27 through 37, with only mild disagreement between the parties. The Defendant's concern instead appears to be the additional non-standard jury instructions the Defendant seeks, to which the Government has objected.

The proposed additional instructions, drafted by prior counsel, only confuse the issue beyond the simple elements of perjury that are laid out in the prior 10 instructions. By way of example, joint proposed Instruction Number 34 is the Modern Federal Jury Instructions pattern instruction defining materiality as it pertains to perjury. It is a simple and straightforward instruction that the parties agree on. However, the Defendant has submitted an additional proposed instruction on materiality that only confuses the issue, as will be discussed below. Therefore, rather than acting to clarify confusion and streamline the process, the instant motion is instead an exercise in relitigating past failed motions. Consider the requested instructions:

   a.   *The Meaning of "Adverse Financial Consequences."*

The Defendant concedes that the Court has already considered the definition of "adverse financial consequences. *See* ECF 206, at 4-5. As the Court held, "the Court reads Section 2202 to

define 'adverse financial consequences' to mean adverse financial consequences that are the result of either: (1) being quarantined, furloughed or laid off; (2) having work hours reduced due to the Coronavirus; (3) being unable to work due to lack of child care due to the coronavirus; or (4) closing or reducing hours of a business owned or operated by the individual." ECF 117 at 8.

 In this case, the Defendant certified that she had suffered these consequences, but in truth she did not experience any of the four enumerated issues. As the Government has previously argued, the most straightforward manifestation of such consequences would be through a reduction in salary (which the Defendant did not experience). *See* ECF 72, at 13. The Defendant proposes a string of hypothetical questions that she claims "remain open." *See* ECF 7 at 16.  But that is all the more reason for the Court to wait to see what evidence comes in at trial, rather than to write hypothetical jury instructions or issue advisory opinions based on non-existent facts. This Court should therefore follow the ordinary practice of holding a charging conference after all the evidence has come in, rather than entertaining hypothetical questions and addressing issues that may never arise at trial because there is no evidence to support those facts. The Court should not conclusively decide the jury instructions prior to the presentation of evidence.

      b.  *Possible Limitations on the Size and Uses of CARES Act Withdrawals*.

The Government has never argued that there is a limitation on how COVID withdrawal funds can be used once they are withdrawn. However, as this Court held, the use of the funds is nevertheless probative of whether the individual suffered adverse financial consequences.  *See* ECF 105, at 19 (holding that "evidence about how Defendant used her withdrawn funds is relevant to, and highly probative of, whether Defendant suffered 'adverse financial consequences' due to the coronavirus."). In other words, the fact that the Defendant used the funds to purchase two vacation homes makes it less likely she suffered adverse financial consequences than if she had

used the funds to mitigate those consequences. There is no reason for a jury instruction at this time regarding limitations on the size and use of the CARES Act withdrawal because it does not appear to be an issue at trial and would only confuse and distract a jury.

       c.   *The Existence of a "Decision-Making" Body*

The Defendant again argues that because Nationwide had to rely on Ms. Mosby's self-certification, it was not a "decision-making body." *See* ECF 206 at 9.  To the contrary, Nationwide as the plan administrator had to make a decision: should it release the funds or not? In making the decision to release the funds, Nationwide relied on the Defendant's self-certification. Nationwide had discretion: in the absence of such a certification (or an incomplete certification), it would not have released the funds. The Defendant argues that because Nationwide *had to rely on her false statement in making its decision* it was not a decision-making body.  But that is nonsensical: the statement influenced the decision-making body, because Nationwide released the funds in full reliance on the self-certification.

In this case, the scheduling order is set. It calls for proposed jury instructions to be submitted on September 15, 2023. *See* ECF 194, at 2. The Defendant now proposes another scheduling change but provides no persuasive rationale for moving the schedule up a month. The Court should adhere to its previous schedule and should finalize jury instructions only when it is clear what evidence has been admitted at trial, as is the normal procedure in any case.

## V.       Conclusion

Each of the Defendant's pretrial motions attempt to relitigate issues this Court has already decided. The motions present no rationale why any of these issues should be revisited, and regardless, they lack merit and are unsupported by case law. This case has been litigated fully, with the Court giving careful consideration to the arguments of both sides before ruling. There is no reason to cause further delay on this trial or to inject further litigation on settled matters. For these and the reasons articulated above, the Defendant's motions should be denied.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

By:      _____/s/_____
         Sean R. Delaney
         Aaron S.J. Zelinsky
         Assistant United States Attorneys

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

_____/s/_____
Sean R. Delaney
Assistant United States Attorney