**United States District Court for
the District of Maryland**

| | |
|---|---|
| **United States** | |
| **v.** | **No. 1:22-cr-7-LKG** |
| **Marilyn Mosby** | |

**Mrs. Mosby's Omnibus Reply in Support of Pre-Trial Motions**

Pending before the Court are Mrs. Mosby's Motion for Early Determination of CARES Act Jury Instructions (ECF 206), Motion to Sever Counts One and Three from Counts Two and Four (ECF 207), and Motion to Strike Allegations Regarding Mrs. Mosby's Use of Funds from Counts One and Three of the Superseding Indictment (ECF 211). The government provides no reason to deny these motions.

First, the government's response makes clear that the parties remain divided on crucial legal questions about how the perjury statute interacts with the CARES Act, such as the meaning of "adverse financial consequences" and whether a "decision-making body" must enjoy discretion to deny a request from someone who self-certifies that she meets the criteria for approval. The government does not identify any additional information the Court must have before it can properly decide these purely legal questions, and it does not claim it

1

would suffer any prejudice from litigating jury instructions at this juncture or from receiving the Court's ruling in advance of trial.

Second, the government does not rebut Mrs. Mosby's showing that a joint trial would subject her to each of the three types of prejudice identified in *United States v. Foutz*, 540 F.2d 733 (4th Cir. 1976). The government argues there is no risk of the jury cumulating and confusing the evidence because the fact that Mrs. Mosby used her CRDs to purchase "vacation homes" is admissible as to both the perjury counts and the mortgage fraud counts. But that argument misreads the CARES Act and relies on a concept—using a CRD to "mitigate" adverse financial consequences—that is meaningless and undefined. And, contrary to the government's claim, this Court is free to revisit its earlier holding that use-of-funds evidence is relevant to the perjury counts. In any event, a single, minor piece of mutually admissible evidence would not generate the kind of efficiencies sufficient to justify a joint trial. The government also contends there is no danger that a properly instructed jury would engage in impermissible propensity reasoning. Given the factual and legal similarity between the two sets of counts, however, the protections of a limiting instruction are illusory in this case. Finally, as explained below and in an ex parte supplement, the government misunderstands why the Fourth Circuit in *Foutz* permitted severance when a joint trial would "confound" a defendant's ability to put on a defense.

Third, the government does not object to Mrs. Mosby's request to withhold the indictment from the jury during deliberations, and the Court should therefore take that course. Alternatively, the Court should strike the use-of-funds allegations from the indictment because (1) the government provides no reason not to follow the "necessary" definition of relevance adopted by other courts in this circuit, and (2) this Court has already

determined, correctly, that those allegations are prejudicial and inflammatory.

**Argument**

**I.      The Court should make an early determination of CARES Act-related jury instructions.**

To allow Mrs. Mosby to adequately prepare for trial (e.g., selecting motions in limine, determining what witnesses to call and for which topics) and to avoid delays during trial (e.g., objections to evidence or argument), Mrs. Mosby asked the Court to make an early determination of a limited number of CARES Act-related jury instructions. ECF 206. The government's response makes clear that, as Mrs. Mosby argued, a number of legal issues remain unresolved and that the government would not be prejudiced by the requested relief.

**A.      The government's response confirms that there remain unresolved legal questions about how the perjury statute interacts with the CARES Act.**

The government's response argues that early determination of jury instructions is "unnecessary" because there "is really no confusion at all" regarding the various CARES Act issues identified by Mrs. Mosby. ECF 215 at 17. It is irrelevant, the government contends, that Mrs. Mosby's prosecution is "the first of its kind," since "[p]erjury has been a crime for as long as the Republic" and Sand's model jury instructions "clearly lay out the elements of perjury." *Id.* at 18. That argument misses the point. It is not the elements of perjury that are novel or confusing in this case, but how those elements interact with a statute (the CARES Act) and specific statutory language ("adverse financial consequences") that have never before formed the basis of a perjury prosecution. On that score, the government's response reveals that, in fact, several legal questions surrounding this prosecution remain unsettled, and that jury instructions are needed to explain to the jury how the CARES Act interacts with the elements of perjury.

***First,*** the government argues "the most straightforward manifestation of [adverse

3

financial] consequences would be through a reduction in salary." *Id.* at 19. As it has throughout this case, however, the government declines to say how else adverse financial consequences might manifest. If the government agrees with Mrs. Mosby that adverse financial consequences can take other forms—e.g., stock-market losses, a business' failure to get off the ground, etc.—it doesn't say so. Nor has the Court decided that question.

Mrs. Mosby is therefore unsure whether the government will object to her efforts to show at trial that she suffered non-salary adverse financial consequences, or whether the Court will even allow her to pursue that theory.[1] This is a crucial question, the answer to which will determine the contours of Mrs. Mosby's opening statement, how she cross-examines the government's witnesses, which witnesses she calls in her defense, and the contents of her closing argument. This is *not* a question that can be answered "after all the evidence has come in," as the government proposes. *Id.* at 19.

**Second,** Mrs. Mosby's motion noted that she had previously argued Nationwide is not a "decision-making body" for perjury purposes because the company lacked discretion to deny a withdrawal to a plan participant who self-certified that she had suffered adverse financial consequences. ECF 206 at 9. The government's response dismisses that argument as "nonsensical." ECF 215 at 20. Even if that's true, it simply means the parties disagree about whether a discretion-less administrator can qualify as a decision-making body. And

---

[1] The government leans on the fact that the Court "has already considered the definition of 'adverse financial consequences,'" limiting them to adverse financial consequences resulting from one of the four circumstances enumerated in § 2202 of the CARES Act. ECF 215 at 18-19 (citing ECF 117 at 8). As Mrs. Mosby's motion explained, however, the Court's ruling "identifies what circumstances can *cause* 'adverse financial consequences' (the four enumerated in § 2202), but it does not say what 'adverse financial consequences' *are*." ECF 206 at 7 (emphasis in original). The government does not argue otherwise. Instead, it simply ignores that crucial distinction, pretending that the Court's prior order definitively settled all relevant aspects of the "adverse financial consequences" definition.

that disagreement—coupled with the fact that the Court has not issued a ruling on this point—is exactly why Mrs. Mosby is asking the Court to resolve the issue now. That the government has its own view of this question does not mean there is "no confusion at all" about the answer.

Not knowing the answers to these questions impedes Mrs. Mosby's ability to prepare for trial. So, too, does uncertainty about whether the Court will instruct the jury on what appear to be undisputed principles of law. For example, in its response, the government agrees there is no "limitation on how COVID withdrawal funds can be used once they are withdrawn." *Id.* at 19. And it appears to agree as well that the CARES Act imposes no "limitations on the size" of a CRD. *See id.* at 19. But the government does not say whether it will agree to jury instructions on these undisputed legal principles. It says only that a jury instruction would "confuse and distract [the] jury" because the size and use of the withdrawal "do[] not appear to be an issue at trial." *Id.* at 20. To the contrary, the government is making the use of the withdrawal a key part of its case on the perjury counts, by arguing that Mrs. Mosby's use of the CRD indicates she did not suffer adverse financial consequences. *E.g.*, *id.* at 15. The government shouldn't be permitted to have its cake and eat it too.

