**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.  LKG-22-007** |
| | * | |
| **MARILYN MOSBY,** | * | |
| | * | |
| **Defendant.** | * | |
| | ******* | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR INTRA-DISTRICT TRANSFER TO THE SOUTHERN DIVISION

Beginning months before the indictment, the defendant and her retained counsel consistently sought to gin up media exposure surrounding this case.  Now, less than ninety days before trial, the defendant claims that the very media spotlight that she sought and encouraged makes it necessary to move her trial to the Southern Division.  This Court should not allow the defendant to conjure a storm and then complain her roof is leaking.  The media exposure the defendant sought and encouraged surrounding this trial does not provide reason for moving it.

In addition, the survey the defendant relies upon contains nine fundamental methodological flaws that render it unreliable.  And even taken on its merits, the difference the defendant identifies between the Southern and Northern Divisions is insignificant and can be solved by voir dire and the jury questionnaire already issued in this case.  In addition, moving the trial to the Southern Division would cause inconvenience for witnesses and could result in an additional delay, because a new juror questionnaire would have to be mailed out and returned.

This case should be tried in Baltimore, where the crimes occurred, the defendant is located, and the witnesses are nearby.  And this case should be tried as scheduled.  The defendant's motion for an intra-district transfer should therefore be denied.

1.   **The Defendant and Her Retained Counsel Regularly Sought and Created the Media Exposure of Which She Now Complains.**

The defendant argues that she has been the subject of "years-long onslaught of negative media coverage in the Baltimore area." ECF 212, at 9.  But it is the defendant who has regularly sought and encouraged media attention surrounding this case.  The defendant's leading role in ginning up this media coverage is detailed at length even in the media articles selected by her own expert.  The defendant should not be able to create and encourage media coverage and then complain, less than ninety days before trial, of the same media coverage she has spent many months encouraging.

For example, even before any indictment in this case, the defendant "fired back for months at prosecutors and the media through her lawyers and supporters, saying she [was] a victim of personal animus and racial targeting."  *See* ECF 212-3, at 3, 6, 11 (noting an October 2021 press conference where Mr. Bolden and others "called for an end to the investigation" of the defendant); *id.* at 30 (noting Mr. Bolden's comment in summer 2021 that "this investigation appears to be essentially a civil audit of my client's tax returns, put into a grand jury by individuals who have a personal, political, and possibly racial animus against Ms. Mosby[,]"); *id.* at 41 ("Marilyn Mosby has been for months calling the investigation into her finances a 'witch hunt'[.]").  The defendant brought attention to the investigation, provided updates on it to the public, and discussed the subject matter far before any indictment was issued in this matter.

The day the indictment was returned, the defendant's then-attorney, Mr. Bolden, sent a statement to the press calling the charges "bogus" and stating they were "rooted in personal, political, and racial animus" – all arguments the Court subsequently found to be false. *See* ECF 212-3, at 5, 8, 10, 22, 29, 33, 90, 94, 99, 197, 214, 219, 296, 317, 350, 414, 435, 443, 448.  Indeed, to the extent the defendant complains about additional information being in the public domain

about other potential charges and investigations, it is *her own attorney* who discussed those matters in public.  *See, e.g.*, ECF 212-3, at 10 ("[Bolden] called the charges 'a far cry from criminal tax evasion and tax related charges that were at the heart of this federal investigation. More importantly, Ms. Mosby has never lied or made a false statement in connection with the allegations contained in the charging document.''); *see also id.* at 11 (discussing meetings with "federal tax authorities").

On January 13, the day after the indictment, the defendant's attorney went on national television and discussed the case and the defendant's "businesses" that were "affected" by Covid-19. ECF 212-3, at 16, 46, 48, 161, 247, 413, 443, 448, 547.  The Defendant herself issued a public statement.  ECF 212-3, at 17.

One day later, Ms. Mosby held a press conference where she "followed the same playbook that her attorney has used in the media since the indictment became public: attack the integrity of the U.S. Attorney's Office in Maryland and claim that racial or political animus is behind the prosecutor's actions."  ECF 212-3, at 14. The defendant stated: "this indictment is merely a political ploy by my political adversaries to unseat me."  ECF 212-3, at 32, 44; 220; 223; 482. That same day, her attorney conducted a radio interview in which he offered up potential defenses and attacked a prosecutor in the case.  ECF 212-3, at 15.

