# Declaration of John Frehse

In the matter of

United States v. Marilyn Mosby

August 11, 2023

Privileged & Confidential

Declaration of John Frehse                                                                     Privileged & Confidential

**TABLE OF CONTENTS**

I.   PROFESSIONAL BACKGROUND AND SCOPE OF ASSIGNMENT ................................. 2

II.  BACKGROUND ................................................................................................................ 3

III. SUMMARY OF OPINIONS ............................................................................................... 4

IV.  PHONE SURVEYS ONLY CAPTURE A LIMITED NUMBER OF PEOPLE AND A HEAVILY SKEWED DEMOGRAPHIC, WHICH LEADS TO BIAS IN THE RESULTS OF DR. EDELMAN'S SURVEY. ................................................................................................ 4

V.   DR. EDELMAN'S RELIANCE ON "ARTICLES PUBLISHED IN NEWSPAPERS" IN HIS ANALYSIS OF PRETRIAL PUBLICITY MAY OVEREMPHASIZE THE IMPACT ON POTENTIAL JURORS. ........................................................................................................ 6

VI.  THE LANGUAGE IN DR. EDELMAN'S SURVEY QUESTIONS IS OFTEN LEADING IN NATURE AND COULD LEAD SURVEY PARTICIPANTS TO BELIEVE THAT MS. MOSBY WAS CORRUPT OR GUILTY, EVEN WHEN NO PRE-EXISTING NOTION MAY HAVE BEEN PRESENT. ........................................................................................................................ 7

VII. A REVIEW OF THE FULL SET OF SURVEY RESPONSES SHOWS THAT MANY RESPONDENTS' OPEN-ENDED ANSWERS WERE NOT SPECIFIC AND MAY NOT BE REFERRING TO MS. MOSBY AT ALL. .......................................................................... 9

**I.   PROFESSIONAL BACKGROUND AND SCOPE OF ASSIGNMENT**

1. I am a Senior Managing Director with Ankura Consulting Group, LLC ("Ankura") in their New York City office. My business address is 485 Lexington Avenue, 10th Floor, New York, NY, 10017. I was retained by the United States Department of Justice ("DOJ") to provide opinions in connection with the matter of United States v. Marilyn Mosby. Specifically, I was asked to provide opinions related to the Declaration of Bryan Edelman[1] ("Declaration") regarding the Renewed Motion for Intra-District Transfer to the Southern Division[2] ("Motion").

2. I am an advisor to Ultimate Kronos Group (UKG) and sit on the board of the Workforce Institute, their think tank. I have more than 25 years of experience focused on labor and operations strategy. As part of this experience, I have developed a specialty in administering surveys that solicit accurate responses and have surveyed over 100,000 hourly and salaried employees across many industries. I have led the evaluation of over 1,000,000 survey data points to help leadership teams at these entities understand workforce culture at all levels across the organization. To get actionable data my perpetual focus is on bias and had to avoid misinformation while gathering anonymous data through surveys. My clients make million-dollar decisions, and sometimes hundreds of millions of dollars in investments based on what we learn through our survey process. My CV, attached as Appendix I, describes my professional experience in greater detail.

3. Ankura is compensated for my time and the time of other Ankura professionals working under my direction in the development of this Declaration. My rate in this matter is $650 per hour and the rates of other professionals range from $450 to $650 per hour. Any compensation or payment to Ankura is not contingent upon my opinions and conclusions, nor on the outcomes of this case.

4. I was retained on this matter by Counsel to review the Declaration of Bryan Edelman, as well as the survey and related data which are at issue in this Motion, and to offer my observations and opinions, as an expert in surveys and survey administration, about some of the positions and arguments therein.

---

[1] Declaration of Bryan Edelman, Ph.D., dated June 29, 2023.
[2] Renewed Motion for Intra-District Transfer to the Southern Division, filed June 30, 2023.

5. In forming my opinions, I have reviewed and relied upon documents produced related to this Motion, as well as my own independent research of relevant literature. These documents are collectively referred to as the "Documents Relied Upon."

6. The facts and opinions in this Declaration are true and correct based on my review of the Documents Relied Upon and my review of this matter. A listing of the Documents Relied Upon is attached as Appendix II. While my review and opinions are complete at this time, I reserve the right to amend this Declaration based upon any new information that comes to my attention during the course of this matter. I also reserve the right to develop diagrams or other demonstratives to facilitate the communication of the opinions that I offer in this Declaration.

