United States District Court for
the District of Maryland

**United States**

v.                                           No. 1:22-cr-7-LKG

**Marilyn Mosby**

**Marilyn Mosby's Requested CARES Act Jury
Instructions and Brief in Support**

Pursuant to the Court's August 1, 2023 order, *see* ECF 221, Marilyn Mosby files her proposed CARES Act-related jury instructions and supportive briefing. Mrs. Mosby's proposed CARES Act-related jury instructions are embedded in this filing and, for convenience, attached collectively in Exhibit 1.

Mrs. Mosby's instructions are accurate summations of the CARES Act and will provide guidance to the jury about how to apply the law. Specifically, Mrs. Mosby's proposals instruct the jury about the CARES Act, including the meaning of "adverse financial consequences," the absence of restrictions on how CARES Act withdrawals could be used, and how the CARES Act allowed withdrawals up to the $100,000 maximum without regard to the amount of the adverse financial consequences experienced. These instructions are necessary because the meaning of "adverse financial consequences"—and Mrs. Mosby's understanding of that term—are at the heart

1

of whether Mrs. Mosby is guilty of perjury as charged in counts one and three. Without these instructions, the jury will have no guidance whatsoever about how to apply the law and Mrs. Mosby will be utterly deprived of the opportunity to put on a defense, particularly as the Court has excluded expert testimony on the CARES Act.

**I.      Procedural background**

On March 10, 2022, a grand jury returned a superseding indictment charging Mrs. Mosby with two counts of perjury, in violation of 18 U.S.C. § 1621. ECF 23 at 1-5, 11-14. Those counts allege that on two occasions in 2020, Mrs. Mosby submitted paperwork to Nationwide, the company that manages her City of Baltimore employee retirement account, asking to withdraw funds from her account. Ordinarily, enrollees in "457(b) plans," like Mrs. Mosby's, can make early withdrawals only when they leave government service or experience "unforeseen emergencies that meet certain legal criteria." *Id.* at 1. But in the Coronavirus Aid, Relief, and Economic Security (CARES) Act of 2020, Congress permitted 457(b) enrollees to take "coronavirus-related distributions" (CRDs) in calendar year 2020 if they

> experience[d] adverse financial consequences as a result of being quarantined, being furloughed or laid off or having work hours reduced due to [covid], being unable to work due to lack of child care due to such virus or disease, closing or reducing hours of a business owned or operated by the individual due to such virus or disease, or other factors as determined by the Secretary of the Treasury (or the Secretary's delegate).

CARES Act, Pub. L. 116-136, § 2202(a)(4)(A)(ii)(III), 134 Stat. 281, 341 (2020).

On the forms she submitted to Nationwide, Mrs. Mosby checked a box indicating she was eligible to make an early withdrawal because she had suffered "adverse financial consequences stemming from [covid-19] as a result of" one of the four circumstances enumerated in § 2202 of the CARES Act. *Id.* at 2-3, 11-12. The indictment alleges these certifications were false because

Mrs. Mosby had not in fact experienced any pandemic-related "adverse financial consequences." *Id.* at 3, 12.

On June 30, 2023, Mrs. Mosby filed a motion asking the Court to resolve a limited number of CARES Act-related jury instructions in advance of trial. ECF 206. She argued that the meaning of "adverse financial consequences"—the term that determined eligibility for a CRD—was unclear, and that clarifying its meaning ahead of trial would permit the parties to better prepare for a fair and efficient trial. *Id.* at 1-3. On August 1, 2023, the Court granted the motion and directed the parties to file "proposed CARES Act-related jury instructions and any supportive briefing" by August 14, 2023. ECF 221 at 1.

**II.     Argument**

**A.     Jury instructions play a vital role in ensuring a defendant receives a fair trial.**

Jury instructions serve a key role in ensuring a defendant receives a fair trial. *See, e.g.*, *United States v. Lemus*, 542 F.2d 222, 224 (4th Cir. 1976) ("An instruction, such as given by the district court, if made in the abstract, would be contrary to prevailing law and would clearly jeopardize defendant's rights to a fair trial."); *Simmons v. Dalsheim*, 702 F.2d 423 (2d Cir. 1983) (holding that trial court's incorrect jury instructions shifted burden of proof, thereby violating petitioner's right to a fair trial).

