## EXHIBIT 1

## Mrs. Mosby's CARES Act Jury Instructions

**Request 1**:

At the time Mrs. Mosby submitted her CARES Act withdrawal forms to her 457(b) plan administrator, neither the CARES Act nor the form she submitted defined "adverse financial consequences." Therefore, for Mrs. Mosby to be guilty of perjury (counts one and three), the government must prove beyond a reasonable doubt that Mrs. Mosby submitted her withdrawal forms knowing that she did not suffer adverse financial consequences according to how she understood the term, and that she did so for the purpose of misleading her 457(b) administrator. In other words, the government must prove that, at the time Mrs. Mosby submitted her withdrawal forms, she subjectively believed she had not suffered "adverse financial consequences," as she understood that term. To guide you in making this determination, the Court will provide additional instructions concerning the CARES Act.

"Adverse financial consequences," as used in the CARES Act, is not limited to quantifiable monetary losses (like a reduction in salary or income from a job). The term can also include other types of financial consequences that are difficult or impossible to quantify or measure with particularity, such as lost or damaged business opportunities, unrecouped start-up business costs, unrecouped business expenditures, business transition costs, and the loss of expected revenue or income.

**Request 2**:

An enrollee in a 457(b) plan can suffer "adverse financial consequences" even if her financial loss is seemingly small, measured in total dollars. There is no minimum dollar amount that an enrollee's loss must surpass; a loss of even one dollar could qualify as "adverse financial consequences."

**Request 3**:

A 457(b) enrollee who qualified for a CARES Act withdrawal was allowed to withdraw up to $100,000, regardless of the dollar amount of the adverse financial consequences she experienced. In other words, the CARES Act withdrawal did not need to match, in dollars, the size of the adverse financial consequences experienced. The enrollee could withdraw an amount that was either smaller or greater than the size of the adverse financial consequences she suffered.

**Request 4**:

The CARES Act permitted a 457(b) enrollee to use withdrawn funds for any purpose she wished, or no purpose at all. The statute imposed no restrictions on how an enrollee could spend her money. In particular, the CARES Act did not require that an enrollee use withdrawn funds to "mitigate" the specific adverse financial consequences she suffered.

**Request 5**:

Once a 457(b) enrollee qualified for a CARES Act withdrawal, she was allowed to make multiple withdrawals up to the $100,000 maximum set by the CARES Act. An enrollee could take a second withdrawal without experiencing new, additional adverse financial consequences after the first withdrawal.

**Request 6**:

The CARES Act was passed by the United States Congress on March 25, 2020, and signed into law on March 27, 2020. One purpose of the CARES Act was to encourage consumer spending in order to prevent a severe economic recession. One way the CARES Act sought to accomplish that goal was to allow individuals to have easier access to funds contained in their retirement accounts.

**Request 7**:

To prove perjury, the government must show that a defendant's statement is material, i.e., that it "has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." A "decision-making body" is a person or institution that enjoys discretion to approve or reject a request based on the particular facts and circumstances of the person making the request. If a person or institution is required to approve a request by someone who self-certifies that she meets the criteria for approval, that person or institution lacks the necessary discretion. That person or institution therefore does not qualify as a "decision-making body."