United States District Court for
the District of Maryland

United States

v.                                                      No. 1:22-cr-7-LKG

Marilyn Mosby

**Initial Reply in Support of Renewed Motion for Intra-District
Transfer to the Southern Division**

Mrs. Mosby's motion for intra-district transfer explained that district courts have

"'broad discretion'" to transfer a case to another division; that to obtain an intra-district

transfer, a defendant "'is not required to show truly compelling circumstances for change

of venue, but rather that all relevant things considered, the case would be better off

transferred to another division'"; and that a defendant need not make a "'strong showing of

prejudice,'" identify "'extreme circumstances,'" or demonstrate that media coverage is "'so

inherently prejudicial that trial proceedings must be presumed to be tainted.'" ECF 212 at

14-18 (citations omitted). She also explained that nothing in federal law establishes a

presumption—or even a preference—in favor of holding trial in the division where the

alleged crimes occurred. *Id.* at 15-16. In short, there is only one relevant question under

Federal Rule of Criminal Procedure 18: which division would better promote the prompt

1

administration of justice, convenience of victims and witnesses, and fairness to the defendant? The government disputes none of this, and that concession is key to evaluating the government's arguments against transfer.

The government relies primarily on a declaration from John Frehse, a "labor and operations strateg[ist]" who attempts to undermine the media survey and telephone poll cited in Mrs. Mosby's motion. ECF 222-1 at 3. For reasons that Mrs. Mosby will explain in a supplemental reply, Mr. Frehse's declaration is deeply flawed—it rests its conclusions on factual and legal errors, and it betrays a misunderstanding of the basic methodology of telephone polls.[1] But even if every one of Mr. Frehse's criticisms were valid, that would not change the fact that Northern Division jurors are meaningfully more likely to enter the courtroom with negative and unmovable prejudgments about Mrs. Mosby. This differential, regardless of its exact size, is real and undeniable. The government never asserts that Southern Division jurors and Northern Division jurors have been exposed to equal amounts of pretrial publicity, hold equally negative views about Mrs. Mosby, or are equally predisposed to find Mrs. Mosby guilty. Nor could it—such a claim would be fanciful. Given Mrs. Mosby's prominence in the Baltimore area, the extensive local press coverage of this case, and reporting on prior unrelated incidents that the media portrays as scandals, it is simply implausible that the Northern Division jury pool is no more tainted than the Southern Division jury pool.

---

[1] In response to a discovery demand, the government informed defense counsel that Mr. Frehse has no experience at all designing or administering telephone polls. Rather, the government reports that Mr. Frehse's "favored techniques" for "assessing sentiment" are "in person surveys."

So if—as the government implicitly concedes—jurors in the Southern Division are less biased toward Mrs. Mosby, why *not* hold the trial there? The government contends a transfer would inconvenience witnesses and might make it impossible to disseminate a juror questionnaire before trial. The only inconvenience the government claims is roughly an hour and a half of roundtrip driving by perhaps six witnesses—a hardship so minimal that neither party has found a single case in which a court afforded it any weight at all. As for the juror questionnaire, Mrs. Mosby hopes and believes the clerk's office can distribute it and collect the results in time for trial, and to facilitate that goal she will make any accommodations the Court requests. But if time is too short, Mrs. Mosby is willing to forego a juror questionnaire and rely instead on the normal courtroom voir dire process in the Southern Division. Finally, the government insists Mrs. Mosby invited the very prejudicial media coverage of which she now complains, but that is both untrue and legally irrelevant under Rule 18.

The Court should transfer this case to the Southern Division.

## I.    No Rule 18 factors outweigh the prejudice that a Northern Division trial would cause Mrs. Mosby.

The government contends that "even taken on its face," and putting aside its supposed "methodological flaws," Dr. Edelman's poll does not support an intra-district transfer because 44 percent of Northern Division respondents said they had not heard of Mrs. Mosby. ECF 222 at 15-16. In light of that finding, the government argues that there are "ample individuals from whom to pick a jury" and that "the voir dire process and juror questionnaire can select a jury." *Id.* at 16.

