United States District Court for
the District of Maryland

**United States**

v.

**Marilyn Mosby**

No. 1:22-cr-7-LKG

**Supplemental Reply in Support of Renewed Motion for
Intra-District Transfer to the Southern Division**

The government has opposed Marilyn Mosby's motion for an intra-district transfer, relying in large part on a declaration from John Frehse, a "labor and operations strateg[ist]" who opined that the media survey and phone poll cited in Mrs. Mosby's motion are unreliable. ECF 222, 222-1. A supplemental declaration from Dr. Bryan Edelman, which is attached as Exhibit A, explains in detail why the government and Mr. Frehse are mistaken—factually, legally, and methodologically. Mrs. Mosby relies on Dr. Edelman's declaration in full, offering only very brief highlights of some of its conclusions below.

**I.   The government's and Mr. Frehse's criticisms of the media survey are misplaced.**

The government and Mr. Frehse lodge four criticisms of Dr. Edelman's media survey.

*First,* the government faults Dr. Edelman's survey for supposedly "fail[ing] to account for the circulations of the various publications, which vary widely." ECF 222 at 8. But in fact, Dr. Edelman's phone poll "include[d] questions designed to measure media habits and

1

consumption of local newspaper publications," and responses to those questions revealed that "prejudicial media items" were not "limited to newspapers with small readership." Ex. A at 2.

*Second,* the government criticizes Dr. Edelman for not including information about television in his analysis of the media survey's results. ECF 222 at 8-9. Dr. Edelman's supplemental declaration explains that there are no reliable methods of "manag[ing] complex search quarries and filters" for local television stories, as there are for print; that "there is no evidence"—either in general or in this case—that "the nature or content of television news coverage is fundamentally different from newspaper coverage"; and that, if anything, his media survey understates the extent of prejudice to Mrs. Mosby, since "television coverage is often more sensational and prejudicial" than print. Ex. A at 2.

*Third,* the government claims Dr. Edelman's original declaration provides "no supporting data" for its conclusion that "much of the media coverage paints Marilyn Mosby in a negative light." ECF 222 at 6. To the contrary, Mrs. Mosby's motion identified numerous articles cited in Dr. Edelman's declaration that portrayed her as guilty, included critical commentary on her case, and referred to unrelated, inadmissible "scandals." ECF 212 at 7-9. The media survey turned up many more such articles that, for space reasons, are not specifically mentioned in Dr. Edelman's declaration. *See, e.g.*, ECF 212-2 at 13, 16; ECF 212-3 at 3-5, 12, 17-18, 29, 38-40, 46-48, 69-70, 92, 158-59. To the extent the government suggests Dr. Edelman should have used some kind of coding technique to systematically sort every media report by degree of prejudice, it offers no authority that such analysis is necessary or even typical in change-of-venue litigation.

*Fourth,* the government contends Dr. Edelman should have conducted a media survey of the Southern Division as well as the Northern Division. ECF 222 at 9-10. That argument misconceives the purpose of a media survey, which is simply to provide context that explains

why attitudes toward a defendant are so negative. To assess the relative difference in attitudes between divisions, litigants and courts look to a different instrument—a phone survey. What matters for transfer purposes is how prejudiced the residents of one division are compared to the residents of another. Ultimately, the source of that prejudice—whether print media, social media, word of mouth, or something else—is irrelevant. In any event, the government never argues media coverage of Mrs. Mosby has been as extensive or as prejudicial in the Southern Division as in the Northern Division. And for good reason—such a claim would not be credible.

**II.      Nothing in the government's response or Mr. Frehse's declaration demonstrates that Dr. Edelman's phone poll is unreliable.**

The government's criticisms of Dr. Edelman's phone poll are equally unpersuasive.

*First,* the government asserts Dr. Edelman "failed to accurately describe his survey sample," which means "it is not clear if it accurately reflects the jury pool in the District of Maryland." ECF 222 at 11. Dr. Edelman's supplemental declaration explains that the poll's "screener was designed to mirror the qualifications put forth in" this District's jury plan. Ex. A at 6. Specifically, respondents "were screened to make sure they were 18 or older, a United States citizen, registered to vote in the relevant division, and understood English." *Id.* at 6-7.

