## <u>DECLARATION OF BRYAN EDELMAN, Ph.D.</u>

I, Bryan Edelman, solemnly, sincerely, and truly declare and affirm as follows:

## I.   INTRODUCTION

I am the co-founder of Trial Innovations, Inc., a national full-service jury research firm. I have worked as a trial consultant for 20 years and have conducted pretrial and post-trial research on both criminal and civil cases across the country. I have been retained as an expert in over 70 high profile cases to assess the impact of pretrial publicity on the fairness of the trial proceedings, including *State of Colorado v. James Holmes*, *United States v. Robert Bowers*, *State of Florida v. Nikolas Cruz*, and the Flint water crisis.

Counsel for the defendant in *United States v. Marilyn Mosby* retained me to research and evaluate: (1) whether there was extensive and prejudicial pretrial publicity regarding allegations that the former Baltimore City State's Attorney fraudulently withdrew money from a retirement account during the Covid pandemic to purchase property in Florida and committed perjury; (2) determine if the media coverage has impacted the defendant's ability to obtain a fair and impartial jury in the Northern Division of the District of Maryland; and (3) based on the findings, recommend appropriate remedial measures—for example, a change of venue or intra-district transfer—to protect Mrs. Mosby's ability to be tried by a fair and impartial jury. As part of my analysis, I evaluated relevant newsprint, television, and social media coverage surrounding these events and conducted a community attitude survey in the Northern and Southern Divisions of the District of Maryland. These surveys were designed to assess case recognition, familiarity with prejudicial media content, and bias.

As explained in my June 2023 declaration, based on my review of the media coverage and findings from the survey, which demonstrated that the media coverage had an impact on the jury pool, I concluded that the "presumption of innocence" in this case had been threatened.[1] As such, I recommended a change of venue or intra-district transfer to protect the defendant's Constitutional rights to a fair and impartial trial.

Defense counsel provided me with the government's response to Mosby's intra-district-transfer motion and the accompanying declaration from John Frehse. Herein, I provide a detailed response and offer relevant data to address the issues and questions raised in both documents.

---

[1] Declaration of Bryan Edelman, Ph.D., (6/30/23), ECF 212-1.

THE MEDIA COVERAGE IN THIS CASE

The government asserts that the media study failed to account for the circulation data of newspapers in the Northern District. It was also critical of my use of newspaper media to evaluate the nature of the pretrial publicity in this case. When conducting a media analysis, I rely primarily on newspaper coverage because it allows for a more reliable method of conducting an exhaustive and empirical search to evaluate the extent of coverage. There are several online news archives available that can manage complex search quarries and filters. These tools are not available when it comes to collecting local television news stories. Furthermore, there is no evidence that the nature or content of television news coverage is fundamentally different from newspaper coverage. By comparison, television coverage is often more sensational and prejudicial. Neither the Government nor Mr. Frehse offers any empirical evidence which suggests that the content or tenor of the television coverage surrounding Mrs. Mosby or this case was different from what was found in the newspaper coverage.

The government also focuses on declining newspaper readership. However, this critique ignores the purpose of the media study and the role of the telephone survey, which is designed to measure the impact of pretrial publicity on the jury pool, i.e., case recognition, bias, and case knowledge. It is of no significance whether a prospective juror was exposed to an inadmissible, prejudicial media item from the *Baltimore Sun* or from a local television story. What matters is whether they retained and developed case-specific knowledge which can be demonstrated to generate bias against the defendant (e.g., prejudgment of guilt). In addition, the telephone survey includes questions designed to measure media habits and consumption of local newspaper publications: *Q10b. What newspapers do you read?  I am interested in both local and out-of-town papers [probe: do you read any other papers?].* More importantly, the survey measures whether prospective jurors have case-specific knowledge and recognize details widely reported in the news media. If prejudicial media items were limited to newspapers with small readership, then recognition rates for such items would be very low. The survey data do not support this hypothesis.

