**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.  LKG-22-007** |
| | * | |
| **MARILYN MOSBY,** | * | |
| | * | |
| **Defendant.** | * | |
| | ******* | |

**GOVERNMENT'S REPONSE TO THE DEFENDANT'S
<u>REQUESTED CARES ACT JURY INSTRUCTIONS</u>**

The Government files this response to the Defendant's proposed CARES Act jury instructions. *See* ECF 223. The Government addresses each instruction separately below. However, collectively the proposed instructions contradict and confuse the other jury instructions already proposed in this case. Rather than focus on the elements of the perjury—the charge on which the jury will need to return a finding of guilt or innocence—the proposed instructions turn the jury's attention to the intricacies of the CARES Act, sometimes redefining elements of perjury that are already defined. In so doing, these instructions are overly complex, confusing, one-sided, and at times incorrect. Where possible, the Government has noted places where it might be able to find common ground with the defense. However, for the Court to enlarge the jury instructions in this case in the fashion requested by the Defendant would be inappropriate and would not serve justice.

**1. The Defendant's Definition of "Adverse Financial Consequences" in Request 1 is Confusing and Contrary to Law.**

To define a three word phrase—"adverse financial consequences"—the Defendant proposes over two hundred. *See* ECF 223, at 5-6. This will only serve to confuse the jury.  The proposed instructions muddle the perjury state of mind instructions already given to the jury and

misstate the law.  "Adverse financial consequences" is a straightforward term that the jury is capable of understanding without further definition (just as it was on the forms the Defendant signed). If the Court believes a definition is required, it should look to regular dictionary definitions and define "adverse financial consequences" simply as "negative outcomes related to money," as would an ordinary person signing the form.

The first paragraph of the Defendant's proposed definition does not relate at all to the term it seeks to define, but instead focuses on the Defendant's state of mind, which has already been extensively addressed in other jury instructions. The Defendant proposes language stating that:

> The government must prove beyond a reasonable doubt that Mrs. Mosby submitted her withdrawal forms knowing that she did not suffer adverse financial consequences according to how she understood the term, and that she did so for the purpose of misleading her 457(b) administrator. In other words, the government must prove that, at the time Mrs. Mosby submitted her withdrawal forms she subjectively believed she had not suffered 'adverse financial consequences' as she understood that term.

*Id.* at 6. But this instruction is at best a confusing repetition of the parties' jointly proposed instruction Nos. 35-37, which detail extensively how the jury should assess "the defendant's state of mind at the time the statements were made," ECF 166, at 51, to determine whether "at the time the answers were given, the defendant knew and believed that her answers were false and that she purposely or intentionally gave the false answers and not because of confusion, mistake or faulty memory." *Id*. at 48. The Defendant's proposal only muddies the Sand & Siffert instructions, the favored instructions in this District, regarding state of mind. Modifying Sand & Siffert in a later instruction will only confuse the jury. There is thus no need for the entire first paragraph of the Defendant's proposed Request 1 related to state of mind. Sand & Siffert correctly summarizes the law already.

Even more troubling, the proposed instruction misstates the law. The instruction declares

that the government must prove that the defendant "subjectively believed that she had not suffered 'adverse financial consequences' as she understood that term." Not so. The government must prove that the defendant did not believe she had "experience[d] adverse financial consequences *stemming from such virus or disease as a result of*: being quarantined, furloughed or laid off; having reduced work hours; being unable to work due to lack of child care; [and] the closing or reduction of hours of a business I own or operate." Superseding Indictment ¶ 12 (emphasis added). The proposed instruction completely omits the necessary cause of an adverse financial consequences per the statute. It reads out the "stemming from such virus" and "as a result of" language that is critical to the perjury counts. Having suffered adverse financial consequences *alone* is insufficient under the CARES Act to trigger the withdrawal. More importantly, it was insufficient on the form the defendant signed under penalty of perjury. Rather, those adverse consequences must be *the result of* a clearly defined set of causes *stemming from the coronavirus*. Congress could have written the CARES Act to allow retirement plans to approve distributions during the pandemic whenever a plan participant suffered from adverse financial consequences, whatever the reason (or none at all). But it didn't. Instead, Congress tied the distribution to specific factual triggers, articulated in Section 2202(a)(4)(A) of the CARES Act. The defendant committed perjury when she claimed to have suffered adverse financial consequences *as a result of* those statutory triggers on a form. The proposed instruction creates the impression that the statutory requirements (and the statement the Defendant averred to under oath) contain nothing about the causes of the adverse financial consequences. That is contrary to the CARES Act and the document the Defendant signed.

