United States District Court for
the District of Maryland

**United States**

v.

**Marilyn Mosby**

No. 1:22-cr-7-LKG

**Proposed Reply in Support of Marilyn Mosby's
Requested CARES Act Jury Instructions**

The government for the most part opposes Marilyn Mosby's proposed CARES Act jury instructions, labeling them confusing, one-sided, and legally erroneous. To the extent some of the supposed confusion can be cured by rewording the instructions, Mrs. Mosby below submits certain potential modifications to which she does not object. In other instances, however, it is the government's arguments that would confuse the jury, by injecting irrelevant matters and unnecessary legal complexity into jurors' deliberations. The government also gets the law wrong in several places, seeking to rewrite the CARES Act to reach results that Congress never intended, and objecting to instructions merely because the statute as written does not contain the limitations the government wishes it did. This Court should therefore overrule the government's objections and instruct the jury consistent with Mrs. Mosby's brief in support of her proposed CARES Act jury instructions.

1

I.     Argument

The government objected individually to each of Mrs. Mosby's proposed jury instructions. She addresses those objections in turn.

  A.     **Instruction 1: manifestation of "adverse financial consequences"**

The government lodges several objections to Mrs. Mosby's proposed instruction on how "adverse financial consequences" can manifest. She addresses them in turn.

To begin, the government asserts Instruction 1 "misstates the law" because it does not specify that adverse financial consequences must result from one of the circumstances enumerated in § 2202 of the CARES Act (quarantine, furlough, etc.). ECF 231 at 2-3. Although she believes it is unnecessary in light of other jury instructions, Mrs. Mosby has no objection to rewording Instruction 1 to clarify that adverse financial consequences must occur "as a result of" one of § 2202's circumstances.

The government also complains that Instruction 1 "does not even define the term adverse financial consequences," and instead provides only a "listing of several potential items" that might qualify. *Id.* at 4. The government therefore cites dictionary entries for "adverse," "financial," and "consequences," from which it cobbles together its own definition of adverse financial consequences: "unfavorable outcomes related to money." *Id.* at 5; *see also id.* at 6 ("a negative outcome related to money"). That the government had to resort to the dictionary confirms, as Mrs. Mosby's brief explained, that neither the CARES Act nor any executive-branch guidance provides a definition of "adverse financial consequences." *See* ECF 223 at 6-7. Nevertheless, Mrs. Mosby does not object to instructing the jury that "adverse financial consequences" means "unfavorable outcomes related to money"—as long as (1) the jury is also instructed that those "unfavorable outcomes" can include the outcomes she identified in Instruction 1 (damaged business opportunities,

2

unrecouped start-up business costs, unrecouped business expenditures, business transition costs, and the loss of expected revenue or income), *see* ECF 223 at 6, and (2) the jury is instructed that "adverse financial consequences" do not need to surpass any minimum dollar threshold, *see infra*, Part I.B.

According to the government, specifying particular outcomes that "adverse financial consequences" "can include" will "only further serve to confuse the jury and invite additional questions—what else might be included? When 'can' those items be included? When 'can' they not be included?" ECF 231 at 4. That fear is misplaced. Mrs. Mosby does not plan to argue she suffered any adverse financial consequences other than those listed in the previous paragraph, so the jury will have no reason to speculate about other possible manifestations of adverse financial consequences. And to the extent that the word "can" introduces some (very minimal) degree of ambiguity, the solution is simply to change "can include" to "includes"—i.e., "the term [adverse financial consequences] *includes* damaged business opportunities, unrecouped start-up business costs, unrecouped business expenditures, business transition costs, and the loss of expected revenue or income." Mrs. Mosby has no objection to that modification.

The government insists, however, that such an instruction would be an "incorrect statement of the law" because "[e]xpenses incurred before COVID-19 are not consequences of COVID-19." ECF 231 at 4. That is true but irrelevant. Notice the government's sleight of hand: the CARES Act does not require that "expenses" result from covid, but rather that "*adverse financial consequences*" result from covid. True enough, money spent before the pandemic—i.e., a pre-pandemic "expense"—is not itself a consequence of covid. But it is possible to suffer "adverse financial consequences" based on pre-pandemic expenses that, as

3

a consequence of covid, cannot be recouped. Relative to the onset of covid, what matters isn't when someone incurs an expense, but rather when she suffers an adverse financial consequence.

