IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>v. )<br><br>MARILYN J. MOSBY, )<br><br>Defendant. ) | Criminal Case No. 22-cr-00007-LKG<br><br>Dated:  September 11, 2023 |

**MEMORANDUM OPINION**
**ON THE DEFENSE'S MOTIONS TO TRANSFER VENUE AND FOR SEVERANCE**

## I.      INTRODUCTION

This memorandum opinion and order resolves several pre-trial motions filed by the Defense.  Defendant, Marilyn J. Mosby, has filed motions to: (1) sever Counts I and III from Counts II and IV of the Superseding Indictment; (2) for an intra-district transfer of venue to the Court's Southern Division; (3) for early jury instructions regarding the CARES Act; and (4) to strike allegations regarding the Defendant's use of funds from Counts I and III of the Superseding Indictment.  ECF Nos. 206, 207, 211 and 212.  These motions have been fully briefed.  ECF Nos. 206, 207, 211, 212, 215, 217, 223, and 231.  The Defendant has also filed motions to seal and for leave to file *ex parte* supplements, which the Government does not oppose.  ECF Nos. 208, 210 and 218.

On August 1, 2023, the Court **GRANTED** the Defendant's motion for early jury instructions.  ECF No. 221.  The parties subsequently filed briefs regarding proposed jury instructions related to the CARES Act.  ECF Nos. 223 and 231.

The Court held a hearing on the Defendant's remaining pre-trial motions on September 8, 2023.  For the reasons that follow, and stated during the pre-trial hearing, the Court: (1) **GRANTS** the Defendant's renewed motion to transfer venue (ECF No. 212); (2) **GRANTS** the Defendant's motion to sever (ECF No. 207); (3) **DENIES-as-MOOT** the Defendant's motion to strike (ECF No. 211); (4) **GRANTS** the Defendant's motion to seal (ECF No. 208); and (5)

**GRANTS** the Defendant's motions for leave to file *ex parte* supplements (ECF Nos. 210 and 218).

## II.      FACTUAL BACKGROUND

On January 13, 2022, a Federal Grand Jury sitting in Baltimore, Maryland returned a four-count Indictment against Defendant, Marilyn J. Mosby.  *See* Indictment, ECF No. 1.  The Federal Grand Jury returned a Superseding Indictment on March 10, 2022.  *See* Superseding Indictment, ECF No. 25.

In Counts I and III of the Superseding Indictment, the Defendant is charged with two counts of perjury, in violation of 18 U.S.C. § 1621.  *See generally*, Superseding Indictment at Counts I and III.  In Counts II and IV of the Superseding Indictment, the Defendant is charged with two counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014.  *See generally*, *id*. at Counts II and IV.

Counts I and III of the Superseding Indictment allege that the Defendant committed perjury on two separate occasions.  *See generally*, Superseding Indictment at Counts I and III. First, the Superseding Indictment alleges that, on May 26, 2020, the Defendant submitted a request to withdraw $40,000 from her City of Baltimore Deferred Compensation Plan while falsely claiming, under penalties of perjury, that she had suffered specific enumerated financial hardships resulting from the COVID-19 pandemic.  *Id*. at 1-5.  Second, the Superseding Indictment alleges that, on December 29, 2020, the Defendant submitted another request to withdraw $50,000 from the same City of Baltimore Deferred Compensation Plan, again falsely claiming, under penalties of perjury, that she had suffered specific enumerated financial hardships resulting from the COVID-19 pandemic.  *Id*. at 11-14.  The Superseding Indictment also alleges that the Defendant used the first COVID-19 financial hardship withdrawal as a down payment to purchase a single-family home located in Kissimmee, Florida in September 2020, and that the Defendant used the second COVID-19 financial hardship withdrawal as a down payment to purchase a condominium located in Long Boat Key, Florida in February 2021.  *Id*. at 4, 13.

