United States District Court for
the District of Maryland

| | |
|---|---|
| **United States**<br><br>v.<br><br>**Marilyn Mosby** | No. 1:22-cr-7-LKG |

## Motion in Limine to Exclude Government's Proposed Summary Charts and Related Testimony

Marilyn Mosby moves in limine to exclude the government from presenting evidence regarding inflows to and outflows from her bank accounts during 2019 and 2020—including, but not limited to, summary exhibits prepared for the government by FBI forensic accountant Jenna Bender.

**I.   Argument**

In July 2022, the government informed defense counsel that it intended to call Jenna Bender, an "FBI forensic accountant," to testify at trial. ECF 80-2 at 1. The government said Ms. Bender's testimony would cover "several summary exhibits she has prepared pursuant to Federal Rule of Evidence 1006."[1] *Id.* Under Rule 1006, the proponent of

---

[1] Copies of those charts are attached to this motion as Exhibit A.

1

evidence "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." The government's notice explained that after examining "voluminous financial records," Ms. Bender created charts that "provide a total number for inflows and a total number for outflows into [Mrs. Mosby's] bank and credit accounts in 2019 and 2020." ECF 80-2 at 2-3. Or, as the government put it in a subsequent filing, Ms. Bender "added up all the credits . . . and all the debits" reflected on Mrs. Mosby's "bank statements and credit card statements." ECF 90 at 11.

The government hopes to use Ms. Bender's testimony and her summary charts to establish that inflows to Mrs. Mosby's account increased between 2019 and 2020, even putting aside funds received from her retirement account. *See* ECF 90 at 15. Mrs. Mosby, in other words, saw a net increase in inflows attributable to her salary, on top of the additional money she obtained through her coronavirus-related distributions (CRDs). And that fact, the government will argue, demonstrates that Mrs. Mosby did not suffer "adverse financial consequences" as a result of any of the circumstances enumerated in § 2202 of the CARES Act.

To the extent Ms. Bender's testimony is meant to serve this purpose, it is irrelevant and should be excluded at trial. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").[2]

The CARES Act permitted 457(b) enrollees to take a CRD if they "experience[d] adverse financial consequences as a result of" any of four covid-related circumstances:

---

[2] If the government represents in its response to this motion that Ms. Bender's testimony would be used for some other purpose, Mrs. Mosby will address that argument in her reply.

(1) "being quarantined, being furloughed or laid off," (2) "having work hours reduced," (3) "being unable to work due to lack of child care," or (4) the "closing or reducing [of] hours of a business owned or operated by the [enrollee]." CARES Act, Pub. L. 116-136, § 2202(a)(4)(A)(ii)(III), 134 Stat. 281, 341 (2020). As the government has observed, "the first three" of these circumstances "have to do with not being able to work and earn income," while "the fourth has to do with 'the closing or reduction of hours of a business.'" ECF 111-2 at 11. For that reason, the first three circumstances might well cause an enrollee's salary to decrease, which would be reflected in reduced inflows to the enrollee's bank account. By showing that payroll inflows to Mrs. Mosby's bank accounts increased in 2020, Ms. Bender's testimony might be relevant to proving that Mrs. Mosby (1) was not "quarantined, being furloughed or laid off," (2) did not "hav[e] work hours reduced," and (3) was not "unable to work due to lack of child care." *See id.* at 8 ("[Mrs. Mosby's] salary never decreased in 2020 and, in fact, it increased over 2019 so we know the first three definitions of 'adverse financial consequences,' were not met.").

But Mrs. Mosby has never claimed, and will not argue at trial, that she (1) was quarantined, furloughed, or laid off, (2) had reduced work hours, or (3) was unable to work due to lack of child care. In fact, she has told the government she is willing to stipulate that she did not experience any of these three circumstances as a result of covid.[3] The existence or non-existence of those circumstances is therefore irrelevant, i.e., it is not "of consequence in determining" whether Mrs. Mosby suffered adverse financial consequences that qualified her to take a CRD. Fed. R. Evid. 401(b) (defining relevance).

---

[3] As of this filing, the parties are still in the process of communicating regarding a possible stipulation.

3

Instead, Mrs. Mosby will argue she experienced adverse financial consequences as a result of the "closing or reducing [of] hours of a business" that she "owned or operated." And the effects of this fourth type of § 2202 triggering event would not—and did not—show up in the inflows to and outflows from Mrs. Mosby's bank account. That's because Mrs. Mosby's business was non-operational, and therefore was not yet producing any income, when the pandemic hit. Mrs. Mosby had invested money in start-up costs, legal and operational fees, and research expenditures, but she was still in the early stages of laying the groundwork to get the business up and running. Then, when the pandemic made it impossible to proceed with opening the business, she experienced sunk costs, expenses, and expenditures, as well as reduced expected profits.

