## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. LKG-22-7** |
| **MARILYN J. MOSBY** | |

## <u>MARILYN MOSBY'S MEMORANDUM IN AID OF SENTENCING</u>

# <u>TABLE OF CONTENTS</u>

INTRODUCTION……………………………………………………………………………..1

ARGUMENT ........................................................................................................................ 4

I.     The Kinds Of Sentences Available, The U.S. Sentencing Guidelines, And Pertinent Policy Statements (18 U.S.C. § 3553(a)(3), (a)(4), & (a)(5)). ...................................................... 4

II.    Marilyn Mosby's Personal History And Characteristics (18 U.S.C. § 3553(a)(1)). ............. 5

   A.   Born To A Close-Knit, Law Enforcement Family In Working-Class Boston, Marilyn Was A First-Generation College And Law School Graduate. ........................................................ 5

   B.   Marilyn Became A Mother To Two Daughters She Has Always Tried To Protect. ........... 7

      1.   Marilyn Became An Involved, Devoted, Loving Mother To Two Teenagers. ................ 7

      2.   █████████████████████████████████████ ...................... 10

      3.   An Expert Opines That Marilyn's Incarceration Would Have Deleterious And Long-Term Effects On Her Teenage Daughters. ........................................................................... 12

   C.   Marilyn Mosby Became A Devoted, Trailblazing Public Servant And Leader When She Became Baltimore City State's Attorney. .................................................................................. 14

      1.   At 35, Marilyn Became One Of The Youngest Top Prosecutors Of Any Major American City .......................................................................................................................... 14

      2.   Marilyn Approached Her State's Attorney Position From A Holistic, Smarter-On-Crime Perspective. ........................................................................................................................ 19

         a.   Marilyn Focused On Proactive Crime Prevention, Including Through Youth-Centered Programs. ...................................................................................................................... 20

            i.   B-More Pop-Ups ............................................................................................. 20

            ii.   Junior State's Attorney Program ................................................................... 22

            iii.   Great Expectations ......................................................................................... 25

            iv.   AIM To B'More .............................................................................................. 26

         b.   Marilyn Worked To Ensure Justice For All. ........................................................... 28

            i.   The Conviction Integrity Unit ........................................................................ 28

            ii.   The Sentence Review Unit ............................................................................. 30

            iii.   Improving The Quality Of Convictions With Empirical Data............................. 33

         c.   Marilyn Worked To Restore Trust In The Community.............................................. 36

            i.   The Community's Relationship With The Police .................................................. 36

            ii.   Victims And Witnesses ................................................................................... 37

         d.   Marilyn Expanded The Traditional Role Of Prosecutor To Advocate For Legislative Initiatives........................................................................................................................ 39

e.   Marilyn Made Policy Changes In Prosecution Decisions. .......................................... 41

D.   Marilyn Has Left A Legacy Through Mentoring And Serving As A Transformative Leader And Trailblazing Reformer For Justice. .......................................................................... 43

III.   The Nature And Circumstances Of The Offense (18 U.S.C. § 3553(a)(1)). .................... 49

IV.   The Need To Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6)). ....... 51

V.   The Need For The Sentence To Reflect The Seriousness Of The Offense, Promote Respect For The Law, And Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A)). ................................ 53

VI.   The Need For The Sentence To Afford Deterrence (18 U.S.C. § 3553(a)(2)(B)). ............ 57

A.   There Is No Need To Send Ms. Mosby To Prison To Specifically Deter Her. ................ 58

B.   Empirical Data Shows That General Deterrence Flows From Certainty Of Prosecution, Not Whether Incarceration Is Imposed Or More Incarceration Rather Than Less. .................. 58

C.   The Fact That Ms. Mosby Has Already Experienced Cataclysmic Consequences From Prosecution And Conviction Sends A Further Deterrence Message To The Public And Public Officials, And Any Further Punishment, Including Imprisonment, Is Gratuitous. ................... 60

D.   The Fact That This Prosecution Is Unusual Sends A Further Deterrence Message To The Public And Particularly Public Officials, Without The Additional Need For A Prison Sentence. 60

E.   There Is A Significant Risk In This Unique Case That Sentencing Ms. Mosby To Prison Sends The *Wrong* Message To The Public. .............................................................................. 61

VII.   The Need To Protect The Public And Provide Training or Other Correctional Treatment (18 U.S.C. § 3553(a)(2)(C)-(D)). .......................................................................................... 62

CONCLUSION…………………………………………….……………………………….59

## INTRODUCTION

While Marilyn Mosby maintains her innocence, that is not the relevant question at this stage of the case. Now, the essential question before the Court is both simple and profound: What is the just sentence for Marilyn Mosby? Under a careful and comprehensive consideration of all the sentencing factors of 18 U.S.C. § 3553(a), the sentence that is sufficient but not greater than necessary to fulfill the goals of sentencing is non-incarceration. Justice here is not jail.

Ms. Mosby faces sentencing for convictions of a highly unusual nature. As a public official, Ms. Mosby rightfully was held to the highest standards of integrity. She was a public official, but this is not a public corruption case. There was no bribery or political kickbacks, no abuse of a public position to commit fraud, no ciphering of public money. Ms. Mosby's offenses were purely personal and solely involved the access and use of funds that were generated from her income for the down payment of two properties. Ms. Mosby was found guilty of falsely certifying CARES Act forms that enabled her to withdraw from her 457(b) retirement savings account – funds that she generated due to her biweekly contributions and were held in trust for her and her alone. She was also found guilty of falsely stating that $5000 was a gift from her husband for closing when in fact it was her own money. Ms. Mosby stands alone as the only public official prosecuted in this District for offenses that entail no victim, no financial loss, and no use of public funds. The uniqueness of her circumstances leaves her in a class of one.

The uniqueness of this case is also highlighted in the advisory U.S. Sentencing Guidelines that apply. In a separate document, the Defense has outlined its position on the Guidelines calculations. The Guidelines range is low: either 12-18 months' imprisonment (Ms. Mosby's position) or 18-24 months' imprisonment (U.S. Probation's position). The ranges are appropriately low because the conduct underlying the convictions are of a non-aggravated nature. Unlike many

1

prosecutions against public officials, there are no Guidelines enhancements for abuse of a position of trust, aggravating financial harm, or the use of public funds because nothing of that nature occurred here. As the Court knows, the Guidelines are merely advisory and are only one factor to consider. The Court is vested fully with the discretion to vary downward from the Guidelines, which happens routinely in this District. A non-incarceration sentence is a modest downward variance but the one justice requires under a full § 3553(a) analysis.

Ms. Mosby's remarkable history and characteristics are another factor this Court must consider, and they are truly extraordinary. Ms. Mosby comes before the Court with laudable accomplishments and a lengthy and deep track record of devoted service to the foundations of our society, including the raising of daughters. Her history is one of fortitude at every life stage – from her days as one of the only children of color in a predominately white school, to persevering for law school admission and bar exam passage, to overcoming miscarriages and complex pregnancies to have children, to overcoming doubters to become the youngest top prosecutor in the nation, and to trailblazing and instituting prosecutorial reforms toward equal justice.

The details of Ms. Mosby's life and work demonstrate that the measure of good she has done far outweighs the conduct for which she is being sentenced. Letters from those who are most familiar with her history and characteristics, and what she has represented as hope and a harbinger of a re-envisioned justice system, demonstrate her measure. These are letters from prominent members of the legal profession, devoted former colleagues, mentees who are forever grateful for her humble and supportive mentorship, and family members who care deeply about her. Their letters make clear that Ms. Mosby is far more than the counts of conviction, and that she is someone who should be permitted to continue living in our community to advance further good.

The details of her life experiences and accomplishments also demonstrate the tremendous

losses Ms. Mosby has endured from this prosecution, which entailed no financial loss or victims. The consequences she has paid and will continue to pay are punishment. Ms. Mosby is imminently at risk of losing her attorney bar license and the profession she worked so hard for, has been deeply committed to, and is her life's work. She will soon be branded a convicted felon and with that, she will suffer the "civil death" of collateral consequences in enumerable life areas from employment through civil rights. Before this prosecution, her professional trajectory was luminous. So many dreams she and others had for herself have been deferred if not destroyed.

Most significantly, the two people she loves and cares for the most in this world – her young teenage daughters – have been harmed immensely from watching their mother experience a nightmare each day since the dawn of this prosecution. Even the thought of being separated from their mother is traumatic enough. As informed professionals opine, incarcerating Ms. Mosby will have devastating, long-lasting effects on her children. Countered with the nature of the offense, the harm of a prison sentence, especially on Ms. Mosby's daughters, tips the scale beyond what is necessary. Ms. Mosby has been punished enough. Any sentence of incarceration will be a sentence of trauma for her children too.

In her dramatic and public fall from grace, the public has seen the possibility of prosecution even for use of one's personally generated funds. The deterrent message has been sent at every level. If public officials are not deterred from the consequences to Ms. Mosby to date, nothing further (*i.e.*, prison time) will deter them.

The Court has an array of non-incarceration sentencing options to select from to tailor the appropriate sentence in this unique situation. Not a day of jail is necessary to meet sentencing goals. Jail is not justice for Marilyn Mosby. The Defense respectfully submits this memorandum in support of a non-incarceration sentence, the appropriate, reasonable sentence under § 3553(a).

## ARGUMENT

As the Court is aware, 18 U.S.C. § 3553(a) mandates that the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing laid out in § 3553(a)(2). The statute requires the Court to consider a number of factors "in determining the sentence to be imposed." 18 U.S.C. § 3553(a). The argument below addresses each of these factors to explain why a non-incarceration sentence is the appropriate sentence in this case.

Letters written to the Court on behalf of Ms. Mosby, and submissions from professionals on the impact of incarceration on children, are attached as numerical exhibits. Other exhibits – consisting of news articles, press coverage, and source materials from Ms. Mosby's time as State's Attorney – are largely available online but attached here for the Court's convenience as alphabetical exhibits.

### I.   The Kinds Of Sentences Available, The U.S. Sentencing Guidelines, And Pertinent Policy Statements (18 U.S.C. § 3553(a)(3), (a)(4), & (a)(5)).

In this case, there is no mandatory imprisonment on any count of conviction. 18 U.S.C. §§ 1014, 1621. And, importantly, Congress has recognized "the appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j).

As explained in a contemporaneous separate filing, the Guidelines in this case are either 18-24 months' imprisonment (Probation's position) or 12-18 months' imprisonment (Ms. Mosby's position). While the Court must consider the Guidelines, that range is much lower than what the Court typically sees in determining the appropriate sentence. Moreover, the Guidelines are merely one factor in the sentencing analysis and are advisory only. *United States v. Booker*, 543 U.S. 220 (2005). Established case law instructs that the Court "may not presume the Guidelines range is reasonable …[and] must make an individualized assessment based on the facts presented." *See*

*Gall v. United States*, 552 U.S. 38, 49-50 (2007) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)). Courts have discretion to impose a sentence outside the Guidelines. *See United States v. Raby*, 574 F.3d 376, 380 (4th Cir. 2009) ("The Sentencing Guidelines are advisory, and sentencing courts have discretion to sentence defendants within the statutory range regardless of whether the sentence falls within the Guidelines range or without.").

For all the reasons herein, the required individualized assessment of the § 3553(a) factors shows that a variance from the Guidelines and a non-incarceration sentence are appropriate.

**II.    Marilyn Mosby's Personal History And Characteristics (18 U.S.C. § 3553(a)(1)).**[1]

    **A.    Born To A Close-Knit, Law Enforcement Family In Working-Class Boston, Marilyn Was A First-Generation College And Law School Graduate.**

Born to a teenage mother on January 22, 1980, Marilyn's maternal grandparents raised her in a close-knit family with deep ties to law enforcement. Her maternal grandfather, Prescott Thompson, was a member of the first Black police organization in Massachusetts. Marilyn grew up in a primarily Black, working-class community in Boston.



Her grandparents instilled in her the importance of education and were supportive of her academic achievements. From the second grade through high school, she was bused from her residence to Dover, a wealthy town in Massachusetts.[2] This

*Marilyn with Nick, N▮▮▮ and A▮▮*

---

[1] This social history is compiled from, among other sources, interviews with former colleagues, mentees, and friends of Marilyn, along with media, newspaper, legislative, and other research.

[2] The busing program was discussed in a recent *New York Times* article by the education reform scholar Jonathan Kozol. *See* Dana Goldstein, "Jonathan Kozol Fought School Inequality for Decades. Here's One

experience was formative for Marilyn, as she took on what she felt was the responsibility of being a positive representation of African Americans in a primarily white environment. She excelled in school and became involved in extracurricular activities like student government, the school newspaper, and civil rights and peer leadership programs.

That experience also informed her desire to attend a historically black college or university. She received a scholarship to Tuskegee University, where she met her future husband, Nicholas Mosby. Marilyn graduated as a first-generation college student *magna cum laude*. As Mr. Kurt Schmoke, President of the University of Baltimore and former Mayor of Baltimore City, writes in his letter to the Court, he remembers meeting Marilyn and Nick at Tuskegee, where he served as a trustee, when they introduced themselves and shared their wish to pursue careers in public service in Baltimore. Exhibit 21. From Tuskegee, Marilyn went on to Boston College Law School.