**B.    Rather than claiming any prejudice from early resolution of jury instructions, the government simply appeals to an unwritten custom to justify delay.**

The government urges the Court to deny Mrs. Mosby's motion not because it will be prejudiced in any way by earlier resolution of CARES Act jury instructions, but because "jury instructions often depend on the evidence presented and the arguments made by counsel." *Id.* at 17. This appeal to an unwritten and discretionary custom is misleading.

To be sure, courts regularly *modify* jury instructions based on evidence introduced

and arguments made at trial.[2] But instructions on the basic parameters of criminal liability are an entirely different manner. Such instructions need to be set prior to the start of a trial so both sides have a shared understanding of the applicable law. Without that understanding, the parties cannot plan opening statements, decide which witnesses to call or what to ask them, select what evidence to present, or develop a trial strategy.[3] The government's approach gets things backwards—have a trial first, figure out the law later. Due process, as well as fairness and judicial efficiency, require the opposite: that Mrs. Mosby have a clear understanding of the law the jury will use to decide her fate *before* she steps into the courtroom for trial.

Moreover, the government does not deny that the questions identified in Mrs. Mosby's motion are purely legal and are, therefore, susceptible to resolution before trial. It does not identify any specific evidentiary rulings that must be made, or witness testimony that must be elicited, before the Court can be in a position to address the legal questions on which the parties disagree. Courts' general practice of deferring some jury-instruction questions until the close of the evidence provides no reason to put off resolving instructional disputes in *this* case, where the law is uncertain and no additional evidentiary development is required. And the government provides no other reason to delay resolution, either.

**C.    CARES Act-related jury instructions that should be resolved ahead of trial.**

Because it will expedite trial preparation, and because the government does not claim it will suffer any prejudice, Mrs. Mosby respectfully requests that the Court set an accelerated schedule for deciding the following CARES Act-related jury instructions:

---

[2] For example, courts await the close of evidence to decide whether to give instructions about uncalled witnesses or the number of witnesses.

[3] Hence the Court's order requiring the parties to submit proposed jury instructions a full month and a half before trial. *See* ECF 194.

- The CARES Act was passed by the United States Congress on March 25, 2020, and signed into law on March 27, 2020. One purpose of the CARES Act was to encourage consumer spending in order to prevent a severe economic recession. One way the CARES Act sought to accomplish that goal was to allow individuals to have easier access to funds contained in their retirement accounts.

- At the time Mrs. Mosby submitted her CARES Act withdrawal forms to her 357(b) plan administrator, neither the CARES Act nor the form she submitted defined "adverse financial consequences." Therefore, for Mrs. Mosby to be guilty of perjury (counts one and three), the government must prove beyond a reasonable doubt that Mrs. Mosby submitted her withdrawal forms knowing that she did not suffer adverse financial consequences according to how she defined and understood the term, and that she did so for the purpose of misleading her 357(b) administrator. In other words, the government must prove that Mrs. Mosby committed perjury according to how she defined "adverse financial consequences" at the time she submitted her withdrawal forms. To guide you in making this determination, the Court will provide additional instructions concerning the CARES Act.

- "Adverse financial consequences," as used in the CARES Act, is not limited to a reduction in salary or income from a job. The term can also include other types of financial loss, including lost or damaged business opportunities, unrecouped start-up business costs, unrecouped business expenditures, business transition costs, and the loss of expected revenue or income.

- An enrollee in a 357(b) plan can suffer "adverse financial consequences" even if her financial loss is seemingly small, measured in total dollars. There is no minimum dollar amount that an enrollee's loss must surpass; a loss of even one dollar could qualify as "adverse financial consequences."

- The CARES Act permitted a 357(b) enrollee to use withdrawn funds for any purpose she wished, or no purpose at all. The statute imposed no restrictions on how an enrollee could spend her money. In particular, the CARES Act did not require that an enrollee use withdrawn funds to "mitigate" the specific adverse financial consequences she suffered.

- A 357(b) enrollee who qualified for a CARES Act withdrawal was allowed to withdraw up to $100,000 regardless of the dollar amount of the adverse financial consequences she experienced. In other words, the CARES Act withdrawal did not need to match, in dollars, the size of the adverse financial consequences experienced. The enrollee could withdraw an amount that was either smaller or greater than the size of the adverse financial consequences she suffered.

- Once a 357(b) enrollee qualified for a CARES Act withdrawal, she was allowed to make multiple withdrawals up to the $100,000 maximum set by the CARES Act. An enrollee could take a second withdrawal without experiencing new, additional adverse financial consequences after the first withdrawal.

- To prove perjury, the government must show that a defendant's statement is material, i.e., that it "has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." A "decision-making body" is a person or institution that enjoys discretion to approve or reject a request based on the particular facts and circumstances of the person making the request. If a person or institution is required to approve a request by someone who self-certifies that she meets the criteria for approval, that person or institution lacks the necessary discretion. That person or institution therefore does not qualify as a "decision-making body."

Resolving these issues now will assist the parties in preparing for trial, streamline further pretrial litigation, and prevent delay from hashing out complicated legal questions mid-trial. The government will not be prejudiced in any way if it has to litigate these issues now or if the Court issues a ruling well in advance of trial.

## II.   The Court should sever the perjury counts from the mortgage fraud counts.

Mrs. Mosby's motion sought severance under Rule 14 for three separate reasons: (1) at a joint trial, the jury will confuse and cumulate evidence, (2) a joint trial risks a conviction predicated on impermissible propensity reasoning, and (3) a joint trial confounds and frustrates Mrs. Mosby's ability to testify in her own defense. ECF 207. The government's response relies on an erroneous application of the "law of the case doctrine," summary and superficial assertions about the jury's ability to segregate evidence of separate counts, an unrealistic belief in limiting instructions' potential to prevent propensity reasoning, and a misunderstanding of how a joint trial can deprive defendants of a "free choice" about whether to invoke their privilege against self-incrimination.

**A.      Ground 1: A joint trial presents the risk that jurors will confuse and cumulate evidence of the perjury and mortgage fraud counts.**

**1.      Severance is warranted because use-of-funds evidence is inadmissible as to the perjury counts, and the Court is not bound by its earlier ruling on that question.**

Mrs. Mosby's motion argued severance is required because the jury at a joint trial may "confuse and cumulate" the evidence, resulting in improper convictions on one or both counts. *Foutz*, 540 F.2d at 736; *see* ECF 207 at 11-28. The motion explains that no evidence of perjury would be admissible at a trial on only the mortgage fraud counts, and vice versa. ECF 207 at 11-21. In response, the government identifies only a single piece of evidence that it thinks would be admissible at separate trials on the two sets of counts: the fact that Mrs. Mosby supposedly used her CARES Act withdrawals to purchase two homes in Florida. ECF 215 at 6-9.