On January 17, 2023, the defendant's attorney, Mr. Bolden, again took to the media, "denouncing the federal charges against his client . . . as racially and politically motivated[,]" ECF 212-3, at 53, and stated that "we have professionals who she consulted with" showing the defendant's innocence.  ECF 212-3, at 55.  On January 23, 2023, Mr. Bolden paid a visit to the daytime talk shows, discussing the case on "Square Off." ECF 212-3, at 79.

On February 1, 2022, the defendant herself went on a national news show on MSNBC as

an "exclusive" guest with her attorney, Mr. Bolden for an eleven-and-half-minute interview.  ECF

212-3, at 157; 163; 290; 295; 400; 735.  The defendant stated that "there's ulterior motives for

something like this. For an attack like this."  Mr. Bolden followed up, "When you bring an

indictment four months before an election . . . you're not trying to find justice or truth. You're

trying to affect the outcome of her re-election effort."  ECF 212-3, at 157.  MSNBC, *Baltimore

City States's Attorney Denies Charges She Calls Retaliation for Indicting Law Enforcement*,

available at https://www.youtube.com/watch?v=h1gPs5xRGR4, February 1, 2022.  On national

television, the defendant spoke directly to the "people in the City of Baltimore," telling them, "this

is more about my election than anything else." *Id.*  MSNBC then replayed the Defendant's January

14, 2022 statement claiming personal animus by the prosecution. *Id.* The defendant again

emphasized that she believed the charges were political, declaring: "let's get to the election,

because this is what it's all about." *Id.*  Later that week—as detailed in the media reports selected

by the defendant's expert—the defendant sent out a fundraising pitch email "decrying a 'weak

indictment' that she blamed on 'powerful entrenched keepers of the status quo.'"  ECF 212-3, at

162.

The next month, March 2022, the defendant held a campaign event on the steps of her

home where she focused on the indictment, continuing to repeat the groundless allegation that the

prosecution of her was political: "We're three months out. I have a trial, we got an election to win

– that's what this is about, this was put in place so that I would not win."  ECF 212-3, at 297.  The

next month, the defendant again repeated the specious argument at a campaign event that she was

"'racially and politically and personally attacked' by prosecutors." ECF 212-3, at 302.

On April 14, 2022, following this Court's finding that there was no support for the

defendant's spurious and unfounded allegations of political and racial animus, the defendant and

her attorney held a press conference on the courthouse steps, where the defendant declared that she "did not expect to prevail" in her arguments of bias that she had been making on national television.  Her attorney further stated, "these facts, while they may not have risen to the level for the judge to dismiss the charges, they're problematic."  ECF 212-3, at 325.  Despite the Court's clear holding that there was no support for her allegations of bias, the defendant stated that a prosecutor on the case "has a history of racial animus-based prosecution that predates me and has been seen in the city of Baltimore since his existence here." ECF 212-3, at 330.  And as the defendant's expert notes, all of these comments by the defendant and her counsel were quickly picked up by the media.  And that was the defendant's intent: the defendant and her attorney addressed these comments directly to the media, in order to garner additional publicity concerning their arguments regarding the case.

On September 14, 2022, immediately following a hearing before this Court, the defendant and her lawyer yet again held a press conference on the courthouse steps.  The unfortunate facts of that particular conference are well known to the Court and need not be rehashed here.  But the profanity uttered by the defendant's attorney as the defendant stood alongside him did not go unremarked on in the news media.  *See, e.g.*, ECF 212-3, at 573, 575, 576, 579, 596, 598, 609, 626, 699, 701, 705, 707, 708, 710, 714, 716, 719, 722, 725, 729, 733, 742, 746, 749, 752, 755, 765, 768.  Like so much of the press attention of which the defendant now complains, the most recent deluge was purely the result of the defendant and her chosen counsel's public actions directed toward the news media.

These actions underscore that it is the defendant who has ginned up the media coverage in Baltimore about which she now complains.  It is the defendant and her counsel who routinely appeared in local and national media to discuss her case.  It is the defendant and her counsel that

held press conferences on the courthouse steps and elsewhere to keep the case in the headlines. The defendant cannot now claim that she needs to move her case because of the press coverage she herself sought and cultivated. *See Monterossa v. City of Vallejo*, 2021 U.S. Dist. LEXIS 269791 (E.D. Cal 2021), *18 (denying an intra-district transfer in part because "it must also be acknowledged that those articles equally contain Defendants' public statements or statements.").