## II. BACKGROUND

7. Marilyn Mosby is a former state's attorney who is facing trial in Baltimore, Maryland and for whom the Defense is seeking a change in venue. As part of this motion, Ms. Mosby, "retained Dr. Bryan Edelman to study the effects that pretrial publicity has had on the potential jury pool in the Northern Division."[3,4]

8. Dr. Edelman describes his responsibilities in being retained as follows:

> *[R]esearch and evaluate: (1) whether there was extensive and prejudicial pretrial publicity regarding allegations that the former Baltimore State Attorney fraudulently withdrew money from a retirement account during the Covid pandemic to purchase property in Florida and committed perjury; (2) determine if the media coverage has impacted the defendant's ability to obtain a fair and impartial jury in the Northern Division of the District of Maryland; and (3) based on the findings, recommend appropriate remedial measures—for example, a change of venue or intra-district transfer—to protect the Mosby's ability to be tried by a fair and impartial jury. As part of my analysis, I evaluated relevant newsprint, television, and social media coverage surrounding these events and conducted a community attitude survey in the Northern and Southern Divisions of the District of Maryland. These surveys were designed to assess case recognition, familiarity with prejudicial media content, and bias.[5]*

---

[3] Renewed Motion for Intra-District Transfer to the Southern Division, filed June 30, 2023 (page 5).
[4] The "Northern Division" of the District of Maryland, includes "Baltimore City and outlying counties." Renewed Motion for Intra-District Transfer to the Southern Division, filed June 30, 2023 (page 2).
[5] Declaration of Bryan Edelman, Ph.D., dated June 29, 2023 (page 1).

Declaration of John Frehse                                                   Privileged & Confidential

### III. SUMMARY OF OPINIONS

9. Throughout my involvement in this engagement, I have formed the following opinions based upon my review of the Documents Relied Upon and my education, training, knowledge, experience, and expertise. Each of these opinions is discussed in greater detail in subsequent sections of this Declaration.

   a. Phone surveys only capture a limited number of people and a heavily skewed demographic, which leads to bias in the results of Dr. Edelman's survey.

   b. Dr. Edelman's reliance on "Articles Published in Newspapers" in his analysis of pretrial publicity may overemphasize the impact on potential jurors.

   c. The language in Dr. Edelman's survey questions is often leading in nature and could lead survey participants to believe that Ms. Mosby was corrupt or guilty, even when no pre-existing notion may have been present.

   d. A review of the full set of survey responses shows that many respondents' open-ended answers were not specific and may not be referring to Ms. Mosby at all.

### IV. PHONE SURVEYS ONLY CAPTURE A LIMITED NUMBER OF PEOPLE AND A HEAVILY SKEWED DEMOGRAPHIC, WHICH LEADS TO BIAS IN THE RESULTS OF DR. EDELMAN'S SURVEY.

10. Dr. Edelman's Declaration is largely based upon findings from a phone survey he conducted with 602 respondents (402 from the Northern Division and 200 from the Southern Division).

11. As indicated by the research below, phone surveys often suffer from non-response bias, meaning that certain demographics are much more likely to respond to these surveys, and as a result have a bias towards those demographics. This non-response bias can be seen for many demographics that would be relevant to the selection of a jury pool and the effects of pretrial publicity. Some of the non-response biases on phone surveys identified by researchers include the following:

Civic activists or those highly engaged in community matters are more likely to respond to phone surveys.[6]

---

[6] Pew Research Center, "What Low Response Rates Mean for Telephone Surveys," dated May 15, 2017.

Declaration of John Frehse                                                      Privileged & Confidential



Highly political people are much more likely (up to 15 points more) to participate in a phone survey than those who do a government survey.[7]



12. Those who are civically active or highly political are much more likely to be aware of stories related to Ms. Mosby than a typical citizen, and therefore skew the results of Dr Edelman's survey. That would also mean that a large portion of the media-disengaged population and those less likely to respond to phone surveys were missed. Ultimately, research indicates that phone surveys suffer from inherent bias, which if not adjusted for, may lead to an inaccurate representation of the population. It appears that Dr. Edelman

---

[7] Pew Research Center, "What Low Response Rates Mean for Telephone Surveys," dated May 15, 2017.

did not adjust his findings to address the biases inherent in phone surveys. In fact, it appears Dr. Edelman selected specific negative responses to include in his Declaration, further accentuating the inherent bias.