"The purpose of jury instructions is to instruct the jury clearly regarding the law to be applied in the case." *United States v. Lewis*, 53 F.3d 29, 34 (4th Cir. 1995); *see also United States v. Ribaste*, 905 F.2d 1140, 1143 (8th Cir. 1990) ("The purpose of instructing the jury is to focus its attention on the essential trial issues in the case and inform it of the permissible ways in which these issues may be resolved."), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997); *United States v. Assi*, 748 F.2d 62, 65 (2d Cir. 1984) ("The purpose of jury instructions is to inform the jury clearly and succinctly of the role it is to play and the decisions it must make.").

The Fourth Circuit's statements in *United States v. Lewis*, 53 F.3d 29 (4th Cir. 1995), regarding the vital role of jury instructions, are instructive. In *Lewis*, the Fourth Circuit reviewed the denial of the defendant's requested jury instruction that he could not be convicted for conspiring with a government agent. *Id.* at 32. In overturning the defendant's conviction for failure to give the requested instruction, the Fourth Circuit stated, "Without instructions as to the law, the jury becomes mired in a factual morass, unable to draw the appropriate legal conclusions based on those facts." *Id.* at 34. In other words, jury instructions guide the jury about how to make legal conclusions based upon the evidence.

Jury instructions also play a role in ensuring a defendant can present her defense. *Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."); *see United States v. Hamrick*, 43 F.3d 877, 885 (4th Cir. 1995) (en banc); *Lewis*, 53 F.3d at 34-35. "The right to have the jury instructed as to the defendant's theory of the case is . . . basic to a fair trial . . . ." 9B Fed. Proc., L. Ed. § 22:2303 (June 2023).

A defendant is entitled to an instruction concerning her theory of the case "if the proposed instructions are supported by the evidence adduced at trial and, 'taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law.'" *United States v. Ford*, 500 F. App'x 248, 251 (4th Cir. 2012) (quoting *United States v. Green*, 599 F.3d 360, 378 (4th Cir. 2010)); *accord United States v. Sielaff*, 615 F.2d 402, 403 (7th Cir. 1979) ("The general principle is well established that a criminal defendant is entitled to have a jury instruction on any defense which provides a legal defense to the charge against him and which has some foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility."); *United States v. Anguiano-Morfin*, 713 F.3d 1208, 1209 (9th Cir. 2013) ("A criminal

defendant has a constitutional right to have the jury instructed according to his theory of the case, provided that the requested instruction is supported by law and has *some* foundation in the evidence." (emphasis added)).

In *United States v. Mitchell*, 495 F.2d 285 (4th Cir. 1974), the defendant was convicted of making and subscribing a false tax return by materially understating his income. On appeal, he argued the district court erred in refusing to instruct the jury on two things: first, an agency theory of defense, and second, a good faith defense based on providing all information to a tax preparer. *Id.* at 287. The Fourth Circuit agreed, holding the instructions "should have been granted" given that they were accurate statements of law and had a foundation in the evidence. *Id.* at 287-88. The Fourth Circuit granted a new trial, finding that the failure to give the latter instruction was not harmless. *Id.* at 288; *see also Lewis*, 53 F.3d at 35 (reversing conviction because the trial court's failure to give the defendant's "proposed government-agent instruction seriously impaired [his] ability to present his defense.").

### B. Mrs. Mosby requests that the Court instruct the jury on the contours of "adverse financial consequences."

To assist the jury in assessing the perjury counts, Mrs. Mosby requests that the Court provide the instructions below about the meaning of "adverse financial consequences" and its relationship to the CARES Act. Each requested instruction is accompanied by Mrs. Mosby's reasons for the proposed instruction.