This argument appeals to the wrong legal standard. For purposes of a Rule 18 intra-district-transfer motion, the question is not whether a trial in the division of indictment is

capable of satisfying the bare constitutional minimum, i.e., whether it is *possible* to empanel an impartial jury in that division. Rather, the proper question is whether, "all relevant things considered, the case would be better off transferred to another [division]." *United States v. Schock*, No. 16-CR-30061, 2016 WL 7156461, at *2 (C.D. Ill. Dec. 7, 2016) (evaluating intra-district transfer); *see* ECF 212 at 16. Transfer may be proper under this standard even when a court "can select a jury" in the division where a case was indicted. ECF 222 at 16. If it is possible to select an impartial jury in either of two divisions, but the jury pool in the division of indictment is more tainted than the jury pool in another division, then "the case would be better off transferred," *id.*, as long as the differential in juror bias is not outweighed by other Rule 18 factors. So assuming for sake of argument that the Court can seat an impartial jury in the Northern Division, that fact is irrelevant to the Rule 18 analysis. What matters is how the Northern Division compares to the Southern Division.

On that question, Dr. Edelman's poll—"taken on its face," ECF 222 at 15—certainly establishes that Northern Division venire members are more predisposed to find Mrs. Mosby guilty based on what they have heard about her and this case. Mrs. Mosby will not repeat all of Dr. Edelman's findings here, but in short, meaningfully larger percentages of Northern Division respondents are familiar with Mrs. Mosby (62 percent versus 42 percent) and this case (62 percent versus 45 percent); recognized "media items" about the case (68 percent versus 58 percent (three items) and 55 percent versus 45 percent (four items)), which "was significantly related to prejudgment" of Mrs. Mosby's guilt; described Mrs. Mosby as "somewhat" or "very" corrupt (45 percent versus 26 percent); believe Mrs. Mosby is "definitely guilty" of perjury (25 percent of those familiar with Mrs. Mosby or

the case, versus 17 percent); and said Mrs. Mosby would have a hard time convincing them that she is not guilty (41 percent versus 36 percent). ECF 212 at 11-12.

And in any event, polls are simply one tool that courts occasionally use to measure prejudice—nothing more. Polling data are not a prerequisite to obtaining an intra-district transfer under Rule 18. Indeed, courts routinely grant intra-district transfers in the absence of any polling data, based only on their intuitive, common-sense understanding that prejudice to the defendant is greater in one division than another. *See, e.g.*, *United States v. Joyce*, No. CR. 07-31 ERIE, 2008 WL 2367307, at *4 (W.D. Pa. June 10, 2008) (ordering transfer without looking at polling, and explaining, "We take judicial notice of the fact that when this Defendant was indicted, there was only brief notice of the indictment in the Pittsburgh news media, but it received a great deal of publicity in Erie"); *United States v. Mathis*, No. 3:14CR00016, 2015 WL 5012159, at *2-4 (W.D. Va. Aug. 21, 2015) (ordering transfer without considering polling); *United States v. Christensen*, No. 17-CR-20037-JES-JEH, 2018 WL 6382050, at *2-7 (C.D. Ill. Dec. 6, 2018) (same); *United States v. Weinberger*, No. 2:06 CR 230 PS, 2011 WL 5040674, at *1-2  (N.D. Ind. Oct. 24, 2011) (same); *United States v. Barrett*, No. 2:20-CR-16-KS-MTP, 2021 WL 1739241, at *1-5 & n.4 (S.D. Miss. May 3, 2021) (same); *United States v. Ackal*, No. CR 16-00048-ALL, 2016 WL 4922854, at *1-7 (W.D. La. Sept. 14, 2016) (same); *United States v. Kott*, No. 3:07-cr-56-RRB, ECF 610 (D. Alaska Aug. 12, 2011) (same); *United States v. Walters*, No. 2:19-CR-51-KS-MTP, 2020 WL 1881352, at *1-3 (S.D. Miss. Apr. 15, 2020) (same).