*Second,* the government claims, channeling Mr. Frehse, that Dr. Edelman's poll had a response rate "well less than 1%," which means that "those likely to be civically active and more likely to read the news" are overrepresented, thereby skewing the results. ECF 222 at 11-12. This is wrong along multiple dimensions. As Dr. Edelman's supplemental declaration explains, none of the American Association for Public Opinion Research's "response option calculators . . . simply divide the number of completed surveys by the number of dials." Ex. A at 7. Instead, "a response rate is calculated by dividing the number of completed interviews by the total number of people in the sample who were **eligible to participate** (i.e., jury eligible)." *Id.* In other words,

3

the denominator in a response-rate calculation will not necessarily include disconnected numbers, government agencies, businesses, call backs, busy signals, fax machines, invalid numbers, answering machines, non-answers, etc. *Id.* Mr. Frehse did not follow that basic rule. Well over 60,000 of the roughly 87,000 calls placed by Dr. Edelman's team fell into one or more of these categories. *Id.*

To get from a (supposedly) low response rate to an "inherent bias" in Dr. Edelman's poll, Mr. Frehse relies solely on a 2017 Pew Research Center report that purportedly found civically engaged people are more likely to respond to phone surveys. *See* ECF 222-1 at 4-5. But as Dr. Edelman notes, that study's "final conclusion" was that "'[r]esponse rate is an unreliable indicator of bias'"—a finding confirmed by other studies—and that "'civic engagement is not strongly correlated with political attitudes or most other measures researchers attempt to study with surveys.'" Ex. A at 8. Although "[n]onresponse bias can be an issue if specific groups [that are] over or underrepresented are correlated with a key variable of interest in the survey," the data provide "no indication that any group was underrepresented in the Mosby survey or that any such a group was significantly related to case recognition, prejudgment, etc." *Id.*; *see also id.* at 8-9 (providing further rebuttal of Mr. Frehse's declaration).

***Third,*** the government accuses Dr. Edelman of posing "leading" questions that encouraged respondents to believe Mrs. Mosby was corrupt or guilty. ECF 222 at 12. Dr. Edelman's questions adhered to the standards in the American Society of Trial Consultants Profession Code for conducting change-of-venue surveys. Ex. A at 9. Consistent with that Code, he deliberately structured his survey "to avoid creating order effects, artificial bias, or priming the survey respondent to 'assume the defendant is guilty.'" *Id.* at 11. His rebuttal of Mr. Frehse's criticisms is detailed and technical, *see id.* at 9-12, but the bottom line is that the poll data

4

"varied in ways indicative of systemic bias against the defendant, not order effects" or other distortions, *id.* at 10-11. As for a poll question that supposedly "shift[ed] the burden of guilt onto the defendant, and so invite[d] a biased response," ECF 222 at 13, this question comes from a prior case in which the judge found it successfully sussed out anti-defendant bias that did not appear in response to other questions. Ex. A at 13.

*Fourth,* the government asserts respondents' answers to open-ended questions are not meaningful because they "came only *after* the initial questions asking respondents to quantify how 'corrupt' the defendant was." ECF 222 at 14 (emphasis in original). Dr. Edelman explains that if the poll questions were "generating bias, perceptions of corruption would be high across all four elected officials" mentioned in the poll (including Joe Biden, Wes Moore, and Brandon Scott)—i.e., "there would be minimal variability" in how corrupt the public believed those four figures to be. Ex. A at 10. The poll results, however, show otherwise. *Id.* In addition, so-called "order effects" "can bias a response to a subsequent question *when two questions on the same topic are asked together*." *Id.* (emphasis added). But neither the government nor Mr. Frehse cites any authority suggesting the same dynamic applies to open-ended questions.

*Fifth,* the government chides Dr. Edelman for not asking whether respondents could set aside their preexisting knowledge of Mrs. Mosby and decide the case based only on the trial evidence. ECF 222 at 14. But as Dr. Edelman notes, this "'magic' set-aside question" is "leading, increases socially desirable responses, and lacks validity (i.e., not correlated with other measures of bias)." *Id.* at 15. The American Society of Trial Consultants therefore recommends that this question "should be avoided." *Id.* at 16-17.

Respectfully submitted,

| | |
|---|---|
| /s/ James Wyda | /s/ Lucius Outlaw |
| James Wyda | Lucius Outlaw |
| Federal Public Defender | Outlaw PLLC |
| Office of the Federal Public Defender | 1351 Juniper Street, NW |
| 100 South Charles Street | Washington, DC 20012 |
| Tower II, 9th Floor | Phone: (202) 997-3452 |
| Baltimore, MD 21201 | loutlaw3@outlawpllc.com |
| Phone: (410) 962-3962 | |
| jim_wyda@fd.org | |

/s/ Maggie Grace
Maggie Grace
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
maggie_grace@fd.org