VALIDITY OF TELEPHONE SURVEY RESEARCH

The government retained John Frehse to review my declaration "as well as the survey and related data" and render an opinion. Mr. Frehse is the Senior Managing Director of Ankura Consulting Group, which is an "independent global expert services and advisory firm that delivers services and end-to-end solutions to help clients at critical inflection points related to change, risk,

disputes, finance, performance, distress, and transformation."[2] According to his declaration and bio, Mr. Frehse's area of expertise is "labor and operations strategy." There is no indication that he has ever consulted in the legal arena, conducted any jury-related research, observed a jury selection, evaluated a juror questionnaire, reviewed the relevant social science literature on juror and jury behavior, studied the impact of pretrial publicity on decision-making, or read voir dire transcripts from a high profile case. Mr. Frehse is a self-described "expert in surveys and survey administration." However, according to the government, he only conducts in-person interviews and has never conducted a telephone survey.

Mr. Frehse claims that phone surveys suffer from inherent bias, and the government argues that such surveys are "unreliable and subject to significant bias." These assertions are simply unfounded and ignore the important contribution telephone surveys make in informing public and private institutions. For example, the U.S. Census Bureau, U.S. Bureau of Labor and Statistics, National Institutes of Health, Bureau of Justice Statistics, and U.S. Fish and Wildlife Service all conduct telephone surveys to track trends, population growth, and the economy, and to inform policy.

It is interesting to note that Ankura—the consulting company where Mr. Frehse serves as Senior Managing Director—posts findings from telephone surveys on its website, for example a 2022 article titled "Holiday 2022 – What Retailers Can Expect from Inflation Weary Shopper."[3] The article cites data from a telephone survey conducted by the Survey Research Center at the University of Michigan.

---

[2] https://www.linkedin.com/company/ankura-consulting-group/
[3] https://angle.ankura.com/post/102hzgg/holiday-2022-what-retailers-can-expect-from-inflation-weary-shoppers



Mr. Frehse has made several presentations on the state of the economy after the pandemic which are available on YouTube.[4] Despite his assertion that telephone surveys are biased and unreliable, he makes numerous references in his presentations to telephone survey data collected by Gallup, the Pew Research Center, and others:



---

[4] For example, https://www.youtube.com/watch?v=BKaoiS6DwDc

DECLARATION OF BRYAN EDELMAN





What is really going on with the Labor Market?

When making the unfounded claim that telephone surveys are unreliable and subject to significant bias, the Government ignores the role these surveys play in the judicial system in both civil and criminal cases, for example, assessing potential bias in the jury pool and evidence of trademark confusion. The Government quotes *United States v. Cloud* to argue that "public polls introduced with the purpose of demonstrating jury bias have found little favor with the courts." However, it neglects to mention that an intra-district transfer was granted in *Cloud* and the Court concluded that "even giving the survey little weight, they tend to show some **predisposition to convict that the Court <u>must</u> take measures to minimize**."

Furthermore, courts in other venues have given significant weight to the survey data I offered as an expert. In *United States v. Sablan*,[5] the Court concluded, "While the actual impact of such publicity cannot be definitely quantified without engaging in an actual attempt at selecting a jury drawn from the Fresno Division, **the potential for influence creating bias is apparent as reflected in Dr. Edelman's survey**…Indeed, Dr. Edelman's **survey shows actual bias in more than half the potential jury pool**."

The court also granted a change of venue in *State of Washington v. David Nickels* based on telephone survey findings demonstrating that there was a risk that prospective jurors knew that Mr. Nickels had been previously convicted.[6] In *California v. Quentin Ray Bealer*, the court granted a change of venue largely based on findings from the telephone survey which were cited throughout the decision: "Dr. Edelman appeared to **use a measured, objective analysis** of the basis for a change of venue."[7]

SURVEY SAMPLE METHODOLOGY

The Government expressed concern over the source of the survey sample in this case. The survey employed a random cell phone (90%) and landline (10%) sample methodology to minimize non-response bias. Cell phone numbers were randomly selected from the counties which compose the Northern and Southern Divisions as put forth in the "Plan of the United States District Court For the District of Maryland for the Random Selection of Grand and Petit Jurors." The sample (44,000 records) was purchased from STS Samples. The survey screener was designed to mirror the qualifications put forth in the jury plan. Prospective survey respondents were screened to make

---

[5] United States v. Joseph Cabrera Sablan (2014) CR-00259-PMP, Order re Defendant Sablan's Motion to Transfer Venue, at *3.
[6] State of  Washington v. David Nickels (2022), 10-1-00322-6, Findings of Fact and Conclusions of Law and Order Regarding Defendant's Motion for a Change of Venue.
[7] State of California v. Quentin Ray Bealer (2014), NCR86297,  Ruling on Defendant's Motion for Change of Venue, at * 21.