In the next paragraph, the Defendant's proposed instruction describes to the jury what the term "adverse financial consequences" is "*not* limited to"—an unnecessary and confusing method of describing to the jury what the phrase means. *See* ECF 223, at 6 (Beginning by defining

"Adverse financial consequences as used in the CARES Act" as "*not* limited to quantifiable monetary loss (like a reduction in salary or income from a job.") (emphasis added). In fact, this proposed paragraph does not even define the term adverse financial consequences; it goes on to discuss what the term "can also include." Representations of what the term "can" include do not serve to define the term, and will only further serve to confuse the jury and invite additional questions—what else might be included? When "can" those items be included? When "can" they not be included? A listing of several potential items is not a definition.

The laundry list of possible consequences also includes further incorrect and confusing statements: that "adverse financial consequences" involve "unrecouped start-up business cost, unrecouped business expenditures, business transition costs, and the loss of expected revenue or income." ECF 223, at 6. But this statement (like the overall definition itself) fails to account for the fact that such activity must be "*consequences*" of "being quarantined, furloughed or laid off; having reduced work hours; being unable to work due to lack of childcare; or the closing or reduction of hours of a business [the defendant] owned or operated." Superseding Indictment ¶ 12. The Defendant's proposed instruction, including various "unrecouped" expenses, wrongly creates the impression that start up costs incurred *before* anyone ever knew about COVID-19, could be a "consequence" of a reduction in hours as a result of COVID-19 months later *even if there is no causal relationship*. That is incorrect. A consequence is something "necessarily following from a set of conditions." Miriam-Webster, "Consequence," available at http://www.merriam-webster.com/dictionary/consequence (emphasis added). Expenses incurred before COVID-19 are not consequences of COVID-19. There is no attempt made to relate these adverse financial consequences to the legislation's necessary trigger that they must occur "as a result of."

Rather than the Defendant's confusing and incorrect statement of the law, the term

"adverse financial consequences" is a straightforward term which does not need further definition to the jury. *See United States v. Gabrielian*, SAG-22-336 (D.MD 2023), ECF 92, at 3 (holding that "this Court finds that the fairly straightforward nature of the term "malicious harm" and the specific intent requirement of the statute mitigate against any vagueness and overbreadth concern"). In fact, it was straightforward enough on the form for the Defendant (and every other person who filled out the form) to understand without further elaboration. However, if the Court believes it should define "adverse financial consequences" above and beyond the ordinary meaning of the term, the Government proposes that the Court define "adverse financial consequences" as "unfavorable outcomes related to money." That definition is clear, concise, and comports with the ordinary definition of the term.

Where "Congress has not defined a statutory term, 'to determine ordinary meaning, [courts] may consult dictionary definitions, interpretations given to the same term by judicial construction, and the statutory context in which the words are used.'" *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 226 (D. Mass.), *quoting Hernandez-Miranda v. Empresas Diaz Masso, Inc.,* 651 F.3d 167, 171 (1st Cir. 2011). "Adverse" means "unfavorable," both in the context of the statute itself and in contemporary dictionaries. *See* Webster's Third New International Dictionary ["Webster's 3rd"], "Adverse," available at ttps://www.merriam-webster.com/dictionary/adverse. "Financial" means "relating to or involving money." *See* Collins Dictionary, "financial," available at https://www.collinsdictionary.com/dictionary/english/financial ("Financial means relating to or involving money."); Webster's 3rd, "Financial" (relating to finance); "Finances" ("money or other lieuid resources of a government, business, group, or individual"; Cambridge Dictionary, "Financial,"                    ("relating                    to                    money"),                    available                    at https://dictionary.cambridge.org/us/dictionary/english/financial;   Oxford   English   Dictionary,

"Financial," available at https://www.oed.com/search/dictionary/?scope=Entries&q=financial ("Of or relating to finance or money matters"). "Consequences" means "outcome." *See,* Dictionary.com, "Consequence," available at https://www.dictionary.com/browse/consequence, ("the effect, result, or outcome of something occurring earlier"); Webster's 3rd, "Consequence," available at https://www.merriam-webster.com/dictionary/consequence (listing "outcome" as a synonym and noting that a definition is "something produced by a cause or necessarily following from a set of conditions"). Ultimately, the Court should attempt to simplify the law for the jury through its instructions, not confuse the issue more, as the Defendant's proposed instruction does. An "adverse financial consequence" is a "negative outcome related to money," in the commonly used understanding of the term. That is what the Defendant claimed she experienced as a result of being quarantined, furloughed, or laid off; having reduced work hours; being unable to work due to lack of childcare; or the closing or reduction of hours of a business she owned or operated.