Consider a restaurateur who is planning to open a pizza parlor. From December of 2019 through February of 2020, he purchases furniture and ingredients, hires and begins paying staff, and makes payments on the restaurant's lease. But in March 2020, before he can open his doors to the public, the coronavirus prompts stay-at-home orders and confines his potential customers to their homes. Unable to get his business off the ground, the restaurateur abandons his plan and shifts to a different, more covid-resilient venture. The loss of money he invested in the pizza parlor, which he cannot recoup, is an "adverse financial consequence"—or, to use the government's phrase, an "unfavorable outcome related to money"—that results from covid. There is a "causal relationship" between the restaurateur's financial loss and the pandemic. *Id.*[1]

Finally, the government argues the jury would be "confus[ed]" by an instruction that adverse financial consequences are "not limited to quantifiable monetary losses (like a reduction in salary or income from a job)." *Id.* at 3. There is nothing confusing about the "not limited to" formulation, either in general or in this case. It is a standard, accepted way of articulating that a concept includes not only one thing, but also others. And here, Instruction

---

[1] As explained above, Mrs. Mosby agrees that any adverse financial consequences arising from pre-pandemic expenses must result from one of the circumstances enumerated in § 2202 of the CARES Act. *See* ECF 231 at 4 (government arguing that "'unrecouped start-up business cost[s], unrecouped business expenditures, business transition costs, and the loss of expected revenue or income' . . . must be '*consequences*' of 'being quarantined, furloughed or laid off; having reduced work hours; being unable to work due to lack of childcare; or the closing or reduction of hours of a business [the defendant] owned or operated'" (emphasis in original)). Mrs. Mosby does not object to modifying Instruction 1 to make this point explicit.

1's "not limited to" clause will dispel, rather than create, juror confusion. The government concedes that a reduction in salary is not the only form that adverse financial consequences can take. *See* ECF 72 at 14. Yet the only theory the government has ever articulated for proving Mrs. Mosby did not suffer adverse financial consequences is that her salary did not decrease during the pandemic. *See, e.g.*, *id.* at 13 ("[I]f the Defendant had been 'quarantined, furloughed or laid off' her salary would have decreased. Similarly, if the Defendant experienced 'reduced work hours' her salary would have decreased."). Given the government's exclusive focus on salary to prove its case, the jury may assume—incorrectly—that salary is the only permissible metric for measuring adverse financial consequences. Instruction 1 will prevent that misconception.[2]

### B. Instruction 2: size of "adverse financial consequences"

The government asks the Court to instruct jurors that although a 457(b) enrollee can experience adverse financial consequences "even if her financial loss is relatively small," the loss "must be more than nominal and insignificant." ECF 231 at 6. The government does not claim—because it can't—that words like "relatively small," "nominal," or "insignificant" appear anywhere in the CARES Act's text. Instead, the government attempts to wring its novel principle out of dictionary entries for "experience," "de minimis," and "consequences." Even assuming that courts should simply engraft dictionary definitions onto statutory text, the government's effort goes nowhere. *But see, e.g.*, *United States v. Tate*, 999 F.3d 374, 378

---

[2] The government also contends Instruction 1's first paragraph is "at best a confusing repetition of the parties' jointly proposed instruction Nos. 35-37," which quote Sand & Siffert's explanation of the perjury statute's "knowingly" and "willfully" elements. *Id.* at 2. But the government never explains in what way that paragraph is "confusing," how it "muddies" the Sand & Siffert instructions, or which part of it is legally erroneous. *See id.* A naked assertion that a statement of law is confusing, without more, does not justify omitting a legally correct jury instruction.

(6th Cir. 2021) ("[A] court should not mechanistically parse down each word of the statute to its dictionary definition, no matter the resulting reading that would give the law."); *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 592 (2d Cir. 2007) ("[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary.").