Counts II and IV of the Superseding Indictment charge the Defendant with two counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014.  *Id.* at 6-10; 15-21.  The Superseding Indictment alleges that, at the time the Defendant made the real estate purchases described above, she owed significant debt to the IRS for unpaid taxes for tax years

2014 and 2015, and that the Defendant made a series of false statements about her tax liabilities and tax delinquencies in two mortgage loan applications.  *Id.* at 9-10; 16-18.  The Superseding Indictment also alleges that, on September 2, 2020, the Defendant signed a "Second Home Rider," which provided that she would maintain "exclusive control" over the ownership of the Kissimmee, Florida property and would not "subject the Property to any . . . agreement that requires the Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property."  *Id.* at 9.  The Superseding Indictment also alleges that this statement was false, because approximately one week before the Defendant signed the Second Home Rider, she executed an agreement with a vacation home management company, giving the management company control over the rental of this property. *Id*.

The Superseding Indictment further alleges that the Defendant made false statements regarding her tax liabilities and tax delinquencies in a mortgage application to Universal Wholesale Mortgage to pay for the Long Boat Key condominium.  *Id*. at 15-19.  Lastly, the Superseding Indictment alleges that the Defendant submitted a false gift letter to Universal Wholesale Mortgage on February 9, 2021, and that she falsely claimed to have lived in Florida for 70 days before she submitted her mortgage application on January 14, 2021.  *Id*. at 15-18.

The Defendant has pled not guilty as to all counts in the Superseding Indictment.  *See* Arraignment, ECF No. 12.

Dr. Edelman's Surveys

The Defense has retained Dr. Bryan Edelman to study what effects the pre-trial publicity about this case has had on the potential jury pool in the Court's Northern Division.[1]  ECF No. 212 at 5.  Dr. Edelman has a Master's degree and Ph.D. in social psychology, and he is the co-founder of Trial Innovations, Inc., a "national full-service jury research firm."  *Id*.

---

[1] The Court's Northern Division includes the following communities:  City of Baltimore and Allegany County, Anne Arundel County, Baltimore County, Caroline County, Carroll County, Cecil County, Dorchester County, Frederick County, Garrett County, Harford County, Howard County, Kent County, Queen Anne's County, Somerset County, Talbot County, Washington County, Wicomico County, and Worcester County.  The Southern Division includes the following communities:  Calvert County, Charles County, St. Mary's County, Montgomery County, and Prince George's County.

To determine the effect of pre-trial publicity on this case, Dr. Edelman conducted a media survey that "evaluated relevant newsprint, television, and social media coverage" of the allegations against the Defendant that has appeared in the Court's Northern Division, during the period January 13, 2022, to May 16, 2023. *Id.* at 6. Dr. Edelman found that, while some of this media coverage simply reported the facts described in the Superseding Indictment, other media coverage reported the Superseding Indictment's allegations as established facts. *Id.* at 6-7. And so, Dr. Edelman concluded that "the Northern Division jury pool has been saturated with prejudicial coverage surrounding the Defendant, her husband, inadmissible investigations, and political controversies." *Id.* at 9.

Dr. Edelman also conducted a community survey that measured the respondents' familiarity with the Defendant and this case, by having pollsters conduct telephone interviews of 402 "jury-eligible" residents of the Court's Northern Division and 200 "jury-eligible" residents of the Court's Southern Division, between May 31, 2023, and June 15, 2023. *Id.* Key findings from this community survey are as follows:

- **62 percent** of Northern Division respondents had read, seen, or heard of the Defendant, compared to **42 percent** for the Southern Division. ECF No. 212-1 at 2-3.

- **62 percent** of Northern Division respondents were familiar with this case, compared to **45 percent** for the Southern Division. *Id.*

- **68 percent** of Northern Division respondents recognized at least three out of seven "media items" relating to the Defendant's case, compared to **58 percent** for the Southern Division. *Id.* at 21.

- **55 percent** of Northern Division respondents recognized at least four out of seven "media items" relating to the Defendant's case, compared to **44 percent** for the Southern Division. *Id.*

- **41 percent** of Northern Division respondents had seen negative campaign ads about the Defendant while she was running for re-election in 2022, compared to **29 percent** for the Southern Division. *Id.* at 20, 35.

- **45 percent** of Northern Division respondents described the Defendant as "somewhat" or "very" corrupt, compared to **26 percent** for the Southern Division. *Id.* at 22.