Because there were no business-related inflows to Mrs. Mosby's bank account when the pandemic began, the closing of her business necessarily did not reduce (or increase) her business-related inflows throughout 2020. The amount of money flowing into and out of Mrs. Mosby's bank accounts in 2020, relative to 2019, therefore sheds no light on how her business' closure affected her financially. In short, those accounts are the wrong place to look to determine whether the closing of the business caused Mrs. Mosby adverse financial consequences. Activity in those accounts therefore has no "tendency to make a" "fact . . . of consequence"—i.e., whether Mrs. Mosby experienced adverse financial consequences—"more or less probable than it would be" otherwise. Fed. R. Evid. 401.

And even assuming that charts summarizing Mrs. Mosby's bank accounts and credit card statements have some very minimal probative value, that probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [and] wasting time." Fed. R. Evid. 403.

*First,* the charts show that in 2020 Mrs. Mosby earned $151,268 in salary—a substantial amount in the eyes of most jurors. Ex. A at 3. Two other aspects of this case make that fact particularly prejudicial: (1) covid did not disrupt Mrs. Mosby's ability to work, and therefore to continue receiving income, and (2) the Court has ruled that the government may introduce evidence showing that Mrs. Mosby used her CRDs to buy two homes in Florida. Thus the picture of Mrs. Mosby that the government will present to the jury will be of someone who continued earning her full $150,000-plus salary yet nevertheless exploited a global pandemic to buy two Florida vacation homes. Given that the pandemic forced millions of people out of work, leaving them strapped for cash, at least some jurors are likely to resent Mrs. Mosby, whom they will perceive as entitled and out of touch. That reaction heightens the risk that jurors will "declar[e] guilt on a ground different from proof specific to the offense charged." *United States v. Miller*, 61 F.4th 426, 429 (4th Cir. 2023) (emphasis omitted); *see also United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006) ("Evidence is unfairly prejudicial and thus should be excluded under Rule 403 when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is disproportionate to the probative value of the offered evidence.").

*Second,* admitting Ms. Bender's charts and testimony will confuse the issues and mislead the jury. There is a real risk that jurors will learn that Mrs. Mosby's income not only did not decrease, but actually increased, between 2019 and 2020—and will conclude she therefore could not have suffered covid-related "adverse financial consequences." After all, jurors will ask, how could someone who made *more* money than she did the year before be *worse* off financially? This instinct is a natural one, but it is inconsistent with how the

5

CARES Act defines "adverse financial consequences." As explained above, the adverse financial consequences Mrs. Mosby suffered are unrelated to her income; her business was not producing any income even before the pandemic began, and so the closing of the business did not lead—and could not have led—to a reduction in income. Because Mrs. Mosby's adverse financial consequences are not the kind that would show up in a bank account's "credits and debits," ECF 90 at 11, presenting evidence of her inflows and outflows will only mislead the jury into thinking Mrs. Mosby's claimed adverse financial consequences never manifested.

*Third,* allowing Ms. Bender to testify about inflows to and outflows from Mrs. Mosby's account will waste time and cause undue delay. That evidence establishes, at most, that Mrs. Mosby did not suffer a loss of income in 2020 and therefore (1) was not "quarantined, being furloughed or laid off," (2) did not "hav[e] work hours reduced," and (3) was not "unable to work due to lack of child care." CARES Act, Pub. L. 116-136, § 2202(a)(4)(A)(ii)(III). But Mrs. Mosby has offered to stipulate to that effect, so there is no need to waste the jury's and the Court's time establishing those facts through hours of testimony. The more efficient, and fairer, route is simply to exclude that evidence entirely.

## II. Conclusion

For the reasons described above, the Court should prohibit the government from introducing evidence regarding inflows to and outflows from Mrs. Mosby's bank accounts during 2019 and 2020, including testimony and summary charts prepared by Ms. Bender.

Respectfully submitted,

| | |
|---|---|
| /s/ James Wyda | /s/ Lucius Outlaw |
| James Wyda | Lucius Outlaw |
| Federal Public Defender | Outlaw PLLC |
| Office of the Federal Public Defender | 1351 Juniper Street, NW |
| 100 South Charles Street | Washington, DC 20012 |
| Tower II, 9th Floor | Phone: (202) 997-3452 |
| Baltimore, MD 21201 | loutlaw3@outlawpllc.com |
| Phone: (410) 962-3962 | |
| jim_wyda@fd.org | |

/s/ Maggie Grace
Maggie Grace
Assistant Federal Public Defender
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
maggie_grace@fd.org