After graduation, Marilyn moved to Nick's hometown of Baltimore, where he had bought a dilapidated rowhouse in the Bolton Hill neighborhood with help from Marilyn's grandparents. Nick and Marilyn married, and they embarked on rehabbing their home and building a life together in Baltimore. That life included fulfilling their college goal of pursuing careers in public service in Baltimore. For Marilyn, that meant going to work at the Baltimore City State's Attorney's Office as a law clerk and then an assistant state's attorney.[3]

---

Final Plea," *New York Times* (Mar. 14, 2024), https://www.nytimes.com/2024/03/14/us/jonathan-kozol-school-inequality.html?smid=nytcore-ios-share&referringSource=articleShare (Exhibit AA). The busing program was, and still is, called the METCO program (Metropolitan Council for Educational Opportunity). More information about METCO is available at https://metcoinc.org/.

[3] For additional information about Ms. Mosby's personal history, we direct the Court's attention to Ms. Mosby's testimony on January 31, 2024 and February 1, 2024 (ECF 504 & 506) and the Presentence Report (ECF 509) ¶¶ 70-77.

**B.**     **Marilyn Became A Mother To Two Daughters She Has Always Tried To Protect.**

    **1.**     **Marilyn Became An Involved, Devoted, Loving Mother To Two Teenagers.**











**3.** **An Expert Opines That Marilyn's Incarceration Would Have Deleterious And Long-Term Effects On Her Teenage Daughters.**

One of Marilyn's mentees, Ms. Jima Chester, who has mentored one of Marilyn's daughters, has expressed anxiety about how this case will impact the girls' "journey" given that "[t]hey have bright futures, and having their mother witness them grow is something they will always need and can only get once." Exhibit 1. Ms. Chester's anxiety, in addition to Ms. Jones' clinical opinions, are mirrored by the sociological research. Attached at Exhibit 27 is an affidavit authored by Dr. Jill McCorkel, a Professor of Sociology and Criminology at Villanova University. She is also the Founder and Executive Director of Philadelphia Justice Project for Women & Girls, a nonprofit organization that, among other things, produces research on gender and mass incarceration to improve public policy and develop socially just and effective alternatives to incarceration. As her resume documents, she has authored publications and been awarded research grants to study incarceration and its impact on children and families. Among other specialty areas, her research explores the social and political impact of mass incarceration on the families and communities of incarcerated men and women.

The impact of an incarcerative sentence on Marilyn's daughters is not theoretical. Dr. McCorkel explains in her affidavit that "children and teens with an incarcerated parent are at substantially higher risk for suffering negative outcomes across every conceivable domain." *Id.* at 1. The domains are many: health and well-being, academic performance, intellectual development, psychology, behavioral and mental health, delinquency and criminality, substance abuse, and contact with the criminal justice system. *Id.* And "[n]egative outcomes have cascading and multiplicative effects," meaning they pile onto each other and compound the harm. *Id.* As outlined in Dr. McCorkel's report, there are certain factors that may increase the harm: (1) Ms. Mosby is a

12

"residential parent" who lives with her daughters; (2) this case involves possible maternal incarceration, as opposed to paternal incarceration; and (3) Ms. Mosby's daughters are teenagers.

*First*, as Dr. McCorkel writes, "the loss of a residential parent" – like Ms. Mosby – "is that much more traumatic and destabilizing for children," even controlling for divorced parents with joint custody. *Id.* at 2. This is not a case where the research shows that removing Ms. Mosby from her daughters could be beneficial for her children. *Id.*

*Second*, the harm to Ms. Mosby's children may be greater if Ms. Mosby goes to jail, simply because she is the maternal figure. *Id.* As Dr. McCorkel states, "[m]aternal incarceration increases the likelihood that children and teens develop depression and depressive symptoms and that they endure a variety of negative social outcomes" and engage in self-harm. *Id.* Dr. McCorkel writes,

> In an interview study that explored these and related mental health impacts in greater depth, researchers found that the pain of separation for children and teens with an incarcerated mother was significant and pronounced, and gave rise to a variety of emotional difficulties. For older children, emotional pain and sadness was compounded by feelings of anger and resentment. Teens reported feeling rejected and betrayed by their mothers as the result of their mothers' participation in crime and subsequent arrest and conviction. Their emotional and mental health challenges were then exacerbated by feelings of social stigma and limited communication with mothers. Stigma deterred them from reaching out for help and discouraged them from sharing feelings and concerns with supportive family members, teachers, and peers. The carceral setting made regular and meaningful communication with their mothers all but impossible. Not surprisingly, a follow up study of the teens as young adults reported that nearly 70% experienced mental health problems into adulthood, 64% used illicit substances, and two-thirds had been arrested either as a teen or as an adult. Forty percent of the sample became parents while they were teenagers. Findings from this interview study are echoed in numerous quantitative studies of the relationship between maternal incarceration and negative mental health impacts.

*Id.* at 2-3 (internal citations omitted).

*Third*, research shows that, while parental incarceration at any stage in a child's life leads to "a greater likelihood of behavioral issues and mental health disorders," "[t]wo large and well-regarded studies of teens and pre-teens report pronounced negative mental health and legal

consequences for those experiencing parental incarceration." *Id.* at 3. Those mental health consequences include depression, anxiety, conduct and behavioral problems, ADHD, and substance use disorder. *Id.* As Dr. McCorkel explains, "[p]arental incarceration during teen years carries with it a unique set of stressors," including awareness of their parent's absence and "heightened levels of shame, resentment, and anger." *Id.* Research also shows that maternal incarceration during a daughter's teenage years is a "significant predictor of later criminal offending" and "diminished bonds of mothers and their daughters." *Id.*

**C.      Marilyn Mosby Became A Devoted, Trailblazing Public Servant And Leader When She Became Baltimore City State's Attorney.**

In addition to being a mother, Marilyn's accomplishments throughout her life are worthy of this Court's consideration in the § 3553(a)(1) analysis.

**1.      At 35, Marilyn Became One Of The Youngest Top Prosecutors Of Any Major American City.**

Marilyn's interest in the criminal justice system was born of personal tragedy. At the young age of 14, her 17-year-old cousin and best friend, Diron Spence, was shot and killed while sitting on a bicycle a few feet from their grandfather's home. Some thought he was killed over sneakers, but the family to this day believes he was mistaken for a neighborhood drug dealer. *See* Zachary R. Dowdy & Michele McPhee, "Boston Officer's Stepson Slain Over Sneakers," *The Boston Globe* (Aug. 20, 1994) (Exhibit BB); Traci Grant, "Mistaken ID Faulted in Slaying of Boston Officer's Stepson," *The Boston Globe* (Aug. 22, 1994) (Exhibit CC).

14

Diron was a good student, caring family member, hard worker, and talented artist who had been putting away $150 each week from his lifeguard job toward college. Like Marilyn, he too dreamed of being a first-generation college student. Diron's murderer, Kevin Denis, the same age as Diron, was ultimately convicted after a neighbor notified police and provided evidence against him. *See Commonwealth v. Denis*, 442 Mass. 617, 619 (2004) (providing account of the important eyewitness testimony).



*The front page of the **Boston Herald** covering Diron Spence's killing.*

The nightmare of her cousin's murder informed *how* Marilyn viewed the criminal justice system. To her, justice was a matter that considered not only the victim (her cousin and her family) and the witnesses of crime (her neighbor), but also the perpetrator. She came away from that nightmare with a perspective of what it was like to be a victim, and about the importance of witnesses being willing to come forward, but also with a deep-seated curiosity about how the

criminal justice system could be used to prevent crime in the first place and make her community safer in alternative ways.

With that formative tragedy in mind, Marilyn attended law school. While there, she devoted herself to learning and understanding the legal and human complexities of the criminal justice system—in both state and federal courts and from both the prosecutorial and defense sides. She was a legal intern at the U.S. Attorney's Office in Boston (summer 2003), a student attorney in a civil litigation clinic with the Boston College Legal Assistance Bureau (fall 2003), a legal intern at the Suffolk County District Attorney's Office (Boston) (spring 2004), a legal intern at the U.S. Attorney's Office in Washington, D.C. (summer 2004), and a student criminal defense attorney as part of a criminal justice clinic in the Dorchester District Court (2004-2005). After law school, she worked at the Baltimore City State's Attorney's Office (SAO) from 2005 through 2011 before leaving to diversify her career.

Eventually, Marilyn became frustrated by the violence she saw after a decade of living in Baltimore City. In 2013, she decided to challenge incumbent Gregg Bernstein for the office of Baltimore City State's Attorney. *See* Luke Broadwater, "Mosby to Run for City's Top Prosecutor," *The Baltimore Sun* A2 (June 25, 2013) (Exhibit DD). Marilyn saw an opportunity to be smarter on crime and to focus prosecutorial efforts differently with the aim of reducing crime, building trust between law enforcement and the community, and creating racial equality.



*Marilyn announcing her candidacy with A[■■]*
*(Source: **The Baltimore Sun** (Exhibit DD))*

16

Marilyn was doubted and criticized as a challenger for the State's Attorney position from the start. She was considered too young and too inexperienced. Election coverage from *The Baltimore Sun* reported:

> Lawyer Marilyn J. Mosby entered the Baltimore state's attorney's race as a decided underdog. Just 34 years old, she was seeking to unseat a well-connected incumbent who would outraise her by a 3-to-1 margin. She'd never prosecuted a rape or murder case. Some of Baltimore's high-powered lawyers met her campaign with eye rolls.

Luke Broadwater, "A Look Back, a Look Ahead," *The Baltimore Sun* A1, A17 (June 26, 2014) (Exhibit EE).

The former *Baltimore City Paper* titled her the "Best Haranguer" and a "bruiser" for, in jest, "h[olding] Bernstein's feet to the fire whenever she can point to anything criminal occurring in Baltimore, a city famed for its persistent crime problems." 2013 Best of Baltimore, *City Paper* E54 (Sept. 18, 2013) (Exhibit FF). The *City Paper* also criticized her understanding of the SAO: "Though she is young, ambitious, and politically wired—she's married to City Councilman Nick Mosby—Marilyn Mosby displays a weak grasp of the office, and its budget." *See* "State of the State's Attorney Race: Mosby's Hungry, Vague; Bernstein's Confident. Will His Record Undo Him?" *City Paper* T12 (June 18, 2014) (Exhibit FFF); *see also* Luke Broadwater & Ian Duncan, "Mosby Beats Bernstein in State's Attorney Race," *The Baltimore Sun*, A1, A10 (June 25, 2014) (Exhibit GG) (noting that "by mid-June [Bernstein] had pulled in almost $630,000 to Mosby's $200,000"). Her gender, too, was raised as a source of concern. *See, e.g.*, The Mosby Effect: The Inauguration of Baltimore's New State's Attorney Was a Godly Rebuke of Her Critics," *City Paper* T10 (Jan. 14, 2015) (Exhibit HH) (quoting a critic as saying, "[I]t'll be interesting to see how the gentleman on the street . . . come to view her").

Marilyn overcame her doubters, beat the incumbent in the Democratic primary, won the general election, and was sworn into office on January 8, 2015, with her husband and daughters by her side. Ms. Michelle Lee, a former colleague who worked in multiple roles under Marilyn, remembers that day. Ms. Lee recalls Marilyn inviting the entire SAO staff to gather with her on the War Memorial Plaza in downtown Baltimore. She also remembers Marilyn offering copies of Bryan Stevenson's book *Just Mercy*, a memoir about the importance of confronting injustice and redemption, to her then-colleagues, and stressing that equity would be at the forefront of her time in office.



***Marilyn with her family at her swearing in on January 8, 2015.***
***(Source: WBALTV11 (Exhibit JJ))***

That day, Marilyn gave an inaugural address highlighting what would be the central pillars to her time in office: justice for all, repairing trust in the community, and intervening in the lives of young people before they become part of the criminal justice system. Marilyn invoked Martin Luther King Jr.'s maxim: "Injustice anywhere is a threat to justice everywhere." *See* The Mosby Effect, *supra*. And she pledged to seek justice for everyone: "As a Black woman who understands

just how much the criminal justice system disproportionately affects communities of color, I will seek justice on your behalf." Stephanie Cornish, "Justice for All Emphasized by New Baltimore City State's Attorney Mosby at Inauguration," AFRO (Jan. 9, 2015) (Exhibit II).[4] She spoke about the need to "repair . . . trust" "between our community and law enforcement." The Mosby Effect, *supra*. And she "emphasized her view that a prosecutor must exercise her 'power to get to our children before they get to the criminal justice system.'" Justice for All, *supra*.

### 2.   Marilyn Approached Her State's Attorney Position From A Holistic, Smarter-On-Crime Perspective.

Marilyn saw becoming State's Attorney not as a job, but as her life's work. Criminal justice was what she had devoted her life to after the death of Diron, what motivated her to go to law school and pursue learning opportunities in public service while there. And with that very personal experience, she had developed new ideas about the role of the prosecutor. In retrospect, some call Marilyn a "progressive prosecutor," and indeed she was one of the first – if not the first – "progressive prosecutors" elected to office. *See* Paul Butler, "Sisters Gonna Work It Out: Black Women as Reformers and Radicals in the Criminal Legal System," 121 Mich. L. Rev. 1071, 1078 (2023) ("Some of the first elected progressive prosecutors were Black women, including Baltimore's Marilyn Mosby, Orlando's Aramis Ayala, Chicago's Kim Foxx, and Boston's Rachael Rollins," each of whom was elected after Marilyn); Brooks Holland & Steven Zeidman, "Progressive Prosecutors or Zealous Defenders, from Coast-to-Coast," 60 Am. Crim. L. Rev. 1467, 1470 (2023) ("The progressive prosecutor movement emerged in the mid-2010s with prosecutors such as Marilyn Mosby in Baltimore."); Exhibit 14 (character letter from former colleague and mentee: "Regardless of how one feels about the evolution of law enforcement and

---

[4]       https://afro.com/justice-for-all-emphasized-by-new-baltimore-city-states-attorney-mosby-at-inauguration/.

prosecution in America, Marilyn Mosby is a central figure in shifting the narrative."). She was the first of her kind.