The government's principal argument in support of admitting this use-of-funds evidence is that the Court has already decided the issue against Mrs. Mosby. The government notes that the Court previously denied Mrs. Mosby's motion in limine to exclude use-of-funds evidence after concluding such evidence was relevant to the perjury counts. *Id.* at 6-9. And the government claims that, under the "law of the case doctrine," the Court may not revisit that determination and is therefore powerless to grant severance based on this first category of prejudice. *Id.* at 6.

The government is mistaken. "By definition, a ruling in limine is preliminary, based on the record that is then before the court." *United States v. Frazier*, 442 F. Supp. 3d 1012, 1016 (M.D. Tenn. 2020). Because a "ruling on a motion in limine is no more than a preliminary or advisory opinion that falls entirely within the discretion of the district court," *Norris v. PNC Bank, N.A.*, No. CV ELH-20-3315, 2023 WL 3688335, at *9 (D. Md. May 26, 2023), it is "subject to change," *Ralev v. Robinson*, No. 2:16-CV-350-JPK, 2021 WL

1170200, at *1 (N.D. Ind. Mar. 26, 2021). Accordingly, a "pre-trial ruling denying a motion in limine does not automatically mean that all evidence contested in the motion will be admitted at trial, because the court is free to revisit evidentiary rulings as appropriate in its exercise of discretion." *Wielgus v. Ryobi Techs., Inc.*, 893 F. Supp. 2d 920, 923 (N.D. Ill. 2012). A district court, in fact, "may revisit its in limine rulings at any time and 'for whatever reason it deems appropriate.'" *United States v. Stone*, 543 F. Supp. 3d 535, 539 (W.D. Ky. 2021) (quoting *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994)); *see also United States v. Menees*, No. CR-21-151-TDD, 2023 WL 127032, at *1 (E.D. Okla. Jan. 6, 2023) ("'[T]he district court may change its ruling at any time for whatever reason it deems appropriate.'" (quoting *Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir. 1995))); *Harris v. Cruz*, No. 3:14-CV-02356, 2023 WL 1089178, at *11 (M.D. Tenn. Jan. 27, 2023) ("The court reiterates that this ruling, like all rulings on motions in limine, is preliminary and may be revisited at any time and for whatever reason the court deems appropriate."); *United States v. Benzer*, No. 2:13-CR-18 JCM GWF, 2014 WL 6884026, at *1 (D. Nev. Dec. 8, 2014) ("District courts have judicial discretion to revisit evidentiary rulings at any time.").

For that reason, the Fourth Circuit has held the law-of-the-case doctrine does not prohibit a district court from reversing an initial in limine ruling. The defendant in *United States v. Young*, 916 F.3d 368, 381 (4th Cir. 2019), filed pretrial motions in limine to exclude certain weapons and statements, which the district court granted. At trial, however, the court "reversed" those rulings and admitted the evidence in question. *Id.* On appeal, the defendant asserted the court's reversal violated his right to rely on the pretrial rulings "as the settled law of the case." *Id.* But the Fourth Circuit rejected that argument, noting that "'[a] district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling,'

especially in light of issues that arise during a trial." *Id.* (quoting *Luce v. United States*, 469 U.S. 38, 41-42 (1984)). The law of the case does not restrict that discretion. Thus, this Court is free to revisit its ruling on the use-of-funds evidence's relevance "at any time and for whatever reason it deems appropriate." *Stone*, 543 F. Supp. 3d at 539.

Beyond "law of the case," the government offers no reason not to revisit the Court's prior ruling. As to the merits, the government for the first time offers a substantive argument for why the use-of-funds evidence is relevant to the perjury counts. That argument is flawed, and the Court should reject it.

The government argues that because Mrs. Mosby did not use her withdrawn funds "to mitigate adverse financial consequences that stemmed from COVID-19," she must not have suffered any adverse financial consequences at all. ECF 215 at 13. If Mrs. Mosby had really suffered adverse financial consequences, then in the government's view she would have spent her CARES Act withdrawals to "mitigate" that hardship, rather than to purchase additional homes. This novel theory of relevance relies on a concept—"mitigation" of adverse financial consequences—that is impossible to apply in practice. And to the extent that concept has any meaning at all, it is unmoored from and contrary to the requirements of the CARES Act.[4]

_____

[4] The government scolds Mrs. Mosby for "misstat[ing] the Government's position on the relevance and admissibility of [her] use of her COVID withdrawals." ECF 215 at 8. It insists that in opposing Mrs. Mosby's prior motion in limine, it "never made the[] arguments" for admissibility that Mrs. Mosby addressed in her motion to sever. ECF 215 at 8. But as Mrs. Mosby's severance motion explained, ECF 207 at 15-16, the government's prior opposition never made *any* arguments for admissibility, *see* ECF 90 at 39-47. It certainly did not advance the "mitigation" theory on which the government now relies. Instead, the government simply repeated—over and over and over again—its bare conclusion that "[Mrs. Mosby's] use of the withdrawal to buy vacation homes is evidence that she had not suffered adverse financial consequences," without ever explaining why that was so. ECF

11

As an initial matter, the notion of "mitigating" covid-related adverse financial consequences might seem facially straightforward, but it is meaningless in practice. What does it mean to use a withdrawal to "mitigate" adverse financial consequences stemming from the pandemic? Purchasing a house apparently does not qualify, although the government doesn't say why. But what about buying a cell phone, a dining room table, a new sweater, a week's worth of groceries, or a tank of gas? Paying utility bills, school tuition, or medical debt? If those expenditures count as "mitigating" adverse financial consequences, why? And if not, why not? Despite hanging its hat entirely on the notion of mitigation, the government never says. The meaning of "mitigating" adverse financial consequences is anyone's guess—the government knows it when it sees it.

Moreover, the government's "mitigation" theory assumes it is possible to determine which money—CRD dollars or non-CRD dollars—a person spends on particular items. But money is fungible, so whether someone purchases a particular item with withdrawal funds or with other funds is impossible to determine. A concept as nebulous and impractical as "mitigation" does not provide a principled basis for determining the admissibility of evidence.

By "mitigation," the government may mean using CRD funds to buy exactly the combination of goods and services that a 357(b) enrollee would have bought if she had never suffered adverse financial consequences. If so, the government's argument cannot be reconciled with the CARES Act.

_____

90 at 42. Mrs. Mosby's severance motion therefore addressed what "appear[ed]" to be the government's admissibility argument, while acknowledging that she could not be sure she had understood the government's position correctly. *See* ECF 207 at 16. Regardless, now that the government has conceded the weakness of the admissibility theories Mrs. Mosby discussed in her severance motion, the Court can disregard them.