> 2. **The Defendant's "Media Survey" Suffers From Four Significant Methodological Flaws That Render It Unreliable**

The defendant's proffered "media survey" appears to consist of Googling various news articles that mention the defendant's name in local papers in the Northern Division. *See,* ECF 212-2 & 3. But this unsophisticated brute-force approach suffers from a multitude of shortcomings. As an initial matter, the catalogue makes no systematic attempt to determine which of the publications are merely factual in nature or only mention the defendant in passing. The survey likewise fails to adjust in any way for the circulation of the various sampled newsprint media, treating them all newsprint organizations alike regardless of readership size. Next, in the era of digital media, a newsprint-only examination is a fantastically narrow lens through which to examine media coverage. Indeed, Dr. Edelman concedes as much in his declaration, though he fails to provide any results from his claimed review of social media and television. Finally, even taken on its own merits, Dr. Edelman's survey includes only the Northern Division, and thus provides no metric for comparison to move to argue for a move to the Southern Division.

*First*, the defendant's media survey fails to differentiate between articles that were merely factual in nature and those that are potentially prejudicial, except to declare, with no supporting data, that "much of the media coverage paints Marilyn Mosby in a negative light." ECF 212-1, at 34." But much of the information included in the appendix appears to be either factual recitations of the charges or completely unrelated articles about a public figure. Some are even laudatory.

*See, e.g.*, ECF 212-3, at 229 (discussing a motion for change of venue in an unrelated case the defendant was prosecuting); 347 (noting that the defendant bet on a particular horse at the Preakness, presented a trophy, had charges pending, and had an opponent in the primary who wore a blue suit to the horse race); 540-542 (Lengthy op-ed titled, "In Defense of Marilyn Mosby"). The Court noted this issue when it denied the defendant's first motion for transfer, stating that "[T]hese news articles involve the Defendant's former role and duties as the State's Attorney for Baltimore City," and therefore were not relevant. ECF 171, at 10. The Court further noted that, "the fact that potential jurors who reside in the Court's Northern Division may have heard of the Defendant, or even heard of this case through the news media, does not establish that trial proceedings in the Northern Division must be presumed to be tainted." *Id.*

The Court's reasoning then applied to many of the opinions cited by the defendant here. Articles merely relaying factual information do not inflame the jury. *See Mosby v. Gov't of the Virgin Islands*, 2011 U.S. Dist. LEXIS 107946, *86 ("[T]he articles included in Mosby's Appendix are primarily factual and objective reports of the crime, investigation, and arrest.") (citing *United States v. Inigo*, 925 F.2d, 641, 655 (3rd Cir. 1991) ("[T]he articles were primarily factual, a factor that undercuts a finding of prejudice.")); *United States v. Skilling*, 561 U.S. 358 381 (2010) ("Prominence does not necessarily produce prejudice, and juror impartiality, we have reiterated, does not require ignorance.").

In addition, the more recent articles regarding the regrettable actions of prior defense counsel on the courthouse steps likewise do not prejudice the defendant in any way. The defendant's previously retained counsel has withdrawn and is no longer involved in the case. And the Court's actions to maintain decorum and compliance with the local rules are not prejudicial to the defendant. *See United States v. Wittig*, 2005 U.S. Dis. LEXIS 5736, at *12 (N.D. Kansas 2005)

("According to defendants, the Court's criticism of defense counsel 'could create the impression that the Court favors the government or is biased against the defendants themselves or defendants' counsel.' The Court disagrees; the obvious import of these news articles is the Court's continuous and on-going effort to maintain order and decorum in the courtroom in the face of overblown theatrics and oftentimes offensive behavior.").

*Second*, the survey failed to account for the circulations of the various publications, which vary widely.  An article in the Baltimore Sun is likely to be seen by more individuals than one in the Towson Times.  Nor is this the first time Dr. Edelman has failed to account for circulation in this type of media survey presented to the Court when seeking a venue change. *See Mackey v. Asuncion*, 2018 U.S. Dist. LEXIS 168319, at *63 (N.D. Cal. 2018) ("In particular, the court asked critical questions of Edelman for failing to take into account the circulations of the various publications, noting that many of the articles were duplicates published in different newspapers."); *Accord United States v. Grace*, 400 F. Supp. 2d 998, 1003 (D. Mont. 2006) (assessing the circulation of publications in a motion for transfer).