13. While the possibility exists that Northern District citizens may be more aware of the case than some other area, the phone survey results do not reflect the full population, as Dr. Edelman's survey had only a 0.690% response rate in Northern Division (Baltimore) and 0.686% in the Southern Division (Greenbelt).[8,9] To arrive at 602 respondents, 87,429 calls were placed.[10] Of this small respondent pool, only 55.6% of respondents answered affirmatively when asked, "Have you read, seen, or heard of former Baltimore state attorney Marilyn Mosby?"[11]

14. Considering the extremely low response rate, the low recognition rate of Ms. Mosby, the traditional demographics of phone survey respondents, and total sample size, the results of this exercise do not yield any significant conclusions about how pretrial publicity impacted the potential jury pool in both Baltimore and Greenbelt.

V. **DR. EDELMAN'S RELIANCE ON "ARTICLES PUBLISHED IN NEWSPAPERS" IN HIS ANALYSIS OF PRETRIAL PUBLICITY MAY OVEREMPHASIZE THE IMPACT ON POTENTIAL JURORS.**

15. Dr. Edelman describes his "Media Analysis" stating that a "careful effort was made to collect the articles published in newspapers with circulation in the Northern Division of the District of Maryland to assess the extent of coverage surrounding Marilyn Mosby and this case. A search of 14 newspapers with coverage in the Baltimore area uncovered 262 articles published between January 13, 2022 and May 16, 2023."[12]

16. When reviewing the impact of a range of media outlets on a potential jury pool, it is critical to understand the reach and influence of these institutions. Dr. Edelman's Declaration cites print media articles and attempts to emphasize their impact and importance in this case. However, since the early 1990s, print media readership has been in decline

---

[8] These percentages were taken by dividing the number of respondents who completed the survey, by the total number of calls in each market. See Baltimore Greenbelt – Disposition Report.pdf.
[9] Pew Research Center found that typical response rates for telephone polls stabilized around 9% from the period 2012-2016. See Pew Research Center, "What Low Response Rates Mean for Telephone Surveys," dated May 15, 2017.
[10] Baltimore Greenbelt – Disposition Report.pdf.
[11] This percentage is calculated by taking the 335 respondents who answered affirmatively to Question 2a, divided by the total respondent population of 602. See *Raw data.csv*
[12] Declaration of Bryan Edelman, Ph.D., dated June 29, 2023 (page 9).

including a 6% decrease from 2019 to 2020 alone.[13] The majority of American consumers use newspapers **less than once per month**.[14] As a result, any impact from print media in this case is on a smaller portion of the potential jury pool and is skewed to older populations.[15]

17. Dr. Edelman also says that his analysis "indicates that the Northern Division jury pool has been saturated with prejudicial coverage surrounding Marilyn Mosby." Given that there is no reference to the number of articles related to Marilyn Mosby that were not prejudicial (which may be considerable given her status as a state attorney), or what percentage these "prejudicial" articles make up of all articles printed by those publications in the same period, stating that the jury pool has been saturated with prejudicial coverage seems unsupported.

VI. **THE LANGUAGE IN DR. EDELMAN'S SURVEY QUESTIONS IS OFTEN LEADING IN NATURE AND COULD LEAD SURVEY PARTICIPANTS TO BELIEVE THAT MS. MOSBY WAS CORRUPT OR GUILTY, EVEN WHEN NO PRE-EXISTING NOTION MAY HAVE BEEN PRESENT.**

18. As part of Dr. Edelman's survey, respondents were asked both multiple-choice questions and questions which allowed the respondents to answer in an open-ended format. Based on my review of the questionnaire script provided in Dr. Edelman's Declaration,[16] I believe the questions were written to put Ms. Mosby in a negative light and solicit responses that would show an existing bias towards Ms. Mosby in the Northern District.