#### 1. Manifestation of "adverse financial consequences"

The Court should instruct the jury as follows:

*At the time Mrs. Mosby submitted her CARES Act withdrawal forms to her 457(b) plan administrator, neither the CARES Act nor the form she submitted defined "adverse financial consequences." Therefore, for Mrs. Mosby to be guilty of perjury (counts one and three), the government must prove beyond a reasonable doubt that Mrs. Mosby submitted her withdrawal forms knowing that she did not suffer adverse financial consequences according to how she understood the term,*

5

> *and that she did so for the purpose of misleading her 457(b) administrator. In other words, the government must prove that, at the time Mrs. Mosby submitted her withdrawal forms, she subjectively believed she had not suffered "adverse financial consequences," as she understood that term. To guide you in making this determination, the Court will provide additional instructions concerning the CARES Act.*
>
> *"Adverse financial consequences," as used in the CARES Act, is not limited to quantifiable monetary losses (like a reduction in salary or income from a job). The term can also include other types of financial consequences that are difficult or impossible to quantify or measure with particularity, such as lost or damaged business opportunities, unrecouped start-up business costs, unrecouped business expenditures, business transition costs, and the loss of expected revenue or income.*

The government has argued the jury can conclude that Mrs. Mosby did not suffer adverse financial consequences because covid did not cause a reduction in her salary. *See* ECF 26 at 5; ECF 72 at 13. Indeed, that is the theory of falsity laid out in the indictment. ECF 23 at 3 (alleging in count one that, "[r]ather than experiencing a reduction in income in 2020, Mosby's gross salary in 2020 increased over her gross salary in 2019"); *id.* at 14 (alleging in count three that Mrs. Mosby's statement was false because she "received her full salary . . . from January 1, 2020, through the date on which she signed th[e relevant] form . . . in bi-weekly gross pay direct deposits . . . and had not experienced any of the enumerated financial hardships she claimed to have experienced"). If Mrs. Mosby had experienced any of the circumstances enumerated in § 2202 of the CARES Act (e.g., furlough, reduced work hours, etc.), then in the government's view, "[her] salary would have decreased." ECF 72 at 13.

To the contrary, nothing in the text of the CARES Act limits "adverse financial consequences" to reductions in salary. Relevant here, § 2202 of the CARES Act provides that 457(b) enrollees could take CRDs in calendar year 2020 if they

> experience[d] adverse financial consequences as a result of being quarantined, being furloughed or laid off or having work hours reduced due to [covid], being unable to work due to lack of child care due to such virus or disease, closing or reducing hours of a business

6

owned or operated by the individual due to such virus or disease, or other factors as determined by the Secretary of the Treasury (or the Secretary's delegate).

CARES Act, Pub. L. 116-136, § 2202(a)(4)(A)(ii)(III), 134 Stat. 281, 341 (2020).

While the law linked "adverse financial consequences" to four enumerated financial hardships, it did not define that ambiguous term.[1] And, giving words their ordinary and common meaning, "financial consequences" can manifest in all kinds of ways. *See In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) ("When interpreting a statute, we begin with the plain language. In doing so, we give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended it to bear some different import."). In addition to quantifiable monetary losses such as reductions in pay or salary, "consequences" that are "financial" in nature can include those that are difficult or impossible to quantify or measure with particularity. Such consequences include the loss of expected business revenue, lost or damaged business opportunities, unrecouped start-up business costs, unrecouped business expenditures, business transition costs, and the loss of expected revenue or income.[2]

---

[1] Indeed, the IRS realized that, because the CARES Act was vague and broad, taxpayers needed further guidance on the law's meaning. *See* Internal Revenue Service, *Coronavirus-related relief for retirement plans and IRAs questions and answers*, https://www.irs.gov/newsroom/coronavirus-related-relief-for-retirement-plans-and-iras-questions-and-answers (last updated July 28, 2023) ("The Treasury Department and the IRS are formulating guidance on section 2202 of the CARES Act and anticipate releasing that guidance in the near future.").