Here, even absent a poll, there could be no serious doubt that the Northern Division has been exposed to much more substantial, and much more prejudicial, media coverage than the Southern Division. The government's response does not claim the Southern

Division jury pool has been tainted as badly as the Northern Division jury pool, and that

concession is a wise one. It does not take a Ph.D. in social psychology, *see* ECF 212-1 at 3,

to understand that, for years, residents of the Northern Division have been bombarded with

negative press coverage of Mrs. Mosby and this case in a way that residents of the

Southern Division have not, and that Northern Division residents are therefore much more

likely to enter the courtroom with fixed and negative opinions. Nor does it require an

advanced degree to grasp that, in the Northern Division more than the Southern Division,

Mrs. Mosby has been the subject of water-cooler conversations and dinner-table debates for

almost a decade now. Rule 18 does not require this Court to renounce its common sense or

pretend that residents of Prince George's County feel as strongly about Mrs. Mosby as

residents of Baltimore City. Because Mrs. Mosby was a public figure in the Northern

Division, not the Southern—and because allegations against public figures are particularly

liable to affect jurors' open-mindedness—the Court can conclude, independent of any

polling evidence, that the Northern Division jury pool is more tainted than the Southern

Division's. *See Ackal*, 2016 WL 4922854, at *6 (explaining intra-district transfer was

proper, in part, because allegations against a local "elected public official" who held a

"position[a] of public trust" are "both inflammatory and of a nature that would influence a

juror's decision").

The fact that the Court "can conduct" voir dire does not dictate a different result.

*See* ECF 222 at 16. For one thing, in cases where the jury pool has been saturated with

prejudicial media coverage, voir dire is not always effective. *See, e.g.*, *United States v.*

*Cloud*, No. 1:19-CR-02032-SMJ-1, 2021 WL 9406685, at *1 (E.D. Wash. Dec. 14, 2021)

("The pervasive media coverage on this case has incited a wave of public passion in the

Yakima community such that the Court is not sufficiently confident *voir dire* will minimize the effects of the pretrial publicity."); *United States v. Lawson*, No. CRIM.A.3:08-21-S-DCR, 2009 WL 511935, at \*1 (E.D. Ky. Mar. 2, 2009) (granting transfer and rejecting government's argument "that any prejudice stemming from the pretrial publicity can be addressed through the voir dire process").

And regardless, voir dire and intra-district transfer are not mutually exclusive remedies, as the government seems to suggest. To the contrary, courts frequently move trial to a different division and *also* conduct extensive voir dire about the effect of pretrial publicity. *See, e.g.*, *Cloud*, No. 1:19-CR-02032-SMJ-1, 2021 WL 9406685 at \*4 (noting could would both grant intra-district transfer and conduct voir dire to address effects of prejudicial media coverage); *United States v. Walters*, No. 2:19-CR-51-KS-MTP, 2020 WL 1881352, at \*1-3 (S.D. Miss. Apr. 15, 2020) (same); *Weinberger*, 2011 WL 5040674, at \*2 (granting transfer and noting, "Of course, voir dire will address the prejudice, if any, of particular jurors, but a jury pool drawn only from Lake and Porter counties would be much more likely to have a strongly negative familiarity with Weinberger's practice and the many legal claims—both civil and criminal—that have been lodged against him"). If voir dire were always sufficient to cure the prejudice from a tainted jury pool, courts would never grant intra-district transfers.

Against the evident prejudice from holding trial in the Northern Division, the government cites only two factors that supposedly counsel against transfer. Neither is persuasive.[2]

---

[2] The government concedes that another factor mentioned in Rule 18—"the convenience of the defendant"—"does not matter" in this case, since Mrs. Mosby has requested that trial be held in the Southern Division. ECF 222 at 18.

*First,* the government claims witnesses will be "inconvenienced" by a Southern Division trial. ECF 222 at 18. Specifically, the government indicates there are roughly six witnesses who "live or work in the Northern Division (and often within the City of Baltimore in particular)," and who would have to drive to Greenbelt to testify. *Id.* The government does not dispute that each of these witnesses will require no more than a single day of testimony, nor does it dispute that the drive from Baltimore to Greenbelt takes approximately 35-50 minutes. *See* ECF 212 at 25. Thus the "inconvenience" posited by the government is roughly an hour and a half of roundtrip driving on a single day for a small handful of witnesses. The government does not cite a single case in which a court has afforded any weight at all to such de minimis inconvenience, and it does not deny that numerous courts have treated inconvenience of that kind as immaterial. *See id.* at 25-26 (collecting cases); *see also, e.g.*, *Joyce*, 2008 WL 2367307, at \*4 (holding "transfer will not unduly burden or inconvenience . . . the witnesses" where "[t]he Erie Courthouse is just 128 miles from the Pittsburgh Courthouse and connected by Interstate Highways 79 and 279").