DECLARATION OF BRYAN EDELMAN

sure they were 18 or older, a United States citizen, registered to vote in the relevant division, and understood English.

The sample design followed standard calling protocols to call sample phone numbers up to three times on different days of the week and at different times of the day in order to reach eligible respondents. The sample size of 400 was calculated via a power analysis to reach a 95% confidence interval of + or − 5% using the most conservative response distribution (50%). The random sampling that was used to achieve the target number of completed surveys allows for the ability to generalize the survey results to the entire jury pool. To put the sample size into context, research organizations such as the Rand Corporation and the Pew Research Center often predict with accuracy across the entire country based on random sampling of only 1,000 households.[8]

SURVEY RESPONSE RATES

The Government and Mr. Frehse incorrectly claim that the Mosby surveys had "abysmal response rates well less than 1%" and do not reflect the "full population."  Mr. Frehse incorrectly calculated the response rate by manufacturing a formula that fails to comply with any known public polling organization's calculation. He simply divided the number of completed surveys (602) by the number of "dials" (87,429). As an "expert in surveys and survey administration," he should know that a response rate is calculated by dividing the number of completed interviews by the total number of people in the sample who were **eligible to participate** (i.e., jury eligible).[9] The 87,000 dials he used in the denominator included answering machines (59,366), no answer (9,262), busy signals (7,811), introduction call backs (5,417), disconnected numbers (1,952), government agencies and businesses (71), fax machines (47), invalid numbers (542), etc. The American Association for Public Opinion Research has developed several response option calculators, including the standard in the field (AAPOR #4).[10] All of these methods are available for free on its website. The calculation of a response rate is complicated. None of the response option calculators simply divide the number of completed surveys by the number of dials, which would include non-eligible participants in addition to call backs (up to three per phone number).

Mr. Frehse asserts that telephone surveys, in general, suffer from "inherent bias" and that

---

[8] See "How can a small sample of 1,000 (or even 10,000) accurately represent the views of 250,000,000+ Americans?" at https://www.pewresearch.org/our-methods/u-s-surveys/frequently-askedquestions/
[9] "Response Rates – An Overview." American Association for Public Opinion Research (AAPOR), 29 September 2008. http://www.aapor.org/Education-Resources/For-Researchers/Poll-Survey-FAQ/Response-Rates-An-Overview.aspx.
[10] A copy of the formula and free excel spreadsheet calculator can be found at https://www.aapor.org/Education-Resources/For-Researchers/Poll-Survey-FAQ/Response-Rates-An- Overview.aspx).

non-response bias undermines the validity of the Mosby survey findings because I failed to address these inherent biases. These conclusions are based on his misrepresentation of a 2017 publication by the Pew Research Center titled, "What Low Response Rates mean for Telephone Surveys," and his incorrect calculation of the response rate.

Mr. Frehse repeatedly mischaracterizes the 2017 Pew publication research, which compared telephone surveys with low response rates to surveys with high response rates. The researchers' final conclusion was that: "*Response rate is an unreliable indicator of bias*."[11] This conclusion mirrors other studies which also found that response rate is not a good predictor of nonresponse error.[12]

Low response rates may lead to nonresponse bias when certain groups in a survey are overrepresented (e.g., Caucasians, women) or underrepresented (e.g., young people). Nonresponse bias can be an issue if specific groups over or underrepresented are correlated with a key variable of interest in the survey. There is no indication that any group was underrepresented in the Mosby survey or that any such a group was significantly related to case recognition, prejudgment, etc.

Mr. Frehse goes on to opine—without offering any supporting evidence—that a "large portion of the **media-disengaged population** and those less likely to respond to phone surveys were missed." Once again, this is not borne out by the survey data. Only **18%** of the total sample reported that they read and watch the local news several times a week. Nearly half of the total sample (**48%**) reported that they read a hard copy or online version of a newspaper <u>once a week or less</u>. In addition, **38%** of the total sample listens to local news on the radio or watches it on the television <u>once a week or less</u>. These data do not suggest that the survey failed to sample the population of "media-disengaged" prospective jurors.