## 2.   Request 2 is Incorrect About the Size of "Adverse Financial Consequences"

The Defendant further seeks an instruction stating that there is "no minimum dollar amount that an enrollee's loss must surpass; a loss of even one dollar could qualify as 'adverse financial consequences." ECF 223, at 8. But while the CARES Act does not set a flat numerical minimum, a plain reading of the form itself and the CARES Act support that an "adverse financial consequence" cannot be *de minimis*. A defendant who misplaced a penny when she was on quarantine cannot be said to "experience" an "adverse financial consequence." If such an instruction is required, the government proposes the following: "An enrollee in a 457(b) plan can experience 'adverse financial consequences' even if her financial loss is relatively small, measured in total dollars, but the loss must be more than nominal and insignificant."

Consider first the CARES Act itself, which provides for distributions for a person who

"*experiences* adverse financial consequences as a result of being quarantined, being furloughed or laid off or having work hours reduced due to such virus or disease, being unable to work due to lack of child care due to such virus or disease, closing or reducing hours of a business owned or operated by the individual due to such virus or disease." (emphasis added). To "experience" something, means to "have something happen to you, or to do or feel something." Cambridge Dictionary, "Experience," available at https://dictionary.cambridge.org/us/dictionary/english/experience. In order to "experience" a loss, that loss must have some significance, otherwise, the individual will not "experience" or "feel" the loss. A *de minimis* loss is not one that can rightly be said to be "experienced," because it is so small—so insignificant by nature—that it is not worthy of consideration. *De minimis* losses are by definition not those that are something a person "feels."

Allowing anything—even an insignificant and *de minimis* event such as the loss of one cent--- to qualify, also flies in the face of the structure of the statute, because it would render the certification provision a nullity. If even one cent qualifies (or even .00001 of a cent), then why would Congress have put the requirement in to place at all? Congress did not write the statute to allow every citizen to withdraw up to $100,000 from their tax-advantaged retirement accounts. Only those who had "experienced adverse financial consequences" could do so. Allowing the defendant to define such consequence down to a negligible amount would render the law a nullity and frustrate the clear purpose of the statute and the form—to help those who had experienced financial adversity as a result of COVID-19.

In short, a consequence must be of some consequence.

Similarly, one cannot be said the have suffered an "adverse" *de minimis* consequence. Because a de minimis consequence is, by definition, so minor as to merit disregard, it is not

something one "feels." *See* Webster's 3rd, "de minimis," available at https://www.merriam-webster.com/dictionary/de%20minimis ("lacking significant or importance; so minor as to merit disregard."). Something so minor as to merit complete disregard—1/1,000,000,000 of a cent, as the defendant would propose, cannot be said to be "adverse" because it is totally immaterially. Such a loss is no more "adverse" to the Defendant than a fly is "adverse" to a giant—so small as to not even register, or to be "experienced."

This straightforward reading supports the notion that the certification is not a nullity. That the "adverse financial consequences" suffered cannot be *de minimis* or insignificant. Indeed, the statute and form further underscore this fact by making the term plural "consequence*s*," rather than singular, "consequence," underscoring that the "consequences" are things of substance that the Defendant must have experienced. A fraction of a penny does not count. Therefore, the jury should be instructed as such.

### 3.   Request 3 Distracts from the Elements of Perjury

Each of the Defendant's proposed Requests 3, 4, and 5 deal with either the amount of or use of funds once withdrawn from an individual's 457(b) plan. Each instruction suffers from its own individual infirmity, but collectively they overcomplicate the jury instructions in their failure to connect to the elements of the offense charged. In the event the Court would like the jury to be instructed on the amount and use of the Defendant's withdrawals, the Court should give a neutral jury instruction that conveys the law accurately, with proper context and within the elements of the offense, rather than a statement of the argument from one side as the Defendant seeks.

By focusing only on what would be allowable under the CARES Act, rather than the elements of perjury themselves, the Defendant's Request 3 will distract the jury from the charges they must consider. The perjury instructions proposed at ECF 166 by the parties accurately

summarize the elements of perjury. The elements of perjury are as follows:

- First, that the defendant, under penalty of perjury, subscribed as true, written information submitted to Nationwide, the administrator of the City of Baltimore's Retirement Savings and Deferred Compensation Plans.

- Second, that the defendant made false statements as to matters about which the defendant subscribed as true as set forth in the indictment.

- Third, that the matters as to which it is charged that the defendant made false statements were material to the issues under inquiry by the City of Baltimore's Deferred Compensation Plan.

- Fourth, that such false statements were willfully made.

*See* ECF 166 at 41; Sand, Siffert, *Modern Fed. Jury Instructions,* Instruction 48:3. Specifically, proposed Instruction Number 27 states the alleged false statement was as follows: "the Defendant experienced adverse financial consequences stemming from the Coronavirus as a result of being quarantined, furloughed, or laid off; having reduced work hours; being unable to work due to lack of child care; or the closing or reduction of house of a business she owned or operated."