First, the government defines "experience" as "to 'have something happen to you, or to do or feel something,'" and then asserts that "to 'experience' a loss, that loss must have some significance, otherwise, the individual will not 'experience' or 'feel' the loss." *Id.* at 7. But that is simply not true. No fluent speaker of the English language would say that someone who loses $10 has not "experienced" a loss. Someone who loses $10 "'experience[s]' or 'feel[s]'" that loss in the form of reduced purchasing power. *Id.* While the loss may not be as significant as the loss of $100 or $100,000, it nonetheless "happens to" the person who loses the money. *Id.*

Next, citing a dictionary entry for "de minimis," the government claims "one cannot . . . suffer[] an 'adverse' *de minimis* consequence," since "a de minimis consequence is, by definition, so minor as to merit disregard, it is not something one 'feels.'" ECF 231 at 7-8. It is unclear why the government relies on a definition of "de minimis"—a term that does not appear in the CARES Act. The relevant term that *does* appear in the CARES Act is "adverse," which means "opposed to one's interests," "unfavorable,"[3] or alternatively, "having a negative or harmful effect on something."[4] As these definitions make clear, the word "adverse" imposes no substantiality requirement; something can be adverse even if it is

---

[3] Merriam-Webster, "Adverse," *available at* https://www.merriam-webster.com/dictionary/adverse (last visited Aug. 29, 2023).

[4] Cambridge Dictionary, "Adverse," *available at* https://dictionary.cambridge.org/us/dictionary/english/adverse (last visited Aug. 29, 2023).

not "*substantially* unfavorable" or does not "hav[e] a *substantially* negative or harmful effect." If the CARES Act contains an implicit "de minimis" exception, then *every* statute must contain one. After all, civil and criminal liability under a statute always turns on the cognizability of a certain harm or other effect, and de minimis harms are, in the government's view, definitionally non-cognizable. This is not, and has never been, the law.

Finally, the government notes that the CARES Act uses the plural "consequence*s*," rather than the singular "consequence," which supposedly "underscore[es] that the 'consequences' are things of substance that the Defendant must have experienced." ECF 231 at 8. The government's conclusion does not follow from its premise. Numerosity and substantiality are not the same thing; whether consequences are one or many has nothing to do with whether those consequences are "of substance."

In addition to its (purportedly) textual arguments, the government asserts the CARES Act must contain an unwritten "de minimis" exception because otherwise "every citizen" would be able "to withdraw up to $100,000 from their tax-advantaged retirement accounts," thereby "render[ing] the law a nullity." *Id.* at 7. That is not true. As the government has repeatedly stressed throughout this case, the only people entitled to take CRDs under the CARES Act were those who suffered adverse financial consequences resulting from one of the circumstances in § 2202. And it is not even remotely true that "every citizen" suffered a covid-related financial loss as a result of being quarantined, being furloughed or laid off, seeing a reduction in work hours, being unable to work because of a lack of child care, or closing or reducing the hours of a business they owned or operated. The government offers no evidence to support that remarkable claim.

At bottom, the government's "de minimis" argument attempts to write into the

CARES Act a requirement that Congress chose not to include. Overriding Congress' will in that way is always improper, but it would be particularly inappropriate in this case given that, in other portions of the CARES Act, Congress did include something like the "de minimis" exception the government urges. Section 2301 of the statute allowed "eligible employer[s]" to take a "credit against applicable employment taxes" if they satisfied certain criteria. CARES Act, Pub. L. 116-136, § 2301(a), 134 Stat. 281, 347 (2020). Relevant here, an employer qualified for the Employee Retention Credit (ERC) only if it suffered a "*significant* decline in gross receipts" in a given quarter. *Id.* § 2301(c)(2)(B) (emphasis added). And the CARES Act explicitly laid out, in detail, which gross-receipts declines qualified as "significant." *See id.* Specifically, an employer was directed to "compar[e] the gross receipts of the calendar quarter in which ERC is considered to the gross receipts of the same calendar quarter in 2019."[5] For 2020, an employer "beg[a]n qualifying in the quarter when [its] gross receipts [we]re less than 50% of the gross receipts of the same quarter in 2019" and "no longer qualif[ied] in the quarter after the quarter in which [its] gross receipts [we]re more than 80% of the same quarter in 2019."[6] For 2021, "gross receipts for the quarter [had to] be less than 80% of the gross receipts for the same quarter in 2019."[7]

Congress could have subjected CRDs to similar limitations, but it elected not to. This Court's jury instructions should honor that choice.