- Of those who were familiar with either the Defendant or this case: **68 percent** of Northern Division respondents believe the Defendant is guilty of making false statements about suffering covid-related "adverse financial consequences," compared to **65 percent**

for the Southern Division.  *Id*. at 20.

- **25 percent** of Northern Division respondents believe the Defendant is "definitely guilty" of making false statements about suffering covid-related "adverse financial consequences," compared to **17 percent** for the Southern Division.  *Id*.

- **41 percent** of Northern Division respondents said the Defendant would have a hard time convincing them that she is not guilty, compared to **36 percent** for the Southern Division.

*Id*. at 20-21.  Dr. Edelman concluded that "the results of the telephone survey indicate that there is bias in the Northern Division jury pool against [the Defendant] stemming from exposure to pretrial publicity" and that "the coverage [in the Northern Division] has undermined the 'presumption of innocence.'"  ECF No. 212 at 12.

## III.    STANDARDS OF DECISION

### A.    Fed. R. Crim. P. 12(b)(3)

Federal Rule of Criminal Procedure 12(b)(3) governs motions that must be made before trial.  This Rule provides, in relevant part, that:

> The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits:
>
> (A) a defect in instituting the prosecution, including:
>
>     (i) improper venue;
>     (ii) preindictment delay;
>     (iii) a violation of the constitutional right to a speedy trial;
>     (iv) selective or vindictive prosecution; and
>     (v) an error in the grand-jury proceeding or preliminary hearing;
>
> (B) a defect in the indictment or information, including:
>
>     (i) joining two or more offenses in the same count (duplicity);
>     (ii) charging the same offense in more than one count (multiplicity);
>     (iii) lack of specificity;
>     (iv) improper joinder; and
>     (v) failure to state an offense;
>     (C) suppression of evidence;
>     (D) severance of charges or defendants under Rule 14; and
>     (E) discovery under Rule 16.

Fed. R. Crim. P. 12(b)(3).

B.     Transfer Of Venue

Federal Rule of Criminal Procedure 18 addresses the appropriate venue for conducting a criminal trial.  This rule provides that "[t]he court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."  Fed. R. Crim. P. 18.  When considering the venue for trial, the Court may also consider other factors, including docket management, courthouse space and security, and pre-trial publicity.  *See United States v. Mathis*, No. 3:14CR00016, 2015 WL 5012159, at *3 (W.D. Va. Aug. 21, 2015), *aff'd*, 932 F.3d 242 (4th Cir. 2019) (citing *United States v. Lipscomb*, 299 F.3d 303, 342 (5th Cir. 2002).[2]

A party may file a motion for intra-district transfer under Rule 18 if the party wishes to move a criminal case from one of a district's divisions to another.  *See, e.g.*, *United States v. Salerian*, No. 1:13CR00017, 2014 WL 279584, at *3 (W.D. Va. Jan. 24, 2014); *United States v. Salko*, No. CRIM. A. 1:07-CR-286, 2008 WL 2444515, at *1-2 (M.D. Pa. June 13, 2008).  And so, Rule 18 gives the Court discretion to decide which division is most appropriate for a given criminal case.  *Florence*, 456 F.2d at 50; *see also United States v. Alvarado*, 647 F.2d 537, 539 (5th Cir. 1981) (referencing district courts' "broad discretion"); *United States v. Stanko*, 528 F.3d 581, 584 (8th Cir. 2008) (same).

The party seeking an intra-district transfer bears the burden of showing that such a transfer is appropriate.  *McDonald*, 2023 WL 2574991, at *2.  In this regard, Courts have recognized that the moving party "is not required to show truly compelling circumstances for change of venue, but rather that all relevant things considered, the case would be better off transferred to another [division]."  *United States v. Chitolie*, No. 3:10-CR-0020, 2010 WL 2384550, at *3 (D.V.I. June 8, 2010) (assessing request for intra-district transfer); *see also*

[2] A previous version of Rule 18 presumptively required that trial occur in the division where the events charged in the Indictment took place. *United States v. Lipscomb*, 299 F.3d 303, 337 (5th Cir. 2002). The federal advisory committee eliminated that requirement in 1966. *Id*. The First Circuit has recognized that the "Committee Note to the [1966] Amendment does not reflect any desire for uniformity" between the "division where the indictment was handed down" and "the division where the offense occurred." *United States v. Cates*, 485 F.2d 26, 28 (1st Cir. 1974).