Marilyn didn't put a label on what she was doing. She just did her job the best way she knew how with the goals of justice, restoring trust in the community, and improving public safety. She sought to combat crime and reduce violence in not just traditional carceral ways but in broader, more holistic ways. She prioritized proactive crime prevention through community and youth-centered approaches. To improve safety on the streets, she knew she didn't just need strong prosecutors who could secure convictions; she needed to improve trust with the community so that victims and witnesses would feel safe coming forward. To ensure her office was administering justice fairly, she was willing to look inward, using empirical data, and advocate on behalf of redemption and second chances. Marilyn's signature efforts as State's Attorney are detailed below.

### a.      Marilyn Focused On Proactive Crime Prevention, Including Through Youth-Centered Programs.

To proactively prevent crime and to introduce youth to the criminal justice system in a positive way, immediately upon taking office and thereafter, Marilyn prioritized youth programming through her Crime Control and Prevention Unit. Her key youth programs are detailed below.

### i.      B-More Pop-Ups

B-more Pop-Ups was a series of summer events hosted by Marilyn and the SAO on Friday nights in the summer. The goal was to create an environment where youth could have fun while staying out of trouble. Mr. Shalik Fulton, a former SAO colleague, explained that they chose to host the Pop-Ups from 6:00 p.m. to 9:00 p.m. on Fridays in the summer in response to



a U.S. Department of Justice report that crime among youth spiked during that timeframe.



Far more than just a crime-aversion program, the SAO partnered with internal and external partners to energize the events and attract the youth. The Pop-Ups varied and included free skate admission and rentals, free bowling, basketball tournaments and talent shows, and admission to the science center. When Covid hit,



they continued, becoming virtual and providing musical entertainment. During the last Pop-Up, the SAO rented out a boat and took youth on a tour of the Inner Harbor.

Ms. Jima Chester, a young community activist who works with a non-profit in Baltimore focused on serving Baltimore youth, met Ms. Mosby when she was only 14 years old. The Pop-Ups were the first time she had the chance to get involved in community organizing or volunteer work, and she was "awe-struck" to see 500-1,000 people, almost entirely Black youth, at these events. Unlike many public events held by law enforcement or members of the criminal justice system, what made the Pop-Ups unique, according to Ms. Chester, was that Marilyn and her office used these events to meet the needs of



*A picture from a Pop-Up at the pool.*

the community, like renting out a pool when it was boiling hot out or doing a memorial service when a young man was killed during an armed robbery at prom.

Over her time as State's Attorney, approximately 20,000 youth and families participated in the B-more Pop-up events. *See* WMAR Staff, "State's Attorney Mosby Hosts Final Bmore Popup for Youth on Inner Harbor Cruise," 2abc WMAR (Aug. 26, 2022) (Exhibit KK).[5]

### ii.      Junior State's Attorney Program

Marilyn championed the Junior State's Attorney (JSA) program, a paid summer program for students to learn about criminal justice and public service careers firsthand. As Angel White,

former Director of Crime Control and Prevention at the SAO explained in an interview with WJZ about the program, the "vision and mission" of Marilyn and the office was to "meet the students in the classrooms as opposed to having to meet them on the wrong side of criminal justice in the courtroom."

JSA introduced ninth and tenth grade participants to how the criminal justice system



*Marilyn with a group of JSAs in 2017.*
*(Source: WJZ (Exhibit LL))*

works from the moment a crime is committed through sentencing in court. Participants met police officers, sheriff's deputies, forensic experts, lawyers, and judges to explore a career in criminal justice. The program concluded at the end of the summer, with a mock trial presentation in front of lawyers and judges. Following their summer experience, JSAs could continue their engagement

---

[5]      https://www.wmar2news.com/news/local-news/states-attorney-mosby-hosts-final-bmore-popup-for-youth-on-inner-harbor-cruise.

with the SAO through the JSA Alumni Association.

It wasn't easy for Marilyn to get JSA off the ground, but she was determined to do it. She faced resistance from even the first coordinators of the program, including Ms. Michelle Lee, who were concerned that the personal, daily challenges some Baltimore youth struggled with would be a barrier to focusing on the program. As Ms. Lee told the Federal Public Defender's Office in an interview, Marilyn



*JSA participants in court.*

mentored the coordinators to believe in the program and gave them the tools to make it work. Ms. Lee explained that Marilyn "injected positivity and hope and determination into each of her many projects designed to transform the SAO and the community." With respect to JSA, in particular, these "kids became Ms. Mosby's scholars," reported Ms. Lee.



*JSA participants in BPD's Foxtrot helicopter.*

The program enjoyed tremendous success. As De'Von Brown, a friend and former SAO colleague, writes in his letter to the Court: "Through this program, [Marilyn] instilled in these students a sense of purpose and possibility, encouraging them to envision themselves as judges, prosecutors, defense attorneys, and even elected officials. Marilyn's commitment to these young individuals restored their hope and affirmed their worth, reminding

23

them that their dreams are valid and their voices matter." Exhibit 12. Over the seven years of the program, 299 participants went through the program. According to a 2021 SAO report, of its 299 participants, 95% graduated high school and 95% were either in college or on a career track. Ms. Lee recounted conversations with "countless educators" who were in "utter disbelief" over the transformation of children who went through the program, including some children whom educators had all but given up on.

More than the numbers, the stories that emerged from this program demonstrate how revolutionary it was. Ms. Jima Chester first met Marilyn through JSA. She credits JSA with "changing [her] life." In her words, "things weren't going so great," and then "things began to look a bit more up." JSA provided her with "the opportunity to learn more about Baltimore City," gain leadership skills, and connect with "mentors," including Marilyn.



*Marilyn with a group of JSAs in 2016.*

Ms. Chester wrote a letter to the Court, which is attached as Exhibit 1. Part of Ms. Chester's letter appears below:

> *My name is Jima Chester, and I'm a sophomore social work major at the illustrious Morgan State University. I'm a Baltimore Polytechnic Institute Alumni, serial entrepreneur, public speaker, and mentor.* **Most importantly, I am a Junior States Attorney (JSA) alumni. I was a part of the JSA program in 2019. This program was my first job and quickly became a stepping stone for me beginning my leadership.** *I met Ms. Mosby during my time in the program and had the pleasure of having her tell me how she assumed her position as state attorney at the time. Her story of adversity, grief, and perseverance was one that not only inspired me but resonated with me. Hearing such a hardship riddled story of Ms. Mosby's upbringing made me think of my own and that despite her not being from Baltimore, she had faced some of the things my peers and I faced. Since the first day I met, Ms. Mosby*

*has shown her dedication and passion for helping youth in Baltimore and equipping us with resources, opportunities, and most importantly, education. Pop-ups were events that the JSA program hosted every Friday in the summer to give youth in Baltimore a positive and safe place to be in the evening. The events were fun, but we could also enjoy that fun with our mentors from the JSA program and Ms. Mosby herself. I didn't realize it at the time. Still, now, as I am older, I see the impact of being able to engage and be personally supported by an elected official on my leadership. **I admire the duality of Ms. Mosby and the example she set as a Black woman, mother, and mentor.** As a JSA alumnus, I had the honor of returning to the program twice after graduation to be a mentor. I even had the pleasure of mentoring Ms. Mosby's daughter. . . . I will continue to represent the JSA and Ms. Mosby's mission to help youth succeed with pride. **People like Ms. Mosby are inspiring generations, and as an example of that inspiration, I hope how far I have come as a leader shows how strong of a leader she is.***

Exhibit 1 (emphasis added).

In 2022, WJZ ran a 2-minute story of the program, which is attached as Exhibit LL.[6] Ms. Chester is interviewed in the video.

### iii.   Great Expectations

Marilyn's office also ran the Great Expectations program, which introduced even younger



*A Great Expectations event.*

children – as young as fourth graders – to the criminal justice system. Over the course of 10 months, the program brought professionals from the SAO, Public Defender's Office, Baltimore City Police Department, Baltimore City Fire Department, District and Circuit Courts, City and State Legislatures, and community activists into classrooms. Great Expectations operated in Franklin Square Elementary (2015); William Pinderhughes Elementary (2016); Matthew A. Henson, Gilmor, and

---

[6]   https://www.cbsnews.com/amp/baltimore/news/baltimore-students-can-explore-criminal-justice-career-through-junior-states-attorney-program/.

City Springs Elementary Schools (2017); Furman L. Templeton, Harlem Park, and Sharp Leadenhall

Elementary Schools (2018); Dorothy I. Heights, Eutaw Marshburn, and Sharp Leadenhall Elementary Schools (2019); and Eutaw Marshburn, Francis Scott Key, and City Springs Elementary Schools (2021). One assistant principal said of the program, "It helps our students see role models in the community, positive



*Delivering Christmas gifts to one of the Great Expectations schools.*
*(Source: WBALTV11 (Exhibit MM))*

role models that help them make an impact in their decisions in future careers." Christina Loscar,

"Santa Luke, Mosby Visit Schools to Deliver Christmas Gifts," WBALTV11 (Dec. 19, 2019)

(Exhibit MM).[7]

#### iv.    AIM To B'More

After Marilyn secured the Democratic primary in June 2014, she visited prosecutorial offices

around the country, including in Manhattan, Brooklyn, Philadelphia, Atlanta, and San Francisco.

One California program that offered an alternative to incarceration, and was started by San Francisco

then-District Attorney Kamala Harris, caught her eye, and Marilyn brought it to Baltimore.[8] She

called it "AIM to B'more."

---

[7]    https://www.wbaltv.com/article/santa-luke-marilyn-mosby-visit-schools-deliver-christmas-gifts/30285417#:~:text=Santa%20Luke%2C%20Mosby%20visit%20schools%20to%20deliver%20Christm as%20gifts&text=One%20of%20the%20schools%20they,Attorney's%20Office's%20Great%20Expectation s%20Program.

[8] The re-entry initiative was called "Back on Track," more information about which can be found here: Jacquelyn L. Rivers & Lenore Anderson, Bureau of Justice Assistance Fact Sheet (Sept. 2009), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/BackonTrackFS.pdf    (Exhibit    NN). Alternatives to Incarceration or problem-solving courts like Back on Track and AIM to B'More have been in operation in several federal judicial districts, too. *E.g.*, U.S. Attorney's Office Central District of

AIM to B'more was a program for non-violent first offenders that offered an alternative to

incarceration. Instead of a purely retributivist response to crime, the program offered certain non-violent first offenders a probation before judgment with the goal of helping these individuals become productive members of the community and break out of the



*An AIM to B'More community event.*

cycle of law-breaking behavior. During the probationary period, participants were required to complete community service tailored to employment goals; complete their GED, associate's



*Marilyn announcing the program.*
*(Source: Baltimore Sun (Exhibit OO))*

degree, or a vocational or similar education program; complete a job skills program; and obtain internships and full time employment. An expungement was granted upon completion of the program to allow easier access to jobs and public services. The program enjoyed huge success.

The Federal Public Defender's Office spoke with now-Baltimore City Council Member Antonio Glover, who worked with participants of the Aim to B'more program. Council Member Glover explained that he saw many participants graduate out of the program and have their record

California, Conviction and Sentence Alternatives Program (CASA) (updated July 17, 2023), https://www.justice.gov/usao-cdca/programs/conviction-and-sentence-alternatives-program-casa. (offering dismissal of charges or a sentence reduction that does not include a term of imprisonment upon competition of intensive supervision and programming).

expunged. A letter to the Court from Bruce Brown, who graduated from the program and was eventually hired by the SAO, where he still works today, is attached at Exhibit 13.



*AIM to B'More participants at a ceremony.*

### b.  Marilyn Worked To Ensure Justice For All.

Marilyn believed her role as State's Attorney encompassed an obligation to ensure meaningful, holistic justice for all. To that end, she worked to ensure convictions had integrity, individuals were given second chances, and justice was administered fairly across racial lines.

### i.  The Conviction Integrity Unit

Early in her time as State's Attorney, Marilyn reconfigured and expanded the Conviction Integrity Unit (CIU) and charged the division with investigating claims of actual innocence and wrongful conviction. It was the first such division in Maryland. In 2018, CIU expanded to include a new investigator through a federal grant that was received in partnership with the Mid-Atlantic Innocence Project and the University of Baltimore's Innocence Project Clinic.