For one thing, the government concedes that the CARES Act does not require withdrawn funds to be spent in any particular way, such as "mitigating" adverse financial consequences. *See* ECF 215 at 14-15. Mrs. Mosby was permitted to spend her CRDs on anything she wished, including a second home. So the fact that Mrs. Mosby (supposedly) purchased items she would not have purchased otherwise does not suggest she ran afoul of the CARES Act.

For another, and despite the government's strenuous objections, *see id.* at 8, the government's argument implicitly assumes that someone who has experienced adverse financial consequences is in dire financial straits. The government apparently believes that mitigating adverse financial consequences is the most normal and natural use of withdrawn funds. And that belief, in turn, assumes that someone who has suffered adverse financial consequences *needs* to mitigate them. It assumes, in other words, that because covid has left a person with less money than she had before, she has urgent needs to meet—and so, of course, she would use her withdrawn funds to satisfy those needs. But that line of reasoning reads into the CARES Act requirements that it does not contain. The statute allowed a person to take a withdrawal regardless of whether "adverse financial consequences" had impaired her ability to make ends meet. As Mrs. Mosby's motion explained, someone who earned $1 million a year and had $3 million in his bank account was entitled to withdraw retirement funds as long as he had suffered adverse financial consequences. ECF 207 at 17. Such a person has no need to use his funds to "mitigate" adverse financial consequences; he would have no trouble paying for his basic needs, and it is entirely unexceptional that he might choose to spend his funds on a new computer or an electric car—or, yes, a second home.

The same is true of non-millionaires as well. After all, a 357(b) enrollee was entitled

to take a withdrawal regardless of how small her "adverse financial consequences" were. A one-week furlough or a ten-day quarantine might cost an enrollee $1,000 or less—a loss that many middle- and upper-middle-class workers are able to absorb. There is no reason to expect such a person to spend the withdrawal on exactly the same basket of goods and services she would have purchased in a non-covid world. That person has enough financial cushion to continue paying for those goods and services with non-withdrawn funds, and to spend her withdrawal, instead, on what the government apparently considers extravagant, non-mitigating luxury items. Thus her use of CRD funds to purchase a house in no way suggests she has not suffered adverse financial consequences. That inference is especially unjustified because, as the government has now conceded, *see* ECF 215 at 8, a 357(b) enrollee could withdraw up to $100,000 from her retirement account even if her adverse financial consequences were de minimis, e.g., $250. Suffering adverse financial consequences, therefore, could actually leave a person *better* able to afford a house than she was before. And that makes sense—one of the CARES Act's primary goals was to avert a pandemic-induced economic calamity by pumping money into the economy.

In any event, the government's concession that CRDs were not required to be used to mitigate adverse financial consequences necessarily lessens the use-of-funds evidence's probative value. Whatever very minor probative value that evidence might have, it is "substantially outweighed by [the] danger" of "unfair prejudice, confusing the issues, [and] misleading the jury." Fed. R. Evid. 403.[5] In addition to creating the misimpression that anyone who has suffered adverse financial consequences cannot afford to buy a home, the

---

[5] The government ignores the Rule 403 argument Mrs. Mosby made in her motion—a fact the Court should consider in deciding whether to revise its Rule 403 analysis. *See supra* Part II.A.1 (explaining court may revisit an in limine ruling at any time and for any reason).

government's new theory will embroil the Court, the parties, and the jury in an intractable debate about what it means to use a withdrawal to "mitigate" adverse financial consequences. The meaning of "mitigation" in this context is obscure, and the parties' sparring over such an indefinite term—one entirely of the government's own making—will distract the jury from deciding the question it must actually decide: whether covid left Mrs. Mosby worse off financially than she was before. These risks, when coupled with the unfair prejudice that use-of-funds evidence would engender, *see* ECF 207 at 20-21, counsel in favor of exclusion.

### 2.   Severance is required even if use-of-funds evidence is admissible as to the perjury counts.

Mrs. Mosby's motion argued that, even assuming the use-of-funds evidence would be admissible at a perjury-only trial, the risk of evidentiary spillover still warrants severance. ECF 206 at 21-28. Each of the government's arguments in response misses the mark.

***First,*** the government may be suggesting severance is not required so long as there is *any* cross-admissibility, however marginal, between evidence of one set of counts and evidence of the other. *See* ECF 215 at 7-8. That claim is not borne out by the case law. Mutual admissibility (meaning evidence of one count comes in at a separate trial on the other count, and vice versa) *may* mitigate prejudice *if* "much of" the evidence is relevant to both sets of counts, *United States v. Cole*, 857 F.2d 971, 974 (4th Cir. 1988), or there is "substantial overlap" in admissible evidence, *United States v. LaRouche*, 896 F.2d 815, 831 (4th Cir. 1990); *see also United States v. Huggans*, 650 F.3d 1210, 1221 (8th Cir. 2011) (no prejudice because "much, if not all, of the evidence on the conspiracy count would have been admissible in a separate trial on the attempt count"); *United States v. Page*, 657 F.3d 126, 130 (2d Cir. 2011) (no abuse of discretion in refusing to sever because separate trials on gun and drug counts "would have required much of the same evidence"). But where evidentiary

overlap between two counts is "slight," the need to avoid prejudicial jury confusion counsels in favor of severance. *United States v. Simmons*, 163 F. Supp. 3d 317, 324 (E.D. Va. 2016). A "slight possible overlap in evidence imposes a small cost, if any, on judicial economy, and that small cost[] pales in comparison to the likelihood of prejudice to [a] defendant that would result" from a joint trial. *Id.*; *cf. United States v. Hubbard*, 61 F.3d 1261, 1271 (7th Cir. 1995) (holding counts were misjoined because, although there was "some evidentiary overlap that might render a joint trial more efficient," the "overlap [wa]s extremely slight"); *United States v. Jenkins*, 884 F. Supp. 2d 789, 793-94 (E.D. Wis. 2012) (severing trials where "the evidentiary . . . overlap" was "slight," i.e., "at most a single witness would have to testify twice if the counts [we]re severed").

This distinction is key to the Rule 14(a) balancing test. The Fourth Circuit instructs district courts to "carefully weigh the possible prejudice to the accused against the often equally compelling interests of the judicial process, which include the avoidance of needlessly duplicative trials involving *substantially similar* proof." *United States v. Jamar*, 561 F.2d 1103, 1106 (4th Cir. 1977) (emphasis added). In other words, it is only when evidence of two counts is "substantially similar" that the "inherent" prejudice of a joint trial, *LaRouche*, 896 F.2d at 831, is "greatly diminished," *Cole*, 857 F.2d at 974. Only "substantial[] similar[ity]," therefore, warrants subordinating fair-trial concerns to increased efficiency; the slightest overlap in two counts' evidentiary foundations is not enough. *See also United States v. Uhrich*, 228 F. App'x 248, 255 (4th Cir. 2007) (directing district courts to ask whether trials on separate counts would involve "substantially similar proof"); *United States v. Isom*, 138 F. App'x 574, 579 (4th Cir. 2005) (same); *United States v. Bobbitt*, 203 F.3d 822, 2000 WL 102925, at *2 (4th Cir. Jan. 31, 2000) (unpublished) (same); *United*

*States v. Brown*, No. 4:13CR110, 2014 WL 31454, at \*2 (E.D. Va. Jan. 3, 2014) (same).