*Third*, newsprint is an incredibly narrow lens through which to assess media coverage and saturation in 2023.  Although Dr. Edelman stated that he reviewed "newsprint, television, and social media coverage surrounding these events" he provides no information regarding anything except newsprint coverage. *See* ECF 212-1, at 1.  There is no evidence concerning social media or television review whatsoever.  But the vast majority of Americans do not get their news from newsprint. *See, e.g.*, Pew Research Center, *More than Eight in Ten Americans Get News From Digital Devices*, January 12, 2021, available at https://www.supremecourt.gov/opinions/URLs_Cited/OT2021/21A720/21A720-1.pdf   (noting that approximately a third of Americans get their news from print publications).   In fact, as the

declaration of James Frehse, a professional with a specialty in administering surveys that solicit accurate responses notes in his attached declaration, "The majority of American consumers use newspapers less than once per month.  As a result, any impact from print media in this case is on a smaller portion of the potential jury pool and is skewed to older populations."  Declaration of John Frehse, attached as Exhibit A (hereafter "Frehse Decl.).  Indeed, courts have routinely received evidence regarding television broadcasts, none of which (despite Dr. Edelman's statements that he conducted a review) are included here.  *See, e.g.*, *United States v. Grace*, 408 F. Supp. 2d 998, 1012 (D. Mont. 2006) (assessing television coverage in the affected area in a motion for transfer); *Dixon v. Rackley*, 2017 U.S. Dist. LEXIS 58377, at *333 (E.D. Ca. 2017) (same).

*Fourth*, Dr. Edelman *never* compares the Northern Division to the Southern Division.  In fact, he *never even examined the media in the Southern Division.*  Dr, Edelman appears only to have run his analysis for the Northern Division, without examining if there were comparable articles in the Southern Division.  *See* ECF 212-1, at 9 ("A careful effort was made to collect articles published in newspapers with circulation in the Northern Division."  In the simplest terms, Dr. Edelman has compared the press attention in the Northern Division to nothing, rather than comparing it to the Southern Division.  Consider the two most populous counties in the Southern Division, Montgomery County (pop. 1.05 million) and Prince George's County (pop. 955,000) are adjacent to Washington, D.C.  But Dr. Edelman makes no attempt to search the dominant paper in that region, the Washington Post, for articles about Ms. Mosby.  Unsurprisingly, the Post has many such articles to which the jury pool in the Southern Division was exposed that go completely uncounted in the survey.[1]  Dr. Edelman claims that his results support a transfer to the Southern

---

[1] *See, e.g.*, *Baltimore's Chief Prosecutor Marilyn Mosby Indicted, Accused of Perjury and Making False Loan Applications*, Washington Post, Jan 13, 2022*; Baltimore Prosecutor Marilyn Mosby Denies Criminal Charges in Federal Probe of her Finances, Claims Retaliation*, Washington Post, January 14, 2022; *Tapping Retirement Funds to Invest in Real Estate Is a Terrible Idea. For Baltimore's Top Lawyer, It led to Federal Charges*, Washington Post,

Division, but he never examines the media effects there.

An incomplete survey of newsprint publications without any attempt to differentiate factual articles from inflammatory ones does not provide the Court with useful information in seeking an intra-district transfer.  There is no dispute that the defendant was a prominent public official in Baltimore; but the collected news articles do not show that the Northern Division is not capable of holding a fair trial.

3.  **The Defendant's Telephone Survey Suffers from Five Methodological Flaws that Render it Unreliable.**

"Public opinion polls introduced with the purpose of demonstrating jury bias have found little favor with the courts."  *United States v. Cloud*, 2021 U.S. Dist. LEXIS 261090, at *9 (E.D. Wash. July 27, 2020) (quoting *Shapiro v. Kauffman*, 855 F.2d 620, 621 (8th Cir. 1988)).  That is for good reason: such surveys are unreliable and subject to significant biases.