19. This negative tone is pervasive throughout the survey and can be seen from the earliest parts of the questionnaire script. For example, the survey was described to respondents as relating to an "upcoming case" in the community, which was followed by the first series of questions asking respondents to describe how corrupt an assortment of local, state, and federal representatives (including Ms. Mosby) were on a scale of "very **corrupt**, somewhat **corrupt**, not too **corrupt**, or not at all **corrupt**."[17] Three of the response options indicated some level of corruption, and four potential responses included the word "corrupt." and as this is the first question, from this point forward in the survey, the respondent has already been exposed to negative bias about Ms. Mosby, and may look at each subsequent question through the lens of corruption. Furthermore, while one could

---

[13] Pew Research Center – News Papers Fact Sheet, dated June 29, 2021.
[14] Statista.com - Frequency of newspaper consumption in the U.S. 2022, by age group, dated May 11, 2023.
[15] Statista.com - Frequency of newspaper consumption in the U.S. 2022, by age group, dated May 11, 2023.
[16] Declaration of Bryan Edelman, Ph.D., dated June 29, 2023 (pages 46-57).
[17] Declaration of Bryan Edelman, Ph.D., dated June 29, 2023 (pages 46-47).

7

claim that this question is to set a baseline against other public representatives, it may also lead the respondent to associate any negative feelings or opinions associated with one of the other public representatives mentioned, to the group as a whole.

20. Dr. Edelman's survey introduces negative bias towards Ms. Mosby from the first question and later questions in the survey are no exception. Each of the multiple-choice questions below is educating the participants on potential wrong-doing and continuing to instill a negative bias towards Ms. Mosby. This is evident when reviewing a sample of Dr. Edelman's questions for the statements made in them (bolded/underlined text):

> *Question: Have you read, seen, or heard if **Marilyn Mosby used the money from her retirement account to purchase two homes in Florida**? [emphasis added]*
>
> *Question: Have you read, seen, or heard if **Marilyn Mosby failed to disclose a lien for unpaid taxes on the mortgage applications for the Florida homes**?[emphasis added]*
>
> *Question: Have you read, seen, or heard if **Marilyn Mosby told investigators before the pandemic started that her travel company was not operating and had no income**? [emphasis added]*
>
> *Question: Have you read, seen, or heard if **Marilyn Mosby's tenure as Baltimore's State Attorney was surrounded by controversy**? [emphasis added]*
>
> *Question: Have you read, seen, or heard if **Marilyn Mosby was under investigation during her tenure as Baltimore's State Attorney**? [emphasis added]*
>
> *Question: Have you read, seen, or heard if **there had been an investigation into the travel business Marilyn Mosby started when she was in office**? [emphasis added]*

21. It is my opinion that the negative bias in Dr. Edelman's questions and throughout the language in the survey would have an effect on participant responses. In my experience administering surveys, the language in the questions and order of questions is critical in receiving accurate feedback. The structure of these questions and survey appear to lead respondents to provide answers that will support the position that the pretrial publicity has affected the jury pool.

## VII. A REVIEW OF THE FULL SET OF SURVEY RESPONSES SHOWS THAT MANY RESPONDENTS' OPEN-ENDED ANSWERS WERE NOT SPECIFIC AND MAY NOT BE REFERRING TO MS. MOSBY AT ALL.

22. Dr. Edelman's Declaration references specific open-ended responses that certain respondents gave related to Ms. Mosby. The responses referenced in Dr. Edelman's Declaration were selected due to their particularly strong language, or in many instances because they described her as a "corrupt" public official. The problem with cherry picking these responses, however, is that they aren't necessarily representative of the whole population. Furthermore, <u>all</u> of these open-ended responses appear to have come after the initial questions asking respondents to quantify how "corrupt" Ms. Mosby was (see Section V above), so seeing the term "corrupt" after that initial series of questions is not unexpected. It appears that the word <u>"corrupt" would have been said a minimum of four times and up to 16 times</u> (depending on how the questions were read by the surveyor) on these calls prior to soliciting any open-ended responses regarding Ms. Mosby.[18]

23. In reviewing the full population of open-ended responses, I saw that there was a full range of responses, including those who had positive opinions of Ms. Mosby, expressed no opinion, or gave such generic responses that it was unclear what their opinion was based on and whether it even related to Ms. Mosby.

24. Of the 602 respondents, only 335 initially said they had ever "read, seen, or heard of former Baltimore state attorney Marilyn Mosby."[19] After those 335 respondents were asked to give their opinion of Ms. Mosby from "Very Positive" to "Very Negative" and then describe why they felt that way in an open-ended response. The following examples are a selection of those open-ended responses exclusively from individuals who said they have a "Negative" or "Very Negative" opinion of her, which demonstrate that even those with supposedly negative opinions, gave responses that were in many cases generic, unrelated, or appeared as though the respondent was not even aware of who they were talking about including thinking she was a he:[20]

> *"because honestly a lot of politicians I don't like him whether he is states attorney or county executive or a president or a Governor. the most part they are corrupts, and I don't like anyone."*