[2] Given a previous similar legislative effort, it is clear that Congress deliberately chose "adverse financial consequences" to reach losses beyond those that are quantifiable in dollars. *See infra*, Part II.B.7. In response to the economic damage caused by Hurricane Katrina, Congress passed the Katrina Emergency Tax Relief Act of 2005, which allowed people living in areas affected by the storm to make retirement account withdrawals if they had experienced "economic loss by reason of Hurricane Katrina." Katrina Emergency Tax Relief Act of 2005, Pub. L. 109-73, § 101(d)(1), 119 Stat. 2016, 2018 (2005). "Economic loss" is far narrower than "adverse financial consequences." The Katrina law demonstrates that Congress had the ability to narrow the reach of § 2202 of the CARES Act to retirement plan enrollees who experienced measurable and quantifiable "economic loss[es]," but chose not to do so.

Because Congress did not define the term "adverse financial consequences," the CARES Act does not treat the above forms of loss any differently from salary reductions. Indeed, Congress' choice of the word "consequences," rather than "losses," indicates that CARES Act qualifying events include, but are not limited to, quantifiable monetary losses. Mrs. Mosby intends to show at trial that she suffered non-salary "adverse financial consequences" because of the pandemic. To prevent jurors from misunderstanding and misapplying the law, the Court should instruct the jury, consistent with the CARES Act's plain text, that Mrs. Mosby was entitled to take a CRD based on such adverse financial consequences.

The perjury statute's mens rea requirement reinforces this point. For the perjury counts, the government must prove that Mrs. Mosby acted "willfully." § 1621; *see United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995). This means that the government must prove she acted with the knowledge that her conduct was unlawful and intended to do something unlawful (i.e., intended to falsely assert that she had experienced adverse financial consequences). *Bryan v. United States*, 524 U.S. 184, 191-92 (1998). Given that high bar, it is essential that the jury be instructed that the meaning of "adverse financial consequences"—what Mrs. Mosby is alleged to have knowingly and willfully lied about—is far broader than the government's cramped interpretation of that term.

    **2.**    **Size of "adverse financial consequences"**

The Court should instruct the jury as follows:

> *An enrollee in a 457(b) plan can suffer "adverse financial consequences" even if her financial loss is seemingly small, measured in total dollars. There is no minimum dollar amount that an enrollee's loss must surpass; a loss of even one dollar could qualify as "adverse financial consequences."*

This instruction accurately states the law and is important in preventing the jury from applying the law incorrectly. Neither the CARES Act nor any executive-branch guidance interpreting the act imposes any minimum dollar amount on qualifying "adverse financial

8

consequences." Given that Mrs. Mosby withdrew almost $100,000 in CRDs—a large amount of money—jurors may conclude she engaged in illegal conduct unless she suffered significant adverse financial consequences. This instruction will avoid that misunderstanding of the law.

### 3. Correspondence between "adverse financial consequences" and a CRD

The Court should instruct the jury as follows:

*A 457(b) enrollee who qualified for a CARES Act withdrawal was allowed to withdraw up to $100,000, regardless of the dollar amount of the adverse financial consequences she experienced. In other words, the CARES Act withdrawal did not need to match, in dollars, the size of the adverse financial consequences experienced. The enrollee could withdraw an amount that was either smaller or greater than the size of the adverse financial consequences she suffered.*

This instruction will prevent the jury from incorrectly applying the law. The CARES Act does not say that a CRD can be no greater (or smaller) than the adverse financial consequences that occasioned the withdrawal. Importantly, Internal Revenue Service guidance, published in June 2020, directly confirms that "the amount of [a] distribution is not required to correspond to the extent of the adverse financial consequences experienced by the qualified individual." Internal Revenue Service, Notice 2020-50, Guidance for Coronavirus-Related Distributions and Loans from Retirement Plans Under the CARES Act, at 6, *available at* https://www.irs.gov/pub/irs-drop/n-20-50.pdf [hereinafter, "IRS CARES Act Guidance"]. Jurors may assume Congress would not have permitted 457(b) enrollees to withdraw more money than they lost to the pandemic, since federal law ordinarily prohibits retirement-plan participants from accessing their retirement funds before they retire. Thus there is a real danger that the jury will infer Mrs. Mosby violated the law if her CRDs are larger than the adverse financial consequences she endured. This instruction will ensure the jury does not infer guilt based on a misunderstanding of what the CARES Act permitted.