*Second,* the government fears a transfer will compromise "the prompt administration of justice" because "[i]t is not clear" that 52 days—the period between the motions hearing and trial—is enough time for the clerk's office to send a juror questionnaire to Southern Division venire members, tabulate the results, and disseminate them to the parties. ECF 222 at 18 & n.4. Like the government, Mrs. Mosby cannot say for sure whether the juror-questionnaire process can be completed in 52 days, although she suspects it can. Certainly, Mrs. Mosby will do anything that the Court or the clerk's office requests to expedite the process. She has no objection, for example, to shortening the

amount of time that the Court would normally afford the parties to review the completed

questionnaires and submit a list of proposed strikes.

Regardless, if the Court concludes the current schedule makes it infeasible to pre-

screen Southern Division venire members, Mrs. Mosby is willing to forego a juror

questionnaire and instead rely on the typical day-of-trial voir dire procedures to eliminate

biased jurors. Prejudicial publicity in and around Baltimore is substantial enough that Mrs.

Mosby would rather forfeit the protection of a juror questionnaire in the Southern Division

than rely on that protection in the Northern Division. This concession will ensure that an

intra-district transfer does not threaten "the prompt administration of justice." Fed. R.

Crim. P. 18.

## II.     Mrs. Mosby's previous statements to the press do not preclude an intra-district transfer.

The government urges the Court to deny a transfer to the Southern Division because

Mrs. Mosby "has regularly sought and encouraged media attention surrounding this case."

ECF 222 at 2. Although the government does not use the term, its argument is essentially

one of estoppel, i.e., that someone who seeks to defend herself in the press is thereby

estopped from arguing that prejudicial media coverage justifies a transfer.

But the government cites no authority for the proposition that a defendant forfeits

her right to a fair trial and an impartial jury by publicly proclaiming her innocence. The

text of Rule 18 makes no mention of a defendant's (or the government's) culpability in

generating media coverage of her case. What matters in assessing a motion to transfer is

*whether* jurors have been prejudiced against a defendant—not *why* that has happened.

Under the Fifth Amendment, "a fair trial in a fair tribunal is a basic requirement of due

process." *Strickland v. United States*, 32 F.4th 311, 343 (4th Cir. 2022). The Sixth

Amendment, in turn, "guarantee[s] to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Hurst v. Joyner*, 757 F.3d 389, 394 (4th Cir. 2014). These are the rights that intra-district transfers are meant to protect, by ensuring that those who determine a defendant's guilt or innocence have not been tainted by prejudicial media coverage. And those rights belong to all defendants, not just those who decline to speak publicly about their cases.

The only case the government cites in support of its estoppel argument is *Monterrosa v. City of Vallejo*, No. 2:20-CV-01563-TLN-DB, 2021 WL 516736 (E.D. Cal. Feb. 11, 2021), but that case does not say what the government wants it to. *See* ECF 222 at 6. In *Monterrosa*, family members of an unarmed man who had been shot by a police officer brought an excessive-force suit against the officer and the department that employed him. 2021 WL 516736, at *1-2. The defendants moved for an intra-district transfer, arguing pretrial publicity jeopardized their constitutional right to a fair trial by an impartial jury. *Id.* at *3. The district court denied the motion. *Id.* at *7. After examining the "press accounts" adduced by the defendants, the court concluded "the community ha[d] not been so saturated with publicity surrounding this incident as to rise to the level of 'inflammatory' media coverage." *Id.* at *5-6. Those press accounts were "largely factual in nature, rather than inflammatory." *Id.* at *6. And "[w]hile the articles Defendants highlight[ed] may contain 'inflammatory' remarks by Plaintiffs' counsel," the court wrote, "it must also be acknowledged that those articles equally contain Defendants' public statements or statements from the police union regarding Defendants' justification for the shooting." *Id.*