Mr. Frehse goes on to assert that the Mosby survey findings are skewed because those who are civically active or highly political are much more likely to be aware of stories about Mrs. Mosby compared to a "typical" citizen. The only research he cites to support his position is the 2017 Pew Research Center study: "Civic activists or those highly engaged in community matters are more likely to respond to phone surveys." Once again, he misrepresents the researchers' findings by omitting their conclusion: "Fortunately for pollsters, **civic engagement is not strongly correlated with political attitudes or most other measures researchers attempt to study with surveys**."

---

[11] https://www.pewresearch.org/methods/2017/05/15/what-low-response-rates-mean-for-telephone-surveys/
[12] See Fowler, F.J., Roman, A.M., Mahmood, R., & Cosenza, C.A., in Journal of Survey Statistics and Methodology, vol. 4, pp. 246-262.

DECLARATION OF BRYAN EDELMAN

Mr. Frehse also misrepresents the Pew study by reporting that "highly political people are much more likely (up to 15 points more) to participate in a phone survey than those who do a government survey." What the researchers found was that the government survey (high response rate survey) indicated that 32% of adults vote in all or almost all elections, compared to 37% in the Pew Center survey, a difference of just five percent.

Thus, the only evidence Mr. Frehse offered to support his position that telephone surveys are inherently biased was his incorrect calculation of the response rate and a published study that found response rate to be an <u>unreliable</u> indicator of bias. If the validity of the Mosby survey data were confounded by response bias associated with civic and political engagement, then it would stand to reason that almost all survey respondents would be familiar with Marilyn Mosby, given her high profile in the media. However, this prediction is not borne out in the data. Approximately 56% of the total sample had heard of the former State's Attorney (62% in the Northern Division), and 38% had seen negative campaign ads about her during the 2022 election (41% in the Northern Division). While these figures are not insignificant, they are not unusually high, especially in an area so close to the epicenter of politics in the United States.

THE SURVEY INSTRUMENT

The survey design and methodology used in this case adhere to the standards and practices put forth by the American Society of Trial Consultants (ASTC) Profession Code for conducting change of venue surveys.[13] The Government and Mr. Frehse claim that the survey instrument created order effects and "encouraged respondents to believe Ms. Mosby was corrupt or guilty." After going through the screening process, survey respondents were told that there are no right or wrong answers and that they could respond with a "don't know" or "no opinion" to any question. They were then asked the following question, which included a four-point balanced Likert scale:

Q1. I am going to read you a list of current and former local, state, and federal government representatives. As I read each one, please tell me if you believe they are very corrupt, somewhat corrupt, not too corrupt, or not at all corrupt. First, **Randomize the list of names** [President Joe Biden, Governor Wes Moore, Former Baltimore state attorney Marilyn Mosby, Baltimore Mayor Brandon Scott]

---

[13]chromeextension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.astcweb.org/resources/Documents/ASTC%20 Professional%20Code%20Updated%202021.pdf

DECLARATION OF BRYAN EDELMAN

The Government claims that the wording of this question is "deeply problematic and phrased to elicit a particular response and to encourage the idea that public officials are corrupt." According to the Government and Mr. Frehse, "the respondent has already been exposed to negative bias about Ms. Mosby and may look at each subsequent question through the lens of corruption."

This question was not designed to elicit a particular response or encourage the idea that public officials are corrupt. The question was included because a substantial focus of the pretrial publicity in this case centered around allegations of corruption surrounding Mrs. Mosby during her tenure as State's Attorney. Furthermore, the question included other public officials to serve as a baseline and to mitigate any potential response bias. The Government opines that the question was designed to elicit a response that public officials are corrupt. Once again, these claims are not supported by the survey data. For example, if this question was generating bias, perceptions of corruption would be high across all four elected officials, i.e., there would be minimal variability. Only 19% of survey respondents reported that Governor Moore was "somewhat" or "very" corrupt, compared to 23% for Baltimore Mayor Scott, 36% for President Biden, and 41% for Marilyn Mosby. None of these numbers are excessively high. In addition—with the exception of Mrs. Mosby—more survey respondents fell into the "not too" or "not at all" corrupt categories than in the "very" or somewhat" corrupt categories. Furthermore, views toward Ms. Mosby varied by county. As expected, over half of survey respondents in Baltimore County and Baltimore City reported that Mrs. Mosby was corrupt. In contrast, only 31% of survey respondents from Montgomery County came to a similar conclusion.