Defendant's Request 3 states: "A 457(b) enrollee who qualified for a CARES Act withdrawal was allowed to withdraw up to $100,000, regardless of the total amount of adverse financial consequences she experienced." The CARES Act did not create a blanket rule that allowed every citizen who qualified to make withdrawals from their 457(b) plan. Rather, the CARES Act *permitted* employers to choose whether and to what extent to permit such withdrawals. *See* Internal Revenue Service Notice 2020-50, "Guidance for Coronavirus-Related Distributions and Loans from Retirement Plans Under the CARES Act," available at https://www.irs.gov/pub/irs-drop/n-20-50.pdf, at 8 ("An employer is permitted to **choose whether**, and to what extent, to treat distributions under its plan as coronavirus-related distributions . . . Thus, for example, an employer **may choose to provide for coronavirus-related distributions** but choose not to change its plan loan provisions or loan repayment schedules."). It further stated

that plan administrators "**may** rely on an individual's certification that the individual (satisfied) the conditions to be a qualified individual in determining whether a distribution is a coronavirus-related distribution, unless the administrator (had) actual knowledge to the contrary." *See id.* at 9 (emphasis added).

The Defendant submitted two separate City of Baltimore Retirement Savings and Deferred Compensation Plans 457(b) Coronavirus-Related Distribution Requests. On each of those forms, she is alleged to have falsely certified under penalties of perjury that she suffered adverse financial consequences stemming from the coronavirus as a result of the specifically enumerated causes. It is the Defendant's alleged false certifications on which the plan relied in issuing her the withdrawals. The Defendant's proposed instruction risks confusing the jury between what the CARES Act permitted an employer to do and what the Defendant is alleged to have falsely certified. In addition, the proposed instruction is overly verbose. The proposed instruction uses three sentences to state a concept which could be said in one sentence. Neither the elements of perjury, nor the alleged false statement depend on the size of the Defendant's withdrawal. The Defendant states, "This instruction will prevent the jury from incorrectly applying the law," *See* ECF 223 at 9, but there is no reason to believe that the jury will do so. The size of the withdrawal is not one of the elements of the offense.

Of course, the jury should be allowed to draw conclusions from the fact that the Defendant withdrew a large amount of money and used withdrawn funds to purchase two vacation homes. As a result, what the Defendant appears to be seeking through this instruction, similar to her proposed Request 4, is a limiting instruction regarding the Defendant's use of those withdrawn funds. In that event, the Court may choose to give a neutral limiting instruction to avoid any concern that the jury may misuse this evidence. However, the Defendant's proposed instruction,

standing alone as written, is not such an instruction.

### 4. Request 4 is Argumentative and an Incomplete Statement of Law.

The Defendant's Request 4, which relates to the expenditure of funds from a retirement plan once a withdrawal was made, misleadingly presents the Defendant's argument without context and is itself an incomplete statement of law. The instruction, taken as a whole, represents an argument rather than a statement of law. The Court should decline to so instruct the jury.

In defense of this instruction, the Defendant reverts to her continued misstatement of the Government's position on the relevance of her expenditure of withdrawn funds, stating: "the government intends to argue that she did not use her CRDs to 'mitigate' those consequences—which, *in the government's view, anyone who had suffered adverse financial consequences would have done*." ECF 223 (emphasis added). The Government has not made such a blanket claim and will not do so at trial. Meanwhile, the instruction is silent as to the potential relevance of evidence of the Defendant's use of her withdrawal, and thus fails as an unbiased statement of the law. It is an accurate statement of the law—and in fact the Court has already ruled—if the Court were to instruct the jury that, "evidence about how Defendant used her withdrawn funds is relevant to determining whether she experienced 'adverse financial consequences' due to the coronavirus." ECF #105 at 19-20. At a minimum, this context is missing from the Defendant's instruction.

To the extent this instruction is meant to serve the purpose of limiting whatever prejudice may stem from this highly relevant evidence, the Defendant's proposed instruction is not a neutral statement of law, but rather an argument of counsel. It states one side of an issue—that the CARES Act itself did not forbid expenditures unrelated to the specific adverse financial consequences caused by COVID that justified the expenditure—while it omits a statement of why the evidence was introduced at trial, as would be typical in any such limiting instruction. Stating one side of

issue without context does not serve the purpose of informing the jury. It instead serves to bias

them. Contrast the Defendant's proposed instructions with those from the parties' prior joint

proposed instructions, for example, Instruction Numbers 22 (Specific Investigative Techniques

Not Required; Government Not Required to Call All Possible Witnesses or Present All Exhibits),

23 (Defendant's Character), and 47 (Expert Witness (If Applicable)). *See* ECF 166 at 31, 33, and

47, respectively. A simple reading of those instructions compared to the Defendant's request here

shows a stark contrast.