---

[5] Internal Revenue Service, *Frequently asked questions about the Employee Retention Credit*, https://www.irs.gov/coronavirus/frequently-asked-questions-about-the-employee-retention-credit#decline (last visited August 29, 2023).

[6] *Id.*

[7] *Id.*

    **C.**    **Instruction 3: correspondence between "adverse financial consequences" and a CRD**

The government argues Instruction 3 "risks confusing the jury between what the CARES Act permitted an employer to do and what the Defendant is alleged to have falsely certified." ECF 231 at 10. According to the government, the CARES Act did not *entitle* qualifying individuals to take CRDs from their 457(b) plans, but rather "*permitted* employers to *choose* whether and to what extent to permit such withdrawals." *Id.* at 9 (first emphasis in original). But even if that's true, it's no reason not to give Instruction 3. It is undisputed that Mrs. Mosby's employer, the City of Baltimore, permitted all eligible employees to take CRDs. Employers' ability to withhold CRDs is therefore irrelevant to this case, and it will not come up at trial or need to be addressed in the jury instructions. There is no risk that Instruction 3 will somehow confuse the jury regarding an issue that is not before the jury.

The government also objects to Instruction 3 on the ground that "[n]either the elements of perjury, nor the alleged false statement depend on the size of the Defendant's withdrawal," so "there is no reason to believe that the jury will" "incorrectly apply[] the law." ECF 231 at 10. Mrs. Mosby's motion identified a reason to fear jurors' misapplication of the law: their assumption that "Congress would not have permitted 457(b) enrollees to withdraw more money than they lost to the pandemic, since federal law ordinarily prohibits retirement-plan participants from accessing their retirement funds before they retire." ECF 223 at 9. Rather than specifically responding to this point, the government simply ignores it.

    **D.**    **Instruction 4: proper uses of a CRD**

The government does not contend that Instruction 4—which says a 457(b) enrollee need not use a CRD to "mitigate" adverse financial consequences—is legally erroneous. Nor does it deny that jurors hearing the government's "mitigation" argument might be misled into

9

believing the CARES Act incorporates a mitigation requirement. Instead, the government believes Instruction 4 is "incomplete," "[s]tat[es] one side of an issue without context," and is "not . . . neutral" because it omits the government's theory for why use-of-funds evidence is relevant. ECF 223 at 11-12.

The government seems to assume that if a statement of law is advantageous to one party but not another, then it is necessarily "bias[ed]." *Id.* at 12. That is not so. Sometimes a legal principle benefits only one party, and when instructing the jury on that principle is necessary to avoid possible juror confusion, courts do and should provide such instructions. Sand & Siffert's "purpose of the statement" perjury instruction, for instance, provides that "[t]he government is not required to prove that the mortgage lending business actually relied upon the alleged false statement." ECF 166 at 64. Instructing the jury on this rule advantages only the government, by removing one possible basis on which jurors might be improperly tempted to acquit. But that fact does not mean the instruction is "bias[ed]" or "not . . . neutral." It just means the law is good for the government in this area.

Regardless, if the Court agrees with Mrs. Mosby that use-of-funds evidence is inadmissible, then Instruction 4 will be unnecessary, as the jury will not know whether Mrs. Mosby used her CRDs to "mitigate" adverse financial consequences or not. If the Court deems such evidence relevant, however, then as the government indicates, Instruction 4 will be necessary to limit the prejudice from its admission. *See id.* But contrary to the government's suggestion, it is not true that "any" or every limiting instruction explains why the government believes evidence is relevant. *Id.* at 11. On occasion, a limiting instruction will describe the permissible "purpose[s] for which [the jury] can use a piece of evidence," *id.* at 13-14—but only when, e.g., the Federal Rules of Evidence specifically prohibit other,

impermissible uses. Rule 404(b), for example, provides that bad-acts evidence "is *not* admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it "*may be* admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" (emphasis added). When evidence is admitted under the latter provision, it is appropriate to instruct the jury on the proper uses of that evidence, in order to ward off improper propensity uses. But otherwise, it is neither necessary nor "typical" for jury instructions to spell out how the jury can use certain evidence, or why it is relevant under Rule 401. ECF 231 at 11. The Court should decline to tip the scales in the government's favor by endorsing its relevance theory in the jury instructions.