*United States v. Schock*, No. 16-CR-30061, 2016 WL 7156461, at *2 (C.D. Ill. Dec. 7, 2016) ("[The moving party] need only show that, 'all relevant things considered, the case would be better off transferred to another [division].'" (quoting *Matter of Balsimo*, 68 F.3d 185, 187 (7th Cir. 1995)) (analyzing intra-district transfer).

### C.       Severance

Pursuant to Rule 8(a) of the Federal Rules of Criminal Procedure, two offenses may properly be joined in an Indictment "if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character. . ." Fed. R. Crim. P. 8(a).  But, once joined, offenses may be severed for trial if joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a).

The United States Court of Appeals for the Fourth Circuit has held that a ruling on a motion to sever is "committed to the discretion of the district court." *United States v. Foutz*, 540 F.2d 733, 736 (4th Cir.1976).  "A defendant making a motion for severance, pursuant to Rule 14, has the burden of demonstrating a strong showing of prejudice." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir.1984); *see also United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008 (the party seeking severance has the burden of demonstrating a strong showing of prejudice.).  And so, when considering a severance motion, the trial court balances any possible prejudice to the accused "against the interests of the efficient administration of justice." *United States v. Cole*, 857 F.2d 971, 974 (4th Cir.1988).

When offenses are joined based upon their "same or similar character," the Court should consider three possible sources of prejudice:

> (1) the jury may confuse and cumulate the evidence, and convict the defendant of one or both crimes when it would not convict her of either if it could keep the evidence properly segregated;
>
> (2)  the defendant may be confounded in presenting defenses, as where she desires to assert her privilege against self-incrimination with respect to one crime but not the other; or
>
> (3) the jury may conclude that the defendant is guilty of one crime and then find her guilty of the other because of her criminal disposition.

*Foutz,* 540 F.2d at 736.  In this regard, the United States Court of Appeals for the District of Columbia Circuit has held that prejudice warranting severance may develop when an accused wishes to testify on one, but not the other, of two joined offenses which are clearly distinct in time, place and evidence.  *Cross v. United States*, 335 F.2d 987, 989 (D.C. Cir. 1964).  The Fourth Circuit has also recognized that prejudice to a defendant is sufficient to justify severance "if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence."  *United States v. Hornsby*, 666 F.3d 296, 309 (4th Cir. 2012).  Courts have similarly recognized that the required prejudice "can take many forms," *United States v. Berg*, 714 F.3d 490, 496 (7th Cir. 2013), and that prejudice often arises from an "inevitable consequence of a joint trial" "that the jury will be aware of evidence of one crime while considering the defendant's guilt or innocence of another."  *Foutz*, 540 F.2d at 736.

But, the simple fact that joinder may make for a more difficult defense, or that a separate trial might increase the defendant's chance of acquittal, are not sufficient grounds for severance. *Goldman,* 750 F.2d at 1225; *see also U.S. v. Taylor*, 218 Fed. Appx 249, 250 (4th Cir. 2007). And so, if "evidence of the joined crimes 'would be mutually admissible for legitimate purposes in separate trials for each offense,'" the possibility of prejudice to the defendant from a joint trial "is greatly diminished."  *Cole,* 857 F.2d at 974 (quoting *United States v. Jamar,* 561 F.2d 1103, 1106 (4th Cir.1977)).

## IV.  ANALYSIS

### A.  The Defense Has Shown That This Case Would Be Better Off Transferred To The Court's Southern Division

The Court first addresses the Defendant's renewed motion to transfer venue for the trial in this matter to the Court's Southern Division.  For the reasons set forth below, the Court GRANTS the Defendant's motion to transfer venue.

Fed. R. Crim. P. 18 affords this Court discretion to decide which division is most appropriate for a given criminal case.  *Florence*, 456 F.2d at 50; *see also*, *Alvarado*, 647 F.2d at 539 (referencing district courts' "broad discretion"); *Stanko*, 528 F.3d at 584.  When applying that discretion, the Court considers "the prompt administration of justice" and the "convenience" to the Defendant, witnesses and any victims.  Fed. R. Crim. P. 18.  The Court also considers

other factors, including, but are not limited to, docket management, courthouse space and security and pretrial publicity. *Lipscomb*, 299 F.3d at 340, 342.