*Marilyn with two exonerees, Kenneth McPherson and Eric Simmons.*

In an interview with *The New York Times*, Marilyn explained why this work was so important to her: "The mission of a prosecutor is not to just go after individuals who have committed crimes and zealously advocate on behalf of victims and witnesses of crime. Your mission is justice over conviction." Timothy Williams, "'Your Mission Is Justice': A Prosecutor on Why She Helped Free 3 Men," *New York Times* (Nov. 27, 2019) (Exhibit PP). In response to critics who opposed her efforts to investigate claims of actual innocence, Ms. Mosby explained it was her "duty . . . to right the wrongs of the past" even if it exposed problems in the very criminal justice system within which she was working. *Id.*

Mr. Eric Simmons, who was exonerated through the work of Ms. Mosby and the CIU in 2019, spoke with the Office of the Federal Public Defender. He recalled a powerful moment with Marilyn:

> I have never seen someone who wasn't family look me in the eyes the way she did when I was released. I saw something in her eyes that I have only seen in two other people's eyes – my mother and my wife. It was something nurturing. There was a respect there I have never seen. She told me she was sorry, and I knew she meant it. That came from a place of respect for the job, for the law, and for me and my brother as human beings.

Mr. Simmons highlighted Marilyn's advocacy even after he and his brother were released. He spoke about a monthly program – called Resurrection After Exoneration – that Marilyn established to connect exonerees to needed re-entry services, including doctors, psychiatric services, and financial advisors. Mr. Simmons reported, "If it wasn't for her, we wouldn't be out, and we would

29

almost certainly have died in prison for a crime we didn't commit." He remarked that, although the CIU had existed before Marilyn's administration, it was not taken seriously until Marilyn took office. Attached as Exhibit 18 is a letter to the Court from Mr. Simmons.

Over the course of her time in office, the CIU exonerated 12 innocent men:

- 2016: Malcolm Bryant released after serving 18 years in prison.

- 2017: Lamar Johnson released after serving nearly 14 years in prison.

- 2018: Jerome Johnson and Clarence Shipley released after serving nearly 30 years and 27 years, respectively, in prison.

- 2019: Alfred Chestnut, Ransom Watkins, and Andrew Stewart released after serving 36 years in prison; Kenneth McPherson and Eric Simmons released after serving nearly 25 years in prison.

- 2020: Melvin Thomas released after serving nearly 19 years in prison.

- 2021: David Morris and Paul Madison released after serving nearly 17 years and 30 years, respectively, in prison.

Though the CIU still exists, it appears that no one has been exonerated since Marilyn left office. *See* Office of the State's Attorney for Baltimore City, Conviction Integrity Unit.[9] In 2021, WJZ devoted a three-minute news segment to the CIU, which is attached as Exhibit QQ.[10]

## ii.        The Sentence Review Unit

In late 2020, Marilyn launched the Sentence Review Unit (SRU). The SRU was created in response to the Covid crisis and empirical data that convinced Marilyn that the SRU was the right thing to do from a criminal justice perspective. First, data showed that prison sentences disproportionately impact minorities; in Maryland, at the time, African Americans made up a mere

---

[9]                                                     https://www.stattorney.org/divisions/conviction-integrity-unit#:~:text=On%20December%2021%2C%202021%2C%20Paul,in%20Cherry%20Hill%2C%20Baltimore%20City (last visited Apr. 29, 2024).

[10]    https://www.cbsnews.com/baltimore/news/i-spent-36-years-in-prison-for-a-crime-didnt-commit-city-states-attorney-office-introduces-new-program-to-help-overturn-wrongful-convictions/.

30% of the population yet comprised 70% of the state's prison population. *See* SRU Factsheet 1 (Exhibit RR).[11] Second, empirical data and anecdotal data from Maryland demonstrated that people age out of crime, and so, releasing this subset of people would not put public safety at significant risk. *Id.* at 3 (also pointing to the release of 200 lifers under a Maryland state court ruling, after which 97% "have been successful in re-acclimating into their communities and haven't re-offended nor returned to prison"). Third, the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), which outlawed mandatory juvenile life without the possibility of parole after reviewing scientific evidence on the juvenile brain, necessitated correcting the de facto, no-pardon policy in Maryland that kept that practice in effect. *Id.* at 3-4.

Marilyn picked Ms. Becky Feldman, a career public defender,[12] to lead the SRU. The creation of the unit was what Ms. Feldman calls an "act of courage that challenged the status quo." Exhibit 8. It wasn't a popular decision – inside or outside the SAO – to create a unit inside a prosecutor's office to advocate for the early release of individuals with valid convictions. As Ms. Feldman writes in her letter to the Court: "At that time, there were only 6 other sentence review units in the US, as the concept of a prosecutor's office supporting the release of those convicted of violent crimes was not a common or popular one." *Id.*; *see also id.* ("Because the concept of this unit was novel, it was not always popular, even amongst other colleagues in the office."). As Mr. Michael Collins, Ms. Mosby's former Policy Director, explains in his letter to the Court, "Advocating for the release of people convicted of homicide was politically risky in a city like Baltimore, but Marilyn was guided by an innate sense of compassion and a desire to give people second chances." Exhibit 9.

---

[11] https://www.stattorney.org/images/SRU_-_Factsheet_224.pdf (last visited April 29, 2024).

[12] Ms. Feldman served the Maryland Public Defender's Office for 15 years as an assistant public defender, chief public defender, and the deputy public defender.

The SRU prioritized reviewing cases in which the defendant either was younger than 18 at the time of the offense and had served over 25 years of a life sentence or was now older than 60 and had served more than 25 years of a life sentence. In reviewing applications for possible relief, the SRU considered a host of factors including the facts of the case, mitigating circumstances, conduct and progress while incarcerated, the available reentry plan, the views of victims, medical conditions, and likelihood of reoffending. The SRU's recommendation about seeking possible relief was reviewed by members of the Executive Team and ultimately by Marilyn, who made the final decision. In her letter to the Court, Ms. Feldman recalls, "The process was a collaborative one with Ms. Mosby. She was very involved with reviewing the evaluations of each case and took great consideration in the voices of the victims. She was easily accessible, as well as honest and forthright with her opinions and questions on each case. We ended up working very well together and developed a trusting working relationship." Exhibit 8. If the decision was made to support early release, the SRU would work with defense counsel to discern what, if any, legal path for release was available, including post-conviction relief.

In total, Marilyn and her office secured the release of almost 60 people under this effort. Mr. Collins recalls sitting in court and hearing a judge release an exoneree because of the work of the SAO "when that person would have otherwise died in prison." Exhibit 9. He recalls that being "one of the most profound experiences of [his] life." *Id.* One of the first individuals released through the efforts of the SRU was Ms. Eraina Pretty, who served more than four decades behind bars for her part as a teenage accomplice in two murders that occurred in the 1970s. *See* Tim Prudente, "'Worthy of Mercy': Maryland's Longest-Serving Woman Behind Bars Wins Her Freedom Amid Coronavirus Concerns," *The Baltimore Sun* (Dec. 14, 2020) (Exhibit SS).[13] While

---

[13]     https://www.baltimoresun.com/2020/12/14/worthy-of-mercy-marylands-longest-serving-woman-behind-bars-wins-her-freedom-amid-coronavirus-concerns/.

incarcerated, Ms. Pretty earned a bachelor's degree in Sociology from Morgan State University, took computer courses and worked as a data entry clerk for over 20 years, organized self-help lunches and volunteered for charity work, was called a "role model" by correctional officers, and only had three rules infractions in more than three decades. *Id.*

Mr. Anthony Muhammad is another individual who was released through the work of the SRU after serving 29 years of incarceration for a murder he committed at the age of 15. Mr. Muhammad's letter to the Court, attached as Exhibit 17, is a powerful anecdotal exemplar of the data and statistics behind the SRU. As Mr. Muhammad explains, he has fought back against the words of his sentencing judge calling him incorrigible and depraved, using the opportunity Marilyn helped give him to not only be a law-abiding citizen but "part of the solution to crime and violence in the very same community where I was once part of the problem." *Id.* Ms. Feldman's letter to the Court mirrors Mr. Muhammad's point. Ms. Feldman notes that she "keep[s] in touch with a majority of the people released, and they are serving Baltimore communities as youth mentors, violence interrupters, reentry counselors, and parole advocates, just to name a few." Exhibit 8.

### iii.     Improving The Quality Of Convictions With Empirical Data.

Marilyn's time in office was notable for her willingness to acknowledge and try to address problems within the SAO. One such example is the 2018 voluntary collaboration between the SAO, Baltimore City Police Department, Maryland Office of the Public Defender, and University of Baltimore Innocence Project (collectively, the Baltimore Event Review Team, or BERT) to identify and learn from problems identified in the wrongful conviction of Malcolm Bryant, one CIU exoneree who died shortly after his release. *See* Report of the Baltimore Event Review Team on *State of Maryland v. Malcolm J. Bryant* (Nov. 2018) (Exhibit TT).[14] The collaboration was

---

[14] https://www.law.upenn.edu/live/files/8862-malcolm-bryant-exoneration.

coordinated by the Quattrone Center for the Fair Administration of Justice at the University of Pennsylvania Law School.[15] Marilyn essentially invited the report even though it was critical of her office; the final report identified factors implicating the SAO that led to the wrongful conviction and helped establish productive ways to avoid making the same mistakes again. *Id.* at 3-8.

Marilyn was also open to collaborating with an outside researcher to study issues of racial inequity in her prosecutions in Baltimore City. In his letter to the Court, Brian Johnson, Professor & Associate Chair of the Department of Criminology & Criminal Justice at the University of Maryland, writes,

> *Ms. Mosby was also at the vanguard in championing racial justice. In 2019, I approached her with an academic proposal to establish a researcher-practitioner partnership to study issues of racial inequity in prosecution in Baltimore City. As background, a passel of research examines disparities in judicial sentencing decisions but far less is known about prosecutorial discretion and how it shapes criminal case outcomes. Prosecutors have long been reticent to open themselves up to academic scrutiny; yet, as Justice Robert Jackson famously opined, they have "more control over life, liberty and reputation than any other person in America." Ms. Mosby was not only willing to collaborate but eager to have an opportunity to use the data from her office to identify and rectify potential sources of inequality and injustice in her office. As part of our partnership, we worked closely together over the next two and a half years, producing a comprehensive report on Racial Justice in Prosecution in Baltimore City.*

Exhibit 16.

---

[15] Penn Carey Law, Quattrone Center, https://www.law.upenn.edu/institutes/quattronecenter/ (last visited May 5, 2024).

The report, entitled "Racial Justice in Prosecution in Baltimore," analyzed data from Baltimore City Circuit Court cases in 2017 and 2018. *See* Brian D. Johnson *et al.*, Final Report on Racial Justice in Prosecution in Baltimore (Feb. 2022) (Exhibit UU). Among other negative findings, the report found: (1) relative to Baltimore City's racial demographics (63% Black), Black people are overrepresented in arrests (83%) and Circuit Court cases (88%), and (2) on average, Black defendants face more serious charges and are overrepresented in violent, firearms, and drug offenses. *Id.*



Marilyn did not shy away from these findings but, instead, was open to transparency and accountability, even when one of her advisors, Mr. Collins, expressed concern about negative publicity for the SAO. As Marilyn acknowledged in the foreword she wrote to the report,

> *Although the study can make for uncomfortable reading, we cannot shy away from the racial disparities that the report details. The work I have done until this point and that I will do in the future is borne out of a knowledge that racism permeates our criminal justice system, that blacks are more likely to be arrested, prosecuted, and incarcerated than their white counterparts. Acknowledging this truth is an important step towards fixing these issues. I recognize that prosecutors have an important role in the criminal justice system, and I know that more must be done as we strive for racial equity and fairness. I hope that other actors in the system will read the report and feel the same way.*

*Id.* at i. According to Mr. Collins, Marilyn's view was to accept the truth and focus on fixing the problems, and she dedicated her time in office to doing just that.

### c.      Marilyn Worked To Restore Trust In The Community.

Integral to her work to combat crime, Marilyn knew she had to work to restore trust in the communities of Baltimore, so she worked tirelessly during her eight years in office to achieve this goal.

### i.      The Community's Relationship With The Police

Only a few short months after she took office, Freddie Gray, a 25-year-old Black man, died of a spinal cord injury while in police custody. He had been shackled and handcuffed, but not secured in a seat belt in a transport van. Following protests and then rioting, looting and arson, Marilyn charged six Baltimore City Police Department (BPD) officers with misconduct along with assault, manslaughter, or murder. Marilyn's decision was seen as pitting her against the BPD and brought her significant criticism. After one officer's trial ended in a hung jury and mistrial and three other officers were acquitted after a bench trial, Marilyn dropped all charges in the remaining pending cases. In explaining her decision to the community, Marilyn reiterated that she was not "anti-police," but "anti-police brutality." *See* Kevin Rector, "Charges Dropped, Freddie Gray Case Concludes with Zero Convictions Against Officers," *The Baltimore Sun* (July 27, 2016) (Exhibit VV).[16]

The U.S. Attorney's Office's prosecution of eight members of the Gun Trace Task Force (GTTF) with racketeering, robbery, extortion, and overtime fraud in 2017 provided her an opportunity to restore trust with the community. In coordination with those federal convictions, Marilyn acted on the state level to restore trust with the community by reviewing the integrity of past convictions involving those officers. The SAO reviewed over 2,100 cases that were impacted by the eight members of the GTTF and, in the pursuit of justice, worked with the state public

---

[16]     https://www.baltimoresun.com/2016/07/27/charges-dropped-freddie-gray-case-concludes-with-zero-convictions-against-officers/.

defender's office to file joint motions to vacate cases tainted by the GTTF. When the SAO faced obstacles to overturn tainted convictions, Marilyn advocated for a bill to allow prosecutors to request that the judge vacate the conviction. That bill, sponsored by then-Delegate Erek Barron, was passed by the Maryland General Assembly and signed into law by then-Governor Hogan. And by the end of 2019, nearly 650 motions to vacate convictions tainted by GTTF officers were granted.