Here, even if the use-of-funds evidence is admissible as to the perjury counts, the evidentiary overlap between those counts and the mortgage fraud counts will be "extremely slight." *Hubbard*, 61 F.3d at 1271. Mrs. Mosby's purchase of the Florida homes would constitute a single, very small part of the government's proof of perjury. The government's evidence of that offense is likely to include a large array of documents (CARES Act withdrawal forms, Mrs. Mosby's bank statements, City of Baltimore employment records, internal Nationwide paperwork, etc.) and testimony from numerous witnesses (including government experts and employees of Nationwide, the City of Baltimore, and the State's Attorney's Office, among others). The government has not identified any other mortgage-fraud-related evidence that it believes would be admissible as to the perjury counts. Accordingly, the proof of mortgage fraud can hardly be described as "substantially similar" to the proof of perjury. *Jamar*, 561 F.2d at 1106.

And, this is not a case where judicial economy tips the scale in favor of trying the counts jointly. The government has not pointed—because it cannot—to any specific tax that severed trials would impose on judicial economy, e.g., particular witnesses who would have to testify at both trials. As far as Mrs. Mosby can tell, a joint trial would achieve only a single efficiency: the selection of one jury rather than two. But the Fourth Circuit has held that such "minimal" "saving of time" cannot justify the failure to sever counts that lack a common evidentiary foundation. *Foutz*, 540 F.2d at 738. If the need to empanel two juries were enough, standing alone, to defeat severance, then severance would never be required.

***Second,*** assuming for sake of argument that use-of-funds evidence is admissible to prove perjury, that fact—at most—lessens the prejudice to Mrs. Mosby's fair-trial right as to

the *perjury* counts. But it does nothing to protect her fair-trial right as to the *mortgage fraud* counts. The government has identified no perjury-related evidence—none at all—that would be admissible at a trial on only the mortgage fraud counts. Failure to sever would therefore run the risk that Mrs. Mosby could not receive a fair trial on the latter counts, as the jury is liable to "confuse and cumulate" evidence of the two sets of counts. *Id.* at 736. Although Mrs. Mosby made this point in her severance motion, ECF 207 at 27-28, the government offers no response. Specifically, the government does not deny that evidence of the perjury counts would be entirely inadmissible at a separate mortgage fraud trial. Nor, given that concession, does it explain how "the interests of the efficient administration of justice" outweigh the "possible prejudice to [Mrs. Mosby]" from injecting perjury-related evidence into the jury's consideration of the mortgage fraud counts. *Cole*, 857 F.2d at 974.

> **Third,** the government asserts that neither the perjury counts nor the mortgage fraud counts are "particularly complicated," and therefore the jury will be able to "separate the individual transactions and apply the facts of each to the individual law." ECF 215 at 9. There are several problems with this argument.

> To begin, certain of the indictment's allegations are in fact quite "complicated." Count four, for example, alleges Mrs. Mosby committed mortgage fraud when she falsely attested on a loan application that she "had received a $5,000 gift from her husband to be applied toward the purchase of the Long Boat Key vacation home." ECF 23 at 19. The indictment's explanation of this allegation is convoluted and difficult to follow, and it will require the jury to follow a winding paper trail, the end goal of which is not readily apparent. *See id.* at 17-18 (alleging confusing shuffling of money among bank accounts that somehow—for reasons unexplained in the indictment—secured a lower interest rate).

But more important, regardless of how "complicated" the charges are, Mrs. Mosby
will be prejudiced because the perjury and mortgage fraud counts are so similar to one
another. When separate counts appear "sufficiently similar," the jury is "likely to cumulate
the evidence improperly." *United States v. Daniels*, 770 F.2d 1111, 1117 (D.C. Cir. 1985).
That is the case here. As Mrs. Mosby's motion explained, the perjury and mortgage fraud
counts are similar in terms of both the facts and the law. ECF 207 at 22, 30. Factually, the
indictment presents the two sets of counts as successive stages of a seamless, uninterrupted
whole: Mrs. Mosby withdrew money from her retirement account (perjury) so she could use
it to buy vacation homes (mortgage fraud). Legally, both sets of counts allege the same core
wrong: making false statements about Mrs. Mosby's finances. It is this seeming similarity—
suggesting the two sets of counts are interrelated parts of a unified scheme—that will lead
the jury to confuse and cumulate the evidence.[6]

The government has nothing to say about this danger. Instead, it summarily labels the
two sets of counts "distinct" and then calls it a day. *See* ECF 215 at 9. Simply saying it,

---

[6] The government asserts the perjury and mortgage fraud evidence will overlap
because both sets of counts "require the jury to review [Mrs. Mosby's] finances." ECF 215 at
6. This argument is far too abstract. When analyzing evidentiary overlap, courts do not sort
evidence by broad general topics, such as "finances," "educational history," or "familial
relations." Instead, they compare specific, discrete pieces of evidence that will be admitted
on a given charge, e.g., an individual medical record, a specific statement by a specific
witness, or a bag of drugs seized from a particular place on a particular day. As explained
above, the government has identified only a single specific piece of mortgage fraud evidence
that (it believes) is admissible at a perjury-only trial, and zero specific pieces of perjury
evidence that are admissible at a mortgage-fraud-only trial. This juxtaposition of distinct,
identifiable pieces of evidence is what matters for overlap purposes—not whether evidence
of two crimes can plausibly be grouped under the same broad, umbrella descriptor
("finances"). And in fact, the risk of "confus[ing] and cumulat[ing] the evidence," *Foutz*, 540
F.2d at 736, is particularly acute in a case, like this one, where evidence on separate counts
*seems* similar because it touches on the same general topic, but is in fact entirely different. It
is this contrast—evidentiary similarity in appearance, but distinctness in fact—that heightens
the prejudice. Thus the fact that both sets of counts involved alleged lies about Mrs. Mosby's
finances supports, rather than undermines, the case for severance.

however, doesn't make it true.

**B.**    **Ground 2: Severance is required to neutralize the risk that jurors will convict Mrs. Mosby based on improper propensity reasoning.**

Mrs. Mosby also seeks severance based on the risk of improper propensity reasoning—i.e., that the jury will conclude she is guilty of one crime and then find her guilty of the other because of a supposed "criminal disposition." *Foutz*, 540 F.2d at 736; *see* ECF 207 at 28-31. The government's responses are unpersuasive.