In this case, in addition to the media survey discussed above, Dr. Edelman conducted a telephone survey that purports to show that jurors in the Northern Division hold significantly more negative views regarding the defendant than those in the Southern Division.  But like the media survey, the telephone survey is riddled with methodological flaws and significant weaknesses.  And even if its results are taken at face value, Dr. Edelman fails to address ways in which the voir dire process accounts for the issues he raises.  Here too, the declaration by James Frehse, points to significant shortcomings in Dr. Edelman's methodology.  And Mr. Frehse is not alone—those same shortcomings in Dr. Edelman's methodology have repeatedly been pointed out by courts

---

Jan. 18, 2022; *Baltimore's Chief Prosecutor Pleads not Guilty to Perjury, Falsifying Loan Applications*, Washington Post, Feb. 4, 2022*; Baltimore State's Attorney Mosby Accuses U.S. Prosecutors of Bias in Charging Her*, Washington Post, Feb. 23, 2022; *New Indictment Details More Allegations Against Baltimore's Top Prosecutor*, Washington Post, March 11, 2022; *Judge Delays Trial of Baltimore State's Attorney Marilyn Mosby*, April 6, 2022; *Court Will Pick Up Tab for Mosby's Witnesses*, Washington Post, July 7, 2022; *No Gifts for Mosbys' Defense Fund, Report Says*, Washington Post, April 23, 2022; *Marilyn Mosby Blasts Maryland AG Over Handling of Adnan Syed Case*, Washington Post, September 21, 2022.

when rejecting surveys nearly identical to the one he proffers here.

*First*, Dr. Edelman failed to accurately describe his survey sample.  He states that the telephone survey involved "jury-eligible" individuals in the Southern Division.  ECF 212-1, at 19. But how were these "jury-eligible" individuals determined?  From what list were they drawn?  Dr. Edelman does not say.  The construction of the sample presents significant issues.  Consider, for example, the recent attempts to move cases related to the January 6, 2021 storming of the Capitol. In *Garcia v. United States,* Judge Amy Berman Jackson carefully examined attitudinal surveys that had been offered by the defense, finding that, "the first problem with the information the defense has provided is that the surveys did not target the full range of this district's jury pool." *United States v. Garcia*, 2022 U.S. Dist. LEXIS 130890, *27-28 (DDC July 22, 2022).  Judge Berman-Jackson reasoned that the surveys used voter registration records, while the jury wheel used different sources.  *Id.*  Without knowing the basis of Dr. Edelman's sample, it is not clear if it accurately reflects the jury pool in the District of Maryland.  Did he use the general election voter registration rolls from which Maryland juries are drawn?  *See* United States District Court for the District of Maryland, Juror Policies, available at https://www.mdd.uscourts.gov/juror-policies.  Or did Dr. Edelman use some other pre-existing telephone database to which he had access?  One cannot tell from his declaration.

*Second*, the use of a phone survey necessarily captures only a limited number of people and a heavily skewed demographic, which leads to bias in the results of Dr. Edelman's survey.  By his own account, Dr. Edelman placed over 87,000 phone calls, of which only 602 completed the survey.  Frehse Decl., at 6.  This resulted in an abysmal response rate *well less than 1%.*  This low response rate captures a particular portion of the population: those likely to be civically active and more likely to read the news.  *See* Frehse Decl., at 6. "Phone surveys suffer from inherent bias,

which if not adjusted for, may lead to an inaccurate representation of the population.  It appears that Dr. Edelman did not adjust his findings to address the biases inherent in phone surveys." *Id.* at 6.  Without any adjustment for the bias of phone surveys, Dr. Edelman's declaration thus exaggerates how informed the population is about these matters because the tiny sliver of the population willing to complete a phone survey is not representative of the larger population.

*Third*, the questions in Dr. Edelman's survey were leading in nature and therefore encouraged respondents to believe that Ms. Mosby was corrupt or guilty, even when no pre-existing notion may have been present in the respondent.  Consider, for example, the question asking respondents if various officials, including the defendant, were "very corrupt, somewhat corrupt, not too corrupt, or not at all corrupt."  *See* ECF 212-1, at 46-47.  Even putting aside the patent absurdity of what qualifies as a "not too corrupt" public official, the wording of the survey questions is deeply problematic and phrased to elicit a particular response, and to encourage the idea that public officials are corrupt.  There are three levels of corruption to choose from, and even the fourth choice includes the word "corrupt."  Frehse Decl. 7.  Moreover, this was the first question in the survey.  Thus, "from this point forward in the survey, the respondent has already been exposed to negative bias about Ms. Mosby, and may look at each subsequent question through the lens of corruption." *Id.* at 7.