---

[18] Question #1 of Dr. Edelman's Survey states, "As I read each one, please tell me if you believe they are very corrupt, somewhat corrupt, not too corrupt, or not at all corrupt" and is then asked of four different individuals. If the answer options are provided after each individual, the respondents would have heard the word corrupt at least 16 times.
[19] Raw data.csv
[20] Open-ended Responses.xlsx

9

> *"I just think, basically anyone in the position of political power is there for their own deed, despite what the position should be, it's about how to benefit themselves."*
>
> *"I DON'T LIKE MONETARY INEQUALITY"*
>
> *"i think she probably did work excuses but im not sure"*
>
> *"I've been in Baltimore City for how many years so I have known her"*
>
> *"I DONT KNOW"*
>
> *"ahhmm in negative i dont have any opinion"*
>
> *"She doesn't do her job well. She needs to learn more about financial management"*
>
> *"i have no personal opinion"*
>
> *"Baltimore has gotten worse over the past 10 years, crime is expanding, jobs are hardest to find and Baltimore nothing gotten better over the years"*
>
> *"Because"*

25. Reviewing the open-ended responses of those who said they had a positive opinion or no opinion of Ms. Mosby offers an even larger variety of responses, which are not addressed in Dr. Edelman's Declaration and which would need to be considered in any survey analysis.

*******

I declare under penalty of perjury under the laws of the State of Maryland that the foregoing facts are true and correct, except as to facts stated upon information and belief, which facts I believe to be true.

_John Frehse_
John Frehse
Dated: August 11, 2023

# Appendix I

Privileged & Confidential

![ankura]

# John Frehse

Senior Managing Director

485 Lexington Avenue, 10th Floor | New York, NY 10017



**Contact**

Direct   +1.212.534.0539
Mobile   +1.415.672.4271
john.frehse@ankura.com

**Education**

BA, Wake Forest University

John Frehse is a Senior Managing Director at Ankura, based in the New York office. He has more than 20 years of experience focused on labor and operations strategy. John has developed and implemented strategies for more than 100 companies, and he delivers to corporate leaders innovative labor solutions that incorporate solutions to employee needs. His work has spanned a wide range of industries, including food and beverage, automotive, chemical, electronics, pharmaceuticals, power, call centers, banking/insurance, distribution, telecommunications, mining, government and healthcare.

John's professional philosophy is that people are the most valuable resource of every company. His experience has proven that in order to create long-term success, a thoughtful and methodical approach to labor must be created. Before joining Ankura, John was a founding partner of Core Practice LLC, an international labor strategies firm. Prior to that, he was head of Global Strategic Services Sales for Blue Pumpkin Software, now known as Verint. His clients included the manufacturer of automobile driveline and drivetrain components and systems, a multinational food manufacturing and processing conglomerate, and a Canadian telecommunications and media company.

John sits on the board of The Workforce Institute and is a thought leader for its think tank. He is also a member of the advisory board for HR.com's Workforce Management practice, where he educates management teams on union negotiation strategies and employee engagement methodologies.

Examples of his professional experience include:

- Evaluation of over 1,000,000 survey data points to help leadership teams understand workforce culture at both the hourly and executive level
- The transformation of one of the worlds largest automotive manufactures through employee survey assessments to understand labor perceptions in the area.
- Senior leadership advisory work on labor strategies for major poultry processor in North America
- Shift schedule and labor policy development for a grower of produce for North America
- Labor strategy for the warehouse and distribution operation of a leading Canadian food operation

1

# Appendix II

Case 1:22-cr-00007-LKG   Document 222-1   Filed 08/11/23   Page 14 of 15

Declaration of John Frense

Privileged & Confidential

# Appendix II
# Documents Relied Upon

| File Description |
| --- |
| Declaration of Bryan Edelman, Ph.D., dated June 29, 2023. |
| Renewed Motion for Intra-District Transfer to the Southern Division, filed June 30, 2023. |
| Baltimore Greenbelt – Disposition Report.pdf. |
| Raw data.csv |
| Open-ended Responses.xlsx |
| Pew Research Center – News Papers Fact Sheet, dated June 29, 2021. |
| Pew Research Center, "What Low Response Rates Mean for Telephone Surveys," dated May 15, 2017. |
| Statista.com - Frequency of newspaper consumption in the U.S. 2022, by age group, dated May 11, 2023. |