### 4. Proper uses of a CRD

The Court should instruct the jury as follows:

> *The CARES Act permitted a 457(b) enrollee to use withdrawn funds for any purpose she wished, or no purpose at all. The statute imposed no restrictions on how an enrollee could spend her money. In particular, the CARES Act did not require that an enrollee use withdrawn funds to "mitigate" the specific adverse financial consequences she suffered.*

This instruction accurately states the law and is important to prevent the jury from convicting Mrs. Mosby based on a misunderstanding of the CARES Act. To prove Mrs. Mosby did not suffer adverse financial consequences, the government intends to argue that she did not use her CRDs to "mitigate" those consequences—which, in the government's view, anyone who had suffered adverse financial consequences would have done. ECF 215 at 13. After hearing this argument, the jury may believe a 457(b) enrollee could use a CRD only to "mitigate" adverse financial consequences, and not for any other purposes.

Contrary to the implication of the government's argument, the CARES Act does not impose any limitation on how CRDs are used or restrict in any way the ends to which someone can put a CRD. Indeed, the government seems to concede this basic point. *Id.* at 14-15. And, as above, the IRS CARES Act Guidance confirms this conclusion, explaining that "the CARES Act does not limit these distributions to amounts withdrawn solely to meet a need arising from COVID-19," and CRDs "are permitted without regard to the qualified individual's need for funds." IRS CARES Act Guidance at 6. Absent this instruction, the jury may be misled into convicting Mrs. Mosby simply because she used her CRDs in a way (i.e., purchasing additional homes) that is entirely legal.

### 5. Multiple withdrawals

The Court should instruct the jury as follows:

> *Once a 457(b) enrollee qualified for a CARES Act withdrawal, she was allowed to make multiple withdrawals up to the $100,000 maximum set by the CARES Act. An enrollee could take a second withdrawal without experiencing new, additional adverse financial consequences after the first withdrawal.*

10

This instruction accurately states the law and is necessary to avoid confusion. The CARES Act defines a CRD as "*any* distribution from an eligible retirement plan made . . . to an individual . . . who experiences adverse financial consequences." CARES Act, Pub. L. 116-136, § 2202(a)(4)(A), 134 Stat. 281, 341 (emphasis added). That definition is expansive, reaching a withdrawal made after a previous withdrawal even if no adverse financial circumstances have intervened.

The IRS CARES Act Guidance reinforces this conclusion. As explained above, it instructs that: (1) a CRD is "not limit[ed] . . . to amounts withdrawn solely to meet a need arising from COVID-19," (2) a CRD is "permitted without regard to the qualified individual's need for funds," and (3) "the amount of the distribution is not required to correspond to the extent of the adverse financial consequences experienced by the qualified individual." IRS CARES Act Guidance at 6. In other words, if a 457(b) enrollee takes a CRD that covers all adverse financial consequences she has suffered, she may take another CRD even though she has no additional "need for funds," and even though the new CRD will exceed "the extent of the adverse financial consequences experienced by [her]." *Id.*

Instructing the jury on this point is necessary to avoid confusion. Again, jurors may bring to this case their pre-existing understanding that federal law tightly restricts the circumstances under which someone can make early withdrawals from a retirement account. They may therefore assume that Congress would not have permitted a 457(b) enrollee to take a second withdrawal unless she had endured additional "adverse financial consequences." And based on that assumption, jurors may conclude Mrs. Mosby lied about her eligibility for a CRD.