Without quoting the full sentence, the government seizes on this last passage to

suggest the *Monterrosa* court adopted an estoppel-type rationale for denying transfer. *See* ECF 222 at 6. But in unabridged form, the court's analysis says something different: that the articles in question presented both parties' views of the case, including the defendant officer's claimed justification, and therefore they could not be considered unfairly prejudicial to the defendants. That this was the court's meaning is evident from the plaintiffs' responsive brief in *Monterrosa*, which made the point more explicitly—in language the district court adopted almost verbatim: "Even the articles where Defendants highlight so-called 'inflammatory' statements attributed to Plaintiffs' counsel, also include Defendants' public statements regarding the justification of the shooting *which reveals these articles' impartial and non-prejudicial nature*." *Monterrosa v. City of Vallejo*, No. 2:20-CV-01563-TLN-DB, ECF 17 at 11 (E.D. Cal. Nov. 19, 2020) (emphasis added). As this passage makes clear, the *Monterrosa* court was swayed by the evenhandedness of the media coverage in that case, not by who had instigated it.

At any rate, even assuming the government's estoppel theory enjoyed some support in the case law, it would have no application in this case.

To begin, much of the media coverage that Mrs. Mosby supposedly "ginned up," ECF 222 at 5, did not feature the kind of inflammatory rhetoric or accusations that might sway jurors' views of the case one way or the other. Many of the statements identified in the government's response amount to little more that Mrs. Mosby's or defense counsel's assertion that she was not guilty of the charged crimes. Among the media reports the government cites to show that Mrs. Mosby "conjure[d] a storm," *id.* at 1, are the following, *see id.* at 2-5:

- "'Ms. Mosby has never lied or made a false statement in connection [with] the allegations contained in the charging document.'" ECF 212-3 at 10 (quoting defense counsel).

- "Pushing back against prosecutors who allege that Baltimore State's Attorney Marilyn Mosby falsely claimed Covid hardship to get early access to her tax-deferred retirement money, her lawyer says they were wrong—she did experience hardship." *Id.* at 16.

- "Her lawyer has explained that the hardship was based on the loss of income from her travel business." *Id.* at 46.

- "Another attorney for Mosby, A. Scott Bolden, explains to the media that the financial hardship experienced by Mosby in 2020 was loss from her private travel business, not consequences to her employment as State's Attorney." *Id.* at 48.

- "Bolden has told the media that Mosby had 'other business interests' that were affected by the COVID-19 pandemic, though he has declined to offer many details." *Id.* at 161.

- "'Remember, Marilyn Mosby has businesses, if you will,' her attorney, A. Scott Bolden, said in a January appearance on Roland Martin's YouTube show. 'And so, those businesses were in the travel space and they were affected by [the coronavirus] and her accountant urged her to take that money.'" *Id.* at 247; *see also id.* at 413, 443, 448.

- "In court Wednesday, another of Mosby's defense attorneys, Kelley Miller, said one of Mosby's expert witnesses, forensic accountant Jerome Schmitt, will testify at trial that Mosby suffered business losses during the pandemic." *Id.* at 547.

- "Taking no questions, State's Attorney Marilyn Mosby spoke briefly today to the media, saying she was innocent and vowing to 'fight with every ounce of energy within my being.'" *Id.* at 17.

- "'I'm telling you she's not only innocent, but we have professionals who she consulted with. She qualified under the statute,' Mosby's attorney, A. Scott Bolden, said at a news conference Monday. . . . Bolden indicated that Mosby's fledgling private businesses allowed her to receive such relief." *Id.* at 55.

- "State's Attorney Marilyn Mosby's attorney says his client is not guilty of falsely claiming hardship in order to withdraw retirement funds early and to apply for mortgages to buy two homes in Florida." *Id.* at 79.

There is nothing remotely inflammatory about these statements. They are straightforward, anodyne, fact-bound denials of criminal responsibility. If comments of this kind forfeited the right to a fair trial by an impartial jury, criminal defendants would never be free to speak publicly about their cases. That is not the law.