The Government and Mr. Frehse opine that survey respondents may "now look through the lens of corruption," thus creating an order effect. They also incorrectly assert that the word "corruption" was used up to 16 times in the first question, which is not accurate. The scale was only read once, unless a survey respondent asked for it to be repeated. Order effects can bias a response to a subsequent question when two questions on the same topic are asked together.[14] The next series of questions measured the extent to which prospective jurors had read, seen, or heard of Marilyn Mosby and whether they had a positive or negative opinion of her. Once again, the data

---

[14] Biemer, P., Groves, R.M., Lyberg, L.E., Mathiowetz, N.A., & Sudman, S. (2004). Measurement Errors in Surveys. Wiley-Interscience, John Wiley & Sons, Inc., Hoboken, NJ.

varied in ways indicative of systemic bias against the defendant, not order effects. For example, opinions of Mrs. Mosby were significantly more negative in Baltimore County and Baltimore City, where over 35% maintained a "very" negative opinion of the defendant, compared to just 6% in Montgomery County. In addition, opinions of Mrs. Mosby were significantly related to the case knowledge questions which were asked later in the survey. As predicted, survey respondents who were familiar with prejudicial media items held stronger negative opinions of the defendant compared to those who had not.

The Government goes on to misrepresent the case knowledge questions at the end of the survey as "leading questions which encourage the respondent to give a particular answer and to assume the defendant is guilty." Media recognition questions are a common component of a change of venue survey. They are used to assess the breadth of prospective jurors' case knowledge and exposure to prejudicial media coverage. These questions are intentionally placed toward the end of the survey—after the prejudgment questions—to avoid creating order effects, artificial bias, or priming the survey respondent to "assume the defendant is guilty." As such, they do not have any impact on how prospective jurors respond to the earlier prejudgment questions. The Government also asserts that "by the close of the survey, when additional open-ended questions are asked, the respondent has been primed to answer in the negative regarding the defendant." However, there are no open-ended questions "by the close of the survey." All of the open-ended questions were placed near the beginning of the survey, before survey respondents were introduced to potentially prejudicial media items.

The Government also opines that the battery of media recognition items "encouraged" a specific response. If acquiescence bias was present, it would predict high rates of affirmation—i.e., "yes" responses—with little variation across questions. Once again, the data do not support such a conclusion. There was considerable variability across media items tested in the survey. Recognition was lowest for items which received less attention in the pretrial publicity:

| Media Recognition Item | Percentage who answered with a "yes" response |
|---|---|
| Have you read, seen, or heard if Marilyn Mosby used the money from her retirement account to purchase two homes in Florida? | 74.6% |
| Have you read, seen, or heard if Marilyn Mosby failed to | |

| | |
|---|---|
| disclose a lien for unpaid taxes on the mortgage applications for the Florida homes? | 57% |
| Have you read, seen, or heard if Marilyn Mosby's attorney said her travel company experienced financial hardship during the Covid pandemic? | 55.5% |
| Have you read, seen, or heard if Marilyn Mosby's tenure as Baltimore's State Attorney was surrounded by controversy? | 72.6% |
| Have you read, seen, or heard if Marilyn Mosby was under investigation during her tenure as Baltimore's State Attorney? | 69.3% |
| Have you read, seen, or heard if there had been an investigation into the travel business Marilyn Mosby started when she was in office? | 40.7 |
| Have you read, seen, or heard if Marilyn Mosby told investigators before the pandemic started that her travel company was not operating and had no income? | 29.4% |

Mr. Frehse claimed, without any supporting evidence, that these questions "introduce negative bias by educating participants on potential wrongdoing and continuing to instill a negative bias towards Ms. Mosby." This assertion ignores the flow of the survey and disregards the purpose of a change of venue survey and what they are designed to measure. These questions were crafted after reading more than 200 articles published between January 2022 and May 2023. They were selected because this material regularly appeared in the coverage. If Mr. Frehse believes this content is indicative of "potential wrongdoing and negative bias," then I assume he agrees that the pretrial publicity that has been pervasive in the Northern District is prejudicial toward the defendant.

MEASURING FIXED OPINIONS

The Government goes on to describe one of the measures of potential bias as the "most deeply flawed" question in the survey:

Given what you have read, seen, or heard about Marilyn Mosby, would she have a difficult time convincing you that she is not—repeat is not— guilty of making false

statements that she suffered financial hardship during the pandemic?