Take joint proposed Instruction Number 22, for example. It begins with a summary of the

evidence to which the Court refers:

> During the trial you have heard testimony of witnesses and argument by
> counsel that the government did not utilize specific investigative techniques.
> (For example, no fingerprints were taken and no transmitting device was
> utilized during the defendant's alleged conversations with the agent.)

It then proceeds to state the proper use of this evidence:

> You may consider these facts in deciding whether the government has met its
> burden of proof, because as I told you, you should look to all of the evidence
> or lack of evidence in deciding whether the defendant is guilty.

It follows this statement with a statement that limits the use of the evidence:

> However, you also are instructed that there is no legal requirement that the
> government use any of these specific investigative techniques to prove its
> case. (There is no requirement to attempt to take fingerprints, or that it offer
> fingerprints or tape recordings in evidence.) Law enforcement techniques are
> not your concern.

The instruction then brings the jury back, in a neutral manner, to the task at hand:

> Your concern, as I have said, is to determine whether or not, on the evidence
> or lack of evidence, the defendant's guilt has been proved beyond reasonable
> doubt.

*Id.* at 31; Sand, Siffert, et al., *Modern Fed. Jury Instructions*, Instruction No. 4:4 (modified). The

instruction does not merely state, "There is no legal requirement that the Government utilize

specific investigative techniques like fingerprints. Law enforcement techniques are not your concern." Such an instruction, much like the Defendant's proposed requests, would lack proper context and be one-sided.

Beyond its biased nature, the Defendant's Request 4 is poorly written. The first sentence contains the repetitive construction that the funds could be used "for any purpose she wished, or no purpose at all." Meanwhile, the second sentence of the instruction casually states, "The statute imposed no restrictions on how an enrollee could spend her money." ECF 223. While it may be true that the CARES Act does not impose restrictions on the use of *properly* withdrawn funds, it is without question that there were restrictions on withdrawals from 457(b) retirement accounts. A reference to the funds in such an account as "her money" is argumentative and implies that there were no restrictions. Such statements are better suited for counsel's argument to the jury, and not in instructions given by the Court.

To the extent the Court wishes to give a limiting instruction that addresses the amount of funds withdrawn by the Defendant from her 457(b) plan, and her use of those funds, the Government submits the following, in place of both the Defendant's Request 3 and 4:

> "You have heard evidence regarding both the amount of funds the Defendant withdrew from her 457(b) plan, as well as how the Defendant used the funds she withdrew. There is no requirement in the law that once a person suffered adverse financial consequences as a result of the coronavirus, that the person withdraw funds equal to or less than those adverse financial consequences or use any portion of the funds withdrawn to mitigate the adverse financial consequences stemming from the coronavirus. However, you may use evidence of the amount of funds withdrawn or the use of those funds by the Defendant for the purpose of determining whether or not the Defendant had in fact suffered adverse financial consequences due to the coronavirus. It is up to you to determine what if any weight you place on this evidence."

This is the type of straightforward and even-handed statement that should make up a limiting jury instruction. It states the law as it applies to the case as simply as possible, informing the jury

of the purpose for which they can use a piece of evidence, while simultaneously ensuring that the jury does not use the evidence incorrectly.

However, the Defendant—in her reply to the Government's response to her motion to sever charges—has now argued for the first time that the Court should reverse its prior ruling on the admissibility of this evidence altogether. *See* ECF 217 at 9-15, 28-29. The Court should decline to do so. First, the Court should decline to do so because the Court's ruling was correct as a matter of law. Second, the Court should decline to do so because the filing of this request in a reply on a separate motion did not allow for proper briefing on the issue.

First, the Court should decline to reverse its prior ruling because the Court was right. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401. The Court has rightly found that the evidence of the Defendant's use of funds is probative of whether she suffered adverse consequences due to the coronavirus, as she certified. This finding does not mean that such evidence is alone dispositive were it not combined with other evidence, such as evidence that the Defendant repeatedly stated that her travel business was non-operational, or evidence taken from the Defendant's calendar and schedule of appearances that she maintained steady employment without being quarantined, furloughed, laid off, or suffering reduced work hours throughout the entire period of prosecution.[1]

The Defendant's reply to the Government's response to her motion to sever charges