In addition to arguing Instruction 4 should be "unbiased," *id.*, the government takes another shot at arguing the relevance of the use-of-funds evidence. The admissibility of that evidence is not among the issues the Court directed the parties to brief in its August 1, 2023 order. *See* ECF 221.[8] Regardless, the government still has not offered a coherent theory of admissibility that is consistent with the CARES Act.

---

[8] The government justifies its digression by claiming that in her reply in support of severance, Mrs. Mosby "argued for the first time that the Court should reverse its prior ruling on the admissibility of [the use-of-funds] evidence," leaving the government unable to submit "proper briefing on the issue." ECF 231 at 14; *see also id.* at 17 ("In her initial severance motion, the Defendant made no indication that she sought to revise the Court's prior ruling."). That claim is not borne out by the record. Mrs. Mosby's severance motion explained, at length, that "the way [she] used her withdrawals is inadmissible to prove she did not suffer adverse financial consequences," and she argued "the Court should exclude use-of-funds evidence." ECF 207 at 15-21. It required no special clairvoyance to discern from this language that Mrs. Mosby was asking the Court to "reverse its prior ruling" on the use-of-funds evidence. ECF 231 at 14. Indeed, in its opposition to severance, the government itself characterized the motion as an "attempt to relitigate [Mrs. Mosby's] failed previous motion [to exclude the use-of-funds evidence]." ECF 215 at 9. The government noted, numerous times, that the Court had "already definitively rejected the Defendant's principal argument that evidence of how the Defendant used her withdrawn funds is irrelevant." *E.g.*,

11

Despite staking admissibility entirely on the concept of "mitigating" adverse financial consequences, the government never defines the term. *See* ECF 231 at 15. Specifically, the government does not say whether "mitigation" means using CRD funds to buy exactly the same basket of goods and services that a 457(b) enrollee would have bought if she had never suffered adverse financial consequences. *See* ECF 217 at 12. If that is indeed what the government means by "mitigation"—and it's hard to imagine what else it might mean—then its theory is at odds with the CARES Act. That theory, as Mrs. Mosby's severance reply explained, implicitly assumes that someone who has suffered adverse financial consequences has a need to mitigate them. *See id.* at 12-13. The government does not deny that, nor does it explain how that assumption can be reconciled with the CARES Act. *See* ECF 231 at 14-17.

Instead, the government simply posits that "[a] reasonable juror . . . will be able to see the difference between paying utility bills and buying two vacation properties in Florida"—without explaining what exactly that difference is, or why it matters. *Id.* The government's silence is especially telling given that Mrs. Mosby's severance reply specifically called out the government for failing to offer a definition of "mitigation." ECF 217 at 12.

Finally, the government quibbles with two aspects of Instruction 4's wording. First, it argues that "[w]hile it may be true that the CARES Act does not impose restrictions on the use of *properly* withdrawn funds, it is without question that there were restrictions on withdrawals from 457(b) retirement accounts." ECF 231 at 13 (emphasis in original). Mrs. Mosby has no objection to rephrasing Instruction 4 to clarify this point, e.g., "The CARES

---

*id.* at 7. And it argued against revisiting that holding by claiming, erroneously, that the "law of the case" doctrine rendered the Court powerless to change its mind. *Id.* at 6, 12. In short, the government had the requisite notice and opportunity to argue, in its response to Mrs. Mosby's severance motion, that the use-of-funds evidence was relevant and admissible.