The Defendant, as the party seeking an intra-district transfer here, bears the burden of showing that such a transfer is appropriate in this case. *McDonald*, 2023 WL 2574991, at *2. The Defendant is not required to show truly compelling circumstances for change of venue. *Id*. But she must show that, all relevant things considered, this case would be better off transferred to the Court's Southern Division. *Chitolie*, 2010 WL 2384550, at *3 (assessing request for intra-district transfer); *see also*, *Schock*, 2016 WL 7156461, at *2 ("[The moving party] need only show that, 'all relevant things considered, the case would be better off transferred to another [division].'" (quoting *Matter of Balsimo*, 68 F.3d at 187 (analyzing intra-district transfer). And so, if the Court determines that this case would be better off transferred to its Southern Division, the Court should grant the Defendant's motion to transfer venue. *Id*.

The Defendant has met her burden. The evidence before the Court shows that, all relevant things considered, this case would be better off transferred to the Court's Southern Division for trial.

The Defense argues that an intra-district transfer of the venue for this case to the Court's Southern Division is warranted under Fed. R. Crim. P. 18, because there is a bias in the Court's Northern Division jury pool against the Defendant that stems from exposure to pretrial publicity about this case. *See generally*, ECF No. 212. The Defense also argues that the pre-trial publicity in the Northern Division has undermined the presumption of innocence with regards to the Defendant. And so, the Defense contends that a transfer of venue to the Court's Southern Division is necessary to ensure a fair and impartial trial. *Id*.

As an initial matter, the Court observes that there can be no genuine dispute that this case has received significant pre-trial publicity since its inception on January 13, 2022. As the Defense points out, there has been some news coverage about this case that portrays the Defendant in a negative light. *See e.g.*, ECF Nos. 151-1; 212-2; and 212-3.

For this reason, the Court, in consultation with the parties, has taken several steps to ensure a fair trial in this case. For example, the Court, in close consultation with the parties, developed a juror questionnaire to be sent to prospective jurors to aid the parties and the Court in identifying any bias among the potential jurors for this case. ECF Nos. 21, 22. The Court has

also issued an Order limiting the extra-judicial comments of counsel in this matter, pursuant to Local Rules 204 and 603.  ECF Nos. 120, 171.

In addition, the Court and the parties are working to develop the jury instructions for this case in preparation of the trial.  ECF Nos. 166, 167, 206, 221, and 231.  The Court is confident that these important tools will help to ensure that a fair and impartial jury is seated in this case in either of the Court's two divisions.

The Defense has, however shown that the pre-trial publicity about this has, to a degree, had a more negative impact on the views held about the Defendant and this case by potential jurors residing in the Court's Northern Division, when compared to their counterparts in the Court's Southern Division.  ECF No. 212 at 9-12.  The Defense's jury selection expert, Dr. Edelman, has provided the Court with the results a community survey that measures the respondents' familiarity with the Defendant and this case, by having pollsters conduct telephone interviews of 402 "jury-eligible" residents of the Court's Northern Division and 200 "jury-eligible" residents of the Court's Southern Division, between May 31, 2023, and June 15, 2023.[3]