During her time in office, Marilyn revamped the Public Trust and Police Integrity Unit in her office, which was charged with investigating allegations against police officers. That meant adding lawyers to the unit, which was staffed only with a law clerk and part-time administrator when Marilyn took office, creating a structure for determining which of the unit's cases had been investigated and which remained open, and expanding police disciplinary file disclosures. On the latter point, Marilyn worked with the City Law Department and the state public defender's office to expand and streamline the process by which defense attorneys had access to police disciplinary files that might qualify as *Brady* or *Giglio* material. The revamped process made for more fair and just prosecutions.

### ii.      Victims And Witnesses

Victims and witnesses held a place close to Marilyn's heart. Marilyn knew that for victims and witnesses to feel safe coming forward to report crime and support prosecutions, she had to work to restore their trust. Ms. Michelle Lee, a former colleague, writes in her letter to the Court that Marilyn "was always interested in the community and how they responded to crime in their neighborhoods," and that "[s]he knew the value of having a direct connection between the courts and the community." Exhibit 11. Ms. Lee explains it was for this reason that – from "day one" – Marilyn reinstituted "Community Liaisons," a position Ms. Lee held, to ensure the SAO had a

presence in and contact with neighborhoods in Baltimore City.

During her time in office, the SAO secured over $9 million in funding to support victims



*Opening the new victim/witness space.*

of crime. Part of this funding was used to expand the number of victim advocate positions, including bilingual advocates, an LGBTQ advocate, and an advocate who focused on mental health and disabilities. And, during her time in office, Marilyn transformed what Ms. Lee calls "a drab and dreary [victim/witness] room that increased anxiety and fear, into a therapeutic modeled room that was more conducive to safety, comfort, resilience, and healing for our crime victims." Exhibit 11. The space included a "living wall," a spot that allowed victims and witnesses to partake in breathing exercises and therapeutic practices, and a dedicated play area for children. During her time in office, the SAO also launched Community Court Watch, a web-based tool that allowed citizens to track case information for crimes occurring in their neighborhoods.

One anecdote Council Member Glover shared with the Federal Public Defender's Office that shows Marilyn's connection with witnesses and victims stands out. Council Member Glover recalled that an individual in Baltimore County who witnessed a shooting in Baltimore County called the Baltimore City SAO because they felt they could trust Marilyn even though they had never met her. Through this outreach, the Baltimore County SAO was able to prosecute the case. To Council Member Glover, this anecdote embodied Marilyn's ability to make witnesses and victims feel secure such that they were willing to come to court.

**d.      Marilyn Expanded The Traditional Role Of Prosecutor To Advocate For Legislative Initiatives.**

Another priority for Marilyn was getting involved in legislative and policy work. In her view, to affect laws prosecutors implemented, they also had to advocate for fair and just laws. So, in her first year in office, she created a Policy and Legislative Affairs Unit and then throughout the course of her time in office, her office advocated for laws that protected victims, ensured the integrity of convictions, toughened laws on violent and sex crimes, and gave individuals second chances where appropriate.

A sampling of legislation advocated for by Marilyn and her office and passed into law is below:

- **Second Chance Act of 2015 (Md. Code Ann., Crim. Pro § 10-301 *et seq.*)**: This Act allowed individuals to petition a court to shield certain nonviolent misdemeanor convictions to help them obtain jobs without their criminal record posing an obstacle, while allowing shielded records to remain fully accessible to law enforcement and the court to ensure public safety.  In her written testimony supporting the bill, Marilyn wrote, "A criminal record significantly reduces the likelihood of a job callback or offer by nearly 50 percent; that rate is even higher for African American men . . . . It is time Maryland joins the over 30 states that limit public access to criminal records to mitigate collateral consequences." Steve Lash, "For Second Chance Act, Backers Hope 4th Time Will Be The Charm," *The Daily Record* (Feb. 19, 2015) (Exhibit WW).

- **Internet Crimes Against Children Task Force Fund (Md. Code Ann., Public Safety § 4-601 *et seq.*)**: This legislation created a special fund to allow local law enforcement agencies to investigate and prosecute internet-based crimes against children.

- **Maryland Fair Access to Education Act of 2017 (Md. Code Ann., Educ § 26-501 *et seq.*)**: This legislation expanded access to higher education for individuals with prior criminal convictions by barring public and private colleges and universities from asking prospective students whether they have a criminal record, while not barring them from performing a background check and considering that information for student safety.

- **Md. Code Ann., Crim. Law § 3-319.1 (SB217)**: This legislation established that sexual assault survivors did not have to prove they physically fought their attackers to establish that a crime occurred.[17]

- **Md. Code Ann., Crim. Proc. § 8-301.1 (HB874)**: This legislation, passed in response to the GTTF scandal, provided a procedural mechanism by which prosecutors could seek to vacate a probation before judgment or conviction under certain circumstances.



*Governor Hogan signs SB217 into law surrounded by Marilyn and others. (Source: CNN)*

- **Grace's Law 2.0 (Md. Code Ann., Crim. Law § 3-805)**: This legislation strengthened provisions relating to the electronic harassment of minors and bullying in general.

- **Md. Code Ann., Crim. Proc. § 10-401**: This legislation limited the public availability of charges that resulted in an acquittal, dismissal, or nolle prosequi. In supporting the bill, Marilyn pointed to the "almost insurmountable barriers to obtaining employment, housing, education, and other critical resources" due to "non-convictions." Letter to Sen. Will Smith from State's Attorney Marilyn J. Mosby (Feb. 19, 2020) (Exhibit XX).

- **Md. Code Ann., Cts. & Jud. Proc. § 10-924**: This was a groundbreaking new law that aimed to protect the integrity of convictions by requiring state prosecutors to record and report information related to jailhouse witnesses to a central unit (the Governor's Office of Crime Control and Prevention) so that prosecutors will know when making charging decisions when that jailhouse witness has testified in the past. In supporting the bill, Marilyn provided an example of when a complete record of a jailhouse informant was discovered after a guilty verdict and resulted in a new trial for the defendant. Letter to Sen. Will Smith from State's Attorney Marilyn J. Mosby (Feb. 19, 2020) (Exhibit YY).

- **Juvenile Restoration Act (Md. Code Ann., Crim. Proc. § 6-235 & § 8-110)**: This legislation prohibited a court from imposing a sentence of life without the possibility of parole or release on a minor convicted as an adult. It also authorized an individual who was convicted as an adult for an offense committed when the individual was a minor to file a motion to reduce the duration of the sentence after imprisonment for at least 20 years. In supporting the bill, Marilyn pointed to evidence that "criminal behavior decreases significantly as people age, and therefore, lengthy and extended incarceration often does

---

[17] The photo is from Emanuella Grinberg, "Maryland Rape Survivors No Longer Need to Prove They Fought Back," CNN (Apr. 18, 2017), https://www.cnn.com/2017/04/18/us/maryland-rape-law-updated-sb-217/index.html.

not promote community safety." The Campaign for Fair Sentencing of Youth, "Juvenile Restoration Act (HB409/SB494) (2021) (Exhibit ZZ).

**e.      Marilyn Made Policy Changes In Prosecution Decisions.**

In addition to legislation, Marilyn enacted policy changes in her office that she believed were in the best interests of the public at large. In February 2019, Marilyn announced that she would no longer prosecute marijuana possession cases, regardless of the amount or a person's prior criminal record. Marilyn believed there was "no public safety value" to prosecuting those cases, they "disproportionately impacte[d] communities of color and erode[d] public trust," and were "a costly and counterproductive use of limited resources." Lulu Garcia-Navarro, "Baltimore State's Attorney Will No Longer Prosecute Marijuana Possession Cases," NPR (Feb. 3, 2019) (Exhibit AAA).[18] Instead, Marilyn chose to spend money and resources on the City's homicide rate. Consistent with that policy decision, Marilyn also sought to vacate nearly 5,000 prior marijuana convictions dating back to 2011. She believed this was important to restore trust in communities of color as marijuana laws had been disproportionately enforced against people of color. *Id.* (citing data); *see also* U.S. Dep't of Justice, Civil Rights Division, *Investigation of the Baltimore City Police Department* 58-59 (Aug. 10, 2016) (finding that "African Americans were . . . five times more likely than others to be arrested for drug offenses").[19] In retrospect, Marilyn was at the forefront of what became later efforts to decriminalize and legalize marijuana and remove the stain of convictions for marijuana offenses.[20]

---

[18]      https://www.npr.org/2019/02/03/690975390/baltimore-states-attorney-will-no-longer-prosecute-marijuana-possession-cases.

[19] https://www.justice.gov/d9/bpd_findings_8-10-16.pdf.

[20] In 2022, President Biden issued a presidential proclamation that pardoned many federal offenses for simple marijuana possession. *See* Office of the Pardon Attorney, U.S. Dep't of Justice, "Presidential Proclamation on Marijuana Possession, Attempted Possession, and Use" (updated May 6, 2024), https://www.justice.gov/pardon/presidential-proclamation-marijuana-possession. In 2023, President Biden

Consistent with those policy choices, Marilyn decided at the very start of the pandemic to stop prosecuting drug possession, prostitution, trespassing, and other crimes. *See* Phillip Jackson & Tim Prudente, "Baltimore State's Attorney Mosby to Stop Prosecuting Drug Possession, Prostitution, Other Crimes Amid Coronavirus," *The Baltimore Sun* (Mar. 18, 2020) (Exhibit BBB).[21] Mere weeks into the Covid pandemic, Marilyn also sent a letter to then-Governor Hogan "commend[ing] him for his continued leadership" and urging him to release certain inmates over 60 in state prisons whose release would pose a low risk to public safety, anyone approved for parole, and low risk inmates who would complete their sentence within the next two years. *See* Letter to Hon. Larry Hogan from State's Attorney Marilyn J. Mosby (Mar. 23, 2020) (Exhibit CCC). As Mr. Collins, her former Policy Director, writes in his letter to the Court, the steps Marilyn took to try to reduce the jail population to prevent "disease and death" were "bold." Exhibit 9. Marilyn's goal was to balance the safety of people behind bars and the safety of the community, and she struck a balance that she believed was in everyone's best interests. Her letter to Governor Hogan was signed by ACLU Maryland, Law Enforcement Action Partnership, and several Johns Hopkins Bloomberg School of Public Health professors. Exhibit CCC.

A year later, Marilyn made her policy of not prosecuting certain minor offenses (drug and drug paraphernalia possession, prostitution, trespassing, minor traffic offenses, open container violations, and urinating and defecating in public) permanent. In an official press release, she

---

issued another proclamation expanding the relief provided by the original proclamation to include offenses under federal law for attempted marijuana possession and others. *Id.* Even more recently, the Biden Administration has moved to reclassify marijuana to a less stringent federal schedule. *See* Julie Tsirkin & Monica Alba, "Biden Administration Plans to Reclassify Marijuana, Easing Restrictions Nationwide," NBC NEWS (Apr. 30, 2024), https://www.nbcnews.com/politics/joe-biden/biden-administration-plans-reclassify-marijuana-easing-restrictions-na-rcna149424.

[21]  https://www.baltimoresun.com/2020/03/18/baltimore-states-attorney-mosby-to-stop-prosecuting-drug-possession-prostitution-other-crimes-amid-coronavirus/.

explained, "We leave behind the era of tough-on-crime prosecution and zero tolerance policing and no longer default to the status quo to criminalize mostly people of color for addiction." Juliana Battaglia, "Baltimore Will No Longer Prosecute Drug Possession, Prostitution and Other Low-Level Offenses" CNN (Mar. 27, 2021) (Exhibit DDD).[22] The press release noted that the Covid policy had led to decreases in the overall incarcerated Baltimore population (by 18%) while violent crime and property crimes were also down (20% and 36%, respectively). *Id.* Her goal was to be smarter on crime, to focus her office's limited resources on violent offenses rather than those driven by addiction.

### D.   Marilyn Has Left A Legacy Through Mentoring And Serving As A Transformative Leader And Trailblazing Reformer For Justice.

To many, Marilyn was an effective State's Attorney. Chief Deputy of eight years, Mr. Michael Schatzow, who has been a member of the bar of this Court for almost 50 years, including time in the U.S. Attorney's Office, provides the Court with his views:

> My name is Michael Schatzow. I have been a member of the bar of this court since 1975. write in connection with the sentencing of Ms. Mosby in the above referenced case. For almost seven years I served as Ms. Mosby's Chief Deputy.
>
> After graduating from the University of Chicago Law School in 1973, I became a Fellow in Georgetown University's Legal Internship Program, a two year graduate program in trial advocacy and clinical instruction, which lead to my LL.M. in trial advocacy. From 1975 through 1978 I served as an Assistant Federal Public Defender in the District of Maryland. I then was an Assistant United States Attorney in the Eastern District of Louisiana for more than three years, including more than two years as a Supervisory AUSA (Chief of Trials). For four years after that I served as an AUSA in the District of Maryland, including more than two years as a Supervisory AUSA (Chief of Fraud Cases). After leaving the U.S. Attorney's Office in Maryland, I spent three years at a now defunct Baltimore law firm. For the next twenty five years I was a partner in the Litigation Division of Venable LLP. During my time in private practice, I was a member of this Court's Criminal Justice Act Panel, accepting court appointments in criminal cases.
>
> After retiring from Venable at the end of December, 2014, I was hired by Ms. Mosby to be the Chief Deputy State's Attorney for Baltimore City. I had not met Ms. Mosby before meeting with her about the job. I served as Chief Deputy from January, 2015 through my

---

[22] https://www.cnn.com/2021/03/27/us/baltimore-prosecute-prostitution-drug-possession/index.html.