***First,*** the government claims "there is nothing about this case that would result in a jury making a decision based on propensity any more than the multitude of charges that are joined in this and other districts across the nation every single day." ECF 215 at 9. That argument ignores the fact that, as explained above, the perjury and mortgage fraud counts are similar both factually (alleging use of CRDs to buy new homes) and legally (asserting Mrs. Mosby lied on financial forms). It is simply not true that the "multitude of charges" brought in federal courts "every single day" share this same degree of factual and legal similarity. Worse, from a prejudice standpoint, the government has announced its intention to highlight the relation between the two sets of counts—i.e., Mrs. Mosby's use of CRD funds to purchase homes in Florida—to argue that she is guilty of every crime charged. It borders on fanciful to suggest that a jury, having concluded Mrs. Mosby told one set of lies, will not be tempted into concluding that she told the other, related set of lies as well.

***Second,*** the government insists that a "properly instructed" jury will be "able to understand that lying on an application to withdraw funds from your retirement account does not make it more likely that you lie on your mortgage application." *Id.* at 2, 9. But while limiting instructions may sometimes mitigate the prejudice from a jury's misuse of evidence, they cannot account for "the uniquely prejudicial impact" that bad-acts evidence has on a

20

jury. *United States v. Caldwell*, 760 F.3d 267, 275 (3d Cir. 2014). The Fourth Circuit has expressed doubt that limiting instructions are "effective" in this context. *See Smith v. Baltimore City Police Dep't*, 840 F.3d 193, 204 & n.6 (4th Cir. 2016) ("Telling juries not to infer from the defendant's [bad acts] that someone who violated the law once is likely to do so again is like telling jurors to ignore the pink rhinoceros that just sauntered into the courtroom."). And it recognized in *Foutz* that even when the evidence of separate counts is easily segregated, a propensity instruction is unlikely to neutralize "the grave[] mischief possible where the jury, while limiting its consideration of the evidence to the crime to which it relates, properly finds the defendant guilty of one crime but considers that finding probative of [her] guilt of another." 540 F.2d at 738 & n.5.

Put simply, a limiting instruction often "cannot cure" the prejudice that results from irrelevant bad-acts evidence. *United States v. Hall*, 858 F.3d 254, 279 (4th Cir. 2017) (reversing admission of such evidence). That is "especially" true when, as in this case, "the prior 'bad act' testimony lack[s] plausible probative value." *United States v. McBride*, 676 F.3d 385, 399 n.5 (4th Cir. 2012) (holding erroneous admission of bad-acts evidence "was not cured by the issuance of a limiting instruction"); *see also United States v. Johnson*, 617 F.3d 286, 297 (4th Cir. 2010) (holding district court abused discretion by admitting bad-acts evidence because "[t]he meager protection afforded by the court's limiting instruction" did not "outweigh the prejudice" of jury's potential propensity reasoning); *Smith*, 840 F.3d at 203-04 (holding admission of bad-acts evidence was error where limiting instruction "afforded meager protection at best"); *United States v. Roberts*, 735 F. App'x 649, 653 (11th Cir. 2018) (reversing admission of bad-acts evidence because, although court "presume[s] juries follow limiting instructions," it "ha[s] also acknowledged that despite limiting

instructions, it is very difficult for juries not to draw propensity inferences" when bad-acts evidence is admitted); *United States v. Jenkins*, 345 F.3d 928, 938-39 (6th Cir. 2003) (finding abuse of discretion because appellate court "d[id] not believe that the district court's limiting instruction was a sufficient remedy" for "the substantial prejudice caused by the admission of this other acts evidence").

Recognizing these limitations, courts frequently grant severance upon concluding that a limiting instruction will fail to ward off illicit propensity reasoning. *See, e.g.*, *Foutz*, 540 F.2d at 738 (concluding district court abused discretion by denying severance because "we cannot presume that the jury adhered to limiting instructions and properly segregated the evidence into separate intellectual boxes"); *United States v. Hawkins*, 776 F.3d 200, 211 (4th Cir. 2015) (holding limiting instruction inadequate because "unrelated bad conduct . . . offered in evidence on another charge . . . to prove the defendant's general propensity to commit crimes can have a substantial and injurious effect or influence in determining the jury's verdict"); *United States v. McCarter*, 316 F.3d 536, 539 (5th Cir. 2002) (explaining, in case where defendant was charged with drug offenses and firearm possession by a felon, that "[a]lthough juries are generally presumed to have followed jury instructions, we recognize that, oftentimes, 'to tell a jury to ignore the defendant's prior convictions in determining whether he . . . committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capabilities'"); *United States v. Oaks*, 285 F. Supp. 3d 876, 882 (D. Md. 2018) (rejecting idea of jury instruction and ordering severance based on "the risk of the jury improperly relying upon a perceived criminal propensity"); *United States v. Martinez*, No. CR 18-00100-MV, 2019 WL 3719073, at *4 (D.N.M. Aug. 7, 2019) (holding limiting instruction insufficient); *United States v.*

22

*Caraballo*, No. 5:12-CR-105, 2013 WL 4647787, at *4 (D. Vt. Aug. 29, 2013) (same); *cf. United States v. Riley*, 21 F. Supp. 3d 540, 548 (D. Md. 2014) ("The Court is skeptical as to the efficacy of limiting instructions in general, and it is especially dubious in this circumstance. Certain bells, once rung, simply cannot be unrung.").

Given the factual and legal parallels between the perjury and mortgage fraud counts, a limiting instruction would be inadequate to protect Mrs. Mosby's right to a fair trial. Severance is required.[7]

### C.      Ground 3: A joint trial would confound Mrs. Mosby's ability to put on a defense.

Contemporaneous with her severance motion, Mrs. Mosby filed an ex parte supplement explaining why a joint trial would confound her ability to assert her privilege against self-incrimination with respect to one set of counts but not the other. The government's response fundamentally misunderstands how this category of prejudice works and why the Fourth Circuit has recognized it. *See* ECF 215 at 10.

***First,*** the government insists "the entire concept" of Mrs. Mosby's position "is flawed" because it is "[her] acts that create her dilemma, not the charges, and not whether she faces them in one or two trials." *Id.* This argument improperly assumes Mrs. Mosby is guilty. It consigns her to the dilemma of a joint trial by treating her guilt—as demonstrated

---

[7] The government does not argue that prejudice to Mrs. Mosby on ground one (confusion and cumulation of evidence) can be cured by jury instructions. Regardless, in that context, too, courts frequently order severance because they conclude limiting instructions are insufficient to guard against prejudice. *See, e.g.*, *Hawkins*, 776 F.3d at 209-11; *Shrader v. United States*, No. CRIM. 1:09-0270, 2010 WL 1837736, at *3 (S.D. W. Va. Mar. 5, 2010); *United States v. Fiel*, No. 3:10CR170-6-HEH, 2010 WL 11530543, at *4 (E.D. Va. Sept. 23, 2010); *United States v. Toney*, 161 F.R.D. 77, 82 n.4 (N.D. Iowa 1995); *United States v. Lee*, No. 4:14-CR-0254, 2015 WL 12631238, at *3 (M.D. Pa. June 2, 2015); *cf. United States v. Lafrance*, 966 F.2d 1445, 1992 WL 130179, at *2 (4th Cir. 1992) (unpublished); *United States v. Martinez*, 994 F.3d 1, 13-15 (1st Cir. 2021); *United States v. White*, No. 2:22-CR-029, 2023 WL 3959398, at *4 (W.D. Va. June 12, 2023).

through her "acts"—as a given. But Mrs. Mosby is presumed innocent, and the Court cannot decide how to structure trial based on an assumption of her guilt. The entire point of a trial, after all, is to determine whether she is, in fact, guilty.