The true/false questions that follow all have similar problems in construction. Consider, for example, "Have you read, seen, or heard if Marilyn Mosby failed to disclose a lien for unpaid taxes on the mortgage applications for the Florida homes?"  ECF 212-1, at 50.  Such a question encourages respondents to believe, as a fact that the defendant failed to disclose the lien. Or the question, "Have you read, seen, or heard if Marilyn Mosby's tenure as Baltimore's State Attorney was surrounded by controversy?"  ECF 212-1, at 22.  Leading questions such as these encourage

the respondent to give a particular answer and to assume the defendant's guilty.  By the close of the survey, when additional open-ended questions are asked, the respondent has been primed to answer in the negative regarding the defendant.  "The structure of these questions and survey appear to lead respondents to provide answers that will support the position that the pretrial publicity has affected the jury pool."  Frehse Decl., at 8.

Perhaps most deeply flawed is a question that Dr. Edelman and the defendant lean on heavily: "Given what you have read, seen, or heard about Marilyn Mosby, would she have a difficult time convincing you that she is not—repeat is not—guilty of making false statements that she suffered financial hardship during the pandemic?"  ECF 212-1, at 47; ECF 212, at 21; ECF 212-1, at 34.  But of course, this question improperly shifts the burden of guilt onto the defendant, and so invites a biased response.  In the United States of America, no defendant ever has to "convince[] you that she is not—repeat is not—guilty"; all defendants are presumed innocent and the government always bears the burden.  Creating a Kafkaesque counterfactual world, better suited to the Queen of Hearts than to a federal courtroom, necessarily invites unreliable results.  *See* Lewis Carroll, Alice's Adventures in Wonderland 96 (Donald J. Gray ed., W.W. Norton 2d ed 1992) (1865) ("Sentence first--verdict afterwards").  And this is not the first time Dr. Edelman's surveys have so suffered.  Just last year, the Eastern District of Washington rejected a similar survey by Dr. Edelman, stating: "In other words, over half of the respondents in the Yakima area who recognized this case stated a bias against the Defendants. But the Court notes that as framed, the *survey question impermissibly shifts the burden of proof from the Government* to the Defendants. While these results are concerning, the Court gives them minimal weight." *United States v. Cloud*, 2021 U.S. Dist. LEXIS 261090, at *9 (E.D. Wash. July 27, 2020).  This Court should do the same, and give these deeply flawed results that rely on this question "minimal

weight." *Id.*

*Fourth*, many of the respondents' open-ended answers were not specific and may not be referring to Ms. Mosby at all, despite the cherry-picking of answers in Dr. Edelman's report. *Every* open-ended response given by Dr. Edelman came only *after* the initial questions asking respondents to quantify how "corrupt" the defendant was. *See* Frehse Decl., at 9. Thus, there is little surprise that after being primed with repeated invocations of the word "corrupt," respondents were willing to agree.[2]

It appears that the word "corrupt" would have been said a minimum of four times and could have been said up to sixteen times (depending on how the questions were read by the surveyor) on these calls prior to soliciting any open-ended responses regarding the defendant. Freshse Decl., at 9. What's more, a review of some of the answers indicate that respondents who gave some of the most "negative" assessment of the defendant were not actually sure whom they were talking about. *Id.* Respondents were confused about whether they were discussing a man or women. *Id.* One respondent stated "I DON'T LIKE MONETARY INEQUALITY." *Id.* Another, who claimed to have strongly negative views, stated that "I DON'T KNOW" about the defendant; another stated at the end "I have no personal opinion." *Id.* There appears to be no attempt by Dr. Edelman to reconcile these comments with the supposed negative feelings held by the person polled. These inconsistent comments support the conclusion that the survey itself primed individuals to give negative answers to their feelings about the defendant, regardless of their actual knowledge about the defendant. Frehse Decl. 9.