### 6. Purpose of the CARES Act

The Court should instruct the jury as follows:

11

> *The CARES Act was passed by the United States Congress on March 25, 2020, and signed into law on March 27, 2020. One purpose of the CARES Act was to encourage consumer spending in order to prevent a severe economic recession. One way the CARES Act sought to accomplish that goal was to allow individuals to have easier access to funds contained in their retirement accounts.*

As a matter of historical fact, this instruction is undeniably true, as another judge of this Court has explained:

> In March 2020, in response to the devastating financial impact of the COVID-19 pandemic on American families, Congress passed and signed into law the Coronavirus Aid, Relief, and Economic Security ('CARES') Act. The CARES Act "implemented a variety of programs to address issues related to the onset of the COVID-19 pandemic," and aimed to provide "fast and direct economic assistance for American workers, families, small businesses, and industries."

*R.V. v. Mnuchin*, 570 F. Supp. 3d 322, 325 (D. Md. 2021) (quoting *About the CARES Act and the Consolidated Appropriations Act*, U.S. Dep't of the Treasury, https://home.treasury.gov/policy-issues/coronavirus/about-the-cares-act)); *see also Small Bus. Admin. V. Weather King Heating & Air, Inc.*, 648 B.R. 200, 205 (N.D. Ohio 2023) (describing CARES Act as a "key product" of "the federal government's efforts to keep the American economy afloat during an unprecedented time of crisis and uncertainty").

The instruction is also legally relevant to the jury's consideration of the perjury counts. The government intends to argue Mrs. Mosby did not suffer adverse financial consequences because she did not use her CRDs to "mitigate" those consequences. *See* ECF 215 at 13. Implicit in this argument is the suggestion that Congress, when writing the CARES Act, intended to tightly restrict the amount of money a 457(b) enrollee could withdraw from her retirement account—i.e., that Congress meant to permit withdrawals big enough to make up for covid-related financial losses, but no bigger. If the jury accepts that mistaken view, it may conclude Mrs. Mosby's "adverse financial consequences" attestations are inconsistent with the CARES Act. Instructing the jury that the CARES Act sought to flood the economy with cash will correct that misimpression.

The proposed instruction is consistent with "purpose of the statute" instructions that are routinely given in criminal cases, even when the defendant objects. The Sand model instructions frequently include such "purpose of the statute" instructions—i.e., those that explain why Congress enacted the particular statute the defendant is alleged to have violated—for a wide range of criminal statutes. *E.g.*, Sand, *Modern Fed. Jury Instructions Criminal* §§ 48-2 (perjury); 59-2 (income tax evasion); 35-46 (felon in possession of a firearm). Challenges to the provision of those instructions are frequently rejected. *E.g.*, *United States v. Denny*, 939 F.2d 1449, 1453-54 (10th Cir. 1991) (concluding that "the 'purpose of statute instruction' given by the trial court was correct and in accordance with the law"); *United Sates v. O'Connor*, 580 F.2d 38, 44 (2d Cir. 1978) (rejecting defendant's contention "that the judge should not have explained the legislative intent behind the Meat Inspection Act, 21 U.S.C. ss 601 et seq."); *United States v. Ramsey*, No. 21-CR-495 (ARR), 2023 WL 2598682, at *7 (E.D.N.Y. Mar. 22, 2023); *see also United States v. Perez*, 702 F.2d 33, 37-38 (2d Cir. 1983) ("A charge on statutory purpose is not an abuse of discretion.").

### 7. The discretion of a "decision-making body"

The Court should instruct the jury as follows:

> *To prove perjury, the government must show that a defendant's statement is material, i.e., that it "has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." A "decision-making body" is a person or institution that enjoys discretion to approve or reject a request based on the particular facts and circumstances of the person making the request. If a person or institution is required to approve a request by someone who self-certifies that she meets the criteria for approval, that person or institution lacks the necessary discretion. That person or institution therefore does not qualify as a "decision-making body."*

*See United States v. Spirito*, 36 F.4th 191, 207 (4th Cir. 2022) ("A statement is material if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed.").