It is true that, on a handful of occasions, Mrs. Mosby and her prior counsel also made public statements questioning the legitimacy of this prosecution and suggesting it was politically or racially motivated. But those statements are irrelevant to the basis for Mrs. Mosby's transfer request. Mrs. Mosby's motion argued a transfer is appropriate because media coverage had "reported the indictment's allegations as established facts," "included 'critical commentary' that maligned her character and took her guilt for granted," and "frequently referenced other events from her past that cast her in a negative light," all or almost all of which would be inadmissible at trial. ECF 212 at 7-9. And because the Baltimore area had been "'saturated with prejudicial coverage surrounding Marilyn Mosby, her husband, inadmissible investigations, and political controversies,'" *id.* at 9, Northern Division jurors were predisposed to believe she was guilty. Mrs. Mosby's and prior counsel's criticisms of the government did not contribute to this claimed form of prejudice. To the extent the defense's criticisms registered with the public, they may have infected potential jurors' views of *the government*, but they were unlikely to sour the jury pool against *Mrs. Mosby*.

The government's argument assumes that media coverage is an undifferentiated mass—that any news article about a case has the same effect on public perception as any other, regardless of what exactly the article is reporting. But of course, news consumers react differently to different press reports about the same case, depending on what aspect of

the case those reports are covering. An article noting that a criminal defendant has been the subject of numerous ethical and political scandals in the past, and that informed observers consider her guilty of the current charges, will prompt a different reaction from an article reporting that the defendant believes the government has engaged in misconduct. One will prejudice the defendant; the other will not. Here, Mrs. Mosby seeks transfer based on the former type of coverage, which she never invited, rather than the latter. Thus the government is wrong to suggest Mrs. Mosby somehow precipitated the very prejudice of which she now complains.

In any event, it is inconceivable that a case of such public importance would fail to generate significant media coverage. Given Mrs. Mosby's national profile and her role as state's attorney, this case was bound to spark a media frenzy regardless of how Mrs. Mosby reacted to the charges. Mrs. Mosby was a prominent public figure running for re-election in Maryland's largest city; intense media scrutiny was inevitable. Even if she had steadfastly refused to speak to the media, journalists would have thoroughly reported on every aspect of this case, and that coverage would undoubtedly have engendered the same prejudice that has in fact arisen. It would therefore be unfair to blame Mrs. Mosby for the media's fixation on her case and the resulting prejudice.

Finally, there is sure to be "a resurgence of coverage as the trial draws near." *Cloud*, 2021 WL 9406685, at *4. This more-recent media coverage is likely to have a greater prejudicial effect on prospective jurors than the coverage to date. *See United States v. Lentz*, 352 F. Supp. 2d 718, 724 n.13 (E.D. Va. 2005) ("It is settled that 'recency is a critical factor to be considered in connection with any claim of pre-trial prejudicial

14

publicity.'") (quoting *Wansley v. Slayton*, 487 F.2d 90, 93 (4th Cir. 1973)).[3] And Mrs.

Mosby will bear no responsibility for the imminent swell in news coverage. Under these

circumstances, holding any past media statements against her would be unreasonable.

### III.     Conclusion

For the reasons described above and in Mrs. Mosby's motion, the Court should

exercise its discretion to transfer this case to the Southern Division.

Respectfully submitted,

/s/ James Wyda                                  /s/ Lucius Outlaw
James Wyda                                      Lucius Outlaw
Federal Public Defender                         Outlaw PLLC
Office of the Federal Public Defender           1351 Juniper Street, NW
100 South Charles Street                        Washington, DC 20012
Tower II, 9th Floor                             Phone: (202) 997-3452
Baltimore, MD 21201                             loutlaw3@outlawpllc.com
Phone: (410) 962-3962
jim_wyda@fd.org

/s/ Maggie Grace
Maggie Grace
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
maggie_grace@fd.org

---

[3] The last statement by either Mrs. Mosby or her prior counsel that the government cites to support its estoppel argument was made in September 2022—more than thirteen months before trial. *See* ECF 222 at 5.