The Government asserts that the question "improperly shifts the burden of guilt onto the defendant" because "in the United States of America, no defendant ever has to convince you that she is not guilty; all defendants are presumed innocent, and the government always bears the burden." Without explanation or supporting evidence, it claims that this question "invites unreliable results." The Government goes on to quote *Cloud* but omits the Court's final determination regarding the survey results before it granted the defendant's motion for an intra-district transfer to Spokane: "Nonetheless, even giving the survey results little weight, **they tend to show some predisposition to convict that the Court <u>must</u> take measures to minimize**."[15]

The Government appears to misunderstand the intent of the survey question at issue. It is true, in a perfect world that does not exist, all defendants are presumed innocent when they enter the courtroom, and no defendant ever has to convince a prospective juror that he or she is not guilty. When a jury pool has been exposed to prejudicial media coverage, many prospective jurors develop case-specific attitudes toward the defendant and his or her guilt. When they enter the courtroom, these attitudes do not magically disappear.

The survey question does not "shift the burden" onto the defendant. Rather, it measures the strength of opinions for those prospective jurors who already believe the defendant is guilty because of exposure to pretrial publicity. Specifically, do they start the trial with a "presumption of guilt" based on what they already know about the case? The question measures prospective jurors' current state of mind based on exposure to media coverage, not their understanding of the law and criminal justice system.

It is important to note that I did not come up with this question on my own. A similar question was used by Judge Jerry Beck while conducting voir dire in a high profile case in Tennessee.[16] A number of prospective jurors expressed bias during voir dire, but also reported that they could be fair and set it aside. However, when Judge Beck followed up and asked if it would take evidence from the defendant to change their mind, many jurors answered in the affirmative.

The Government was also critical of the survey instrument for failing to ask if jurors could set aside their opinions and judge fairly based on the evidence presented before them. Ironically, it criticizes the survey for what it views as leading questions and then focuses on the omission of a question well known for generating socially desirable responses.

---

[15] *United States v. James Dean Cloud,* (2021), 1:19-cr-01032-AMJ-1, Order Granting Defendants' Motion for Intradistrict Transfer, at * 9.
[16] State of Tennessee v. Nikolaus Johnson, (2010), Case No S50059.

DECLARATION OF BRYAN EDELMAN

In *Rideau*, the jury pool was exposed to a taped 20-minute interview in the jail between the defendant and Sheriff.[17] In the interrogation, the defendant confessed to the murder of three people during a bank robbery. A soundtrack was added to the recording and the interview aired three times on television within a few months leading up to trial. Three of the 12 seated jurors had seen the televised interrogation. Despite the highly prejudicial nature of such a sensational televised confession, all three jurors told the court during voir dire that they could "lay aside any opinion, give the defendant the presumption of innocence as provided by law, base their decision solely upon the evidence, and apply the law as given by the court."[18] Chief Justice Hughes offered this honest assessment of the world nearly ninety years ago in *United States v. Wood*:[19]

"[i]mpartiality is not a technical conception. It is a state of mind." A trial court's decision whether a juror possessed "this mental attitude of appropriate indifference" must be reviewed in the totality of circumstances. It is not limited to the juror's response to a "magic question."

In *Irvin v. Dowd*, the Court ruled:

No doubt, each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see." With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.[20]

Finally, in *Montgomery. v. Commonwealth of Kentucky*,[21] the Court ruled that jurors who should be considered disqualified by personal knowledge, past experience or attitude cannot be rehabilitated by means of any "**magic question**" as to whether they will be able to set aside preconceived notions and decide impartially.

---

[17] *Rideau v. Louisiana*, 373 U.S. 723 (1963).
[18] *Id*. at 732.
[19] *United States v. Wood*, 299 U.S. 123, 146, 57 S. Ct. 177, 185, 81 L.Ed. 78 (1936), at *718
[20] *Irvin v. Dowd*, 366 U.S. 717, 727-28 (1960).
[21] Joseph Montgomery v. Commonwealth of Kentucky, Nos. 89–SC–286–MR, 89–SC–315–MR and 89–SC–316–MR. (1991).