---

[1] The Defendant also states in the same reply in support of severance that, besides the use of funds evidence, "the government has not identified any other mortgage-fraud related evidence it believes would be admissible as to the perjury counts." ECF 217 at 17. This is incorrect. Of course, evidence of the Defendant's whereabouts, such as her calendar, credit card transactions, work appearances, or other scheduled engagements in Maryland would be equally admissible in both perjury and mortgage fraud trials, regardless of severance. Such evidence would show that she was not quarantined, furloughed, laid off, had reduced work hours, or was unable to work due to lack of childcare—all relevant to the perjury charges. In addition, such evidence would be equally admissible in a separate trial for mortgage fraud because it goes to prove that the Defendant had not spent "the past 70 days" living in Florida, as she stated she had in a letter submitted in support of her application.

attempts a passionate rebuttal to the conclusions she feels can be drawn from the fact that the Defendant put her 457(b) withdrawal to the purchase of two vacation homes in Florida. However, that is all it is: the Defendant's argument about the weight of the evidence, not a successful argument against its admissibility. In fact, the Defendant's argument presents no new facts or insights that were not already present over a year ago when the Defendant previously filed a motion, followed by additional briefing by both sides, and oral argument. The defendant argues, for example, that it is difficult to ascertain what "mitigating" the effects of COVID might be— buying a sweater? tank of gas? Paying utility bills? *See* ECF 217 at 12. A reasonable juror, however, will be able to see the difference between paying utility bills and buying two vacation properties in Florida. And that is why there is at least a logical inference that can be drawn from the evidence. The Defendant even rehashes the same failed argument she previously made about the fungibility of money. *See id.* The Defendant complains that "whether someone purchases a particular item with withdrawal funds or with other funds is impossible to determine." *See id.* However, materials submitted in the Disclosure of Joshua Johnston, filed as Exhibit 3 to ECF 182, shows such a conclusion can be made based on the evidence.

Paragraph 20 of that disclosure states as follows:

> Ms. Mosby's bank statements, as well as the loan documents associated with the Kissimmee Property, show that Ms. Mosby used the $36,000 CRD to fund the purchase of the Kissimmee Property. As demonstrated in **Table 1** below, but for the $36,000 CRD Ms. Mosby received from her 457(b) Plan, she would not have been able to satisfy the closing costs of $62,934 on the Kissimmee Property.

*Id.* at 7 (internal footnote removed). It then includes the following table:

**Table 1**

| Checking & Savings Accounts | Account Balances 9/1/2020 | | Closing Costs Paid 9/2/2020 | | Difference | |
|---|---|---|---|---|---|---|
| Bank of America (XXXX9041) | $ | 63,572 | | | | |
| MECU Credit Union (XXXX8205) | | 741 | | | | |
| MECU Credit Union (XXXX8200) | | 27 | | | | |
| **Total** | $ | 64,340 | $ | 62,934 | $ | 1,406 |

*Sources:*
USA-003919-004458; USA-004635-004664; USA-005056-005079; USA-004687-004706; USA-008133-008267; USA-009020-009031; USA-009107-009110; USA-009169-009174; USA-005111-005319 at USA-005121

*Id.* at 8. Johnston also analyzed the second withdrawal and, in Paragraph 24, stated:

> Ms. Mosby's bank statements, as well as the loan documents associated with the Long Boat Property, indicate that Ms. Mosby used the proceeds from her 457(b) Plan distribution to fund the purchase of the Long Boat Property.  As demonstrated in **Table 2** below, but for the $45,000 CRD Ms. Mosby received from her 457(b) Plan, she would not have been able to satisfy the closing costs on the Long Boat Property.  As with the Kissimmee Property, rather than use the December 2020 CRD to compensate for adverse financial consequences brought on by the Pandemic, Ms. Mosby applied the proceeds from her 457(b) Plan to purchase real estate in Florida.

*Id.* at 8-9 (internal footnotes removed). It then includes the following table:

**Table 2**

| Checking & Savings Accounts | Account Balances 2/18/2021 | | Closing Costs Paid 2/19/2021 | | Difference | |
|---|---|---|---|---|---|---|
| Bank of America (XXXX9041) | $ | 36,963 | | | | |
| MECU Credit Union (XXXX8205) | | 467 | | | | |
| MECU Credit Union (XXXX8200) | | 1,920 | | | | |
| **Total** | $ | 39,350 | $ | 30,699 | $ | 8,651 |

*Sources:*
USA-003919-004458; USA-004635-004664; USA-005056-005079; USA-004687-004706; USA-008133-008267; USA-009020-009031; USA-009107-009110; USA-009169-009174; USA-013291-014209 at USA-013557

*Id.* at 9.