12

Act permitted an *eligible* 457(b) enrollee to use withdrawn funds for any purpose she wished, or no purpose at all. . . ." Second, the government maintains Instruction 4 is "argumentative," *id.*, because it says the CARES Act "imposed no restrictions on how an enrollee could spend *her money*," ECF 223 at 10 (emphasis added). Again, Mrs. Mosby is happy to reword this instruction in a way that accommodates the government's concerns, e.g., the CARES Act "imposed no restrictions on how an enrollee could spend *withdrawn funds*."[9]

---

[9] Straying even farther afield from the Court's August 1, 2023 order, the government argues severance is inappropriate because Mrs. Mosby's severance reply "incorrect[ly]" claimed "'the government ha[d] not identified any other mortgage-fraud related evidence it believes would be admissible as to the perjury counts.'" ECF 231 at 14 n.1 (quoting ECF 217 at 17). The government indicates that to prove Mrs. Mosby had not been quarantined, furloughed, laid off, etc., it will introduce "evidence of [her] whereabouts, such as her calendar, credit card transactions, work appearances, or other scheduled engagements in Maryland." *Id.* According to the government, this perjury-related evidence would also be admissible as to the mortgage fraud counts to show that Mrs. Mosby "had not spent 'the past 70 days' living in Florida, as she stated she had in a letter submitted in support of her [loan] application." *Id.* The government did not cite any of this evidence in its opposition to severance, *see* ECF 215 at 2-10, so Mrs. Mosby's reply was in fact correct to note that, beyond the use-of-funds evidence, "the government ha[d] not identified any other mortgage-fraud related evidence it believes would be admissible as to the perjury counts." ECF 217 at 17.

Worse, this late-breaking argument appears to be nothing more than an attempt to defeat severance by manipulating the evidence. Does the government really intend to introduce evidence of Mrs. Mosby's "whereabouts," "calendar," "work appearances," and "other scheduled engagements" over a year-long period in order to show that she was not quarantined, furloughed, or laid off? It seems unlikely the Court would allow such an enormously tedious and time-consuming presentation, especially since Mrs. Mosby will not be arguing at trial that she was quarantined, furloughed, or laid off. *See* Fed. R. Evid. 403. And, unsurprisingly, until Mrs. Mosby moved for severance, even the government did not plan to present evidence of a year's worth of Mrs. Mosby's "whereabouts." In opposing Mrs. Mosby's initial motions in limine last summer, the government wrote that "[t]he jury will hear testimony *from the City of Baltimore's payroll department* that the Defendant was not quarantined, furloughed, or laid off, nor did she have reduced work hours, all of which would have resulted in a decrease in her salary." ECF 90 at 41 (emphasis added). To the extent evidence of quarantine status, etc. is necessary at all in this trial, a single payroll employee is a sensible way of introducing it; tracking Mrs. Mosby's public whereabouts for an entire year is not. The government's recent change of heart is simply an effort to manufacture some basis for opposing severance.

13

### E. Instruction 5: multiple withdrawals

The government agrees that if a 457(b) enrollee qualified for a CRD, she was permitted to take a second withdrawal without suffering intervening adverse financial consequences. *See* ECF 231 at 18. Nevertheless, the government opposes Instruction 5 on the ground that it "presupposes evidence for which there appears to be no basis," i.e., that Mrs. Mosby "qualified for the first withdrawal." *Id.* at 17. The government says it will (or might) drop its opposition if "there is evidence at trial" that Mrs. Mosby was eligible to take the first withdrawal. *Id.*

It is hard to know which part of Instruction 5's wording supposedly assumes Mrs. Mosby was eligible for the first withdrawal, since the government does not specify. Perhaps it is the word "once"—as in, "*once* a 457(b) enrollee qualified for a CARES Act withdrawal, she was allowed to make multiple withdrawals up to the $100,000 maximum set by the CARES Act." ECF 223 at 10 (emphasis added). To the extent this word presupposes eligibility, Mrs. Mosby has no quarrel with changing it to "if": "*If* a 457(b) enrollee qualified for a CARES Act withdrawal, she was allowed to make multiple withdrawals up to the $100,000 maximum set by the CARES Act." Jury instructions—including several that the government has previously agreed to in this case—routinely contain conditional statements of this sort, and courts deliver them without waiting for "evidence at trial" to demonstrate that the condition precedent has been satisfied. *See, e.g.*, 166 at 44 ("*If* you should find that a particular question was ambiguous—that is, subject to more than one interpretation—and that the defendant truthfully answered one reasonable interpretation of the question under the circumstances presented, then such answer would not be false." (emphasis added)); *id.* at 51 ("The Government's failure to prove a motive does not establish innocence. But *if* you do find evidence of a motive, that may help you decide what the defendant's state of mind was."