---

[3] The Government argues that Dr. Edelman's phone and community surveys are unreliable due to nine flaws with the methodology for these surveys: (1) the media survey fails to distinguish factual and prejudicial media coverage; (2) the media survey fails to account for differences in circulation for various publications; (3) the reliance on  print news media is too narrow; (4) the media survey does not compare news media coverage in the Northern Division to news coverage in the southern Division; (5) Dr. Edelman does not accurately describe the survey sample for the community survey; (6) the telephone community survey captures a limited demographic; (7) the community survey used leading questions; (8) the respondent's answers to the survey questions are open-ended; and (9) the community survey failed to ask whether the respondents could set aside any bias and judge the case impartially.  ECF No. 222 at 6-15.  But, the Defense counters that these surveys are reliable, because: (1) the responses to the media survey shows that prejudicial media items were not limited to newspapers with small readership; (2) there are no reliable methods for managing complex search queries and filters for television stories and there is no evidence that the nature and content of television news coverage is fundamentally different from newspaper coverage; (3) the Defense has identified numerous news articles that paint the Defendant in a negative light; (4) it was not necessary to conduct a media survey of the southern Division to accomplish the purpose of the media survey; (5) he respondents to the community survey were screened to mirror the qualifications in the Court's jury plan; (6)  the data provide no indication that any group was underrepresented in e community survey; (7) the questions in the media survey adhered to the American Society of Trial Consultants Professional Code for conducting change of venue surveys; (8) the community survey results show that the question did not generate bias; and (9) a question about setting aside bis was not include in the community survey, because the American Society of Trial Consultants recommends that this question should be avoided.  ECF No. 212 at 10-19.

*Id*.  Dr. Edelman explains that this survey found that, 45 % of the Court's Northern Division respondents described the Defendant as "somewhat" or "very" corrupt.  ECF No. 212-1 at 2-3.

By comparison, the same survey found that 26 % of the respondents residing in the Court's Southern Division described the Defendant in this manner.  *Id*.  Given the almost 20 percentage point disparity between the survey results for the two divisions on this question, the Defense argues with persuasion that there are more negative views held about the Defendant among potential jurors residing in the Court's Northern Division, when compared to the Court's Southern Division.

While not as convincing, the Defense has also provided data to show that there is a greater presumption of guilt with regards the Defendant and the offenses charge in this case among potential jurors residing in the Court's Northern Division, when compared to their counterparts in the Southern Division.  For example, Dr. Edelman's community survey found that, of those who were familiar with either the Defendant or this case, 68 % of the Northern Division respondents believe that the Defendant is guilty of making false statements about suffering covid-related "adverse financial consequences."  *Id*. at 20.  By comparison, the survey found that 65 % of Southern Division respondents held this view.  *Id*.

The community survey also found that 25 % of the Northern Division respondents believe that the Defendant is "definitely guilty" of making false statements about suffering covid-related "adverse financial consequences."  *Id*.  By comparison, the survey found that 17% of Southern Division respondents held this same view.  *Id*.  In addition, the community survey found that 41 % of the Northern Division respondents said that the Defendant would have a hard time convincing them that she is not guilty, as compared to 36 % for the Southern Division respondents.  *Id*. at 20-21.

To be clear, these survey responses show relatively modest differences between the attitudes of potential jurors in the two divisions.  For example, there is a difference of only 3 percentage points between the two divisions on the question of whether the respondents believe that the Defendant is guilty of making false statements about suffering covid-related "adverse financial consequences."  *Id*.  But, overall, the survey results consistently show that Northern Division respondents hold a more negative view of the Defendant than their Southern Division counterparts.  And so, on balance, the data provided by the Defense shows that the pool of potential jurors in the Southern Division would hold less bias against the Defendant.  For this

11

reason, the impact of the pre-trial publicity about this case weighs in favor of a transfer of venue to the Court's Southern Division.

The remaining factors that the Court considers in deciding whether to transfer this case to the Southern Division neither weigh significantly in favor nor against a transfer of venue.  When considering a motion to transfer venue under Rule 18, the Court also considers the convenience of the Defendant, any victim and witnesses; the prompt administration of justice; and other factors, such as docket management, courthouse space and security.  Fed. R. Crim. P. 18; *United States v. Mathis*, No. 3:14CR00016, 2015 WL 5012159, at *3 (W.D. Va. Aug. 21, 2015), *aff'd,*932 F.3d 242 (4th Cir. 2019) (citing *United States v. Lipscomb*, 299 F.3d 303, 342 (5th Cir. 2002).

With regards to the convenience of the Defendant, the Defendant, who resides in Baltimore, Maryland, has represented to the Court that she has no objection to holding her trial in the Court's Southern Division.  ECF No. 212 at 24; *see also*, ECF No. 222 at 17-18.  The parties also agree that several of the potential witnesses in this case do not reside in Maryland.  ECF No. 212 at 25; ECF No. 222 at 18.  And so, these witnesses will be no more inconvenienced if the trial is held in Greenbelt, Maryland rather than in Baltimore, Maryland.