*retirement on October 1, 2021. As Chief Deputy, I was responsible to Ms. Mosby for the activity of more than two hundred prosecutors and the more than 41,000 cases they handled each year.*

*I have no personal knowledge of the facts involved in the above referenced case. I know a great deal about Ms. Mosby's performance as the twice elected State's Attorney for Baltimore City, and wish to share that with you.*

*The Criminal Justice System in Baltimore is largely dysfunctional, and has been for quite some time. It is under-resourced: the courthouses are decrepit for the most part, the prosecutors and public defenders overworked and underpaid. Yet these problems pale in comparison to the biggest problem: the community's lack of trust in the system, primarily resulting from the lengthy and egregious misconduct of various Baltimore Police Officers, and related problems of police training and management. All of these problems are compounded by racial bias and inequity.*

*To her credit, Ms. Mosby determined to use her office to address these long standing problems. Her passion to change the system to make it fairer and less racially biased was not met with overwhelming support. Many actors in the system and some outside it were resistant to change, and actively worked to undermine Ms. Mosby's efforts at reform. That she was young, female, and Black worked to intensify the opposition.*

*. . .*

*. . . In her elected position, she was a passionate advocate for change, focusing on fairness, racial equity, and community outreach. She demonstrated her integrity and ethics frequently, perhaps most notably in her steadfast efforts, in the face of both internal and external opposition, to exonerate those wrongly convicted, and to seek, find, and disclose Brady information on a far broader scale than previously.*

Exhibit 10.

Mr. Doug Colbert, a long-time professor at Maryland Francis King Carey School of Law,

opines,

*In my opinion, Ms. Mosby demonstrated unusual courage and resolve during her two terms as the State's Attorney for Baltimore City. From the moment she assumed office, Ms. Mosby commenced addressing each of these long-standing, yet consistently ignored, issues involving over-incarceration, wrongful convictions and police criminal misconduct. For someone who has practiced law for more than four decades, I found Ms. Mosby provided a genuine voice for Baltimore's Black and impoverished communities, and a sincere commitment to embrace her role as a minister of justice committed to equality and fairness.*

*. . .*

44

*. . . Ms. Mosby has done more than most elected prosecutors to address racial, class and gender inequity within Baltimore's and many other states criminal justice systems.*

Letter U.

As former-Baltimore City Mayor Kurt Schmoke, who spoke at times with Marilyn while she was in office "about issues that confront big city prosecutors," writes,

*In my view, she was an effective States Attorney, firm but fair in carrying out her duties. Some of her policies were considered controversial by some because she sought change in the criminal justice system while others were comfortable with the status quo. The community rewarded her by re-electing her to a second term. I believe she would have been elected for a third term had not the issues arose which bring her before your court today.*

Exhibit 21. Mr. George J. Hazel, a former federal judge in this District and Ms. Mosby's former SAO colleague, writes in his letter that Marilyn likely would have won re-election but for this case. Exhibit 20.

But she is far more than that. She is a trusted friend. A supportive, steadfast mentor to many. A dedicated colleague. And a forward-thinking change agent just trying to make the world fairer and more just for everyone, without regard to race, religion, creed, or belief. The character letters attached from an array of people attest to all these traits and more. Though selected portions are included below, we respectfully urge the Court to read each letter carefully:

- **Taylor-Omaree Smith, former intern, employee, and mentee since she was 17 years old**: "*[At 17], I was the youngest and only intern that the [State's Attorney's] office had and I was eager to learn the legal profession through and through. Over the next five years, I would intern throughout my Undergraduate education and eventually land a job within the office upon graduation. I worked six summers straight, gladly, with no pay because I was taken care of so well. I had finally met someone who not only cared enough to teach me about the legal profession, but also mentored me through my life challenges and successes alike. Mrs. Mosby always provided me with a shoulder and listening ear. She provided me with the most honest professional advice, paired with the most genuine love and support. . . . Mrs. Mosby is one of the most trailblazing, selfless women that I have come in contact with. Her genuine desire to teach and provide justice for those who cannot for themselves is admirable and what I aspire to do, one day.*" Exhibit 3.

- **Jasmine Collins, former mentee and then SAO colleague**: "*I remember the first time I encountered Marilyn. I was a legislative aid for the City Council President at the time, and*

*she had just been sworn in as the 25th State's Attorney for Baltimore City. We were at a press conference that shortly turned into a meet and greet for Marilyn. She greeted me with a smile and hug before asking about my aspirations in life. I shared with her that I was interested in pursuing law school, and she didn't hesitate to give me her contact information. A few weeks later, we met for lunch, and we bonded over similar trauma, as well as similar accomplishments. . . . After discussing my career goals with Marilyn, she offered me her support, and since then, her word has been her bond. My position as a community relations coordinator for the Baltimore Police Department allowed me the opportunity to work alongside Marilyn at community relations council meetings, neighborhood safety walks, community association meetings, as well as several community events. I was later presented with the opportunity to join the States's Attorney Office under Marilyn's leadship as a community liaison. In my experience, Marilyn has always displayed a strong work ethic, and an unwavering commitment to her employees and the residents in Baltimore City. Marilyn has also supported my academic goals. When I decided to go back to school to pursue a master's degree, Marylin provided me with a letter of recommendation. As my mentor, she was always one call away.*" Exhibit 6.

- **George J. Hazel, former SAO colleague and former federal Judge**: "*I still remember my first interactions with Marilyn Mosby. I was the new Chief Deputy State's Attorney at the Baltimore City State's Attorney's Office. She was an Assistant State's Attorney in the General Felony section. In an effort to get to know the office, I was making the rounds and having lunch with different felony level attorneys. I invited Marilyn to lunch and suggested she include a colleague. Rather than bringing a peer as most did, she brought a very junior misdemeanor assistant, someone who was much less likely to have the opportunity for an audience with the Front Office. I immediately gained a sense of her as a leader and mentor to younger attorneys.*" Exhibit 20.

- **Becky Feldman, former SAO colleague**: "*Ms. Mosby's support of the mission [of the Sentence Review Unit] never waivered.  She was also a constant force of support during difficult hearings and decisions, where sometimes there was some degree of backlash or disappointment. In those moments, she was always willing to protect me from the negativity and put it on her own shoulders. I think of those moments as her "big sister" moments where protecting me or any of her other employees was very important to her, and she did it without hesitation.  In my opinion, she always acted with honesty and integrity. Her policies and leadership changed lives for the better, and I am certainly a better person for having worked with her, even for a short period of time.*" Exhibit 8.

- **Caron Watkins, former SAO colleague and professional mentee**: "*In 2015, I became a member of [Marilyn's] inaugural leadership team, serving as her Special Assistant and then Chief of Staff for the first term of her administration as Baltimore City State's Attorney. During this time, our bond grew as my role required long hours and exposed me to the most personal aspects of her life—establishing mutual trust and respect and evolving our mentor-mentee relationship into a sisterhood.*" Exhibit 14.

- **Tracy Estep, friend**: "*Ms. Mosby is an affectionate and compassionate mother to her children, family, and friends. Her commitment to the community and her ability to lead*

*others is evident in her role as a mentor and supporter of young women. She possesses qualities like respect, integrity, responsibility, kindness, and courage.*" Exhibit 24.

- **Shalik Fulton, former SAO colleague**: Mr. Fulton likewise considers Marilyn to be a mentor to this day. During an interview, he reported having a "little brother, big sister relationship" with Marilyn that he "will forever value." Mr. Fulton credits Marilyn for "pushing" him to succeed and giving him his first leadership role. Exhibit 7.

- **CaTonya Lester, friend**: "*Ms. Mosby accomplished great goals and developed many initiatives in her role as former States Attorney of Baltimore City. She also continuously supported adult and youth Baltimore citizens, in her personal time, with strategies and campaigns to help increase their careers and lives. Mrs. Mosby was also very active in the process of empowering and strengthening women in the community.*" Exhibit 25.

- **Michelle Lee, former SAO colleague**: "*Marilyn Mosby is a woman who stood up against the status quo, when nobody else was willing to do so. She was the voice of the people who wanted equal justice for all, irrespective of race, gender, color, creed, or profession. I believe that she took a stand for what was right, and as a result, there is more accountability for everyone across the country. She worked tirelessly to educate her staff so that we all had a better understanding of systemic racism and how it looks in the court system.*" Exhibit 11.

- **Eric Simmons, exoneree**: "*I've known Ms. Mosby for almost five years and I've met her family. During this time, I have come to highly value her strong work ethic, her fairness without favoritism, her courage and determination, and her commitment to her family. . . . [I]n spite of Ms. Mosby's conviction, I'm hoping and praying that she'll be able to continue her broader work with the community, her advocacy work with women, her advocacy work with the wrongly convicted, and her very purpose in life of being a public servant.*" Exhibit 18.

- **Michael Collins, former SAO colleague**: "*It is this level of compassion that I hope your court can show Mrs. Mosby. She is someone who has fought for those with less power than her, for those who have been discriminated against, for those who would have died in prison without her help. She is a mother of two wonderful children. She is a friend. To work alongside her was the honor of my life. I got to help people. I got to see people reunited with their families. I got to see people given second chances. And it was all because of her commitment to justice. I have remained in regular contact with Mrs. Mosby as she has navigated the legal process, and I know that she has suffered enough.*" Exhibit 9.

- **Monica Brockman, neighborhood association member**: "*I came to know Ms. Marilyn Mosby through neighborhood associations where she frequently addressed reducing crime and enhancing safety. Her deep-rooted passion for justice and equality has driven her to initiate numerous outreach programs, aimed at bridging the gap between the legal community and the public. Mosby's relentless advocacy for underrepresented groups has touched us all in the community. Her generosity and attentive presence, especially when we felt overlooked, have always been admirable to me. Ms. Mosby is a beacon of hope and*

47

*progress in Baltimore, a city that has often felt the harsh sting of being torn down. Her efforts have not only directed benefited those she serves but have also ignited a broader movement for justice and community enhancement.*" Exhibit 2.

In addition to these significant, personal words that speak to the true, genuine Marilyn, her impressive, forward-thinking work also earned her accolades and countless competitive awards:

- The Vanguard Award, from NORML, Maryland State Chapter (2020)
- Citizen of the Year Award, from Omega Psi Phi Fraternity, Inc., Pi Omega Chapter (2019)
- Parren J. Mitchell Vanguard for Justice Award, from the Capital Region Minority Supplier Development Council (2019)
- 2019 Trailblazer Award, from the 20/20 Bipartisan Justice Center (2019)
- Outstanding American Women Award, from The Imperial Court Auxiliary of A.E.A.O.N.M.S. of North & South America and Its Jurisdictions, Inc. (2019)
- Community Service Award, from DTLR (2019)
- 2019 Faith Leader Award, from Alpha Phi Alpha Fraternity, Inc., Delta Lambda Chapter, (2019)
- Exemplifying Excellence Award, from Alpha Kappa Alpha Sorority, Inc., Epsilon Omega Chapter (2019)
- 2018 CLEO EDGE Greater Equality Award, from CLEO, Inc. (2018)
- Change Maker Award, from Black Girls Vote & Color Vision (2018)
- Recognition Award, from Baltimore Child Abuse Center (2018)
- Women of Courage Award, from National Organization for Women, Maryland State Chapter (2018)
- Beacon of Light Award, from the Baltimore Teacher Network (2017)
- National Distinguished Social Justice Advocacy Leadership Award, from the National Coalition of 100 Black Women, Inc. (2017)
- Civil Rights Champion of Justice, from the NAACP Office of the General Counsel (2017)
- Liberty Award, from Mayor James F. Kenney of Philadelphia (2016)
- Measure of a Person Award, from United Negro College Fund, Washington Inter-Alumni Council (2016)
- Newsmaker of the Year Award, from The National Newspaper Publishers Association (2016)
- Law Day Recent Graduate Award, from Boston College Law School (2016)
- WEEN Award for Community Leadership, from the Women in Entertainment Empowerment Network (2015)

- MAMLEO Achievement Award, from the Massachusetts Association Minority Law Enforcement Officers, Inc. (2015)
- Truth Award, from the National Congress of Black Women, Inc. (2015)
- Junius W. Williams Young Lawyer of the Year, from the National Bar Association (2015)
- Woman of Courage Award, from the National Women's Political Caucus (2015)
- J. Ernest Wilkins Award, from the Cook County Bar Association (2015)

*　　　*　　　*

It is Marilyn's rise from humble beginnings, her devotion to her daughters, and her life's work of seeking justice for all that we ask the Court to consider when weighing her "history and characteristics" under § 3553(a)(1). The good she has done, and will do, far outweighs the offense conduct.