Regardless, Mrs. Mosby's guilt or innocence is irrelevant to whether a joint trial would "confound[]" her ability to present a defense. *Id.* Guilty defendants, just as much as innocent ones, have the right to put on a defense, to invoke their privilege against self-incrimination, or to testify in their own defense. The purpose of the "confounding defenses" basis for severance is to ensure that defendants "hav[e] a free choice with respect to" those rights, *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984), and courts must ensure that "free choice" to *all* defendants—not just those who appear innocent pre-trial.

The government's argument, moreover, would render the "confounding defenses" basis for severance a dead letter. Defendants typically invoke this basis precisely because they fear the evidence makes them look guilty on one count but not another, and courts grant severance for precisely that reason. *See, e.g.*, *Oaks*, 285 F. Supp. 3d at 881-82 ("The Defendant asserts that it is 'reasonable' and 'plausible' that he 'may wish to testify as to Count Ten, but not Counts One through Nine, since . . . the government's proof is the word of someone (Person # 1) who was (and perhaps still is) facing criminal prosecution.' . . . It is objectively reasonable for the Defendant to desire to testify *solely* as to Count Ten in order to refute, explain, or qualify either the alleged obstructive comments or his own alleged confession, neither of which was recorded on tape." (emphasis in original)); *United States v. Gray*, 78 F. Supp. 2d 524, 532 (E.D. Va. 1999) ("Given the highly inflammatory nature of a charge of possessing child pornography, it is easy to imagine that defendant may wish to testify on his own behalf on the charges of unauthorized access of a government computer,

24

yet be reluctant to do so on the charge of possessing child pornography."). If apparent guilt were enough to defeat severance based on this ground, the "confounding defenses" portion of the Fourth Circuit's case law would be rendered a nullity.

**Second,** the government argues that if Mrs. Mosby testifies, "her veracity is undoubtedly of importance to the jury." ECF 215 at 10. Therefore, the government posits, she should "be questioned about her demonstrably false statements, including those made either on her hardship request, or her mortgage applications." *Id.* Fully explaining the error in this particular argument requires discussion of sensitive, privileged information that Mrs. Mosby cannot be required to divulge to the public or the prosecution. Therefore, she will seek leave to file a short ex parte supplement to this reply.

**Third,** the government alleges Mrs. Mosby has not made the requisite showing because she relied on "a series of arguments involving untested evidence that has not withstood cross examination or analysis." *Id.* But the "arguments" and "evidence" identified by the government were not cited by Mrs. Mosby in support of relief on the "confounding defenses" theory of severance. *See* ECF 207 at 23-26. Rather, Mrs. Mosby relies on the points and proffers made in her ex parte supplements.

### III. The Court should not give the indictment to the jury, but if it does, it should strike the use-of-funds allegations.

#### A. The Court should decline to give the indictment to the jury.

Mrs. Mosby's motion argued that the Court should strike from counts one and three any allegation about how she used CRD funds, since those allegations are irrelevant, inflammatory, and prejudicial. ECF 211 at 1-8. Alternatively, Mrs. Mosby's motion argued the Court should not provide a copy of the indictment to the jury. *Id.* at 8-9. In its response, the government "defers to the Court[]" as to whether the jury should receive the indictment,

and it does not object to Mrs. Mosby's request. ECF 215 at 16 n.4. Given the government's

non-opposition, and because the Court will provide jurors all the information they need

during jury instructions, the Court should withhold the indictment from the jury during

deliberations. Doing so would make it unnecessary for the Court to resolve the remainder of

Mrs. Mosby's motion.

      **B.**    **If the Court decides to give the indictment to the jury, the Court should strike allegations about how Mrs. Mosby spent her CRDs.**

            **1.**    **Whatever standard the Court applies, use-of-funds allegations are not "relevant."**

                  **a.**    **The Court should apply the "necessary" standard of relevance used by other courts in this circuit.**

Mrs. Mosby's motion argued that to be "relevant"—and thus properly included in an

indictment under Federal Rule of Criminal Procedure 7(d)—allegations must be

"'necessary'" in "'making out a prima facie pleading'" of a statutory violation. ECF 211 at 4

(quoting *United States v. Cooper*, 384 F. Supp. 2d 958, 960 (W.D. Va. 2005)). The

government resists that conclusion, contending the standard applied by the *Cooper* court

"does not appear aligned with other federal courts." ECF 215 at 14. The cases the

government cites are all from outside the Fourth Circuit. *See* ECF 215 at 15 n.3. And in any

event, even some out-of-circuit courts apply the "necessary" standard. *See, e.g.*, *United

States v. Sawyer*, No. 08-40045-JAR, 2008 WL 4299932, at *1 (D. Kan. Sept. 12, 2008)

(striking surplusage because, "[w]hile the information about defendants' past dealings with

the City of Lawrence regarding their industrial waste disposal is relevant to the *mens rea*

element of the offense, 'it is certainly not essential in making out a *prima facie* pleading of

violation'"); *United States v. Miller*, No. 107CR12801MHSAJB, 2008 WL 11293926, at *4

(N.D. Ga. Sept. 23, 2008) (defining surplusage as "any fact or circumstance set forth in the

indictment which is not a necessary ingredient of the offense"); *Brady v. United States*, 24

F.2d 397, 399 (8th Cir. 1928) ("Surplusage has been defined as follows: 'Any allegation without which the pleading would remain adequate in law.'"); *United States v. Chase*, No. 2:06CR00065-PMP-PAL, 2006 WL 3780007, at *2 (D. Nev. Dec. 14, 2006) (same).