*Fifth*, the survey fails to ask the most critical question in seating a fair jury: could a potential

---

[2] Dr. Edelman did not include the full data set in his report. However, the defense has produced the full data set to the government upon its request. Because the data set is large and in a raw format, it is not included here as an attachment. But if the Court wishes to review the raw data, the government can provide it in spreadsheet format.

juror set aside their impressions and judge fairly based only on the evidence presented before them in Court?  This is not the first time Dr. Edelman's survey has failed to ask this critical question. *See Asuncion,* 2018 U.S. Dist. LEXIS 168319, at *64 ("There were no questions as to whether a respondent could set aside his or her initial impressions and judge the defendants fairly if they were called upon to act as jurors.").  Indeed, the failure to inquire whether jurors can put aside prejudice is a fatal flaw in Dr. Edelman's methodology—and one that has been pointed out to him previously by Court's when he has sought to support transfer. "The court believed Edelman's findings overstated the percentage of potential jurors who had truly 'prejudged' defendants in the sense that they would be unable to set aside their preexisting impressions and give defendants a fair trial, observing that it had 'great skepticism' about Edelman's conclusions and actually thought he was 'wrong.' *Asuncion*, 2018 U.S. Dist. LEXIS 168319 at *76.  Indeed, that question—can a potential juror put aside any knowledge and judge based solely on the facts established in court and the law as instructed by the Judge—goes to the heart of the voir dire process, one which Dr. Edelman almost wholly discounts.  As another District Court has properly declared in dismissing Dr. Edelman's findings: "We will not ignore that [voir dire] process in ruling on the appeal, as defendants would have us do—and as Edelman did." *Id.* at *96.

Like the media survey, the telephone survey similarly suffers from fundamental methodological flaws that render its results unreliable.  For good reason, other courts have not relied on similar surveys conduct by Dr. Edelman that suffer from the same flaws.  This Court should similarly not place any weight on these unreliable results.

4.  **Even Taken on Its Face, the Survey Results Do Not Support an Intra-District Transfer.**

Even turning a blind eye to the numerous glaring methodological flaws in Dr. Edelman's surveys, the results do not support an intra-district transfer.  *First*, Dr. Edelman failed to include

any standard error calculation in his results, and so it is difficult to determine the actual magnitude of the difference in population he claims exists. *See United States v. Garcia*, 2022 U.S. Dist. LEXIS 13089, at *8 (discussing "[t]he margin of error for the sample of 400 DC registered voters is +/- 5 percentage points from a universe of emails of such registered voters" in the Zogby poll in that case).

*Second*, *in the Northern Division 44% of all respondents had never even heard of the defendant*. *See* Frehse Decl. at 6. This Court sent out a pre-trial questionnaire in this matter. Even assuming Dr. Edelman's flawed survey to be accurate, almost half the jury population has never even heard of the defendant, let alone formed any opinion about her. Surely, this will give ample individuals from whom to pick a jury.

What's more, Dr. Edelman's assessment gives almost no weight to the voir dire process the Court can conduct as well. Another Court that considered Dr. Edelman's support for transfer put it succinctly: the Court "questioned 'a lot of the baseline assumptions [Dr. Edelman] was making about this Court's or any court's ability to ferret out prejudice.' The court noted that 'a lot' of Edelman's testimony was 'inconsistent with my own lived experience as a lawyer and a judge in this county,' and it also disagreed with Edelman's comments about 'jurors' unwillingness to be forthright during voir dire,' saying, 'It's just not my experience.'" *Mackey v. Asuncion*, 2018 U.S. Dist. LEXIS 168319, *68 (N.D. Cal. 2018). Surely, the voir dire process and juror questionnaire can select a jury when almost half the jury pool – according to the defendant's own expert – has never even heard of the defendant. *See United States v. Halderman*, 559 F.2d 31, 46, n.42 (D.C. Cir. 1976) (*"the trial court did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures,

practices and principles developed by the common law since the reign of Henry II").

This Court recognized the critical role the voir dire process plays when it denied the

defendants first motion:

> The Court is confident that any prejudice or bias present due to pre-trial publicity
> can be effectively addressed by this voir dire process. To the extent that there is any
> doubt about this, it is appropriate for the Court to conduct the voir dire of
> prospective jurors first, to determine if actual prejudice exists in this case. To extent
> that such prejudice is found, Defendant may renew her motion to transfer venue at
> that time.