The requested instruction is consistent with the CARES Act. The CARES Act envisioned an essentially ministerial, functionary-like role for retirement-plan administrators that received CRD requests. As the IRS CARES Act Guidance explains:

> The administrator of an eligible retirement plan may rely on an individual's certification that the individual satisfies the conditions to be a qualified individual in determining whether a distribution is a coronavirus-related distribution, unless the administrator has actual knowledge to the contrary. The requirement that an administrator not have "actual knowledge" that is contrary to an individual's certification does not mean that the administrator has an obligation to inquire into whether an individual has satisfied the conditions . . . to be a qualified individual. Rather, this requirement is limited to situations in which the administrator already possesses sufficiently accurate information to determine the veracity of a certification.

IRS CARES Act Guidance at 9.

When a withdrawal qualifies as a CRD, an administrator has no discretion to deny the withdrawal request—it *must* disburse the funds. Rather, the administrator's only role is to determine whether the person making a request is a "qualified individual." *Id.* And in making that determination, the administrator "does not . . . ha[ve] an obligation to inquire into whether [the] individual has satisfied the conditions" for eligibility. *Id.* The administrator may assume, based on the requester's attestations, that she is eligible, unless the administrator "has actual knowledge to the contrary."

This language contrasts with how the IRS has defined an administrator's role in similar contexts in the past. Much as it responded to covid in 2020, Congress responded to Hurricane Katrina in 2005 by allowing certain people affected by the storm to make early withdrawals from their retirement accounts. Specifically, Congress allowed for "qualified Hurricane Katrina distribution[s]," defined as "any distribution from an eligible retirement plan made on or after August 25, 2005, and before January 1, 2007, to an individual whose principal place of abode on August 28, 2005, is located in the Hurricane Katrina disaster area and who has sustained an

14

economic loss by reason of Hurricane Katrina." Katrina Emergency Tax Relief Act of 2005 (KETRA), Pub. L. 109-73, § 101(d)(1), 119 Stat. 2016, 2018 (2005). In a guidance document issued shortly after KETRA's passage, the IRS directed that "[i]n making a determination that a distribution is a Katrina distribution, a plan sponsor or plan administrator of an employer retirement plan is permitted to rely on reasonable representations from a distributee with respect to the distributee's principal place of abode on August 28, 2005, and whether the distributee suffered an economic loss by reason of Hurricane Katrina, unless the plan sponsor or plan administrator has actual knowledge to the contrary." Internal Revenue Service, Notice 2005-92, Hurricane Katrina Relief under sections 101 and 103 of the Katrina Emergency Tax Relief Act of 2005, at 8, *available at* https://www.irs.gov/pub/irs-drop/n-05-92.pdf [hereinafter, "KETRA Guidance"].

      The KETRA Guidance permits a plan administrator to rely on a distributee's representations only if they are "reasonable." By contrast, the IRS CARES Act Guidance requires administrators to accept self-certifications at face value, regardless of whether they are reasonable or not (unless the administrator has "actual knowledge" of their falsity). And the IRS CARES Act Guidance, unlike the KETRA Guidance, affirmatively provides that administrators do "not . . . ha[ve] an obligation" to investigate whether a self-certifying requester is eligible. These differences indicate a plan administrator enjoyed no discretion to reject a withdrawal request from a 457(b) enrollee who self-certified that she satisfied the CARES Act's eligibility requirements.

### III.   Conclusion

Mrs. Mosby respectfully requests that the Court instruct the jury in accordance with the additional CARES Act-related instructions described above.


Respectfully submitted,

| | |
|---|---|
| /s/ James Wyda | /s/ Lucius Outlaw |
| James Wyda | Lucius Outlaw |
| Federal Public Defender | Outlaw PLLC |
| Office of the Federal Public Defender | 1351 Juniper Street, NW |
| 100 South Charles Street | Washington, DC 20012 |
| Tower II, 9th Floor | Phone: (202) 997-3452 |
| Baltimore, MD 21201 | loutlaw3@outlawpllc.com |
| Phone: (410) 962-3962 | |
| jim_wyda@fd.org | |

/s/ Maggie Grace
Maggie Grace
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
maggie_grace@fd.org