The social science literature has also shown that the set-aside question is leading, increases socially desirable responses, and lacks validity. For example, research has demonstrated that answers to the set-aside question often conflict with or are unrelated to other measures of bias (e.g., prejudgment, extent of case knowledge, exposure to prejudicial media coverage). Moran and Cutler (1991) found that 62% of jury-eligible residents in a high profile case said they could be fair and impartial and decide the case solely on the basis of the evidence presented. However, only 39% said they could put knowledge of the media out of their minds.[22] They also found that subjective estimates of the ability to be fair and impartial were not related to case knowledge. Sue, Smith, and Pedrozza (1975) found that participants who had been exposed to negative pretrial publicity and reported that they could render a fair and impartial verdict were just as likely to convict compared to their counterparts in a control group who had read neutral pretrial publicity and also reported that they could be fair and impartial.[23]

My own research demonstrates the unreliability of the "magic" set-aside question. A 2020 study presented at the American Psychology Law and Society annual conference found that prospective jurors profess that they can be fair and impartial, even in the most extreme of circumstances.[24] Participants were recruited from a Facebook page dedicated to a miniseries about Robert Durst, a real estate mogul in New York, who had been associated with a string of murders. Durst was charged with murder in California shortly after the documentary aired. The miniseries included a number of highly prejudicial and inadmissible details, including a murder trial in Texas, the disappearance of his wife, and a confession that was unintentionally recorded while Durst was in the bathroom.

People who publicly posted strong negative opinions about Durst on the Facebook page were recruited for the study. For example, one participant posted: "This is the true vision of a sociopath. I am physically ill over the conclusion. I am beside myself. I was overjoyed at the news that he was arrested."

Approximately 92% of participants in the study believed Durst was guilty, and 77% reported that he would have a difficult time convincing them that he was not guilty in his upcoming murder trial. Participants were familiar with multiple prejudicial media items from the

[22] Moran, C., & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology*, 21(5), 345-67.
[23] Sue, S., Smith, R. E., & Pedroza, G. (1975). Authoritarianism, pretrial publicity, and awareness of bias in simulated jurors. *Psychological Reports, 37*(3, Pt 2), 1299–1302.
[24] Gordan, N. & Edelman, B. (2020). Self-Assessments About Fairness in the Robert Durst Case.  Presented at the American Psychology Law Society Annual Conference, New Orleans, LA.

documentary, including: (1) he was a suspect in his wife's disappearance (96%), (2) he was a suspect in several murders (92%), (3) he had been tried in Texas for murder (92%), and (4) he had allegedly confessed (100%). Thus, these participants: (1) were highly engaged in a prejudicial miniseries about the defendant; (2) made negative public statements about the defendant on social media; (3) knew multiple inadmissible details including a confession; and (4) reported strong opinions about the defendant's guilt. One would hope that prospective jurors with such a mind set would report that they cannot be a fair and impartial juror.

Participants were then read an introductory instruction based on the transcript from a high profile case. The introduction mentioned that Durst was entitled to a fair and impartial trial. The burden of proof was on the prosecution to prove that he was guilty "beyond a reasonable doubt." Participants were also told that the law requires them to set aside any biases and opinions they had and decide the case solely based on the evidence in the courtroom.

After reading the instruction, participants were then asked if they "could be a fair and impartial juror and decide the case solely on the basis of the evidence as the law required." Even though these participants had been exposed to a highly prejudicial miniseries with multiple inadmissible prejudicial details, publicly posted negative comments about the defendant, believed he was guilty, and maintained a "presumption of guilt," **81%** reported that they could be fair and impartial.

When asked an open-ended question, their responses mirrored the language from the instruction. For example, the participant who described Durst as a "true vision of a sociopath" reported that he could "definitely" be fair and impartial: "I could start from the beginning and listen to the information presented and follow the directions and wipe out everything that I know. I would need to be convinced beyond a shadow of a doubt."

These findings are consistent with the body of social science literature on the efficacy of the "magic" set-aside question. Even in the most extreme of circumstances, prospective jurors provide the socially desirable response. While the Court may review the "totality of the circumstances" when weighing a prospective juror's response to a set-aside question, such an evaluation cannot be taken in a survey.  It is not appropriate to ask a question demonstrated in the research to result in potentially socially desirable responses in a change of venue survey. The ASTC Professional Code for conducting venue surveys recognizes these problems and specifically

addresses the set-aside question in Paragraph G:[25]

> Direct questions about a respondent's ability to be fair and impartial if called to be
> a juror in the case should be avoided. Such questions and others that inquire whether
> the respondent can set aside prejudicial information and reach a verdict based on
> the evidence presented at trial yield inflated estimates of this ability.