It is inappropriate at this late juncture to ask the Court to reverse itself, as opposed to

16

inviting full briefing if the Court believes the issue needs to be revisited. The Defendant's strategy is perplexing. In her initial severance motion, the Defendant made no indication that she sought to revise the Court's prior ruling, and in fact ignored the Court's prior ruling altogether. It was only after the Government pointed out that this issue had already been fully litigated that the Defendant asked the Court to reconsider it. The Court was right in the first place and should decline to grant the Defendant's requested relief.

To the extent the Defendant has concerns about the jury using evidence of her use of withdrawn funds, her proposed jury instructions are not appropriate remedies. However, such concerns could instead be allayed by a jury instruction similar to that proposed by the Government above.

### 5. The Defendant's Request 5 is Misleading and Presupposes Evidence For Which There Appears No Basis.

The Defendant's Request 5 is premature and, as written, would confuse the jury. There has been no indication of a factual basis that will be support this instruction at trial. Beyond this, the instruction is misleading and suffers a similar infirmity as Request 3. It distracts from the elements of perjury by focusing only on the requirements of the CARES Act.

The proposed instruction states, "Once a 457(b) enrollee qualified for a CARES Act withdrawal, she was allowed to make multiple withdrawals up to the $100,000 maximum set by the CARES Act. An enrollee could take a second withdrawal without experience new, additional adverse financial consequences after the first withdrawal." This instruction presupposes evidence for which there appears to be no basis. If there is evidence at trial that supports a position that the Defendant qualified for the first withdrawal, but no additional qualifying event took place between the two withdrawals, then an instruction addressing this situation could be relevant and some form of this instruction could be revisited.

However, similar to Request 3, this instruction creates confusion between what the CARES Act permitted an employer to do and what the Defendant is alleged to have twice falsely certified. Here, the Defendant filled out two forms that are alleged to have been false certifications of her qualifications to make withdrawals from her 457(b) plan. If she had suffered adverse financial consequences as a result of the coronavirus that met the requirements of the law, then it appears that she could have lawfully made multiple withdrawals up to $100,000. Her employer, as permitted under the CARES Act, still required her to fill out a certification for each withdrawal, however, and she in fact did fill out two certifications under the penalties of perjury. The Defendant's proposed instruction as written runs the risk of making it seem to the jury as if only one certification matters. The Court should therefore decline to give it.

### 6.  There is No Reason to Instruct the Jury on the Purpose of the CARES Act

There is no reason to instruct the jury on what the Defendant improperly concludes was the purpose of the CARES Act. *See* ECF 223, at 12. A purpose instruction is appropriate for the charged offense, such as that found in ECF 166 at Instruction 43 pertaining to the Defendant's false statements on her loan application charges. It is not appropriate here. There has not to date even been a proposed instruction as to the purpose of the law against perjury (the offense for which the defendant was charged). There is simply no reason why the Court should instruct the jury on the purpose of the CARES Act.

The Defendant—again focused on what the jury might think of her use of withdrawn funds—submits that this instruction would be necessary to counter a perceived misinterpretation of this evidence and "instruct the jury that the CARES Act sought to flood the economy with cash." *See* ECF 223 at 12. This instruction, and the logic behind its inclusion, is patently wrong. If Congress, through the CARES Act, sought only to "flood the economy with cash," it would have

allowed unfettered withdrawals without preconditions tied to the coronavirus in amounts greater than $100,000. Instead, Congress tied the distribution to specific factual triggers, articulated in Section 2202(a)(4)(A) of the CARES Act. Coronavirus related distributions were not stimulus payments meant to inject cash into a struggling economy. They were instead an emergency option granting limited access to retirement funds in order to mitigate the negative financial consequences people suffered as a result of the Coronavirus, just as the government had previously done in times of natural disasters. "These coronavirus-related distributions were meant as a financial lifeline for cash-strapped households during a time of economic carnage and the highest rate of unemployment since the Great Depression." Iacurci, Greg, "Time is running out to repay Covid-era 401(k), IRS withdrawals—and claim a tax refund" CNBC Personal Finance, published June 3, 2023, available at http://www.cnbc.com/amp.2023/06/03/deadline-to-repay-covid-era-401k-ira-withdrawals-approaches.html. Just because Congress did not make the Defendant itemize her expenses does not mean that Congress wanted its citizenry to raid their tax-advantaged retirement savings and go on spending sprees purchasing second and third homes.

This makes Defendant's Request 6 not only unnecessary, but incorrect. The Defendant cites a decision from this district regarding economic impact payments in support of the statement she drafts, but the language in her proposed instruction looks nothing like the language from that opinion. *See* ECF 223 at 12; *R.V. v. Mnuchin*, 570 F. Supp. 3d 322, 325 (D. Md. 2021). In fact, the words "recession" and "consumer spending" do not appear in any of the citations given in support of her statement that this instruction is "undeniably true"—not in *R.V. v. Mnuchin*, not in the Department of Treasury article that case quotes, nor even in *U.S. Small Bus. Admin. v. Weather King Heating & Air, Inc.*, 648 B.R. 200, 205 (N.D. Ohio 2023), the Northern District of Ohio case involving the Payroll Protection Plan that the Defendant strains to use to support this instruction.