14

(emphasis added)).

The government also asserts Instruction 5 is confusing because it may suggest to jurors that an eligible 457(b) enrollee could take a second CRD without submitting a second withdrawal form. ECF 231 at 18. Given that Mrs. Mosby did in fact submit a second form, it's hard to see how or why the jury would be confused. But regardless, Mrs. Mosby does not object to rewriting Instruction 5 to make it clear that a second withdrawal required submission of a second form.

### F. Instruction 6: purpose of the CARES Act

The government argues Instruction 6 is wrong to describe "one purpose" of the CARES Act as "encourage[ing] consumer spending in order to prevent a severe economic recession." ECF 223 at 12. According to the government, "[i]f Congress, through the CARES Act, sought *only* to 'flood the economy with cash,' it would have allowed unfettered withdrawals without preconditions tied to the coronavirus in amounts greater than $100,000." ECF 231 at 18-19 (emphasis added). This is a straw-man argument. Mrs. Mosby does not claim—and Instruction 6 does not suggest—that the "only" thing Congress cared about when enacting the CARES Act was propping up the economy. Rather, she recognizes that the CARES Act, like most pieces of legislation, sought to balance various competing interests that Congress deemed important. Congress did hope to use the CARES Act to stave off a recession, but the limitations in § 2202 indicate that it sought to do so in a way that would not unduly undermine Congress' long-standing policy of encouraging workers to save for retirement. Instruction 6 does not suggest otherwise.

Indeed, Instruction 6 says explicitly that preventing a recession was "one purpose" of the CARES Act. ECF 223 at 12. The government resists this caveat because "it would be inappropriate for a jury instruction to select only one purpose of the statute that serves the

15

Defendant, to the exclusion of others." ECF 231 at 20. But the government has not indicated which other purposes, if any, are relevant to this prosecution. If the government believed that other policies underlying the CARES Act bear on this case, it could have proposed its own jury instructions. It chose not to do so. Indeed, the government filed no response at all to the Court's August 1, 2023 order to brief proposed CARES Act jury instructions.

The government also disputes Instruction 6's accuracy, noting that none of the sources cited in Mrs. Mosby's brief specifically used "the words 'recession' [or] 'consumer spending,'" which appear in Instruction 6. *Id.* at 19. But so what? Whatever precise terminology a certain court or article uses, there's no denying Mrs. Mosby's basic point: that the CARES Act, including its provision for CRDs, was meant to put money in people's pockets so they could spend it, thereby averting a recession. *See, e.g.*, Tom Zgainer, *Op-ed: The CARES Act makes it easier to tap your 401(k). Here's exactly what you need to know before you do*, MSNBC (June 24, 2020, 9:20 a.m.), https://www.cnbc.com/2020/06/24/what-to-know-before-you-tap-your-401k-or-ira-under-the-cares-act.html ("[I]n response to our massive economic downturn and sudden unemployment affecting 30 million-plus Americans, Congress passed new legislation in March to make it easier to access your retirement savings."); *WP Co. LLC v. U.S. Small Bus. Admin.*, 502 F. Supp. 3d 1, 7 (D.D.C. 2020) ("The CARES Act remains the federal government's primary legislative response to the economic crisis that the pandemic precipitated."); *In re Vital Pharms., Inc.*, 651 B.R. 847, 848-49 (S.D. Fla. 2023) (noting Congress passed CARES Act because "the closure of nonessential businesses" caused "consumer spending and the country's gross domestic product [to] plummet[], while unemployment skyrocketed").

## II.     Conclusion

Mrs. Mosby respectfully requests that the Court instruct the jury in accordance with her proposed CARES Act-related instructions.


Respectfully submitted,

/s/ James Wyda                    
James Wyda
Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
jim_wyda@fd.org

/s/ Lucius Outlaw                
Lucius Outlaw
Outlaw PLLC
1351 Juniper Street, NW
Washington, DC 20012
Phone: (202) 997-3452
loutlaw3@outlawpllc.com


/s/ Maggie Grace                 
Maggie Grace
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
maggie_grace@fd.org