As the Government correctly observes, there are potential witnesses in this case who do either reside or work in Baltimore, Maryland, and these witnesses would have to come to Greenbelt, Maryland to testify if the trial is held in the Court's Southern Division.  ECF No. 222 at 17-18.  While this travel could impose some inconvenience for these witnesses, the commuting distance between the two venues of approximately 30 miles is not significant.  More importantly, neither party has identified any witness who would be unable to travel to Greenbelt for the trial.  *See generally*, ECF Nos. 212, 222.

The Government does, however, raise an important concern about the potential for delay of this trial, which is currently scheduled to commence on November 1, 2023, if there is a change of venue.  In this regard, the Government argues that the administration of justice could be hindered in this case, because it is not clear that the Clerk's Office could organize an extra-large venire panel and send out a new juror questionnaire, tabulate results and call in the appropriate panel in time for the trial, if the trial were moved to the Southern Division.  ECF No. 222 at 18-19.  But, a new juror questionnaire will be needed regardless of the location of the trial.  And so, a transfer of venue to the Southern Division would not cause a delay of the trial.

As a final matter, the Court also observes that there are adequate facilities and security to hold the trial in this case in either of the Court's two divisions. Given this, the other factors that the Court considers in determining whether a transfer of venue is warranted in this case neither weigh significantly for or against a transfer of venue.

Because the Defense has shown through its survey data that the pre-trial publicity about this case has, to a degree, negatively impacted the views held about the Defendant by potential jurors residing in the Court's Northern Division more so than their counterparts in the Southern Division, the Defendant has shown that, all relevant things considered, this case would be better off transferred to the Court's Southern Division. And so, for this reason, the Court GRANTS the Defense's motion to transfer venue.

**B.      The Defense Has Shown That Severance
Of Counts I And III From Counts II And IV Is Warranted**

Turning to the Defense's motion for severance, the Defense has made a strong showing of prejudice to warrant severance of Counts I and III from Counts II and IV of the Superseding Indictment under *Foutz* Category 2. *See United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976).

The Fourth Circuit has held that, when offenses are joined based upon their "same or similar character," the Court should consider three possible sources of prejudice:

> (1) the jury may confuse and cumulate the evidence, and convict the defendant of one or both crimes when it would not convict her of either if it could keep the evidence properly segregated;
>
> (2)  the defendant may be confounded in presenting defenses, as where she desires to assert her privilege against self-incrimination with respect to one crime but not the other; or
>
> (3) the jury may conclude that the defendant is guilty of one crime and then find her guilty of the other because of her criminal disposition.

*Foutz,* 540 F.2d at 736. In this regard, the District of Columbia Circuit has held that prejudice warranting severance may develop when an accused wishes to testify on one, but not the other, of two joined offenses which are clearly distinct in time, place and evidence. *Cross v. United States*, 335 F.2d 987, 989 (D.C. Cir. 1964). Under such circumstances, the decision whether to testify "will reflect a balancing of several factors with respect to each count: the evidence against

13

[her], the availability of defense evidence other than [her] testimony, the plausibility and substantiality of [her] testimony, the possible effects of demeanor, impeachment, and cross-examination." *Id*. And so, if the two charges are joined for trial, it is not possible for a Defendant to weigh these factors separately as to each count.[4] *Id.*

The Defense argues that there are three distinct sources of prejudice under *Foutz* to justify severance of the perjury and mortgage fraud counts in this case. ECF No. 207 at 7-11. First, the Defense argues that severance is appropriate under *Foutz* Category 1, because a jury may cumulate and confuse the evidence to the Defendant's prejudice at a joint trial due to the lack of an overlap of admissible evidence between the perjury and mortgage fraud counts in this case. ECF No. 207 at 11-28.

Second, the Defense argues that severance is warranted under *Foutz* Category 3, because a joint trial risks a conviction predicated upon impermissible propensity reasoning. *Id*. at 28-31. In this regard, the Defense argues that:

> At a joint trial, the jury would be asked to decide whether Mrs. Mosby lied on her CARES Act withdrawal forms while aware of evidence purporting to show she lied on her mortgage applications. And it would be asked to decide whether she lied on her mortgage applications while aware of evidence purporting to show that she lied on her CARES Act withdrawal forms.