### III.    The Nature And Circumstances Of The Offense (18 U.S.C. § 3553(a)(1)).

In addition to a consideration of the "history and characteristics" of the defendant, § 3553(a)(1) requires a consideration of the "nature and circumstances of the offense." We ask the Court to consider several factors about the nature and circumstances of this case.

Ms. Mosby anticipates the Government will argue that the nature and circumstances of the offenses are serious given her former position as a public official. Ms. Mosby, of course, was State's Attorney, and she does not dispute public officials are held to, and should be held to, high ethical and legal standards. The fact remains, however, that the nature of this case is less aggravating than typical prosecutions of public officials.

This is *not* a public corruption prosecution in which a public official abused her public office by stealing taxpayer funds for personal gain or obtained a quid pro quo for using her authority to benefit the payor, as in, for example, an honest services fraud case, a public corruption case, or a bribery case. As the evidence established, Ms. Mosby accessed money she put away in her retirement savings account and then money from her biweekly paycheck to purchase homes to

49

establish financial independence from her husband. Her actions did not in any way impact her service as State's Attorney.

This distinction is important. A core feature of a public corruption cases is abusing one's position of trust to either steal from taxpayers for personal gain or obtain something as a quid pro quo for doing a favor for the payor. That feature – using one's public office to steal or obtain something from someone seeking something from government – is absent here. While Ms. Mosby acknowledges the conduct here led to a decline in public trust of her character and, thus, her ability to be State's Attorney, that harm was addressed when Ms. Mosby did not win reelection.

Moreover, the monetary harm here is less aggravating than in most other cases. There is no loss or restitution here. In cases with financial impacts, the Court is accustomed to seeing individuals fraudulently accessing monetary benefits belonging to someone else—for example, in Social Security fraud cases someone lies to receive a deceased parent's benefits or to receive SSDI or SSI benefits; in Paycheck Protection Program fraud cases someone lies to receive a loan to which they were not entitled; in healthcare fraud cases a provider lies about services provided. This case is less aggravating than those, as Ms. Mosby was accessing retirement funds that, though held in trust, were derived from her own income, as was the money used to fund the $5,000 gift letter. She did not defraud taxpayers, government agencies, or others to access someone else's money.

As a result of her taking early withdrawals under the CARES Act, no one – not the City of Baltimore, not Nationwide, not the federal government – suffered a material financial harm. As it relates to 457(b) plan participants, the CARES Act only broadened the early withdrawal criteria. When taking early withdrawals, Ms. Mosby did not skip out on paying a penalty for taking the early withdrawals, and she chose to pay full federal taxes on the withdrawals upfront. Likewise,

though the jury found Ms. Mosby submitted a false gift letter, no one suffered a material financial harm as a result of that conduct. Under the mortgage provisions, United Wholesale Mortgage could have – but did not – seek to hold Ms. Mosby in default or take adverse action, even after learning of the investigation and prosecution of Ms. Mosby. Ms. Mosby was and has been a sound financial investment for the lenders.

These distinctions are important in considering the goals of sentencing (incapacitation, deterrence, etc.) and, in particular, whether a prison sentence is greater than necessary to meet the purposes of sentencing.

## IV.    The Need To Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6)).

Dovetailing with the nature and circumstances of the offense, is the need "to avoid unwarranted sentencing disparities." 18 U.S.C. § 3553(a)(6). A prison sentence is not necessary to avoid unwarranted sentencing disparities.

*First*, the U.S. Sentencing Commission's Judiciary Sentencing Information (JSIN) appended to the PSR indicates there are no comparators that would warrant imposing a prison sentence in this case. Citing JSIN, the PSR states,

> During the last five years . . . there was an insufficient number of defendants (1) whose primary guideline was §2J1.3, with a Final Offense Level of 15 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure; and (2) who received a sentence of imprisonment in whole or in part.

ECF 509 (PSR) at 29. In other words, there are no comparators for the Court to consider because these cases are not typically prosecuted and/or those individuals do not receive a prison sentence.

*Second*, while Ms. Mosby anticipates the Government will point the Court to prior cases in which public officials have received prison sentences, those cases are not relevant comparators the Court should consider. As explained above, the purely personal nature of this case distinguishes this one from other cases involving public officials. Research and anecdotal observation from the

Defense confirm that Ms. Mosby is the only public official who has been prosecuted in this District for an offense that entails no victim, no financial loss, and no use of public funds. Accordingly, any comparisons to sentences received by public officials in this District are not relevant. *See Gall v. United States*, 552 U.S. 38, 55 (2007) (recognizing need to avoid "unwarranted *similarities*" between defendants who are not similarly situated (emphasis in original)).

*Third*, a non-incarceration sentence in this case is appropriate in light of non-incarceration sentences that are routinely imposed in more aggravated factual contexts. For example, courts in this District routinely imposes non-incarceration sentences in cases involving theft of public benefits where the illegal conduct occurs over a longer period of time, there is a victim or victims (government agencies and taxpayers), and there is a real, tangible financial harm. *E.g.*, *United States v. Leroy Kamzura*, CCB-18-582 (imposing 1 year probation and home detention and approx. $177,000 restitution for failing to report work to a government agency for 7 years); *United States v. Craig Colbert*, GJH-19-093 (imposing 4 years' probation to include 9 months of home detention and approx. $216,000 restitution for converting deceased father's retirement benefits to his own use for 10 years); *United States v. Keisha Jones*, RDB-18-590 (imposing 3 years' probation to include 12 months of home detention and approx. $145,000 restitution for receiving SSI and concealing and not disclosing marriage for 20 years); *United States v. Betty Ann Garner-Newby*, PWG-19-157 (imposing 3 years' probation to include 18 months of home detention and approx. $325,000 restitution for stealing retirement annuity payments for a deceased victim for 25 years); *United States v. Frederick Kellner*, DKC-19-267 (imposing 5 years' probation to include 6 months of home detention and approx. $357,000 restitution for converting parents' retirements to defendant's own use for nearly 27 years).

**V.     The Need For The Sentence To Reflect The Seriousness Of The Offense, Promote Respect For The Law, And Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A)).**

The Court is required to consider the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). Those goals have already been served through the prosecution of this case and the resulting convictions. Ms. Mosby does not need to serve prison time in furtherance of those goals.

In considering the impact of a conviction alone as punishment, it is significant that Ms. Mosby appears to be the only person who has been prosecuted for accessing retirement benefits through the CARES Act even though information suggests others, also, did not actually qualify.[23] Given the unique nature of this case, the fact of conviction alone is a significant part of the punishment Ms. Mosby has had to pay for her conduct. To be clear, Ms. Mosby accepts the Court's finding that there has been no vindictive or selective prosecution, and counsel does not seek to relitigate that issue.

Another consideration is the collateral consequences Ms. Mosby has experienced, and will continue to experience, as a result of the prosecution and convictions in this case. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 180-81, 184 (E.D.N.Y. 2016) (explaining that "there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons," and referring to them as "civil death"). Such

---

[23] Millions of people took Covid-related early retirement distributions, including close to 120,000 federal employees, *see* Treasury Inspector General for Tax Administration, "Taxpayers Were Notified About the CARES Act Retirement Plan Provisions; However, Additional Actions Could Be Taken to Identify Potential Noncompliance," Report Number: 2021-16-044, at 3-4 (July 2021), https://www.oversight.gov/sites/default/files/oig-reports/TIGTA/202116044fr.pdf, and 739 City of Baltimore employees, *see* 11/6/23 Rough Trial Transcript at 63:24-25 & 64:1. The Treasury Inspector General has suggested that the prevalence of distributions meant people took such distributions "even though they do not qualify," *see* Treasury Inspector General, *supra*, at 3-5, and David Randall, the Administrator of the City of Baltimore's Retirement plan surprised police and firefighters took distributions, *see* Exhibit EEE (filed under seal).

collateral consequences are appropriate to consider under the "just punishment" prong. *See, e.g.*, *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming sentencing court's consideration of the loss of the defendant's teaching certificate and state pension in granting downward variance as "consistent with § 3553(a)'s directive that the sentence reflects the need for 'just punishment' and 'adequate deterrence'"); *United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) (collateral consequence of deportation is a permissible § 3553(a) factor); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (affirming lower court's consideration of conviction's effect on the defendant's future employment opportunities, because "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"); *United States v. Jaime*, 188 F. Supp. 3d 262, 265 (D.D.C. 2017) ("[T]he Court is mindful of the potentially devastating collateral consequences of a criminal conviction, including it being an impediment to future employment."); *Nesbeth*, 188 F. Supp. 3d at 187.

Ms. Mosby has lost significantly in every aspect of her life – personally, professionally, and financially. She worked tirelessly to attain her degrees, her attorney bar license, her profession, and her status in the community. She came from humble economic beginnings to earn a three-figure salary. For someone who had difficulty gaining admission to law school and passing the bar exam, it was a crowning achievement to become a lawyer, not to mention the City's top prosecutor and one of the youngest top prosecutors in America. Her position enabled her to put into action the beginnings of a re-envisioned justice system. In her position, she advanced numerous policies and community outreach efforts that defined her as a reformer and progressive prosecutor. With her young age, relative inexperience, and reformist brand of prosecution, she had to work tirelessly to overcome her doubters. To many, she became a mentor and a role model.

In rising to the level she did, advancing the prosecution priorities she had, and weathering pressure and protest from powerful entities, her dramatic fall is stunning, painful, and embarrassing. She is mired in debt now, having returned to the humble beginnings from whence she came. The details of her private family life, and in particular her marriage, were on full display in open court. Through the investigations, prosecution, and trials, her personal life has been strip searched and displayed for public reckoning and judgment. And with convictions, she is now at significant risk of losing her law license, losing the ability to practice in a field she has literally devoted most of her life to, and facing prison time, which if received, will be fraught with danger as she comes into contact with individuals or family members of individuals of whom she has prosecuted in the past.

Not only that, but she has also endured personal attacks as a result of this case, too. Approximately 10 days after the first trial, Ms. Mosby received a threatening letter that was sent to her personal address; through counsel, that letter was submitted to law enforcement. The letter called her a "stupid f****** n*****" and said, "I hope someone murders you're a** in prison. If they don't, I will give you what you deserve!!!" As the Court knows, during the course of the second trial, Ms. Mosby was the target of multiple offensive comments by court security staff in the very courthouse in which she was on trial. While such animus directed at her is nothing new, enduring this type of racist and otherwise hurtful vitriol because of this case has been added punishment.

In addition to these practical collateral consequences, there are legal and other ramifications as well. She will be prohibited from employment opportunities, she may be barred from receiving certain professional licenses, and she may not be able to hold certain public

offices.[24] A particularly poignant potential consequence is that Ms. Mosby, a former prosecutor who cherishes her legal service, will forever be barred from federal jury service unless her civil rights are restored. 28 U.S.C. § 1865(b)(5). The sentence in this case may also impact her right to serve on a State jury.[25]

"Just" punishment does not mandate, or always include, a prison sentence. The purpose of "just" punishment "carries the need for retribution, the need to make the punishment fit the crime, and the need not just to punish but to punish justly." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). There is a great need here to "balance the harm done as a result of the crimes for which a jury found [Ms. Mosby] guilty, with the harm that the sentence likely sought by the government will have on her family." Exhibit 20 (Letter from Mr. George J. Hazel). As Mr. Hazel writes, "As much as I disagreed with some of Marilyn's policies, I respect that much of her time in office seemed to be directed towards reducing the prison population. It was the ultimate demonstration of mercy by one who is used to wielding tremendous power in the criminal justice system. With her power already taken away, she will now seek what she has given." *Id.*

The Defense proposes a non-incarceration sentence to include a term of supervised release. As the PSR outlines in detail (PSR pp. 26-27), the mandatory and standard conditions of supervision are tangible requirements and restrictions placed on Ms. Mosby. In a dramatic turn from being the City's top prosecutor, Ms. Mosby will be subject to a probation officer's scrutiny. On supervision, Ms. Mosby will be subject to such conditions as:

---

[24] *See* National Inventory of Collateral Consequences of Conviction, https://niccc.nationalreentryresourcecenter.org/consequences (last visited May 4, 2024).

[25] *See* Dep't of Legis. Servs., Office of Policy Analysis, "Collateral Consequences of a Criminal Conviction," 2 (Dec. 2021), https://dls.maryland.gov/pubs/prod/CourtCrimCivil/Final_Report_Collateral_Consequences_Felony.pdf.

- Reporting to a probation officer;

- Not leaving Maryland without prior authorization from the Court or the probation officer;

- Answering questions of the probation officer;

- Living in a place approved by the probation officer;

- Obtaining approval for living arrangements;

- Not changing living arrangements without probation officer approval;

- Allowing the probation officer to visit at any time at any place, including the home;

- Working full time (at least 30 hours per week) unless excused by the probation officer;

- Notifying the probation officer of a change in where she works and any change in position or job responsibilities;

- Not knowingly communicating or interacting with anyone she knows has been convicted of a felony without first getting the probation officer's permission;

- Notifying the probation officer of any questioning by law enforcement;

- If the probation officer determines that Ms. Mosby poses a risk to another person, including an organization, the probation officer may require her to notify that person/organization about the risk. Probation may contact the person/organization and confirm the risk notification.

- Following all instructions of the probation officer related to the conditions of supervision.

These conditions outlined in the PSR are punishment. Ms. Mosby must comply with all conditions or risk going to prison for up to three years for a violation of supervised release. *See* 18 U.S.C. § 3583(e)(3).

## VI.   <u>The Need For The Sentence To Afford Deterrence (18 U.S.C. § 3553(a)(2)(B)).</u>

The Court must consider the need to afford specific and general deterrence. 18 U.S.C. § 3553(a)(2)(B). A careful review of this factor, including empirical data, shows that a prison sentence is greater than necessary to achieve these goals.

57

### A.      There Is No Need To Send Ms. Mosby To Prison To Specifically Deter Her.

The fact that Ms. Mosby maintains her innocence does not mean that she has not been deterred and, therefore, needs to go to prison. Ms. Mosby acknowledges she should have – and wishes she had – acted differently. Maintaining her innocence is not inconsistent with refraining from decisions that brought her under scrutiny, prosecution, and conviction. Ms. Mosby's frustration and antagonism have at times been apparent during this case. She has no desire to ever find herself or her family in this position again. She has experienced enough consequences already to fully incentivize a lifetime of following the law. Not a day in prison is needed to fulfill specific deterrence goals in this case. Deterrence has already been served. No one desires to be in Ms. Mosby's situation right now, including Ms. Mosby.

### B.      Empirical Data Shows That General Deterrence Flows From Certainty Of Prosecution, Not Whether Incarceration Is Imposed Or More Incarceration Rather Than Less.

As to general deterrence, the fact that Ms. Mosby has been prosecuted provides deterrence to others who are similarly situated. There is no evidence that additional jail time provides a meaningful deterrent effect. This is a well-known, empirically based fact: "Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment." *See* Valerie Wright, The Sentencing Project, "Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment" 4 (Nov. 2010).[26] Likewise, Daniel Nagin, a leading deterrence scholar, concludes that "[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment" and that "the effect of certainty rather than severity of punishment reflect[s] a response to the

---

[26] https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.

certainty of apprehension." Daniel S. Nagin, "Deterrence in the Twenty-First Century: A Review of the Evidence," Crime & Justice, Vol. 42, No. 2013.

This finding is echoed elsewhere, too. *See* National Research Council, National Academies Press, "The Growth of Incarceration in the United States: Exploring Causes and Consequences" 90 (2014) ("Three National Research Council studies have examined the literature on deterrence and concluded that insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects. Nearly every leading survey of the deterrence literature in the past three decades has reached the same conclusion." (citations omitted));[27] Ray Paternoster, "How Much Do We Really Know About Criminal Deterrence?", 100 J. Crim. L. & Criminology 765, 801 (2010) ("Certainty of punishment is generally considered to be more important than the severity of that punishment."). The Department of Justice's National Institute of Justice has issued its own guidance reflecting that "[i]ncreasing the severity of punishment does little to deter crime" and *"[t]he certainty of being caught is vastly more powerful deterrent than the punishment.*" *See* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, "Five Things About Deterrence" 1-2 (May 2016) (emphasis added).[28]

Practically applied, this empirical fact is important in a case like this, particularly in pushing back on the argument that prison is necessary. The science shows that imposing prison time – an additional punitive sanction – will *not* additionally deter public officials.

---

[27] https://www.nap.edu/read/18613/chapter/1.

[28] https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

C.  **The Fact That Ms. Mosby Has Already Experienced Cataclysmic Consequences From Prosecution And Conviction Sends A Further Deterrence Message To The Public And Public Officials, And Any Further Punishment, Including Imprisonment, Is Gratuitous.**

Even if the Court gives weight to the severity of punishment in spreading the message of general deterrence, there has already been severe, public punishment for all to see, including public officials. The public witnessed Ms. Mosby lose her State's Attorney position in the midst of this prosecution. The public saw her breathtaking fall from a position of tremendous power to being prosecuted by her law enforcement peers. The public watched her go from prosecuting police officers to being called the defendant. The public observed her go from holding press conferences near courthouses as a prominent prosecutor to walking into federal courthouses to answer to her prosecution. The public watched her stand trial as the details of a damaged marriage to her college sweetheart were on display for all to see. And the public witnessed her answer to two juries who convicted her, rendering her a felon with her law license imperiled. Such public, obvious, and devastating consequences due to the prosecution are undeniable.

The general deterrence message has already resonated resoundingly. If a public official is not already deterred from committing a similar crime based on the consequences Ms. Mosby has already experienced (federal prosecution, loss of public office, felony convictions, potential loss of law license, public humiliation, etc.), there is likely little hope for deterring such a person at all.

D.  **The Fact That This Prosecution Is Unusual Sends A Further Deterrence Message To The Public And Particularly Public Officials, Without The Additional Need For A Prison Sentence.**

Regardless of varying public perceptions, this prosecution has reinforced the message that no one is above the law: not even someone who accesses their own money, whose offense is victimless, who has no prior record, is a licensed attorney, and made significant contributions to advancing justice in Baltimore City communities. No one is beyond the government's reach. The

prosecution has sent a message to everyone, including public officials, of the need to act scrupulously. And that message has already been sent, without Ms. Mosby having ever served a day in prison.

      **E.**      **There Is A Significant Risk In This Unique Case That Sentencing Ms. Mosby To Prison Sends The *Wrong* Message To The Public.**

The prosecution of Ms. Mosby has been met with a variety of public responses. Some believe the relatively minor nature of the offense means Ms. Mosby was wrongfully targeted due to her work and position as the State's Attorney, while others believe her position alone meant she should be subject to prosecution for dishonesty. In considering the message that is sent to the public, the appropriate sentence must acknowledge both the limited nature of the conduct and the fact that Ms. Mosby, while still in office, failed on three occasions, as found by the jury, to be honest, and the major consequences Ms. Mosby has already suffered as a result. That sentence is not incarceration.

Professor Sherilynn Ifill, a well-respected civil rights advocate, has written a letter to the Court that is attached as Exhibit 19. As with all the attached letters, we ask the Court to review Professor Ifill's letter carefully and only excerpt small portions below:

> *Whatever the motivation for this particular investigation and prosecution of Ms. Mosby, the perception of disparity will only be exacerbated by imposing a harsh sentence in this case. This is not to suggest that Black women public servants should be immune from scrutiny or accountability. Indeed all public servants, prosecutors in particular, should be held to the letter of the law. And where they violate their oath by engaging in misconduct in office, or by acts of public corruption, they are appropriately subject to prosecution and punishment.*

> *But there always must be proportion and a sensible and humane exercise of discretion in the use of prosecutorial and judicial power. Were Ms. Mosby convicted of a crime of public corruption, or of violence, or one in which identifiable victims sought the vindication of wrongs done to them, a sentence of some period of confinement might well be warranted. But this is not such a case.*

*Frankly, the crimes for which Ms. Mosby has been convicted are not of the sort that the public regards as the kind of felonious activity that would justify years in prison, and this will affect how the punishment meted out to Ms. Mosby is perceived. This is not a case involving public corruption, or a betrayal of the integrity of her office. Whatever errors Ms. Mosby has made in pursuing this real estate transaction injured no one but herself and her family. She did not seek to access anyone else's money, or funds intended for the public. For her errors, she has endured public humiliation, financial devastation, the loss of her profession and career-ending public censure. During the course of this prosecution her marriage has ended. She has been so financially compromised that she qualified to be represented by a public defender. Most importantly, she carries the stain of conviction for a felony offense, and will face all of the collateral consequences attendant to such a conviction.*

*...*

*My point is not to suggest that Ms. Mosby should be insulated from accountability for violations of the law because she is a public servant. Indeed given her record and high profile, had Ms. Mosby been convicted of crimes that directly violated her oath of office, some measure of exemplary punishment might be warranted. But compelling Ms. Mosby to serve time in a federal prison for the nature of the crimes for which she has been convicted, given her stature and notable contributions as a public servant will send yet another devastating message about the nature of our justice system and its uncompromising and harsh application to people of color.*

Exhibit 19.

## VII.    The Need To Protect The Public And Provide Training or Other Correctional Treatment (18 U.S.C. § 3553(a)(2)(C)-(D)).

The Court must also consider the need to protect the public and the need to provide training or other correctional treatment. 18 U.S.C. § 3553(a)(2)(C) & (D). There is no need to *protect* the public from Ms. Mosby. Quite the opposite. Given her nearly lifetime devotion to public service, the need is to allow Ms. Mosby to continue doing her life's work. Ms. Mosby is an asset, not a threat, to her daughters and the community. That point is made loud and clear by the character letters attached, for example:

- **Jima Chester, mentee and former JSA participant**: "*Lastly, this prosecution is disheartening because it doesn't fit or represent my impactful relationship and experience with Ms. Mosby. I will continue to represent the JSA and Ms. Mosby's mission to help youth succeed with pride. People like Ms. Mosby are inspiring generations, and as an example of that inspiration, I hope how far I have come as a leader shows how strong of a leader she is.*" Exhibit 1.

- **Monica Brockman, neighborhood association member**: "*Ms. Mosby is a beacon of hope and progress in Baltimore, a city that has often felt the harsh sting of being torn down. Her efforts have not only directly benefited those she serves but have also ignited a broader movement for justice and community enhancement.*" Exhibit 2.

- **De'Von Brown, friend and former SAO colleague**: "*Marilyn exemplifies true leadership by confronting injustice head-on, never succumbing to pressure, but rather, facing it with courage and determination. We need more leaders like Marilyn, who boldly confront injustice, refusing to fold under pressure, and instead, stand up to it like the bully it is, ultimately defeating it. In a world in desperate need of fearless leaders like Marilyn, her resilience serves as an inspiration to us all. In closing, I urge you to consider the countless lives that Marilyn has touched and the immense contributions she has made to our community. She is a beacon of hope and inspiration, and I believe that she deserves nothing less than mercy and compassion in return.*" Exhibit 12.

- **Michelle Lee, former SAO colleague**: "*It is my fervent prayer that the courts will show mercy and compassion to Marilyn Mosby at the time of her sentencing. Please do not separate her from her daughters. In my humble opinion, she should be in a position where she can freely continue her work as a leader in the community, an advocate and activist for social justice, and most importantly… an amazing mother to her daughters.*" Exhibit 11.

- **Jasmine Collins, mentee and former SAO colleague**: "*Like many of us, Marilyn has made mistakes; nevertheless, she remains an asset to our city.*" Exhibit 6.

The Court should also consider the cost to the public of incarcerating Ms. Mosby. The monthly cost of incarcerating Ms. Mosby would be $4,147—a steep number compared to the monthly cost of supervision by a probation officer ($366). ECF 509 ¶ 101. The monthly costs of incarceration would be borne by taxpayers, who have not been financially harmed by the conduct underlying Ms. Mosby's convictions.

Not only that, but a prison sentence would be far harsher on Ms. Mosby than the average individual. Given her job as a prosecutor, she will constantly be at risk for retribution and danger by those she prosecuted, family members of those she prosecuted, or people who dislike her simply because she was a prosecutor.

Given her history and other characteristics and the nature and circumstances of the offense, the Court should find there is no need to protect the public from future crimes or to provide

Ms. Mosby with further treatment or training and that, in fact, these factors mitigate in favor of a non-incarceration sentence.

<u>**CONCLUSION**</u>

Considering Ms. Mosby's prodigiously positive history, the nature of the offenses involving the use of Ms. Mosby's personally generated funds with no victims or financial loss, the unusual circumstances of the prosecution, the major consequences she and her family have experienced, and the deterrent message already accomplished, Ms. Mosby has been personally, professionally, and publicly punished enough. The impact on her life and future due to this prosecution is profound. Imposing incarceration upon Marilyn Mosby is gratuitous under the statutory sentencing goals of 18 U.S.C. § 3553(a).

For the reasons herein, we respectfully ask the Court to impose a non-incarceration sentence expressed in the Judgment as time-served and 1 year of supervised release.[29] If the Court deems it necessary to add further conditions of supervised release beyond the mandatory statutory conditions of § 3583(d) and the standard conditions imposed in this District, (PSR, pp. 26-27), the Court is statutorily empowered to do so. As long as the further conditions of supervised release comport with the requirements of 18 U.S.C. § 3583, the Court has discretion to order a host of additional conditions, including, for example, a fine, home detention, community service hours, and employment restrictions. *See* 18 U.S.C. § 3583(d)(1)-(3) (requiring conditions to be "reasonably related" and involving "no greater deprivation of liberty than is reasonably necessary to specified § 3553(a) factors and consistent with pertinent Sentencing Commission policy statements under 28 U.S.C. § 944(a)).

---

[29] The sentence should be expressed in the Judgment as time-served and 1 year of supervised release. Courts in this District routinely consider processing by the U.S. Marshals Service as part of the Initial Appearance to constitute "time-served."

The Court has expended significant time and attention to the demands of this case. The Defense thanks the Court for its comprehensive review of this memorandum and all materials submitted in aid of sentencing to answer the question: What is the just sentence for Marilyn Mosby? The sentence that is sufficient but not greater than necessary to comport with sentencing goals is time served with 1 year of supervised release. Jail is not justice for Marilyn Mosby.

Respectfully submitted,

/s/ _____

James Wyda (#25298)
Maggie Grace (#29905)
Sedira Banan (#804827)
Counsel for Marilyn Mosby
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
Phone: (410) 962-3962
jim_wyda@fd.org
maggie_grace@fd.org
sedira_banan@fd.org