Notably, the government makes no attempt to explain why cases applying the "necessary" standard are wrongly decided. Indeed, the logic of those cases, based on the Rule's clear text, is sound. The Government does not deny that Rule 7 requires an indictment to be "a *plain, concise, and definite* written statement of the *essential* facts constituting the offense charged." Fed. R. Crim. P. 7(c) (emphasis added). This language "contemplates an indictment that merely pleads each of the factual elements of the offense charged." *Cooper*, 384 F. Supp. 2d at 960. Nor does the government deny that if Rule 7(d) permitted "the inclusion of every piece of evidence that ultimately may be relevant to building a case against the defendant," an indictment "would be free to grow from a 'plain and concise' statement of 'essential' facts to an unreadable monstrosity." *Id.* The government offers no explanation for why its preferred approach—under which an indictment may include any facts that are admissible at trial—would not "contravene the explicit language of Rule 7(c)." *Id.*

Like other courts in this circuit, therefore, this Court should apply the "necessary" standard of relevance. *See* ECF 211 at 4 (collecting cases); *United States v. Manginen*, 565 F. Supp. 1024, 1025 (E.D. Va. 1983) ("'Surplusage' is any fact or circumstance set forth in the indictment which is not a necessary ingredient of the offense." (citing *Johnson v. Biddle*, 12 F.2d 366, 369 (8th Cir. 1926)); *United States v. Kennedy*, No. CIV. 07-CR-131, 2007 WL 2156611, at *4 (E.D. Va. July 25, 2007) (defining surplusage as "any fact or circumstance set forth in the indictment which is not a necessary ingredient of the offense from the

indictment"); *United States v. Schofield*, No. CRIM 06-CR-427 JCC, 2006 WL 3408101, at

*3 (E.D. Va. Nov. 22, 2006) (striking surplusage: "The language regarding Defendant's

sexual activity in Asia is thus not essential to any of the charges against him. The arguments

presented by the Government against striking the language as surplusage relate to the

ultimate admissibility of evidence supporting the allegations in Paragraph 8, but offer no

explanation as to why the language was necessary in the indictment.").

Under the "necessary" standard, references to how Mrs. Mosby used her withdrawn

funds are irrelevant. As explained above, the government concedes that there was no legal

requirement to use withdrawn funds to "mitigate" adverse financial consequences. *See* ECF

215 at 14-15. Accordingly, allegations about how Mrs. Mosby used her CRDs are not

"necessary" to make out a prima facia pleading of the perjury statute; counts one and three

would still plead proper violations of 18 U.S.C. § 1621 without those allegations. *See, e.g.*,

*United States v. Afsharjavan*, No. 1:15-CR-144 JCC, 2015 WL 5047438, at *3 (E.D. Va.

Aug. 26, 2015); *United States v. Presgraves*, 658 F. Supp. 2d 770, 783-84 (W.D. Va. 2009)

(striking allegations because they "are not necessary to prove[] any of the twenty-two counts

charged in the first indictment"); *Johnson*, 12 F.2d at 369.

> **b.    Even under the government's preferred standard, the allegations relating to Mrs. Mosby's home purchases are irrelevant.**

Even assuming Rule 7(d)'s relevance standard mirrors Federal Rule of Evidence 401,

allegations about how Mrs. Mosby used her withdrawals are irrelevant. The government

notes that, in denying a previous motion in limine, the Court concluded use-of-funds

evidence was relevant to whether Mrs. Mosby had suffered adverse financial consequences.

ECF 215 at 12-13. The relevance of that evidence is therefore "law of the case," the

government asserts, and cannot be revisited. *Id.* at 12. As explained above, that argument

disregards the well-settled rule that in limine rulings are "preliminary" and may be "revisit[ed] . . . at any time and for whatever reason [the district court] deems appropriate." *Frazier*, 442 F. Supp. 3d at 1016; *Stone*, 543 F. Supp. 3d at 539; *see Young*, 916 F.3d at 381 (law-of-the-case doctrine does not prevent a district court from reversing a prior evidentiary ruling). Thus, the Court is not bound by its prior ruling on Mrs. Mosby's motion in limine.

On the merits, the government argues use-of-funds allegations are relevant to the perjury counts because the fact that Mrs. Mosby used her withdrawals to purchase "two vacation homes" suggests she did not suffer any adverse financial consequences. ECF 215 at 13. The government's theory of relevance is that, if Mrs. Mosby had truly experienced adverse financial consequences, she would have used her withdrawn funds to "mitigate" those consequences rather than purchase the homes. *Id.* at 12. As explained above, the government's theory of relevance is incompatible with the CARES Act and relies on an undefined—and ultimately undefinable—concept ("mitigating" adverse financial consequences). *See supra* Part II.A.1. The Court should reject it.

### 2. Allegations about Mrs. Mosby's home purchases are inflammatory and prejudicial.

The government appears to argue this Court's in limine ruling already held the use-of-funds allegations are not inflammatory and prejudicial for purposes of Rule 7(d). *See* ECF 215 at 15-16. That was not the Court's ruling. The Court held only that Federal Rule of Evidence 403 did not bar admission of use-of-funds evidence because Mrs. Mosby "ha[d] not shown that the probative value of this evidence is *substantially* outweighed by a danger of unfair prejudice, confusing the jury, or wasting time." ECF 105 at 19 (emphasis in original). Rule 403 and Rule 7(d) are distinct. While Rule 403's use of the word "substantially" establishes a "high bar" for exclusion, *United States v. Miller*, 61 F.4th 426, 429 (4th Cir.

2023), Rule 7(d) lacks a similar requirement of heightened prejudice. A defendant need only show that allegations in an indictment "are not relevant to the charge and are inflammatory and prejudicial." *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006). This Court's in limine ruling, therefore, did not address whether the indictment's inclusion of these allegations was prejudicial or inflammatory under Rule 7(d)'s lower standard. And in any event, a ruling on a motion in limine is "preliminary," subject to revision "at any time and for whatever reason [the district court] deems appropriate." *Stone*, 543 F. Supp. 3d at 539.

On the merits, the government argues the use-of-funds allegations are prejudicial "merely in the sense that [they are] probative of [Mrs. Mosby's] crime," which is insufficient to establish prejudice under Rule 7(d). ECF 215 at 16. All the cases the government cites, however, involve Rule 403 and its requirement that probative value be "substantially outweighed" by "unfair prejudice." *See United States v. Grimmond*, 137 F.3d 823, 832-33 (4th Cir. 1998) (citing other authorities on which government relies). None of those cases addresses Rule 7(d), which requires only that allegations be "inflammatory and prejudicial." *Williams*, 445 F.3d at 733. The use-of-funds allegations easily clear that lower bar. As the Court previously determined, this evidence "could elicit jealousy or misgivings by the jury." ECF 105 at 19. This conclusion is materially indistinguishable from finding the evidence is "inflammatory and prejudicial" under Rule 7(d). Other than asserting summarily that the allegations are "not inflammatory in any sense," the government does not argue otherwise, nor does it engage with the specifics of the argument in Mrs. Mosby's motion. ECF 215 at 16.

## Conclusion

For the reasons described above, the Court should (1) set an expedited schedule for deciding a limited number of CARES Act-related jury instructions, (2) sever counts one and

three from counts two and four, and (3) decline to give the indictment to the jury or,

alternatively, strike the use-of-funds allegations from the perjury counts.


Respectfully submitted,

/s/ James Wyda
James Wyda
Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
jim_wyda@fd.org


/s/ Maggie Grace
Maggie Grace
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
maggie_grace@fd.org

/s/ Lucius Outlaw
Lucius Outlaw
Outlaw PLLC
1351 Juniper Street, NW
Washington, DC 20012
Phone: (202) 997-3452
loutlaw3@outlawpllc.com