ECF 171, at 11.[3]

### 5.  Witnesses are Located in The Northern Division, and Moving to the Southern Division Risks Delay.

The Defendant accurately states that her previous counsel garbled the standard for an intra-

district transfer.  *See* ECF 212, at 17 n.5.  In fact, "there is no constitutional right to trial within a

division."  *United States v. Florence,* 456 F.2d 46, 50 (4th Cir. 1972); *see United States v.*

*Anderson*, 328 U.S. 699, 704, 705 (1946); *Barrett v. United States*, 169 U.S. 218 (1898); *Lafoon*

*v. United States*, 250 F.2d 958 (5th Cir. 1958); *Carrillo v. Squier*, 137 F.2d 648 (9th Cir. 1943);

*McNealey v. Johnston*, 100 F.2d 280, 282 (9th Cir. 1938); *cf. Platt v. Minn. Mining &*

*Manufacturing Co.*, 376 U.S. 240 (1964).  Therefore, the defendant's argument boils down to this:

the Court *could* transfer the case to the Southern Division, but it need not do so.  *See* ECF 212, at

17.  And here, the factors in Rule 18 counsel in favor of the trial remaining as scheduled: in the

Northern Division.

First, the "convenience of the defendant" cuts in favor of the Northern Division, as the

---

[3] The Government notes that while the Court dismissed the defendant's prior motion for change of venue without prejudice, ECF 171, at 1, it allowed the defendant to "renew her motion to transfer" only after voir dire has taken place ("at that time.").  The defendant has not waited as directed but rather responded prior to the voir dire process envisioned in the Court's decision, and therefore the entire motion is arguable unripe at this time for consideration under the Court's prior order.

defendant lives in Baltimore, though this factor does not matter, as the defendant has waived this particular right. *See* ECF 212, at 24. Second, while the defendant claims that witnesses will likely not be inconvenienced, ECF 212, at 25, this is incorrect. While some potential witnesses may come from abroad, others, including the defendant's former spokesperson, three of her attorneys who issued statements on her behalf, and individuals associated with the Baltimore retirement and payroll systems all live or work in the Northern Division (and often within the City of Baltimore in particular), and the added travel time, particularly given that they may have to remain in Greenbelt so they can be ready to testify (rather than staying in their office that is close by) poses a significant inconvenience.

Even more problematic, transfer to the Southern Division presents the distinct risk that this case will be further delayed and the "the prompt administration of justice" will therefore suffer. Fed. R. Crim. P. 18. Because of the public nature of this case, the parties long-ago agreed to a pretrial survey, which will help to remedy some of the potential issues raised by Dr. Edelman. *See* ECF 171, at 10 ("A comprehensive juror questionnaire has been developed for this case to aid the parties and the Court in identifying any bias and impact of pre-trial publicity on the jury selection process."). But the trial date is now less than ninety days away. It is not clear that the Clerk's Office could organize an extra-large venire panel and send out a new survey, tabulate results, and call in the appropriate panel in time if the trial were to be moved to Greenbelt. Indeed, on previous occasions, the Court has discussed the difficulty in scheduling due to the need for a pretrial survey and an increased venire.[4]

---

[4] While the precise amount of time the Clerk's Office needs is better known to the Court rather the government, it appears from the Court's statements that the questionnaire must be mailed at least sixty (60) days before jury selection begins. *See* ECF 171, at 11 (noting on January 17, 2023, that the questionnaire will "be sent to prospective jurors in just a few days to begin the process of jury selection in this case), with trial then scheduled to begin March 23, 2023. As of now, this motion is scheduled to be argued on September 8, 2023, ECF 214, at 2, with Jury Selection to begin October 31, 2023. *Id.* That means that even if the Court were to grant this motion on the day of oral argument, the Clerk's Office would be left with only 52 days to prepare and mail the questionnaires to potential jurors, have jurors

And if the case were moved at this late date and there were insufficient time for a new jury pre-trial questionnaire and increased venire, then the problems which the defendant claims—jurors who already have prejudged the case—would perversely only increase, because there would be no opportunity to screen the Greenbelt venire prior to its arrival in the courthouse.

This case has already been delayed on numerous occasions.  It is time to try the case where the witnesses are, where the defendant lives, and where the Court is ready to try the case: in the Northern Division.  Courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  Surely this case, in which nearly half of the Northern Division pool (by the defendant's own contention) has never even heard of the defendant, should not be transferred either.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of Enron Corporation CEO); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks).

---

fill out the questionnaire, return the questionnaire to the Court, tabulate responses, disseminate to counsel, determine which jurors should be struck for cause based on the questionnaire, and communicate the same back to the jurors.

## CONCLUSION

For the reasons given above, the defendant's motion should be denied.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

By: _____/s/_____
Sean R. Delaney
Aaron S.J. Zelinsky
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

           /s/_____
Aaron S.J. Zelinsky
Assistant United States Attorney