In conclusion, based on my own experience reviewing voir dire transcripts and juror questionnaires from high profile cases, sitting in over a hundred jury selections, and conducting research on the reliability of the set-aside question, it is my opinion that it is inappropriate to include a set-aside question in a survey designed to measure bias in the jury pool related to exposure to pretrial publicity.

VOIR DIRE IS NOT A RELIABLE REMEDY IN HIGH PROFILE CASES

Finally, the government asserts that I failed to give proper weight to voir dire as a tool for ferreting out bias. My position on the value of voir dire in high profile cases is based on my own experience assisting with jury selections over the last 20 years, my research on the topic, and the social science literature.[26]

To support its position, the Government quotes a California decision dating back to a 2009 change of venue study I worked on. Although the court in *Mackey* disagreed with my 2009 conclusions, there are several other instances where courts agreed with my assessment of voir dire as an inadequate remedy for addressing prejudicial pretrial publicity. For example, in *Sablan*, the court wrote that "there is little assurance that even the most rigorous procedures would mitigate the apparently legitimate specter of bias or prejudice to the process of a fair trial" when addressing voir dire.[27] The court came to a similar conclusion in *Cloud*: "The Court is unpersuaded that voir dire will combat the publicity concerns described above."[28] The court in *Nickels* also dismissed voir dire as a reliable tool for fully assessing prospective jurors' exposure to prejudicial content: "Given the limitations of voir dire in uncovering the extent of case knowledge and the risk that jurors know about Mr. Nickels, this Court finds that transferring venue to another county will help

---

[25] chromeextension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.astcweb.org/resources/Documents/ASTC%20 Professional%20Code%20Updated%202021.pdf

[26] See Declaration of Bryan Edelman, Ph.D., (6/30/23), ECF 212-1 (citing research and sources on the efficacy of voir dire).

[27] United States v. Joseph Cabrera Sablan (2014) CR-00259-PMP, Order re Defendant Sablan's Motion to Transfer Venue, at *4.

[28] *United States v. James Dean Cloud,* (2021), 1:19-cr-01032-AMJ-1, Order Granting Defendants' Motion for Intradistrict Transfer, at * 10-11.

DECLARATION OF BRYAN EDELMAN

ensure Mr. Nickels' constitutional right to a fair and impartial jury."[29] Recently, the Court of Appeals in the Seventh District of Texas addressed the risk of relying on voir dire as a remedy for addressing bias in the jury pool:

> By this logic, it would be permissible to improperly influence a jury panel so long as we have a competent set of attorneys and a diligent trial judge willing to parse through the venire and eliminate any potential bias injected into the jury by that improper influence. That is not the way our judicial system works. Litigants should enter the courtroom on an equal basis, not one made equal by the hard work of conducting voir dire on a biased panel. "*The law is exceedingly jealous of the purity of the jury box*, and always has been. It seeks to shut up every avenue through which corruption . . . or any other improper influence, could possibly make an approach to it." *Pierson v. State*, 18 Tex. App. 524, 559 (1885) (Emphasis added).[30]

My own post-conviction work reviewing voir dire transcripts in high profile cases demonstrates the reality of the voir dire process and its limitations. Consistent with the social science literature, many jurors who have developed opinions from exposure to pretrial publicity are easily rehabilitated after expressing bias on a juror questionnaire or in voir dire. Even when hundreds of prospective jurors are called for jury duty in a high profile case, the voir dire process often emphasizes efficiency to speed up the process. In addition, the adversarial nature of the process affords the government the opportunity to ask leading questions, rehabilitate jurors who express bias, and educate prospective jurors on how to answer the set-aside question well before the defense gets to ask any questions. In conclusion, I do not believe voir dire is a reliable tool for ferreting out bias in the rare instances when the jury pool has been exposed to extensive and prejudicial media coverage.

---

[29] State of Washington v. David Nickels (2022), 10-1-00322-6, Findings of Fact and Conclusions of Law and Order Regarding Defendant's Motion for a Change of Venue, at *8.
[30] *William A. Brewer III v. Lennox Health Products, LLC, et al.* (2018), No. 07-16-00121-CV, at *21-22.

DECLARATION OF BRYAN EDELMAN

I declare under penalty of perjury under the laws of the State of California that the foregoing facts are true and correct, except as to facts stated upon information and belief, which facts I believe to be true.

Executed on August 23, 2023

_____

Bryan Edelman