Finally, the instruction states what it purports to be only "one purpose" of the CARES Act. *See* ECF 223 at 12. Setting aside the inaccuracy of the stated purpose, it would be inappropriate for a jury instruction to select only one purpose of the statute that serves the Defendant, to the exclusion of others. Because the instruction is not only unnecessary but also incomplete and incorrect, the Court should decline to give it entirely.

### 7. The Defendant's Instruction Regarding Decision-Making Bodies Misstates the Law and the Facts.

Finally, the Defendant's instruction on the definition of a decision-making body unnecessarily repeats elements already covered in the materiality instruction and wrongly characterizes the law and the facts of the decision-making body.

First, Defendant proposes that the Court instruct the jury that "To prove perjury, the government must show that a defendant's statement is material, i.e., that it "has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." That is at best an incomplete repetition of proposed Jury Instruction No. 34, regarding materiality. *See* ECF 166, at 48 ("A false statement is material if it has a natural tendency to influence or is capable of influencing the decision of the agency. To find that the testimony was material you need not find that it did in fact influence the decision of the City of Baltimore's Deferred Compensation Plan. You need only find that it was capable of influencing the City of Baltimore's Deferred Compensation Plan's decision."). There is no need to rephrase a partial version of the materiality instruction in a different place in the jury instructions.

Moreover, the Defendant goes on to propose that the Court instruct that, "If a person or institution is required to approve a request by someone who self-certifies that she meets the criteria for approval, that person or institution lacks the necessary discretion. That person or institution therefore does not qualify as a decision-making body." ECF 223, at 13.  Here, in an attempt to

essentially instruct the jury to acquit, the defendant misstates the law. First, she provides no support for the sweeping assertion she would have the Court make—that if *any* "person" is required to approve her request based on her perjury, she should not be guilty of perjury. But that sweeps far too broad—imagine a mortgage agent who has been instructed by her employer to approve a loan if certain criteria are met. Surely, lying to that mortgage agent would qualify as fraud, even if the agent herself was merely checking *on behalf of her employer* that the defendant met certain criteria.

In addition, the defendant fails to understand that Nationwide, as the plan administrator for the Baltimore City Retirement Plan, had the discretion to deny the withdrawal *and would have done so if the defendant had told the truth*. First, the CARES Act itself (and the IRS guidance she cites) merely *permitted* a plan administrator to rely on self-certification. The CARES Act did not require the administrator to do so. Therefore, even her argumentative description of what qualifies as a "decision-making body" is not an accurate assessment of the facts. *See* ECF 223, at 14 (quoting IRS CARES Act guidance stating that an "eligible retirement plan *may* rely on an individual's certification that the individual satisfies the conditions to be a qualified individual in determining whether a distribution is a coronavirus-related distribution, unless the administrator has actual knowledge to the contrary). Nor is her statement that "the IRS CARES Act Guidance *requires* administrators to accept self-certifications at face value." ECF 223, at 15. The CARES Act *allowed* administrator's the latitude to rely on self-certification as safe harbor *if they chose to do so*. Nowhere in the CARES Act or IRS Guidance was any plan administrator required to disburse funds on an employee certification. Indeed, it was up to the Plan to decide whether to offer such disbursements in the first place. The CARES Act merely provided an option allowing them to do so.

Even more troubling, the Defendant completely disregards that a plan could still disallow

a withdrawal if the "administrator has actual knowledge to the contrary," that is, if the *Defendant had told the truth*, the plan would have not disbursed the funds.  In the up-is-down world the Defendant seeks to create, the fact that the regulations she cites clearly indicate the materiality of her false statement—only with her certification could the funds be released—means that she was not dealing with a decision-making body. The fact that a decisionmaker chooses to rely on a statement from the Defendant does not render them a non-decisionmaker. It means the Defendant's statement was material. The perjured statements were not just capable of influencing a decisionmaker. They actually did so. The materiality instruction is clear and should not be muddied with the legally incorrect information the Defendant proposes.

## CONCLUSION

For the reasons given above, the Court should decline to give the Defendant's additional proposed jury instructions.

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

By:_____/s/_____
    Sean R. Delaney
    Aaron S.J. Zelinsky
    Assistant United States Attorneys

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

____/s/_____
Sean R. Delaney
Assistant United States Attorney