*Id*. at 29.

Lastly, the Defense argues that severance is also warranted under *Foutz* Category 2, because trying the perjury and mortgage fraud counts in this case together would confound and frustrate the Defendant's ability to testify in her own defense at trial. *Id*. at 32-33. In this regard, the Defense argues that the Defendant would be confounded in presenting her defenses at a joint trial, because she may desire to assert her privilege against self-incrimination with respect to one of the crimes alleged in the Superseding Indictment, but not with respect to the other alleged crime. *Id*. To support this argument, the Defense has submitted an *ex parte* brief under seal that

---

[4] As the District of Columbia Circuit has recognized, if a defendant testifies on one count, she runs the risk that any adverse effects will influence the jury's consideration of the other count. *Cross*, 35 F.2d. 987, 989 (D.C. Cir. 1964). A defendant's silence on one count would also be damaging in the face of an express denial of the other count. *Id*. Given this, a defendant could be coerced into testifying on the count upon which she wished to remain silent. *Id*.

explains the nature of this dilemma as it relates to the Defendant's expected defenses of the perjury and mortgage fraud charges this case.  ECF No. 210-1.

The Government opposes the Defense's motion to sever and counters that severance is unwarranted in his case, because: (1) the perjury and mortgage fraud counts are sufficiently distinct so that there is no likelihood that the jury will confuse the issues; (2) there is an overlap of the evidence for the perjury and mortgage fraud counts, because evidence about how the Defendant used her CARES Act withdrawal funds is admissible at trial; (3) there is no propensity risk, because a properly instructed jury can separate the perjury and mortgage fraud charges and make individual determinations as to guilt or innocence; and (4) the Defendant has not shown that she would be confounded in presenting her defenses, because it would be proper for the Government to question her about the alleged false statements related to either set of charges during cross-examination.  ECF No. 215 at 2-10.  And so, the Government requests that the Court deny the Defense's motion to sever.  *Id*. at 21.

The Defense has made a strong showing that the joinder of Counts I and III with Counts II and IV of the Superseding Indictment would present "a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about [the Defendant's] guilt or innocence." *Cardwell*, 433 F.3d at 387–88.  Notably, the Court is concerned that a joint trial would encumber the Defendant's decision about whether to assert her Fifth Amendment privilege against self-incrimination with regards to certain counts in this case.

For example, should the Defendant wish to testify in defense of the perjury charges in Counts I and III of the Superseding Indictment, she would be subject to cross-examination on the mortgage fraud charges in Counts II and IV of the Superseding Indictment during a joint trial. Should the Defendant wish not to testify on the mortgage fraud charges in Counts II and IV of the Superseding Indictment, she would similarly be prevented from giving testimony that she otherwise wishes to make in her defense on the perjury charge in Counts I and III during a joint trial.

Given this, the Defendant's "silence on one count would be damaging in the face of [her] express denial of the other."  *Cross*, 335 F.2d at 989.  And so, the Court is satisfied that the Defendant fits the type of defendant that *Foutz* Category 2 seeks to protect.

No jury instruction that the Court could give would remedy the resulting negative impact on the Defendant's assertion of her Fifth Amendment privilege against self-incrimination.  For

these reasons, the Court GRANTS the Defense's motion for severance and exercises its discretion under Rule 14 to sever Counts I and III of the Superseding Indictment from Counts II and IV.

The first trial shall proceed on Counts I and III of the Superseding Indictment, pursuant to the Court's current trial schedule.

## V.        CONCLUSION

For the foregoing reasons, the Court:

1.    **GRANTS** the Defendant's renewed motion to transfer venue (ECF No. 212);

2.   **GRANTS** the Defendant's motion to sever (ECF No. 207);

3.   **DENIES-as-MOOT** the Defendant's motion to strike (ECF No. 211);

4.   **GRANTS** the Defendant's motion to seal (ECF No.208); and

5.   **GRANTS** the Defendant's motions for leave to file *ex parte* supplements (ECF No. 210 and 218).

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge